# Michael Eakin

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MONTANA
## BILLINGS DIVISION

## CV-07-116-BLG-RFC-CSO

## JUNE TIFT AND TIMOTHY McCOLLOUGH

## VS.

## JOHNSON, RODENBURG, & LAUINGER

## October 30, 2008

## Reported by:

Exh. B

Page 4

WHEREUPON, the following proceedings were had and testimony taken, to wit:

\* \* \* \* \* \* \* \*

(Whereupon, Deposition Exhibit Number 50 was marked for identification.)

DENNIS MICHAEL EAKIN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SIMPSON:

Q.    Please state your full name for the record.

A.    Dennis Michael Eakin.

Q.    And, Mike, we just met briefly.  For the record, I am Fred Simpson.  I represent the defendant, Johnson, Rodenburg & Lauinger.

What is your business address?

A.    2442 - 1st Avenue North, Billings, Montana, 59101.

Q.    You're an attorney employed with Montana Legal Services Association?

A.    Yes, I am.

Q.    What year did you finish law school?

A.    1976.

Q.    Where did you get your JD?

A.    University of Texas.

Q.    When did you take the Montana bar?

A.    In 1978, October.

Q.    Been continuously licensed in the state of Montana to practice law since that time, I take it?

A.    Yes, I have.

Q.    Since taking the Montana bar in October 1978, where have you been employed?

A.    Montana Legal Services.

Q.    Exclusively at Montana Legal Services?

A.    Yes.

Q.    Okay.

A.    There -- I've been employed continuously by Montana Legal Services.  I served one term as an appellate judge on the Flathead Reservation.  That incurred, you know, involved about 40 hours a year, so.

Q.    Bet that was an interesting experience?

A.    Yes.

Q.    Do you have a title with Montana Legal

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 6

Services Association?

A.    My current title is director of litigation.

Q.    Is that for the entire state?

A.    Yes.

Q.    What does that involve?

A.    I have to approve any appeals that they -- an attorney might want to take, beyond a trial court level.  And I help direct the, you know, the -- any appeals taken; review briefs.

I also supervise any litigation going on.  I mean, as an advisor to any of the attorneys that may have less experience on litigating matters.  And then help develop sort of a litigation agenda for if we notice particular problems; look for things that might be worth litigating.

Q.    How long have you held the position of director of litigation?

A.    Just over a year.

Q.    Prior to that, what was your role at the MLSA?

A.    I was deputy director in charge of the Indian law offices.

Q.    How long were you in that position?

A.    Since 1989.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 11

A.    I believe it was three or four years ago at a CLE in Helena.

Q.    Do you remember who sponsored the CLE?

A.    I believe that one was the state bar, but I'd have to check.

Q.    Do you have your materials still, that you presented at that CLE in Helena?

A.    I should.  If I look at computers sitting here on the desk, and having just gotten my computer back yesterday and trying to find out once their IT person worked on it what he managed to delete, you know, I should have those materials. But I can't promise that I do, and I don't know that I've referred to them in the last two or three years.

Q.    Do you have any plans to make any presentations on collection matters in the next six months?

A.    No.  Not that I know of, at this time.

Q.    There aren't any outstanding invitations to Mike to come talk to our group about fair debt collection practices matters?

A.    No.

Q.    Okay.  Have you been involved in litigation on behalf of clients being sued by

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Page 12

Johnson, Rodenburg & Lauinger?

A.    Yes.

Q.    How many suits?  To within your best estimate.

A.    Between 20 and 30, myself, I believe. But . . . some of those it's hard to give a -- and that number could be smaller.  That we see a number of clients for whom we draft pro se answers, simply because we do not have the time to represent every individual client.

(Whereupon, Mr. Patten entered the room.)

THE WITNESS:  And I may be confusing some of those.

BY MR. SIMPSON:

Q.    So sometimes you'll draft an answer for a pro se defendant, but you won't appear?

A.    That's -- he will appear or she will appear pro se.

Q.    Okay.

A.    That if you can convince congress to increase funding or other people to increase funding, we would appear.

Q.    And that's over your 30-plus years, you figure 20 to 30 lawsuits with Johnson, Rodenburg &

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 17

(Whereupon, Deposition Exhibit Number 51 was marked for identification.)

