**James Patten**

# IN THE UNITED STATES DISTRICT COURT
# DISTRICT OF MONTANA
# BILLINGS DIVISION

## CV-07-166-BLG-RFC-CSO

## JUNE TIFT AND TIMOTHY McCOLLOUGH

## VS.

## JOHNSON, RODENBURG, & LAUINGER

## October 30, 2008

## Reported by:
## Jennifer Lewis

CHARLES FISHER COURT REPORTING, INC.
503 East Mendenhall
Bozeman, Montana 59715
Phone: (406) 587-9016
Fax: (406) 586-0926
fisherreporting@imt.net
fishercourtreporting.com

Exh. E

looked for and found.

Q.    And then you have a greenish folder?

A.    I've got a green folder that has my reports, Mr. Hick's report, and just a client sheet, whatever you want to call it.

Q.    And then you have some other materials it looks like over on your right?

A.    These other materials are the same thing that I think you talked to Mr. Eakin about.

Q.    Okay.  Copy of a case called Seipel, S-e-i-p-e-l, vs. Olympic Coast Investment, 188 P.3d 1027.  A noncitable or nonpublishable case from California Court of Appeals, Second District, called Vargas vs. Cedars-Sinai Medical Center, 2008, West Law 331068.

NARCA newsletter, which we previously identified with Mr. Eakin; the Reichert case, and the MSN article on zombie debt.

Did you locate these first case -- two cases, Seipel and Vargas?

A.    No.  Mr. Heenan gave those to me.

Q.    Have you read those?

A.    Yes.

Q.    What did Mr. Heenan ask you to do when he first contacted you?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 10

A.    To the best of my recollection, he asked me to render an opinion about whether the actions of Johnson, Rodenburg & Lauinger met the Montana standard of practice; whether there were -- an opinion for any violations of the Fair Debt Collections Practice Act; and an opinion about the reasonableness of his hourly fee and a time spent on services.

Q.    Did Mr. Heenan communicate those requests to you in writing?

A.    Not that I recall.

Q.    How many meetings have you had with Mr. Heenan to discuss this case?

A.    I believe it's been three.

Q.    Do you remember when those occurred and what was discussed?

A.    I met with him yesterday and he gave me these.

Q.    The cases of Seipel and Vargas?

A.    Yes.

Q.    And we talked about me coming over and sitting through Mr. Eakin's deposition.

I recall meeting with him initially and him providing me with this expert binder, and talking in a general sense about what he was --

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 12

Q.    Do you recall if Mr. Heenan asked you to make any changes to your first report?

A.    Yes.  I'm going to be hard pressed to tell you exactly what he asked, but my recollection is that he asked me if I would -- if I had an opinion about something in particular and if I would include it in the report.

Q.    Did you keep a copy of your first draft?

A.    No.  Unless it's been saved in the Word Perfect file.

Q.    So that was -- was it in the nature of an addition that was requested by Mr. Heenan, or was he asking you to revise or amend something you already stated?

A.    No, it was in addition.  And I'm trying to remember.  Need to refresh my recollection.  As I recall, he asked me to express an opinion, if I could, on whether Johnson, Rodenburg & Lauinger could fall within the bona fide error provisions of the Fair Debt Collection Practice Act.

Q.    Have you tracked your time that you spent working on this file?

A.    Yes.

Q.    How many hours have you spent so far?

A.    I can't tell you as I sit here.  I do

James Patten

A.    Might have been just me.  And then in the mid '90s, I started practicing with Scott Green and Bruce Bekkedahl.

Q.    Are you in a firm with those folks today?

A.    Yes.

Q.    And what's the name of your firm?

A.    Patten, Peterman, Bekkedahl & Green.

Q.    And what -- well, I guess going back to 1990.  Has your practice gotten back into the collection side, the creditor side?

A.    We started representing institutional kind of lenders, you know, banks, credit unions.

Q.    You personally were doing that work?

A.    Yeah.  I mean, I do it more now than I did then.  Scott Green represented Associates and did a lot of their collections for a number of years.

Q.    And that's Portfolio Recovery Associates, or is that somebody else?

A.    No.  It was a consumer finance, like household finance or something like that.

Q.    Within, say, the last ten years, have you regularly represented any client to pursue consumer collections, on behalf of the client?

A.    No, no.

James Patten

Page 29

Q.    Within the last -- well, let's go all the way back to 1990.  Have you routinely represented any client to attempt to collect credit card debts?

