IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

June Tift and Timothy McCollough,                  )
                                                   )
                                                   )
            Plaintiffs,                             )
                                                   )    Cause No. CV-07-
      -vs-                                          )    166-B:G-RFC-CSO
                                                   )
Johnson, Rodenburg & Lauinger                      )
and CACV of Colorado, LLC,                         )
                                                   )
            Defendants.                             )


TRANSCRIPT OF

DEPOSITION OF CHARLES DENDY


Taken At
216 North Second Street
Bismarck, North Dakota
July 22, 2008


(APPEARANCES AS NOTED HEREIN)

cases.

Q. In the last year and a half have you filed any lawsuits on behalf of clients in North Dakota?

A. Yes.

Q. How many?

A. I don't know.

Q. As many as you have in Montana?

A. I don't believe so, but I'd have to pull the numbers.

Q. More than 100?

A. You're asking about North Dakota?

Q. Correct.

A. Probably more than 100 cases in North Dakota.

Q. In the discovery that's been produced, it's my understanding that you, on behalf of your clients, have filed over 2,700 lawsuits against Montana residents since the beginning of 2007; is that correct?

A. If that's the information that was provided, it's correct.

Q. What's the most amount of lawsuits that you've ever filed in a single day?

A. I don't know.

Q. How about approximately?

Q. In a debt collection action?

A. That's correct.

Q. Was the debtor represented by counsel?

A. No, they weren't.

Q. Were you successful at trial?

A. Yes, I was.

Q. And how about in the Bozeman District Court action, what were those circumstances?

A. Same circumstances. The defendant was not represented and the trial was successful.

Q. What, if anything, do you do prior to filing a lawsuit on behalf of a client in the State of Montana?

A. I review the file and determine that the suit is proper to be filed. I check to make sure a demand letter has gone out, that it hasn't come back undeliverable. I look for any pre-suit disputes that need to be addressed in one way or another. I look to check to make sure the statute of limitations date is proper, we're within the statute of limitations and there's enough time for the court document to get to the court and be filed before the statute passes, and I check to make sure all the items on the complaint, summons and complaint are correct, accurate and match the information provided

A. Approximately 40 in a day.

Q. Of the 2,700 lawsuits that you filed in Montana since the beginning of 2007, how many times have you physically appeared in a Montana court?

A. Which time frame were you asking?

Q. Since the beginning of 2007.

A. I'd have to review all our records to know for sure, but I believe I've traveled to Montana two to three times in the last -- in that time period.

Q. Two to three times to appear in court?

A. That's correct.

Q. Do you remember what courts you appeared in?

A. One was the court in Butte, District Court.

Q. And how about the other times?

A. One was a District Court in Bozeman.

Q. Who was -- any more?

A. The other was just a deposition. It wasn't actually an in-court appearance.

Q. So two in-court appearances?

A. That's correct.

Q. What were the circumstances for appearing in Butte District Court?

A. It was a trial.

by our client.

Q. When you say, Mr. Dendy, that you review the file to make sure it's proper to be filed, what specifically do you mean by that?

A. I just review the file, make sure there haven't been any unanswered disputes under the Fair Debt Collection Practices Act, that there isn't any other kind of problem that would prevent the file from going forward, possibly a bankruptcy filing or something of that nature.

Q. What documents, if any, did you review in this case prior to signing the complaint and filing it against Mr. McCollough?

A. In this case I relied upon the information that was provided by the client.

Q. Which was what?

A. I'd have to look at our notes. I don't recall that information.

Q. Let me direct your attention to Deposition Exhibit 7, which are the notes.

A. In this particular case I would have reviewed what happened in the file prior to April 17th of 2007.

Q. What specific information would you have reviewed with respect to Mr. McCollough?

our client to sign, but I don't recall off the top of my head.

Q.    Does Johnson, Rodenburg draft the affidavits for its clients to sign in support of summary judgment motions?

A.    Sometimes.  Sometimes the clients provide affidavits on their own forms.  Sometimes we draft an affidavit and send it to the client for review and changes.

Q.    How about with respect to affidavits that come from the debt seller, not the client?

A.    From debt seller, you mean the original creditor?

Q.    Correct.

A.    If the original creditor is our client, we might draft an affidavit for them, but I don't believe we generally draft affidavits for businesses we don't represent.

Q.    Have you ever had occasion to question the accuracy or legitimacy of an affidavit provided to you by a client?

A.    From time to time.

Q.    What about with respect to an affidavit from a Martha Kunkle?

A.    Yes.

---

38

Q.    (MR. HEENAN CONTINUING)  How about any other circumstances, Mr. Dendy, where you've had occasion to question the veracity or legitimacy of an affidavit provided by a client?

A.    It doesn't happen often, but from time to time I'll see an affidavit in a particular matter that appears like the balance might not be correct, something like that, so in that circumstance I'll ask the client to take another look at it and ensure that the affidavit is correct.

Q.    Describe for me when the last time, other than the Martha Kunkle, that you questioned the validity or accuracy of an affidavit provided to you?

MR. SIMPSON:  Let me just, I guess, give him a cautionary warning.  If you can do it without identifying -- assuming it's not related to this case, if you can do it without identifying the client so that you don't go into attorney-client privilege.

