IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

| | |
|---|---|
| June Tift and Timothy McCollough,<br><br>    Plaintiffs,<br><br>    -vs-<br><br>Johnson, Rodenburg & Lauinger and CACV of Colorado, LLC,<br><br>    Defendants. | )<br>)<br>)<br>)<br>)  Cause No. CV-07-<br>)  166-B:G-RFC-CSO<br>)<br>)<br>)<br>)<br>) |


TRANSCRIPT OF VIDEOTAPED

DEPOSITION OF LISA LAUINGER


Taken At
216 North Second Street
Bismarck, North Dakota
July 22, 2008


(APPEARANCES AS NOTED HEREIN)

14

well, explain to me. So your territory now is primarily South Dakota and part of Minnesota?

A. That's correct.

Q. Mr. Dendy's territory is Montana?

A. Yes.

Q. How about North Dakota?

A. Jessica Knutson handles most of North Dakota.

Q. And how about Minnesota?

A. Joel Boon handles part of Minnesota.

Q. Do you supervise Mr. Dendy in his capacity as a Montana attorney practicing in Montana?

A. Since I manage the office, yes.

Q. Can you explain to me what the extent of that supervision is, please?

A. Well, he is an attorney and so, I mean, we have rules and procedures in place, which were provided in discovery, and those rules also apply to all of the attorneys.

Q. Rules and procedures with respect to abiding by the Fair Debt Collection Practices Act?

A. That's correct.

Q. When did the -- when did you essentially cease being responsible for the Montana territory?

A. I really don't remember. I would venture

Q. Because you've been licensed in Montana since 1998?

A. Yes.

Q. And so since 1998, you filed lawsuits on behalf of your clients in Montana?

A. That's correct.

Q. And so do you have even a general idea since 1998 of how many lawsuits you've filed against people in the State of Montana?

A. I don't.

Q. The total number of over 2,700 lawsuits primarily by Mr. Dendy in the last roughly year and a half, do you have any idea of how many lawsuits Johnson, Rodenburg has filed within that same time frame in, say, South Dakota, North Dakota, Minnesota?

A. I don't.

Q. Would it be more or less?

A. It depends on the state. I would probably say, you know, for South Dakota, and this is a guess, it would probably be less. Minnesota would maybe be a little bit more. North Dakota, I don't really know.

Q. The reason I ask this, because there's not a whole lot of people in Montana in terms of overall

13

to say it was shortly after Charles Dendy became licensed in Montana.

Q. When did Mr. Dendy become licensed to practice law in Montana?

A. I really don't remember. I can make a guess, but I don't remember specifically.

Q. Okay. Well, we'll ask him here in a little bit.

A. Yeah.

Q. Do you have any idea how many lawsuits you've filed against Montana residents on behalf of your clients?

A. No, I do not. That was information that was provided to you in discovery, but I don't have a total number.

Q. How about just in general terms, would it be more than a thousand people?

A. Based on the discovery responses, yes.

Q. Because you've been --

A. Myself, personally or --

Q. Yourself, personally.

A. Oh, I don't know. I'm sorry.

Q. That's okay. It's important that we make sure we're on the same page.

A. Okay.

15

population and I know, for instance, Minnesota has a lot larger population.

A. Mm-hmm. Yeah.

Q. So is that why you would answer the way you're answering?

A. Yes. Both North Dakota and South Dakota and Montana are smaller populations.

Q. Can you describe for me what procedures and protocols Johnson, Rodenburg has in place to avoid filing lawsuits on time-barred debt?

A. Well, the account is set up by the person responsible for that.

Q. And who is that?

A. Currently, Desirae Lien or Zaste, I think, is her married name now. She either manually sets up the accounts or she will download them if they're sent to us electronically. She will review the file and add the information to the file. In Montana we use a five-year statute of limitations period for most accounts, so she would calculate it from the last payment date for that. She adds information to the different screens in Collection-Master and reviews the account. If a statute of limitations has expired or may be expiring soon, she will diary it to the account manager to review that account.

**48**

McCollough claim prior to June 18th?

A. Yes. April 17th, the summons and complaint was prepared and Charles Dendy would have reviewed the summons and complaint and would have been the attorney responsible for reviewing the account at that time.

Q. Do you have personal knowledge that Mr. Dendy reviewed the summons and complaint in this case?

A. Yes, his signature is on it, on the complaint.

Q. Sure. So we know that he signed it, but do you, Ms. Lauinger, have any personal knowledge of his review of the account prior to signing the lawsuit?

A. Well, on a general basis, yes, because Charles and I always talk about how -- I shouldn't say "always." We talk about how we review cases when we sign. And the cases are initially brought into our office, the summons and complaints that have been prepared. We sign them at that point. We review the file, and then they are sent out to be scanned and then they come back into our office for a final review before they're actually sent out to the court.

**49**

Q. So the attorneys review the file twice?

A. Yes.

Q. And that's Johnson, Rodenburg protocol?

A. In Bismarck that's what we do. We'll look at the file when signing the complaint, look through the paperless, and then it comes back into our office and we make sure that things are in order with the paperwork before it goes out, and we sign the cover letter in addition.

Q. How long does the review process take, generally?

A. Depends on the length of the file, depends on the information in the file. It depends on a lot of factors, so it can range from a minute for a very short file to I've probably spent, you know, 15 minutes to a half-hour sometimes looking at a file.

Q. If there's no information other than the electronic download, as I understand it, it can take a minute to review prior to signing a complaint?

A. That would be my guess. I've never actually timed it. And I'm speaking on behalf of myself.

Q. I understand.

A. Because I've already seen the file from

**50**

the account being turned over. I've worked with Collection-Master for 12 years. I know the screens pretty good, and so when I'm looking at the account, you know, I will see the information that I've already verified before and then I will go through it again.

Q. What's the most lawsuits that you've ever signed in a single day?

A. I don't know. I -- they'll do them in batches and they bring them in to me and then I will go through them as I have the time to make sure that I'm able to review them. So if I have a busy day, I don't get through very many, and if I have a slower day, I get through quite a few.

Q. When you say "quite a few," what's the most complaints that you've ever filed in a single day?

A. This is a guess, but maybe 50. That would be a guess.

Q. Is Mr. McCollough the only person that Johnson, Rodenburg has ever sued that has complained about the statute of limitations potentially being up?

A. No.

Q. Is it fair to say that oftentimes the

**51**

people that get sued complain about the statute of limitations?

A. That is a common affirmative defense, along with laches and, you know, kind of the standard defenses.

Q. Is Johnson, Rodenburg a party to any franchise agreement with any of these debt buyers?

A. What do you mean by that?

Q. Is Johnson, Rodenburg characterized as a franchisee by any of the clients?

A. I don't think so. If I'm understanding your question correctly, are we a debt buyer?

Q. No, a franchisee is what I'm asking. I'll show you.

(Deposition Exhibit 12 was marked for identification.)

Q. (MR. HEENAN CONTINUING) I've just handed you Deposition Exhibit 12, which is information about Collect America or CACV as reported on Bud Hibbs' web site. Do you know who Bud Hibbs is?

A. No, I do not.

Q. You've never heard of him before?

A. Huh-uh.

Q. Well, if we flip to page 2 -- well, I'll represent to you that Mr. Hibbs is a -- has a radio