IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

_____

JUNE TIFT and TIMOTHY

McCOLLOUGH,

      Plaintiffs,

  vs.         Cause No. CV-07-166-BLG-RFC-CSO

JOHNSON, RODENBURG &

LAUINGER,

      Defendant.

_____

DEPOSITION UPON ORAL EXAMINATION OF

DENNIS MICHAEL EAKIN

_____

BE IT REMEMBERED, that the deposition upon oral examination of DENNIS MICHAEL EAKIN, appearing at the instance of the Defendant, was taken at the offices of Fisher Court Reporting, 100 North 27th Street, Suite 750, Billings, Montana, on October 30, 2008, beginning at 11:00 a.m., pursuant to Federal Rule of Civil Procedure 30, before Jennifer D. Lewis, Court Reporter and Notary Public.

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFFS,

MS. JUNE TIFT, MR. TIMOTHY McCOLLOUGH:

Mr. John C. Heenan, Esq.

Heenan Law Firm

2602 - 1st Avenue North

Suite 305

P.O.  Box 2278

Billings, Montana 59103

ATTORNEY APPEARING ON BEHALF OF THE DEFENDANT,

JOHNSON, RODENBURG & LAUINGER:

Mr. Fred Simpson, Esq.

Bohyer, Simpson & Tranel, P.C.

283 West Front

Suite 201

P.O. Box 7729

Missoula, Montana 59807-7729

ALSO PRESENT:  James A. Patten

Page 2

Michael Eakin

E X H I B I T S

EXHIBITS:                                        PAGE

Exhibit 50    September 2, 2008 Report

              From Mr. Eakin, To Mr. Heenan

              2 pages. . . . . . . . . . . 4, 21,

                                    23, 36, 37, 59

Exhibit 51    NARCA Newsletter

              2 pages. . . . . . . . 17, 36, 59

Exhibit 52    MSN Money Article:

              Zombie Debt is Hard to Kill

              8 pages. . . . . . 31, 35, 36, 59

Exhibit 53    Collection Actions, First Edition

              National Consumer Law Center

              5 pages. . . . . . . . 35, 36, 59

Page 3

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

WHEREUPON, the following proceedings were had and testimony taken, to wit:

* * * * * * * *

(Whereupon, Deposition Exhibit Number 50 was marked for identification.)

DENNIS MICHAEL EAKIN, called as a witness herein, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SIMPSON:

Q.    Please state your full name for the record.

A.    Dennis Michael Eakin.

Q.    And, Mike, we just met briefly.  For the record, I am Fred Simpson.  I represent the defendant, Johnson, Rodenburg & Lauinger.

What is your business address?

A.    2442 - 1st Avenue North, Billings, Montana, 59101.

Q.    You're an attorney employed with Montana Legal Services Association?

Page 4

A.   Yes, I am.

Q.   **What year did you finish law school?**

A.   1976.

Q.   **Where did you get your JD?**

A.   University of Texas.

Q.   **When did you take the Montana bar?**

A.   In 1978, October.

Q.   **Been continuously licensed in the state of Montana to practice law since that time, I take it?**

A.   Yes, I have.

Q.   **Since taking the Montana bar in October 1978, where have you been employed?**

A.   Montana Legal Services.

Q.   **Exclusively at Montana Legal Services?**

A.   Yes.

Q.   **Okay.**

A.   There -- I've been employed continuously by Montana Legal Services.  I served one term as an appellate judge on the Flathead Reservation.  That incurred, you know, involved about 40 hours a year, so.

Q.   **Bet that was an interesting experience?**

A.   Yes.

Q.   **Do you have a title with Montana Legal**

Services Association?

    A.  My current title is director of litigation.

    Q.  **Is that for the entire state?**

    A.  Yes.

    Q.  **What does that involve?**

    A.  I have to approve any appeals that they -- an attorney might want to take, beyond a trial court level.  And I help direct the, you know, the -- any appeals taken; review briefs.

    I also supervise any litigation going on. I mean, as an advisor to any of the attorneys that may have less experience on litigating matters. And then help develop sort of a litigation agenda for if we notice particular problems; look for things that might be worth litigating.

    Q.  **How long have you held the position of director of litigation?**

    A.  Just over a year.

    Q.  **Prior to that, what was your role at the MLSA?**

    A.  I was deputy director in charge of the Indian law offices.

    Q.  **How long were you in that position?**

    A.  Since 1989.

Page 6

Q.    So, for what, eight years, seven years?

A.    More like 18, 19.

Q.    Oh, '89.

A.    '89.

Q.    I'm sorry.  I was doing my math wrong.
Sorry.  '89, okay.

As director of litigation, do you have direct file responsibility for any cases?

A.    Yes.

Q.    So you handle clients of your own?

A.    Yes.

Q.    What courts are you licensed to practice in?

A.    Oh, U.S. Supreme Court, Ninth Circuit Federal Court of Appeals, the Montana Courts, the Tribal Courts; I'm licensed in Crow and Northern Cheyenne.  I was licensed in Texas, but I allowed that to lapse, seeing how I've been here 20 years at the time and they increased the dues and I have kids in college and let that one lapse.

Q.    Tell me about MLSA's litigation agenda. You said you're involved in developing it.

A.    That we have different substantive units, domestic violence unit, the housing unit, the public benefits unit, Indian law unit, consumer

Page 7

unit. And these are folks that, you know, that have a -- although generally carrying a general case load, because we're a very small legal services firm, have a developing interest in one of these areas, you know, well beyond that sort of task force; and then notice any particular problems that low income clients might have in that area.

Q. **Is there a written agenda for these various units?**

A. No. That we develop, you know -- when the various units meet, which is, you know, annually usually, they will meet and develop, you know, discuss various issues and, you know, but do not come up with a written report, but.

Q. **Are you a member of any of the units of MLSA?**

A. The Indian law unit and the consumer law unit.

Q. **I take it the consumer law unit is the unit that is related, if you will, to the issues in this case?**

A. Yes.

Q. **Okay. How many people are in the consumer law unit? How many attorneys?**

A. There are four attorneys that -- I'm in

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

it, Jennifer Beardsley in it, Chuck Munson is in it, and Karla Bosse.

Q.    **Are those all attorneys here in Billings?**

A.    No.

Q.    **You and Ms. Beardsley are located in Billings?**

A.    Yes.

Q.    **Does the consumer unit have a stated agenda, even if it's not in writing?**

A.    To protect consumers.  I mean, and, you know, but no set agenda that we're -- you know, social goal we're trying to achieve other than protecting consumers and seeing where that particularly leads.

Q.    **Aside from representing clients and advising clients, with respect to discreet matters, consumer matters, does MLSA undertake any lobbying activities with respect to consumer issues?**

A.    We do not lobby on any of the issues. That, you know, we do have some -- but, no.  So, we do not lobby.

Q.    **Okay.  Have you spoken to any groups about consumer law issues?**

A.    Yes.

Q.    **Who?**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.   You know, any number.  The ones I remember most are the Tribal Court Judges Association.  I've spoken at state bar-sponsored CLEs on consumer issues.  And I haven't reviewed who all I've spoken to.  You know, they're community groups, both at Dull Knife Memorial College, at --

Q.   **Where's that?**

A.   That's in Lame Deer, on the Northern Cheyenne Reservation.

At Human Resource Development Council, serves community education or financial education; they require some of their participants in some of their programs to attend; I've spoken there.  And I'm sure there's ones I'm leaving out.

Q.   **Do you prepare written materials for these presentations you've given?**

A.   Yes.  Yeah, it varies on -- from presentation to presentation, and how much notice I'm given and how much they want.

Q.   **Have you spoken on matters involving the Fair Debt Collection Practices Act?**

A.   Yes.

Q.   **When was the most recent such presentation or discussion?**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    I believe it was three or four years ago at a CLE in Helena.

Q.    **Do you remember who sponsored the CLE?**

A.    I believe that one was the state bar, but I'd have to check.

Q.    **Do you have your materials still, that you presented at that CLE in Helena?**

A.    I should.  If I look at computers sitting here on the desk, and having just gotten my computer back yesterday and trying to find out once their IT person worked on it what he managed to delete, you know, I should have those materials.  But I can't promise that I do, and I don't know that I've referred to them in the last two or three years.

Q.    **Do you have any plans to make any presentations on collection matters in the next six months?**

A.    No.  Not that I know of, at this time.

Q.    **There aren't any outstanding invitations to Mike to come talk to our group about fair debt collection practices matters?**

A.    No.

Q.    **Okay.  Have you been involved in litigation on behalf of clients being sued by**

Page 11

Johnson, Rodenburg & Lauinger?

A.    Yes.

Q.    How many suits?  To within your best estimate.

A.    Between 20 and 30, myself, I believe. But . . . some of those it's hard to give a -- and that number could be smaller.  That we see a number of clients for whom we draft pro se answers, simply because we do not have the time to represent every individual client.

(Whereupon, Mr. Patten entered the room.)

THE WITNESS:  And I may be confusing some of those.

BY MR. SIMPSON:

Q.    So sometimes you'll draft an answer for a pro se defendant, but you won't appear?

A.    That's -- he will appear or she will appear pro se.

Q.    Okay.

A.    That if you can convince congress to increase funding or other people to increase funding, we would appear.

Q.    And that's over your 30-plus years, you figure 20 to 30 lawsuits with Johnson, Rodenburg &

Page 12

Lauinger?

A.    That would probably all be within the last five years or so.

Q.    Okay.  Any before that?

A.    I do not remember any before that time.

Q.    Do you have a special list or file that you refer to that would show you how many such suits you had to the precise number?

A.    I don't know if it'd be an accurate precise number, but it could be a precise -- an exact number that the case tracking system may be able to produce that.  That at one time we would -- did not keep track of opposing counsel and we'd only record as an adverse party, like Portfolio Recovery, and it would not reflect Johnson Rodenburg.

So, it's only in the last two or three years that we've also started recording opposing counsel in the case tracking system.

Q.    Of those 20 to 30 suits that you testified to, how many, if any, proceeded all the way through judgment?

A.    Those that, you know, were pro se where I'd simply drafted an answer, I do not know.  Those where we've appeared, probably most of them have

Page 13

proceeded to judgment.

Q.    In favor of?  Can you give me a percentage favorable to the JRL's client and a percentage favorable to your client?

A.    And actually -- and I misspoke.  Most of them do not proceed to judgment.  Because we end up with and -- with a voluntary dismissal on a large percentage of them, after we appear.

That of -- and in our case tracking system, after it's been filed, that because it was a dismissal rather than a negotiated settlement, it would show up in our case tracking system as a court decision.

Actually, very few judgments, and of five, six judgments probably about 50-50.

Q.    Five to six judgments of the 20 to 30?

A.    Yes.

Q.    And of those it's been about 50-50 as to who wins?  Did I get that right?

A.    Yeah.  I believe so.  And, you know, I'm hesitant at this time without reviewing, you know, going through and reviewing how many cases.  You know, without pulling up the cases and taking a look.

Q.    Have any of them settled?

A.    I don't believe any in which I have appeared have settled, but I believe some in which the person filed a pro se answer settled.

Q.    **And when you talk about these 20 to 30 suits, are those suits that you've directly been involved in as counsel of record?  Aside from the ones where you referred to the separate class of pro se defendants?**

A.    Okay.  And I'd have to take a look at exactly how many I have appeared in as counsel of record.  That. . . but somewhere, you know, close to that number.  Some of them there maybe no appearance.  That I can think of one or two, where there was a letter indicating we would file an appearance, but we thought it had been filed in the improper jurisdiction.  And we -- it was dismissed without an appearance ever being made.

Q.    **Do you include in this number of suits that you've estimated, cases where you're not the responsible attorney but another attorney in your office is defending against a JRL filed suit?**

A.    No.  I've not included that in the number.

Q.    **Okay.  Did you review any materials before your deposition today?**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.   Briefly, yes.

Q.   **What did you review?**

A.   Probably most of the materials you have in the book in front of you.  The various depositions; the -- some of the discovery answers; the complaint.  I think I also reviewed a recent NARCA article that was provided to me, that I know I discussed with Mr. Heenan.  The Reichert decision out of the Ninth Circuit, reviewed it.

Q.   **Where did you get the NARCA article?**

A.   You know, Mr. Heenan provided it to me.

Q.   **Do you remember what the title of the article is?**

A.   Not off the top of my head, but I probably have it here.

Q.   **Yeah.  If you could refer to it, that'd be great.**

A.   Challenges For Collecting Purchased Debt.

Q.   **And this is something you reviewed in particular for your deposition today?**

A.   Yes.

Q.   **Would you mind if we made a copy of this as an exhibit?**

A.   I have no objection.

MR. HEENAN:  Neither do I.

Page 16

(Whereupon, Deposition Exhibit Number 51 was marked for identification.)

BY MR. SIMPSON:

Q. **Did you review the deposition, the video deposition of Mr. McCollough?**

A. No, I did not.

Q. **Have you ever met Mr. McCollough?**

A. I've never met Mr. McCollough.

Q. **Take it you've never spoken to him on the phone either?**

A. No, I have not, to my knowledge.

Q. **Never corresponded with him?**

A. Not to my knowledge.

Q. **Have you ever filed on behalf of a client a Fair Debt Collection Practices Act lawsuit?**

A. Yes, I have.

Q. **How many?**

A. Only one or two, I believe.

Q. **Who did you sue?**

A. We sued Landlords Collection Company.

Q. **Is that a business here in Billings?**

A. It was. I'm thinking there may be another that I don't remember off the top of my head.

Page 17

Q.    I take it you don't currently have any such suits pending, where you're suing somebody for a violation of the FDCPA?

A.    Not that we affirmatively filed.  That there may be . . . it may have been raised as a counterclaim or set off in some other action, but I do not believe I currently have another one filed, an affirmative action.

Q.    Do you know if you have ever raised as a counterclaim -- I don't know if it'd be a counter claim, but have you ever made a Fair Debt Collection Practices Act claim against Johnson, Rodenburg & Lauinger?

A.    I don't believe I have.

Q.    Have you ever met any of the attorneys at Johnson, Rodenburg & Lauinger?

A.    Not in person.

Q.    Spoken to them on the phone?

A.    Yes.

Q.    Which ones?

A.    I believe Charles Dendy, Erin Zasada.  I don't believe I've talked to, on the phone, to any of the others, although I could be mistaken.  I don't believe so.

Q.    Did your discussions with either

Mr. Dendy or Ms. Zasada have anything to do with this case?

A.    No.

Q.    Have you ever filed a collection action on behalf of a creditor?

A.    No.

Q.    Have you ever filed a complaint that was later determined to be beyond the statute of limitations?

A.    No.

Q.    Does MLSA have a form bank that it uses to generate pleadings, discovery, motions?

A.    Not an active form bank.

Q.    Does it have an inactive form bank?

A.    Yes.  I mean, there -- at times there have been form banks or brief banks, and that were -- probably are not used as much in the age -- computer age when it is easier to look in a particular case file and cut and paste rather than go into a form bank.

Q.    But you're not recreating the wheel each time; fair enough?

A.    Fair enough.  They are individualized and it will be, you know, changed for the particular case.  But, no, we do not reinvent the wheel each

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

time.

Q. **When you help a pro se party draft a pleading, what all do you do before you put the pleading together?**

A. Well, it depends on what the pleading is. Generally, you know, there's an interview with the client; review the facts with the client. You know, draft it, proofread it. Then I go over it with the client, after, you know, afterwards to make sure that it is what the client -- contains the facts that the client has given us.

Q. **Is that your same practice regardless of whether it's a pro se party you're assisting or a formal client of the firm that you're going to appear as a counsel of record for?**

A. Pretty much, yes.

Q. **And you're relying on your clients to provide you with the information you need to put together pleadings; fair statement?**

A. In a defense, yes. In an affirmative action, it depends on the type of case. That if we're bringing an affirmative action against, say, a car dealer, we will demand -- before we file, before we draft a complaint, we will want to see the originating documents from the sale of the car.

Page 20

Often in drafting, if the answer contains an affirmative defense or a set-off of some type, based on some consumer protection laws, such as truth in lending, or others, we will want to see the documents that would give rise to that, rather than simply rely on the client's statement about those facts.

Q. **Have you been asked to testify as an expert at the trial of this case?**

A. Yes.

Q. **Handing you what's been marked as Exhibit 50. I don't know if we have two copies here.**

MR. HEENAN: I have a copy.

MR. SIMPSON: You have a copy, okay.

BY MR. SIMPSON:

Q. **Can you identify that for us?**

MR. HEENAN: Do you need that?

MR. SIMPSON: Yeah, I need one.

THE WITNESS: Yes. It's a letter I sent to Mr. Heenan.

BY MR. SIMPSON:

Q. **And does this letter, it's dated September 2, 2008; that has your signature on page 2?**

A. Yes.

Q.    And does this constitute your written report of your opinions in this case?

A.    Yes.

Q.    Are there any other opinions or matters you intend to testify to at the trial that are not expressed in this report?

A.    It probably depends on questions I am asked.  I think this is the basis of the, what the testimony would be.  I would imagine that it would be more detailed and that, you know, so, that -- you know, it would be more than simply reading this and I'd be responding to questions and answering questions.  And that, probably covering a bit broader area, but this would be the general outline of the testimony.

Q.    Have you ever been admitted to testify as an expert in a case involving allegations of violation of the FDCPA?

A.    No.

Q.    Have you ever been admitted to testify as an expert on any matter in either a Montana state or federal court?

A.    No.

Q.    Have you ever been disclosed as an expert in another case?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    No.

Q.    I want to go through your opinions in Exhibit 50, piece by piece, and ask you some questions about the opinions that you've expressed in this letter.  Second paragraph.

A.    Yes.

Q.    Third sentence, I believe it's the third sentence.  Begins:  From a cursory investigation, it appears the overwhelming number of lawsuits filed by JRL result in default judgments.

What was the scope of your cursory investigation?

A.    You know, when looking at files, the computerized files of the JP Court here and the number of times they're plaintiff.  And I sent a vista in our office over to look through those records.

Q.    When did you do that?

A.    Probably last summer.  And it confirms the -- the cursory investigation confirmed what I previously thought.  I know I talked to other collection attorneys here in town that indicated that they are able to take defaults in over 90 percent of the time.  In reviewing the depositions, in this case, that of Mr. Bruce Spencer, I think he

Page 23

indicated over 95 percent of the time.

And that a short investigation, it appeared that the same was true for Johnson Rodenburg, and that appears to be consistent with reports in various literature about debt collection cases.

Q.    **Backing up for just a second here.  When you say last summer, do you mean summer of 2007 or 2008?**

A.    2008.

Q.    **And were you asked to do that search by Mr. Heenan, or did you do it of your own accord?**

A.    I did it of my own accord when I was told that he was bringing this action.  That there's some discussion before September, about being an expert.

