[James A. Patten]

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

JUNE TIFT and TIMOTHY McCOLLOUGH, )
)
Plaintiffs, )
)
vs. )No. CV-07-166-BLG-RFC-CSO
)
JOHNSON, RODENBURG, & LAUINGER, )
)
Defendants, )
)

**Billings, Montana**
**October 30, 2008**

## DEPOSITION UPON ORAL EXAMINATION OF
## JAMES A. PATTEN

PREPARED FOR:                *CHARLES FISHER COURT REPORTING, INC.*
*503 East Mendenhall*
*Bozeman, Montana 59715*
*(406) 587-9016*

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

JUNE TIFT and TIMOTHY

McCOLLOUGH,

         Plaintiffs,

   vs.          Cause No. CV-07-166-BLG-RFC-CSO

JOHNSON, RODENBURG &

LAUINGER,

         Defendant.

DEPOSITION UPON ORAL EXAMINATION OF

JAMES A. PATTEN

BE IT REMEMBERED, that the deposition upon oral examination of JAMES A. PATTEN, appearing at the instance of the Defendant, was taken at the offices of Fisher Court Reporting, 100 North 27th Street, Suite 750, Billings, Montana, on October 30, 2008, beginning at 1:00 p.m., pursuant to Federal Rule of Civil Procedure 30, before Jennifer D. Lewis, Court Reporter and Notary Public.

Page 1

APPEARANCES

ATTORNEY APPEARING ON BEHALF OF THE PLAINTIFFS,

MS. JUNE TIFT, MR. TIMOTHY McCOLLOUGH:

          Mr. John C. Heenan, Esq.

          Heenan Law Firm

          2602 - 1st Avenue North

          Suite 305

          P.O.  Box 2278

          Billings, Montana 59103

ATTORNEY APPEARING ON BEHALF OF THE DEFENDANT,

JOHNSON, RODENBURG & LAUINGER:

          Mr. Fred Simpson, Esq.

          Bohyer, Simpson & Tranel, P.C.

          283 West Front

          Suite 201

          P.O. Box 7729

          Missoula, Montana 59807-7729

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

James Patten

I N D E X

EXAMINATION OF JAMES A. PATTEN:                    PAGE

        Mr. Fred Simpson, Esq. . . . . . . . . 4, 79

        Mr. John C. Heenan, Esq. . . . . . . . . 74


E X H I B I T S

EXHIBITS:                                          PAGE

Exhibit 54    Mr. Patten's File. . . . . . . 6


EXHIBITS MENTIONED:

Exhibit 53    Collection Actions, First Edition

              National Consumer Law Center

              5 pages. . . . . . . . . . . . 75

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

WHEREUPON, the following proceedings were had and testimony taken, to wit:

* * * * * * * *


JAMES A. PATTEN,

called as a witness herein, having been first duly sworn, was examined and testified as follows:


EXAMINATION

BY MR. SIMPSON:

Q.    **Would you please state your full name and business address.**

A.    James A. Patten; 2817 - 2nd Avenue North, Billings, Montana.

Q.    **I've heard you go by Andy?**

A.    Yes.

Q.    **Do you mind if I call you Andy?**

A.    That'd be fine.

Q.    **Did you bring your file with you today?**

A.    I did.

Q.    **You were here when I recited the list of materials that were contained in Mr. Eakin's file?**

A.    Yes.

Q.    **Do you have anything in your file, aside perhaps from his report, that wasn't identified in**

Page 4

his file?

A.    I'm not sure.  I've got -- I've got a notebook with some, what I think was the discovery and the pleadings up to a certain date.

Q.    **You could walk through these things.  I don't need to make them all exhibits, but if I could identify them, I can get them later if I need.**

**In your notebook you've got plaintiff's responses to defendant's first discovery requests in the case of Portfolio Recovery Associates LLC, plaintiff, vs., looks like Linnae --**

A.    Schemmel.

Q.    **-- Schemmel.  And that's in Yellowstone County, Cause DV -- is it DV-08-485?**

A.    485.

Q.    **When were you provided with that?**

A.    I believe I was provided all of this stuff at the same time, which would have been earlier this summer.

Q.    **Got deposition -- telephonic deposition of Delvenia Rush in the case of Portfolio Recovery Associates vs. Jeanie Cole.**

**You've got a page labeled Index, at the beginning of your notebook, that identifies first**

Page 5

amended complaint and demand for jury trial;
defendant's answers and affirmative defenses to
plaintiff's first amended complaint.

I'll tell you what.  Do you have any objection if I ask the court reporter to make a copy of this as an exhibit?

A.    The whole thing?

Q.    Yeah.

A.    I don't care.

Q.    Let's do that afterwards and we'll call this 54.

(Whereupon, Deposition Exhibit Number 54 was marked for identification.)

BY MR. SIMPSON:

Q.    You've also got a manila folder --

A.    I've got a folder with some material on -- it might be redundant from what's in there. Here's some deposition transcripts of Lisa Lauinger, Charles Dendy, and Grace Lauinger.  Got some more pleadings and documents in this case and in some other cases.

Q.    You have a pleading in your stack here that's entitled, Plaintiff's Expert Witness Disclosure in the Case of Lester Ammondson, first

named plaintiff, vs. Northwestern Corporation, Butte-Silver Bow County, Cause DV-05-97. Do you know why that's in here?

A.    No.

Q.    Do you know if it has some relation to this case?

A.    I don't think that it does. I'm not sure why I -- I think John gave me a copy of it. And I'm not sure -- I'm not sure what it's for. I actually don't remember reading it, but I may have.

Q.    Try not to get your file out of order here.

A.    Didn't have any order.

Q.    There was no particular order?

A.    No.

Q.    It looks like an e-mail printed by you from John Heenan to you, dated August 18, 2008, and that contains apparently some attachments?

A.    Yes.

Q.    This e-mail that we just mentioned, appears to discuss compensation of Mr. Heenan relative to the prior suit by JRL against McCollough; is that correct?

A.    Yes.

Q.    Are you offering an opinion in this case

Page 7

as to the reasonableness of the fee claimed by Mr. Heenan?

A.  Yes.

Q.  Or by Mr. McCollough rather, I'm sorry.

A.  Yes.

Q.  And then you've got some other materials.

A.  I've got some case decisions printed -- three cases printed out.

Q.  Do you have other e-mails in your file that you exchanged with Mr. Heenan?

A.  Not in the file.

Q.  Do you have them elsewhere?

A.  They'd be on my computer.

Q.  Do you have an estimate of how many you have?

A.  Five or ten maybe.

Q.  Tell you what, when we take the break for your court appearance at 2:00, would you have an opportunity to run by your office and print those?

A.  I'll do my best, yes.

Q.  Are these cases that you handed me that are in your file, are these cases that you found during your research or were those cases that someone else provided to you?

A.  No.  These would have been ones that I

Page 8

looked for and found.

Q.    And then you have a greenish folder?

A.    I've got a green folder that has my reports, Mr. Hick's report, and just a client sheet, whatever you want to call it.

Q.    And then you have some other materials it looks like over on your right?

A.    These other materials are the same thing that I think you talked to Mr. Eakin about.

Q.    Okay.  Copy of a case called Seipel, S-e-i-p-e-l, vs. Olympic Coast Investment, 188 P.3d 1027.  A noncitable or nonpublishable case from California Court of Appeals, Second District, called Vargas vs. Cedars-Sinai Medical Center, 2008, West Law 331068.

NARCA newsletter, which we previously identified with Mr. Eakin; the Reichert case, and the MSN article on zombie debt.

Did you locate these first case -- two cases, Seipel and Vargas?

A.    No.  Mr. Heenan gave those to me.

Q.    Have you read those?

A.    Yes.

Q.    What did Mr. Heenan ask you to do when he first contacted you?

Page 9

A.    To the best of my recollection, he asked me to render an opinion about whether the actions of Johnson, Rodenburg & Lauinger met the Montana standard of practice; whether there were -- an opinion for any violations of the Fair Debt Collections Practice Act; and an opinion about the reasonableness of his hourly fee and a time spent on services.

Q.    Did Mr. Heenan communicate those requests to you in writing?

A.    Not that I recall.

Q.    How many meetings have you had with Mr. Heenan to discuss this case?

A.    I believe it's been three.

Q.    Do you remember when those occurred and what was discussed?

A.    I met with him yesterday and he gave me these.

Q.    The cases of Seipel and Vargas?

A.    Yes.

Q.    And we talked about me coming over and sitting through Mr. Eakin's deposition.

I recall meeting with him initially and him providing me with this expert binder, and talking in a general sense about what he was --

Page 10

what sort of opinion he was looking for.

I read the documents in the binder and reviewed the deposition transcripts; met him at his office, talked a little bit more about the opinion. Then I prepared a report; he met me in my office, we reviewed it.  And then met again yesterday.  So, four meetings.

Q.    And you prepared two reports; is that right?

A.    Yes.

Q.    Did you prepare a draft of either report before signing off on a final?

A.    I don't remember, but I'm -- my practice would be to have a draft.

Q.    Would you share that with anyone outside your office?

A.    My practice is to keep redrafting stuff; as much time as I have, I'll keep working on it. At some point I would have shown sort of the final draft to Mr. Heenan and we would go through it.  I recollect that we did go through it.  And I recollect that there were some changes made; that was on the first opinion.  The rebuttal opinion or reply opinion, whatever it's called, I don't remember reviewing that with Mr. Heenan.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.   Do you recall if Mr. Heenan asked you to make any changes to your first report?

A.   Yes.   I'm going to be hard pressed to tell you exactly what he asked, but my recollection is that he asked me if I would -- if I had an opinion about something in particular and if I would include it in the report.

Q.   Did you keep a copy of your first draft?

A.   No.   Unless it's been saved in the Word Perfect file.

Q.   So that was -- was it in the nature of an addition that was requested by Mr. Heenan, or was he asking you to revise or amend something you already stated?

A.   No, it was in addition.   And I'm trying to remember.   Need to refresh my recollection.   As I recall, he asked me to express an opinion, if I could, on whether Johnson, Rodenburg & Lauinger could fall within the bona fide error provisions of the Fair Debt Collection Practice Act.

Q.   Have you tracked your time that you spent working on this file?

A.   Yes.

Q.   How many hours have you spent so far?

A.   I can't tell you as I sit here.   I do

have a bill that would have my time and date and what I did.

Q.   Do you have a rough estimate as to the number of hours you've spent?  Let me ask it this way.  Would it be possible for you after your hearing or before your hearing, whichever is easier for you, when you check to see if you could print any e-mails, to print the bill?

A.   Yeah.

Q.   Okay.  And what's your hourly rate?

A.   Two and a quarter.

Q.   Is that what you charge most clients?

A.   Yeah, although I've increased it recently.

Q.   Congratulations.

A.   Bankruptcy practice is pretty good these days.

Q.   I can imagine.  Have you ever met with or spoken with Timothy McCollough?

A.   Not that I know of.

Q.   Have you ever met or spoken with his wife, Dorleen?

A.   Not that I know of.

Q.   I take it you've never exchanged any written correspondence of any sort with him?

Page 13

A.    Not that I can recall.

Q.    **Have you ever had a case, for a client, where Johnson, Rodenburg & Lauinger is representing the other side?**

A.    Yes.

Q.    **Can you identify that?**

A.    I'm not going to be able to identify all of them.  And I've got a husband/wife client now that probably have Johnson, Rodenburg & Lauinger on the other side on five or six cases, separate cases.

Q.    **Do you know the last name?**

A.    Mintling, M-i-n-t-l-i-n-g.

Q.    **Are those cases filed separately or are they all --**

A.    Separately, separately.

Q.    **And those are debt collection actions?**

A.    Yes.

Q.    **Are they all here in Yellowstone County?**

A.    Yes.

Q.    **District court or justice?**

A.    District.

Q.    **How long have those cases been ongoing?**

A.    I'm guessing on this one, four years. There've been a series of them.

**Charles Fisher Court Reporting, Inc.**
**503 East Mendenhall, Bozeman, MT 59715 (406)587-9016**

Q.   Are they being vigorously contested?

A.   Yes.

Q.   Has Johnson Rodenburg voluntarily dismissed any of those?

A.   Yes.

Q.   When was the most recent one you can think of?

A.   The most recent one, I'm guessing, this year sometime, maybe.

Q.   How many are currently underway?

A.   Right now there may not be any.

Q.   What was the nature of the debt that was sued on in the Mintling litigation?

A.   Credit card.

Q.   Did Johnson, Rodenburg & Lauinger obtain recovery on any of those matters?

A.   There was one that they got, obtained a judgment after a trial.

Q.   Were you involved in the trial?

A.   Yes.

Q.   Who tried the case for Johnson Rodenburg, if you recall?

A.   Matt Erickson.

Q.   Any others where JRL obtained a judgment against the Mintlings?

A.    Not that I can recall, but there may be. I know that there's a couple cases where a judgment was obtained, but if I recall, as I sit here, that it was with different attorneys.

Q.    **Different attorneys representing the Mintlings?**

A.    No.  Different attorneys representing creditors.

Q.    **Okay.**

A.    I know that there's a couple judgments that have been entered against the Mintlings; one or the other or both.

I recall a trial with Johnson, Rodenburg & Lauinger, and I recall consenting to a judgment against Mrs. Mintling in, I want to say in consideration, but at the same time they dismissed the claims against Mr. Mintling.  I don't remember if that was Johnson, Rodenburg & Lauinger, or somebody else.

Q.    **I might be confused, or didn't understand your earlier testimony.  Were the roughly four or five matters that you've handled for the Mintlings, each of those involving a client of Johnson, Rodenburg & Lauinger?  Or were there other --**

A.    There were other cases too.

Page 16

Q.    Okay.

A.    I probably have eight or nine files from the Mintlings.  And, as I sit here, I'm thinking half of them are Johnson, Rodenburg & Lauinger files, and half are somebody else.

Q.    **Other clients that you've defended in suits filed by Johnson, Rodenburg & Lauinger?**

A.    I was trying to think of the particular names while you were deposing Mr. Eakin.

The one that I -- there's a whole -- there's a number of them.  I can't think of the defendants' names as I sit here, other than there was one, and I don't remember his first name, but his last name was Limpp, L-i-m-p-p.  And I have a recollection of the circumstances in that.

Q.    **And that was a case where there was a debt that was sued on against Mr. Limpp?**

A.    Yes.

Q.    **What happened in that case?**

A.    What happened was is that he had a statute of limitations defense.  He was served by publication and didn't know anything about being sued until his wages were being garnished.  And we had to file a motion to vacate the judgment.  And, as I recall, the case was then dismissed on statute

Page 17

of limitation grounds.

Q. Did he recover the money that had been garnished?

A. I'm sure he did.  I'm pretty sure he did.

Q. Was that a credit card debt in the Limpp case?

A. I think so.

Q. Was there any dispute as to the statute of limitations defense applying in that case?

A. I think we had to argue about it.  I mean, there was no question in my mind.  And it was -- in order to vacate the default judgment, we did two things.  One of them is showed that service by publication was improper, but we also showed that there was a bona fide defense and that's where the statute of limitations came in.

Q. So was that --

A. As I recall, this was a couple years ago.

Q. Was that a contested motion to dismiss?

A. I think it was, yeah.

Q. Was that here in Yellowstone County?

A. Yes.

Q. Any other cases that you can think of as we sit here now, involving Johnson, Rodenburg & Lauinger?

Page 18

A.   I can think of the circumstances, but I can't think of the name of the parties.

Q.   **Have you met any of the attorneys from that firm?**

A.   No.

Q.   **You spoken to them on the phone?**

A.   Yes.

Q.   **Do you know which ones?**

A.   I've talked to Mr. Dendy.  I've talked to Ms. Lauinger.  I've talked to Erin, whatever her name is.

Q.   **Zasada?**

A.   In Fargo.  And Mr. Rodenburg has been around for a long time and I've talked to him before, although not recently.

Q.   **I take it when you spoke with Mr. Dendy and Ms. Lauinger it didn't have anything to do with this particular case, McCollough?**

A.   No, no.

Q.   **Did it have to do with either Mintling or Limpp or one of the other suits?**

A.   Yeah.  I would have -- I remembered the Limpp case was -- Lisa Lauinger was the attorney.  And the Mintling cases I'm pretty sure have been Mr. Dendy.  And, in fact, as I sit here, I think

Page 19

that most of my contact with that firm, at least over the last couple years, have been with Mr. Dendy.

Q.   In the Mintling case you mentioned, I apologize if I asked this already, but I want to make sure I get this figured out.  You said one of the cases went to trial and there was a judgment entered?

A.   Yes.

Q.   And was that a credit card case?

A.   Yes.

Q.   And what was the nature of the dispute that your clients had with the claim?

A.   My recollection was there was a dispute over the interest rate that was being charged, and that, I guess, an accounting or whatever of the total that they were claiming.

Q.   I've seen your report, but I guess just for purposes of refreshing my mind, can you describe your education after high school?

A.   I have a BA in economics from University of Montana; went to George Washington Law School, during the Carter administration.  And I . . .

Q.   What year did you graduate from law school?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    '78.

Q.    **Moved back to Montana after that?**

A.    Immediately after that.  In fact, I didn't go to graduation; I just came back.

Q.    **You and Mr. Eakin probably sat for the bar at the same time, huh?**

A.    I don't remember that, but I -- I've known Mike since I got back, as far as I can recall.

Q.    **Did you grow up here in Billings?**

A.    Yes.  I'm a Billings guy.

Q.    **And did you sit for the bar in the fall of '78?**

A.    Fall of '77.  Actually, I started law school at night.  And, so, that's a four-year program when you go at night.  And halfway through I was able to go full-time, which put me at -- I finished at the end of the fall semester in 1977.

Back then the bar exam was offered in October.  Back then you could petition the Supreme Court for all sorts of things, and so I petitioned the Supreme Court to take the bar exam early so I didn't have to wait.  And there were a number of us that had done that.

