IN THE U.S. DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION
CAUSE NO. CV-07-166-BLG-CSO

FILED
BILLINGS DIV.

2009 APR 8 PM 3 53

PATRICK E. DUFFY, CLERK

BY _____ # 141 ___

DEPUTY CLERK

---

TIMOTHY McCULLOUGH        :    DEPOSITION

    Plaintiff        :JOSEPH McELHINNY, PSY.D

    vs.        :

JOHNSON, RODENBURG & LAUINGER:    **ORIGINAL**

    Defendant        :

---

October 31, 2008

---

R E P O R T E D   B Y:

VIRGINIA LEYENDECKER, Certified Shorthand Reporter, (NJ License No. 1701) and Notary Public, on the above date, commencing at 9:00 a.m., at the offices of Joseph McElhinny, 1643 Lewis Avenue Billings, Montana.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

A P P E A R A N C E S:

HEENAN LAW FIRM
BY:   JOHN HEENAN, ESQUIRE
     For the Plaintiff

BOHYER, SIMPSON & TRANEL, P.C.
BY:   FRED SIMPSON, JR., ESQUIRE
     For the Defendant

VK LEYENDECKER, LLC

20 Medicine Crow Road

Columbus, Mt. 59019 - (406) 322-5061

I N D E X

WITNESS              EXAMINING ATTORNEY          PAGE

Dr. McElhinny        Mr. Heenan                  4
                     Mr. Simpson                 57


- - - - - - - - -


E X H I B I T S


                                                 MARKED
NUMBER               DESCRIPTION                 FOR ID

55                   Medical file               29


VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

JOSEPH McELHINNY, having been duly sworn, was examined and testified as follows:

BY MR. HEENAN:

Q.    Can you please state your full name and business address?

A.    Joseph K. McElhinny.  My address is 1643 Lewis Avenue, Suite 7, Billings, Montana, 59102.

Q.    What is your profession, sir?

A.    I'm a clinical psychologist specializing in neuropsychology.

Q.    Can you explain to the jury what the difference is between a neuropsychologist and a regular clinical psychologist?

A.    A neuropsychologist is primarily interested in how the brain functioning affects human behavior and emotions.  So we visit with a number of patients who have had mild head injuries or more severe head injuries, strokes, tumors or other central nervous system insults, and we are brought in to consult with medical treatment providers in their medical treatment, their vocational planning and educational planning.

We have to be good clinical psychologists first.  Neuropsychology is a specialization that is sought after once a person

has become a clinical psychologist.

Q.      So is it fair to say that your specialty is people with head injuries?

A.      Yes.

Q.      Is there any particular reason that you know of why the defendant in this case sought the opinion of a neuropsychologist over that of a clinical psychologist?

A.      I can't account for that decision, other than I am constantly engaged in the personality and behavioral assessments of individuals who don't necessarily have any documented neuropsychological impairment.  Perhaps in this case, due to Mr. McCullough's history of traumatic brain injury, I was on the list.  Other than that, I don't know.

Q.      So other than that, you don't have any awareness from the defendant or the defendant's counsel as to why they sought out a neuropsychologist versus a clinical psychologist?

A.      That's correct.

Q.      Do you have any patients that you're presently treating?

A.      Yes.

Q.      How many?

A.      Three, probably, or four.

Q.      Are those three or four patients new within the last year?

A.      Two of them are.  One of them I've been seeing for more than a year.

Q.      Prior to this deposition, I reviewed deposition testimony that you gave in January of last year and you said at that point that you weren't presently treating any patients.  You were just a consultant.

Has that changed since January of 2007?

A.      Yes, it has.  There are -- would you like me to explain?

Q.      Sure.  You're treating three people?

A.      Don't let me talk too much.  There have been times in my practice where I'm not seeing patients because seeing patients is not -- you know, treating patients in psychotherapy is not the primary activity of my practice.  So people come, people go.  And so there are periods of time where I'm not doing any direct treatment with patients.  Hopefully that explains it.

Q.      Currently you have three or four patients that you are treating on a regular basis?

A.    Regular?  There are ongoing treatments, but there may be patients that I may see once a month, once every six weeks in follow-up.  And then there -- I have one patient that I see every week, one patient I see every couple of weeks and then several that I'm following up every four to six, something like that is my best estimate.

Q.    Are any of the patients that you're currently treating dealing with issues regarding financial stress?

A.    In my estimation, everybody is dealing with financial distress in this time of the financial decline in the country.  But more specifically, most of the people I treat -- I'm going to withdraw that.  I'm going to say at least half the people I treat are dealing with reduced financial resources, which is stressing their monthly budget on a regular basis.

Q.    So let me pin you down.  Currently four patients that you're seeing on an ongoing basis at the present moment?

A.    Yes.

Q.    So at least two of those people are dealing with financial stress to some degree?

A.    Probably three.  Three out of four right

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

now.

Q.    Doctor, can stress result in mental symptoms, including worry, anxiety and depression?

A.    Yes.

Q.    Can stress cause physiological responses such as increased blood pressure?

A.    Yes.

Q.    Insomnia?

A.    Yes.

Q.    Fatigue?

A.    Yes.

Q.    Can increased stress exacerbate cognitive problems?

A.    Yes.

Q.    Are people with head injuries more susceptible to having stress cause them to have their symptoms exacerbated?

A.    Depends upon the nature of the head injury.  But very frequently, people with head injuries are less resistant to stress.

Q.    Would you agree that depression is significantly higher for people who have suffered a brain injury as compared to those who haven't?

A.    That's what all the research seems to show, yes.

Q.    Would you agree that psychological pain can be quite disabling and may be more disabling than physical pain?

A.    Yes.

Q.    Would you agree that stress with no clear resolution can be more negative than short-term stress?

A.    Yes.

Q.    Do you have a test that determines the source of an individual patient's stress?

A.    Probably, but I don't use tests to pinpoint the source of stress very often.

Q.    What tests could be used to attempt to pinpoint the source of someone's stress?

A.    There are various questionnaires that one can utilize.  What I'm thinking in particular is there are a lot of questionnaires regarding a person's pain and disability, physical disabilities, that are very specific in their questioning of a patient of what causes them the most distress on a day-to-day basis.