BY MR. SIMPSON:

Q.   Did you review the deposition, the video deposition of Mr. McCollough?

A.   No, I did not.

Q.   Have you ever met Mr. McCollough?

A.   I've never met Mr. McCollough.

Q.   Take it you've never spoken to him on the phone either?

A.   No, I have not, to my knowledge.

Q.   Never corresponded with him?

A.   Not to my knowledge.

Q.   Have you ever filed on behalf of a client a Fair Debt Collection Practices Act lawsuit?

A.   Yes, I have.

Q.   How many?

A.   Only one or two, I believe.

Q.   Who did you sue?

A.   We sued Landlords Collection Company.

Q.   Is that a business here in Billings?

A.   It was.  I'm thinking there may be another that I don't remember off the top of my head.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

A.    No.

Q.    I want to go through your opinions in Exhibit 50, piece by piece, and ask you some questions about the opinions that you've expressed in this letter.  Second paragraph.

A.    Yes.

Q.    Third sentence, I believe it's the third sentence.  Begins:  From a cursory investigation, it appears the overwhelming number of lawsuits filed by JRL result in default judgments.

What was the scope of your cursory investigation?

A.    You know, when looking at files, the computerized files of the JP Court here and the number of times they're plaintiff.  And I sent a vista in our office over to look through those records.

Q.    When did you do that?

A.    Probably last summer.  And it confirms the -- the cursory investigation confirmed what I previously thought.  I know I talked to other collection attorneys here in town that indicated that they are able to take defaults in over 90 percent of the time.  In reviewing the depositions, in this case, that of Mr. Bruce Spencer, I think he

Michael Eakin

Page 24

indicated over 95 percent of the time.

And that a short investigation, it appeared that the same was true for Johnson Rodenburg, and that appears to be consistent with reports in various literature about debt collection cases.

Q.    Backing up for just a second here.  When you say last summer, do you mean summer of 2007 or 2008?

A.    2008.

Q.    And were you asked to do that search by Mr. Heenan, or did you do it of your own accord?

A.    I did it of my own accord when I was told that he was bringing this action.  That there's some discussion before September, about being an expert.

Q.    Did you search beyond the Yellowstone County Justice Court records?

A.    No, I did not.

Q.    Who were the other collection attorneys in the area that you spoke with?

A.    Randy Jacobs.

Q.    Do you recall when you spoke with Randy?

A.    I've had numerous conversations, usually while changing clothes at the Y.  That when I

Page 38

final draft was printed and signed?

A.    I am sure I did.  I don't believe I provided a draft to anyone else.

Q.    You kept it in-house and finalized it?

A.    In-house.  I may have provided it, a copy to someone else in-house, but I did not provide a copy to Mr. Heenan prior to delivering the. . .

Q.    What was it that Mr. Heenan asked you to do in this matter?

A.    You know, basically he wants me to, as I understand it, testify as to someone that sees folks on a regular basis that have to defend collection actions from Johnson Rodenburg, and has asked me to explain their predicaments and any of the actions that Johnson Rodenburg has taken that may violate fair debt collection that imposes a burden on those that cannot -- that they're Legal Services eligible, being low income, and the burden it puts on them in defending these actions, or not being able to defend the actions.

Q.    When you talk about Johnson Rodenburg's violations of the FDCPA, do you mean with respect to just its activities with Mr. McCollough in this matter, or with respect to cases you've defended?

A.    With respect to cases that I've seen in

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 39

my capacity at Legal Services.

Q.    Okay.    Let's talk about those.    How many; who are they; what are the violations, I guess we could start with.    Can you give me a -- describe the specifics of these various cases.    Who you were defending; what the violations were.

A.    And I said in the ones that I've seen in my capacity at Legal Services, that will include some that I did not handle myself.    That there are any number of cases where, and, you know, an exact number, I can't give you, but cases where we've suspected a statute of limitations problem.

That when, if we propound discovery, it will then be a request to dismiss without prejudice.    If -- times that we believe that Johnson Rodenburg does not have documents to support its case, even if it's within the statute, and if we propound discovery requesting certain documents, that we get a, a request that it be dismissed without prejudice.

And one -- I think, those indicate, one, that either a knowledge or that, in the ones where we think it may be past the statute of limitations, either knowledge that it was or filing without knowledge and not trying to obtain that knowledge

until requested, and then providing -- and then moving to dismiss.

That, or filing actions where there are not the documents to support the action in their possession at the time. And either because of lack of the documents or the expense of obtaining the documents, which I don't know -- you know, I don't know their thought process. But, or it quickly becomes a -- not financially feasible to prosecute a case on an old debt when it is being actively defended.

Q. Well, let's start, then, with cases where you suspect Johnson Rodenburg has filed beyond the statute of limitations. Can you give me names of debtors that you've defended in those cases; and identify the circumstances that led you to that conclusion.