A.    No.

Q.    Do you collect credit card debts for banks or credit unions?

A.    I don't.

Q.    Have you ever?

A.    Not that I can recall.  Maybe in a bankruptcy case or something, but not in a non-bankruptcy collection case, that I can remember.

Q.    If you look at your practice now, and I don't know if it's fair to say look back over the last ten years of your practice, could you give me an estimate percentagewise of the different fields that you practiced in?

A.    75 percent bankruptcy, 15 percent institutions, 10 percent commercial kind of litigation.

Q.    And when you say bankruptcy, are you usually representing debtor or creditor interest?

A.    Both.  A little bit more debtor than creditor, but we represent creditors, trustees, debtors.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 30

Q. Of the 15 percent that you attributed to institutional clients, what kind of work is that?

A. Bank collections, foreclosures, credit union foreclosures.

Q. And, then, the other roughly 10 percent is commercial litigation?

A. Yeah.

Q. Has that apportionment stayed relatively close over the last ten years?

A. I'd say so.

Q. Have you ever represented a debt buyer client?

A. No.

Q. What do you understand to be a debt buyer?

A. Somebody who buys debt from the original lender, or a successor to the original lender.

Q. Of the folks that you're representing as debtors in bankruptcies, do you have an estimation of how many of those people usually have credit card debts?

A. 95 percent.

Q. Do you have an estimation --

A. Of the individuals.

Q. Individuals.

James Patten

Page 31

A.    Yeah.

Q.    Consumers.

A.    Yeah.

Q.    Okay.  Is the credit card debt often a factor in bankruptcy filings in your practice?

A.    I'd say almost always.

Q.    Just out of curiosity, what percent is medical related?

A.    Not very much.  You know, I've seen reports about medical bankruptcies, but that's not what I encounter.  You know, I've had clients that had a medical wreck and had to do a bankruptcy, but without question the greatest number are out of control credit cards.

Q.    Has that changed since congress amended the Bankruptcy Act a few years back?

A.    No.

Q.    So, do you routinely defend cases filed by debt buyer companies that are being sued on against your folks?

A.    Yes.

Q.    Do you know which companies those are?  I mean, have you defended suits filed by CACV of Colorado?

A.    You know, I don't recognize that name.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

Portfolio Recovery Associates; Unifund.  Who's the plaintiff -- who --

Q.    CACV of Colorado was the plaintiff, yeah.

A.    I don't remember running into them before, but I know that those companies oftentimes go by different names.  LV Funding or something like that.

Q.    When you're defending -- well, let me back up.

Are you dealing with them in bankruptcy scenarios where you've got an adversary proceeding in the bankruptcy filed by one of these folks?

A.    No, no.  There may be some claims objections.  But usually it is -- the typical situation is someone comes in, wants to do a bankruptcy, and for whatever reasons we don't want to file it right away, but in the meantime they get sued by Portfolio Recovery or something like that.  And, so, we'll defend them with the ultimate goal being a bankruptcy filing.

Q.    It's just a matter of timing when that's going to be filed?

A.    Typically, yeah.  And the more imminent the bankruptcy, sort of the less attention we pay to what the actual claims are in the lawsuit.  It's

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 39

now, my recollection is that they've been dismissed. And I've learned how to deal with Johnson, Rodenburg & Lauinger, and that's to give them discovery, which they can't, or rarely answer. And, so, it's a routine practice to do that.

Q. Have you ever filed a claim against any person or entity for violation of the Fair Debt Collection Practices Act?

A. No. Filed a claim in court?

Q. Yeah.

A. No.

Q. Have you made a claim prior to litigation being commenced?

A. I made demands.

Q. Have you made demands against Johnson, Rodenburg & Lauinger for violation of the FDCPA?

A. No, no. Unless it was a counterclaim, and I don't remember specifically, but. . .

Q. The parties you referenced that were debt buyers, Portfolio Recovery, Unifund, possibly LV Funding, who are those -- who have you defended, or who has filed those suits that you defended?

A. My recollection would be Johnson, Rodenburg & Lauinger, Smith Law Firm, or David Hull.

James Patten

Page 42

Q.    In this case?

A.    In this case.  And I guess from my observations in other cases that involved debt buyers.

Q.    Do you have a sense in broad terms of how many cases you have defended that have been filed by debt buyers?  Either that have gotten to the point of suit being filed or cases where a client's come into your office and said, Andy, I've got this CACV of Colorado and they're sending me letters, what do I do?