THE WITNESS:  I understand.  I don't recall the last time I questioned one.  Like I said, it doesn't happen very often, but from time to time you'll notice something in the affidavit usually that a client has prepared that doesn't seem quite

---

37

Q.    Describe for me, if you will, what circumstances caused you to question the accuracy or validity of the Martha Kunkle affidavit?

A.    It was brought to my attention that there might be some irregularities surrounding her signing of affidavits.

Q.    When was that brought to your attention?

A.    I believe that was in the summer of 2007.

Q.    What did you do -- well, who brought it to your attention?

MR. SIMPSON:  Hold on here.  I'm going to object, because I understand this is a subject of a different lawsuit and I'm not sure what relevance, if any, it would have in this suit and given that it's ongoing -- there's another lawsuit ongoing, as I understand it, against Johnson, Rodenburg & Lauinger and he's not here to be deposed in that suit, I think it's improper to go into that and I'm not sure if that invokes attorney-client privilege or not.  I'm going to instruct him not to answer.

MR. HEENAN:  Understand that that's one we might need to further address in light of the fact that your client has asserted bona fide error as a defense in this case.

MR. SIMPSON:  I understand.

---

39

right and I'll ask them to take another look at it and ensure that their affidavit is entirely correct before filing it.

Q.    (MR. HEENAN CONTINUING)  Do you have any awareness of the volume of affidavits that your debt buyer clients like CACV or Portfolio provide to courts throughout the country?

A.    No.

Q.    In Portfolio's deposition they said that it can be up to 200 affidavits a day that will be signed by particular employees.  Is that in line with what understanding you have, if any?

A.    I don't have any understanding about that.  I'm not there when those affidavits are signed.

Q.    Are you aware of any instances in which a Montana District Court Judge has complained about the conduct of Johnson, Rodenburg in Montana courts?

A.    I received a letter this spring from one particular judge that complained of my conduct.

Q.    Who was that judge?

A.    That was Judge Fagg.

Q.    What specifically did Judge Fagg complain about?

A.    I don't recall the exact wording of the letter, but it was a case where a pro se defendant,

40

I believe, had filed an answer pro se and didn't serve our office with a copy of the answer, so I had submitted default judgment papers and the Court responded with the letter from Judge Fagg indicating that he was concerned about the default judgment filing as an answer was filed in that case.

Q.   Is that the only instance, that you're aware of, where a Montana judge has complained about the conduct of Johnson, Rodenburg?

A.   That's the only one I can recall.

Q.   Assuming a case -- assuming the defendant doesn't respond and a default judgment is entered, how much time does that take you, as the attorney, to handle that claim?  Maybe it would be easier, Mr. Dendy, if you explained under those circumstances what your involvement is in a case that proceeds to default judgment.

A.   In a typical case where there's been no dispute prior to initiation of litigation and there's absolutely no contact after initiation of litigation, that proceeds straight to a default judgment, my typical involvement with the file would be reviewing the file before the summons and complaint are filed with the court, reviewing the file again before the praecipe goes out to the

41

sheriff for service of the summons and complaint and then reviewing the file again at the time the default judgment papers are submitted to the court.

Q.   Johnson, Rodenburg, through its software system and its support staff, the complaint and summons is drafted by someone else; correct?

A.   No.  The forms that the summons and complaint are drafted on are drafted by attorneys and then support staff fills in the particular caption and information for a particular case on the forms that we provided.

Q.   Just so we're clear, though, you don't start from scratch every time a new complaint is filed?

A.   No.

Q.   There's a form complaint that's been created by the attorneys at the Johnson, Rodenburg firm and the support staff fills in the blanks?

A.   Typically, unless it's a really unusual case.

Q.   And then like in the same manner with the default judgment, those are forms that have been prepared that support staff fills in and you review?

A.   That's correct.

Q.   Under that circumstance, you talked about

42

reviewing the complaint and summons once before filing, again before serving and then again before entering the default judgment.  How much time, typically, would that take you in a garden-variety default judgment case?

A.   In a garden-variety case, probably five minutes to review the summons and complaint and ten minutes to review the judgment documents and another few minutes to review the file at the time the praecipe goes out to the sheriff.

Q.   Was a summary judgment motion prepared in this case?

A.   No, I don't believe one was.

Q.   I know that one wasn't filed, but you're not aware of one being drafted?

A.   Not that I remember.

Q.   Is it possible?

A.   I don't recall ever seeing a summary judgment motion draft in this particular file.

Q.   Is that something that your paralegal would also be involved in, drafting summary judgment motions?

A.   Yes, the paralegal has a hand in drafting summary judgment motions, but those are more in-depth than a default judgment and the brief and a

43

substantial amount of work on the summary judgment motion is done by myself usually.

Q.   How about written discovery, is that something that the paralegal would be involved with?

A.   Typically, the paralegal does the rough draft of the written discovery and then I review that and make any changes or additions that I need to make before they go out.

Q.   The typical requests for admissions that Johnson, Rodenburg uses in lawsuits in Montana courts, again, is that a form that's been created by the Johnson, Rodenburg attorneys that is changed by a paralegal or by yourself?

A.   That's correct.

Q.   Is there a reason that in the requests for admissions that Johnson, Rodenburg serves on defendants in Montana courts, the defendants aren't apprised of how much time they have to respond to the requests for admissions?

A.   Not that I know of.

Q.   Explain to the jury, if you will, what the consequences are of failing to timely respond to requests for admissions.

A.   The Rules of Civil Procedure provide that if you fail to timely respond, the requested matters