Q.    **Did you search beyond the Yellowstone County Justice Court records?**

A.    No, I did not.

Q.    **Who were the other collection attorneys in the area that you spoke with?**

A.    Randy Jacobs.

Q.    **Do you recall when you spoke with Randy?**

A.    I've had numerous conversations, usually while changing clothes at the Y.  That when I

Page 24

talked about, you know -- and it was not the summer, it was at some other time, and I do not remember the exact time I talked to him. Also talked to Matt Erickson.

Q. Is Mr. Erickson also an attorney involved with collections?

A. Yes, he is.

Q. And did Mr. Erickson or Mr. Jacobs both represent creditors as opposed to debtors?

A. Yes.

Q. And my understanding from your testimony is that Mr. Jacobs and Mr. Erickson informed you that they are successful in obtaining defaults in about 90 percent of the time?

A. Yes. I don't know that it came up as that question, but that was in the conversation, yes.

Q. Did you discuss Johnson, Rodenburg & Lauinger's litigation efforts, if you will, with either Mr. Jacobs or Mr. Erickson?

A. I know I have with Mr. Erickson.

Q. Tell me about the conversation.

A. I said I was unaware that he was associated with them. Because he -- there was a hearing set and he appeared at the hearing. And he

indicated he had been contacted, I think the previous afternoon, and asked to make an appearance.

Q. Was there any substance beyond that, in your conversation with him?

A. Not at that time. Later there -- he indicated he no longer had an association with Johnson Rodenburg.

Q. Did he tell you why?

A. He implied it was because of an ethical problem he had.

Q. Did he tell you what it was?

A. No -- well, he had been, you know, publicly reprimanded for not being actively pursuing a case for a client. And he -- after the public reprimand, he -- Johnson Rodenburg no longer used his services. That I believe they had been using him as -- to appear locally, when necessary.

He also -- I can think of one other case where he had appeared and basically I had asked him, you know, whether he was appearing only for that one day.

Q. So, his ethical situation wasn't directly related to his work for Johnson, Rodenburg & Lauinger; is that right?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    No.  No.

Q.    **Okay.**

A.    He indicated that they probably suffered the relationship because of it.

Q.    **Did he ever express to you any concerns he had about working with, or for Johnson, Rodenburg & Lauinger?**

A.    In one case where he appeared, he did express some concern, yes.

Q.    **And what was that?**

A.    That he appeared to argue a motion for summary judgment.  He thought the motion was not well founded.  And I think he did a -- I think it was one where the judge also thought it was not well founded.  And the -- he may have saved Johnson Rodenburg from receiving some sanctions.

Q.    **What was the name of the case?  Do you remember?**

A.    It was, I believe, Portfolio, I'm not sure of the plaintiff, vs. Reynolds.

Q.    **Were you on the other side of that?**

A.    Yes.

Q.    **How was the case resolved?  Or is it still going?**

A.    No, it's not going.  I believe it was

Page 27

dismissed at the request of the plaintiff after the motion for summary judgment was denied.

Q.    Okay.

A.    And that may be why I'm confused as to which ones reach a court decisions, and which ones, you know, go to judgment.

And earlier when I said I cannot give you a precise answer, this is one that I might count as a court judgment when the court denies a motion for summary judgment, yet it ends up being voluntarily dismissed and, which someone can say, oh, it never reached the judgment because it was voluntarily dismissed.

Q.    So what was it that Mr. Erickson did that you think may have saved JRL from some sanction?

A.    He brought some humor into the situation, and he had the judge chuckling.  And I think when the judge was chuckling at his situation, it was harder to be mad.

Q.    Was that a district court or justice court case?

A.    That was a district court case.

Q.    In Yellowstone County?

A.    Yes.

Q.    Do you handle cases for consumers who are

being sued in collection matters in court outside of Yellowstone County?

A.    Yes.

Q.    **Which districts?**

A.    In Big Horn County.  Occasionally in Rosebud County.  And in the Crow and Northern Cheyenne Tribal Courts.

Q.    **Getting back to my question that led us down that road.  Back to the issue of your investigation.  You ran a search, or you had somebody run a search at the JP court?**

A.    Yes.

Q.    **Okay.  Any other elements that led to that, your opinions, in your investigation?**

A.    Other elements would be the number of requests that we get, and knowing that if we do not represent or do not assist that there's not much other assistance out there.  And also just a, you know, general knowledge that we probably only see the tip of the iceberg and that we don't see every single case.

So, that, and, you know, my general experience in defending debtors has been that there has been some event that causes a default.  It's not simply a lack of wanting to pay.  It's the loss

of a job or health issues.

And, so, knowing that they have nowhere else to go, and, so, that they will not be able to retain counsel and would thus end up having a judgment taken by default when they, you know, cannot afford to fight the action.

Q.    **Your opinion continues a little further down.  It says, this is about halfway through the second paragraph on page 1:  In my opinion this increase is related to the corresponding rise in the, in quotes, debt buyer, end quotes, industry.**

**What's your knowledge of the debt buyer industry; and tell me how you gained that knowledge.**

A.    I think many of the debts are sort of bundled and sold in big blocks that defaulted -- particularly defaulted credit cards, but accounts are bundled, sold in big blocks.

I gained this information through, you know, various areas that I -- we subscribe to the Consumer Law Center Court, the books they publish on any number of areas which include debt collection; it's discussed in some of theirs.  That the Consumer Law Center also holds a CLE every year and I've attended that on occasion and, where the

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

debt buying industry has been discussed.

Also, it's been in the general media, some discussion which confirms what I had already learned, that they're bundled and sold for pennies on the dollar. That Mr. Heenan wanted to refresh me on that, so he provided me with a copy of an MSN article about it.

But that was -- and it may have had some specifics about exactly what percentage, you know, whether it was five cents on the dollar or three cents on the dollar, ten cents on the dollar. But that only confirmed what I had heard at the various CLEs and had read.

Q.    Do you have the MSN article with you?

A.    I believe I do.

MR. HEENAN:  It's right here.

THE WITNESS:  Oh.

MR. SIMPSON:  Let's take a brief break.

(Whereupon, a break was taken.)

(Whereupon, Deposition Exhibit Number 52 was marked for identification.)

MR. SIMPSON:  Back on the record.

///

Page 31

BY MR. SIMPSON:

Q.   I guess, to get back to a point that John raised on the break.  What materials did you bring in response to this subpoena that we haven't already seen here today?

A.   I don't know that -- you know, this book and . . . that excerpt from the NCLC Debt Collection Book, and the Reichert decision out of the Ninth Circuit.

Q.   Can I see your notebook for a second?

A.   (Witness handing over notebook.)

Q.   This is -- the notebook labeled Tim McCollough vs. Johnson, Rodenburg & Lauinger.  This is something that was given to you by Mr. Heenan?

A.   Yes.

Q.   Rather than copying this, I think I want to just flip through it and we can confirm what's in here.  Well, it starts at Tab 4.  Was there a Tab 1, 2, and 3 at some point?

A.   I never had a Tab 1, 2, and 3.

Q.   Okay.  Maybe John's office ran out of tabs and got to reuse --

MR. HEENAN:  That would be my guess.  I wouldn't read too much conspiracy into it.

MR. SIMPSON:  No, I won't.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

BY MR. SIMPSON:

Q.    Let's see.  Your deposition notice and subpoena, the front, Tab 4.  Tab 5 is Plaintiff's Rule 26(a)(2), expert -- or liability expert witness disclosures.

Tab 6 is the deposition of Grace Lauinger with exhibits.  Tab 7 is the transcript of the deposition of Lisa Lauinger with exhibits.  Tab 8, deposition of Charles Dendy with exhibits.  Did you read all those depositions, by the way?

A.    Yes.

Q.    Tab 9, deposition of Bruce Spencer.  Do you know Mr. Spencer?

A.    I do know Mr. Spencer.

Q.    Have you worked against him?

A.    I don't believe that I've worked against him.  He's in Helena.  And I know other attorneys -- you know, Ms. Beardsley in my office has worked against him.  But mostly I've seen, you know, are attorneys in Helena or elsewhere.  I know I've spoken with him at CLEs.  He's been at a couple of Legal Services board functions for some reason.

MR. PATTEN:  He's a state bar liaison to the Legal Services.

THE WITNESS:  I knew he wasn't one of my bosses, but.

BY MR. SIMPSON:

Q.    First amended complaint.  Johnson, Rodenburg & Lauinger preliminary pretrial statement.  Plaintiff's preliminary pretrial statement.

We're up to Tab 13, plaintiff's motion for partial summary judgment on FDCPA liability. Looks like the brief is included.  Tab 14 is JRL's response to plaintiff's third combined discovery. Tab 15, JRL's response to the plaintiff's fourth combined discovery requests.

Tab 16, JRL's . . . spelled my client's name -- fourth supplemental responses to plaintiff's fifth combined discovery requests.  Tab 17, JRL's first supplemental response to the plaintiff's first combined discovery requests.

Tab 18 is defendant Johnson, Rodenburg & Lauinger responses to plaintiff's second combined discovery requests.  Tab 19, finally, is defendant JRL's second supplemental responses to the plaintiff's first combined discovery requests.

Did you read the entirety of JRL's discovery responses as contained in the notebook?

Page 34

A.    No.  And some of, I mean, some of the exhibits were a list of cases filed and I did not read, you know, everything.

Q.    And, then, what's the article that you brought that's not contained in the notebook underneath the Reichert decision?

A.    It is from the NCLC Defending Debt Collection.

Q.    NCLC, National Consumer Law --

A.    Law Center.  They publish Hornbooks on various areas; fair debt collection, defending debt collection, foreclosure, automobile fraud, unfair trade practices.  There's a series of about 20 different books.  And I believe they give a discounted rate to Legal Services to subscribe.

Q.    Do you own a copy of the book from which these pages were taken?

A.    I do not own a copy of the book.  Legal Services subscribes, so Legal Services has a copy. The Defending Debt Collection one was just published this summer.  I don't have it on my shelf right now.  Maybe Ms. -- I don't know where it is.

Q.    Fair enough.  Can I make this, a copy of this; we'll do this as 52.  Or 53, I'm sorry.  I lost track.  And that's the NCLC pages?

A.    Yes.

(Whereupon, Deposition Exhibit Number 53 was marked for identification.)

BY MR. SIMPSON:

Q.    Does that constitute, then, what we've listed here as Exhibits 50, 51, 52, your notebook, Exhibit 53, the article, does that constitute your file in this case?

A.    Yes.

Q.    Do you have any notes?

A.    No.

Q.    Do you not take notes when you are reviewing materials?

A.    I generally do not take notes.

Q.    Okay.

MR. HEENAN:  Do you care to see that?

BY MR. SIMPSON:

Q.    When did Mr. Heenan first talk to you about this lawsuit?

A.    Probably before he filed it.  And, you know, we have, you know, probably discussions fairly frequently.  And when we first discussed this one, I don't know.

Q.    Did you take notes at that point, when

you were asked to become a witness?

A.    You know, well, at that point or -- there's a different point than when I was asked to become a witness.  I was asked to become a witness this summer, and I don't believe I took notes at that point, because it was probably an informal conversation and no specifics were discussed at that time.

Q.    Do you exchange e-mails with Mr. Heenan on this case?

A.    I'm not a big e-mail writer.  I do exchange e-mails with Mr. Heenan.  Whether any of them have been related to this case or not, I cannot tell you.

Q.    Can you look and see?

A.    I can look, yes.

Q.    I take it if you had some e-mail that related to this case, you'd consider it part of your file in this case?

A.    Yes.

Q.    Okay.  Would you look and, if you do have such e-mails, produce those to us?

A.    Yes.

Q.    Did you produce any drafts of your report, which we've labeled Exhibit 50, before this

final draft was printed and signed?

A.    I am sure I did.  I don't believe I provided a draft to anyone else.

Q.    **You kept it in-house and finalized it?**

A.    In-house.  I may have provided it, a copy to someone else in-house, but I did not provide a copy to Mr. Heenan prior to delivering the. . .

Q.    **What was it that Mr. Heenan asked you to do in this matter?**

A.    You know, basically he wants me to, as I understand it, testify as to someone that sees folks on a regular basis that have to defend collection actions from Johnson Rodenburg, and has asked me to explain their predicaments and any of the actions that Johnson Rodenburg has taken that may violate fair debt collection that imposes a burden on those that cannot -- that they're Legal Services eligible, being low income, and the burden it puts on them in defending these actions, or not being able to defend the actions.

Q.    **When you talk about Johnson Rodenburg's violations of the FDCPA, do you mean with respect to just its activities with Mr. McCollough in this matter, or with respect to cases you've defended?**

A.    With respect to cases that I've seen in

my capacity at Legal Services.

Q.    Okay.  Let's talk about those.  How many; who are they; what are the violations, I guess we could start with.  Can you give me a -- describe the specifics of these various cases.  Who you were defending; what the violations were.

A.    And I said in the ones that I've seen in my capacity at Legal Services, that will include some that I did not handle myself.  That there are any number of cases where, and, you know, an exact number, I can't give you, but cases where we've suspected a statute of limitations problem.

That when, if we propound discovery, it will then be a request to dismiss without prejudice.  If -- times that we believe that Johnson Rodenburg does not have documents to support its case, even if it's within the statute, and if we propound discovery requesting certain documents, that we get a, a request that it be dismissed without prejudice.

And one -- I think, those indicate, one, that either a knowledge or that, in the ones where we think it may be past the statute of limitations, either knowledge that it was or filing without knowledge and not trying to obtain that knowledge

Page 39

until requested, and then providing -- and then moving to dismiss.

That, or filing actions where there are not the documents to support the action in their possession at the time. And either because of lack of the documents or the expense of obtaining the documents, which I don't know -- you know, I don't know their thought process. But, or it quickly becomes a -- not financially feasible to prosecute a case on an old debt when it is being actively defended.

Q. **Well, let's start, then, with cases where you suspect Johnson Rodenburg has filed beyond the statute of limitations. Can you give me names of debtors that you've defended in those cases; and identify the circumstances that led you to that conclusion.**

A. I'm trying to remember which ones, you know, are public, you know, if it's -- if we filed it as an affirmative defense, I think I'd be free to answer that. If we did not file it as -- did not file the answer but only corresponded with Johnson Rodenburg, I think I would, client confidentiality, I'd need my clients' permission to disclose that fact. And --

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

**Q.    Do you see my problem with that, though? If you're going to be at trial testifying about these things, I need to know which ones you're going to testify to beforehand, assuming it's admissible in the first place.  But which ones can you identify, then, without breaching client confidentiality?**

A.    I did not know I was going to be asked about specific cases, and, so, I did not review specific cases.  So, I can't give you an answer to that at this time.

**Q.    Can you identify a single specific case by a name, where you believe Johnson, Rodenburg & Lauinger filed a case beyond the statute of limitations?**

A.    Not by name at this time, but just as, you know, one of the exhibits shows, you know, 2,000 cases or so filed.  We may have, in our case tracking system, over 200 cases that are identified as one that -- a plaintiff that is often represented by Johnson Rodenburg, such as Portfolio or Cass, or identifying Johnson Rodenburg as a --as the opposing counsel.

And of those numerous ones, you know, do I remember at this point particular names or

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

particular facts, no.

Q.   What about -- can you identify then, or same question then with respect to cases where you've become involved actively defending and propounded discovery and JRL has then dismissed the case.  Can you identify those cases?

A.   One, you know, and once again, I'm trying to think of names where it will be of record.  The most recent would be Bensh.  And that's --

Q.   B-e-n-n?

A.   B-e-n-s-h, or s-c-h.

Q.   Where was that filed?

A.   That's in Yellowstone County.

Q.   JP court or district court?

A.   I believe that one is district court.

Q.   Does that, in your mind, constitute a violation of Fair Debt Collection Practices Act?  To dismiss a case without prejudice after the other side has served discovery?

A.   I would say it violates Fair Debt Collection Practice Act to file a lawsuit never intending to prosecute it if it's going to be defended.

Q.   Are you aware of case law or statutes that support that opinion?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A. No.

Q. Have you had a judge rule in your favor on a theory like that before?

A. No.

Q. What was next on your list? We talked about cases where you suspected statute of limitation problems; cases where you actively defended and served discovery and that's resulted in a dismissal by JRL. Are there other types of conduct by JRL that you've had experience with handling cases that you feel constitutes -- such conduct constitutes a violation of the FDCPA?

A. Yes. That cases where they will, in after obtaining a judgment, will execute on what is very likely to be exempt resources of the debtor.

Q. Okay. Name names and provide details.

A. Well, one in this case, I believe, was June Tift. And although it was not the particular action here, and I may be once again confusing names, but I believe they executed on Social Security benefits when they had at least reason to suspect that it was exempt benefits.

That another one that was litigated, and you made a motion so it's of record, is Wellnitz.

Q. Pardon me?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    Wellnitz.

Q.    **Do you know how you spell that name?**

A.    W-e-l-l-n-i-t-z.

That there -- in almost every case where they execute, when they execute, they execute on the entire bank account of the judgment debtor. When there is probably, you know, an exceedingly high likelihood that there are exempt funds of some sort in the bank account.

Q.    **And what's the debtor's remedy in that case?**

A.    The debtor's remedy in that case is to file a claim of exemption.

Q.    **And the judge gets to sort it out at that point; right?**

A.    The judge does get to sort it out at that point.  That does not restore the debtor to the position they were in before.  Because if, one, there are bank fees.  Also, it's a, it causes the debtor often to have -- the debtor will often have written checks on the account a day or two earlier that if you had to clear the bank, then it will cause checks to the grocery store, checks to the landlord, other checks to bounce, when, if the exempt funds had been left in there, they would not

have bounced.

Q.    **So what authority are you aware of that supports your theory that executing on a bank account constitutes a violation of the FDCPA, assuming you've got a valid judgment and get a writ of execution?**

A.    That the Fair Debt Collection Practices Act, the specific language says the collector cannot take an action not permitted by law, and to the extent you cannot execute or should not execute on exempt funds.  Then knowingly executing on exempt funds would be a violation of the Fair Debt Collection Practices Act.

Q.    **Okay.  Then tell me the specific situations you're aware of where JRL has knowingly executed on exempt funds.**

A.    And, you know, that in ones . . . you know, I believe the June Tift was one, where they had knowledge that she was receiving Social Security benefits.  That in -- but, if you're, you know, if you're also saying that they have to have specific knowledge, and I don't know that that is the standard that is required.  That if there is a high probability, but they do not have specific knowledge.