So, I was able to come back, take the

**Charles Fisher Court Reporting, Inc.**
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

bar; they tell you immediately. And I was able to go back to school and tell everybody that I passed the bar exam.

Q. Congratulations. Yeah, I guess that makes up for no diploma privilege?

A. Yeah.

Q. Were you working during law school?

A. Yes.

Q. What were you doing?

A. Worked for a law firm in DC.

Q. You moved back here in 1978. Describe your practice for me, if you would, since then.

A. From -- as soon as I moved back until about 1981, I was a staff attorney for the Northern Plains Resource Council.

Q. What is the Northern Plains Resource Council?

A. It's a group of farmers and ranchers that were -- my job was mainly fighting the permitting of coal strip units three and four.

Q. Is that group still together?

A. Yes.

Q. And you did that work as staff attorney for Northern Plains Resource Council for three years?

A.   I think that was it, yes.

Q.   **What'd you do after that?**

A.   Opened an office with Jeff Renz.

Q.   **Roughly 1981?**

A.   I think so.

Q.   **Here in Billings, you opened that office?**

A.   Yep.

Q.   **What kind of a practice did you have?**

A.   Whatever walked in the door with money.

Q.   **General practice?**

A.   Yeah.

Q.   **Got about three minutes.**

A.   Okay.

Q.   **Were you and Mr. Renz in a partnership?**

A.   We were for maybe three or four years.

Q.   **Did you do any debtor/creditor work during that time frame?**

A.   Yes.

Q.   **Which side were you on typically?**

A.   Fairly early on we took over a practice of a retiring attorney who had a collection practice.  So, we -- and it became a -- primarily did -- not primarily, but we did debt collection work.

Q.   **Who was the attorney that had retired?**

Page 23

A.    His name was Fred Dugan.

Q.    **What kind of matters were you collecting on?**

A.    They were mainly what I would call commercial collections.  They were business -- business debts.

Q.    **Debts of businesses to other businesses, or debts of individuals to businesses?**

A.    Yes.  Debts of businesses to other businesses.

Q.    **Was there a client group that came with Mr. Dugan's practice?**

A.    The main client group was called the Montana Association of Credit Management.  But he had a number of contacts in the industry and there was some consumer credit collections.

(Whereupon, the cell phone alarm sounded.)

MR. HEENAN:  Sorry.

MR. SIMPSON:  That's all right.

THE WITNESS:  That -- he retired but he could make a certain amount and still get Social Security.  And, so, he had an office with us and would come in part-time and kind of show us what to do and that kind of thing.

Page 24

MR. SIMPSON:  Do you want to conclude there?

THE WITNESS:  Yeah.

MR. SIMPSON:  Off the record.

(Whereupon, a break was taken.)

BY MR. SIMPSON:

Q.  **Andy, I was just sorting through the e-mails that you printed off for us over the break. I saw a reference in there to a person named Craig Martinson?**

A.  Yes.

Q.  **Who's that?**

A.  He's an attorney in my office.

Q.  **Does he handle collection work?**

**Craig and I do mainly bankruptcy, and so there's always some -- usually or oftentimes some collection stuff that precedes bankruptcy.**

**That was mixed in there.  In -- when I printed them all off and went and grabbed it, this was buried in the middle of it.**

Q.  **A bankruptcy petition?**

A.  It's proof of claim.  Somebody else must have printed it and got slipped in between what I was printing on.

Q.  **Doesn't have anything to do with this**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

file?

A.    No, no.

Q.    Just before we took the break, you had described to me your practice with Jeff Renz and how you'd taken over the practice of Attorney Fred Dugan, and you were doing work for the Montana Association of Credit Management.  I think you said you were also doing some consumer collection at the time?

A.    Fred Dugan had a collection practice; that's all he did.  And he was in some books or publications, I don't remember what now, that he would get cases referred to him.  And, so, when we took over his practice, then we would get them.

They were mainly business collections, but there was some consumer collections.  It was not a major part of it, but there were consumer collections.

Q.    How long, then, at the end of this three- to four-year period, where you were practicing with Jeff Renz, what happened at the end of that time?

A.    Jeff left.  We continued doing some of the collections and that work kind of fell off as bankruptcy work filled in.

Q.    When you say We, was there another

attorney that joined you?

A.    Pat Smith was with me for a while.  Pat's a lawyer in Missoula now.  I don't know if you know him.

Q.    **Name sounds familiar.**

A.    Does mainly Indian law.  In fact, that's all he does is Indian law.  And then Russ Yerger and I were together for a while.

Q.    **Were you doing collection work throughout the 1980s?**

A.    Yeah.  But it started to taper off and started doing more of the other side, so that by 1990 was pretty much just doing debtor kind of work.

Q.    **And was that debtor work as far as filing bankruptcies, or were you also defending debtors on -- I suppose start with a debtor -- I mean a collection suit, work into a bankruptcy?**

A.    Yeah.  It was primarily bankruptcy, but a lot of times there was some preceding, you know, disputes and litigation and stuff.  But it was usually related somehow to bankruptcy.

Q.    **If we start with 1990, at which point you were changing your focus more towards bankruptcies; which firm are you with at this point?**

Page 27

A.   Might have been just me.  And then in the mid '90s, I started practicing with Scott Green and Bruce Bekkedahl.

Q.   **Are you in a firm with those folks today?**

A.   Yes.

Q.   **And what's the name of your firm?**

A.   Patten, Peterman, Bekkedahl & Green.

Q.   **And what -- well, I guess going back to 1990.  Has your practice gotten back into the collection side, the creditor side?**

A.   We started representing institutional kind of lenders, you know, banks, credit unions.

Q.   **You personally were doing that work?**

A.   Yeah.  I mean, I do it more now than I did then.  Scott Green represented Associates and did a lot of their collections for a number of years.

Q.   **And that's Portfolio Recovery Associates, or is that somebody else?**

A.   No.  It was a consumer finance, like household finance or something like that.

Q.   **Within, say, the last ten years, have you regularly represented any client to pursue consumer collections, on behalf of the client?**

A.   No, no.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.    Within the last -- well, let's go all the way back to 1990.  Have you routinely represented any client to attempt to collect credit card debts?

A.    No.

Q.    Do you collect credit card debts for banks or credit unions?

A.    I don't.

Q.    Have you ever?

A.    Not that I can recall.  Maybe in a bankruptcy case or something, but not in a non-bankruptcy collection case, that I can remember.

Q.    If you look at your practice now, and I don't know if it's fair to say look back over the last ten years of your practice, could you give me an estimate percentagewise of the different fields that you practiced in?

A.    75 percent bankruptcy, 15 percent institutions, 10 percent commercial kind of litigation.

Q.    And when you say bankruptcy, are you usually representing debtor or creditor interest?

A.    Both.  A little bit more debtor than creditor, but we represent creditors, trustees, debtors.

Page 29

Q.   Of the 15 percent that you attributed to institutional clients, what kind of work is that?

A.   Bank collections, foreclosures, credit union foreclosures.

Q.   And, then, the other roughly 10 percent is commercial litigation?

A.   Yeah.

Q.   Has that apportionment stayed relatively close over the last ten years?

A.   I'd say so.

Q.   Have you ever represented a debt buyer client?

A.   No.

Q.   What do you understand to be a debt buyer?

A.   Somebody who buys debt from the original lender, or a successor to the original lender.

Q.   Of the folks that you're representing as debtors in bankruptcies, do you have an estimation of how many of those people usually have credit card debts?

A.   95 percent.

Q.   Do you have an estimation --

A.   Of the individuals.

Q.   Individuals.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.    Yeah.

Q.    **Consumers.**

A.    Yeah.

Q.    **Okay.  Is the credit card debt often a factor in bankruptcy filings in your practice?**

A.    I'd say almost always.

Q.    **Just out of curiosity, what percent is medical related?**

A.    Not very much.  You know, I've seen reports about medical bankruptcies, but that's not what I encounter.  You know, I've had clients that had a medical wreck and had to do a bankruptcy, but without question the greatest number are out of control credit cards.

Q.    **Has that changed since congress amended the Bankruptcy Act a few years back?**

A.    No.

Q.    **So, do you routinely defend cases filed by debt buyer companies that are being sued on against your folks?**

A.    Yes.

Q.    **Do you know which companies those are?  I mean, have you defended suits filed by CACV of Colorado?**

A.    You know, I don't recognize that name.

Page 31

Portfolio Recovery Associates; Unifund. Who's the plaintiff -- who --

Q. **CACV of Colorado was the plaintiff, yeah.**

A. I don't remember running into them before, but I know that those companies oftentimes go by different names. LV Funding or something like that.

Q. **When you're defending -- well, let me back up.**

**Are you dealing with them in bankruptcy scenarios where you've got an adversary proceeding in the bankruptcy filed by one of these folks?**

A. No, no. There may be some claims objections. But usually it is -- the typical situation is someone comes in, wants to do a bankruptcy, and for whatever reasons we don't want to file it right away, but in the meantime they get sued by Portfolio Recovery or something like that. And, so, we'll defend them with the ultimate goal being a bankruptcy filing.

Q. **It's just a matter of timing when that's going to be filed?**

A. Typically, yeah. And the more imminent the bankruptcy, sort of the less attention we pay to what the actual claims are in the lawsuit. It's

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

just a matter of getting a trial date and having a deadline to file a bankruptcy before the trial date.

Q.    In any of the cases where you're defending against a suit by one of these companies that is a debt buyer, do you have occasion to request through discovery their file?

A.    We request certain documents.  I don't want to say we request their file, but we request certain documents.

Q.    What kinds of documents do you usually request?

A.    We always request a copy of whatever document it is by which they claim to own the account.  When we were doing the collections back in the '80s, that was an essential part of every complaint was to specifically identify the transfer of the account and to attach a copy of it to the complaint.

And I think that, frankly, is the law in Montana; that you got to be able to prove that you, indeed, own the account.  And, so, we always ask for a copy of it.  We ask a for copy of the original contract, and we ask for a copy of the monthly invoices on the credit card, the monthly

Page 33

statements.

Q. **Have you had occasions where you've requested those various categories of documents and been told that they're not available?**

A. Yes.

Q. **Does it seem to be the norm that the documents are or are not available?**

A. Are not.

Q. **They're usually not available?**

A. No.

Q. **Okay. Aside from Johnson, Rodenburg & Lauinger, are there other firms you routinely deal with that are representing debt buyer clients?**

A. We deal with the Smith Firm in Helena, occasionally. Deal with David Hull in Helena occasionally. We deal with Michael Moore in Missoula, but he doesn't, as far as I can recall, he doesn't represent the debt buyer types. Smith and Hull do.

There's somebody else in Missoula whose name escapes me right now, or he might be in Hamilton. And I've dealt with him before on credit cards, and I don't remember if it was a debt buyer or the original card company. Sometimes Scott Radford out of Great Falls.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.    The suits that you defended for Mintlings, were those filed on behalf of the debt buyer client, or do you know?

A.    My recollection is that they were debt buyers.

Q.    And do you recall -- did you request the categories of documents we discussed?

A.    Yes.

Q.    Do you know if you got them?

A.    We got -- I'm trying to remember the timing on this.

It seems to me that I first started regularly encountering the Johnson Rodenburg Firm maybe four or five years ago, and it might have been the first case against Mintling.  And I requested the documents and at some point they filed a motion to dismiss without prejudice.  And I thought, okay, fine, and let it be dismissed without prejudice.

Then, on behalf of a different creditor, another suit was filed.  Went through the same process and this time I objected to dismissal without prejudice.  I don't remember which attorney was involved.

Q.    Was this another matter for the

Page 35

**James Patten**

**Mintlings, or a different client?**

A.   I recall it was for the Mintlings.  And I recall that they then moved to have a witness appear by -- well, I'm trying to think of the timing on this.

It may have been they moved to -- I think they just moved to dismiss without prejudice, like right before the trial.  I objected and then I went over to the courthouse to the trial and nobody showed up, and I moved to dismiss for -- with prejudice for lack of prosecution, which was granted.

And as I sit here, I think there've been three other cases that have been dismissed, with that firm and with the Mintlings, all based on their inability to answer the discovery.

Q.   **Have you spoken with Charles Dendy or Lisa Lauinger, or anybody else at the office about why they can't respond to the discovery?**

A.   I've spoken with the attorneys and I don't remember who it was, about extensions of time for them to answer the discovery.  And I don't -- my recollection is that they just say that they're trying and they can't get it or they haven't got it or something.

Page 36

Sometimes they'll formally file a motion to extend the time for them to answer; sometimes they don't. And I've never really gone back to see if it's one attorney that does it and one attorney that doesn't. But typically there's no documents produced in the case; gets dismissed, with or without prejudice.

Q. **Did the same scenario you've just described occur in the case where you were representing Mr. Limpp?**

A. I don't think it got that far. Because Mr. Limpp came to me and -- because his wages were being garnished, he advised me that he'd never been served, which I hear all the time. So, I don't -- I never believe what my clients tell me.

So we got a copy of the file and saw that it -- service had been made by publication, which I didn't think was possible in a case like this. But as I looked at the rule, you can do it, but the judge has to sign the order allowing publication. And in this case the clerk signed it.

So, and then also Limpp brought in some kind of document that supported his claim from when his last payment had been made. And so we moved to set aside the default judgment and asserted that

Page 37

the claim was time barred and we had some documentation of some kind.

Lisa Lauinger was the attorney. I recall that she opposed it and that the judge granted it and then granted the motion to dismiss, based on statute of limitations.

Q.   **And that was filed here in Billings?**

A.   Yeah. And I need to caution that I may have the name wrong. I can picture the guy's face, but I'm --

Q.   **Happens all the time.**

A.   I'm guessing on his name.

Q.   **Of the cases with the Mintlings and the person you think might be Mr. Limpp, does that encompass the entirety of the suits you've defended that JRL has filed?**

A.   No.

Q.   **There are others?**

A.   There are others.

Q.   **Can you recall names?**

A.   I can't think of their names.

Q.   **Have any of those others gone to judgment? And I guess when I say gone to judgment, I mean a judgment in favor of JRL's client.**

A.   I don't know. My -- as I sit here right

Page 38

now, my recollection is that they've been dismissed. And I've learned how to deal with Johnson, Rodenburg & Lauinger, and that's to give them discovery, which they can't, or rarely answer. And, so, it's a routine practice to do that.

Q. **Have you ever filed a claim against any person or entity for violation of the Fair Debt Collection Practices Act?**

A. No. Filed a claim in court?

Q. **Yeah.**

A. No.

Q. **Have you made a claim prior to litigation being commenced?**

A. I made demands.

Q. **Have you made demands against Johnson, Rodenburg & Lauinger for violation of the FDCPA?**

A. No, no. Unless it was a counterclaim, and I don't remember specifically, but. . .

Q. **The parties you referenced that were debt buyers, Portfolio Recovery, Unifund, possibly LV Funding, who are those -- who have you defended, or who has filed those suits that you defended?**

A. My recollection would be Johnson, Rodenburg & Lauinger, Smith Law Firm, or David Hull.

Page 39

Q.    If you've asked -- have you sent discovery to David Hull or to the Smith Law Firm in those cases?

A.    David Hull, I have.  I don't recall with Smith Law Firm.  I -- yeah -- you know what -- I had a -- the Smith Law Firm was involved in one of the Mintling cases.  And I think we . . . I think we sent the discovery, yeah.

Q.    Have you gotten responsive documents in return?

A.    With Hull, I didn't.  I think with the Smith Law Firm, we did.  And the Hull's case was dismissed without prejudice.  But the statute of limitations had run according to my client.

Q.    What's your knowledge of the documentation that Johnson, Rodenburg & Lauinger had with respect to Mr. McCollough's debt?

A.    My understanding was that they got an electronic information that had the name, the address, the amount, a last payment date, maybe Social Security number, the name of the original creditor.  As I sit here, that's all that -- I think I've seen the printout anyway, I think of a screen or some kind of a report that's in -- in here.

Page 40

Q.    Refer to your notebook if you need to.

Have you seen an affidavit of sale of the debt, from Chase Manhattan, the original creditor, to CACV of Colorado?

MR. HEENAN:  Objection; foundation.

THE WITNESS:  You know, I don't remember if I saw that or not.

BY MR. SIMPSON:

Q.    Okay.

A.    I think if I hadn't seen it, I would have raised it as an issue in my report.  I'm not sure. But for some reason I'm thinking that there is an affidavit in there some place.  But there's a number of affidavits, I think, that -- from various cases that I've seen, in here, so.

Q.    And glancing through your file I note that it appears maybe there were some affidavits from unrelated lawsuits.

A.    (Witness nodding head.)

Q.    Are you generally aware of firms that routinely practice in this field representing debt buyers, what information they routinely have in their possession before filing suit?

A.    Only from the discovery materials that I've looked at.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.    In this case?

A.    In this case.  And I guess from my observations in other cases that involved debt buyers.

Q.    **Do you have a sense in broad terms of how many cases you have defended that have been filed by debt buyers?  Either that have gotten to the point of suit being filed or cases where a client's come into your office and said, Andy, I've got this CACV of Colorado and they're sending me letters, what do I do?**

A.    Thirty maybe.  That's kind of a wild-ass guess off the top of my head.  Because a lot of them get filed and then there's bankruptcy that's just right on their heels.  So sometimes we file a motion to dismiss and that's all we have to do, or sometimes we file an answer and then get the bankruptcy filed before the case gets litigated in any way.

Q.    **Are most of the bankruptcies that you're filing for individual consumer debtors no asset Chapter 7 liquidation?**

A.    If they're not no asset, they're low asset.  Maybe a tax refund or some small -- car worth a little bit more than exemption.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.    In your experience, do the creditors, both credit card companies and debt buyers, tend to drop out as soon as the bankruptcy is filed?  Or do they pursue claims in these bankruptcies on a regular basis?

A.    They usually file a proof of claim.  And I had a recent case where they, after the discharge, several years after the discharge, they sent out a demand for payment.