Q.    What specific questionnaires or tests do you have in mind, Doctor?

A.    I have to get up and look because it would take me too long to retrieve.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

Q.      Sure.

A.      One in particular is called a Pain Interference and Impairment Index.

Q.      Are you looking for more?

A.      I was wondering if I should look for more. These are questionnaires that I have in my file that I utilize with some patients, to try to understand their experience of symptoms regarding stress and how physical symptoms are causing their distress.  Often I rely on extensive interviewing to obtain that information.

Q.      So with extensive interviewing and the Pain Interference Impairment Index, are there any other tests or questionnaires that you can think of that you might administer to a patient to determine the source of their stress?

A.      Yes.  The Battery for Health Improvement II is a questionnaire I utilize to help clarify the sources of stress for individuals who are experiencing medical problems of one sort or another.

Q.      What do you mean, "medical problems of one sort or another."

A.      People that have had various injuries or accidents, they may be preparing for various

VK LEYENDECKER, LLC

20 Medicine Crow Road

Columbus, Mt. 59019 - (406) 322-5061

orthopedic or neurosurgery procedures, or they have been coming out of a variety of different types of surgery situations and they're experiencing physical symptoms related to their injuries, the surgery and their long-term conditions.

Q.    I want to backtrack a little bit, Doctor. The notion that psychological pain can be quite disabling and may actually be more disabling than physical pain, can you expand on that?

MR. SIMPSON:  Objection.  Vague.

BY MR. HEENAN:

Q.    Can you explain to our jury what that notion would mean?

A.    My experience with patients that I have seen over the years is that psychologic distress is much more bothersome over the long run, causes more suffering to individuals than physical symptoms.

Q.    So in layman's terms, if someone's psychologically feeling pain in their own mind, that pain could hurt worse than if they were actually physically hurt?

A.    All physical injuries are really determined from a psychological standpoint.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

Physical pain is interpreted through our brain, which makes it a psychologic phenomenon.

For instance, most individuals that experience the common cold will have behavior symptoms associated with it. I myself, when I have a cold, kind of like to be left alone, like to rest. I don't like people asking of me a lot of demands, people having a lot of demands when I have a cold or the flu, similar things.

People with chronic headaches will more often than not have some sort of behavioral or emotional response to the headaches. This is, to me, an excellent example of psychological pain being worse than the physical pain.

Q.    How about with respect to, in the context of this case, being harassed by a debt collector? Is it fair to say that the same objective conduct by the debt collector could cause greatly differing reactions based on who is on the receiving end?

MR. SIMPSON: Objection to form with respect to the use of the word harass. I don't think there is proof of that.

You may answer.

THE WITNESS: I assume that when

people are in contact with a debt collector that in most all cases it's stressful.  And I agree with you that individuals handle that stress in different manners.

Some people are able to let it roll off their back because they have had many contact with debt collectors.  They know how to forget it and put it aside and carry on with whatever they are going to do with their life. Other people may be very naïve regarding being in the middle of a collectable debt.  They worry about this initially a little bit more.  They have to figure out how they are going to manage it.

Q.      The same question with respect to someone being sued.  Is it fair to say that different people would react to being sued differently?

A.      Oh, I think so, yes.

Q.      I want to talk about financial stress a little bit more.  You would agree there is no question that being in debt can be stressful?

A.      No, I don't agree with that, being the debt is kind of the American way.  I think there are a lot of people in our country that are in debt that I don't perceive that they have any

stress. It's kind of like expected in our culture.

Q. What about being in debt to the extent that you're being contacted by debt collectors, sued by debt collectors, et cetera? Would that be stressful?

A. I would say that would be stressful to most people, yes.

Q. Would you agree that financial stress can cause a person to be run down, have more colds, migraines, headaches and cause their present medical conditions to get worse?

A. Yes.

Q. Have you seen the documentary movie Maxed Out?

A. No.

Q. I will represent to you in that documentary, one of the profiles is a woman named Yvonne Pavi, who drowned herself in 2004 rather than face bill collectors and humiliation before family members.

In your experience as a clinical psychologist, is that kind of the extreme of what some of the actions a person can take faced with the stress of dealing with debt collectors?

A.        Not only that but the considerable psychopathology in that person to begin with.

Q.        What do you mean by that?

A.        People of average psychological functioning will not go out and commit suicide because they are going bankrupt or because someone is suing them or because they're in debt.

Q.        So if someone has a preexisting psychopathology, that makes them more susceptible. That would be the situation where they commit suicide or take some of the more extreme measures that I just described to you in dealing with debt collectors?

A.        I want to say yes.

          MR. SIMPSON:  Objection.  Calls for speculation.

          THE WITNESS:  There is a lot of factors to consider.

BY MR. HEENAN:

Q.        Let me rephrase my question, I guess.

A.        Thank you.

Q.        Can we agree that a normal person, when faced with -- and "normal," I mean no psychological baggage or history -- when faced with extreme debt, debt collectors, harassing debt

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

collectors, would not commit suicide?

A.      Yes.  I would not expect them to commit suicide.

Q.      But someone with preexisting psychopathic problems, say someone who is a paranoid schizophrenic, facing those same issues and circumstances may be driven to that extreme.  Do you agree with that?

A.      May be driven to that extreme how?

Q.      I'm asking you if that's what you would agree with or not.  If not, tell me why, please.

A.      Those were your words so I'm trying to clarify the question for me.

People with severe psychopathology, including paranoid schizophrenia, may commit suicide for a variety of reasons.  And all these reasons can be associated with some sort of stress.

Q.      Have you done any research or come across any scholarly articles about the debt-collection industry?

A.      No.

Q.      Do you have any opinions about the psychology that's in play when a debt collector tries to collect a debt from someone?