A. I'm trying to remember which ones, you know, are public, you know, if it's -- if we filed it as an affirmative defense, I think I'd be free to answer that. If we did not file it as -- did not file the answer but only corresponded with Johnson Rodenburg, I think I would, client confidentiality, I'd need my clients' permission to disclose that fact. And --

Michael Eakin

Page 41

Q.    Do you see my problem with that, though? If you're going to be at trial testifying about these things, I need to know which ones you're going to testify to beforehand, assuming it's admissible in the first place.  But which ones can you identify, then, without breaching client confidentiality?

A.    I did not know I was going to be asked about specific cases, and, so, I did not review specific cases.  So, I can't give you an answer to that at this time.

Q.    Can you identify a single specific case by a name, where you believe Johnson, Rodenburg & Lauinger filed a case beyond the statute of limitations?

A.    Not by name at this time, but just as, you know, one of the exhibits shows, you know, 2,000 cases or so filed.  We may have, in our case tracking system, over 200 cases that are identified as one that -- a plaintiff that is often represented by Johnson Rodenburg, such as Portfolio or Cass, or identifying Johnson Rodenburg as a -- as the opposing counsel.

And of those numerous ones, you know, do I remember at this point particular names or

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 42

particular facts, no.

Q.    What about -- can you identify then, or same question then with respect to cases where you've become involved actively defending and propounded discovery and JRL has then dismissed the case.  Can you identify those cases?

A.    One, you know, and once again, I'm trying to think of names where it will be of record.  The most recent would be Bensh.  And that's --

Q.    B-e-n-n?

A.    B-e-n-s-h, or s-c-h.

Q.    Where was that filed?

A.    That's in Yellowstone County.

Q.    JP court or district court?

A.    I believe that one is district court.

Q.    Does that, in your mind, constitute a violation of Fair Debt Collection Practices Act?  To dismiss a case without prejudice after the other side has served discovery?

A.    I would say it violates Fair Debt Collection Practice Act to file a lawsuit never intending to prosecute it if it's going to be defended.

Q.    Are you aware of case law or statutes that support that opinion?

A.    No.

Q.    Have you had a judge rule in your favor on a theory like that before?

A.    No.

Q.    What was next on your list?  We talked about cases where you suspected statute of limitation problems; cases where you actively defended and served discovery and that's resulted in a dismissal by JRL.  Are there other types of conduct by JRL that you've had experience with handling cases that you feel constitutes -- such conduct constitutes a violation of the FDCPA?

A.    Yes.  That cases where they will, in after obtaining a judgment, will execute on what is very likely to be exempt resources of the debtor.

Q.    Okay.  Name names and provide details.

A.    Well, one in this case, I believe, was June Tift.  And although it was not the particular action here, and I may be once again confusing names, but I believe they executed on Social Security benefits when they had at least reason to suspect that it was exempt benefits.

That another one that was litigated, and you made a motion so it's of record, is Wellnitz.

Q.    Pardon me?

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 44

A.    Wellnitz.

Q.    Do you know how you spell that name?

A.    W-e-l-l-n-i-t-z.

That there -- in almost every case where they execute, when they execute, they execute on the entire bank account of the judgment debtor. When there is probably, you know, an exceedingly high likelihood that there are exempt funds of some sort in the bank account.

Q.    And what's the debtor's remedy in that case?

A.    The debtor's remedy in that case is to file a claim of exemption.

Q.    And the judge gets to sort it out at that point; right?

A.    The judge does get to sort it out at that point.  That does not restore the debtor to the position they were in before.  Because if, one, there are bank fees.  Also, it's a, it causes the debtor often to have -- the debtor will often have written checks on the account a day or two earlier that if you had to clear the bank, then it will cause checks to the grocery store, checks to the landlord, other checks to bounce, when, if the exempt funds had been left in there, they would not

Michael Eakin

Page 45

have bounced.

Q.    So what authority are you aware of that supports your theory that executing on a bank account constitutes a violation of the FDCPA, assuming you've got a valid judgment and get a writ of execution?

A.    That the Fair Debt Collection Practices Act, the specific language says the collector cannot take an action not permitted by law, and to the extent you cannot execute or should not execute on exempt funds.  Then knowingly executing on exempt funds would be a violation of the Fair Debt Collection Practices Act.