A.    Thirty maybe.  That's kind of a wild-ass guess off the top of my head.  Because a lot of them get filed and then there's bankruptcy that's just right on their heels.  So sometimes we file a motion to dismiss and that's all we have to do, or sometimes we file an answer and then get the bankruptcy filed before the case gets litigated in any way.

Q.    Are most of the bankruptcies that you're filing for individual consumer debtors no asset Chapter 7 liquidation?

A.    If they're not no asset, they're low asset.  Maybe a tax refund or some small -- car worth a little bit more than exemption.

James Patten

Page 50

as I sit here, is that it was made before suit was filed.

Q.    And is it -- reading your report I understand that it's your opinion that that inquiry to CACV and CACV's response was not satisfactory and didn't meet the standard of care that you believe they're held to?

A.    That's right.

Q.    Why is that?

A.    Because remarkably CACV has a contract with them that says, in other words, you can't believe what we tell you.

And, so, it's my opinion that if your client is telling you from the get-go that you can't rely on what they tell you, I think you need to see the documents, you need to feel them and touch them and read them yourself and draw your own conclusions from the documents, and not just accept the information that they give to you, in the format that it's given.

Q.    So, in what manner, then, did JRL fail to meet the standard of Rule 11?

A.    I think that the -- based on my experience with them, when they're asked to produce documents that substantiate the claim and they

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

Page 51

can't -- and they routinely cannot do it, then I don't know how they can file suit making assertions of a complaint when they really have no idea whether those assertions are correct or not.

Because they don't have the documents, they know they don't have the documents, they know they are likely not to get the documents, and they're told by their client:  You can't believe what we tell you.

Q.    I can't remember if I asked you this earlier.  Have you defended any suits alleging violation of the Fair Debt Collection Practices Act, on behalf of a client?

A.    No.

Q.    And I think you testified earlier you've not prosecuted any such suits; is that right?  Or at least that you can recall?

A.    I don't prosecute them.  I haven't -- I know that I've recovered money for clients before, for Fair Debt Collection Practice Act violations.

I know that -- I'm pretty certain that we have raised them as an issue in cases before.  I don't remember putting on evidence before a judge about a violation of the Fair Debt Collection Practice Act.  And I'm pretty sure that I never

have; it'd never gone that far.

Q.   So that's not a regular part of your practice?

A.   No.

Q.   Do you have any understanding as to whether Mr. McCollough actually contests having incurred the credit card bill that was the subject of the underlying dispute?

MR. HEENAN:  Object to form; vague with respect to time.

THE WITNESS:  My recollection is that his contention is that the credit card debt was incurred in the early '90s, and he stopped paying in the early '90s.  He may, and I don't recall, dispute the dollar amount.  I don't think he disputes that at some point in the distant past he had a liability on a card that was involved in the case.

But I kind of recall he suffered a brain injury from something and lost his ability to pay his debts at that point.

BY MR. SIMPSON:

Q.   Would it make any difference to your opinion if you found out that he applied for the credit card from Chase Manhattan years after his

and so we always had that language on there.

And I think actually, on behalf of some banks, when we send out a letter for a bank, a demand letter, even on a commercial deal, I think we just automatically put that -- those magic words at the bottom of the letter, just so that there's no issue.

Q.    Are you aware among collection attorneys what the standard is for their receipt of information prior to filing suit?  What kinds of information they receive and what form it usually takes?

A.    I'm aware from my practice, which was some time ago, and I'm aware that -- I mean depending on the type of collection.

Q.    And I guess I want to refer to the kind of debt we're talking about here, which is consumer credit card debt.

A.    Okay.  I think that consumer credit card debt, the information that's probably pretty routine -- I'm guessing on this -- but probably pretty routine in the format that Johnson, Rodenburg & Lauinger get.

Q.    In the electronic download?

A.    Yes.

James Patten

Page 55

Q.    Okay.   In that sense, what they're doing most likely isn't any different than what other collection attorneys who represent those kind of clients do; is that fair to say?

A.    In the format that they get the information?

Q.    Yeah.

A.    Yes.   I would say that's probably true.

(Whereupon, a break was taken.)

BY MR. SIMPSON:

Q.    All right.   When you take in a file for a client and there aren't a lot of documents, what do you do to try to find out whether what your client is telling you about the case is true or not?

A.    I guess the kind of work that I do is always document intensive.   So, I get the documents.   I mean, if it's a foreclosure or something like that, there's going to be, you know, mortgages or deeds of trust or whatever.