Page 45

If they have the high probability of executing on exempt funds, I would be -- say that is also a violation of the Fair Debt Collection Practices Act.

Q. **Which cases so hold?**

A. I can't give you a case cite right now. And, yeah.

Q. **Let's talk about Ms. Tift for a second. Were you aware that Johnson Rodenburg never obtained a default judgment against her?**

A. No.

Q. **Have you seen a copy of the judgment that they -- you think they obtained against her?**

A. No. I think I said earlier I may be confusing her with one other where we were defending the, you know, the execution on benefits. And, yeah. There are any number of cases and I may have confused two names here.

Q. **So, Wellnitz was the other one that you mentioned. And that was a case that JRL filed?**

A. Yes. And they obtained a default judgment and we were actually unsuccessful in setting aside the default.

Q. **She was pro se at the time that you obtained the judgment?**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.   I don't believe she appeared.

Q.   **I mean, she wasn't represented by you at that point; is that right?**

A.   No.  We entered the action when her bank account was executed upon.

Q.   **And do you have information that JRL knew or had a high probability of knowing that her funds were all exempt?**

A.   I do not know what they have in their records.  Often the credit card application will, if they're receiving, often has to disclose a source of income.  That if a credit card application discloses Social Security as to the source of income, that is probably information that should be available to -- when someone sues on the credit card account.

That also -- I'll leave it there at this time.

Q.   **Is that pure speculation in this case, with respect to Ms. Wellnitz?  Do you know what information Johnson Rodenburg had in its file regarding assets?**

A.   Oh, no.  I do not know what they had in their file.  I'm saying if they had obtained, you know, the credit card application, they could have

Page 47

that information.

Q.    **Have you seen her credit card application?**

A.    No.

Q.    **So, what was it that led you to believe that they knew or had this knowledge in that case?**

A.    In . . . any time you execute on a bank account, on someone of moderate means, you are likely to hit exempt funds.  That three-quarters of wages are exempt.  All public benefits are exempt. So that if you sweep a bank account, execute on a bank account, and take the funds in the bank account, there is a high probability that that will include wages, three-quarters of which are exempt.

Q.    **So, are you aware of what standard governs attorneys executing on judgments what they have to do before having a writ executed on, so that they don't?**

A.    Yeah.  Very little standard.

Q.    **What is it?**

A.    None.

Q.    **They don't have to do anything?  They just have to have the writ issued and give it to a sheriff's deputy and they can go around and hit the bank accounts; is that right?**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    That is correct.

Q.    **Are you saying that that's illegal under the Fair Debt Collection Practices Act?**

A.    That I do believe the Fair Debt Collection Practices Act places a higher burden on attorney -- on debt collectors.  And that an attorney debt collector must meet the standards of the Fair Debt Collection Practices Act; that and a general practitioner that does not regularly engage in collection activity would not have to meet.

Q.    **So, what does the attorney who's governed by the FDCPA have to do before levying execution?**

A.    Probably try to make some inquiry as to what funds are in the account.

Q.    **Are your clients --**

A.    That does put them in a difficult position because that, giving prior notice may encourage someone to make sure the asset is not there.  But, you know, being in that, but I do think that the law may impose that burden and add that difficulty.

Q.    **You'd agree that if the debtor is nonresponsive to communications from a collection attorney, with respect to trying to settle a case or trying to work out a situation after a**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

judgment's been entered, it's awfully difficult for the collection attorney to do anything other than levy execution; is that right?

A.    It is difficult, yes.

Q.    It's near impossible, isn't it?

A.    You know, I don't know what -- you know, sometimes people may be more response -- I mean, we're getting into hypotheticals here.

Q.    Well, it seems like we've been operating in hypotheticals for a while here.

A.    Yes.

Q.    And I haven't gotten any specifics yet. So, tell me -- you've mentioned Ms. Wellnitz and Ms. Tift.  Are there other cases you can think of where they've done that?

A.    Well, obviously if I had Ms. Tift confused with another client, yes.  And there is one in Butte; I'm trying to remember the name.  I'm trying to remember -- and it was, we did make a motion, so it should be public record, for return of motion, for return of exempt assets.  Ivy.

Q.    And did the judge order them returned?

A.    That, a portion of them returned.

Q.    So a portion of the assets were non-exempt?

Page 50

A.    There's still a dispute over that.

Q.    **What information do you think JRL had in its possession that -- ahead of time that it was levying on exempt funds?  Any specific information?**

MR. HEENAN:  Objection; speculation.

THE WITNESS:  I have no idea what they keep in their file.  That, you know, that planned ignorance sometimes can be beneficial.

BY MR. SIMPSON:

Q.    **Well, do your clients typically volunteer information about their assets to collection attorneys?**

A.    Not to my knowledge.  But there may be other sources that often you can obtain a credit record that may indicate a source of income.  And probably often a credit report is obtained.  And I do not know the protocols of Johnson Rodenburg, but if -- often there may be a, someone may obtain a credit report before filing suit, to determine if it's worth filing.

And, so, that is something that's often is available.  That often it may be obtained so they know which banks to execute at, and those credit reports may contain information.

Q.    **That's, again, speculation on your part?**

A.    That is, again, speculation.

Q.    **All right.  Any other types of conduct by Johnson, Rodenburg & Lauinger that you've seen that you believe constitutes a violation of the FDCPA?**

A.    Yes.  I've seen them send out discovery requests to pro se litigants, that will come in seeking help with answers, and without a sort of full explanation of how to respond.  And there are times when they send out requests that, like -- like admit that there is no defense when a defense has been set out in the answer.

And I think often it is sent out not to clarify issues, but to try to obtain admission, rather than -- without regard to the actual facts. I think it'd be an unfair debt collection practice to request an admission that you do not have some basis for asserting the fact in the request for admission.

Q.    **Can you think of specific instances where that's occurred?**

A.    Well, I believe it occurred in this particular case; Mr. McCollough.

Q.    **I meant cases that you've been involved in.**

A.    Okay.  That in the Reynolds case, I

Page 52

mentioned, they may have sent a request that he had never -- you know, please admit that he never disputed the bill, when in fact he had disputed the bill. There may have been other similar requests for admissions.

Q. Were you representing Mr. Reynolds in that case?

A. I believe I represented Mr. Reynolds in that case.

Q. So, did you serve responses to those requests?

A. Yes.

Q. I mean, you know what the Rules of Civil Procedure provide happens if you don't respond within 30 days to a request for admission; correct?

A. Yes.

Q. You didn't need the instructions given to you at that point, did you?

A. No. I think in Mr. Reynolds' case, they had initially sent out request for admissions of the JP court action. And it ended up being appealed to the district court.

Q. Was the JP court action initiated and prosecuted before you became involved on behalf of Mr. Reynolds? Or Mrs. Reynolds, I'm not sure

which.

A.    Mister.   I believe I represented Mr. Reynolds throughout.

Q.    Okay.

A.    But, once again, when -- I don't believe they reinvent the wheel and give different instructions to pro se clients than to those represented.   And where I may know that the rules to respond for Mr. Reynolds, I don't think they give out different instructions, like setting out time frames to pro se clients.

Q.    Was there a rule, under the FDCPA, that says they have to provide those kind of directions to unrepresented litigants?

A.    Is there an express prohibition for doing that sort of thing; no.   Are there catch-alls for other unfair practices in debt collection; yes.

Q.    Well, which one does that fall under? Which catch-all?

A.    You know, in the laundry list of, I believe, 1692f, the, you know, the other methods determined to be unfair.

Q.    Any other types of conduct by JRL that you've seen in your representation of clients that you believe constitutes a violation of the Act?

Page 54

Michael Eakin

A.    Not other than what I've mentioned and what I've set out.

Q.    **In your report?**

A.    In my report.

Q.    **What are you aware about -- I'm sorry.**

**What are you aware of with respect to JRL's efforts in this case to determine that this claim was not going to be filed -- that they were asked to file against Mr. McCollough, was not going to be outside the statute of limitations?**

A.    That in this particular case, you know, my knowledge would come from reading their depositions.  As I understand it, there were some problems with this whole batch of claims that they had received.

And that, you know, they, you know . . . and it appears that they did file after the statutes had run.  And even after they had received information, to indicate the statute had run, they sent out, in this particular case I understand it, they sent out a request for an admission that the statute had not run.

Q.    **You're aware that at the outset they identified a potential problem with the statute of limitations, before filing suit.  Are you aware of**

Page 55

that?

A.    Yes.

Q.    And are you aware of what steps JRL took to resolve that issue before filing suit?

A.    It -- you know, can I cite them off now; no.  I did read them in the deposition, yes.

Q.    And in your mind -- well, back up.

Are you aware that they, in fact, obtained written confirmation from their client as to the date the client had for last payment for Mr. McCollough?

A.    As I know, I did not recall that it was in writing.

Q.    Would it change your opinion if it was in writing?

MR. HEENAN:  Object to form; opinion. Regarding what?

BY MR. SIMPSON:

Q.    Well, I think we're talking about the steps that Johnson Rodenburg took before filing suit against Mr. McCollough, to determine whether, in fact, this claim was filed beyond the statute of limitations or was already beyond the statute before filing.

If they obtained written verification

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Case 1:07-cv-00166-CSO    Document 114-2    Filed 03/11/09    Page 57 of 90

Michael Eakin

**from their client that the last payment was within the five-year statute, would that change your opinion?**

A.    It would depend on the nature of the verification.  If they had a monthly statement from Bank of America, or whoever it might have come from, that showed a payment, I'd find that more reliable than a statement from a debt buyer that says:  Don't worry, it's in the statute of limitations.

**Q.    And you're not aware of what the statement was in this case?**

A.    No.

**Q.    Do you believe that at the time the plaintiff filed suit to collect on a claim, that it has to have all its proof that it intends to use to win at trial already lined up?**

A.    No.  But it needs sufficient, to justify filing the action.

MR. HEENAN:  I'm going to interpose an objection, to form with respect to -- vague with respect to attorney.  Debt collection attorney or litigation attorney?  But you already answered.

MR. SIMPSON:  He already answered, so.

///

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

BY MR. SIMPSON:

Q.    **Is it fair to say that you don't have any personal knowledge of what the standard of practice is for debt collection attorneys as to what types of information they routinely have in their file before filing suit?**

A.    That's a fair statement.

Q.    **That's because you've never practiced in that field?**

A.    I've only defended in that field.  That may be --

Q.    **Fair enough, I'm sorry.  You've never practiced from the creditor's side in that field?**

A.    I've never practiced from the creditor's side.

Q.    **Are you currently defending any clients against the suits filed by JRL?**

A.    Yes, I believe I am.  And it may be one I've not filed an appearance and have asked them to dismiss for filing the wrong form.

MR. SIMPSON:  Let's take a quick break.  I think we're about done.  I just want to go over my notes.

(Whereupon, a break was taken.)

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

MR. SIMPSON:  Let's go back on the record.  I just want to do a couple housekeeping things to make sure our record's clear.

BY MR. SIMPSON:

Q.   We've already established Exhibit 50 is your written report in this case?

A.   Yes.

Q.   Exhibit 51 is the NARCA newsletter, first quarter 2003, and that was an article provided to you by Mr. Heenan?

A.   Yes.

Q.   Exhibit 52, another material -- document in your file was an article from MSN Money that says:  Zombie Debt Is Hard To Kill?

A.   Yes.

Q.   And that was an article that you reviewed prior to your deposition today?

A.   Yes.

Q.   And then, finally, we have Exhibit 53, which I believe you described earlier, but my understanding is this is an article from -- now, can you tell me the name of the publication?

A.   Collection Actions.

Q.   And that's Collection Actions, First Edition, National Consumer Law Center?

A.    Yes.

Q.    And then we also discussed but have not marked as an exhibit the items in your notebook?

A.    Yes.

Q.    That constitutes your file?

A.    Yes.

Q.    Except if you might have some other --

A.    Correspondence from Mr. Heenan that I would provide, yes.

Q.    Are you charging Mr. Heenan for your services in this matter?

A.    I'm not charging Mr. Heenan.

Q.    Can I look at the other materials you've got there?  I think we've identified those, but I want to just double check.  You've got a copy of the Reichert vs. National Credit Systems case.

A.    I believe.

Q.    Those are all just photocopies of other materials that are already labeled?

A.    Yeah.

Q.    Have we discussed all your opinions that you intend to offer at trial?

A.    I believe so.

Q.    Okay.

A.    Yes.  You know, as I said earlier, that

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

often at trial it takes new -- takes turns and sometimes don't understand that if there's something that I'm asked at some point that somehow was not asked today I will respond, but I would not bring up myself in anything.

Q.   **As far as you know, you've provided a complete statement of your opinions in your report and in your testimony today; is that correct?**

A.   Yes.

Q.   **Okay.  Nothing further.**

MR. SIMPSON:  Thank you.  Pleasure meeting you.

MR. HEENAN:  We'll reserve.

(Whereupon, the deposition was concluded.)

Page 61

**CHARLES FISHER**
**COURT REPORTING, INC.**

503 East Mendenhall
Bozeman, MT 59715
Phone (406) 587-9016
Fax    (406) 586-0926

November 12, 2008

Mr. Dennis Michael Eakin
2442 1st Ave. North
Billings, MT 59101

Re:    June Tift and Timothy McCollough vs. Johnson, Rodenburg, & Lauinger

Dear Mr. Eakin:

Enclosed please find a copy of your sworn statement taken on October 30, 2008 along with a
Deponent's Certificate and a correction sheet.

Please read the copy of your deposition and fill out the correction sheet as needed.  Sign the
Deponent's Certificate *and* the correction sheet before a Notary Public, and then return both
documents to us within thirty (30) days of the date hereon.

The copy of the transcript is yours to keep.  If you have any questions or concerns please feel free
to call our office at any time.

Truly yours,

CFCR

Charles Fisher Court Reporting
CFCR:lf
Enclosures

cc:
Fred Simpson
John Heenan

C E R T I F I C A T E

STATE OF MONTANA      )

: ss.

COUNTY OF GALLATIN  )

I, Jennifer D. Lewis, Court Reporter - Notary Public in and for the County of Pierce, State of Washington, do hereby certify:

That the witness in the foregoing deposition was by me first duly sworn to testify the truth, the whole truth and nothing but the truth in the foregoing cause; that the deposition was then taken before me at the time and place herein named, that the deposition was reported by me in shorthand and later transcribed into typewriting under my direction, and the foregoing pages contain a true record of the testimony of the witness, all done to the best of my skill and ability.

IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this __19th__ day of __November__, 2008.

_____
Jennifer D. Lewis, Court Reporter
Notary Public, State of Washington
Residing at Bozeman, Montana
My commission expires:  4-25-2009

Page 63

**A**

ability 63:17
able 13:12 23:23
  30:3 38:20
about 5:21 7:21
  9:23 11:21 14:15
  14:18 15:4 21:6
  23:4 24:5,15 25:1
  25:14,22 27:6
  30:8 31:7,9 35:13
  36:20 38:21 39:2
  41:2,9 42:2 43:6
  46:8 51:11 55:5
  56:19 58:22
accord 24:12,13
account 44:6,9,21
  45:4 47:5,16 48:8
  48:11,12,13
  49:14
accounts 30:17
  48:25
accurate 13:9
achieve 9:12
Act 10:22 17:16
  18:12 42:17,21
  45:8,13 46:4 49:3
  49:5,8 54:25
action 18:6,8 19:4
  20:21,22 24:14
  30:6 40:4 43:19
  45:9 47:4 53:21
  53:23 57:19
actions 3:12 38:13
  38:15,19,20 40:3
  59:23,24
active 19:13
actively 26:14
  40:10 42:4 43:7
activities 9:18
  38:23
activity 49:10
actual 52:14
actually 14:5,14
  46:22
add 49:20
address 4:21
admissible 41:5
admission 52:13,16
  52:18 53:15
  55:21
admissions 53:5,20
admit 52:10 53:2
admitted 22:16,20

adverse 13:14
advising 9:16
advisor 6:12
affirmative 18:8
  20:20,22 21:2
  40:20
affirmatively 18:4
affixed 63:19
afford 30:6
after 14:8,10 20:9
  26:15 28:1 42:18
  43:14 49:25
  55:17,18
afternoon 26:2
afterwards 20:9
again 42:7 43:19
  51:25 52:1 54:5
against 15:21 18:12
  20:22 33:15,16
  33:19 46:10,13
  55:9 56:21 58:17
age 19:17,18
agenda 6:14 7:21
  8:8 9:9,11
ago 11:1
agree 49:22
ahead 51:3
allegations 22:17
allowed 7:17
almost 44:4
already 31:3 32:5
  56:23 57:17,23
  57:24 59:5 60:19
although 8:2 18:23
  43:18
amended 34:4
America 57:6
annually 8:12
another 15:20
  17:24 18:7 22:25
  43:23 50:17
  59:12
answer 12:16 13:24
  15:3 21:1 28:8
  40:21,22 41:10
  52:11
answered 57:23,24
answering 22:12
answers 12:8 16:5
  52:7
anyone 38:3
anything 19:1
  48:22 50:2 61:5
appealed 53:22

appeals 6:7,10 7:15
appear 12:17,18,19
  12:23 14:8 20:15
  26:18
appearance 15:13
  15:15,17 26:3
  58:19
APPEARANCES
  2:1
appeared 13:25
  15:2,10 24:3
  25:25 26:20 27:8
  27:11 47:1
appearing 1:18 2:2
  2:10 26:21
appears 23:9 24:4
  55:17
appellate 5:20
application 47:10
  47:13,25 48:3
approve 6:7
area 8:7 22:14
  24:21
areas 8:5 30:20,22
  35:11
argue 27:11
around 48:24
article 3:9 16:7,10
  16:13 31:7,14
  35:4 36:8 59:9,13
  59:16,21
aside 9:15 15:6
  46:23
asked 21:8 22:8
  24:11 26:2,20
  37:1,3,4 38:8,14
  41:8 55:9 58:19
  61:3,4
asserting 52:17
asset 49:18
assets 47:22 50:21
  50:24 51:11
assist 29:17
assistance 29:18
assisting 20:13
associated 25:24
association 4:25 6:1
  10:3 26:7
assuming 41:4 45:5
attend 10:14
attended 30:25
attorney 2:2,10
  4:24 6:8 15:20,20
  25:5 49:6,7,11,24

50:2 57:22,22,23
attorneys 6:12 8:24
  8:25 9:3 18:15
  23:22 24:20
  33:18,20 48:16
  51:12 58:4
authority 45:2
automobile 35:12
available 47:15
  51:22
Avenue 2:6 4:22
aware 42:24 45:2
  45:15 46:9 48:15
  55:5,6,23,25 56:3
  56:8 57:11
awfully 50:1
a.m 1:21