Q.    On a discharged debt?

A.    On a discharged debt.

Q.    Did my client have anything to do with that one?

A.    No.

Q.    Do you have your report, Andy?

A.    Yes.

Q.    I guess before I get into the meat of your report.  Before, back in the early '80s, when you were doing some collection work, do you think you ever filed a suit without having all the supporting documents?

A.    No.

Q.    Aside from your work, then, in the collection field, have you ever filed a suit on behalf of a party seeking money damages on, you

Page 43

know, not a collection suit but just some piece of commercial litigation, where you haven't had all the documents up front?

MR. HEENAN:  Object to form.  Vague with respect to all of the documents, but you can answer.

THE WITNESS:  Okay.

BY MR. SIMPSON:

Q.  Yeah.  If you need me to make it more specific, I can.

A.  I think I know what you're asking.

I may have when I was much younger and learned the painful way what happens when you get deep into a case without knowing everything and how much time you waste.

Q.  Okay.  What case was that?

A.  Well, I can't think of anything particular, but I think I learned over the years that it's better to get the information up front and that way you're not surprised after you invested a lot of time into a case.

Q.  Have you ever filed a suit believing the facts to be one way and finding out later that what you understood at the beginning of the suit was not, in fact, what had occurred?

Page 44

A.   I probably have, but I can't think of a particular situation.

Q.   **I think you said earlier you don't believe what your clients tell you half the time.**

A.   No, I don't.

Q.   **Is there a reason for that in particular?**

A.   Yeah.

Q.   **Yeah?  Did you get burned on one or two?**

A.   I didn't get burned so much, but I got -- some people I was associated with got burned.  And it wasn't a big deal, but it was an important lesson.

Q.   **Have you ever filed a case beyond the statute of limitations?**

A.   Not that I know of, but --

Q.   **Let me ask you about a recent one I found.**

A.   Okay.

Q.   **There was a recently reported decision --**

A.   Jock West?  Was this the attorney's name?

Q.   **Yes.**

A.   Yeah.

Q.   **What happened in that one?**

A.   There was an attorney's lien filed in a lawsuit and the judge -- it was a dispute over a

Page 45

trust as I recall, and the judge kind of screwed around forever and ever on it.  And then something happened that made the parties to the lawsuit get together.

The attorneys -- and the attorney's lien was filed by Bruce Bekkedahl and Jock West, as I recall.  And they represented one party and she was fighting with her kid, who was the trustee over her late husband's trust or assets he had put in the trust.

It was very contentious, and it -- kind of between languishing with the court and the judge not doing stuff real promptly, at some point the kid and the mom made some kind of a settlement that cut out the attorneys from getting anything, and that's sort of when the issue came up.

And there was a, I think a dispute or a -- as to when the statute of limitations started running.  And it was our position that it never did start running, I think.  And it was the court's conclusion that it ran, I think, when the lien was filed, as I kind of recall.

Q.   **So that's who was determined to be outside the statute?**

A.   Yeah.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.    Okay.    Your report makes mention on page 1, this is the first report, that you believe that Johnson, Rodenburg & Lauinger failed to meet the minimum standard imposed by Rule 11, both the Federal and Montana Rules of Civil Procedure, and that their pleadings are not formed after a reasonable inquiry, and the claims alleged in their factual contentions do not have evidentiary support.

Have you ever been on the receiving end of a Rule 11 order?

A.    No.    No.    I've been on the receiving end of a Rule 11 motion.

Q.    But no court's ever held you as having violated Rule 11?

A.    99 percent sure.

Q.    Okay.    Fair enough.    Has claim ever been made against you or your firm, either the current firm or the firm that you were with in the early '80s, for violating any provision of the Fair Debt Collection Practices Act?

A.    No.    If it -- you know, I should back up. If it did, it never got litigated to my recollection.    I mean, there may have been a counterclaim or something like that, that raised the issue, but I have no recollection of ever

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

actually litigating that.

Q.    What's your understanding, if any, of what Johnson, Rodenburg & Lauinger did at the outset of this case to identify the statute of limitations problem?

A.    My understanding is that they made an inquiry with CACV about that 75-dollar payment that shows up in that information that was dumped onto them.  And it might have been after the McCollough, either in response to their demand letter or to their complaint.

I think McCollough raised the issue of statute of limitations.  So they asked -- they inquired CACV of Colorado about it and was told that it was a payment.

Q.    So, is it your understanding, then, when you wrote this opinion that -- I want to make sure I understand this -- that Johnson, Rodenburg & Lauinger only inquired of CACV of the status of Mr. McCollough's payments after Mr. McCollough raised the statute of limitations as a defense?

A.    I don't know if he formally raised them or I -- I'm not sure exact wording, but early on there was some inquiry about the statute of limitations.

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.    What's your understanding of the scope of the inquiry and what was done?

A.    I think it was to ask the CACV to confirm that there was a payment made within the period of limitations.

Q.    And what is your understanding as to CACV's response?

A.    CACV initially said, yeah, there was a payment made within -- I don't remember if they talked about it in number of years or a particular date, but CACV advised Johnson, Rodenburg & Lauinger that a payment had been made on whatever date that shows up on there.

Q.    And is it your understanding that Montana follows a five-year statute of limitations for an account stated?

A.    Yes.

Q.    For credit card debt?

A.    Yes.

Q.    Okay.  And is -- I guess timingwise, this is important to my perspective on the case, at least.  Do you understand JRL's inquiry about the payment, the last payment date to have been made before or after it filed the suit?

A.    I think it -- I guess, my understanding

as I sit here, is that it was made before suit was filed.

Q.   And is it -- reading your report I understand that it's your opinion that that inquiry to CACV and CACV's response was not satisfactory and didn't meet the standard of care that you believe they're held to?

A.   That's right.

Q.   Why is that?

A.   Because remarkably CACV has a contract with them that says, in other words, you can't believe what we tell you.

And, so, it's my opinion that if your client is telling you from the get-go that you can't rely on what they tell you, I think you need to see the documents, you need to feel them and touch them and read them yourself and draw your own conclusions from the documents, and not just accept the information that they give to you, in the format that it's given.

Q.   So, in what manner, then, did JRL fail to meet the standard of Rule 11?

A.   I think that the -- based on my experience with them, when they're asked to produce documents that substantiate the claim and they

Page 50

can't -- and they routinely cannot do it, then I don't know how they can file suit making assertions of a complaint when they really have no idea whether those assertions are correct or not.

Because they don't have the documents, they know they don't have the documents, they know they are likely not to get the documents, and they're told by their client:  You can't believe what we tell you.

Q.    I can't remember if I asked you this earlier.  Have you defended any suits alleging violation of the Fair Debt Collection Practices Act, on behalf of a client?

A.    No.

Q.    And I think you testified earlier you've not prosecuted any such suits; is that right?  Or at least that you can recall?

A.    I don't prosecute them.  I haven't -- I know that I've recovered money for clients before, for Fair Debt Collection Practice Act violations.

I know that -- I'm pretty certain that we have raised them as an issue in cases before.  I don't remember putting on evidence before a judge about a violation of the Fair Debt Collection Practice Act.  And I'm pretty sure that I never

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

have; it'd never gone that far.

Q.    So that's not a regular part of your practice?

A.    No.

Q.    Do you have any understanding as to whether Mr. McCollough actually contests having incurred the credit card bill that was the subject of the underlying dispute?

MR. HEENAN:  Object to form; vague with respect to time.

THE WITNESS:  My recollection is that his contention is that the credit card debt was incurred in the early '90s, and he stopped paying in the early '90s.  He may, and I don't recall, dispute the dollar amount.  I don't think he disputes that at some point in the distant past he had a liability on a card that was involved in the case.

But I kind of recall he suffered a brain injury from something and lost his ability to pay his debts at that point.

BY MR. SIMPSON:

Q.    Would it make any difference to your opinion if you found out that he applied for the credit card from Chase Manhattan years after his

Page 52

claim to head injury and incurred debts on it at that time?

A. Well, might make a difference in terms of the statute of limitations. But if he has a brain injury, then I guess he's got a brain injury. I don't know the extent of it.

Q. You're aware that -- well, maybe you aren't. Are you aware that CACV of Colorado was a previous defendant in this lawsuit?

A. I don't think I'm aware of that.

Q. So you're unaware of any settlement that occurred between Mr. McCollough and CACV?

A. I'm not aware of any of that.

Q. Do you consider yourself an attorney governed by Fair Debt Collection Practices Act?

A. No.

Q. Do you believe that you --

A. At this time?

Q. At this time.

A. No.

Q. When was the last time you believe you would have fit that definition?

A. I think when we were doing these collections for Montana Association of Credit Management we weren't sure whether we were or not,

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

and so we always had that language on there.

And I think actually, on behalf of some banks, when we send out a letter for a bank, a demand letter, even on a commercial deal, I think we just automatically put that -- those magic words at the bottom of the letter, just so that there's no issue.

Q.    Are you aware among collection attorneys what the standard is for their receipt of information prior to filing suit?  What kinds of information they receive and what form it usually takes?

A.    I'm aware from my practice, which was some time ago, and I'm aware that -- I mean depending on the type of collection.

Q.    And I guess I want to refer to the kind of debt we're talking about here, which is consumer credit card debt.

A.    Okay.  I think that consumer credit card debt, the information that's probably pretty routine -- I'm guessing on this -- but probably pretty routine in the format that Johnson, Rodenburg & Lauinger get.

Q.    In the electronic download?

A.    Yes.

Page 54

Q.    Okay.    In that sense, what they're doing most likely isn't any different than what other collection attorneys who represent those kind of clients do; is that fair to say?

A.    In the format that they get the information?

Q.    Yeah.

A.    Yes.    I would say that's probably true.

(Whereupon, a break was taken.)

BY MR. SIMPSON:

Q.    All right.    When you take in a file for a client and there aren't a lot of documents, what do you do to try to find out whether what your client is telling you about the case is true or not?

A.    I guess the kind of work that I do is always document intensive.    So, I get the documents.    I mean, if it's a foreclosure or something like that, there's going to be, you know, mortgages or deeds of trust or whatever.

We will, a lot of times, do a UCC search. We will get into the clerk of the court's website and see about transfers of real property interest. We will get information from county assessors if -- it kind of depends what the issue is -- but if

Page 55

there's certainly a claim of a lien or a debt, then we want at least a copy of it in the original documents.

And if the client doesn't have them, then we'll get them from whatever public type places that they're available, or we'll tell the client to go get them from wherever they should be found.

Q. You've taken issue in your report, page 4, with Johnson, Rodenburg & Lauinger's discovery practices. In particular, you've noted that the form utilized for request for admission contain instructions but does not advise a defendant, including pro se defendants, of the consequence of failure -- failing to answer the admissions.

Are you aware of any authority which holds that that kind of instruction is required, otherwise you're in violation of the Fair Debt Collection Practices Act?

A. No.

Q. You're aware in this case that Mr. McCollough was served with request for admission?

A. Yes.

Q. You're aware that his counsel denied the request that he took issue with?

A. I don't know that, but --

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

Q.   Okay.  Do you specifically think that Johnson, Rodenburg & Lauinger's issuance for service of request for admission in this case caused some harm to Mr. McCollough?

A.   Probably caused him to incur some defense costs.  Leave it at that.  I got to tell you, I think it's deceptive the way that they do it, by having some fairly detailed instructions about the request for admission, then sort of omitting the very most critical part of the request for admissions.

Q.   Are you aware that in this case, before serving the lawsuit on Mr. McCollough, Johnson, Rodenburg & Lauinger sent him a letter asking him if he disputed the validity of the claim at CACV?

A.   I think I understand that.

Q.   And what's your knowledge of what response, if any, Mr. McCollough made?

A.   I guess I was -- as I sit here, I was thinking that he responded and asserted the statute of limitations as an issue.

Q.   He didn't respond before the suit was served though; is that your understanding?

A.   I guess I thought that he had.

Q.   Based on what?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.   Well, it would have been based on the documents in that file.

Q.   **Okay.   If I tell you that he didn't -- I'll represent to you that he did not contact Johnson, Rodenburg & Lauinger prior to service of the lawsuit, would that have made a difference if he had?   I guess that's purely speculative at this point.**

A.   Made a difference in what way?

Q.   **Well, let me go at it from this way.**

**If you have a client that comes to you and says, I'm being sued on a credit card debt and I dispute this and the collection firm has sent me this letter, do you usually tell your clients to ignore the letter, or to respond and tell them, the company, why they dispute the debt?**

A.   I usually tell the client to respond.   I mean, if they truly dispute it, I usually tell them to dispute it.   Or, if we got a bankruptcy that we're just about to file and they may dispute part of it but not all of it, then it might be -- doesn't matter, we'll do the bankruptcy and it'll take care of it anyways.

So, depends a little bit on the -- if somebody came in to see me, though, and said, I'm

Page 58

not filing for bankruptcy but I got this demand letter and I dispute it, what should I do; my advice is send them a letter of dispute, or pay me to send them a letter of dispute.

Q.  **And why do you do that?**

A.  If it nips it in the bud, then saves everybody agony.

Q.  **Let me hand you a copy of a letter of February 8, 2007.  I'm not going to label it here because it's already been produced in discovery and Bates stamped JRL00015.  Have you seen that?**

A.  If it's in here, I have.

Q.  **Have you seen that type of letter from -- when representing clients, in the past?**

A.  I'm sure I have.

Q.  **And you testified earlier, I think it's your understanding that you believe Mr. McCollough contacted Johnson Rodenburg before filing suit to say, I do contest this debt?**

A.  As I had recalled it, he had responded by raising the issue of statute of limitations.

Q.  **In the answer or some other way?**

A.  In response to the letter.  Not in answer to the litigation, but in response to that letter. If that's my understanding, the letter would be in

Page 59

this file.

Q. I'm not trying to trip you up.

A. No, no, I understand. But if I'm incorrect, then I'll stand corrected.

Q. I guess my point here is I haven't seen that, and I think, I think he testified at his deposition that he didn't.

A. Okay.

Q. I guess my point is that would have possibly nipped this in the bud at the outset, I think as you said earlier, if he said I hadn't had any contact with this credit card company for five years or six years or whatever he felt the time frame was. Could be?

A. Could be, yeah.

Q. All right. Have you ever used the Collection Master software that Johnson Rodenburg uses?

A. No.

Q. I take it you're not familiar with that?

A. Not at all.

Q. Have you expressed all the opinions you intend to offer at trial in your two reports?

A. Yes.

Q. What's the basis for your statement on

Page 60

**the bottom of page 3, that Johnson, Rodenburg & Lauinger, being aware that they cannot prove their claims in a substantial number of the cases that are actually defended, must also recognize that they also could not prove a substantial number of the claims in the cases where they obtain a default judgment?**

A.    In the depositions, in Bruce Spencer's deposition and in one or more of the Johnson, Rodenburg & Lauinger depositions, they stated that about 90 percent of the cases are concluded with default judgments.

Now, Spencer talked about five percent of the cases, as I understand his explanations; I think he's got some funny percentages in there. But what I understood it to be is about five percent of the cases in Spencer's experience are defended by attorneys, and there was a consistent kind of percentage in the Lauinger or Dendy deposition.

Based on my experience, in the cases that I've defended, that there's a very substantial number of claims that they cannot prove.  When you ask them to actually prove it, they can't do it.

And I think that if they logically apply

Page 61

that same percentage to all of these cases where they're getting a default judgment, they have to recognize that they're getting default judgments in lots of cases that they ultimately can't prove, if they were forced to, that there's any liability.

Q.   Assume for a minute that that -- assuming that that practice that you ascribed to them is true, do you think that violates some provision of the Fair Debt Collection Practices Act?

A.   Yes.

Q.   How so?

A.   They're making claims that they can't back up.  They're doing things that they can't prove.  They're getting judgments that they, if compelled to, couldn't prove.

Q.   Have you seen the account agreement or the card member agreement in this case?

MR. HEENAN:  Object to form, with respect to the characterization of the account agreement in this case.

BY MR. SIMPSON:

Q.   I'll call it the card member agreement. There's a document that's been labeled, Card Member Agreement, that was produced by Johnson, Rodenburg & Lauinger, or its client, for Mr. McCollough's

credit card account?

MR. HEENAN:  And I'll just interpose an objection to foundation, which has been raised previously, and hearsay, but you can answer.

BY MR. SIMPSON:

Q.  Just wondering if you've seen the document.

A.  I've seen the document.  I think if I understand it right, there's a dispute as to whether that's the applicable card member agreement.

Q.  I'm not sure if there's a dispute on that or not; there might be.

A.  Okay.

Q.  Have you reviewed it?

A.  My recollection is it's incomprehensible because it's been photocopied too many times.

Q.  It's difficult to read, but I'll tell you it's not entirely incomprehensible.  Have you seen the attorney's fees provision in it?

A.  No.

Q.  Assume for a minute that my representation is true, that there is an attorney's fees provision in it.  Would you still take issue with Johnson, Rodenburg & Lauinger's prayer for

Page 63

attorney's fees?

A.    Yes.

Q.    Why is that?

A.    Because their legal theory is not a contract, which I think the card member agreement would be the basis for a contract.  Their legal theory is account stated, and under account stated you don't get attorney's fees.

Q.    So, under that theory, any credit card company suing on a credit card debt would be barred from seeking fees in Montana; is that right?

A.    Yeah.

Q.    Is there any case law that supports that?

A.    Yeah, yeah.  Story vs. First National Bank of Denver, or something like that.

Q.    That's a Montana Supreme Court case?

A.    Yeah.

Q.    And it says you cannot get attorney's fees on a credit card?

A.    Yes.  You cannot get -- it actually does two things.  It says, one, a credit card is an account stated, and that it's subject to a five-year statute of limitations.

And it also then goes on to say that you don't get attorney's fees on an account stated

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

because it's not -- there is no contract.  There's no written document signed by the lender and the borrower that sets out the relationship.  So it is -- it is an account stated.