A.       I don't have enough knowledge to have an opinion about that.

Q.       Dr. Kelly McGonigle, psychologist at Stanford University who studies stress, called debt, quote, a toxic version of stress that feels uncontrollable and is chronic at times and is the most difficult kind of stress, unquote.

         Would you agree with Dr. McGonigle in that regard?

A.       No.

Q.       Why not?

A.       Because I think there are other forms of stress that I think are, quote, unquote, toxic and unresolvable, that have similar issues.  I think stress is different.  The etiology of stress is different for different people.

Q.       Would you agree that debt is a toxic version of stress?

A.       I don't know what that means.

Q.       Would you agree that psychological stress can cause an individual to suffer from headaches, including migraine headaches?

A.       Yes.

Q.       How about stomachaches?

A.       Yes.

Q.        How about ulcers?

MR. SIMPSON:  What is the question?

BY MR. HEENAN:

Q.        What about ulcers?

MR. SIMPSON:  What is the precursor to the question?  That stress can cause ulcers?

BY MR. HEENAN:

Q.        Psychological stress can cause ulcers?

A.        We used to think so.  I'm not so sure anymore because I think the medical research has been variable around stress and ulcers.  Again, I'm not an expert on ulcers, but I've read enough to know, you know, there is some disagreement about the etiology of ulcers these days.

Q.        How about anxiety?

A.        Again, we are backing up to stress can cause anxiety?

Q.        Stress can cause anxiety.  Would you agree with that?

A.        Yes.

Q.        Can stress cause trouble concentrating?

A.        Yes.

Q.        Can stress cause trouble sleeping?

A.    Yes.

Q.    Can stress cause people to be more prone to get upset for no reason?

A.    Yes.

Q.    Would you agree, Doctor, any type of chronic and overwhelming stress, including financial stress, can have an effect on both mental and physical well being?

A.    Yes.

Q.    Would you agree people who have good coping skills generally cope better with stress than people with poor coping skills?

A.    Yes.

Q.    Would you agree that stress can actually lead to psychosis?

A.    In psychotic individuals, yes.

Q.    Is my client, Mr. McCullough, a psychotic individual, in your opinion?

A.    Mr. McCullough has significant psychotic tendencies, so in that respect, yes.

Q.    You gave him a diagnosis of psychotic disorder.

A.    I did.

Q.    And you strongly suspect paranoid schizophrenia?

A.    I do.

Q.    Explain to the jury, if you will, please, what it means for an individual to have a psychotic disorder and, specifically, paranoid schizophrenia.

A.    Psychotic disorder is characterized by either hallucinations, auditory or visual hallucinations, or delusional thinking.

In Mr. McCullough's case, you know, I didn't find any evidence of hallucinations, but there was considerable evidence for delusional thinking.  Individuals with paranoid schizophrenia will have hallucinations or delusional thinking that is based on an overly suspicious, angry, hostile belief system.

Q.    Were you done, Doctor?

A.    Yes.

Q.    In layman's terms, a person with paranoid schizophrenia thinks people are out to get them?

A.    More than likely, yes.

Q.    In their mind, they think that's real, right?

A.    That's correct.

Q.    I want to have you look at your report.

Do you have that in front of you?

A.    I do.

Q.    Mr. McCullough reported to you that he was being sued by a, quote, law firm, unquote, which is also a collection agency, unquote.  And you put law firm and collection agency in quotes.  Any reason for that?

A.    Those were his precise words.  I wasn't really sure -- it was confusing to me.  The nature of this whole case was confusing to me when I saw Mr. McCullough.  But I didn't need to understand the case to perform a psychological evaluation on him.

But when I used the quotes in my report, that was the only way I could get across to the reader what his responses to my historic queries were, because I couldn't come up with adequate words to describe his responses.

Q.    That specific note there, did that sound strange to you, Doctor, that there would be a law firm which is also a collection agency coming after him?

A.    Not strange.  It could have been unusual, but I didn't know enough to know whether it was unusual or not unusual.  But it didn't make sense

to me and he couldn't clarify that to me any further.

Q.    Let me ask it this way.  Have you ever heard of that, a law firm that acts as a debt collector?

A.    I have no knowledge of that, no.

Q.    What knowledge do you have about the background of this case, Doctor?

A.    The knowledge I have I received this morning, before today's deposition, from Mr. Simpson.

Q.    How did you receive that knowledge?

A.    Mr. Simpson was in my office just previous to this deposition and we had a meeting.  And I asked Mr. Simpson, "Please explain the nature of this lawsuit to me."

Q.    How long did that meeting take place with Mr. Simpson?

A.    We probably talked for 30 minutes.

Q.    What was Mr. Simpson's characterization of the background of this lawsuit?

A.    I'm not sure I understand your question.

Q.    You asked Mr. Simpson, as I understand it, in this meeting this morning, before I arrived, to explain what the background was.  How did he

characterize it?

A.    This is a complex thing for me.  What I'm going to do is tell you what my understanding is now, based on my talk with Mr. Simpson.  And he was probably much better organized and prepared in discussing the details of the lawsuit than I'm going to tell you right now.

Q.    I understand.

A.    So I don't want to mischaracterize Mr. Simpson.  I understand that Mr. McCullough had an outstanding credit card bill that went to collections.  It was determined that there was -- that they couldn't collect it because it had been too much time, too long a time, and so that was settled.

And that clarified a few things that Mr. McCullough told me.  At least I could understand some of the things Mr. McCullough told me that day.

And that Mr. McCullough filed a suit against the collection agency and the law firm who represents the collection agency, or is associated with the collection agency -- I'm not sure how things are connected there -- but Mr. McCullough filed a lawsuit against those two

sources, and the collection agency has since settled the case. So there still is a lawsuit that Mr. McCullough has against a law firm.

Q.    Did he explain to you the law firm that he represents that has hired you to be an expert in this case, the nature of what they do?

A.    I don't understand the nature of what they do. So he may have explained it to me, but I may not have understood it.