Q.    Okay.  Then tell me the specific situations you're aware of where JRL has knowingly executed on exempt funds.

A.    And, you know, that in ones . . . you know, I believe the June Tift was one, where they had knowledge that she was receiving Social Security benefits.  That in -- but, if you're, you know, if you're also saying that they have to have specific knowledge, and I don't know that that is the standard that is required.  That if there is a high probability, but they do not have specific knowledge.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B

Michael Eakin

Page 46

If they have the high probability of executing on exempt funds, I would be -- say that is also a violation of the Fair Debt Collection Practices Act.

Q.    Which cases so hold?

A.    I can't give you a case cite right now. And, yeah.

Q.    Let's talk about Ms. Tift for a second. Were you aware that Johnson Rodenburg never obtained a default judgment against her?

A.    No.

Q.    Have you seen a copy of the judgment that they -- you think they obtained against her?

A.    No.  I think I said earlier I may be confusing her with one other where we were defending the, you know, the execution on benefits. And, yeah.  There are any number of cases and I may have confused two names here.

Q.    So, Wellnitz was the other one that you mentioned.  And that was a case that JRL filed?

A.    Yes.  And they obtained a default judgment and we were actually unsuccessful in setting aside the default.

Q.    She was pro se at the time that you obtained the judgment?

A.    I don't believe she appeared.

Q.    I mean, she wasn't represented by you at that point; is that right?

A.    No.  We entered the action when her bank account was executed upon.

Q.    And do you have information that JRL knew or had a high probability of knowing that her funds were all exempt?

A.    I do not know what they have in their records.  Often the credit card application will, if they're receiving, often has to disclose a source of income.  That if a credit card application discloses Social Security as to the source of income, that is probably information that should be available to -- when someone sues on the credit card account.

That also -- I'll leave it there at this time.

Q.    Is that pure speculation in this case, with respect to Ms. Wellnitz?  Do you know what information Johnson Rodenburg had in its file regarding assets?

A.    Oh, no.  I do not know what they had in their file.  I'm saying if they had obtained, you know, the credit card application, they could have

Michael Eakin

Page 48

that information.

Q.    Have you seen her credit card application?

A.    No.

Q.    So, what was it that led you to believe that they knew or had this knowledge in that case?

A.    In . . . any time you execute on a bank account, on someone of moderate means, you are likely to hit exempt funds.  That three-quarters of wages are exempt.  All public benefits are exempt.  So that if you sweep a bank account, execute on a bank account, and take the funds in the bank account, there is a high probability that that will include wages, three-quarters of which are exempt.

Q.    So, are you aware of what standard governs attorneys executing on judgments what they have to do before having a writ executed on, so that they don't?

A.    Yeah.  Very little standard.

Q.    What is it?

A.    None.

Q.    They don't have to do anything?  They just have to have the writ issued and give it to a sheriff's deputy and they can go around and hit the bank accounts; is that right?

Michael Eakin

Page 52

A.    That is, again, speculation.

Q.    All right.  Any other types of conduct by Johnson, Rodenburg & Lauinger that you've seen that you believe constitutes a violation of the FDCPA?

A.    Yes.  I've seen them send out discovery requests to pro se litigants, that will come in seeking help with answers, and without a sort of full explanation of how to respond.  And there are times when they send out requests that, like -- like admit that there is no defense when a defense has been set out in the answer.

And I think often it is sent out not to clarify issues, but to try to obtain admission, rather than -- without regard to the actual facts. I think it'd be an unfair debt collection practice to request an admission that you do not have some basis for asserting the fact in the request for admission.

Q.    Can you think of specific instances where that's occurred?

A.    Well, I believe it occurred in this particular case; Mr. McCollough.

Q.    I meant cases that you've been involved in.

A.    Okay.  That in the Reynolds case, I

BY MR. SIMPSON:

Q.    Is it fair to say that you don't have any personal knowledge of what the standard of practice is for debt collection attorneys as to what types of information they routinely have in their file before filing suit?

A.    That's a fair statement.

Q.    That's because you've never practiced in that field?

A.    I've only defended in that field.  That may be --

Q.    Fair enough, I'm sorry.  You've never practiced from the creditor's side in that field?

A.    I've never practiced from the creditor's side.

Q.    Are you currently defending any clients against the suits filed by JRL?

A.    Yes, I believe I am.  And it may be one I've not filed an appearance and have asked them to dismiss for filing the wrong form.

MR. SIMPSON:  Let's take a quick break.  I think we're about done.  I just want to go over my notes.

(Whereupon, a break was taken.)

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

02228a2f-0525-4c04-aede-e06f8c4b6e7f

Exh. B