We will, a lot of times, do a UCC search. We will get into the clerk of the court's website and see about transfers of real property interest. We will get information from county assessors if -- it kind of depends what the issue is -- but if

James Patten

Page 56

there's certainly a claim of a lien or a debt, then we want at least a copy of it in the original documents.

And if the client doesn't have them, then we'll get them from whatever public type places that they're available, or we'll tell the client to go get them from wherever they should be found.

Q.   You've taken issue in your report, page 4, with Johnson, Rodenburg & Lauinger's discovery practices.  In particular, you've noted that the form utilized for request for admission contain instructions but does not advise a defendant, including pro se defendants, of the consequence of failure -- failing to answer the admissions.

Are you aware of any authority which holds that that kind of instruction is required, otherwise you're in violation of the Fair Debt Collection Practices Act?

A.   No.

Q.   You're aware in this case that Mr. McCollough was served with request for admission?

A.   Yes.

Q.   You're aware that his counsel denied the request that he took issue with?

A.   I don't know that, but --

James Patten

Page 63

credit card account?

MR. HEENAN:  And I'll just interpose an objection to foundation, which has been raised previously, and hearsay, but you can answer.

BY MR. SIMPSON:

Q.    Just wondering if you've seen the document.

A.    I've seen the document.  I think if I understand it right, there's a dispute as to whether that's the applicable card member agreement.

Q.    I'm not sure if there's a dispute on that or not; there might be.

A.    Okay.

Q.    Have you reviewed it?

A.    My recollection is it's incomprehensible because it's been photocopied too many times.

Q.    It's difficult to read, but I'll tell you it's not entirely incomprehensible.  Have you seen the attorney's fees provision in it?

A.    No.

Q.    Assume for a minute that my representation is true, that there is an attorney's fees provision in it.  Would you still take issue with Johnson, Rodenburg & Lauinger's prayer for

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 64

attorney's fees?

A.   Yes.

Q.   Why is that?

A.   Because their legal theory is not a contract, which I think the card member agreement would be the basis for a contract.  Their legal theory is account stated, and under account stated you don't get attorney's fees.

Q.   So, under that theory, any credit card company suing on a credit card debt would be barred from seeking fees in Montana; is that right?

A.   Yeah.

Q.   Is there any case law that supports that?

A.   Yeah, yeah.  Story vs. First National Bank of Denver, or something like that.

Q.   That's a Montana Supreme Court case?

A.   Yeah.

Q.   And it says you cannot get attorney's fees on a credit card?

A.   Yes.  You cannot get -- it actually does two things.  It says, one, a credit card is an account stated, and that it's subject to a five-year statute of limitations.

And it also then goes on to say that you don't get attorney's fees on an account stated

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 65

because it's not -- there is no contract. There's no written document signed by the lender and the borrower that sets out the relationship. So it is -- it is an account stated.

Q. So fees were at issue in that case? Attorney's fees?

A. Yeah.

Q. So when you get a complaint -- well, let me ask it this way. Have you received or defended a client that's been sued by another party by Johnson, Rodenburg & Lauinger where attorney's fees have been requested?

A. Yes.

Q. And what have you done in response to that?

A. I think in the one case where they got a judgment, I didn't raise the issue of attorney's fees. I have gone through some files and there must be a case that I have where it's Cliff Rodenburg who's the attorney, or maybe Erin whatever her name is, and they don't ask for attorney's fees. I looked at a number of files and they don't request attorney's fees.

My conclusion is the Fargo office doesn't ask for attorney's fees and the Bismark office

does.  Every complaint that I looked at that was filed by the Bismark office asks for attorney's fees.  And every file I looked at filed by the Fargo office did not ask for attorney's fees.

Q.    So you were taking steps to specifically address the prayer for fees in the complaint?

A.    No.  Because other than the one case that went to trial, they've always been dismissed.

Q.    Have you been asked to offer any opinions about the applicability of the Montana Unfair Trade Practices and Consumer Protection Act to this case?

A.    No.

Q.    Well, since we're here.  Do you have an opinion as to whether the Consumer Protection Act applies to claims against debt collection attorneys?

MR. HEENAN:  Objection; foundation, speculation, and outside the scope of what this witness has been asked to express opinions on.  With that said, you can answer.

THE WITNESS:  As I sit here, I don't have an opinion on it.

MR. SIMPSON:  Jeez, his answer was shorter than your objection.

///

James Patten

Page 73

verify the allegations of the complaint.  My distinct impression was that he signed -- they cranked -- his staff creates the complaints and he just sits and signs them.