**B**

B 3:1
back 11:10 29:8,9
  31:24 32:2 56:7
  59:1
Backing 24:7
bank 19:11,13,14
  19:20 44:6,9,19
  44:22 45:3 47:4
  48:7,11,12,12,25
  57:6
banks 19:16,16
  51:23
bar 5:6,12 11:4
  33:24
bar-sponsored 10:3
based 21:3
basically 26:20
  38:10
basis 22:8 38:12
  52:17
batch 55:14
Beardsley 9:1,5
  33:18
became 53:24
become 37:1,4,4
  42:4
becomes 40:9
before 1:22 13:4,5
  15:25 20:3,23,24
  24:15 36:21
  37:25 43:3 44:18
  48:17 49:12
  51:19 53:24
  55:25 56:4,20,24
  58:6 62:15 63:12

beforehand 41:4
beginning 1:21
Begins 23:8
behalf 2:2,10 11:25
  17:15 19:5 53:24
being 11:25 15:17
  24:15 26:14
  28:10 29:1 38:18
  38:20 40:10
  49:19 53:21
believe 11:1,4 12:5
  14:20 15:1,2
  17:19 18:7,14,21
  18:22,24 23:7
  26:17 27:19,25
  31:15 33:16
  35:14 37:5 38:2
  39:15 41:13
  42:15 43:17,20
  45:18 47:1 48:5
  49:4 52:4,21 53:8
  54:2,5,21,25
  57:14 58:18
  59:20 60:17,23
beneficial 51:8
benefits 7:25 43:21
  43:22 45:20
  46:16 48:10
Bensh 42:9
best 12:3 63:17
Bet 5:23
Between 12:5
beyond 6:8 8:5 19:8
  24:17 26:4 40:13
  41:14 56:22,23
big 29:5 30:16,18
  37:11
bill 53:3,4
Billings 1:3,20 2:9
  4:22 9:3,6 17:22
bit 22:13
blocks 30:16,18
board 33:22
Bohyer 2:13
book 16:4 32:6,8
  35:16,18
books 30:21 35:14
Bosse 9:2
bosses 34:2
both 10:6 25:8
bounce 44:24
bounced 45:1
Box 2:8,16
Bozeman 63:24

breaching 41:6
break 31:18,19
  32:3 58:21,24
brief 19:16 31:18
  34:10
briefly 4:18 16:1
briefs 6:10
bring 32:3 61:5
bringing 20:22
  24:14
broader 22:14
brought 28:16 35:5
Bruce 23:25 33:12
bundled 30:16,18
  31:4
burden 38:17,18
  49:5,20
business 4:21 17:22
Butte 50:18
buyer 30:11,12
  57:8
buying 31:1
B-e-n-n 42:10
B-e-n-s-h 42:11

_____ C _____

C 2:4 63:1,1
called 4:10
came 25:15
capacity 39:1,8
car 20:23,25
card 47:10,12,16,25
  48:2
cards 30:17
care 36:17
carrying 8:2
case 8:3,21 13:11
  13:19 14:9,12
  19:2,19,25 20:21
  21:9 22:2,17,25
  23:25 26:15,19
  27:8,17,23 28:21
  28:22 29:21 36:9
  37:10,13,18,19
  39:17 40:10
  41:12,14,18 42:6
  42:18,24 43:17
  44:4,11,12 46:6
  46:20 47:19 48:6
  49:24 52:22,25
  53:7,9,19 55:7,11
  55:20 57:12 59:6
  60:16
cases 7:8 14:22,23

15:19 24:6 28:25
  35:2 38:24,25
  39:5,10,11 40:12
  40:15 41:9,10,18
  41:19 42:3,6 43:6
  43:7,11,13 46:5
  46:17 50:14
  52:23
Cass 41:22
catch-all 54:19
catch-alls 54:16
cause 1:8 44:23
  63:11
causes 29:24 44:19
Center 3:13 30:21
  30:24 35:10
  59:25
cents 31:10,11,11
certain 39:18
CERTIFICATE
  62:1
certify 62:4 63:7
CF 62:25
Challenges 16:18
change 56:14 57:2
changed 19:24
changes 62:6
changing 24:25
charge 6:22
charging 60:10,12
Charles 18:21 33:9
check 11:5 60:15
checks 44:21,23,23
  44:24
Cheyenne 7:17
  10:10 29:7
Chuck 9:1
chuckling 28:17,18
Circuit 7:14 16:9
  32:9
circumstances
  40:16
cite 46:6 56:5
Civil 1:22 53:13
claim 18:11,12
  44:13 55:8 56:22
  57:15
claims 55:14
clarify 52:13
class 15:7
CLE 11:2,3,7 30:24
clear 44:22 59:3
CLEs 10:4 31:13
  33:21

client 12:10 14:3,4
  17:15 20:7,7,9,10
  20:11,14 26:15
  40:23 41:6 50:17
  56:9,10 57:1
clients 7:10 8:7
  9:15,16 11:25
  12:8 20:17 40:24
  49:15 51:10 54:7
  54:11,24 58:16
client's 21:6 34:14
close 15:11
clothes 24:25
collect 57:15
Collecting 16:18
collection 3:12
  10:22 11:17,22
  17:16,21 18:12
  19:4 23:22 24:5
  24:20 29:1 30:23
  32:8 35:8,11,12
  35:20 38:13,16
  42:17,21 45:7,13
  46:3 49:3,5,8,10
  49:23 50:2 51:11
  52:15 54:17
  57:22 58:4 59:23
  59:24
collections 25:6
collector 45:8 49:7
collectors 49:6
college 7:20 10:7
combined 34:11,13
  34:16,18,20,23
come 8:14 11:21
  52:6 55:12 57:6
commission 62:22
  63:25
communications
  49:23
community 10:6,12
Company 17:21
complaint 16:6
  19:7 20:24 34:4
complete 61:7
computer 11:10
  19:18
computerized
  23:14
computers 11:8
concern 27:9
concerns 27:5
concluded 61:15
conclusion 40:17

conduct 43:10,12
  52:2 54:23
confidentiality
  40:24 41:7
confirm 32:17
confirmation 56:9
confirmed 23:20
  31:12
confirms 23:19
  31:3
confused 28:4
  46:18 50:17
confusing 12:13
  43:19 46:15
congress 12:21
consider 37:18
consistent 24:4
conspiracy 32:24
constitute 22:1 36:6
  36:8 42:16
constitutes 43:11
  43:12 45:4 52:4
  54:25 60:5
consumer 3:13 7:25
  8:17,19,24 9:8,17
  9:18,23 10:4 21:3
  30:21,24 35:9
  59:25
consumers 9:10,13
  28:25
contacted 26:1
contain 51:24 63:15
contained 34:25
  35:5
contains 20:10 21:1
continues 30:7
continuously 5:8,18
conversation 25:16
  25:22 26:5 37:7
conversations
  24:24
convince 12:21
copies 21:12
copy 16:22 21:13
  21:14 31:6 35:16
  35:18,19,23 38:5
  38:7 46:12 60:15
copying 32:16
correct 49:1 53:15
  61:8 62:8
correction 62:7
corresponded
  17:13 40:22
Correspondence

60:8
corresponding
  30:10
Council 10:11
counsel 13:13,19
  15:6,10 20:15
  30:4 41:23
count 28:8
counter 18:10
counterclaim 18:6
  18:10
County 24:18 28:23
  29:2,5,6 42:13
  63:4,6
couple 33:22 59:2
court 1:1,19,23 6:9
  7:14,15 10:2
  14:13 22:22
  23:14 24:18 28:5
  28:9,9,20,21,22
  29:1,11 30:21
  42:14,14,15
  53:21,22,23 63:5
  63:22
courts 7:12,15,16
  29:7
covering 22:13
credit 30:17 47:10
  47:12,16,25 48:2
  51:14,16,19,24
  60:16
creditor 19:5
creditors 25:9
creditor's 58:13,14
Crow 7:16 29:6
current 6:2
currently 18:1,7
  58:16
cursory 23:8,11,20
cut 19:19
CV-07-166-BLG-...
  1:8

_____ D _____

D 1:23 63:5,22
date 56:10
dated 21:22
day 26:22 44:21
  62:16 63:19
days 53:15
dealer 20:23
debt 3:10 10:22
  11:21 16:18
  17:16 18:11 24:5

30:11,12,22 31:1
32:7 35:7,11,11
35:20 38:16
40:10 42:17,20
45:7,12 46:3 49:3
49:4,6,7,8 52:15
54:17 57:8,22
58:4 59:14
**debtor** 43:15 44:6
44:17,20,20
49:22
**debtors** 25:9 29:23
40:15
**debtor's** 44:10,12
**debts** 30:15
**decision** 14:13 16:8
32:8 35:6
**decisions** 28:5
**Deer** 10:9
**default** 23:10 29:24
30:5 46:10,21,23
**defaulted** 30:16,17
**defaults** 23:23
25:13
**defend** 38:12,20
**defendant** 1:11,18
2:10 4:20 12:17
34:19,21
**defendants** 15:8
**defended** 38:24
40:11,15 42:23
43:8 58:10
**defending** 15:21
29:23 35:7,11,20
38:19 39:6 42:4
46:16 58:16
**defense** 20:20 21:2
40:20 52:10,10
**delete** 11:12
**delivering** 38:7
**demand** 20:23
**Dendy** 18:21 19:1
33:9
**denied** 28:2
**denies** 28:9
**Dennis** 1:14,17 4:9
4:17 62:3,13
**depend** 57:4
**depends** 20:5,21
22:7
**deponent** 62:3
**DEPONENT'S**
62:1
**deposition** 1:13,16

4:5 15:25 16:20
17:1,5,6 31:21
33:2,6,8,9,12
36:2 56:6 59:17
61:14 62:4,9 63:8
63:11,13
**depositions** 16:5
23:24 33:10
55:13
**deputy** 6:22 48:24
**describe** 39:4
**described** 59:20
**desk** 11:9
**detailed** 22:10
**details** 43:16
**determine** 51:19
55:7 56:21
**determined** 19:8
54:22
**develop** 6:14 8:10
8:12
**developing** 7:22 8:4
**Development** 10:11
**different** 7:23
35:14 37:3 54:6
54:10
**difficult** 49:16 50:1
50:4
**difficulty** 49:21
**direct** 6:9 7:8
**direction** 63:15
**directions** 54:13
**directly** 15:5 26:23
**director** 6:2,18,22
7:7
**disclose** 40:25
47:11
**disclosed** 22:24
**discloses** 47:13
**disclosures** 33:5
**discounted** 35:15
**discovery** 16:5
19:12 34:11,13
34:16,18,21,23,25
39:13,18 42:5,19
43:8 52:5
**discreet** 9:16
**discuss** 8:13 25:18
**discussed** 16:8
30:23 31:1 36:23
37:7 60:2,21
**discussion** 10:25
24:15 31:3
**discussions** 18:25

36:22
**dismiss** 39:14 40:2
42:18 58:20
**dismissal** 14:7,11
43:9
**dismissed** 15:16
28:1,11,13 39:20
42:5
**dispute** 51:1
**disputed** 53:3,3
**district** 1:1,2 28:20
28:22 42:14,15
53:22
**districts** 29:4
**DIVISION** 1:3
**document** 59:12
**documents** 20:25
21:5 39:16,19
40:4,6,7
**doing** 7:5 54:15
**dollar** 31:5,10,11
31:11
**domestic** 7:24
**done** 50:15 58:22
63:16
**double** 60:15
**down** 29:9 30:8
**draft** 12:8,16 20:2,8
20:24 38:1,3
**drafted** 13:24
**drafting** 21:1
**drafts** 37:24
**dues** 7:19
**Dull** 10:6
**duly** 4:10 63:9

_____
**E**
_____

**E** 3:1 63:1,1
**each** 19:21,25
**Eakin** 1:14,17 3:4
4:9,17 62:3,13
**earlier** 28:7 44:21
46:14 59:20
60:25
**easier** 19:18
**Edition** 3:12 59:25
**education** 10:12,12
**efforts** 25:19 55:7
**eight** 7:1
**either** 17:11 18:25
22:21 25:20
39:22,24 40:5
**elements** 29:13,15
**eligible** 38:18

**elsewhere** 33:20
**employed** 4:24 5:13
5:18
**encourage** 49:18
**end** 14:6 30:4,11
**ended** 53:21
**ends** 28:10
**engage** 49:9
**enough** 19:22,23
35:23 58:12
**entered** 12:12 47:4
50:1
**entire** 6:4 44:6
**entirety** 34:24
**Erickson** 25:4,5,8
25:12,20,21
28:14
**Erin** 18:21
**Esq** 2:4,12
**established** 59:5
**estimate** 12:4
**estimated** 15:19
**ethical** 26:10,23
**even** 9:9 39:17
55:18
**event** 29:24
**ever** 15:17 17:8,15
18:9,11,15 19:4,7
22:16,20,24 27:5
**every** 12:9 29:20
30:24 44:4
**everything** 35:3
**exact** 13:11 25:3
39:10
**exactly** 15:10 31:9
**examination** 1:13
1:17 4:13
**examined** 4:11
**exceedingly** 44:7
**Except** 60:7
**excerpt** 32:7
**exchange** 37:9,12
**Exclusively** 5:15
**execute** 43:14 44:5
44:5,5 45:10,10
48:7,11 51:23
**executed** 43:20
45:16 47:5 48:17
**executing** 45:3,11
46:2 48:16
**execution** 45:6
46:16 49:12 50:3
**exempt** 43:15,22
44:8,25 45:11,12

45:16 46:2 47:8
48:9,10,10,14
50:21 51:4
**exemption** 44:13
**exhibit** 3:3,7,9,12
4:6 16:23 17:2
21:12 23:3 31:22
36:3,8 37:25 59:5
59:8,12,19 60:3
**exhibits** 3:2 33:7,8
33:9 35:2 36:7
41:17
**expense** 40:6
**experience** 5:23
6:13 29:23 43:10
**expert** 21:9 22:17
22:21,24 24:16
33:4,4
**expires** 62:22 63:25
**explain** 38:14
**explanation** 52:8
**express** 27:5,9
54:15
**expressed** 22:6 23:4
**extent** 45:10
**e-mail** 37:11,17
**e-mails** 37:9,12,22

_____
**F**
_____

**F** 63:1
**fact** 40:25 52:17
53:3 56:8,22
**facts** 20:7,11 21:7
42:1 52:14
**fair** 10:22 11:21
17:16 18:11
19:22,23 20:19
35:11,23 38:16
42:17,20 45:7,12
46:3 49:3,4,8
58:2,7,12
**fairly** 36:23
**fall** 54:18
**far** 61:6
**favor** 14:2 43:2
**favorable** 14:3,4
**FDCPA** 18:3 22:18
34:9 38:22 43:12
45:4 49:12 52:4
54:12
**feasible** 40:9
**federal** 1:22 7:15
22:22
**feel** 43:11

fees 44:19
few 14:14
field 58:9,10,13
fifth 34:16
fight 30:6
figure 12:25
file 7:8 13:6 15:14
    19:19 20:23 36:9
    37:19 40:21,22
    42:21 44:13
    47:21,24 51:7
    55:9,17 58:5
    59:13 60:5
filed 14:10 15:3,15
    15:21 17:15 18:4
    18:7 19:4,7 23:10
    35:2 36:21 40:13
    40:19 41:14,18
    42:12 46:20 55:8
    56:22 57:15
    58:17,19
files 23:13,14
filing 39:24 40:3
    51:19,20 55:25
    56:4,20,24 57:19
    58:6,20
final 38:1
finalized 38:4
finally 34:21 59:19
financial 10:12
financially 40:9
find 11:10 57:7
finish 5:2
firm 2:5 8:4 20:14
first 3:12 4:10 34:4
    34:17,18,23
    36:19,23 41:5
    59:8,24 63:9
Fisher 1:19
five 13:3 14:15,16
    31:10
five-year 57:2
Flathead 5:20
flip 32:17
folks 8:1 38:12
following 4:1
follows 4:11
force 8:6
foreclosure 35:12
foregoing 62:4,5
    63:8,11,15
form 19:11,13,14
    19:16,20 56:16
    57:21 58:20

formal 20:14
founded 27:13,15
four 8:25 11:1
fourth 34:12,15
frames 54:11
fraud 35:12
Fred 2:12 4:19
free 40:20
frequently 36:23
from 3:4 9:15 10:18
    15:6 20:25 23:8
    25:11 27:16
    28:15 32:7 35:7
    35:16 38:13
    49:23 55:12 56:9
    57:1,5,7,8 58:13
    58:14 59:13,21
    60:8
front 2:14 16:4
    33:3
full 4:15 52:8 62:8
functions 33:22
funding 12:22,23
funds 44:8,25 45:11
    45:12,16 46:2
    47:7 48:9,12
    49:14 51:4
further 30:7 61:10

_____ G _____

gained 30:13,19
GALLATIN 63:4
general 8:2 22:14
    29:19,22 31:2
    49:9
generally 8:2 20:6
    36:15
generate 19:12
gets 44:14
getting 29:8 50:8
give 12:6 14:2 21:5
    28:7 35:14 39:4
    39:11 40:14
    41:10 46:6 48:23
    54:6,10
given 10:17,20
    20:11 32:14
    53:17 62:9
giving 49:17
go 19:20 20:8 23:2
    28:6 30:3 48:24
    58:22 59:1
goal 9:12
going 6:11 14:22

20:14 27:24,25
    41:2,4,8 42:22
    55:8,9 57:20
gotten 11:9 50:12
governed 49:11
governs 48:16
Grace 33:6
great 16:17
grocery 44:23
group 11:21
groups 9:22 10:6
guess 32:2,23 39:3

_____ H _____

H 3:1
halfway 30:8
hand 63:18
handing 21:11
    32:11
handle 7:10 28:25
    39:9
handling 43:11
happens 53:14
hard 3:10 12:6
    59:14
harder 28:19
having 4:10 11:9
    30:4 48:17
head 16:14 17:25
health 30:1
heard 31:12
hearing 25:25,25
Heenan 2:4,5 3:4
    16:8,11,25 21:13
    21:17,20 24:12
    31:5,16 32:14,23
    36:17,19 37:9,12
    38:7,8 51:5 56:16
    57:20 59:10 60:8
    60:10,12 61:13
held 6:17
Helena 11:2,7
    33:17,20
help 6:9,14 20:2
    52:7
her 46:10,13,15
    47:4,7 48:2
hereinbefore 62:9
hereunto 63:18
hesitant 14:21
high 44:8 45:24
    46:1 47:7 48:13
higher 49:5
him 17:10,13 25:3