Q.   So fees were at issue in that case? Attorney's fees?

A.   Yeah.

Q.   So when you get a complaint -- well, let me ask it this way.  Have you received or defended a client that's been sued by another party by Johnson, Rodenburg & Lauinger where attorney's fees have been requested?

A.   Yes.

Q.   And what have you done in response to that?

A.   I think in the one case where they got a judgment, I didn't raise the issue of attorney's fees.  I have gone through some files and there must be a case that I have where it's Cliff Rodenburg who's the attorney, or maybe Erin whatever her name is, and they don't ask for attorney's fees.  I looked at a number of files and they don't request attorney's fees.

My conclusion is the Fargo office doesn't ask for attorney's fees and the Bismark office

Page 65

does.  Every complaint that I looked at that was filed by the Bismark office asks for attorney's fees.  And every file I looked at filed by the Fargo office did not ask for attorney's fees.

Q.   **So you were taking steps to specifically address the prayer for fees in the complaint?**

A.   No.  Because other than the one case that went to trial, they've always been dismissed.

Q.   **Have you been asked to offer any opinions about the applicability of the Montana Unfair Trade Practices and Consumer Protection Act to this case?**

A.   No.

Q.   **Well, since we're here.  Do you have an opinion as to whether the Consumer Protection Act applies to claims against debt collection attorneys?**

MR. HEENAN:  Objection; foundation, speculation, and outside the scope of what this witness has been asked to express opinions on.  With that said, you can answer.

THE WITNESS:  As I sit here, I don't have an opinion on it.

MR. SIMPSON:  Jeez, his answer was shorter than your objection.

///

Page 66

BY MR. SIMPSON:

Q.    I want to talk a little bit about your opinion on John's hourly rate of $200.  When you represent clients in defense of debt collection actions, whether it be actually defending a suit in state court or taking that through to the bankruptcy, what's your hourly rate?

A.    I charge the same hourly rate no matter what I do.  And, so, it's increased over time, surprise surprise.  Right now it's 250.  It has been, earlier this year, 225.

Q.    You have 30 years of experience; is that right?

A.    I hate to say it, but yes.

Q.    Feather in your cap.  Have you done a survey of other attorneys, and this is by no means to disparage Mr. Heenan, but of attorneys with his experience, years of experience, to find out what they would charge for this kind of work?

A.    What I have found is that there are a few people who focus or specialize in this kind of work.  And I guess I would consider what John does and what I do comparable.  And I think that, because there's so few people that do it, we're able to charge more than what other attorneys get

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

charged.

Q.    Do you think most of the folks, though, that are being sued on credit card debts, can afford $200 an hour?

A.    I don't know if I would say most.  I would say that certainly there's some that can't. There is an amazingly large number of people who can.  There's an amazingly large number of people that make lots of money and have credit card problems and they're willing to pay to help resolve their credit card problems.

Q.    Do other attorneys in your firm have this kind of practice representing debtors?

A.    Craig Martinson does.

Q.    Do you know what Craig Martinson charges per hour?

A.    Two and a quarter.

Q.    How long has he been in practice?

A.    Longer than I have.

Q.    Do you know any attorneys with one to five years of experience who practice in this area?

A.    I don't know.  I mean, I don't know specifically how long people have practiced.

Q.    What's your understanding of how long Mr. Heenan has been in practice?

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

A.   My understanding that Mr. Heenan clerked in the federal court for a year, worked for Cliff Edwards for a couple years, and has been out of Cliff's office for a couple years.

Q.   So he's in the five, six --

A.   Plus or minus, yeah.

Q.   Do you know -- I guess have you obtained information as to what people with Mr. Heenan's experience that are doing this kind of work can charge?

A.   I'd say that if they're in bankruptcy court, they can charge at 200-dollar an hour range.

Q.   To some clients?  Obviously the clients that are in MLSA aren't paying that?

A.   No, they're not paying that either.  But I -- I think, for whatever reason, there's a limited number of attorneys that go into this type of practice.  And there's not a lot of competition among attorneys for it.  So, I think the hourly rates tend to be higher in this kind of practice than in a lot of things.

Q.   And what's your understanding of the number of hours he billed in the underlying case?

A.   I think it was 7.6.  I think it was in one -- I thought I saw that in something.

Page 69

Q.    Okay.  So the total fee was somewhere in the range of $1500?

A.    Best as I recall, yeah.

Q.    Did you see a billing statement for that?

A.    No.  I saw a description of time and service.

Q.    Do you know where you saw that?  Was that in --

A.    That was in that one e-mail.  There was an e-mail that you looked at and showed me.

Q.    I think it was your e-mail of -- that's not it -- August 18th maybe seems like the day.

A.    Name of that case is Colorado National Bank vs. Story.  You know, I think it was . . . in here.  Yes.  This e-mail is dated August 18th, and it has a description, it's got the date, the time, and the work that was done.

Q.    On the other side of this equation, of attorney's fees, you've mentioned, bottom of page 6:  I'm familiar with the hourly rates charged by various debtors' and creditors' counsel in Billings and elsewhere.  Who on the creditors' side are you familiar with?

A.    Doug James.  Bill Lambdin.  Steve Johnson.  John Paul.  Martin King.  Ron Bender.  I

know I'm leaving a bunch out.  John Doke.  Those are the names that come to head -- to my mind right away.

Q.    Do any of those attorneys, to your knowledge, have less than ten years' experience?

A.    No.

Q.    Okay.  What's your understanding with respect to whether the Montana Rules of Professional Conduct constitute a standard of care actionable in a suit?

A.    I think they're actionable as a malpractice claim.  I think that's a duty that can be breached in a nature of a malpractice claim.

Q.    Have you read the preamble to the Rules of Professional Conduct lately?

A.    Oh, I probably have.

Q.    Have you read the -- why am I blanking on the name -- the case out of Great Falls involving the Marra Wenz Firm?

A.    Yeah.  I know what you're talking about, where they represented both sides in a case.

Q.    Yeah.

A.    Yes.

Q.    And it's your opinion that the Rules of Professional Conduct do set a standard that can be

Page 71

breached and that can be remedied by an action of law?

A. Well, I'm not sure that the remedy is for breach. I don't know if it's a direct remedy for violation of the standard, but I think it sets a -- the standards create a duty that if the duty is breached then there's a claim that exists. And I think that's what happened in that Marra Wenz case.

Q. Do you take issue with the fact that Johnson, Rodenburg & Lauinger has a forms directory that it uses in its practice?

A. No.

Q. Do you take issue with the fact that people who are not licensed attorneys are involved in preparing the first draft of pleadings for final review and signature by attorneys?

A. Not in and of itself, no.

Q. Okay. Sounds like there's something more there, though?

A. There is.

Q. I may be slow, but I'm not that slow.

A. I'm thinking, in Mr. Dendy's deposition, he testified as to how many complaints he signs a day. And to me it was an astonishing number, and to me it reflected that he can't possibly . . .

Page 72

verify the allegations of the complaint.  My distinct impression was that he signed -- they cranked -- his staff creates the complaints and he just sits and signs them.

Q.   Do you know for a fact what he's able to review before he signs them?

A.   Well, he -- at best, he's able to review this information that his client says you can't trust.  But it doesn't seem to me that he can -- doesn't seem to me that he can do what I think a lawyer should do, practicing law in Montana, in preparing a complaint.

Q.   The client CACV doesn't actually say you can't or don't trust our information, does it?  It says, we don't warranty the accuracy of this, doesn't it?

A.   I don't remember the magic words, but I think that's the gist of what they're saying.

If I had a client that came to me and said, I want you to see somebody, but, you know, I'm really not going to back up what I tell you, that's going to make me immediately say, Well, why don't you go find a different attorney.

Q.   So I guess, as I understand it, then, you simply would not represent CACV under the terms of

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

this agreement, at all?

A.   I wouldn't, no, no.

Q.   **And you believe it's a violation of the Fair Debt Collection Practices Act for Johnson Rodenburg to do so?**

A.   I think it's a violation.  That, combined with the form and the format of the information upon which Johnson, Rodenburg & Lauinger commenced suit, combined with their inability to get any kind of supporting documents, I think that violates Fair Debt Collection Practice act.

Q.   **I think I already asked you this, but just in case.  Are there any opinions you intend to offer at trial that aren't discussed in your reports?**

A.   No.

MR. SIMPSON:  Thank you.

THE WITNESS:  Yep.

MR. SIMPSON:  Pleasure.

MR. HEENAN:  I have a few follow-up questions.

EXAMINATION

BY MR. HEENAN:

Q.   **Mr. Patten, if I told you that two Montana District Court Judges, Judge Fagg here in Yellowstone County and Judge Rice in Hill County,**

have both recently approved my rate of $200 per hour in cases where Johnson Rodenburg were on the other side, would that lend credence to your opinion that $200 an hour is reasonable?

A.    Yes.

Q.    With respect to the request for admissions, I'm going to show you what's been marked as Deposition Exhibit 53.  And this is a portion of the National Consumer Law Center's manual that you brought with you to your deposition today; is that correct?

A.    Yeah.  Well, I don't know.  I brought this with me.

Q.    Okay.  I'll represent to you that Exhibit 53 is a portion.

A.    Okay.

Q.    And the author of this book writes -- essentially has a whole section on debt buyer and debt buyer lawyers' tactic of serving these requests for admissions on unrepresented debtors. And says, By serving request for admission, collectors prey on unrepresented consumers' lack of legal knowledge, attempting to prove their cases by sleight of hand when they cannot do so by evidence, end quote.

In your opinion, is that what happened here?

A.    Yes.

Q.    What I want to ask you, and as I think been discussed already and expressed in your courts, but just to be clear, you're a Montana attorney?

A.    Yes.

Q.    Long-time Montana attorney?

A.    Too long.

Q.    Have filed many lawsuits on behalf of clients in the state of Montana?

A.    Yeah.

Q.    Over the years?

A.    Yeah.

Q.    Have filed, in your career, collection actions on behalf of clients?

A.    Yes.

Q.    What's the standard of care, for a Montana attorney filing a lawsuit in Montana, under Rule 11 of the Montana Rules of Civil Procedure, the Montana Rules of Ethics, and otherwise, what's the standard of care that you have in filing a collection action in Montana?

MR. SIMPSON:  Objection; foundation.

THE WITNESS: I think the standard of care is probably, in my view, is that set by Rule 11. You have to do a diligent inquiry into the facts, or a reasonable inquiry into the facts, to determine what the facts are. And you need to be in a position to actually prove it. You can't just make allegations and hope that they fly without any ability to back them up.

BY MR. HEENAN:

**Q. In your opinion, did Johnson, Rodenburg & Lauinger, as a law firm practicing law in the state of Montana, meet that standard of care?**

A. Not in connection with the McCollough case; not in connection with the cases that I've been involved with. With the exception of the one case that actually went to trial and they actually had some evidence.

**Q. Is it appropriate, as a Montana lawyer, to continue to attempt to win a case when you have actual knowledge that your case should not be prosecuted?**

A. What was the first part of the question?

**Q. It was kind of long.**

MR. HEENAN: Maybe if you would read it back.

///

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

(Whereupon, the last question was read.)

THE WITNESS:  No.  I think it violates the Rules of Professional Conduct.

BY MR. HEENAN:

Q.    How so?

A.    You're engaged in acts to oppress and abusing the process, I guess.

Q.    Is it fair to say that Rule 11 of the Montana Rules of Civil Procedure essentially, in layman's terms, precludes lawyers from filing, quote, frivolous, unquote, lawsuits?

A.    That's the purpose, yes.  Frivolous pleadings, of any kind.

Q.    And it's an effort, under our Montana Rules, that we as Montana attorneys hold ourselves to, not to file and maintain frivolous lawsuits?

A.    Yes.

Q.    In your opinion, did Johnson, Rodenburg & Lauinger file and/or maintain a frivolous lawsuit against Mr. McCollough?

A.    Yes.

Q.    You've reviewed Mr. Hick's expert disclosure?

A.    Yes.

Page 78

Q. In your opinion, Mr. Patten, are there two standards of care for lawyers in Montana; lawyers that represent debt buyers and everyone else? Or is there just one standard of care for Montana lawyers?

A. I think there's one standard of care.

MR. HEENAN: I don't have any more questions at this time.

MR. SIMPSON: I want to ask a follow-up.

EXAMINATION

BY MR. SIMPSON:

Q. We discussed earlier that it's your understanding that Mr. McCollough acknowledged that he did, in fact, have a Chase Manhattan credit card on which he expended the money at some point in the past?

A. That's my understanding, yeah.

Q. And he hadn't paid it all off?

MR. HEENAN: And I'll object that that mischaracterizes the evidence, but you can answer.

BY MR. SIMPSON:

Q. That's your understanding?

A. That's my understanding.

Q. Is it your opinion that any time a party files a suit that's later found to be barred by the

**statute of limitations, regardless of the merits of the suit otherwise, that's a frivolous lawsuit?**

A.    Depending on -- I think it depends on the facts in each case.  But in the McCollough case, they continued prosecuting this suit after they knew the statute of limitations had run.

**Q.    Well, I'll disagree with you on that. But was commencement of the suit in the first place, let's assume for a minute that they honestly believe the statute of limitations was not expired and that they could file suit, do you think that's a frivolous filing?**

A.    Well, I think that they can't claim to honestly believe anything, given the limitations on their contract with their client.

**Q.    That --**

A.    I mean that's part of the whole problem, I think, is they cannot rely on the information that they're provided by their client.

And if they can't rely on that to begin with and they don't do anything else to check or verify the accuracy of that information, I think it is an abuse to file a suit when you know that you don't have reliable information and you know from experience that you probably can't get the

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

underlying documents to back up the information.

Q.   **You're aware that they, in fact, did receive and produced to Mr. McCollough at some point down the road backup documents.  They produced a card member agreement and they did produce some account statements.**

MR. HEENAN:  Objection; foundation, hearsay with respect to the documents.

THE WITNESS:  I understand that there was a card member agreement produced.  It's my understanding that there's a dispute or a question about whether that's the applicable card member agreement.

And if they got the underlying invoices, the monthly statements, then I'd say they were lucky, because they haven't been able to do it in most of the cases I've been involved in.  But, I think my point is they ought to get that stuff before they file suit; not after they file suit.

BY MR. SIMPSON:

Q.   **Well, let's assume that aside from the representation from the client, about the date of Mr. McCollough's last payment, that the other information they provided was substantially true; that he had an account with Chase Manhattan for a**

Charles Fisher Court Reporting, Inc.
503 East Mendenhall, Bozeman, MT 59715 (406)587-9016

credit card, that he'd incurred charges on the account, and that he hadn't paid off the account; filing a complaint on those facts is not a frivolous lawsuit, is it?

A.    I think it is if they -- if they're aware from the beginning that they may not be able to prove it, then I think it is frivolous.

Q.    **Even if it turns out they can prove it?**

A.    Even if it turns out that they can prove it.  Because they ought to get what they can prove -- they ought to get that proof in advance of filing suit.  But I think the -- that's my beef with what they do on all of these default cases that they get, all the default judgments.

In this particular case, that information in their file that the statute of limitations had run, and they continued to prosecute the case, and they continued to give -- they served those, the request for admission on Mr. McCollough, with the information in their file that disproved the critical request for admission.

Q.    **What's your understanding as to exactly what was communicated to them that disproved the issue on the statute of limitations?**

A.    My understanding that there's a

communication to Grace Lauinger that the June 20th, 2004, whatever the date is, payment was not a payment but it was a return of costs. And that that was provided to her well in advance of the request for admissions among them.

MR. SIMPSON: Okay. That's it.

(Whereupon, the deposition was concluded.)

**CHARLES FISHER
COURT REPORTING, INC.**

503 East Mendenhall
Bozeman, MT 59715
Phone (406) 587-9016
Fax     (406) 586-0926

November 19, 2008

Mr. James A. Patten
2817 2nd Ave. North
Billings, MT 59101

**Re:     June Tift and Timothy McCollough vs. Johnson, Rodenburg, & Lauinger**

Dear Mr. Patten:

Enclosed please find a copy of your sworn statement taken on October 30, 2008 along with a
Deponent's Certificate and a correction sheet.

Please read the copy of your deposition and fill out the correction sheet as needed.  Sign the
Deponent's Certificate *and* the correction sheet before a Notary Public, and then return both
documents to us within thirty (30) days of the date hereon.

The copy of the transcript is yours to keep.  If you have any questions or concerns please feel free
to call our office at any time.

Truly yours,

CFCR

Charles Fisher Court Reporting
CFCR:lf
Enclosures

cc:
Fred Simpson
John Heenan

C E R T I F I C A T E

STATE OF MONTANA      )

                                    :  ss.

COUNTY OF GALLATIN    )

        I, Jennifer D. Lewis, Court Reporter - Notary

Public in and for the County of Pierce, State of

Washington, do hereby certify:

        That the witness in the foregoing deposition was

by me first duly sworn to testify the truth, the

whole truth and nothing but the truth in the

foregoing cause; that the deposition was then taken

before me at the time and place herein named, that

the deposition was reported by me in shorthand and

later transcribed into typewriting under my

direction, and the foregoing pages contain a true

record of the testimony of the witness, all done to

the best of my skill and ability.