Q.    This Johnson, Rodenburg & Lauinger law firm I will represent to you now is a law firm located in North Dakota and they've filed these debt-collection lawsuits trying to collect credit card debt in several states, including Montana. The attorney who sued Mr. McCullough, his testimony was that he sues approximately 2,000 people in Montana every year, Mr. McCullough being one of them.

Have you ever heard of a law firm like that in your experience, Doctor?

A.    No, but that would not be unusual.

Q.    I want to talk specifically about the psychological effects of an individual being sued. I think we covered that it's fair to say different people would react differently to being sued.

A.      Yeah, that's my opinion.

Q.      Have you yourself ever been sued, Doctor?

A.      I don't believe I have, no.

Q.      Have you had patients who have been sued?

A.      Absolutely.

Q.      Have you had colleagues who have been sued?

A.      Yes.

Q.      Can you describe for me the range of emotions that you've seen through your patients and colleagues after being sued?

A.      Anger, disbelief, sadness, anxiety.

Q.      Those are all fairly common reactions to being sued?

A.      Yes.

Q.      Have you, in your experience, either with treating patients or with colleagues, known anyone to be on the receiving end of a frivolous lawsuit?

                MR. SIMPSON:  Objection.  Vague.

                THE WITNESS:  I'm not prepared to make that kind of judgement.  No.  I don't know.

BY MR. HEENAN:

Q.      Have you ever had colleagues or patients who have been sued characterize the lawsuit as, quote, frivolous, unquote?

A.        I've heard the term frivolous associated with lawsuits, usually from attorneys who are somehow involved.

Q.        So it's fair to say that in answer to my question you never had a patient or colleague characterize a lawsuit as frivolous.

A.        I've heard lawsuits being characterized as stupid and irrelevant.

Q.        Is it fair to say that if someone were on the receiving end of a stupid or irrelevant lawsuit that might make them more angry than a typical lawsuit?

MR. SIMPSON:  Objection.  Calls for speculation.

THE WITNESS:  I don't know.  It could and could not.  It depends on the circumstance.  We have a lot of circumstance and a lot of different psychologic styles running through my head.  And I can imagine that it would affect some people more strongly than others, and I could imagine where it wouldn't.

BY MR. HEENAN:

Q.        What about if someone had preexisting psychopathology?  What in your opinion, Doctor, would be their reaction to being the recipient of

a frivolous lawsuit?  Or to use your term, a stupid lawsuit.

MR. SIMPSON:  Objection.  Calls for speculation and it's ambiguous as to what is psychopathology.

THE WITNESS:  Yes, it would determine -- it would be determined on what type of psychopathology we are talking about, so the reactions would be quite wide, depending upon the psychopathology.  I mean, certain people with anti-social personality disorder may get aggressive and homicidal; I mean, on one end of the continuum.  And then individuals perhaps with very severe dependent personality may become very depressed, helpless, immobilized.

Q.    You met with Mr. McCullough and evaluated him?

A.    I did.

Q.    How long did that meeting or evaluation take, Doctor?

A.    Looking at my notes right now to see if I made -- I interviewed Mr. McCullough for 90 minutes.  I then -- he then completed the Beck Depression Inventory and Personality Assessment Inventory.  And on average, that would take

anywhere from another 60 to 90 minutes beyond the interview time.

Q.    The Beck Depression Inventory is a 21-question multiple-choice test?

A.    Yes.

Q.    And the Personality Assessment Inventory is a 344-item questionnaire that asks the tester to self-report various questions?

A.    Yes.

Q.    Did you administer any other tests or questionnaires to Mr. McCullough?

A.    No.

Q.    Do you have those questionnaires or tests in your file?

A.    I do.

Q.    Can I see them, please?

        MR. HEENAN:  Off the record.

        (Discussion off the record.)

BY MR. HEENAN:

Q.    That is your entire file with respect to Mr. McCullough, Doctor?

A.    It is.

Q.    Based on what we just talked about, I'm going to have it marked as an exhibit, with your permission, including these, and expedite things.

A.        That would be fine.

MR. HEENAN:  We will mark it as Exhibit 55.

(Exhibit 55 is marked for identification.)

BY MR. HEENAN:

Q.        I may have just asked you, forgive me if I did, but those two tests, the Beck Depression Inventory II and the Personality Assessment Inventory, those were the only two tests or questionnaires that you administered to Mr. McCullough?

A.        That's correct.

Q.        Mr. McCullough reported to you in the interview that he got sick, migraines, for a day or two.  Is that correct?

A.        Yes.

Q.        What is a migraine, Doctor?

A.        A migraine is a bad headache.

Q.        Would you agree that migraine headaches can be extremely painful?

A.        Yes.

Q.        Would you agree that people with post-concussive disorders can have horrible headaches?

A.      Yes.

Q.      Worse than people without, who haven't suffered a head injury?

A.      I won't go that far.  I also have patients who have a history of severe migraines and I don't know if you could top those, even with a head injury.  I don't know how to measure that.  I just know that people have severe pain with headaches, and to try to say one is worse than the other becomes a moot issue.

Q.      Headaches can be extremely painful?

A.      That's correct.

Q.      And migraines are kind of the extreme of extremely painful headaches.

A.      Maybe.  Oftentimes they are the most extreme headache, but my contact with neurologists -- and I have lots of contact with neurologists who treat headaches -- has educated me to the fact that muscle tension headaches can be as or more painful than many migraines.

Q.      What are some of the symptoms or discrete complaints associated with migraine headaches that you've seen in your experience?

A.      Well, first of all, I need to say I'm not a migraine headache expert and I don't diagnose

migraine headaches.  And when people tell me they have had migraine headaches, I assume that's what they think they have until I see it in a neurologist's report that they had migraine headaches.  Because we are very poor at discriminating whether we're having a migraine headache or what other kind of headaches they are.  Headaches are tough.

Q.     Let's clear that.  Let's talk about general headaches.  What are some of the discrete symptoms or complaints that you're aware of when patients are suffering from headaches?