Q.    Do you know for a fact what he's able to review before he signs them?

A.    Well, he -- at best, he's able to review this information that his client says you can't trust.  But it doesn't seem to me that he can -- doesn't seem to me that he can do what I think a lawyer should do, practicing law in Montana, in preparing a complaint.

Q.    The client CACV doesn't actually say you can't or don't trust our information, does it?  It says, we don't warranty the accuracy of this, doesn't it?

A.    I don't remember the magic words, but I think that's the gist of what they're saying.

If I had a client that came to me and said, I want you to see somebody, but, you know, I'm really not going to back up what I tell you, that's going to make me immediately say, Well, why don't you go find a different attorney.

Q.    So I guess, as I understand it, then, you simply would not represent CACV under the terms of

79bb79d1-6b3e-457f-95a2-ac8903d552cd

this agreement, at all?

A.   I wouldn't, no, no.

Q.   And you believe it's a violation of the Fair Debt Collection Practices Act for Johnson Rodenburg to do so?

A.   I think it's a violation.  That, combined with the form and the format of the information upon which Johnson, Rodenburg & Lauinger commenced suit, combined with their inability to get any kind of supporting documents, I think that violates Fair Debt Collection Practice act.

Q.   I think I already asked you this, but just in case.  Are there any opinions you intend to offer at trial that aren't discussed in your reports?

A.   No.

MR. SIMPSON:   Thank you.

THE WITNESS:   Yep.

MR. SIMPSON:   Pleasure.

MR. HEENAN:   I have a few follow-up questions.

EXAMINATION

BY MR. HEENAN:

Q.   Mr. Patten, if I told you that two Montana District Court Judges, Judge Fagg here in Yellowstone County and Judge Rice in Hill County,

In your opinion, is that what happened here?

A.    Yes.

Q.    What I want to ask you, and as I think been discussed already and expressed in your courts, but just to be clear, you're a Montana attorney?

A.    Yes.

Q.    Long-time Montana attorney?

A.    Too long.

Q.    Have filed many lawsuits on behalf of clients in the state of Montana?

A.    Yeah.

Q.    Over the years?

A.    Yeah.

Q.    Have filed, in your career, collection actions on behalf of clients?

A.    Yes.

Q.    What's the standard of care, for a Montana attorney filing a lawsuit in Montana, under Rule 11 of the Montana Rules of Civil Procedure, the Montana Rules of Ethics, and otherwise, what's the standard of care that you have in filing a collection action in Montana?

MR. SIMPSON:  Objection; foundation.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 77

THE WITNESS:  I think the standard of care is probably, in my view, is that set by Rule 11.  You have to do a diligent inquiry into the facts, or a reasonable inquiry into the facts, to determine what the facts are.  And you need to be in a position to actually prove it.  You can't just make allegations and hope that they fly without any ability to back them up.

BY MR. HEENAN:

Q.    In your opinion, did Johnson, Rodenburg & Lauinger, as a law firm practicing law in the state of Montana, meet that standard of care?

A.    Not in connection with the McCollough case; not in connection with the cases that I've been involved with.  With the exception of the one case that actually went to trial and they actually had some evidence.

Q.    Is it appropriate, as a Montana lawyer, to continue to attempt to win a case when you have actual knowledge that your case should not be prosecuted?

A.    What was the first part of the question?

Q.    It was kind of long.

MR. HEENAN:  Maybe if you would read it back.

///

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E

James Patten

Page 78

(Whereupon, the last question was read.)

THE WITNESS:  No.  I think it violates the Rules of Professional Conduct.

BY MR. HEENAN:

Q.   How so?

A.   You're engaged in acts to oppress and abusing the process, I guess.

Q.   Is it fair to say that Rule 11 of the Montana Rules of Civil Procedure essentially, in layman's terms, precludes lawyers from filing, quote, frivolous, unquote, lawsuits?

A.   That's the purpose, yes.  Frivolous pleadings, of any kind.

Q.   And it's an effort, under our Montana Rules, that we as Montana attorneys hold ourselves to, not to file and maintain frivolous lawsuits?

A.   Yes.

Q.   In your opinion, did Johnson, Rodenburg & Lauinger file and/or maintain a frivolous lawsuit against Mr. McCollough?

A.   Yes.

Q.   You've reviewed Mr. Hick's expert disclosure?

A.   Yes.

79bb79d1-6b3e-457f-95a2-ac8903d552cd

Exh. E