26:5,18,21 33:15
    33:17,19,21
hit 48:9,24
hold 46:5
holds 30:24
Horn 29:5
Hornbooks 35:10
hours 5:21
housekeeping 59:2
housing 7:24
Human 10:11
humor 28:16
hypotheticals 50:8
    50:10

_____ I _____

iceberg 29:20
idea 51:6
identification 4:7
    17:3 31:23 36:4
identified 41:19
    55:24 60:14
identify 21:16
    40:16 41:6,12
    42:2,6
identifying 41:22
ignorance 51:7
illegal 49:2
imagine 22:9
implied 26:10
impose 49:20
imposes 38:16
impossible 50:5
improper 15:16
inactive 19:14
include 15:18 30:22
    39:8 48:14
included 15:22
    34:10
income 8:7 38:18
    47:12,14 51:15
increase 12:22,22
    30:10
increased 7:19
incurred 5:21
Indian 6:23 7:25
    8:17
indicate 39:21
    51:15 55:19
indicated 23:22
    24:1 26:1,7 27:3
indicating 15:14
individual 12:10
individualized

19:23
industry 30:11,13
    31:1
informal 37:6
information 20:18
    30:19 47:6,14,21
    48:1 51:2,4,11,24
    55:19 58:5
informed 25:12
initially 53:20
initiated 53:23
ink 62:7
inquiry 49:13
instance 1:18
instances 52:19
instructions 53:17
    54:7,10
intend 22:5 60:22
intending 42:22
intends 57:16
interest 8:4
interesting 5:23
interpose 57:20
interview 20:6
investigation 23:8
    23:12,20 24:2
    29:10,14
invitations 11:20
involve 6:6
involved 5:21 7:22
    11:24 15:6 25:5
    42:4 52:23 53:24
involving 10:21
    22:17
in-house 38:4,5,6
issue 29:9 56:4
issued 48:23
issues 8:13,20 9:18
    9:19,23 10:4 30:1
    52:13
items 60:3
it'd 13:9 18:10
    52:15
Ivy 50:21

_____ J _____

Jacobs 24:22 25:8
    25:12,20
James 2:18
JD 5:4
Jennifer 1:23 9:1
    63:5,22
job 30:1
John 2:4 32:2

**Johnson** 1:9 2:11
    4:20 12:1,25
    13:15 18:12,16
    24:3 25:18 26:8
    26:16,24 27:6,15
    32:13 34:4,19
    38:13,15,21
    39:16 40:13,23
    41:13,21,22 46:9
    47:21 51:17 52:3
    56:20 62:25
**John's** 32:21
**JP** 23:14 29:11
    42:14 53:21,23
**JRL** 15:21 23:10
    28:15 42:5 43:9
    43:10 45:15
    46:20 47:6 51:2
    54:23 56:3 58:17
**JRL's** 14:3 34:10
    34:12,14,17,22,24
    55:7
**judge** 5:20 27:14
    28:17,18 43:2
    44:14,16 50:22
**Judges** 10:2
**judgment** 13:22
    14:1,6 27:12 28:2
    28:6,9,10,12 30:5
    34:9 43:14 44:6
    45:5 46:10,12,22
    46:25
**judgments** 14:14,15
    14:16 23:10
    48:16
**judgment's** 50:1
**June** 1:5 2:3 43:18
    45:18
**jurisdiction** 15:16
**just** 4:18 6:19 11:9
    24:7 29:18 32:17
    35:20 38:23
    41:16 48:23
    58:22 59:2 60:15
    60:18
**justice** 24:18 28:20
**justify** 57:18

———— **K** ————
**Karla** 9:2
**keep** 13:13 51:6
**kept** 38:4
**kids** 7:20
**Kill** 3:10 59:14

**kind** 54:13
**knew** 34:1 47:6
    48:6
**Knife** 10:6
**know** 5:21 6:10 8:1
    8:5,10,11,13,13
    9:11,11,20 10:1,5
    11:12,13,19 13:9
    13:23,24 14:20
    14:21,23 15:11
    16:7,11 18:9,10
    19:24 20:6,8,9
    21:12 22:10,11
    23:13,21 25:1,15
    25:21 26:13,21
    28:6 29:19,22
    30:5,20 31:9 32:6
    32:6 33:13,14,17
    33:18,20,20 35:3
    35:22 36:22,22
    36:24 37:2 38:10
    39:10 40:7,7,8,19
    40:19 41:3,8,17
    41:17,24 42:7
    44:2,7 45:17,18
    45:21,22 46:16
    47:9,20,23,25
    49:19 50:6,6,6
    51:7,17,23 53:2
    53:13 54:8,20,21
    55:11,16,16 56:5
    56:12 60:25 61:6
**knowing** 29:16 30:2
    47:7
**knowingly** 45:11,15
**knowledge** 17:12
    17:14 29:19
    30:12,14 39:22
    39:24,25,25
    45:19,22,25 48:6
    51:13 55:12 58:3

———— **L** ————
**labeled** 32:12 37:25
    60:19
**lack** 29:25 40:5
**Lame** 10:9
**landlord** 44:24
**Landlords** 17:21
**language** 45:8
**lapse** 7:18,20
**large** 14:7
**last** 11:14 13:3,17
    23:19 24:8 56:10

    57:1
**later** 19:8 26:6
    63:14
**Lauinger** 1:10 2:11
    4:20 12:1 13:1
    18:13,16 26:25
    27:7 32:13 33:6,8
    34:5,20 41:14
    52:3 62:25
**Lauinger's** 25:19
**laundry** 54:20
**law** 2:5 3:13 5:2,9
    6:23 7:25 8:17,17
    8:19,24 9:23
    30:21,24 35:9,10
    42:24 45:9 49:20
    59:25
**laws** 21:3
**lawsuit** 17:16 36:20
    42:21
**lawsuits** 12:25 23:9
**leads** 9:14
**learned** 31:4
**least** 43:21
**leave** 47:17
**leaving** 10:15
**led** 29:8,13 40:16
    48:5
**left** 44:25
**legal** 4:25 5:14,15
    5:19,25 8:3 33:22
    33:25 35:15,18
    35:19 38:17 39:1
    39:8
**lending** 21:4
**less** 6:13
**let** 7:20
**letter** 15:14 21:19
    21:22 23:5
**let's** 31:18 33:2
    39:2 40:12 46:8
    58:21 59:1
**level** 6:9
**levy** 50:3
**levying** 49:12 51:4
**Lewis** 1:23 63:5,22
**liability** 33:4 34:9
**liaison** 33:24
**licensed** 5:8 7:12,16
    7:17
**like** 7:2 13:14 34:10
    43:3 50:9 52:9,10
    54:10
**likelihood** 44:8

**likely** 43:15 48:9
**limitation** 43:7
**limitations** 19:9
    39:12,23 40:14
    41:15 55:10,25
    56:23 57:10
**lined** 57:17
**Lisa** 33:8
**list** 13:6 35:2 43:5
    54:20
**listed** 36:7
**literature** 24:5
**litigants** 52:6 54:14
**litigated** 43:23
**litigating** 6:13,16
**litigation** 6:3,11,14
    6:18 7:7,21 11:25
    25:19 57:23
**little** 30:7 48:19
**load** 8:3
**lobby** 9:19,21
**lobbying** 9:17
**locally** 26:18
**located** 9:5
**long** 6:17,24
**longer** 26:7,16
**look** 6:15 11:8
    14:24 15:9 19:18
    23:16 37:15,16
    37:21 60:13
**looking** 23:13
**Looks** 34:10
**loss** 29:25
**lost** 35:25
**low** 8:7 38:18

———— **M** ————
**mad** 28:19
**made** 15:17 16:22
    18:11 43:24 62:6
**make** 11:16 20:10
    26:2 35:23 49:13
    49:18 50:19 59:3
**managed** 11:11
**many** 8:23,24 12:3
    13:7,21 14:22
    15:10 17:18
    30:15 39:2
**marked** 4:6 17:2
    21:11 31:22 36:3
    60:3
**material** 59:12 62:5
**materials** 10:16
    11:6,12 15:24

    16:3 32:3 36;14
    60:13,19
**math** 7:5
**Matt** 25:4
**matter** 22:21 38:9
    38:24 60:11
**matters** 6:13 9:16
    9:17 10:21 11:17
    11:22 22:4 29:1
**may** 6:13 12:13
    13:11 17:23 18:5
    18:5 27:15 28:4
    28:15 31:8 38:5
    38:16 39:23
    41:18 43:19
    46:14,17 49:17
    49:20 50:7 51:13
    51:15,18,18,22,24
    53:1,4 54:8 58:11
    58:18
**maybe** 15:12 32:21
    35:22
**McCOLLOUGH**
    1:6 2:3 17:6,8,9
    32:13 38:23
    52:22 55:9 56:11
    56:21
**mean** 6:12 9:10
    19:15 24:8 35:1
    38:22 47:2 50:7
    53:13
**means** 48:8
**meant** 52:23
**media** 31:2
**meet** 8:11,12 49:7
    49:10
**meeting** 61:11
**member** 8:15
**Memorial** 10:6
**mentioned** 46:20
    50:13 53:1 55:1
    62:10
**met** 4:18 17:8,9
    18:15
**methods** 54:21
**Michael** 1:14,17
    4:9,17 62:3,13
**might** 6:8,16 8:7
    28:8 57:6 60:7
**Mike** 4:18 11:21
**mind** 16:22 42:16
    56:7
**Missoula** 2:17
**misspoke** 14:5

mistaken 18:23
Mister 54:2
MLSA 6:21 8:16
  9:17 19:11
MLSA's 7:21
moderate 48:8
Money 3:9 59:13
Montana 1:2,20 2:9
  2:17 4:23,24 5:6
  5:9,12,14,15,19
  5:25 7:15 22:21
  62:20 63:2,24
monthly 57:5
months 11:18
more 7:2 22:10,11
  50:7 57:7
most 10:2,24 13:25
  14:5 16:3 42:9
mostly 33:19
motion 27:11,12
  28:2,9 34:8 43:24
  50:20,21
motions 19:12
moving 40:2
MSN 3:9 31:6,14
  59:13
much 10:19,20
  19:17 20:16
  29:17 32:24
Munson 9:1
must 49:7
myself 12:5 39:9
  61:5

— N —
name 4:15 27:17
  34:15 41:13,16
  43:16 44:2 50:18
  59:22 62:19
named 63:12
names 40:14 41:25
  42:8 43:16,20
  46:18
NARCA 3:7 16:7
  16:10 59:8
National 3:13 35:9
  59:25 60:16
nature 57:4
NCLC 32:7 35:7,9
  35:25
near 50:5
necessary 26:18
need 20:18 21:17
  21:18 40:24 41:3

53:17
needs 57:18
negotiated 14:11
Neither 16:25
never 17:9,10,13
  28:11 32:20
  42:21 46:9 53:2,2
  58:8,12,14
new 61:1
newsletter 3:7 59:8
next 11:17 43:5
Ninth 7:14 16:9
  32:9
None 48:21
nonresponsive
  49:23
non-exempt 50:25
North 1:20 2:6 4:22
Northern 7:16 10:9
  29:6
notarial 63:19
Notary 1:23 62:20
  63:5,23
notebook 32:10,11
  32:12 34:25 35:5
  36:7 60:3
notes 36:11,13,15
  36:25 37:5 58:23
nothing 61:10
  63:10
notice 6:15 8:6
  10:19 33:2 49:17
nowhere 30:2
number 4:6 10:1
  12:7,7 13:8,10,11
  15:12,18,23 17:2
  23:9,15 29:15
  30:22 31:22 36:3
  39:10,11 46:17
numerous 24:24
  41:24

— O —
Object 56:16
objection 16:24
  51:5 57:21
obtain 39:25 51:14
  51:18 52:13
obtained 46:10,13
  46:21,25 47:24
  51:16,22 56:9,25
obtaining 25:13
  40:6 43:14
obviously 50:16

occasion 30:25
Occasionally 29:5
occurred 52:20,21
October 1:21 5:7
  5:12
off 16:14 17:24
  18:6 56:5
offer 60:22
office 15:21 23:16
  32:21 33:18
offices 1:19 6:23
often 21:1 41:20
  44:20,20 47:10
  47:11 51:14,16
  51:18,21,22
  52:12 61:1
oh 7:3,14 28:11
  31:17 47:23
okay 5:17 7:6 8:23
  9:22 11:24 12:20
  13:4 15:9,24
  21:14 27:2 28:3
  29:13 32:21
  36:16 37:21 39:2
  43:16 45:14
  52:25 54:4 60:24
  61:10
old 40:10
once 11:10 42:7
  43:19 54:5
one 5:19 7:20 8:4
  11:4 13:12 15:13
  17:19 18:7 21:18
  26:19,22 27:8,14
  28:8 34:1 35:20
  36:24 39:21,21
  41:17,20 42:7,15
  43:17,23 44:18
  45:18 46:15,19
  50:18 54:18
  58:18
ones 10:1,15 15:7
  18:20 28:5,5 39:7
  39:22 40:18 41:3
  41:5,24 45:17
only 13:14,17 17:19
  26:21 29:19
  31:12 40:22
  58:10
operating 50:9
opinion 30:7,9
  42:25 56:14,16
  57:3
opinions 22:2,4

23:2,4 29:14
  60:21 61:7
opposed 25:9
opposing 13:13,18
  41:23
oral 1:13,17 62:8
order 50:22
originating 20:25
other 9:12 12:22
  18:6 22:4 23:21
  24:20 25:2 26:19
  27:21 29:13,15
  29:18 33:17
  42:18 43:9 44:24
  46:15,19 50:2,14
  51:14 52:2 53:4
  54:17,21,23 55:1
  60:7,13,18
others 18:23 21:4
out 10:15 11:10
  16:9 29:18 32:8
  32:21 44:14,16
  49:25 52:5,9,11
  52:12 53:20
  54:10,10 55:2,20
  55:21
outline 22:14
outset 55:23
outside 29:1 55:10
outstanding 11:20
over 6:19 12:24
  20:8 23:16,23
  24:1 32:11 41:19
  51:1 58:22
overwhelming 23:9
own 7:10 24:12,13
  35:16,18

— P —
page 3:2 21:24 30:9
pages 3:5,8,11,14
  35:17,25 62:5
  63:15
paragraph 23:5
  30:9
Pardon 43:25
part 37:18 51:25
partial 34:9
participants 10:13
particular 6:15 8:6
  16:20 19:19,24
  41:25 42:1 43:18
  52:22 55:11,20
particularly 9:14

30:17
party 13:14 20:2,13
past 39:23
paste 19:19
Patten 2:18 12:11
  33:24
pay 29:25
payment 56:10 57:1
  57:7
pending 18:2
pennies 31:4
people 8:23 12:22
  50:7
percent 23:24 24:1
  25:14
percentage 14:3,4,8
  31:9
permission 40:24
permitted 45:9
person 11:11 15:3
  18:17
personal 58:3
phone 17:11 18:18
  18:22
photocopies 60:18
piece 23:3,3
Pierce 63:6
place 41:5 62:9
  63:12
places 49:5
plaintiff 23:15
  27:20 28:1 41:20
  57:15
Plaintiffs 1:7 2:2
plaintiff's 33:3 34:6
  34:8,11,12,16,18
  34:20,23
planned 51:7
plans 11:16
pleading 20:3,4,5
pleadings 19:12
  20:19
please 4:15 53:2
Pleasure 61:11
point 32:2,19 36:25
  37:2,3,6 41:25
  44:15,17 47:3
  53:18 61:3
Portfolio 13:14
  27:19 41:21
portion 50:23,24
position 6:17,24
  44:18 49:17
possession 40:5

51:3
potential 55:24
practice 5:9 7:12
  20:12 42:21
  52:15 58:3
practiced 58:8,13
  58:14
practices 10:22
  11:22 17:16
  18:12 35:13
  42:17 45:7,13
  46:4 49:3,5,8
  54:17
practitioner 49:9
precise 13:8,10,10
  28:8
predicaments 38:14
prejudice 39:15,20
  42:18
preliminary 34:5,6
prepare 10:16
PRESENT 2:18
presentation 10:19
  10:19,25
presentations 10:17
  11:17
presented 11:7
pretrial 34:5,6
Pretty 20:16
previous 26:2
previously 23:21
PRINT 62:19
printed 38:1
prior 6:20 38:7
  49:17 59:17
pro 12:8,17,19
  13:23 15:3,8 20:2
  20:13 46:24 52:6
  54:7,11
probability 45:24
  46:1 47:7 48:13
probably 13:2,25
  14:15 16:3,15
  19:17 22:7,13
  23:19 27:3 29:19
  36:21,22 37:6
  44:7 47:14 49:13
  51:16
problem 26:11
  39:12 41:1 55:24
problems 6:15 8:6
  43:7 55:14
Procedure 1:22
  53:14

proceed 14:6
proceeded 13:21
  14:1
proceedings 4:1
process 40:8
produce 13:12
  37:22,24
programs 10:14
prohibition 54:15
promise 11:13
proof 57:16
proofread 20:8
propound 39:13,18
propounded 42:5
prosecute 40:9
  42:22
prosecuted 53:24
protect 9:10
protecting 9:13
protection 21:3
protocols 51:17
provide 20:18 38:6
  43:16 53:14
  54:13 60:9
provided 16:7,11
  31:6 38:3,5 59:9
  61:6
providing 40:1
public 1:24 7:25
  26:16 40:19
  48:10 50:20
  62:20 63:6,23
publication 59:22
publicly 26:14
publish 30:21 35:10
published 35:21
pulling 14:23
Purchased 16:18
pure 47:19
pursuant 1:21
pursuing 26:15
put 20:3,18 49:16
puts 38:19
P.C 2:13
P.O 2:8,16