        IN WITNESS WHEREOF, I have hereunto set my hand

and affixed my notarial seal this __19th__ day of

__November__, 2008.

_____

Jennifer D. Lewis, Court Reporter

Notary Public, State of Washington

Residing at Bozeman, Montana

My commission expires:  4-25-2009

Page 85

## A

ability 52:20 77:8 85:17
able 14:7 21:17,25 22:1 33:21 67:25 73:5,7 81:16 82:6
about 9:9 10:2,6,21 10:25 11:4 12:6 17:22 18:10 22:14 23:12 31:10 36:18,21 45:16 48:7,14,24 49:10,22 51:24 54:17 55:15,23 57:8 58:20 61:11 61:13,16 66:10 67:2 71:20 81:12 81:22
abuse 80:23
abusing 78:8
accept 50:18
according 40:14
account 33:15,18 33:22 49:16 62:16,19 63:1 64:7,7,22,25 65:4 81:6,25 82:2,2
accounting 20:16
accuracy 73:15 80:22
acknowledged 79:13
act 10:6 12:20 31:16 39:8 47:20 51:13,20,25 53:15 56:18 62:9 66:11,14 74:4,11
action 72:1 76:24
actionable 71:10,11
actions 3:12 10:2 14:17 67:5 76:17
acts 78:7
actual 32:25 77:20
actually 7:10 21:14 48:1 52:6 54:2 61:4,24 64:20 67:5 73:13 77:6 77:16,16
addition 12:12,15
address 4:12 40:20 66:6
administration 20:23

admission 56:11,21 57:3,9 75:21 82:19,21
admissions 56:14 57:11 75:7,20 83:5
advance 82:11 83:4
adversary 32:11
advice 59:3
advise 56:12
advised 37:13 49:11
affidavit 41:2,13
affidavits 41:14,17
affirmative 6:2
affixed 85:19
afford 68:4
after 13:5 15:18 20:20 21:2,3 23:2 43:7,8 44:20 47:6 48:9,20 49:24 52:25 80:5 81:19
afterwards 6:10
again 11:6
against 7:22 15:25 16:11,15,17 17:17 31:20 33:5 35:15 39:6,15 47:17 66:15 78:21
ago 18:18 35:14 54:14
agony 59:7
agreement 62:16,17 62:19,22,24 63:11 64:5 74:1 81:5,10,13
alarm 24:18
allegations 73:1 77:7
alleged 47:7
alleging 51:11
allowing 37:20
almost 31:6
already 12:14 20:5 59:10 74:12 76:5
although 13:13 19:15
always 25:16 31:6 33:13,22 54:1 55:17 66:8
amazingly 68:7,8
amend 12:13
amended 6:1,3

31:15
Ammondson 6:25
among 54:8 69:19 83:5
amount 24:22 40:20 52:15
Andy 4:15,17 25:7 42:9 43:15
and/or 78:20
another 26:25 35:21,25 65:10
answer 36:16,22 37:2 39:4 42:17 44:6 56:14 59:22 59:23 63:4 66:20 66:23 79:20
answers 6:2
anybody 36:18
anyone 11:15
anything 4:24 17:22 19:17 25:25 43:12 44:17 46:15 80:14,21
anyway 40:23
anyways 58:23
apologize 20:5
apparently 7:18
Appeals 9:13
appear 36:4
appearance 8:18
APPEARANCES 2:1
appearing 1:17 2:2 2:10
appears 7:21 41:17
applicability 66:10
applicable 63:10 81:12
applied 52:24
applies 66:15
apply 61:25
applying 18:9
apportionment 30:8
appropriate 77:18
approved 75:1
area 68:21
argue 18:10
around 19:14 46:2
article 9:18
ascribed 62:7
aside 4:24 34:11 37:25 43:23

81:21
asked 10:1 12:1,4,5 12:17 20:5 40:1 48:13 50:24 51:10 66:9,19 74:12
asking 12:13 44:11 57:14
asks 66:2
asserted 37:25 57:20
assertions 51:2,4
assessors 55:24
asset 42:21,23,24
assets 46:9
associated 45:10
Associates 5:11,23 28:15,18 32:1
Association 24:14 26:7 53:24
assume 62:6 63:22 80:9 81:21
assuming 62:6
astonishing 72:24
attach 33:18
attachments 7:18
attempt 29:3 77:19
attempting 75:23
attention 32:24
attorney 2:2,10 19:23 22:14,23 23:21,25 25:13 26:5 27:1 35:23 37:4,4 38:3 53:14 65:20 73:23 76:7 76:9,20
attorneys 16:4,5,7 19:3 36:20 46:5 46:15 54:8 55:3 61:18 66:16 67:16,17,25 68:12,20 69:17 69:19 71:4 72:14 72:16 78:16
attorney's 45:20,24 46:5 63:20,23 64:1,8,18,25 65:6 65:11,17,22,23,25 66:2,4 70:19
attributed 30:1
August 7:17 70:12 70:15
author 75:17
authority 56:15

automatically 54:5
available 34:4,7,9 56:6
Avenue 2:6 4:13
aware 41:20 53:7,8 53:10,13 54:8,13 54:14 56:15,20 56:23 57:12 61:2 81:2 82:5
away 32:17 71:3

## B

B 3:7
BA 20:21
back 21:2,4,8,19,20 21:25 22:2,11,13 28:8,9 29:2,14 31:16 32:9 33:15 37:3 43:18 47:21 62:13 73:21 77:8 77:24 81:1
backup 81:4
bank 30:3 54:3 64:15 70:14
bankruptcies 27:16 27:24 30:19 31:10 42:20 43:4
bankruptcy 13:16 25:15,17,21 26:24 27:18,19 27:22 29:10,18 29:21 31:5,12,16 32:10,12,16,20,24 33:2 42:14,18 43:3 58:19,22 59:1 67:7 69:11
banks 28:12 29:6 54:3
bar 21:6,12,19,22 22:1,3
barred 38:1 64:10 79:25
based 36:15 38:5 50:23 57:25 58:1 61:21
basis 43:5 60:25 64:6
Bates 59:11
became 23:22
beef 82:12
before 1:22 11:12 13:6 19:15 26:3 32:5 33:2 34:22 36:8 41:23 42:18

43:17,18 49:24 50:1 51:19,22,23 57:12,22 59:18 73:6 81:19 84:15 85:12
**begin** 80:20
**beginning** 1:21 5:25 44:24 82:6
**behalf** 2:2,10 28:24 35:2,20 43:25 51:13 54:2 76:11 76:17
**being** 15:1 17:22,23 20:15 31:19 32:20 37:13 39:13 42:8 58:12 61:2 68:3
**Bekkedahl** 28:3,7 46:6
**believe** 5:18 10:14 37:15 45:4 47:2 50:7,12 51:8 53:17,21 59:17 74:3 80:10,14
**believing** 44:22
**Bender** 70:25
**best** 8:20 10:1 70:3 73:7 85:17
**better** 44:19
**between** 25:23 46:12 53:12
**beyond** 45:13
**big** 45:11
**bill** 13:1,8 52:7 70:24
**billed** 69:23
**billing** 70:4
**Billings** 1:3,20 2:9 4:14 21:10,11 23:6 38:7 70:22
**binder** 10:24 11:2
**Bismark** 65:25 66:2
**bit** 11:4 29:23 42:25 58:24 67:2
**blanking** 71:17
**Bohyer** 2:13
**bona** 12:19 18:15
**book** 75:17
**books** 26:11
**borrower** 65:3
**both** 16:12 29:23 43:2 47:4 71:21 75:1
**bottom** 54:6 61:1

70:19
**Bow** 7:2
**Box** 2:8,16
**Bozeman** 85:24
**brain** 52:19 53:4,5
**breach** 72:4
**breached** 71:13 72:1,7
**break** 8:17 25:4,8 26:3 55:9
**bring** 4:19
**broad** 42:5
**brought** 37:22 75:10,12
**Bruce** 28:3 46:6 61:8
**bud** 59:6 60:10
**bunch** 71:1
**buried** 25:20
**burned** 45:8,9,10
**business** 4:12 24:5 24:6 26:15
**businesses** 24:7,7,8 24:9,10
**Butte-Silver** 7:2
**buyer** 30:11,15 31:19 33:6 34:13 34:18,23 35:3 75:18,19
**buyers** 35:5 39:20 41:22 42:4,7 43:2 79:3
**buys** 30:16

_____
            **C**
_____

**C** 2:4 3:4 85:1,1
**CACV** 31:23 32:3 41:4 42:10 48:7 48:14,19 49:3,8 49:11 50:5,10 53:8,12 57:15 73:13,25
**CACV's** 49:7 50:5
**California** 9:13
**call** 4:17 6:10 9:5 24:4 62:22
**called** 4:6 9:10,14 11:24 24:13
**came** 18:16 21:4 24:11 37:12 46:16 58:25 73:19
**cap** 67:15
**car** 42:24

**card** 15:14 18:5 20:10 29:3,5 30:21 31:4 33:25 34:24 43:2 49:18 52:7,12,17,25 54:18,19 58:12 60:12 62:17,22 62:23 63:1,10 64:5,9,10,19,21 68:3,9,11 79:14 81:5,10,12 82:1
**cards** 31:14 34:23
**care** 6:9 50:6 58:23 71:9 76:19,23 77:1,12 79:2,4,6
**career** 76:16
**Carter** 20:23
**case** 5:11,22 6:21 6:25 7:6,25 8:7 9:10,12,17,19 10:13 14:2 15:21 17:16,19,25 18:6 18:9 19:18,23 20:4,10 29:10,11 35:15 37:6,9,18 37:21 40:12 42:1 42:2,18 43:7 44:14,16,21 45:13 48:4 49:21 52:18 55:15 56:20 57:3,12 62:17,20 64:13 64:16 65:5,16,19 66:7,11 69:23 70:13 71:18,21 72:8 74:13 77:14 77:16,19,20 80:4 80:4 82:15,17
**cases** 6:22 8:8,21,22 8:23 9:20 10:19 14:10,11,14,23 16:2,25 18:23 19:24 20:7 26:13 31:18 33:4 36:14 38:13 40:3,7 41:15 42:3,6,8 51:22 61:3,6,11 61:14,17,21 62:1 62:4 75:2,23 77:14 81:17 82:13
**categories** 34:3 35:7
**cause** 1:8 5:15 7:2

85:11
**caused** 57:4,5
**caution** 38:8
**Cedars-Sinai** 9:14
**cell** 24:17
**Center** 3:13 9:14
**Center's** 75:9
**certain** 5:4 24:22 33:8,10 51:21
**certainly** 56:1 68:6
**CERTIFICATE** 84:1
**certify** 84:4 85:7
**CF** 84:25
**changed** 31:15
**changes** 11:22 12:2 84:6
**changing** 27:24
**Chapter** 42:22
**characterization** 62:19
**charge** 13:12 67:8 67:19,25 69:10 69:12
**charged** 20:15 68:1 70:20
**charges** 68:15 82:1
**Charles** 6:20 36:17
**Chase** 41:3 52:25 79:14 81:25
**check** 13:7 80:21
**circumstances** 17:15 19:1
**Civil** 1:22 47:5 76:21 78:10
**claim** 20:13 25:22 33:14 37:23 38:1 39:6,9,12 43:6 47:16 50:25 53:1 56:1 57:15 71:12 71:13 72:7 80:13
**claimed** 8:1
**claiming** 20:17
**claims** 16:17 32:13 32:25 43:4 47:7 61:3,6,23 62:12 66:15
**clear** 76:6
**clerk** 37:21 55:22
**clerked** 69:1
**client** 9:4 14:2,8 16:23 24:11,13 28:23,24 29:3 30:12 35:3 36:1

38:24 40:14 43:12 50:14 51:8 51:13 55:13,14 56:4,6 58:11,17 62:25 65:10 73:8 73:13,19 80:15 80:19 81:22
**clients** 13:12 17:6 20:13 30:2 31:11 34:13 37:15 45:4 51:19 55:4 58:14 59:14 67:4 69:13 69:13 76:12,17
**client's** 42:8
**Cliff** 65:19 69:2
**Cliff's** 69:4
**close** 30:9
**coal** 22:20
**Coast** 9:11
**Cole** 5:23
**collect** 29:3,5
**collecting** 24:2
**collection** 3:12 12:20 14:17 23:21,23 25:14 25:17 26:8,10 27:9,18 28:10 29:11 39:8 43:19 43:24 44:1 47:20 51:12,20,24 53:15 54:8,15 55:3 56:18 58:13 60:17 62:9 66:15 67:4 74:4,11 76:16,24
**collections** 10:6 24:5,16 26:15,16 26:18,23 28:16 28:24 30:3 33:15 53:24
**collectors** 75:22
**Colorado** 31:24 32:3 41:4 42:10 48:14 53:8 70:13
**combined** 74:6,9
**come** 21:25 24:24 42:9 71:2
**comes** 32:15 58:11
**coming** 10:21
**commenced** 39:13 74:8
**commencement** 80:8
**commercial** 24:5

29:19 30:6 44:2
54:4
commission 84:22
85:25
communicate 10:9
communicated
82:23
communication
83:1
companies 31:19,22
32:5 33:5 43:2
company 34:24
58:16 60:12
64:10
comparable 67:23
compelled 62:15
compensation 7:21
competition 69:18
complaint 6:1,3
33:17,19 48:11
51:3 65:8 66:1,6
73:1,12 82:3
complaints 72:23
73:3
computer 8:13
conclude 25:1
concluded 61:11
83:8
conclusion 46:21
65:24
conclusions 50:18
Conduct 71:9,15,25
78:4
confirm 49:3
confused 16:20
Congratulations
13:15 22:4
congress 31:15
connection 77:13
77:14
consenting 16:14
consequence 56:13
consider 53:14
67:22
consideration
16:16
consistent 61:18
constitute 71:9
consumer 3:13
24:16 26:8,16,17
28:20,23 42:21
54:17,19 66:11
66:14 75:9
consumers 31:2

75:22
contact 20:1 58:4
60:12
contacted 9:25
59:18
contacts 24:15
contain 56:12 85:15
contained 4:22
contains 7:18
contention 52:12
contentions 47:7
contentious 46:11
contest 59:19
contested 15:1
18:19
contests 52:6
continue 77:19
continued 26:22
80:5 82:17,18
contract 33:24
50:10 64:5,6 65:1
80:15
control 31:14
copy 6:6 7:8 9:10
12:8 33:13,18,23
33:23,24 37:16
56:2 59:8
Corporation 7:1
correct 7:23 51:4
75:11 84:8
corrected 60:4
correction 84:7
correspondence
13:25
costs 57:6 83:3
Council 22:15,17
22:24
counsel 56:23 70:21
counterclaim 39:17
47:24
county 5:15 7:2
14:19 18:21
55:24 74:25,25
85:4,6
couple 16:2,10
18:18 20:2 69:3,4
court 1:1,19,23 6:5
8:18 9:13 14:21
21:21,22 39:9
46:12 64:16 67:6
69:2,12 74:24
85:5,22
courthouse 36:9
courts 76:6

court's 46:20 47:13
55:22
Craig 25:9,15
68:14,15
cranked 73:3
create 72:6
creates 73:3
credence 75:3
credit 15:14 18:5
20:10 24:14,16
26:7 28:12 29:3,5
29:6 30:3,20 31:4
31:14 33:25
34:22 43:2 49:18
52:7,12,25 53:24
54:18,19 58:12
60:12 63:1 64:9
64:10,19,21 68:3
68:9,11 79:14
82:1
creditor 28:10
29:22,24 35:20
40:22 41:3
creditors 16:8
29:24 43:1 70:21
70:22
critical 57:10 82:21
curiosity 31:7
current 47:17
currently 15:10
cut 46:15
CV-07-166-BLG-...
1:8

_____
             D
_____

D 1:23 3:1 85:5,22
damages 43:25
date 5:4 13:1 33:1,3
40:20 49:11,13
49:23 70:16
81:22 83:2
dated 7:17 70:15
David 34:15 39:24
40:2,4
day 70:12 72:24
84:16 85:19
days 13:17
DC 22:10
deadline 33:2
deal 34:12,14,15,16
39:2 45:11 54:4
dealing 32:10
dealt 34:22
debt 9:18 10:5

12:20 14:17
15:12 17:17 18:5
23:23 30:11,14
30:16 31:4,19
33:6 34:13,18,23
35:2,4 39:7,19
40:17 41:3,21
42:3,7 43:2,10,11
47:19 49:18
51:12,20,24
52:12 53:15
54:17,18,20 56:1
56:17 58:12,16
59:19 62:9 64:10
66:15 67:4 74:4
74:11 75:18,19
79:3
debtor 27:13,15,17
29:22,23
debtors 27:16
29:25 30:19
42:21 68:13
70:21 75:20
debtor/creditor
23:16
debts 24:6,7,8,9
29:3,5 30:21
52:21 53:1 68:3
deceptive 57:7
decision 45:19
decisions 8:7
deeds 55:20
deep 44:14
default 18:12 37:25
61:6,12 62:2,3
82:13,14
defend 31:18 32:19
defendant 1:11,18
2:10 53:9 56:12
defendants 17:12
56:13
defendant's 5:10
6:2
defended 17:6
31:23 35:1 38:15
39:21,22 42:6
51:11 61:4,18,22
65:9
defending 27:16
32:8 33:5 67:5
defense 17:21 18:9
18:15 48:21 57:5
67:4
defenses 6:2

definition 53:22
Delvenia 5:22
demand 6:1 43:9
48:10 54:4 59:1
demands 39:14,15
Dendy 6:20 19:9,16
19:25 20:3 36:17
61:19
Dendy's 72:22
denied 56:23
Denver 64:15
depending 54:15
80:3
depends 55:25
58:24 80:3
deponent 84:3
DEPONENT'S
84:1
deposing 17:9
deposition 1:13,16
5:21,21 6:12,19
10:22 11:3 60:7
61:9,20 72:22
75:8,10 83:7 84:4
84:9 85:8,11,13
depositions 61:8,10
describe 20:20
22:11
described 26:4 37:9
description 70:5,16
detailed 57:8
determine 77:4
determined 46:23
difference 52:23
53:3 58:6,9
different 16:4,5,7
29:16 32:6 35:20
36:1 55:2 73:23
difficult 63:18
diligent 77:3
diploma 22:5
direct 72:4
direction 85:15
directory 72:10
disagree 80:7
discharge 43:8,8
discharged 43:10
43:11
disclosure 6:25
78:24
discovery 5:3,10
33:7 36:16,19,22
39:4 40:2,8 41:24
56:10 59:10

discuss 7:21 10:13
discussed 10:16
　35:7 74:14 76:5
　79:12
dismiss 18:19 35:17
　36:7,10 38:5
　42:16
dismissal 35:22
dismissed 15:4
　16:16 17:25
　35:18 36:14 37:6
　39:2 40:13 66:8
disparage 67:17
disproved 82:20,23
dispute 18:8 20:12
　20:14 45:25
　46:17 52:8,15
　58:13,16,18,19,20
　59:2,3,4 63:9,12
　81:11
disputed 57:15
disputes 27:21
　52:16
distant 52:16
distinct 73:2
District 1:1,2 9:13
　14:21,22 74:24
DIVISION 1:3
document 33:14
　37:23 55:17
　62:23 63:7,8 65:2
documentation
　38:2 40:16
documents 6:21
　11:2 33:8,10,11
　34:3,7 35:7,16
　37:5 40:9 43:21
　44:3,5 50:16,18
　50:25 51:5,6,7
　55:13,18 56:3
　58:2 74:10 81:1,4
　81:8
doing 22:9 26:6,8
　26:22 27:9,12,13
　28:13 33:15
　43:19 46:13
　53:23 55:1 62:13
　69:9
Doke 71:1
dollar 52:15
done 21:24 49:2
　65:14 67:15
　70:17 85:16
door 23:9