A.     Obviously excruciating headache pain in various parts of the head or all over, people have auras and strange smells and strange tastes that predict an oncoming headache.  People get sonophobic and phonophobic to the point where they frequently have to shut themselves up in a bedroom or shut down the blinds and pull the covers over their head, and that's what they are.

Q.     Have you watched Mr. McCullough's deposition in this case?

A.     I have not.

Q.     I will represent to you that he testified essentially that during the course of his dealing

with this debt collection law firm, sometimes he would be laid up on the couch for a day or two with these terrible headaches.

Is that the type of reaction in extreme cases that you've seen from patients suffering migraines and headaches in general?

MR. SIMPSON:  Objection vague. Reaction to what?

THE WITNESS:  It's not unusual for people with headaches to lay on the couch and rest.  That's my response.

BY MR. HEENAN:

Q.      How about for that amount of time, all day?

A.      Some people have headaches that last all day and they lay down all day.  I've had people stay in their beds with the door shut and no lights and no sound for a day at a time.

Q.      Now, you're aware that Mr. McCullough did suffer a head injury in 1990?

A.      I reviewed medical records that suggested that he may have had a head injury in 1990.

Q.      The medical records that you reviewed, was there any indication prior to the head injury that he was suffering from any type of psychotic

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

disorders such as paranoid schizophrenia?

A.    I saw no medical records related to any medical treatment that he had previous to his head injury in 1990.

Q.    On page nine of your report, you say you think Mr. McCullough has been a paranoid schizophrenia with a mixed personality disorder throughout his adult life.

A.    Yes.

Q.    Without having any medical records prior to this head injury in 1990, do you have any medical basis for drawing that conclusion?

A.    The nature of schizophrenia, paranoid delusions and personality disorders.  I don't have any specific evidence on Mr. McCullough, but these types of diagnoses are lifelong and they are not caused by head injuries.  You don't become a paranoid schizophrenia with a head injury, especially one of questionable intensity and seriousness, of questionable seriousness that occurred to Mr. McCullough in 1990.

Q.    You question the seriousness of the head injury that he suffered in 1990?

A.    I do.

Q.    Why?

A.        Just from reading the medical records,
they weren't convincing to me that Mr. McCullough
had a serious head injury in 1990.

I think that it's more often --
more probable than not that his symptomatology at
that time was part of the paranoid delusions that
we see today.

Q.        Do you treat people with paranoid
schizophrenia?

A.        I have, but I don't make it a practice.

Q.        When was the last time you treated someone
with paranoid schizophrenia?

A.        I diagnose it approximately once a year.
So I believe I've seen a case earlier this year
where it was diagnosed and I referred the patient
to one of the local psychiatrists.

Q.        What was the basis in this case for your
diagnosis of psychotic disorder, strongly
suspected paranoid schizophrenia with respect to
Mr. McCullough?

A.        His verbalizations.  His verbalizations to
me during the history were classic signs of
delusional disorder, and it's where I suspected
paranoid schizophrenia.  For me to make the
diagnosis with Mr. McCullough of paranoid

schizophrenia, I would want to see him several more times across a period of time so that I could ascertain the depth and breadth of his symptomatology. One visit often does not clarify a diagnosis of paranoid schizophrenia because these individuals are not often easy to diagnose.

Q.    As we sit here today, do you feel comfortable in your diagnosis of Mr. McCollough that he has a psychotic disorder?

A.    Yes. Absolutely.

Q.    But just not with respect to whether it's specifically paranoid schizophrenia?

A.    That's correct.

Q.    Have you ever treated a patient with a psychotic disorder, specifically paranoid schizophrenia, who then subsequently suffered a head injury?

A.    No.

Q.    Do you have any opinions about what the effect would be on a paranoid schizophrenic suffering a head injury?

A.    I have speculations. And I would speculate that they could become either less or more paranoid.

Q.    How is that?

A.        Well, due to the nature of the brain damage, it's either going to -- it can increase the symptoms of either hallucinations or delusions or decrease them, or I guess it could stay the same too.

MR. SIMPSON:  Kind of covered all your bases there.

THE WITNESS:  I did.  I felt I needed to talk about how it could have stayed the same too.

BY MR. HEENAN:

Q.        So I understand it, if someone is a paranoid schizophrenic, they get hit in the head with a bar, that could either hurt them or help them, or have no impact whatsoever?

A.        Have no impact on their diagnosis of paranoid schizophrenia or their symptoms?

Q.        On their symptoms.

A.        Getting hit in the head with a bar, I'm not sure what we are talking about there.  People get hit in the head all the time with no head injury, with no brain injury.  So I'm not sure what we are discussing in relation to getting hit in the head with a bar.

Q.        How about just more generally suffering a

head injury?

A.      Yes, paranoid schizophrenic who suffers a head injury may have decreased symptomatology, increased symptomatology or no change in his delusional hallucinatory-type symptomatology.

Q.      As part of your practice, you oftentimes, on behalf of insurance companies, see people who are making worker's compensation claims?

A.      Yes.

Q.      Based on your experience, worker compensation companies pay claims to people who they believe have actually suffered injuries?

A.      No, worker's compensation or any type of insurance company typically do not pay claims where they do not think an injury has taken place, unless it's cheaper to pay the claim than to fight the issue.

Q.      The records from Billings Deaconess back in 1990 indicate that Mr. McCollough was diagnosed with post-concussive syndrome.  Correct?

A.      I believe so, yes.

Q.      Have you seen Dr. Veraldi's report in this case?

A.      Very briefly before today's deposition.

Q.      Does Mr. McCullough, in your opinion,

Doctor, have symptoms of stress or anxiety?

A.      Yes.

Q.      Did you utilize any test, Doctor, that would show the presence of situational stress in Mr. McCullough?

A.      Yes.

Q.      What tests were those?

A.      Beck Depression Inventory.

Q.      And what was your conclusion with respect to situational stress?

A.      He was not experiencing enough situational stress for a diagnosis of major depressive disorder.

Q.      But he was experiencing situational stress, in your opinion, Doctor?

A.      Yes.

Q.      Dr. Veraldi, in her report, concluded that Mr. McCullough demonstrates a hypervigilant personality style.  He keeps himself on the alert for potential sources of threat to his safety and security.  People are approached often with caution and suspicion.