—————— Q ——————
quarter 59:9
question 25:16 29:8
  42:3
questions 22:7,12
  22:13 23:4
quick 58:21
quickly 40:8

quotes 30:11,11

—————— R ——————
R 63:1
raised 18:5,9 32:3
ran 29:10 32:21
Randy 24:22,23
rate 35:15
rather 14:11 19:19
  21:5 32:16 52:14
reach 28:5
reached 28:12
read 31:13 32:24
  33:10 34:24 35:3
  56:6 62:5
reading 22:11
  55:12
reason 33:23 43:21
recall 24:23 56:12
received 55:15,18
receiving 27:16
  45:19 47:11
recent 10:24 16:6
  42:9
record 4:16,19
  13:14 15:6,11
  20:15 31:24 42:8
  43:24 50:20
  51:15 59:1 63:16
recording 13:18
records 23:17
  24:18 47:10
record's 59:3
Recovery 13:15
recreating 19:21
refer 13:7 16:16
referred 11:14 15:7
reflect 13:15
refresh 31:5
regard 52:14
regarding 47:22
  56:17
regardless 20:12
regular 38:12
regularly 49:9
Reichert 16:8 32:8
  35:6 60:16
reinvent 19:25 54:6
related 8:20 26:24
  30:10 37:13,18
relationship 27:4
reliable 57:8
rely 21:6
relying 20:17

remedy 44:10,12
remember 10:2
  11:3 13:5 16:12
  17:24 25:3 27:18
  40:18 41:25
  50:18,19
REMEMBERED
  1:16
report 3:3 8:14
  22:2,6 37:25
  51:16,19 55:3,4
  59:6 61:7
reported 63:13
Reporter 1:23 63:5
  63:22
Reporting 1:19
reports 24:5 51:24
represent 4:19 12:9
  25:9 29:17
representation
  54:24
represented 41:21
  47:2 53:8 54:2,8
representing 9:15
  53:6
reprimand 26:16
reprimanded 26:14
request 28:1 39:14
  39:19 52:16,17
  53:1,15,20 55:21
requested 40:1
requesting 39:18
requests 29:16
  34:13,16,18,21,23
  52:6,9 53:4,11
require 10:13
required 45:23
Reservation 5:20
  10:10
reserve 61:13
Residing 62:21
  63:24
resolve 56:4
resolved 27:23
Resource 10:11
resources 43:15
respect 9:16,18
  38:22,24,25 42:3
  47:20 49:24 55:6
  57:21,22
respond 52:8 53:14
  54:9 61:4
responding 22:12
response 32:4

34:11,12,17 50:7
responses 34:15,20
  34:22,25 53:10
responsibility 7:8
responsible 15:20
restore 44:17
result 23:10
resulted 43:8
retain 30:4
return 50:20,21
returned 50:22,23
reuse 32:22
review 6:10 15:24
  16:2 17:5 20:7
  41:9
reviewed 10:4 16:6
  16:9,19 59:16
reviewing 14:21,22
  23:24 36:14
Reynolds 27:20
  52:25 53:6,8,19
  53:25,25 54:3,9
right 14:19 26:25
  31:16 35:22
  44:15 46:6 47:3
  48:25 50:3 52:2
rise 21:5 30:10
road 29:9
Rodenburg 1:9
  2:11 4:20 12:1,25
  13:16 18:13,16
  24:4 25:18 26:8
  26:16,24 27:7,16
  32:13 34:5,19
  38:13,15 39:16
  40:13,23 41:13
  41:21,22 46:9
  47:21 51:17 52:3
  56:20 62:25
Rodenburg's 38:21
role 6:20
room 12:12
Rosebud 29:6
routinely 58:5
rule 1:22 33:4 43:2
  54:12
rules 53:13 54:8
run 29:11 55:18,19
  55:22

—————— S ——————
S 3:1
sale 20:25
same 20:12 24:3

42:3 62:6
sanction 28:15
sanctions 27:16
saved 27:15 28:15
saying 45:21 47:24
    49:2
says 30:8 45:8
    54:13 57:9 59:14
school 5:2
scope 23:11
se 12:8,17,19 13:23
    15:3,8 20:2,13
    46:24 52:6 54:7
    54:11
seal 63:19
search 24:11,17
    29:10,11
second 23:5 24:7
    30:9 32:10 34:20
    34:22 46:8
Security 43:21
    45:20 47:13
see 12:7 20:24 21:4
    29:19,20 32:10
    33:2 36:17 37:15
    41:1
seeing 7:18 9:13
seeking 52:7
seems 50:9
seen 32:5 33:19
    38:25 39:7 46:12
    48:2 52:3,5 54:24
sees 38:11
send 52:5,9
sent 21:19 23:15
    52:12 53:1,20
    55:20,21
sentence 23:7,8
separate 15:7
September 3:3
    21:23 24:15
series 35:13
serve 53:10
served 5:19 42:19
    43:8
serves 10:12
services 4:25 5:14
    5:15,19 6:1 8:4
    26:17 33:22,25
    35:15,19,19
    38:18 39:1,8
    60:11
set 9:11 18:6 25:25
    52:11 55:2 63:18

setting 46:23 54:10
settle 49:24
settled 14:25 15:2,3
settlement 14:11
set-off 21:2
seven 7:1
sheet 62:7
shelf 35:21
sheriff's 48:24
short 24:2
shorthand 63:13
show 13:7 14:12
showed 57:7
shows 41:17
side 27:21 42:19
    58:13,15
signature 21:23
signed 38:1 62:7
similar 53:4
simply 12:8 13:24
    21:6 22:11 29:25
Simpson 2:12,13
    4:14,19 12:15
    17:4 21:14,15,18
    21:21 31:18,24
    32:1,25 33:1 34:3
    36:5,18 51:9
    56:18 57:24 58:1
    58:21 59:1,4
    61:11
since 5:9,12 6:25
single 29:21 41:12
sitting 11:8
situation 26:23
    28:16,18 49:25
situations 45:15
six 11:17 14:15,16
skill 63:17
small 8:3
smaller 12:7
social 9:12 43:20
    45:19 47:13
sold 30:16,18 31:4
some 9:20 10:13,13
    12:6,13 15:2,12
    16:5 18:6 21:2,3
    23:3 24:15 25:2
    27:9,16 28:15,16
    29:24 30:23 31:3
    31:8 32:19 33:22
    35:1,1 37:17 39:9
    44:8 49:13 52:16
    55:13 60:7 61:3
somebody 18:2

29:11
somehow 61:3
someone 28:11 38:6
    38:11 47:15 48:8
    49:18 51:18
something 16:19
    32:14 51:21 61:3
sometimes 12:16
    50:7 51:8 61:2
somewhere 15:11
sorry 7:5,6 35:24
    55:5 58:12
sort 6:14 8:5 30:15
    44:9,14,16 52:7
    54:16
source 47:12,14
    51:15
sources 51:14
special 13:6
specific 41:9,10,12
    45:8,14,22,24
    51:4 52:19
specifics 31:9 37:7
    39:5 50:12
speculation 47:19
    51:5,25 52:1
spell 44:2
spelled 34:14
Spencer 23:25
    33:12,13,14
spoke 24:21,23
spoken 9:22 10:3,5
    10:14,21 17:10
    18:18 33:21
sponsored 11:3
ss 63:3
standard 45:23
    48:15,19 58:3
standards 49:7
start 39:4 40:12
started 13:18
starts 32:18
state 4:15 5:8 6:4
    10:3 11:4 22:21
    33:24 62:20 63:2
    63:6,23
stated 9:8
statement 20:19
    21:6 34:6,7 57:5
    57:8,12 58:7 61:7
STATES 1:1
statute 19:8 39:12
    39:17,23 40:14
    41:14 43:6 55:10

55:19,22,24
    56:22,23 57:2,9
statutes 42:24
    55:18
steps 56:3,20
still 11:6 27:24 51:1
store 44:23
Street 1:20
subpoena 32:4 33:3
subscribe 30:20
    35:15
Subscribed 62:15
subscribes 35:19
substance 26:4
substantive 7:23
successful 25:13
sue 17:20
sued 11:25 17:21
    29:1
sues 47:15
suffered 27:3
sufficient 57:18
suing 18:2
suit 15:21 51:19
    55:25 56:4,21
    57:15 58:6
Suite 1:20 2:7,15
suits 12:3 13:8,20
    15:5,5,18 18:2
    58:17
summary 27:12
    28:2,10 34:9
summer 23:19 24:8
    24:8 25:2 35:21
    37:5
supervise 6:11
supplemental 34:15
    34:17,22
support 39:17 40:4
    42:25
supports 45:3
Supreme 7:14
sure 10:15 20:10
    27:20 38:2 49:18
    53:25 59:3
suspect 40:13 43:22
suspected 39:12
    43:6
sweep 48:11
sworn 4:11 62:15
    63:9
system 13:11,19
    14:10,12 41:19
Systems 60:16

s-c-h 42:11

_____
T
_____

T 3:1 63:1,1
Tab 32:18,19,20
    33:3,3,6,7,8,12
    34:8,10,12,14,16
    34:19,21
tabs 32:22
take 5:6,9 6:8 8:19
    15:9 17:10 18:1
    23:23 31:18
    36:13,15,25
    37:17 45:9 48:12
    58:21
taken 1:19 4:2 6:10
    30:5 31:20 35:17
    38:15 58:25
    63:11
takes 61:1,1
taking 5:12 14:23
talk 11:21 15:4
    36:19 38:21 39:2
    46:8
talked 18:22 23:21
    25:1,3,4 43:5
talking 56:19
task 8:6
tell 7:21 25:22 26:9
    26:12 30:13
    37:14 45:14
    50:13 59:22
ten 31:11
term 5:19
testified 4:11 13:21
testify 21:8 22:5,16
    22:20 38:11 41:4
    63:9
testifying 41:2
testimony 4:2 22:9
    22:15 25:11 61:8
    63:16
Texas 5:5 7:17
Thank 61:11
that'd 16:16
their 10:13,14
    11:11 38:14 40:4
    40:8 47:9,24 51:7
    51:11 55:12 56:9
    57:1 58:5
theirs 30:23
theory 43:3 45:3
thereon 62:6
thing 54:16

things 6:16 41:3 59:2
think 15:13 16:6 22:8 23:25 26:1 26:19 27:13,13 28:15,17 30:15 32:16 39:21,23 40:20,23 42:8 46:13,14 49:20 50:14 51:2 52:12 52:15,19 53:19 54:9 56:19 58:22 60:14
thinking 17:23
third 23:7,7 34:11
though 41:1
thought 15:15 23:21 27:12,14 40:8
three 11:1,14 13:17 31:10
three-quarters 48:9 48:14
through 13:22 14:22 23:2,16 30:8,19 32:17
throughout 54:3
Tift 1:5 2:3 43:18 45:18 46:8 50:14 50:16
Tift/McCollough 62:25
Tim 32:12
time 5:9 7:19 11:19 12:9 13:5,12 14:21 19:22 20:1 23:24 24:1 25:2,3 25:14 26:6 37:8 40:5 41:11,16 46:24 47:18 48:7 51:3 54:11 57:14 62:9 63:12
times 19:15 23:15 39:15 52:9
TIMOTHY 1:5 2:3
tip 29:20
title 5:25 6:2 16:12
today 15:25 16:20 32:5 59:17 61:4,8
together 20:4,19
told 24:13
top 16:14 17:24
town 23:22
track 13:13 35:25

tracking 13:11,19 14:9,12 41:19
trade 35:13
Tranel 2:13
transcribed 63:14
transcript 33:7 62:8
trial 6:9 21:9 22:5 41:2 57:17 60:22 61:1
Tribal 7:16 10:2 29:7
true 24:3 62:8 63:15
truth 21:4 63:9,10 63:10
try 49:13 52:13
trying 9:12 11:10 39:25 40:18 42:7 49:24,25 50:18 50:19
turns 61:1
two 11:14 13:17 15:13 17:19 21:12 44:21 46:18
type 20:21 21:2
types 43:9 52:2 54:23 58:4
typewriting 63:14
typewritten 62:5
typically 51:10

**U**

unaware 25:23
under 49:2 54:12 54:18 63:14
underneath 35:6
understand 38:11 55:13,20 61:2
understanding 25:11 59:21
undertake 9:17
unfair 35:12 52:15 54:17,22
unit 7:24,24,25,25 8:1,17,18,19,20 8:24 9:8
UNITED 1:1
units 7:23 8:9,11,15
University 5:5
unrepresented 54:14
unsuccessful 46:22

until 40:1
use 57:16
used 19:17 26:17
uses 19:11
using 26:18
usually 8:12 24:24
U.S 7:14

**V**

vague 57:21
valid 45:5
varies 10:18
various 8:9,11,13 16:4 24:5 30:20 31:12 35:11 39:5
verification 56:25 57:5
very 8:3 14:14 43:15 48:19
video 17:5
violate 38:16
violates 42:20
violation 18:3 22:18 42:17 43:12 45:4,12 46:3 52:4 54:25
violations 38:22 39:3,6
violence 7:24
vista 23:16
voluntarily 28:10 28:12
voluntary 14:7
volunteer 51:10
vs 1:8 27:20 32:13 60:16 62:25

**W**

wages 48:10,14
want 6:8 10:20 20:24 21:4 23:2 32:16 58:22 59:2 60:15
wanted 31:5
wanting 29:25
wants 38:10
Washington 63:7 63:23
wasn't 26:23 34:1 47:2
way 13:22 33:10
well 8:5 20:5 26:13 27:13,15 32:18 37:2 40:12 43:17

50:9,16 51:10 52:21 54:18 56:7 56:19
Wellnitz 43:24 44:1 46:19 47:20 50:13
were 4:1 6:24 13:23 19:17 24:11,20 27:21 35:2,17 37:1,7 39:5,6 44:18 46:9,15,22 47:8 50:24 53:6 55:8,13
West 2:14
we'll 35:24 61:13
we're 8:3 9:11,12 20:22 34:8 50:8 56:19 58:22
we've 13:18,25 36:6 37:25 39:11 50:9 59:5 60:14
wheel 19:21,25 54:6
WHEREOF 63:18
while 24:25 50:10
whole 55:14 63:10
win 57:17
wins 14:19
wit 4:2
witness 4:10 12:13 21:19 31:17 32:11 33:5 34:1 37:1,4,4 51:6 63:8,16,18
work 26:24 49:25
worked 11:11 33:15,16,19
working 27:6
worry 57:9
worth 6:16 51:20
wouldn't 32:24
writ 45:5 48:17,23
writer 37:11
writing 9:9 56:13 56:15
written 8:8,14 10:16 22:1 44:21 56:9,25 59:6
wrong 7:5 58:20
W-e-l-l-n-i-t-z 44:3

**X**

X 3:1

**Y**

Y 24:25
yeah 10:18 14:20 16:16 21:18 46:7 46:17 48:19 60:20
year 5:2,21 6:19 30:24
years 7:1,1,18 11:1 11:15 12:24 13:3 13:18
Yellowstone 24:17 28:23 29:2 42:13
yesterday 11:10

**Z**

Zasada 18:21 19:1
Zombie 3:10 59:14

**1**

1 30:9 32:19,20
1st 2:6 4:22
100 1:19
11:00 1:21
13 34:8
14 34:10
15 34:12
16 34:14
1692f 54:21
17 3:8 34:17
18 7:2 34:19
19 7:2 34:21
1976 5:3
1978 5:7,13
1989 6:25

**2**

2 3:3,5,8 21:23,24 32:19,20
2,000 41:18
20 7:18 12:5,25 13:20 14:16 15:4 35:13
200 41:19
2003 59:9
2007 24:8
2008 1:21 3:3 21:23 24:9,10 62:16 63:20
201 2:15
21 3:5
2278 2:8
23 3:6

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

**2442** 4:22
**26(a)(2)** 33:4
**2602** 2:6
**27th** 1:20
**283** 2:14

—————————— **3** ——————————
**3** 32:19,20
**30** 1:21,22 12:5,25
   13:20 14:16 15:4
   53:15
**30-plus** 12:24
**305** 2:7
**31** 3:11
**35** 3:11,14
**36** 3:6,8,11,14
**37** 3:6

—————————— **4** ——————————
**4** 3:5 32:18 33:3
**4-25-2009** 63:25
**40** 5:21

—————————— **5** ——————————
**5** 3:14 33:3
**50** 3:3 4:6 21:12
   23:3 36:7 37:25
   59:5
**50-50** 14:15,18
**51** 3:7 17:2 36:7
   59:8
**52** 3:9 31:22 35:24
   36:7 59:12
**53** 3:12 35:24 36:3
   36:8 59:19
**59** 3:6,8,11,14
**59101** 4:23
**59103** 2:9
**59807-7729** 2:17

—————————— **6** ——————————
**6** 33:6
**61** 62:5

—————————— **7** ——————————
**7** 33:7
**750** 1:20
**7729** 2:16

—————————— **8** ——————————
**8** 3:11 33:8
**89** 7:3,4,6

—————————— **9** ——————————

**9** 33:12
**90** 23:23 25:14
**95** 24:1

# Montana Legal Services Association   MLSA

*Provide, protect and enhance access to justice.*

D. Michael Eakin
Staff Attorney
Montana Legal Services Association
2442 First Ave. North
P.O. Box 3093
Billings, MT 59103

Phone: (406) 248-7113 Ext.207
Fax: (406) 252-6055
Toll Free: (800) 999-4941

E-mail: meakin@mtlsa.org

September 2, 2008

EXHIBIT _50_
WITNESS _Eakin_
DATE _10-30-08_

John Heenan
Heenan Law Firm
P.O. Box 2278
Billings, MT 59103

Re: Expert testimony concerning JRL

Dear Mr. Heenan:

I am a lawyer employed at Montana Legal Services for 32 years. The last 28 years I have been working in Billings. Montana Legal Services represents clients with income at or below 125% of the poverty level. Approximately 50% of my practice is in the area of consumer law including defending consumers in debt collection actions. In defending collection cases I have seen both legitimate collections activities and abusive collection activities.

In my capacity as a consumer lawyer at Montana Legal Services, I have represented and advised dozens of clients who have been sued by the North Dakota firm Johnson, Rodenburg and Lauinger ("JRL.") JRL regularly files lawsuits against Montana residents and citizens as part of its debt collection activities. From a cursory investigation, it appears the overwhelming number of lawsuits filed by JRL result in default judgments. In my opinion, this is directly correlated to the fact that the overwhelming majority of individuals whom JRL sues lack the financial resources to hire an attorney, and lack the understanding of the legal system sufficient to defend themselves against experience lawyers. Although JRL has been collecting debts in Montana for some time, the amount of clients and potential clients we see who have been the subject of debt collection activity by JRL, including the subjects of lawsuits, has dramatically increased over the past few years. In my opinion, this increase is related to the corresponding rise in the "debt buyer" industry. I have had many occasions to defend my clients against lawsuits brought by debt buyers. Debt buyers purchase debts from creditors, including credit card companies, for less than face value, and then actively attempt to collect on the debts. In my experience, debt buyers often lack the documents they would need to prove the debt is owed if called upon to do so in a court of law. In my opinion, oftentimes the only way debt buyers are able to secure valid judgments in Montana courts is through default judgment or against individuals not represented by attorneys. Even though JRL files a high vlume of collection suits in Montana, I have never seen a JRL actually set foot in a Montana courtroom. While JRL may appear in person on

---

**Administrative Office**

616 Helena Ave., Suite 100
Helena, MT 59601
Toll Free: (800) 666-6124
Phone: (406) 442-9830
Fax: (406) 442-9817

Statewide HelpLine Number ☎ 1-800-666-6899

**Websites:**
www.MontanaLawHelp.org
www.mtlsa.org

**Funded in part by:**
The Crow Nation
Montana Justice Foundation

&

LSC
America's Partner
For Equal Justice

Heenan
Page 2

occasion, those occasions are exceedingly rare. If even minimal discovery requests are made or an answer is sufficient to actually require a trial, the case will be voluntarily dismissed.. JRL, as a regional debt collection law firm, is able to convert potentially worthless debt buyer claims (because of statute of limitations problems, lack of evidence, or otherwise) into valid and enforceable judgments.