Dorleen 13:22
Doug 70:24
down 81:4
download 54:24
draft 11:11,14,20
　12:8 72:15
draw 50:17
drop 43:3
Dugan 24:1 26:6,10
Dugan's 24:12
duly 4:6 85:9
dumped 48:8
during 8:23 20:23
　22:7 23:17
duty 71:12 72:6,6
DV 5:15
DV-05-97 7:2
DV-08-485 5:15

_____ E _____

E 3:1,7 85:1,1
each 16:23 80:4
Eakin 9:9,17 17:9
　21:5
Eakin's 4:22 10:22
earlier 5:20 16:21
　45:3 51:11,15
　59:16 60:11
　67:11 79:12
early 21:22 23:20
　43:18 47:18
　48:23 52:13,14
easier 13:6
economics 20:21
Edition 3:12
education 20:20
Edwards 69:3
effort 78:15
eight 17:2
either 11:11 19:20
　42:7 47:17 48:10
　69:15
electronic 40:19
　54:24
elsewhere 8:12
　70:22
encompass 38:15
encounter 31:11
encountering 35:13
end 21:18 26:19,21
　47:9,11 75:25
engaged 78:7
enough 47:16
entered 16:11 20:8

entirely 63:19
entirety 38:15
entitled 6:24
entity 39:7
equation 70:18
Erickson 15:23
Erin 19:10 65:20
error 12:19
escapes 34:21
Esq 2:4,12 3:3,4
essential 33:16
essentially 75:18
　78:10
estimate 8:14 13:3
　29:16
estimation 30:19,23
Ethics 76:22
even 54:4 82:8,9
ever 13:18,21 14:2
　29:8 30:11 39:6
　43:20,24 44:22
　45:13 46:2 47:9
　47:13,16,25
　60:16
every 33:16 66:1,3
everybody 22:2
　59:7
everyone 79:3
everything 44:14
evidence 51:23
　75:24 77:17
　79:20
evidentiary 47:8
exact 48:23
exactly 12:4 82:22
exam 21:19,22 22:3
examination 1:13
　1:17 3:2 4:9
　74:21 79:10
examined 4:7
exception 77:15
exchanged 8:10
　13:24
exemption 42:25
exhibit 3:9,12 6:6
　6:13 75:8,15
exhibits 3:8,11 5:6
exists 72:7
expended 79:15
experience 43:1
　50:24 61:17,21
　67:12,18,18
　68:21 69:9 71:5
　80:25

expert 6:24 10:24
　78:23
expired 80:10
expires 84:22 85:25
explanations 61:14
express 12:17 66:19
expressed 60:22
　76:5
extend 37:2
extensions 36:21
extent 53:6
e-mail 7:16,20 70:9
　70:10,11,15
e-mails 8:9 13:8
　25:8

_____ F _____

F 85:1
face 38:9
fact 19:25 21:3 27:6
　44:25 72:9,13
　73:5 79:14 81:2
factor 31:5
facts 44:23 77:3,4,5
　80:4 82:3
factual 47:7
Fagg 74:24
fail 50:21
failed 47:3
failing 56:14
failure 56:14
fair 10:5 12:20
　29:14 39:7 47:16
　47:19 51:12,20
　51:24 53:15 55:4
　56:17 62:9 74:4
　74:10 78:9
fairly 23:20 57:8
fall 12:19 21:12,14
　21:18
Falls 34:25 71:18
familiar 27:5 60:20
　70:20,23
far 12:24 21:8
　27:15 34:17
　37:11 52:1
Fargo 19:13 65:24
　66:4
farmers 22:18
favor 38:24
FDCPA 39:16
Feather 67:15
February 59:9
federal 1:22 47:4

69:2
fee 8:1 10:7 70:1
feel 50:16
fees 63:20,24 64:1,8
　64:11,19,25 65:5
　65:6,11,18,22,23
　65:25 66:3,4,6
　70:19
fell 26:23
felt 60:13
few 31:16 67:20,24
　74:20
fide 12:19 18:15
field 41:21 43:24
fields 29:16
fighting 22:19 46:8
figured 20:6
file 3:9 4:19,22,24
　5:1 7:11 8:9,11
　8:22 12:10,22
　17:24 26:1 32:17
　33:2,7,9 37:1,16
　41:16 42:15,17
　43:6 51:2 55:12
　58:2,20 60:1 66:3
　78:17,20 80:11
　80:23 81:19,19
　82:16,20
filed 14:14 17:7
　31:18,23 32:12
　32:22 35:2,17,21
　38:7,16 39:6,9,22
　42:6,8,14,18 43:3
　43:20,24 44:22
　45:13,24 46:6,22
　49:24 50:2 66:2,3
　76:11,16
files 17:2,5 65:18
　65:22 79:25
filing 27:15 32:20
　41:23 42:21
　54:10 59:1,18
　76:20,23 78:11
　80:12 82:3,12
filings 31:5
filled 26:24
final 11:12,19
　72:15
finance 28:20,21
find 55:14 67:18
　73:23
finding 44:23
fine 4:18 35:18
finished 21:18

firm 2:5 19:4 20:1
    22:10 27:25 28:4
    28:6 34:14 35:13
    36:15 39:24 40:2
    40:5,6,12 47:17
    47:18,18 58:13
    68:12 71:19
    77:11
firms 34:12 41:20
first 3:12 4:6 5:10
    5:25 6:3,25 9:19
    9:25 11:23 12:2,8
    17:13 35:12,15
    47:2 64:14 72:15
    77:22 80:8 85:9
Fisher 1:19
fit 53:22
five 8:16 14:10
    16:22 35:14
    60:12 61:13,16
    68:21 69:5
five-year 49:15
    64:23
fly 77:7
focus 27:24 67:21
folder 6:16,17 9:2,3
folks 28:4 30:18
    31:20 32:12 68:2
following 4:1
follows 4:7 49:15
follow-up 74:20
    79:9
forced 62:5
foreclosure 55:18
foreclosures 30:3,4
foregoing 84:4,5
    85:8,11,15
forever 46:2
form 44:4 52:9
    54:11 56:11
    62:18 74:7
formally 37:1 48:22
format 50:20 54:22
    55:5 74:7
formed 47:6
forms 72:10
found 8:22 9:1
    45:17 52:24 56:7
    67:20 79:25
foundation 41:5
    63:3 66:17 76:25
    81:7
four 11:7 14:24
    16:21 22:20

23:15 35:14
four-year 21:15
    26:20
frame 23:17 60:14
frankly 33:20
Fred 2:12 3:3 24:1
    26:5,10
frivolous 78:12,13
    78:17,20 80:2,12
    82:4,7
from 4:25 6:18 7:17
    9:12 17:2 19:3
    20:21,24 22:13
    30:16 34:11
    37:23 41:3,14,18
    41:24 42:2 43:23
    46:15 50:14,18
    52:20,25 54:13
    55:24 56:5,7
    58:10 59:13
    64:11 78:11
    80:24 81:21,22
    82:6
front 2:14 44:3,19
full 4:11 84:8
full-time 21:17
Funding 32:6 39:21
funny 61:15

_____ G _____
GALLATIN 85:4
garnished 17:23
    18:3 37:13
gave 7:8 9:21 10:17
general 10:25 23:10
generally 41:20
George 20:22
gets 37:6 42:18
getting 33:1 46:15
    62:2,3,14
get-go 50:14
gist 73:18
give 29:15 39:3
    50:19 82:18
given 50:20 80:14
    84:9
glancing 41:16
go 4:15 11:20,21
    21:4,16,17 22:2
    29:1 32:6 56:7
    58:10 69:17
    73:23
goal 32:19
goes 64:24

going 12:3 14:7
    28:8 32:22 55:19
    59:9 73:21,22
    75:7
gone 37:3 38:22,23
    52:1 65:18
good 13:16
gotten 28:9 40:9
    42:7
governed 53:15
grabbed 25:19
Grace 6:20 83:1
graduate 20:24
graduation 21:4
granted 36:12 38:4
    38:5
Great 34:25 71:18
greatest 31:13
green 9:3 28:2,7,15
greenish 9:2
grounds 18:1
group 22:18,21
    24:11,13
grow 21:10
guess 20:16,18 22:4
    28:8 38:23 42:2
    42:13 43:17
    49:20,25 53:5
    54:16 55:16
    57:19,24 58:7
    60:5,9 67:22 69:7
    73:24 78:8
guessing 14:24 15:8
    38:12 54:21
guy 21:11
guy's 38:9

_____ H _____
H 3:7
half 17:4,5 45:4
halfway 21:16
Hamilton 34:22
hand 59:8 75:24
    85:18
handed 8:21
handle 25:14
handled 16:22
happened 17:19,20
    26:21 45:23 46:3
    72:8 76:1
happens 38:11
    44:13
hard 12:3
harm 57:4

hate 67:14
having 4:6 33:1
    43:20 47:13 52:6
    57:8
head 41:19 42:13
    53:1 71:2
hear 37:14
heard 4:15
hearing 13:6,6
hearsay 63:4 81:7
heels 42:15
Heenan 2:4,5 3:4
    7:17,21 8:2,10
    9:21,24 10:9,13
    11:20,25 12:1,12
    24:19 41:5 44:4
    52:9 62:18 63:2
    66:17 67:17
    68:25 69:1 74:20
    74:22 77:9,24
    78:5 79:7,19 81:7
Heenan's 69:8
held 47:13 50:7
Helena 34:14,15
help 68:10
her 19:10 46:8,8
    65:21 83:4
hereinbefore 84:9
hereunto 85:18
Hick's 9:4 78:23
high 20:20
higher 69:20
Hill 74:25
him 10:17,23,24
    11:3 13:25 19:14
    26:13 27:4 34:22
    57:5,14,14
hold 78:16
holds 56:16
honestly 80:9,14
hope 77:7
hour 68:4,16 69:12
    75:2,4
hourly 10:7 13:10
    67:3,7,8 69:19
    70:20
hours 12:24 13:4
    69:23
household 28:21
huh 21:6
Hull 34:15,19 39:25
    40:2,4,11
Hull's 40:12
husband's 46:9

husband/wife 14:8

_____ I _____
idea 51:3
identification 6:14
identified 4:25 9:17
identifies 5:25
identify 5:7 14:6,7
    33:17 48:4
ignore 58:15
imagine 13:18
immediately 21:3
    22:1 73:22
imminent 32:23
important 45:11
    49:21
imposed 47:4
impression 73:2
improper 18:14
inability 36:16 74:9
include 12:7
including 56:13
incomprehensible
    63:16,19
incorrect 60:4
increased 13:13
    67:9
incur 57:5
incurred 52:7,13
    53:1 82:1
indeed 33:22
Index 5:24
Indian 27:6,7
individual 42:21
individuals 24:8
    30:24,25
industry 24:15
information 40:19
    41:22 44:19 48:8
    50:19 54:10,11
    54:20 55:6,24
    69:8 73:8,14 74:7
    80:18,22,24 81:1
    81:24 82:15,20
initially 10:23 49:8
injury 52:20 53:1,5
    53:5
ink 84:7
inquired 48:14,19
inquiry 47:6 48:7
    48:24 49:2,22
    50:4 77:3,4
instance 1:18
institutional 28:11

30:2
institutions 29:19
instruction 56:16
instructions 56:12
　57:8
intend 60:23 74:13
intensive 55:17
interest 20:15
　29:22 55:23
interpose 63:2
invested 44:21
Investment 9:11
invoices 33:25
　81:14
involved 15:19
　35:24 40:6 42:3
　52:17 72:14
　77:15 81:17
involving 16:23
　18:24 71:18
issuance 57:2
issue 41:11 46:16
　47:25 48:12
　51:22 54:7 55:25
　56:8,24 57:21
　59:21 63:24 65:5
　65:17 72:9,13
　82:24
it'd 52:1
it'll 58:22

**J**

James 1:14,17 3:2
　4:5,13 70:24 84:3
　84:13
Jeanie 5:23
Jeez 66:23
Jeff 23:3 26:4,21,22
Jennifer 1:22 85:5
　85:22
job 22:19
Jock 45:20 46:6
John 2:4 3:4 7:8,17
　67:22 70:25 71:1
Johnson 1:9 2:11
　10:3 12:18 14:3,9
　15:3,15,21 16:13
　16:18,23 17:4,7
　18:24 34:11
　35:13 39:3,15,23
　40:16 47:3 48:3
　48:18 49:11
　54:22 56:9 57:2
　57:13 58:5 59:18

60:17 61:1,9
62:24 63:25
65:11 70:25
72:10 74:4,8 75:2
77:10 78:19
84:25
John's 67:3
joined 27:1
JRL 7:22 15:24
　38:16 50:21
JRL's 38:24 49:22
JRL00015 59:11
judge 37:20 38:4
　45:25 46:1,12
　51:23 74:24,25
Judges 74:24
judgment 15:18,24
　16:2,14 17:24
　18:12 20:7 37:25
　38:23,23,24 61:7
　62:2 65:17
judgments 16:10
　61:12 62:3,14
　82:14
June 1:5 2:3 83:2
jury 6:1
just 7:20 9:4 20:18
　21:4 25:7 26:3
　27:13 28:1 31:7
　32:21 33:1 36:7
　36:23 37:8 42:15
　44:1 50:18 54:5,6
　58:20 63:2,6 73:4
　74:13 76:6 77:6
　79:4
justice 14:21

**K**

keep 11:17,18 12:8
kid 46:8,14
kind 23:8 24:2,24
　24:25 26:23
　27:13 28:12
　29:19 30:2 37:23
　38:2 40:24 42:12
　46:1,11,14,22
　52:19 54:16 55:3
　55:16,25 56:16
　61:19 67:19,21
　68:13 69:9,20
　74:9 77:23 78:14
kinds 33:11 54:10
King 70:25
knew 80:6

know 7:3,5 13:20
　13:23 14:12 16:2
　16:10 17:22 19:8
　27:3,3,20 28:12
　29:14 31:9,11,22
　31:25 32:5 35:3,9
　38:25 40:5 41:6
　44:1,11 45:15
　47:21 48:22 51:2
　51:6,6,19,21 53:6
　55:19 56:25 68:5
　68:15,20,22,22
　69:7 70:7,14 71:1
　71:20 72:4 73:5
　73:20 75:12
　80:23,24
knowing 44:14
knowledge 40:15
　57:17 71:5 75:23
　77:20
known 21:8

**L**

label 59:9
labeled 5:24 62:23
lack 36:11 75:22
Lambdin 70:24
language 54:1
languishing 46:12
large 68:7,8
last 14:12 17:14
　20:2 28:22 29:1
　29:15 30:9 37:24
　40:20 49:23
　53:21 78:1 81:23
late 46:9
lately 71:15
later 5:7 44:23
　79:25 85:14
Lauinger 1:10 2:11
　6:20,20 10:3
　12:18 14:3,9
　15:15 16:14,18
　16:24 17:4,7
　18:25 19:10,17
　19:23 34:12
　36:18 38:3 39:3
　39:16,24 40:16
　47:3 48:3,19
　49:12 54:23
　57:14 58:5 61:2
　61:10,19 62:25
　65:11 72:10 74:8
　77:11 78:20 83:1

84:25
Lauinger's 56:9
　57:2 63:25
law 2:5 3:13 9:15
　20:22,24 21:14
　22:7,10 27:6,7
　33:20 39:24 40:2
　40:5,6,12 64:13
　72:2 73:11 75:9
　77:11,11
lawsuit 32:25 45:25
　46:3 53:9 57:13
　58:6 76:20 78:20
　80:2 82:4
lawsuits 41:18
　76:11 78:12,17
lawyer 27:3 73:11
　77:18
lawyers 75:19
　78:11 79:2,3,5
layman's 78:11
learned 39:2 44:13
　44:18
least 20:1 49:22
　51:17 56:2
Leave 57:6
leaving 71:1
left 26:22
legal 64:4,6 75:23
lend 75:3
lender 30:17,17
　65:2
lenders 28:12
less 32:24 71:5
lesson 45:12
Lester 6:25
let 13:4 32:8 35:18
　45:16 58:10 59:8
　65:8
letter 48:10 54:3,4
　54:6 57:14 58:14
　58:15 59:2,3,4,8
　59:13,23,24,25
letters 42:10
let's 6:10 29:1 80:9
　81:21
Lewis 1:23 85:5,22
liability 52:17 62:5
licensed 72:14
lien 45:24 46:5,21
　56:1
like 5:12 7:16 9:7
　28:20,21 32:7,18
　36:7 37:18 47:24