Is that consistent with how you found Mr. McCullough to present?

A.      Yes.

Q.        Dr. Veraldi in her report stated that, Mr. McCullough does not suffer from major depression. He is experiencing considerable emotional stress that is interfering with his pleasure in life and that is causing him to have symptoms of anxiety and dysphoria.

Would you agree with Dr. Veraldi's conclusions in that regard?

A.        I think I can agree with that.

Q.        Dr. Veraldi concluded that, Any type of chronic and overwhelming stress including financial stress is known to have an effect on both mental and physical well being.  Furthermore, an individual like Mr. McCullough, who is already compromised by impaired cognitive functioning and mental health problems, is more susceptible to the effects of chronic stress.

Would you agree with Dr. Veraldi in that regard?

A.        Partially.  I'm not sold that he has a history of traumatic brain injury.  But that's immaterial, I think.  In general, yeah, I think Mr. McCullough is more, the term susceptible, to any kind of environmental stressors.

Q.        Including financial stress?

A.        Including financial stress, right.

Q.        Dr. Veraldi concluded that, It's more probable than not that the stress from the collection process has been a significant factor in Mr. McCullough's current situational stress and symptoms of anxieties.

          Would you agree with that?

A.        No.

Q.        Why not?

A.        I think that his delusional disorder is longstanding and he has always -- he has stress from all different directions.  And I don't think that it's been a major factor in his current circumstances.  I think it's just another factor. I think that he experienced -- he does not tolerate environmental stress well.  In fact, you might say that he tolerates stress poorly, and that any even day-to-day stressors that average people take for granted would overcome Mr. McCullough's psychologic resources.

Q.        So in your opinion, Doctor, Mr. McCullough tolerates stress more poorly than the average person?

A.        Absolutely.

Q.        In your opinion, then, would he be less

VK LEYENDECKER, LLC

20 Medicine Crow Road

Columbus, Mt. 59019 - (406) 322-5061

able to cope and deal with being the victim of a frivolous lawsuit than a normal person?

A.    I would say that any lawsuit would be more stressful for Mr. McCullough than the average person.

Q.    Based on your review of Mr. McCullough and his psychological capacity and his psychological background, do you have an opinion on how well equipped he would be to deal with litigating a case himself?  That is, without an attorney.

A.    First of all, I'm not sure, when you say "litigating a case," how broad a term that is and what that means as far as what a person has to do.

Q.    Let me break it down a little bit for you because that was a broad question.

I will represent to you in this case Mr. McCullough was sued on this credit card debt by a law firm out in Helena.  He represented himself in that case and got the case dismissed. Then, a year and a half later, this Johnson Rodenburg & Lauinger law firm files the exact same lawsuit against him that he already had dismissed, and he doesn't have a lawyer and he was trying to represent himself and defend himself in court.

Do you have an opinion, from what

Q. you know about Mr. McCullough and his psychological capabilities and his mental capabilities, of how effectively he would be able to defend himself in a legal proceeding?

A. By himself?

Q. By himself.

A. I think Mr. McCullough in general would be incapable of managing his own legal case without counsel.

Q. Is it your medical opinion that Mr. McCullough's financial stress is not or was not a significant factor in his current situational stress and anxiety?

A. Yes.

Q. Anything other than what you've already discussed that would substantiate your opinion in that regard?

A. No.

Q. What other stressors are you aware of in Mr. McCullough's life in 2007, at the time that he was sued by this Johnson, Rodenburg & Lauinger law firm?

A. Well, I'm aware that he has perceived enemies in the world, that he perceives that he's a target for a quote, unquote, hit, because of

whatever activities he engaged in earlier in his life, that these are ongoing stressors and keep him quite vigilant as to who's walking around his yard.

Did I answer your question?  I'm sorry.  I got lost.

Q.    I'm aware of, obviously, the financial stressors that Mr. McCullough was suffering from last year when he was dealing with this debt collection law firm and now we are both aware of it.  Are you aware of any other stressors?  For instance, a death of someone in the family, anything else that would lead you to conclude that these financial stressors were not significant to Mr. McCullough and the stress and anxiety that he suffered from last year.

A.    That's a lot of words for me to process.

Q.    Let me make it simpler for you.  Let me change the question.

We are here because of the financial stressor issue, this debt collection law firm.

A.    Yes.

Q.    You've testified, as I understand it, that the financial stressors, contrary to what Dr.

Veraldi found, were not a significant factor. So what I'm asking you is, what other factors are you aware of that would lead you to that conclusion?

A.    The other factors are simply his ongoing status as having paranoid-type delusions that cause stress for him all the time and that he lives with, and I think are the nature, probably, or the etiology, probably, for many of his headaches and other physical symptoms. Because that's how he handles stress. And, yeah, the legal issues are stress. It's just on a list of stressors that Mr. McCullough deals with.

Q.    Tell me what the other stressors on that list are, is my question.

A.    People out to get him that he perceives, people out to get him.

Q.    But the people that he perceives back in 2007 to be out to get him are this law firm.

A.    Well, they're out to get him too. They are just on the list of the people out to get him.

Q.    Are you aware of anyone else on the list that Mr. McCullough perceives to be out to get him?

A.    He wouldn't tell me specifically who they were, but he led me to believe there were a number

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

of people that were out to get him.

Q.      So specifically we don't have anyone to add to that list other than this law firm that was suing him?

A.      That's correct.

Q.      Any other stressors on that list that we can throw into the mix?

A.      Not that I'm aware of.

Q.      So if Mr. McCullough were operating last year as an individual who was paranoid schizophrenic, thought people were out to get him, and the only objective major stress in his life was, in his mind, being persecuted by debt collectors in North Dakota, you would agree that would be a significant factor in the stress that he felt, wouldn't you, Doctor?