A judgment in Montana lasts for 10 years or more, and enables a judgment creditor to take many different tacks to collect it, including wage garnishment and attachment of checking or savings accounts. Once JRL obtains a judgment it will seek to enforce that judgment against assets that with reasonable investigation would know JRL would know to be exempt. For example, JRL will cause a process server to take all funds out of a checking account when those funds are exempt in their entirety, such as Social Security benefits, or exempt in great part, such as 75% of net wages.

I understand that JRL has asserted a "bona fide error" defense to the claims of Mr. McCollough. In my opinion, such a defense is not justified by the practices which JRL employs in the collection of debt and in bringing lawsuits in Montana. I have represented clients who have experienced problems and concerns of the same type as those alleged by Mr. McCollough in this case. In my opinion, JRL fails to employ any adequate protocols which would assure that claims are not time-barred at the time suit is filed. JRL does not have any policy for what documents it should have and review prior to filing lawsuits in Montana, including the actual credit card contract, account statements, and payment statements. In my opinion, complete reliance by JRL upon the statements of debt buyer clients is inappropriate as such statements would not qualify as sufficient proof for JRL to win a claim at trial. At trial, I will be able to relate my experiences with JRL in the context of defending many clients who have been subjected to debt collection activities by JRL.

Sincerely,

D. Michael Eakin

### NARCA
NATIONAL ASSOCIATION OF
RETAIL COLLECTION ATTORNEYS

THE ONLY NATIONAL TRADE ASSOCIATION DEDICATED TO THE NEEDS OF THE COLLECTION ATTORNEY

**First Quarter 2003**



# NARCA $Newsletter$

EXHIBIT __51__
WITNESS __Eakin__
DATE __10-30-08__

- About Us
- Code of Ethics
- Industry Suppliers
- Laws & Legislation
- Newsroom
- Publications
- Contact Info

- Site Search

## Challenges for Collecting Purchased Debt
James M. McNeile
Cohen McNeile Pappas & Shuttleworth P.C., Leawood, Kansas

All of us know it is more difficult to collect purchased debt than originated debt by using the traditional legal collection approach. The difficulties from a lawyer's perspective lie mainly in problems of proof. A creditor that originates debt has access to the documentation that courts require attorneys to introduce as evidence in order to obtain a judgment. Many debt purchasers either do not have access to the source documents or can only obtain those documents at great cost. How then can debt purchasers utilize the court system to collect debts that are legally due and valid? Ken Gelhaus reports that in New York the problems of collecting on purchased debt have increased greatly in the last year. At one time in New York, court clerks entered a default judgment on claims for "sums certain" without running the papers past a judge for review and signature. In recent months, however, clerks are refusing to do so and requiring that a judge's order granting default judgment be obtained.

In one of his recent cases, Ken reports that he applied for a default judgment using the affidavit of an officer of the purchasing plaintiff. The affidavit, although able to reference the date of the purchase of the debt and the balance purchased, was deficient in that it did not include any actual business records of the originating creditor. The court found that the affidavit of the debt purchaser was insufficient and conclusory. The court suggested the debt purchaser furnish a copy of the assignment or contract assigning the claims, along with a copy of any statement or record clearly demonstrating the calculation and the amount of the claim. If monthly statements were furnished to the defendant, copies of the most recently sent statements should be annexed. Reliable and factual information concerning the claim is required.

Even if we as attorneys include such items, they are business records of the originating creditor, not the purchasing plaintiff. At least in New York, these business records would have no probative value, because no one at the purchasing plaintiff has "personal knowledge" of the creation, maintenance, issuance, and tracking of the statements. In the eyes of the court, such affidavits are hearsay and therefore not admissible. A purchasing plaintiff is unable to swear to the authenticity of the originating or source documents of a credit transaction because they do not have personal knowledge of the events which transpired at that period of time in the life of the credit agreement. The original cardholder agreement, any correspondence, and monthly statements issued by the original credit grantor are not admissible as the purchasing plaintiff's business records, as the purchasing plaintiff has no personal knowledge of how those records were created or maintained.

How then can the purchasing plaintiff's counsel obtain a judgment for their client in the face of a court's refusal to grant judgment on a legitimate debt purchased by a third-party? The obvious answer is to obtain the affidavit of the originating creditor and annex the documents of the originating creditor to their affidavit. The originating creditor would have actual and personal knowledge of the events which led to the creation of the debt, as well as the events which lead to the sale of the debt. A second alternative would be to attempt to obtain a novation of the original credit agreement, which might be accomplished by either obtaining a signed statement from the debtor agreeing to pay the balance owed. Alternatively, if the debtor refuses to sign such a

statement, the purchaser could send monthly statements which, if not objected to by the debtor, might be introduced by way of the purchasing plaintiff's affidavit, indicating that no objection had been made to the statements of account. Therefore, the debtors are estopped from denying the existence of the balance.

Absent a willingness by debt sellers to sign a business records affidavit as to the origination and sale of the account, or a novation by the purchasing plaintiff of the original debt, lawyers will be increasingly hard pressed to obtain judgments for legitimate debts purchased by debt buyers. If purchasing plaintiffs wish to continue to be able to use the court system to enforce their purchased debt, it is going to be increasingly necessary for documentation to be readily available for their counsel and the courts.

**Notice:** The NARCA Newsletter is a publication of the Association of Retail Collection Attorneys with headquarters at 1620 I Street, NW Ste 615, in Washington, D.C. 20006 -- Telephone 800-633-6069 or 202-861-0706. An appearance of an advertiser in this publication does not constitute an endorsement.

Privacy Policy    Home        NARCA • 1620 I Street, NW • Suite 615 • Washington, DC 20036 • (202) 861-0706 • fax: (202) 463-6498 • narca@narca.org

©Copyright 2003, National Association of Retail Collections Attorneys. All Rights Reserved.

http://www.narca.org/Newsletter/2003/1stquarter/challenges.asp (2 of 2)6/9/2004 12:44:05 PM

'Zombie' debt is hard to kill - MSN Money

EXHIBIT 52
WITNESS Eakin
DATE 10-30-08



Liz Pulliam Weston

## The Basics

# 'Zombie' debt is hard to kill

There's a hot new growth industry: companies that buy ancient bad debts for pennies and squeeze you to pay. Here's how to get them off your back.

advertisement

# Article Tools

- **E-mail to a friend**
- Tools Index
- Print-friendly version
- Site Map
- Discuss in a Message Board
- Article Index

## Rate this Article

Click on the stars below to rate this article from 1 to 5 **Low**  ☆ ☆ ☆ ☆ ☆  **High**
**E-mail us your comments** on this article
View all **top-rated articles**
*By Liz Pulliam Weston*

An identity thief victimized Nancy Rose 10 years ago, running up a $5,045 bill on a credit card account in her name.

Rose, a Baton Rouge saleswoman, battled collection agencies for years over the bogus account. They harassed her by phone and trashed her credit report. She'd no sooner convince one that the debt wasn't

hers than the account would be sold to another and the calls would start all over again.

At last, with the help of attorney David Szwak, she sued the most recent -- and aggressive -- collection agency for numerous violations of federal laws. She accused the company of falsifying records, pursuing the debt when the agency knew it wasn't valid and illegally reporting the same account twice to the credit bureaus. The collection agency settled for $40,000, according to Rose and Szwak. They thought they had finally won the war.

That was in 2003. Three years later, Rose got a letter in the mail -- from a new collection agency, dunning her for the same $5,045 debt.

"It never ends," Rose said.

## There's money in old debt

A decade ago, few creditors tried to collect on old accounts, figuring it wasn't worth the effort.

Today, however, collecting on old debts is a rapidly expanding industry. Aggressive companies can buy charged-off credit card accounts from the original lenders for pennies on the dollar or less. Then, they use credit-scoring and other new technologies to identify which debtors are most likely to pay. The players in this "junk debt" market range from fly-by-night outfits to well-established companies funded by Wall Street investors.

## More from MSN Money



- How do lenders see your credit?
- Life without credit is tough and expensive
- 9 money rules to live by
- 10 easy ways to save $500 or more
- Are you frugal, or stingy?

It's a business that's exploded in recent years as collectors discover gold in old bills. Debt buyers are expected to snap up $110 billion in face value of delinquent debt this year, said Paul Legrady, director of research for Kaulkin Ginsberg, a company that advises the debt collection industry. That's twice what was purchased in 2000.

Among the signs of the industry's growth:

- Asset Acceptance Capital, one of the nation's largest debt buyers, saw its revenues quadruple between 2001 and 2005, to $252.7 million, while profits rose from $18.9 million to $51.3 million.

- In the same period, profits at Portfolio Recovery Associates rose more than six-fold, from $5.6 million to $36.8 million. Revenues quintupled, from $32.3 million to $148.5 million.

- Encore Capital Group experienced similar sharp increases with $221.8 million in revenues in 2005, compared to $47.8 million in 2001. The company rose from a $10 million loss in 2001 to a profit of $31.1 million in 2005.

- Arrow Financial Services, at one time the country's largest debt buyer, was acquired by Sallie Mae in 2004, making the student lender the nation's largest collection agency.

### Your old debts sold for 3 cents on the dollar

| Buyer | Bought debt worth: | Paid: | Cents on $ |
|---|---|---|---|
| Asset Acceptance | $4.2 billion | $102.3 million | 2.4 |
| Encore Capital Group | $5.9 billion | $195.6 million | 3.3 |
| Portfolio Recovery Associates | $5.3 billion | $149.6 million | 2.8 |

*Source: 2005 SEC filings.*

The amount that companies pay for bad debt depends on the type of account and its age. Interestingly, all the growth has led to increased competition, Legrady said, which has bid up prices for old debt. Since 2003, "fresh" debt -- the kind that has recently been written off by the original creditor and not yet placed with a collection agency -- costs a penny or two more for each dollar of face value.

But the price is still pretty cheap. In general:

- Debts that are delinquent but not yet charged off by the original creditor can be purchased for up to 12 cents on the dollar, Legrady said.

- Accounts that have recently been charged off: 7 to 9 cents on the dollar.

- Accounts that are slightly older and on which a collection agency or two has already taken a whack: 1 to 3 cents on the dollar.

- Years-old, out-of-statute debts: A penny or less.

The oldest debt is by far the cheapest, sometimes costing the collector 25 cents for every $100 in face value. If the collector can convince the borrower to cough up even $1, the company has made back its costs.

## Opportunity frequently turns into abuse

Where some are finding profits, though, others are spotting abuses. The Federal Trade Commission received more complaints in 2005 about third-party debt collectors than any other industry, and the number of complaints -- 66,627 -- was six times higher than in 1999.

The FTC has sued several collection agencies over their practices. In 2004, NCO Group -- a major buyer of old debt -- agreed to pay a then-record $1.5 million civil fine after the FTC accused it of reporting inaccurate information to credit bureaus. In 2005, the FTC won a $10.2 million judgment against National Check Control for, among other violations, threatening consumers with lawsuits and jail for purported debts. In many cases, the consumer didn't owe the debt, or the amount had been vastly inflated.

1 | 2 | next >

## Cool Tools

- Find a great credit card deal.
- Savvy Spending Quiz
- How much can you save?
- Evaluate Your Credit
- Which car costs less to insure?

## Manage Debt

Your guide to smart borrowing and rapid repayment.

## Resources

- Track Investments



**The Basics**

# 'Zombie' debt is hard to kill

Continued from page 1

**advertisement**

# Article Tools

- **E-mail to a friend**
- Tools Index
- Print-friendly version
- Site Map
- Discuss in a Message Board
- Article Index

# Rate this Article

Click on the stars below to rate this article from 1 to 5 **Low**  **High**
**E-mail us your comments** on this article
View all **top-rated articles**

Consumer attorneys contend such violations of the federal Fair Credit Reporting Act and the Fair Debt Collection Practices Act are widespread, and becoming worse.

"I don't advocate people not paying their bills," said attorney Szwak, co-owner of the MyFairCredit.com Web site. "But there's an element of the debt collections field that is rabid." Some collectors, he said, "will go to any lengths to harass people and defraud them."

# How consumers are abused

Among the worst practices attorneys have seen:

- Badgering consumers for debts they don't owe, that have already been paid or that were legally erased in bankruptcy court.

- Suing or threatening to sue over debts even though the statute of limitations has long expired.

- Illegally "re-aging" debts on credit reports. The collectors tell credit bureaus that an old debt is, in fact, a new one. The goal: To extend the seven-year limit on reporting negative items and put more pressure on the consumer.

- Promising to delete a negative mark from the consumer's credit report in exchange for a token payment. Not only does the collector fail to follow through, but the payment can revive the statute of limitations and lead to a lawsuit. Even if the collector does back off, the unpaid debt could be sold to another company that might renew collection activity.

- Bait-and-switch credit cards. Some credit card companies have offered borrowers low-rate credit cards and then tacked old, charged-off debts -- often purchased from other lenders -- onto the balance. The card issuers typically insist they disclosed that the old debts would come with the cards, Szwak said, but the borrowers say no such disclosure was made.

- Verbally abusing and harassing consumers. My readers have reported being cursed, berated and called repeatedly despite requests to stop -- all violations of federal laws.

Mickey, a Virginia resident, said he was the target of "colorful words" when he told a collection agency to cease bothering him about an old debt. Mickey stopped paying on his $4,000 Discover card balance in 1994; the account no longer appears on his credit report and the statute of limitations ended years ago.

"They would usually start out with a normal tone. ... It went downhill fast," Mickey said. "They were calling a couple of times a day for awhile."

# Sometimes, it's smarter just to hang up

Consumer advocates say this is exactly the kind of behavior Congress and state lawmakers were trying to prevent when they put curbs on collection behaviors such as statutes of limitations, the seven-year credit reporting limit and prohibitions against abusive collection practices.

"We don't have debtors' prisons," Szwak said. "We have laws to protect people from being harassed by debt collectors for the rest of their lives."

In fact, paying these old debts -- or even talking to the collection agency about them -- can make a bad situation worse.

As mentioned above, the smallest payment can revive the statute of limitations in some states, leading to more aggressive collections and lawsuits. Even acknowledging that the debt is yours can restart the clock in some jurisdictions.

That's why Robin Leonard, author of "Money Troubles: Legal Strategies to Cope with Your Debts," advises consumers simply to put the phone down and walk away if collectors call about an out-of-statute debt. (This chart at Bankrate.com summarizes state statutes of limitations, but details can vary by state.)

In the past, paying an old debt potentially could wreak havoc on a consumer's credit. Such a payment could update a delinquency so that it looked more recent and took a heavier toll on a credit score, the three-digit number lenders use to gauge credit-worthiness. That's less likely to happen these days, because the company that creates the leading credit score, the FICO, worked with credit bureaus to iron out that particular wrinkle in the formula.

**Get the latest from Liz Pulliam Weston. Sign up to receive her free weekly newsletter.**

Preferred format:

⊙ HTML  ◯ Plain Text

Your e-mail address: [                    ] Learn more about newsletters Go

But paying the debt is no guarantee that the nightmare will stop. The collector may decide that if you're willing to pay at all, you could be made to pay more. Settling a debt for a smaller amount than the collector says you owe could result in another agency trying to collect the unpaid portion. Or the collector might inform the Internal Revenue Service (IRS) that you've received "income" in the form of forgiven debt.

Even if you manage to wrangle written promises from the collector that none of the above will happen, you would have to be willing to go to court if the agency reneged -- and possibly face an unsympathetic judge or one who doesn't know much about collections law.

# How to fight back

If you're being contacted about an old debt, here's what consumer attorneys advise:

**Know the statute of limitations.** If you racked up a debt in another state, you might want to check the statute of limitations there as well. But generally, it's the statute of your current state that applies. If the

statute has expired, the collection agencies' legal remedies are limited.

**Know your rights.** Credit and debt collections can be an extremely complicated area of the law. Consider arming yourself with a book such as Leonard's "Money Troubles" and -- if the amounts at stake are considerable or the level of harassment unbearable -- consider contacting an attorney. The National Association of Consumer Advocates can provide referrals.

**Consider ignoring the call.** If the statute of limitations has expired, Szwak said, put the phone down and walk away. There's little to gain and a lot to lose if you keep talking. You could inadvertently extend the statute of limitations or find yourself roped into a repayment agreement that might not be in your best interest. "The debt collector is a lot smarter than (consumers) are, a lot more savvy," he said. "They don't have any obligation to tell you your rights."

**Write them.** If ignoring them isn't working, consider writing a letter demanding the agency stop contacting you. Send it certified mail, return receipt requested. Federal law requires them to comply with your request. Make sure in the letter you specifically say that you aren't acknowledging you owe the debt.

**Negotiate carefully.** If the statute of limitations hasn't expired, you may want to negotiate a settlement rather than risk a lawsuit. (Again, a lawyer's advice could come in handy here.)

**Keep an eye on your credit report.** If a collection agency tries to repost an old debt or lie about the date it went delinquent, you'll need to fight back vigorously. Dispute the entry with the credit bureaus and with the collection agency.

If the collector persists in its deception, you can demand that the collector produce a copy of the documentation that created the debt, such as the credit card agreement you originally signed, along with an account history, said consumer attorney Daniel Edelman of Chicago. Chances are the collector won't have this documentation, and continuing to report the account without providing proof that you owe the money is a violation of the Fair Debt Collection Practices Act, Edelman said.

Again, an attorney experienced in debt collection law might prove helpful in particularly difficult cases.

*Liz Pulliam Weston's column appears every Monday and Thursday, exclusively on MSN Money. She also answers reader questions in the* Your Money message board.

< previous | 1 | **2** |

## Cool Tools

- Find a great credit card deal.

## 1.4.2 Debt Buyers Identified

Debt buyers are often large corporations that do business on an enormous scale, often collecting debts under a variety of names. In 2006 the ten largest debt buyers accounted for 81% of all bad debts purchased.[18] Major debt buyers with revenues over $100 million (well over $100 million in many cases) include Sherman Financial Group, Unifund, Asset Acceptance Corp, Firstcity Financial, Encore Capital Group, Portfolio Recovery Associates, and Asta Funding.