55:19 64:15
70:12 72:18
likely 51:7 55:2
limitation 18:1
limitations 17:21
　18:9,16 38:6
　40:14 45:14
　46:18 48:5,13,21
　48:25 49:5,15
　53:4 57:21 59:21
　64:23 80:1,6,10
　80:14 82:16,24
limited 69:17
Limpp 17:14,17
　18:5 19:21,23
　37:10,12,22
　38:14
Linnae 5:12
liquidation 42:22
Lisa 6:19 19:23
　36:18 38:3
list 4:21
litigated 42:18
　47:22
litigating 48:1
litigation 15:13
　27:21 29:20 30:6
　39:12 44:2 59:24
little 11:4 29:23
　42:25 58:24 67:2
LLC 5:11
locate 9:19
logically 61:25
long 14:23 19:14
　26:19 68:18,23
　68:24 76:10
　77:23
Longer 68:19
Long-time 76:9
look 29:13,14
looked 9:1 37:19
　41:25 65:22 66:1
　66:3 70:10
looking 11:1
looks 5:12 7:16 9:7
lost 52:20
lot 27:20 28:16
　42:13 44:21
　55:13,21 69:18
　69:21
lots 62:4 68:9
low 42:23
lucky 81:16
LV 32:6 39:20

L-i-m-p-p 17:14

**M**

made 11:22 37:17 37:24 39:12,14 39:15 46:3,14 47:17 48:6 49:4,9 49:12,23 50:1 57:18 58:6,9 84:6
magic 54:5 73:17
main 24:13
mainly 22:19 24:4 25:15 26:15 27:6
maintain 78:17,20
major 26:17
make 5:6 6:5 12:2 20:6 24:22 44:9 48:17 52:23 53:3 68:9 73:22 77:6
makes 22:5 47:1
making 51:2 62:12
malpractice 71:12 71:13
Management 24:14 26:7 53:25
Manhattan 41:3 52:25 79:14 81:25
manila 6:16
manner 50:21
manual 75:10
many 8:14 10:12 12:24 15:10 30:20 42:6 63:17 72:23 76:11
marked 6:13 75:8
Marra 71:19 72:8
Martin 70:25
Martinson 25:10 68:14,15
Master 60:17
material 6:17 84:5
materials 4:22 8:6 9:6,8 41:24
Matt 15:23
matter 32:21 33:1 35:25 58:22 67:8
matters 15:16 16:22 24:2
may 7:10 15:11 16:1 32:13 36:6 38:8 44:12 47:23 52:14 58:20 72:21 82:6

maybe 8:16 15:9 23:15 29:9 35:14 40:20 41:17 42:12,24 53:7 65:20 70:12 77:24
McCOLLOUGH 1:6 2:3 7:23 8:4 13:19 19:18 48:9 48:12,20 52:6 53:12 56:21 57:4 57:13,18 59:17 77:13 78:21 79:13 80:4 81:3 82:19
McCollough's 40:17 48:20 62:25 81:23
mean 18:11 27:17 28:14 31:23 38:24 47:23 54:14 55:18 58:18 68:22 80:17
means 67:16
meat 43:17
medical 9:14 31:8 31:10,12
meet 47:3 50:6,22 77:12
meeting 10:23
meetings 10:12 11:7
member 62:17,22 62:23 63:10 64:5 81:5,10,12
mention 47:1
mentioned 3:11 7:20 20:4 70:19 84:10
merits 80:1
met 10:3,17 11:3,5 11:6 13:18,21 19:3
Michael 34:16
mid 28:2
middle 25:20
might 6:18 16:20 28:1 34:21 35:14 38:14 48:9 53:3 58:21 63:13
Mike 21:8
mind 4:17 18:11 20:19 71:2

minimum 47:4
Mintling 14:13 15:13 16:15,17 19:20,24 20:4 35:15 40:7
Mintlings 15:25 16:6,11,22 17:3 35:2 36:1,2,15 38:13
minus 69:6
minute 62:6 63:22 80:9
minutes 23:12
mischaracterizes 79:20
Missoula 2:17 27:3 34:17,20
mixed 25:18
MLSA 69:14
mom 46:14
money 18:2 23:9 43:25 51:19 68:9 79:15
Montana 1:2,20 2:9 2:17 4:14 10:3 20:22 21:2 24:14 26:6 33:21 47:5 49:14 53:24 64:11,16 66:10 71:8 73:11 74:24 76:6,9,12,20,20 76:21,22,24 77:12,18 78:10 78:15,16 79:2,5 84:20 85:2,24
monthly 33:25,25 81:15
Moore 34:16
more 6:21 11:4 27:12,24 28:14 29:23 32:23 42:25 44:9 61:9 67:25 72:18 79:7
mortgages 55:20
most 13:12 15:6,8 20:1 42:20 55:2 57:10 68:2,5 81:17
motion 17:24 18:19 35:17 37:1 38:5 42:16 47:12
moved 21:2 22:11 22:13 36:3,6,7,10 37:24

MSN 9:18
much 11:18 27:13 31:9 44:12,15 45:9
must 25:22 61:4 65:19
M-i-n-t-l-i-n-g 14:13

**N**

N 3:1
name 4:11 14:12 17:13,14 19:2,11 24:1 27:5 28:6 31:25 34:21 38:9 38:12 40:19,21 45:20 65:21 70:13 71:18 84:19
named 7:1 25:9 85:12
names 17:9,12 32:6 38:20,21 71:2
NARCA 9:16
National 3:13 64:14 70:13 75:9
nature 12:11 15:12 20:12 71:13
need 5:6,8 12:16 38:8 41:1 44:9 50:15,16 77:5
never 13:24 37:3,13 37:15 46:19 47:22 51:25 52:1
newsletter 9:16
night 21:15,16
nine 17:2
nipped 60:10
nips 59:6
nobody 36:9
nodding 41:19
noncitable 9:12
nonpublishable 9:12
non-bankruptcy 29:11
norm 34:6
North 1:19 2:6 4:13
Northern 22:14,16 22:24
Northwestern 7:1
notarial 85:19
Notary 1:23 84:20 85:5,23

note 41:16
notebook 5:3,9,25 41:1
noted 56:10
nothing 85:10
number 6:13 13:4 17:11 21:23 24:15 28:16 31:13 40:21 41:14 49:10 61:3 61:5,23 65:22 68:7,8 69:17,23 72:24

**O**

object 44:4 52:9 62:18 79:19
objected 35:22 36:8
objection 6:5 41:5 63:3 66:17,24 76:25 81:7
objections 32:14
observations 42:3
obtain 15:15 61:6
obtained 15:17,24 16:3 69:7
Obviously 69:13
occasion 33:6
occasionally 34:15 34:16
occasions 34:2
occur 37:9
occurred 10:15 44:25 53:12
October 1:20 21:20
off 11:12 25:3,8,19 26:23 27:11 42:13 79:18 82:2
offer 60:23 66:9 74:14
offered 21:19
offering 7:25
office 8:19 11:4,5 11:16 23:3,6 24:23 25:13 36:18 42:9 65:24 65:25 66:2,4 69:4
offices 1:19
often 31:4
oftentimes 25:16 32:5
Oh 71:16
okay 9:10 13:10 16:9 17:1 23:13

31:4 34:11 35:18 41:9 44:7,16 45:18 47:1,16 49:20 54:19 55:1 57:1 58:3 60:8 63:14 70:1 71:7 72:18 75:14,16 83:6
**Olympic** 9:11
**omitting** 57:9
**one** 14:24 15:6,8,17 16:11 17:10,13 18:13 19:21 20:6 32:12 33:5 37:4,4 40:6 43:13 44:23 45:8,16,23 46:7 61:9 64:21 65:16 66:7 68:20 69:25 70:9 77:15 79:4,6
**ones** 8:25 19:8
**ongoing** 14:23
**only** 41:24 48:19
**onto** 48:8
**opened** 23:3,6
**opinion** 7:25 10:2,5 10:6 11:1,4,23,23 11:24 12:6,17 48:17 50:4,13 52:24 66:14,22 67:3 71:24 75:4 76:1 77:10 78:19 79:1,24
**opinions** 60:22 66:9 66:19 74:13
**opportunity** 8:19
**opposed** 38:4
**oppress** 78:7
**oral** 1:13,17 84:8
**order** 7:11,13,14 18:12 37:20 47:10
**original** 30:16,17 33:24 34:24 40:21 41:3 56:2
**other** 6:22 8:6,9 9:6 9:8 14:4,10 16:12 16:24,25 17:6,12 18:23 19:21 24:7 24:9 27:12 30:5 34:12 36:14 42:3 50:11 55:2 59:22 66:7 67:16,25 68:12 70:18 75:3 81:23

**others** 15:24 38:18 38:19,22
**otherwise** 56:17 76:22 80:2
**ought** 81:18 82:10 82:11
**ourselves** 78:16
**out** 7:11 8:8 20:6 31:7,13 34:25 43:3,9 44:23 46:15 52:24 54:3 55:14 65:3 67:18 69:3 71:1,18 82:8 82:9
**outset** 48:4 60:10
**outside** 11:15 46:24 66:18
**over** 9:7 10:21 20:2 20:15 23:20 25:8 26:5,14 29:14 30:9 36:9 44:18 45:25 46:8 67:9 76:14
**own** 33:14,22 50:17

---
**P**

**page** 3:2,8 5:24 47:2 56:9 61:1 70:20
**pages** 3:14 84:5 85:15
**paid** 79:18 82:2
**painful** 44:13
**part** 26:17 33:16 52:2 57:10 58:20 77:22 80:17
**particular** 7:14 12:6 17:8 19:18 44:18 45:2,6 49:10 56:10 82:15
**parties** 19:2 39:19 46:3
**partnership** 23:14
**party** 43:25 46:7 65:10 79:24
**part-time** 24:24
**passed** 22:2
**past** 52:16 59:14 79:16
**Pat** 27:2
**Patten** 1:14,17 3:2 4:5,13 28:7 74:23 79:1 84:3,13

**Patten's** 3:9
**Pat's** 27:2
**Paul** 70:25
**pay** 32:24 52:20 59:3 68:10
**paying** 52:13 69:14 69:15
**payment** 37:24 40:20 43:9 48:7 48:15 49:4,9,12 49:23,23 81:23 83:2,3
**payments** 48:20
**people** 30:20 45:10 67:21,24 68:7,8 68:23 69:8 72:14
**per** 68:16 75:1
**percent** 29:18,18,19 30:1,5,22 31:7 47:15 61:11,13 61:17
**percentage** 61:19 62:1
**percentages** 61:15
**percentagewise** 29:16
**Perfect** 12:10
**perhaps** 4:25
**period** 26:20 49:4
**permitting** 22:19
**person** 25:9 38:14 39:7
**personally** 28:13
**perspective** 49:21
**Peterman** 28:7
**petition** 21:20 25:21
**petitioned** 21:21
**phone** 19:6 24:17
**photocopied** 63:17
**picture** 38:9
**piece** 44:1
**Pierce** 85:6
**place** 41:13 80:9 84:9 85:12
**places** 56:5
**Plains** 22:15,16,24
**plaintiff** 5:12 7:1 32:2,3
**Plaintiffs** 1:7 2:2
**plaintiff's** 5:9 6:3 6:24
**pleading** 6:23
**pleadings** 5:4 6:21

47:6 72:15 78:14
**please** 4:11
**Pleasure** 74:19
**Plus** 69:6
**point** 11:19 27:23 27:25 35:16 42:8 46:13 52:16,21 58:8 60:5,9 79:15 81:4,18
**Portfolio** 5:11,22 28:18 32:1,18 39:20
**portion** 75:9,15
**position** 46:19 77:6
**possession** 41:23
**possible** 13:5 37:18
**possibly** 39:20 60:10 72:25
**practice** 10:4,6 11:13,17 12:20 13:16 22:12 23:8 23:10,20,22 24:12 26:4,5,10 26:14 28:9 29:13 29:15 31:5 39:5 41:21 51:20,25 52:3 54:13 62:7 68:13,18,21,25 69:18,20 72:11 74:11
**practiced** 29:17 68:23
**practices** 39:8 47:20 51:12 53:15 56:10,18 62:9 66:11 74:4
**practicing** 26:20 28:2 73:11 77:11
**prayer** 63:25 66:6
**preamble** 71:14
**precedes** 25:17
**preceding** 27:20
**precludes** 78:11
**prejudice** 35:17,19 35:23 36:7,11 37:7 40:13
**prepare** 11:11
**prepared** 11:5,8
**preparing** 72:15 73:12
**pressed** 12:3
**pretty** 13:16 18:4 19:24 27:13 51:21,25 54:20

54:22
**previous** 53:9
**previously** 9:16 63:4
**prey** 75:22
**primarily** 23:22,23 27:19
**print** 8:19 13:7,8 84:19
**printed** 7:16 8:7,8 25:8,19,23
**printing** 25:24
**printout** 40:23
**prior** 7:22 39:12 54:10 58:5
**privilege** 22:5
**pro** 56:13
**probably** 14:9 17:2 21:5 45:1 54:20 54:21 55:8 57:5 71:16 77:2 80:25
**problem** 48:5 80:17
**problems** 68:10,11
**Procedure** 1:22 47:5 76:21 78:10
**proceeding** 32:11
**proceedings** 4:1
**process** 35:22 78:8
**produce** 50:24 81:6
**produced** 37:6 59:10 62:24 81:3 81:5,10
**Professional** 71:9 71:15,25 78:4
**program** 21:16
**promptly** 46:13
**proof** 25:22 43:6 82:11
**property** 55:23
**prosecute** 51:18 82:17
**prosecuted** 51:16 77:21
**prosecuting** 80:5
**prosecution** 36:11
**Protection** 66:11,14
**prove** 33:21 61:2,5 61:23,24 62:4,14 62:15 75:23 77:6 82:7,8,9,11
**provided** 5:17,18 8:24 80:19 81:24 83:4
**providing** 10:24

provision 47:19 62:8 63:20,24
provisions 12:19
public 1:23 56:5 84:20 85:6,23
publication 17:22 18:14 37:17,20
publications 26:12
purely 58:7
purpose 78:13
purposes 20:19
pursuant 1:21
pursue 28:23 43:4
put 21:17 46:9 54:5
putting 51:23
P.C 2:13
p.m 1:21
P.O 2:8,16
P.3d 9:11

**Q**

quarter 13:11 68:17
question 18:11 31:13 77:22 78:2 81:11
questions 74:20 79:7
quote 75:25 78:12

**R**

R 85:1
Radford 34:25
raise 65:17
raised 41:11 47:24 48:12,20,22 51:22 63:3
raising 59:21
ran 46:21
ranchers 22:18
range 69:12 70:2
rarely 39:4
rate 13:10 20:15 67:3,7,8 75:1
rates 69:20 70:20
rather 8:4
read 9:22 11:2 50:17 63:18 71:14,17 77:24 78:2 84:5
reading 7:10 50:3
real 46:13 55:23
really 37:3 51:3 73:21

reason 41:12 45:6 69:16
reasonable 47:6 75:4 77:4
reasonableness 8:1 10:7
reasons 32:16
rebuttal 11:23
recall 10:11,23 12:1 12:17 14:1 15:22 16:1,3,13,14 17:25 18:18 21:9 29:9 34:17 35:6 36:2,3 38:3,20 40:4 46:1,7,22 51:17 52:14,19 70:3
recalled 59:20
receipt 54:9
receive 54:11 81:3
received 65:9
receiving 47:9,11
recent 15:6,8 43:7 45:16
recently 13:14 19:15 45:19 75:1
recited 4:21
recognize 31:25 61:4 62:3
recollect 11:21,22
recollection 10:1 12:4,16 17:15 20:14 35:4 36:23 39:1,23 47:23,25 52:11 63:16
record 25:3 85:16
recover 18:2
recovered 51:19
recovery 5:11,22 15:16 28:18 32:1 32:18 39:20
redrafting 11:17
redundant 6:18
refer 41:1 54:16
reference 25:9
referenced 39:19
referred 26:13
reflected 72:25
refresh 12:16
refreshing 20:19
refund 42:24
regardless 80:1
regular 43:5 52:2
regularly 28:23

35:13
Reichert 9:17
related 27:22 31:8
relation 7:5
relationship 65:3
relative 7:22
relatively 30:8
reliable 80:24
rely 50:15 80:18,20
remarkably 50:10
remedied 72:1
remedy 72:3,4
remember 7:10 10:15 11:13,25 12:16 16:17 17:13 21:7 26:12 29:12 32:4 34:23 35:10,23 36:21 39:18 41:6 49:9 51:10,23 73:17
remembered 1:16 19:22
render 10:2
Renz 23:3,14 26:4 26:21
reply 11:24
report 4:25 9:4 11:5,11 12:2,7 20:18 40:24 41:11 43:15,18 47:1,2 50:3 56:8
reported 45:19 85:13
reporter 1:23 6:5 85:5,22
Reporting 1:19
reports 9:4 11:8 31:10 60:23 74:15
represent 29:24 34:18 55:3 58:4 67:4 73:25 75:14 79:3
representation 63:23 81:22
represented 28:15 28:23 29:2 30:11 46:7 71:21
representing 14:3 16:5,7 28:11 29:22 30:18 34:13 37:10 41:21 59:14 68:13

request 33:7,8,9,9 33:12,13 35:6 56:11,21,24 57:3 57:9,10 65:23 75:6,21 82:19,21 83:5
requested 12:12 34:3 35:16 65:12
requests 5:10 10:9 75:20
required 56:16
research 8:23
Residing 84:21 85:24
resolve 68:10
Resource 22:15,16 22:24
respect 40:17 44:5 52:10 62:18 71:8 75:6 81:8
respond 36:19 57:22 58:15,17
responded 57:20 59:20
response 48:10 49:7 50:5 57:18 59:23,24 65:14
responses 5:10
responsive 40:9
retired 23:25 24:21
retiring 23:21
return 40:10 83:3
review 72:16 73:6,7
reviewed 11:3,6 63:15 78:23
reviewing 11:25
revise 12:13
Rice 74:25
right 9:7 11:9 15:11 24:20 32:17 34:21 36:8 38:25 42:15 50:8 51:16 55:12 60:16 63:9 64:11 67:10,13 71:2
road 81:4
Rodenburg 1:9 2:11 10:3 12:18 14:3,9 15:3,15,21 16:13,18,24 17:4 17:7 18:24 19:13 34:11 35:13 39:3 39:16,24 40:16 47:3 48:3,18