A.      This all gets very complex for me. Paranoid schizophrenics or people with delusional disorders -- let's not even talk -- let's just talk delusional disorders, and the psychotic disorders that I diagnosed him with typically live in a very fearful word. They are scared underneath all the time. So to point out one thing that is making them more scared than other things is a difficult situation for me. I think

everything makes him scared.

Q.    I'm asking you to assume with me for a minute that the only objective, not in Mr. McCullough's mind, but the objective real world, if the only objective real-world stressor on Mr. McCullough last year was being forced to deal with this law firm out of North Dakota that was harassing him, would that be a significant factor in the stress that he was suffering from last year?

MR. SIMPSON:  Objection.  Assumes facts not in evidence.

Go ahead and answer.

THE WITNESS:  Yeah, I think it's an important aspect that the law firm thing is going on for Mr. McCullough.  I think it's impacting him as far as stress.  But to say that it's the thing --

BY MR. HEENAN:

Q.    To be real clear, that's not my question. I'm not asking you to conclude that it's the thing.

What I'm asking you is to conclude or would you agree that it's a significant factor? Not the only factor, just a significant factor,

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

Doctor.

A.    Significant factor in what?

Q.    In the stress and anxiety that he was suffering last year.  Not the only factor, just a significant factor.

A.    I would say it was a significant factor, but not necessarily the most significant.

Q.    What was the most significant objective real world stressor in Mr. McCullough's life last year?

A.    I don't know.

Q.    But you do know that it wasn't being harassed by the debt collectors in North Dakota?

A.    That was one thing that was going on for him.  I'm not sure.  I only saw Mr. McCullough once.  I gave him a delusional disorder -- or a psychotic disorder not otherwise specified diagnosis.  I'm not sure what he's more afraid of because I don't know him well enough yet.

Q.    What were the other things that were affecting his life that were causing him fear last year?

A.    His thoughts and delusions about what's going on, what's going on in the world and who is after him.  And how he's going to protect himself.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

It's a very mixed up psychotic --

Q.    I will represent to you that, as I understand it, Mr. McCullough basically doesn't leave his house.  He raises chickens and turkeys and basically isolates himself from the normal world.  So if you take me at my word for that and he was just in his house watching movies and raising chickens and turkeys last year, and a process server, a deputy sheriff, came to his house and served him with a Complaint and was forced to deal with a debt collection law firm and tried to defend himself in a legal proceeding without an attorney, that would be a significant stress that he suffered with last year, wouldn't it be, Doctor?

A.    Yes, that would be a significant factor.

Q.    It's fair that that would cause him, in light of the baseline psychotic disorder that you diagnosed, would cause him heightened anger, frustration, humiliation, chagrin, all the various words that we use to describe emotional distress.  Isn't that true, Doctor?

A.    I'm sorry.  Would you restate?

MR. HEENAN:  Could you read it back?

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

(Designated question is read.)

THE WITNESS:  Yes.

BY MR. HEENAN:

Q.    So Mr. McCullough expressed anxiety when you saw him because he considered you to be hired by the bad guys.  Is that true?

A.    He expressed suspicion and paranoia because I was hired by the bad guys.

Q.    Those are quotes that are in your report?

A.    That's correct.

Q.    The bad guys.

A.    That's correct.

Q.    And in Mr. McCullough's mind, this law firm out of North Dakota that he perceived to have persecuted him last year, they are really in his mind the bad guys, aren't they, Doctor?

A.    Yes, they are.

Q.    Would you agree that someone with psychotic disorder would suffer more stress as a result of being sued than someone that is not psychotic?

A.    I would agree with that.

Q.    Is there anything in Dr. Veraldi's report that you reviewed this morning other than what we have already discussed, that you disagree with?

A.        I'm not intimate with Dr. Veraldi's report and am not prepared to make a comment on whether I agree or disagree with Dr. Veraldi.

Q.        Do you have any opinions other than those that are expressed in your report of August -- date of the exam is August 21st.  When was the report generated?  I will make it an easier question.

Do you have any other opinions other than those expressed in your report, that we haven't discussed already?

A.        No.

Q.        How much, Doctor, are you going to charge this debt collection law firm for your testimony at trial?  As I understand it, it's $4,000.  Would that be correct?

A.        I always have to look.  Court time is billed at $4,000 per full day and $2,000 per half day.

Q.        Is there any reason, Doctor, that you charge more to be in court or here in a deposition than you do to just simply evaluate someone in your office?

A.        Absolutely.

Q.        What is that reason?

A.      These types of circumstances, legal circumstances, have dates change, the times change and they are very demanding.  I have to review records.  I have to think very hard and my opinion is being scrutinized and utilized more than in my day-to-day clinical activities.

Q.      So as a consequence you charge more for your time in dealing with legal proceedings because of the heightened demand on you personally, on your time?

A.      That's one aspect, yes.  And I've been, I will use the term burnt a number of times with various legal proceedings that have been scheduled.  I've blocked considerable time off my calendar and, at the last minute, they are cancelled or times change, just because it's the nature of our legal system.

Q.      And I see that you billed into your fee schedule penalties essentially for when those changes occur and your time is wasted.  But with respect to just the actual time you spend in a legal proceeding such as a deposition here this morning versus a nonlegal proceeding evaluating a patient, the reason you charge more money for the legal proceeding is because it's more demanding.

MR. SIMPSON: Objection. Asked and answered.

THE WITNESS: Yes, it is more demanding. And you did lead me, but it is demanding.

BY MR. HEENAN:

Q.    The materials you provided, looks like, in the last four years you've offered testimony in 33 legal proceedings.

A.    I haven't counted them, but that's probably correct.

Q.    Is offering opinions as part of legal proceedings a significant portion of your practice?

A.    I don't know about significant, but, you know, I would say when I go back and look at the numbers, we are looking at maybe 15 percent, maybe 20 percent. At some part, depending upon the year, I think some years it goes up. But I think overall, dealing with attorneys and legal cases is like 15 percent of my practice. So significant? I could still be in practice without it, but, yeah, I would probably miss it.