## 1.4.3 Resulting Explosion in Collection Litigation

Debt buyers aggressively use state courts to collect on their purchased debt. In 2006 approximately 320,000 consumer debt cases were filed in New York City alone, seeking almost $1 billion.[19] A study has found that 89.3% of these cases were filed by debt buyers.[20] Consumer debt cases are clogging up state courts, making up over 50% of some courts' dockets.[21] Just one debt buyer, Encore Capital Group, in 2007 filed over 350,000 lawsuits around the country. Asset Acceptance has 350 employees in its legal collections department.

Most of these debt buyer collection actions are for credit card debt, but other types of debt also result in collection actions. When AT & T Wireless merged with Cingular in 2004, it sold a significant amount of its debt to debt buyers, including Palisades Collection. This purchased AT & T debt was a major source of court filings in New York City in 2006.[22]

---

18  *See id.*
19  Urban Justice, Debt Weight, the Consumer Credit Crisis in New York City and Its Impact on the Working Poor (Oct. 2007).
20  *Id.*
21  *Id.*; Richard M. Hynes, *Broke But Not Bankrupt: Consumer Debt Collection in State Courts*, 60 Fla. L. Rev. 1 (Jan. 2008).
22  Urban Justice, Debt Weight, the Consumer Credit Crisis in New York City and Its Impact on the Working Poor (Oct. 2007).

## 1.4.4 Characteristics of Debt Buyer Collection Lawsuits

Eighty percent of consumer collection actions York City in 2006 resulted in default judgments against unrepresented consumers,[23] with an average award of $3063.[24] The same 80% default judgments statistic was reported in a study of collection actions in Massachusetts.[25] Only about 2% of the default judgments in New York City were later set aside.[26] The collectors recovered about $800 million of the almost $1 billion sought.[27]

The New York City study also found that in 99% of the cases in which default judgments were entered, the materials underlying those applications constituted inadmissible hearsay and did not meet New York's standards for the entry of a default judgment.[28] In 85% of the cases the supporting evidence was an affidavit from the debt buyer's own employee, and in another 12% it was from an employee of an unidentified entity.[29]

The New York City study looked at a sample of 600 collection cases and found that only two of the 600 consumers were represented by counsel.[30] On the other hand, over 70% of the 320,000 collection actions brought in New York City in 2006 were brought by just four law firms: Pressler & Pressler, Cohen & Slamowitz, Mel S. Harris & Associates, and Wolpoff & Abramson.[31] This means that *each week*, on average, in New York City alone, *each* of these four firms filed over 1000 new cases and obtained over 800 default judgments in other cases.

---

23  *Id.*
24  *Id.*
25  *Dignity Faces a Steamroller: Small-Claims Proceedings Ignore Rights, Tilt to Collectors*, The Boston Globe, July 31, 2006.
26  Urban Justice, Debt Weight, the Consumer Credit Crisis in New York City and Its Impact on the Working Poor (Oct. 2007).
27  *Id.*
28  *Id.*
29  *Id.*
30  *Id.*
31  *Id.*

EXHIBIT ~~54~~ 53
WITNESS  Eakin
DATE  10-30-08

## Chapter 2

# Case Selection, Advising the Client, and Litigation Strategy

## 2.1 Ten Reasons to Defend Consumer Collection Actions

### 2.1.1 Consumers Often Have Dispositive Defenses

Many people, including some judges, assume that when a collector sues on a debt the consumer almost always owes the money. Whatever the accuracy of this view in times past, changed practices in the marketplace have dramatically altered the facts. Today, consumers have complete defenses in a significant number of collection cases.

The major reason for this development is the explosive expansion of the multi-billion dollar distressed debt buying industry, in which debt collectors purchase literally millions of old debts for pennies on the dollar that the original creditors have written off. The debt buyers receive minimal information on each account, and certainly do not receive the contract or copies of any communications in which the consumer might have disputed the amount owed. In addition, after having unsuccessfully attempted to collect the accounts, these debt buyers regularly resell repackaged portfolios of uncollectable debts to other debt buyers whose connection to the original creditor—and to original documentation and proof—is even more attenuated.

Because debt buyers purchase very old debt, the statute of limitations is an important consumer defense. Debt buyers who can not produce the written contract often bring the case on a claim not based upon that contract.[1] In many states, such causes of action have a shorter limitations period than a claim based upon a written contract.[2] Moreover, the credit contract's choice of law provision may select a state whose limitations period is shorter than the forum state's period.[3]

Because the debts are old, the consumer often will have moved after the credit account was closed, and the debt buyer must first try to locate the consumer's present residence. Debt buyers may try to serve the consumer at the

wrong address or evens sue the wrong consumer. Debt buyers rely on credit reports to locate the consumer but the credit reports themselves are filled with errors, including "mismerged" information that mixes the credit reports of two or more people with similar names and other identifying information and that results in the collector then suing the wrong person.

Creditors also may commit billing errors which may be the reason the creditor stopped collection efforts—the consumer did not owe all or part of the money claimed. When these debts are sold the debt buyer does not receive or retain this information concerning consumer defenses. The consumer can then defend the collection action based upon the original dispute the consumer had with the creditor.

Too often debt buyers will bring actions against spouses and other parties knowing these defendants do not owe the debt, but hoping to either pressure them into payment or obtain a default judgment against them. The debt buying business model is to cast a wide net without consideration as to whether the consumer owes the money, and see what money is recovered.

At the same time that debt buyers are suing people without sufficient knowledge whether they actually owe the money or whether the statute of limitations has run, there has also been an explosion of identity theft and unauthorized use of credit cards. While federal law states that consumers in these situations do not owe the money, the collector may still sue the consumer.

Another factor leading to the recent increase in valid consumer defenses is that creditors have aggressively offered credit to almost anyone, including college and even high school students. Credit is being thrust upon not only the young but also upon others who traditionally would not have been eligible. This practice leads to the increased relevance of the defense of lack of capacity, including that the consumer was underage, had mental disabilities, or was intoxicated at the time of the credit offer.

Another change in the marketplace is that many creditors base their profitability on consumers *not* paying their debts. Creditors are content to load up interest charges and fees on those who pay less than the minimum amount due. Collectors also seek enormous extra charges when suing on the debt, including finance charges at jacked up rates and un-

---

1    See Ch. 4, *infra.*
2    See § 3.7.3.1, *infra.*
3    See § 3.7.2, *infra.*

§ 2.1.2                    *Collection Actions*

reasonable or even illegal attorney fees. Because most cases end in unexamined default judgments, there is little incentive for the collector to limit the amount requested over and above the original debt.

The bottom line is that attorneys, judges, and the public must readjust their expectations. When consumers are sued the operating assumption should be that they owe either nothing or less than is being sought. Certainly the assumption should not be that they owe the amount the collector is seeking.

## 2.1.2 Stopping Systematic Abuse of the Justice System

Debt buyers today are using the courts to engage in wholesale litigation abuse. They sue huge numbers of consumers with no real knowledge whether the consumer owes the debt or whether the statute of limitations has run. Debt buyers sue with little or no evidence to prove that the consumer owes the money, that the debt buyer in fact owns the debt, or even that they are suing the right consumer. This litigation strategy is effective because very few consumers obtain legal representation, and the overwhelming majority of consumer defendants default in the collection action.

When the consumer contests an action the collector utilizes various techniques to win without having to produce admissible evidence to prove its claim. The collector may take advantage of the unrepresented consumer by working out a stipulated judgment without disclosing that the collector can not prove the debt. Another technique is to send the consumer a long list of requests for admission to which the consumer does not timely respond. The requests are deemed admitted, and the collector needs no other evidence to prove its case.[4] Alternatively, collectors seek summary judgment on junk evidence—attachments that are not attached, affidavits from debt buyer employees (or even non-employees) who state conclusory facts about which the affiant has no personal knowledge, or about pretend business records created years after the fact.

Consumers fare much better in court when they obtain legal representation. Many debt buyers will not even pursue the case once they realize the consumer has legal representation. Such an individual consumer victory has no adverse impact on a debt buyer that has purchased the debt for pennies on the dollar. But that strategy may educate the court as to the shoddy practices of certain debt buyers and collection attorneys. The next time the collector or collection attorney brings a series of cases asking that court to enter default judgments the court may look more closely at the collector's evidence, throw out large numbers of uncontested collection actions, or establish standards for when default judgments will be allowed in uncontested consumer collection matters.

Individual collection litigation can be the vehicle that creates a jurisdiction's controlling standards. A collector or collection attorney who brings cases that are clearly not actionable under those established standards runs a significant risk that a Fair Debt Collection Practices Act (FDCPA) class action will succeed in producing a large award for the class.

For example, individual litigation in a collection case may establish the state's rule recognizing, for example, a three-year limitations period for an account stated claim or barring an account stated claim on an "account statement" that the debt buyer created and sent to the consumer years after the creditor wrote off the account, thereby resulting in FDCPA liability for future actions.[5]

## 2.1.3 Counterclaims Can Result in the Recovery of Damages and Attorney Fees

In many collection actions the consumer will have significant counterclaims. Being able to raise consumer claims as counterclaims has both advantages and disadvantages. Some of the advantages are that filing fees are avoided and federal claims can stay in state court. Disadvantages include that the collector may be less willing to dismiss its claims and may prosecute the collection case more aggressively in order to vigorously contest the counterclaim.

A good example of a collection case that raises numerous potential counterclaims is when the collector is seeking to recover a deficiency after a car repossession and sale. The consumer may have counterclaims under Uniform Commercial Code (UCC) Article 9 and other state laws relating to the repossession and sale or to the original sale and performance of the vehicle. Consumers can also raise in many collection cases counterclaims based upon the FDCPA and related debt harassment theories. It may even be possible to raise counterclaims related to the collector's litigation misconduct. Legal representation can thus result not only in dismissal of the collector's case but also in the consumer's recovery of significant damages and attorney fees.

## 2.1.4 Prevailing in the Collection Action Can Improve a Consumer's Credit Rating

Consumers are rightfully concerned about their credit rating, and prevailing in the collection action can have an impact on their credit record. If the case is dismissed the consumer can take action to insure that credit reports indicate that the current balance of that debt is now reported as

---

4  *See* § 4.2.2, *infra.*

5  *See* § 14.4, *infra.*

8

Chapter 4                    The Collector's Proof of the Merits

## 4.1 Introduction

This chapter examines the debt collector's proof as to the merits of its causes of action. As the burden is on the plaintiff to prove its claims no recovery can be had, either at trial or on summary judgment, unless the debt collector presents proper evidence satisfying the elements of the collector's cause of action. As a general rule, debt buyers assume virtually all complaints will end in a default judgment. As a result debt buyers will not produce this level of evidence, and the consumer is in a strong position to defend against the claim.

This chapter first analyzes various general challenges to a collector's offer of evidence.[1] Then the chapter turns to the application of these evidentiary rules to the various elements of the collector's claims. When a debt buyer is bringing the action, the first and often most important issue is whether the collector can prove that it owns the debt being sued upon.[2]

Assuming the collector can establish standing, it can only recover under one or more delineated causes of action. Section 4.4, *infra*, explains that the collector must clearly specify which causes of action it is bringing in a case, and that the court should rule only on those claims and not on any others.

The chapter then turns to the collector's proof of the nature of the credit contract. The collector's failure to produce this proof will not only defeat its breach of contract cause of action, but will also limit its recovery under other causes of action.[3] Proof of the balance due is then examined, being essential to any claim on an open-end account for breach of contract, "on account," or "open account."[4] "Account stated" is another common collector cause of action, being based not upon the contract or proof of individual charges, but upon the allegation that the consumer has explicitly or implicitly agreed to pay an amount owed.[5] The chapter concludes with a brief analysis of other possible causes of action, such as *quantum meruit*, money lent, or materials and services supplied.

## 4.2 Sufficiency of the Collector's Evidence

### 4.2.1 Introduction

Most contested consumer collection actions do not involve extensive testimony, but are largely decided based upon documents submitted to the court. The collector may move for summary judgment, attaching admissions, affidavits, and purported business records. Even when small claims court rules do not allow for summary judgment motions, the collector will typically seek to prevail at trial using similar documentation, without relying on witness testimony.

This section focuses on three forms of evidence collectors commonly use: the consumer's admissions, affidavits in support of a summary judgment motion, and business records. This section provides merely an overview of the subject as it relates to collection actions. It does not replace a thorough knowledge of a state's rules of evidence. The discussion should also be supplemented with review of general treatises on evidence.

### 4.2.2 Collector's Request for Admissions

#### 4.2.2.1 General

Debt buyers in particular may have little evidence to establish their case, and little interest in obtaining the evidence. Instead they may try to win their case using the consumer's own admissions. Along with the complaint, or shortly thereafter, the collector will send the consumer a lengthy list of statements, asking the consumer to admit to them, hoping the consumer will not respond in a timely manner. Failure to respond is treated as an admission of all the requested statements.[6] The collector then appends those statements to a summary judgment motion and seeks to

---

1  *See* § 4.2, *infra.*
2  *See* § 4.3, *infra.*
3  *See* § 4.5, *infra.*
4  *See* § 4.6, *infra.*
5  *See* § 4.7, *infra.*

---

6  *See* McLane v. MRC Receivables Corp., 2007 WL 29435 (Ky. Ct. App. Jan. 5, 2007); Great Seneca Fin. Corp. v. Lee, 2006 WL 1132473 (Ohio Ct. App. Apr. 26, 2006); Asset Acceptance, L.L.C. v. Rees, 2006 WL 416373 (Ohio Ct. App. Feb. 23, 2006); Luke v. Unifund CCR Partners, 2007 WL 2460327 (Tex. App. Aug. 31, 2007).

39

*Collection Actions*

prevail in the case although presenting little or none of its own evidence.[7] By serving requests for admission collectors prey on unrepresented consumers' lack of legal knowledge, attempting to prove their cases by sleight of hand when they can not do so by evidence.

This section examines two related questions: first, how to respond to requests for admission when there is still an opportunity to timely do so;[8] second, what should be done if the consumer has failed to timely respond to the requests.[9]

The rules as to requests for admissions vary by state and even by court within the same state. This section focuses on the rules set out by Federal Rules of Civil Procedure 36 and 37, as many state rules of procedure are patterned after the federal rules. But practitioners must compare the federal rule with their own state's rules and the procedures that apply for the court in which the action is brought. For example, small claims courts may not even allow requests for admission or will not provide for any negative consequences if the consumer fails to respond. If a court's rules do not establish any negative consequences, there will be little reason to respond.

Federal Rule of Civil Procedure 36 states that parties can seek admissions as to the facts, the application of law to the facts, and the genuineness of described documents. Matters are admitted unless there is a response within thirty days.[10] If the consumer admits to the statement then the collector need not prove that statement in court by its own evidence, and the matter is deemed proven. If the consumer timely responds to the requests but denies the statement without good cause to do so, Federal Rule of Civil Procedure 37(c)(2) provides that, if the collector later proves the statement to be true, the consumer is liable for the reasonable expenses of the collector's proof—which would include attorney fees and other expenses.

### 4.2.2.2 How to Respond to Requests for Admissions

If a request for admissions contains statements meeting all the elements of the causes of action the collector is raising, the collector can prevail on summary judgment based solely upon the consumer's failure to respond.[11] Consequently, the worst thing that the consumer can do is

fail to respond to the request for admissions. The consumer's options as to each requested admission are to admit (in whole or in part), deny (in whole or in part), neither admit nor deny (with explanation), or object.

In responding, the consumer does not want to admit to matters that are not true or that the collector could not prove or will not seek to prove. On the other hand, there is risk in denying matters which are true and that the collector will be able to prove to be true. The consumer can be ordered to pay the costs required to prove those matters—both attorney fees and other costs associated with developing that evidence.

One option is to neither admit nor deny the matter. Federal Rule of Civil Procedure 36 allows the consumer to state in detail why the answering party can not truthfully admit or deny the matter, such as no records or no recollection. Lack of knowledge can be a basis for the inability to admit or deny only if the party states he or she has first made a reasonable inquiry and that the information known or readily obtainable by the party is insufficient to enable the party to admit or deny the matter.[12] The consumer can not be expected to admit or deny information outside the consumer's control, or about which the consumer has no personal knowledge.[13]

If the lack of knowledge is reasonable, then the consumer is not liable under Rule 36 for the collector's expenses in proving that fact.[14] For example, the consumer does not have to go to the trouble or expense of trying to get records from the original creditor; that is up to the debt buyer that has to prove its case.

The consumer can also reasonably state she is neither admitting nor denying that a debt buyer is the owner of an indebtedness, because to do so would require knowledge of facts not known to the consumer. The consumer can also deny that the collector's "predecessor in interest" made the loan, because the consumer does not know who is being referred to or even if the collector has an interest in the debt. The consumer should also be able to reasonably refuse to admit or deny that a standard form contract is identical to the one the consumer received, if the consumer no longer possesses the consumer's copy. Likewise, the consumer can also state that she is neither admitting nor denying that various documents generated by the debt buyer are genuine business records of the debt buyer. For all of these requests, the consumer has no ability to obtain sufficient information on which to base a response.

The consumer is also allowed to object to a request for admissions, stating the grounds for the objection.[15] At that point, the collector can request that the court determine the sufficiency of the objection and the court, if it overrules the

---

7 *See* Great Seneca Fin. Corp. v. Lee, 2006 WL 1132473 (Ohio Ct. App. Apr. 26, 2006).

8 *See* § 4.2.2.2, *infra.*

9 *See* § 4.2.2.3, *infra.*

10 Fed. R. Civ. P. 36; *see also* McLane v. MRC Receivables Corp., 2007 WL 29435 (Ky. Ct. App. Jan. 5, 2007); Great Seneca Fin. Corp. v. Lee, 2006 WL 1132473 (Ohio Ct. App. Apr. 26, 2006); Asset Acceptance, L.L.C. v. Rees, 2006 WL 416373 (Ohio Ct. App. Feb. 23, 2006); Luke v. Unifund CCR Partners, 2007 WL 2460327 (Tex. App. Aug. 31, 2007).

11 *See* Great Seneca Fin. Corp. v. Lee, 2006 WL 1132473 (Ohio Ct. App. Apr. 26, 2006); Luke v. Unifund CCR Partners, 2007 WL 2460327 (Tex. App. Aug. 31, 2007).

12 Fed. R. Civ. P. 36.

13 United States *ex rel.* England v. Los Angeles County, 235 F.R.D. 675 (E.D. Cal. 2006).

14 Fed. R. Civ. P. 36.

15 Fed. R. Civ. P. 36(a)(5); *see also* ADC Telecommunications Inc. v. Telect, Inc., 143 F.R.D. 214 (D. Minn. 1992).