49:11 54:23 56:9 57:2,14 58:5 59:18 60:17 61:1 61:10 62:24 63:25 65:11,20 72:10 74:5,8 75:2 77:10 78:19 84:25
Ron 70:25
rough 13:3
roughly 16:21 23:4 30:5
routine 39:5 54:21 54:22
routinely 29:2 31:18 34:12 41:21,22 51:1
rule 1:22 37:19 47:4,10,12,14 50:22 76:21 77:2 78:9
Rules 47:5 71:8,14 71:24 76:21,22 78:4,10,16
run 8:19 40:14 80:6 82:17
running 32:4 46:19 46:20
Rush 5:22
Russ 27:7

**S**

S 3:7
sale 41:2
same 5:19 9:8 16:16 21:6 35:21 37:8 62:1 67:8 84:6
sat 21:5
satisfactory 50:5
saved 12:9
saves 59:6
saw 25:9 37:16 41:7 69:25 70:5,7
saying 73:18
says 50:11 58:12 64:18,21 73:8,15 75:21
scenario 37:8
scenarios 32:11
Schemmel 5:13,14
school 20:20,22,25 21:15 22:2,7
scope 49:1 66:18
Scott 28:2,15 34:24

screen 40:24
screwed 46:1
se 56:13
seal 85:19
search 55:21
Second 9:13
section 75:18
Security 24:23
    40:21
see 13:7 37:3 50:16
    55:23 58:25 70:4
    73:20
seeking 43:25 64:11
seem 34:6 73:9,10
seems 35:12 70:12
seen 20:18 31:9
    40:23 41:2,10,15
    59:11,13 60:5
    62:16 63:6,8,19
Seipel 9:10,20
    10:19
semester 21:18
send 54:3 59:3,4
sending 42:10
sense 10:25 42:5
    55:1
sent 40:1,8 43:9
    57:14 58:13
separate 14:10
separately 14:14,16
    14:16
series 14:25
served 17:21 37:14
    56:21 57:23
    82:18
service 18:13 37:17
    57:3 58:5 70:6
services 10:8
serving 57:13 75:19
    75:21
set 37:25 71:25
    77:2 85:18
sets 65:3 72:5
settlement 46:14
    53:11
several 43:8
share 11:15
sheet 9:5 84:7
shorter 66:23
shorthand 85:13
show 24:24 75:7
showed 18:13,14
    36:10 70:10
shown 11:19

shows 48:8 49:13
side 14:4,10 23:19
    27:12 28:10,10
    70:18,22 75:3
sides 71:21
sign 37:20
signature 72:16
signed 37:21 65:2
    73:2 84:7
signing 11:12
signs 72:23 73:4,6
simply 73:25
Simpson 2:12,13
    3:3 4:10 6:15
    24:20 25:1,3,6
    41:8 44:8 52:22
    55:11 62:21 63:5
    66:23 67:1 74:17
    74:19 76:25 79:9
    79:11,21 81:20
    83:6
since 21:8 22:12
    31:15 66:13
sit 12:25 16:3 17:3
    17:12 18:24
    19:25 21:12
    36:13 38:25
    40:22 50:1 57:19
    66:21
sits 73:4
sitting 10:22
situation 32:15
    45:2
six 14:10 60:13 69:5
skill 85:17
sleight 75:24
slipped 25:23
slow 72:21,21
small 42:24
Smith 27:2 34:14
    34:18 39:24 40:2
    40:5,6,12
Social 24:22 40:21
software 60:17
some 5:3 6:17,19,21
    6:22 7:5,18 8:6,7
    9:6 11:19,22
    24:16 25:16,16
    26:8,11,16,22
    27:20 32:13
    35:16 37:22 38:1
    38:2 40:24 41:12
    41:13,17 42:24
    43:19 44:1 45:10

46:13,14 48:24
    52:16 54:2,14
    57:4,5,8 59:22
    61:15 62:8 65:18
    68:6 69:13 77:17
    79:15 81:3,6
somebody 16:19
    17:5 25:22 28:19
    30:16 34:20
    58:25 73:20
somehow 27:22
someone 8:24 32:15
something 12:6,13
    28:21 29:10 32:6
    32:18 36:25 46:2
    47:24 52:20
    55:19 64:15
    69:25 72:18
sometime 15:9
sometimes 34:24
    37:1,2 42:15,17
somewhere 70:1
soon 22:13 43:3
sorry 8:4 24:19
sort 11:1,19 13:25
    32:24 46:16 57:9
sorting 25:7
sorts 21:21
sounded 24:18
sounds 27:5 72:18
specialize 67:21
specific 44:10
specifically 33:17
    39:18 57:1 66:5
    68:23
speculation 66:18
speculative 58:7
Spencer 61:13
Spencer's 61:8,17
spent 10:7 12:21,24
    13:4
spoke 19:16
spoken 13:19,21
    19:6 36:17,20
ss 85:3
stack 6:23
staff 22:14,23 73:3
stamped 59:11
stand 60:4
standard 10:4 47:4
    50:6,22 54:9 71:9
    71:25 72:5 76:19
    76:23 77:1,12
    79:4,6

standards 72:6
    79:2
start 27:17,23
    46:20
started 21:14 27:11
    27:12 28:2,11
    35:12 46:18
state 4:11 67:6
    76:12 77:11
    84:20 85:2,6,23
stated 12:14 49:16
    61:10 64:7,7,22
    64:25 65:4
statement 60:25
    70:4
statements 34:1
    81:6,15
STATES 1:1
status 48:19
statute 17:21,25
    18:8,16 38:6
    40:13 45:14
    46:18,24 48:4,13
    48:21,24 49:15
    53:4 57:20 59:21
    64:23 80:1,6,10
    82:16,24
stayed 30:8
steps 66:5
Steve 70:24
still 22:21 24:22
    63:24
stopped 52:13
Story 64:14 70:14
Street 1:20
strip 22:20
stuff 5:19 11:17
    25:17 27:21
    46:13 81:18
subject 52:7 64:22
Subscribed 84:15
substantial 61:3,5
    61:22
substantially 81:24
substantiate 50:25
successor 30:17
sued 15:13 17:17,23
    31:19 32:18
    58:12 65:10 68:3
suffered 52:19
suing 64:10
suit 7:22 27:18 33:5
    35:21 41:23 42:8
    43:20,24 44:1,22

44:24 49:24 50:1
    51:2 54:10 57:22
    59:18 67:5 71:10
    74:9 79:25 80:2,5
    80:8,11,23 81:19
    81:19 82:12
Suite 1:20 2:7,15
suits 17:7 19:21
    31:23 35:1 38:15
    39:22 51:11,16
summer 5:20
support 47:8
supported 37:23
supporting 43:21
    74:10
supports 64:13
suppose 27:17
Supreme 21:20,22
    64:16
sure 5:2 7:7,9,9
    18:4,4 19:24 20:6
    41:11 47:15
    48:17,23 51:25
    53:25 59:15
    63:12 72:3
surprise 67:10,10
surprised 44:20
survey 67:16
sworn 4:7 84:15
    85:9
S-e-i-p-e-l 9:11

———————
    T
———————
T 3:7 85:1,1
tactic 75:19
take 8:17 13:24
    19:16 21:22,25
    55:12 58:23
    60:20 63:24 72:9
    72:13
taken 1:18 4:2 25:5
    26:5 55:10 56:8
    85:11
takes 54:12
taking 66:5 67:6
talk 67:2
talked 9:9 10:21
    11:4 19:9,9,10,14
    49:10 61:13
talking 10:25 54:17
    71:20
taper 27:11
tax 42:24
telephonic 5:21

tell 6:4 8:17 12:4,25
22:1,2 37:15 45:4
50:12,15 51:9
56:6 57:6 58:3,14
58:15,17,18
63:18 73:21
telling 50:14 55:15
ten 8:16 28:22
29:15 30:9 71:5
tend 43:2 69:20
terms 42:5 53:3
73:25 78:11
testified 4:7 51:15
59:16 60:6 72:23
testify 85:9
testimony 4:2 16:21
85:16
Thank 74:17
That'd 4:18
their 28:16 33:7,9
36:16 38:21
41:23 42:15 47:5
47:7 48:10,11
51:8 54:9 61:2
64:4,6 68:11 74:9
75:23 80:15,15
80:19 82:16,20
theory 64:4,7,9
thereon 84:6
They'd 8:13
thing 6:7 9:8 24:25
things 5:5 18:13
21:21 62:13
64:21 69:21
think 5:3 7:7,8 9:9
15:7 17:8,11 18:7
18:10,20,23 19:1
19:2,25 23:1,5
26:7 33:20 36:4,6
36:13 37:11,18
38:14,21 40:7,7
40:11,23,23
41:10,14 43:19
44:11,17,18 45:1
45:3 46:17,20,21
48:12 49:3,25
50:15,23 51:15
52:15 53:10,23
54:2,4,19 57:1,7
57:16 59:16 60:6
60:6,11 61:15,25
62:8 63:8 64:5
65:16 67:23 68:2
69:16,19,24,24

70:11,14 71:11
71:12 72:5,8
73:10,18 74:6,10
74:12 76:4 77:1
78:3 79:6 80:3,11
80:13,18,22
81:18 82:5,7,12
thinking 17:3 41:12
57:20 72:22
Thirty 42:12
though 57:23 58:25
68:2 72:19
thought 35:18
57:24 69:25
three 8:8 10:14
22:20,24 23:12
23:15 26:19
36:14
through 5:5 10:22
11:20,21 21:16
25:7 33:7 35:21
41:16 65:18 67:6
throughout 27:9
TIFT 1:5 2:3
Tift/McCollough
84:25
time 5:19 10:7
11:18 12:21 13:1
16:16 19:14 21:6
23:17 26:9,21
35:22 36:21 37:2
37:14 38:1,11
44:15,21 45:4
52:10 53:2,18,19
53:21 54:14
60:13 67:9 70:5
70:16 79:8,24
84:9 85:12
times 27:20 55:21
63:17
timing 32:21 35:11
36:5
timingwise 49:20
Timothy 1:5 2:3
13:19
today 4:19 28:4
75:11
together 22:21 27:8
46:4
told 34:4 48:14
51:8 74:23
top 42:13
total 20:17 70:1
touch 50:17

towards 27:24
tracked 12:21
Trade 66:10
Tranel 2:13
transcribed 85:14
transcript 84:8
transcripts 6:19
11:3
transfer 33:17
transfers 55:23
trial 6:1 15:18,19
16:13 20:7 33:1,2
36:8,9 60:23 66:8
74:14 77:16
tried 15:21
trip 60:2
true 55:8,15 62:8
63:23 81:24 84:8
85:15
truly 58:18
trust 46:1,9,10
55:20 73:9,14
trustee 46:8
trustees 29:24
truth 85:9,10,10
try 7:11 55:14
trying 12:15 17:8
35:10 36:4,24
60:2
turns 82:8,9
two 9:19 11:8 13:11
18:13 45:8 60:23
64:21 68:17
74:23 79:2
type 54:15 56:5
59:13 69:17
types 34:18
typewriting 85:14
typewritten 84:5
typical 32:14
typically 23:19
32:23 37:5

_____
        U
_____
UCC 55:21
ultimate 32:19
ultimately 62:4
unaware 53:11
under 64:7,9 73:25
76:20 78:15
85:14
underlying 52:8
69:23 81:1,14
understand 16:20

30:14 48:18
49:22 50:4 57:16
60:3 61:14 63:9
73:24 81:9
understanding
40:18 48:2,6,16
49:1,6,14,25 52:5
57:23 59:17,25
68:24 69:1,22
71:7 79:13,17,22
79:23 81:11
82:22,25
understood 44:24
61:16
underway 15:10
Unfair 66:10
Unifund 32:1 39:20
union 30:4
unions 28:12 29:6
UNITED 1:1
units 22:20
University 20:21
Unless 12:9 39:17
unquote 78:12
unrelated 41:18
unrepresented
75:20,22
until 17:23 22:13
used 60:16
uses 60:18 72:11
usually 25:16 27:22
29:22 30:20
32:14 33:11 34:9
43:6 54:11 58:14
58:17,18
utilized 56:11

_____
        V
_____
vacate 17:24 18:12
vague 44:4 52:9
validity 57:15
Vargas 9:14,20
10:19
various 34:3 41:14
70:21
verify 73:1 80:22
very 31:9 46:11
57:10 61:22
view 77:2
vigorously 15:1
violated 47:14
violates 62:8 74:10
78:3
violating 47:19

violation 39:7,16
51:12,24 56:17
72:5 74:3,6
violations 10:5
51:20
voluntarily 15:3
vs 1:8 5:12,23 7:1
9:11,14 64:14
70:14 84:25

_____
        W
_____
wages 17:23 37:12
wait 21:23
walk 5:5
walked 23:9
want 9:5 16:15 20:5
25:1 32:16 33:9
48:17 54:16 56:2
67:2 73:20 76:4
79:9
wants 32:15
warranty 73:15
Washington 20:22
85:7,23
wasn't 4:25 45:11
waste 44:15
way 13:5 29:2
42:19 44:13,20
44:23 57:7 58:9
58:10 59:22 65:9
website 55:22
well 28:8 29:1 32:8
36:4 44:17 53:3,7
58:1,10 65:8
66:13 72:3 73:7
73:22 75:12 80:7
80:13 81:21 83:4
went 20:7,22 25:19
35:21 36:8 66:8
77:16
Wenz 71:19 72:8
were 4:1,21,22 5:17
8:23 10:4 11:22
15:19 16:21,24
16:25 17:9,23
20:17 21:23 22:7
22:9,19 23:14,15
23:19 24:2,4,5
26:6,8,15,17,20
27:8,9,16,24
28:13 33:15 35:2
35:4 37:9,12
39:19 41:17
43:19 47:18

53:23,25 62:5
65:5 66:5 75:2
81:15
**weren't** 53:25
**West** 2:14 9:15
45:20 46:6
**we'll** 6:10 32:19
56:5,6 58:22
**we're** 54:17 58:20
66:13 67:24
**What'd** 23:2
**WHEREOF** 85:18
**whichever** 13:6
**while** 17:9 27:2,8
**whole** 6:7 17:10
75:18 80:17
85:10
**wife** 13:22
**wild-ass** 42:12
**willing** 68:10
**win** 77:19
**wit** 4:2
**witness** 4:6 6:24
24:21 25:2 36:3
41:6,19 44:7
52:11 66:19,21
74:18 77:1 78:3
81:9 85:8,16,18
**wondering** 63:6
**Word** 12:9
**wording** 48:23
**words** 50:11 54:5
73:17
**work** 22:23 23:16
23:24 25:14 26:6
26:23,24 27:9,14
27:15,18 28:13
30:2 43:19,23
55:16 67:19,22
69:9 70:17
**worked** 22:10 69:2
**working** 11:18
12:22 22:7
**worth** 42:25
**wouldn't** 74:2
**wreck** 31:12
**writes** 75:17
**writing** 10:10
**written** 13:25 65:2
**wrong** 38:9
**wrote** 48:17

**X**

**X** 3:1,7

**Y**

**yeah** 6:8 13:9,13
18:20 19:22 22:4
22:6 23:11 25:2
27:11,19 28:14
30:7 31:1,3 32:3
32:23 38:8 39:10
40:5,8 44:9 45:7
45:8,22 46:25
49:8 55:7 60:15
64:12,14,14,17
65:7 69:6 70:3
71:20,22 75:12
76:13,15 79:17
**year** 15:9 20:24
67:11 69:2
**years** 14:24 18:18
20:2 22:25 23:15
28:17,22 29:15
30:9 31:16 35:14
43:8 44:18 49:10
52:25 60:13,13
67:12,18 68:21
69:3,4 71:5 76:14
**Yellowstone** 5:14
14:19 18:21
74:25
**Yep** 23:7 74:18
**Yerger** 27:7
**yesterday** 10:17
11:6
**younger** 44:12

**Z**

**Zasada** 19:12
**zombie** 9:18

**$**

**$1500** 70:2
**$200** 67:3 68:4 75:1
75:4

**1**

**1** 47:2
**1st** 2:6
**1:00** 1:21
**10** 29:19 30:5
**100** 1:19
**1027** 9:12
**11** 47:4,10,12,14
50:22 76:21 77:2
78:9
**15** 29:18 30:1

**18** 7:17
**18th** 70:12,15
**188** 9:11
**1977** 21:18
**1978** 22:11
**1980s** 27:10
**1981** 22:14 23:4
**1990** 27:13,23 28:9
29:2

**2**

**2nd** 4:13
**2:00** 8:18
**20th** 83:2
**200-dollar** 69:12
**2004** 83:2
**2007** 59:9
**2008** 1:21 7:17 9:15
84:16 85:20
**201** 2:15
**225** 67:11
**2278** 2:8
**250** 67:10
**2602** 2:6
**27th** 1:19
**2817** 4:13
**283** 2:14

**3**

**3** 61:1
**30** 1:21,22 67:12
**305** 2:7
**331068** 9:15

**4**

**4** 3:3 56:9
**4-25-2009** 85:25
**485** 5:16

**5**

**5** 3:14
**53** 3:12 75:8,15
**54** 3:9 6:11,13
**59103** 2:9
**59807-7729** 2:17

**6**

**6** 3:9 70:20

**7**

**7** 42:22
**7.6** 69:24
**74** 3:4
**75** 3:14 29:18

**75-dollar** 48:7
**750** 1:20
**77** 21:14
**7729** 2:16
**78** 21:1,13
**79** 3:3

**8**

**8** 59:9
**80s** 33:16 43:18
47:19
**83** 84:5

**9**

**90** 61:11
**90s** 28:2 52:13,14
**95** 30:22
**99** 47:15