Q.    Well, you testified already about the four patients that you're treating presently. Right?

A.    Right.

Q.    What percentage of your practice does that make up?

A.    Very small, single digits.  The rest of my practice is assessments that I provide for physicians, insurance companies, for private patients.

Q.    Is it fair to say that a significant portion of your practice is on behalf of insurance companies or corporations or here, a debt collection law firm, evaluating people who are making claims against them, be it in worker's compensation or in formal litigation?

A.    Again, I struggle with the word significant, but I certainly evaluate a lot of patients who are in the midst of making claims against insurance companies or, yeah, insurance companies.

Q.    And you evaluate them on behalf of the insurance company?

A.    What does "behalf" mean?

Q.    The insurance company is paying your bill.

A.    The insurance company has always paid my bill, no matter who I'm evaluating.

Q.    Let's break it down, I guess, first with

worker's compensation.  When someone claims that they are injured and they make a claim in the worker's compensation system, is it the injured worker who hires you to evaluate him and treat him, or is it the worker's compensation insurance company that hires you to evaluate them?

A.      That's up for grabs.  I get brought into the cases by treating physicians who are treating the worker compensation patients probably more often than I am by the insurance company, or at least 50-50.  The insurance company will contact me to evaluate neuropsychologically or psychologically a claimant who has had a verifiable work-related injury.

Q.      As I understand it, it's about 50-50 in your practice right now between evaluating people who have suffered or claimed to have suffered workplace injuries, half the time on behalf of the insurance company, half the time on behalf of the injured worker or in conjunction with the injured worker's treating physician?

A.      Yes.

Q.      Do you want me to rephrase?

A.      Yes, that works.

Q.      How about with respect to cases that are

litigated?  I reviewed last night -- let me just start off, in the last four years, looks like, you've given testimony either in depositions like this morning or in trial 30-some odd times.

Is that reflective of your entire practice, about seven or eight times a year?

A.        Yes.

Q.        What is your best guess in terms of the amount of times you've been deposed or testified at trial in your career?

A.        Over a hundred, but that's a wild guess. But just based on numbers, you know, I've been doing this for 20 years.  Probably about a hundred times or more.

Q.        In your current practice, with respect to participating in cases that are being litigated, what percentage of your time are you hired by the defendant or their insurance company?

A.        You know, I've been asked that question a number of times.  That vacillates somewhat from year to year.  But 30 to 40 percent of the time I'm hired by plaintiffs' representatives.  And then 60 to 70 percent of the time I'm hired by representatives of the defense.

Q.        Let me have you look at just for the past

four years.  And of those cases, to the best of your recollection, which of those cases were you hired by the plaintiff or their representative?  And by that I mean the person who is making the claim against the insurance company or the corporation.

A.      Well, not all this is based on insurance claims.  Some of this sometimes I'm brought in to other types of legal issues.  It's hard for me to describe with one word.  And I'm involved with criminal cases as well.

Q.      Let's limit on that list just to civil cases.  That's a fair objection or couching.  There is a plaintiff and there's a defendant in every lawsuit.  How many of those civil cases on that list were you hired to offer testimony or did you in fact offer testimony in favor of the plaintiff?

A.      Some of these cases I would have to pull out to remember.  But on the last page, four out of 11 were plaintiffs' cases.

Q.      Which cases were those?

A.      Shanor v. Smith Oil; JC Davis v. David Williams; Kory Rogers v. John Doe; Erma Pense Berger Estate.  The page before that I was hired

by the plaintiff on the Charles Jennings v. A-1 Traffic Control. David Kaluza v. Mid-Century Insurance was initiated by the plaintiff's representative. On the first page, Joanne Erdall v. Singleton I was hired by the plaintiff's attorney.

Q.    Thank you. Have you ever been excluded as a witness?

A.    No.

Q.    Have you ever testified on behalf of a debt collector?

A.    I don't believe so.

Q.    Do you have any opinions about debt collectors?

A.    No.

Q.    Do you have any opinions about lawyers that file stupid or frivolous lawsuits?

A.    No.

MR. HEENAN: I don't have any more questions. I appreciate your time.

BY MR. SIMPSON:

Q.    You were asked a number of questions by Mr. Heenan about the, I think he called them the objective real-world stressors that could be identified for Mr. McCullough during the year

2007.   Do you remember those questions?

A.        Yes, I remember struggling with those questions, I do.

Q.        I want to make sure I understand your opinion.  Is it that the objective real-world stressors are not really the issue for Mr. McCullough, it's whatever subjective fantasy and delusional things that are going on that are the concern for him?

A.        In my opinion, Mr. McCullough's world is dominated by his delusional thoughts and processes.  I think that's what Mr. McCullough pays most attention to because he's forced to.  He has a psychiatric illness.  It's not his fault.  It's unfortunate that he has to live life this way.  So in my opinion that is an ongoing stressor because it's real life for Mr. McCullough and it's ongoing stresses that are constant but with variable intensity over time; variable intensity which we cannot predict because it's the nature of the illness.

Q.        Did he tell you he thought an agency of some sort was after him, a government agency?

A.        Several agencies, and that he worked for several agencies in activities that he could not

talk about.

MR. SIMPSON:  Thank you.

MR. HEENAN:  All done.

C E R T I F I C A T E   O F   O F F I C E R.

I, Virginia Leyendecker, a Certified Shorthand Reporter and Notary Public, do hereby certify that prior to the commencement of the examination, the witness was duly sworn by me.

I do further certify that the foregoing is a true and accurate transcript of the testimony as taken stenographically by and before me at the date, time and location aforementioned.

I do further certify that I am neither a relative nor employee, nor attorney or counsel to any parties involved; that I am neither related to nor employed by any such attorney or counsel, and that I am not financially interested in the action.

_Virginia E Leyendecker_,CSR

Notary Public

My Commission expires (July 7, 2009)

NJ C.S.R. License No. XI-1701

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061