IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

2008 APR 8 PM 3 53

PATRICK E. DUFFY, CLERK

BY #142 DC

June Tift and Timothy McCollough,

      Plaintiffs,

  -vs-

Johnson, Rodenburg & Lauinger and CACV of Colorado, LLC,

      Defendants.

Cause No. CV-07-166-B:G-RFC-CSO

TRANSCRIPT OF

DEPOSITION OF CHARLES DENDY

Taken At
216 North Second Street
Bismarck, North Dakota
July 22, 2008

(APPEARANCES AS NOTED HEREIN)

**EMINETH & ASSOCIATES**
**Court Reporters**
BISMARCK, NORTH DAKOTA
(701) 255-3513

ORIGINAL



**Registered**
**Professional**
**Reporters**

2

**A P P E A R A N C E S**


MR. JOHN HEENAN
       HEENAN LAW FIRM
       Attorney at Law
       2601 First Avenue North, Suite 305
       P. O. Box 2278
       Billings, Montana 59103

                            FOR THE PLAINTIFFS.

                            --------

MR. FRED SIMPSON, JR.,
       BOHYER, SIMPSON & TRANEL, P.C.
       Attorneys at Law
       283 West Front, Suite 201
       P. O. Box 7729
       Missoula, Montana 59807

                            FOR THE DEFENDANT,
                            JOHNSON, RODENBURG &
                            LAUINGER.

                            --------


          ALSO PRESENT:  MS. LISA LAUINGER

                            --------

3

CONTENTS

Page No.

CHARLES DENDY

Examination by Mr. Heenan                        5

CERTIFICATE OF DEPONENT                          48

CERTIFICATE OF COURT REPORTER
   AND NOTARY PUBLIC                             49

--------

DEPOSITION EXHIBITS MARKED:

No.       Description                        Page No.

13    December 7, 2007 e-mail to Lesley
      Smith from Charles Dendy                   22

14    Subpoena duces tecum                       45

--------

4

(Pursuant to Notice to Take the Videotaped Deposition of CHARLES DENDY, in the above-entitled cause, the following examination came on for taking before Linda L. Gingery, a Registered Professional Reporter and a Notary Public in and for the State of North Dakota, at 216 North Second Street, in the City of Bismarck, County of Burleigh, State of North Dakota, on the 22nd day of July, 2008, commencing at 1:54 p.m., counsel appearing on behalf of the respective parties as hereinbefore indicated:)

--------

(The following proceedings were had and made of record:)

MR. EMINETH:   This is the videotaped deposition of Charles Dendy, being taken by the plaintiffs in the matter of June Tift and Timothy McCollough, plaintiffs, versus Johnson, Rodenburg & Lauinger, and CACV of Colorado, LLC, defendants, Cause No. CV-07-166 in the United States District Court for the District of Montana, Billings Division.

The deposition is being held at 216 North Second Street, in Bismarck, North Dakota, on Tuesday, July 22, 2008, commencing at the time indicated on the video screen, being 1:54 p.m.

5

My name is Al Emineth of the firm of Emineth & Associates, located at 216 North Second Street, in Bismarck, North Dakota 58501, and I'm the videographer.  The court reporter and notary public is Linda Gingery, also of the firm of Emineth & Associates, located at the same address.

Will counsel please state their appearances?

MR. HEENAN:  John Heenan for the plaintiffs.

MR. SIMPSON:  Fred Simpson, representing the defendant, Johnson, Rodenburg & Lauinger.

MR. EMINETH:  The witness will now be sworn.

CHARLES DENDY,

being first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HEENAN:

Q.    Mr. Dendy, can you please state your name and business address for the record?

A.    Yes.  My name is Charles Dendy.  My address at work is 1004 East Central Avenue, Bismarck, North Dakota 58501.

Q.    Okay.  And who are you employed by?

6

A.    I'm employed by Johnson, Rodenburg & Lauinger.

Q.    In what capacity?

A.    I'm an attorney.

Q.    How long have you been at Johnson, Rodenburg & Lauinger?

A.    I've been with Johnson, Rodenburg & Lauinger since the fall of 2004.

Q.    Any prior legal work before joining Johnson, Rodenburg & Lauinger?

A.    Before joining the firm, I was a law clerk for Magistrate Dwight Kautzmann in Bismarck for about two years.

Q.    And Judge Kautzmann is a U.S. Magistrate Judge?

A.    He was a U.S. Magistrate Judge.  He's retired now.

Q.    Okay.  You're a member of the Montana Bar?

A.    That's correct.

Q.    When did you sit for the Montana Bar?

A.    I sat for the Montana Bar in February of 2006, I believe.

Q.    Are you licensed to practice law in any other states besides Montana?

A.    North Dakota and Montana.

7

Q.    You're aware that Lisa Lauinger's deposition was earlier today?

A.    Yes, I am.

Q.    Ms. Lauinger testified that you essentially handle the Montana litigation; is that correct?

A.    That's correct.

Q.    At this point all of it?

A.    I handle all the Montana cases for the Bismarck office.

Q.    Who handles the Montana cases from the Fargo office?

A.    I'm not sure.

Q.    How are Montana cases split up between the Bismarck and the Fargo office?

A.    There is no split between the Bismarck and Fargo offices.  The Bismarck office handles its cases and the Fargo office handles its cases.

Q.    So the different offices have different clients or the same clients?

A.    Different clients.

Q.    Who are the main -- well, strike that. You handle all the Montana cases.  Do you handle cases in any other places, like North Dakota?

A.    Currently, I handle primarily Montana

8

cases.

Q.    In the last year and a half have you filed any lawsuits on behalf of clients in North Dakota?

A.    Yes.

Q.    How many?

A.    I don't know.

Q.    As many as you have in Montana?

A.    I don't believe so, but I'd have to pull the numbers.

Q.    More than 100?

A.    You're asking about North Dakota?

Q.    Correct.

A.    Probably more than 100 cases in North Dakota.

Q.    In the discovery that's been produced, it's my understanding that you, on behalf of your clients, have filed over 2,700 lawsuits against Montana residents since the beginning of 2007; is that correct?

A.    If that's the information that was provided, it's correct.

Q.    What's the most amount of lawsuits that you've ever filed in a single day?

A.    I don't know.

Q.    How about approximately?

A.    Approximately 40 in a day.

Q.    Of the 2,700 lawsuits that you filed in Montana since the beginning of 2007, how many times have you physically appeared in a Montana court?

A.    Which time frame were you asking?

Q.    Since the beginning of 2007.

A.    I'd have to review all our records to know for sure, but I believe I've traveled to Montana two to three times in the last -- in that time period.

Q.    Two to three times to appear in court?

A.    That's correct.

Q.    Do you remember what courts you appeared in?

A.    One was the court in Butte, District Court.

Q.    And how about the other times?

A.    One was a District Court in Bozeman.

Q.    Who was -- any more?

A.    The other was just a deposition.  It wasn't actually an in-court appearance.

Q.    So two in-court appearances?

A.    That's correct.

Q.    What were the circumstances for appearing in Butte District Court?

A.    It was a trial.

10

Q.    In a debt collection action?

A.    That's correct.

Q.    Was the debtor represented by counsel?

A.    No, they weren't.

Q.    Were you successful at trial?

A.    Yes, I was.

Q.    And how about in the Bozeman District Court action, what were those circumstances?

A.    Same circumstances.  The defendant was not represented and the trial was successful.

Q.    What, if anything, do you do prior to filing a lawsuit on behalf of a client in the State of Montana?

A.    I review the file and determine that the suit is proper to be filed.  I check to make sure a demand letter has gone out, that it hasn't come back undeliverable.  I look for any pre-suit disputes that need to be addressed in one way or another.  I look to check to make sure the statute of limitations date is proper, we're within the statute of limitations and there's enough time for the court document to get to the court and be filed before the statute passes, and I check to make sure all the items on the complaint, summons and complaint are correct, accurate and match the information provided

11

by our client.

Q.    When you say, Mr. Dendy, that you review the file to make sure it's proper to be filed, what specifically do you mean by that?

A.    I just review the file, make sure there haven't been any unanswered disputes under the Fair Debt Collection Practices Act, that there isn't any other kind of problem that would prevent the file from going forward, possibly a bankruptcy filing or something of that nature.

Q.    What documents, if any, did you review in this case prior to signing the complaint and filing it against Mr. McCollough?

A.    In this case I relied upon the information that was provided by the client.

Q.    Which was what?

A.    I'd have to look at our notes.  I don't recall that information.

Q.    Let me direct your attention to Deposition Exhibit 7, which are the notes.

A.    In this particular case I would have reviewed what happened in the file prior to April 17th of 2007.

Q.    What specific information would you have reviewed with respect to Mr. McCollough?

12

A.    I would have reviewed the file to make sure the demand letter went out, that it wasn't returned as undeliverable.  I would have checked to make sure that there weren't any disputes sent to our office in response to that demand letter.  This particular case, prior to initiating suit, our office had corresponded with the client to confirm the balance on the file and the date of last payment for purposes of calculating the statute of limitations, so I would have also reviewed that material.

Q.    Did you review any documents provided to you by the client?

A.    I would have reviewed a couple of e-mails that were provided by the client.

Q.    Would you agree with me at the time this lawsuit was filed, there was no account statements?  Would you agree with that?

A.    No account statements where?

Q.    In the file.

A.    In our file?

Q.    Correct.

A.    That's correct.

Q.    Likewise, would you agree that there was no credit contract or credit card contract in the

13

file at the time the lawsuit was filed?

A.    I'm not certain what you mean by credit card contract, but we didn't have an application in the file, if that's what you're referring to.

Q.    Did you have any information from Chase Manhattan Bank, the original creditor?

A.    We had the information provided by our client.

Q.    Which was what?

A.    That would have consisted of the balance information on the file, the date of the last payment, and the statute of limitations date.

Q.    And that information is just inputs that are downloaded from Collect America into Johnson, Rodenburg's Collection-Master software?

A.    That's my understanding of it.

Q.    Any specific documents from the original creditor, Chase Manhattan Bank?  Were there any documents from Chase Manhattan Bank in the file at the time the lawsuit was filed against Mr. McCollough?

A.    No, not in our file.

Q.    Is that unusual for Johnson, Rodenburg to file a lawsuit without having any documents from the original creditor?

14

A.    We rely on the representations of our client.

Q.    But is it unusual to file a lawsuit without any documentation from the original creditor in the file?

A.    No.  We rely on the representations of the client.

Q.    So is that not unusual?

MR. SIMPSON:  I think he answered it.

Q.    (MR. HEENAN CONTINUING)  I'm just trying to get clarification.  Is it normal for Johnson, Rodenburg to file lawsuits based solely on the representations made by the client?

A.    We file lawsuits based upon the representations of the client.  Sometimes those representations come along with documents. Sometimes they don't.  It depends on the particular case.

Q.    What about with respect to Collect America, do those representations, more often than not, come with documents from the original creditor?

A.    I don't know.  Often we have some documentation supporting the claim from the client on CACV cases.

Q.    How about with respect to Portfolio

15

Recovery cases, same question?

A.    Same answer.  It varies.  Every client, every case, it depends on who the original creditor was.  Sometimes there are documents.  Sometimes there aren't.

Q.    What about documents specifically with respect to whether Johnson, Rodenburg's client is the real party in interest to the lawsuit?

A.    I don't understand what kind of documents you're talking about.

Q.    How about like an assignment, how do you verify that Collect America has standing to sue somebody?

A.    Often Collect America provides some kind of an assignment document or an affidavit indicating there's been an assignment.

Q.    What about if they don't?

A.    It depends on the file and their procedures, how they change.

Q.    In this instance you would agree that there was no affidavit on the file at the time the lawsuit was filed against Mr. McCollough?

A.    Not in our file.

Q.    And, again, is that unusual?

A.    No.

16

Q.    Have you ever had reason to suspect the information you've been provided from your client could be inaccurate?

A.    Which client are you speaking about?

Q.    Any client.

A.    From time to time.

Q.    Explain to me those circumstances.

A.    In this particular case there was an indication that the balance information and date of last payment information might not be correct early on in the case, so the way we responded to that was to verify that information with the client and determine what the correct information was.

Q.    But when Johnson, Rodenburg got back with Collect America, they continued to rely solely on the information provided to them by Collect America; correct?

A.    That's correct.

Q.    What other instances can you recall where you suspected that the information provided to you from the client could be inaccurate?

A.    I don't recall any off the top of my head. It happens from time to time.

Q.    What do you do when it happens?

A.    We verify the information before we

proceed.

Q.    Does Johnson, Rodenburg do any type of independent verification?  And by "independent," I mean by inquiring from sources other than the client whether the information the client is providing is accurate.

A.    From time to time.

Q.    Under what circumstances would that happen?

A.    Sometimes I ask for information from the defendant or defense counsel.

Q.    After a lawsuit has been filed?

A.    It depends.  If defense counsel has contacted us before a lawsuit, then we would certainly speak with them at that time.

Q.    Any other circumstances where you would -- "you" meaning Johnson, Rodenburg -- conduct an independent investigation to determine whether the information provided by your client is accurate?

A.    Information comes from our client most of the time.

Q.    I'm sorry.  My question was, are there any circumstances or any other times that you can recall where you would -- Johnson, Rodenburg conducts an independent investigation to determine whether the

18

information provided to you by your client was accurate?

A.    No.    If we need information, typically, we ask our client for that information.    They collect it and forward it to us for review.

Q.    Do you ever -- what about in instances where the person you're about to sue has already been sued before, does that ever happen?

A.    Not that I'm aware of.

Q.    Well, how about in this case, you're aware that Mr. McCollough had been sued before through a different attorney and advised that attorney that the statute of limitations was up and that attorney consequently dismissed the case?

A.    I became aware of that after the litigation was already dismissed.

Q.    So your client didn't advise you that they had sued Mr. McCollough previously?

A.    I was not aware of that prior to filing suit, no.

Q.    Is that information that's not typically provided to you by the client?

A.    I'm not aware of that circumstance happening very often.

Q.    Is Mr. McCollough the only instance where

19

you've ever heard of that circumstance happening?

A.    It's the only one I can recall.

Q.    What other information could Johnson, Rodenburg compile, if they wanted to, to ensure the accuracy of what their client was representing prior to filing a lawsuit?

MR. SIMPSON:    In this case or in general?

Q.    (MR. HEENAN CONTINUING)    In general.

A.    Could you rephrase the question?    I'm not sure exactly what you're asking for.

Q.    Sure.    What information would be helpful to Johnson, Rodenburg to have prior to filing a lawsuit on behalf of one of its debt buyer clients?

A.    In the event where there hasn't been any dispute of the debt from a defendant or an attorney, the information that the client provides as to the amount of the balance and last payment date would be sufficient.

Q.    But what information could Johnson, Rodenburg attempt to gather if it wanted to ensure the accuracy of what the client was representing to it prior to filing a lawsuit?

A.    If there was some reason to gather additional information, we could ask for copies of statements, perhaps copies of payments.

20

Q.     What else?

A.     Which type of information are you trying to --

Q.     For credit card.

A.     For a credit card, you could ask for a copy of the e-cardmember agreement.

Q.     Why would that be important?

A.     That sets forth the terms of the account.

Q.     What other information would be helpful?

A.     It depends on the --

Q.     For credit card.

A.     -- circumstances of the dispute.  But, generally, that's the type of information that's applicable in a credit card case.

Q.     Why would copies of payments be helpful?

A.     That would show when the last payment was possibly or when some payments were made.

Q.     Are statute of limitations issues oftentimes in play in these debt buyer lawsuits?

A.     Not often.

Q.     Rarely?

A.     I'd say rarely.  Well, I guess to clarify, by "in play," do you mean is there a valid statute of limitations defense or do you mean is statute of limitations raised as one of many defenses?

21

Q.    I mean are there -- by "in play," I'm asking are those issues that Johnson, Rodenburg as a law firm and a debt collector needs to investigate?

A.    Statute of limitations is important in any case that's filed.

Q.    Why so?

A.    Because you want to file a case within the statute of limitations or you don't file it.

Q.    Why would copies of statements be helpful?

A.    Copies of statements might show the balance owing and might show when the date of last payment was.

Q.    How often is it when Johnson, Rodenburg files lawsuits against people in Montana that they have any of those documents in their possession, copies of statements, copies of payments, or a copy of the cardmember agreement?

A.    I don't know.  It depends on the particular client and who the debt was purchased from.  I don't keep track of those numbers.

Q.    When was the last time, that you can recall, on a Collect America case where the actual cardmember agreement was in the file at the time the lawsuit was filed?

A.    I don't recall.  I'd have to review our

22

files.

Q.    With respect to Mr. McCollough, there was no cardmember agreement in the file at the time the lawsuit was filed; true?

A.    That's correct, in our file.

(Deposition Exhibit 13 was marked for identification.)

Q.    (MR. HEENAN CONTINUING)  Mr. Dendy, I've just handed you what's been marked as Deposition Exhibit 13, which is an e-mail from you regarding Mr. McCollough's claim, dated December 7th, 2007.

Who is Lesley Smith?

A.    She's an employee of CACV.

Q.    Was she your contact at CACV at the time this e-mail was sent?

A.    That is correct.

Q.    Is she still your contact at CACV?

A.    No, she isn't.

Q.    If you would, please, Mr. Dendy, read into the record what you wrote Ms. Smith.

A.    Which part of it?

Q.    All of it.  And then I'm going to follow up.

A.    Okay.  This actually shows two e-mails from me.  The first e-mail from me I indicate that,

23

"An attorney has appeared in this action and has served a discovery request.  Proposed responses will be forwarded later on today or Monday."  The next paragraph, "The attorney is one who is anti purchased debt and who attempts to run up costs in an attempt to secure a large cost award against plaintiff.  I anticipate he will file numerous motions throughout the course of litigation."

Q.    And let me stop you there, Mr. Dendy.  Am I the attorney?  Who is the attorney?

A.    That would be you, I believe.

Q.    And who is the plaintiff?

A.    Plaintiff in that action was CACV of Colorado, LLC.

Q.    Okay.  Proceed, please.

A.    "And will seek to depose as many people as he can get his hands on.  Please do everything you can to make sure the people who respond to discovery or who are produced to be deposed are fully familiar with the account and very familiar with the practices and procedures of the original creditor."

Q.    Let me stop you there, Mr. Dendy.  Is it not normally the case that the client would provide you with people who are fully familiar with the account in response to litigation?

24

A.    No.    Clients typically do provide people that are familiar with the account.    My intent in sending that was to make them aware of their need to have people that are also familiar with the practices and procedures of the original creditor.

Q.    And what did you mean by that?

A.    The client -- I want the client to send people that are familiar with the practices and procedures of the original creditor for hearsay purposes.

Q.    Who did you anticipate that they would be able to send, if anyone?

A.    I didn't anticipate anybody.    I don't know who they're going to provide as a witness.

Q.    Describe to the jury, if you would, please, what you mean by "for hearsay purposes"?

A.    These are records of the original creditor and for our client to get those records admitted, they need to have somebody, a witness that's familiar with the practices and procedures of not only their organization, but also of the original creditor so they can demonstrate to the Court that those records are reliable.

Q.    Okay.    Continue, please.

A.    "Please provide me with copies of

everything you can get for documentation as soon as possible. We need to request everything available from the original creditor, not just the things you normally request. Application, statements, cardmember agreement, copies of payments, copies of any correspondence. Please have the request expedited, if possible."

Q. Let me stop you there. What do you mean the things that are normally requested, et cetera?

A. When documents are requested from a client, sometimes clients will request a certain set of documents, and I wanted to make clear that the client knew they needed to request everything they can get, not just a standard document package that they might request in response to a disputed case.

Q. What would a standard document package consist of?

A. I don't know. I've never heard that term before, but that's the way I describe it. It might be a few statements, cardmember agreement. It depends on the client and the original creditor.

Q. I took Portfolio Recovery Associates' deposition last week in a different matter, and Portfolio Recovery testified that by contract they're limited how many times they can ask for

26

information from the debt seller.  Are you aware of that?

A.    No.

Q.    You've never heard that before?

A.    No.

Q.    Please continue.

A.    "If there was any correspondence between Collect America and defendant, please provide copies of that to me right away.  If you have any notes of phone conversations between Collect America, please provide that as well.  If you have any questions or want to discuss the file, please give me a call."

Q.    Is it fair that Johnson, Rodenburg could make the requests that you did in this e-mail in each and every single one of the cases that it brings in Montana?  Maybe that was a bad question, Mr. Dendy.

Is it fair that in every case prior to filing a lawsuit in Montana you could ask the client to provide you with the information that you've requested in this e-mail here?

A.    Yes.  It's possible to ask the client to provide every piece of documentation prior to filing a lawsuit.

Q.    But Johnson, Rodenburg doesn't?

27

A.    No.

Q.    And we can stop that.  Although, I guess, Mr. Dendy, you said that there's another aspect to the e-mail.  Which part is that or what are you referencing?

A.    I believe the e-mail I just read from me and then a response from Lesley Smith.

Q.    What does she say?

A.    She says, I don't -- "Hello.  I don't remember if I've responded to this or not.  For this file we are not able to get anymore media.  The retention date is seven years from c/o, which was 10/2000."

Q.    C/o, would that stand for charge-off?

A.    I believe she meant charge-off.  "I have sent you all the docs we do have."

Q.    And then at the top you responded to her?  Or what's that e-mail at the top there?

A.    That's me responding back to Lesley.

Q.    And you told her that we had already discussed that one over the phone?

A.    That's correct.

Q.    And what was your discussion with Ms. Smith over the phone, to the best of your recollection?

A.    To the best of my recollection, I discussed the case with Ms. Smith over the phone preparing responses to the discovery requests and at that time she advised me that the last payment date they had provided to our office was incorrect and that the statute of limitations had passed before the file was sent to our office and the case should be dismissed.

Q.    Now I want to direct your attention to Deposition Exhibit 9.  It should be in that stack somewhere.  There you go.  Deposition Exhibit 9 is a letter from Grace Lauinger containing a bunch of documents and mailed to Mr. McCollough on October 29th, 2007.

Ms. Lauinger, I'll represent to you, testified earlier this morning that you prepared that letter for her and the documents attached.

Is that true?

A.    That's correct.

Q.    Can you tell me, please, where -- the documents attached to Deposition Exhibit 9, where you got them from?

A.    (Witness reviews document.)  Those would have been documents that were provided by the client.

Q.    Directly to you?

A.    To our law firm, if you mean the law firm by "you."

Q.    So they would have been mailed from CACV to Johnson, Rodenburg?

A.    That's possible or they might have been e-mailed.

Q.    How about with respect to this credit card agreement that's attached to Deposition Exhibit 9, did your client ever represent to you that that was the credit card agreement to which Mr. McCollough was a party?

A.    I don't understand what you mean by the question, I guess.

Q.    Okay.  Let me ask it more broadly.  Did these documents come with any direction from the client as to what they were?

A.    The documents came from the client with some indication that they related to this particular file.

Q.    Did Collect America ever represent to Johnson, Rodenburg that this credit card agreement was Mr. McCollough's credit card agreement?

A.    Our office requested copies of documentation related to this particular account and

30

the client sent this documentation in response to that request.

Q.    Does Johnson -- I'm sorry.  Were you finished?

A.    I was going to say so, yes, I believe they represented that this is the agreement relative to this particular account.

Q.    Does Johnson, Rodenburg maintain stock or standard credit card agreements for the various credit card companies?

A.    No.

Q.    And so the next step to that, Johnson, Rodenburg doesn't ever file or rely on contracts that they're not sure the person was actually a party to?

A.    I don't.

Q.    I'll show you what's been marked as Deposition Exhibit 2, which is a copy of the complaint that you filed against Mr. McCollough.  At the time you signed the complaint against Mr. McCollough, can you explain to me what investigation you did to make sure it was proper to be filed?

A.    When I review a complaint, I look at the file and make sure a demand letter has gone out,

31

that it hasn't been returned as undeliverable, and then I next look to see if there's any indication of a bankruptcy filing or any kind of Fair Debt Collection Practices Act dispute prior to initiation of litigation.  There wasn't anything like that in this file.  Next, I look at the caption to make sure that the plaintiff's name is correct and defendant's name and the venue is correct.  Then I look at the information actually contained in the complaint.  I look to make sure the original creditor's name is right, the account number is correct and matches the information provided by our client, which is housed in our computer system, and then I check the balance information to make sure that information is correct and matches anything that our clients provided.

Next, I pull up the legal screen and I look at the statute of limitations date and make sure the action would be within the statute of limitations based on the information provided by our client.

Q.    How about with respect to the amount of interest requested in the complaint, upon what is that figure based?

A.    The interest amount is based upon the information provided by our client as to what

interest is owing on the account.

Q. What information specifically is provided by the client with respect to interest?

A. Well, when the client places an account, they provide us with the amount of interest owing on the account at the time of placement.

Q. Do they provide you with any type of calculation or explanation for what the contractually agreed interest rate is?

A. Not that I know of.

Q. How about with respect to attorney's fees, at the time this lawsuit was filed against Mr. McCollough, what was the basis for seeking attorney's fees against him?

A. This is a credit card account and cardmember agreements provide for recovery of attorney's fees.

Q. You testified earlier that there was no cardmember agreement for Mr. McCollough in the file at the time the lawsuit was filed against him; true?

A. That's correct. It wasn't in our file.

Q. Was it represented to you that it was in someone else's file?

A. Not that I recall.

Q. How about with respect to the amount of

33

attorney's fees requested, how is that figure arrived at?

A.    We calculate the amount of attorney's fees in a case like this based upon the ratio set by the Second Judicial District.  It's a set schedule they have by local rule.  It's 10 percent of the first -- or it works out to a maximum of $1,100 in fees.  I think it's 20 percent of the first $1,000 and then 10 percent of the next amount up to $9,000, for no more than a total of $1,100.

Q.    Now, this lawsuit was filed in the 13th Judicial District Court, not the Second Judicial District Court?

A.    That's correct.

Q.    And I want to have you look at Deposition Exhibit 7, which is the account notes here.  At the time this complaint was filed against Mr. McCollough, can you estimate for me the amount of time you, as an attorney, spent on the case?

A.    This particular file, I'd estimate that I spent 20 minutes to a half-hour on the file.

Q.    And upon what do you base that statement?

A.    My time prior to filing the complaint would have been essentially my time reviewing the complaint before signing it and filing it.

34

Q.    Which would take 20 to 30 minutes?

A.    I believe so, in this case, based upon the history of the file.

Q.    The testimony was previously that the complaint and summons were drafted by someone else. Is that the case?

A.    That's correct.

Q.    Your initials don't appear on the claim notes until June 18th of 2007; is that correct?

A.    That's correct.

Q.    And that was when Mr. McCollough filed his answer?

A.    That's correct.

Q.    Did you review Mr. McCollough's answer when it came in?

A.    Yes, I did.

Q.    Mr. McCollough represented in his answer that the statute of limitations was up and that he was disabled and that this was the third time that this particular debt buyer had brought him to court on this account?

MR. SIMPSON:   Object to the extent that the answer speaks for itself.

Q.    (MR. HEENAN CONTINUING)   Do you recall that?

A.    That's in line with what I remember the answer saying.

Q.    Who is Levi?

A.    He's a paralegal.

Q.    And do you work with Levi on the cases that you file in Montana?

A.    From time to time.

Q.    How about in this case?

A.    Yes.

Q.    What did Levi do in this case?

A.    It appears he monitored the file for receipt of documents from the client, drafted a summary judgment affidavit, a cover letter to the sheriff.

Q.    Let me stop.  The summary judgment affidavit would have been an affidavit -- well, explain to the jury what a summary judgment affidavit is, please.

A.    Well, a summary judgment affidavit is an affidavit from somebody attesting to the facts of a particular case that's usually filed in support of a summary judgment motion.

Q.    And in this particular circumstance, who was Levi drafting an affidavit for?

A.    It would have likely been an affidavit for

36

our client to sign, but I don't recall off the top of my head.

Q.   Does Johnson, Rodenburg draft the affidavits for its clients to sign in support of summary judgment motions?

A.   Sometimes.   Sometimes the clients provide affidavits on their own forms.   Sometimes we draft an affidavit and send it to the client for review and changes.

Q.   How about with respect to affidavits that come from the debt seller, not the client?

A.   From debt seller, you mean the original creditor?

Q.   Correct.

A.   If the original creditor is our client, we might draft an affidavit for them, but I don't believe we generally draft affidavits for businesses we don't represent.

Q.   Have you ever had occasion to question the accuracy or legitimacy of an affidavit provided to you by a client?

A.   From time to time.

Q.   What about with respect to an affidavit from a Martha Kunkle?

A.   Yes.

37

Q.    Describe for me, if you will, what circumstances caused you to question the accuracy or validity of the Martha Kunkle affidavit?

A.    It was brought to my attention that there might be some irregularities surrounding her signing of affidavits.

Q.    When was that brought to your attention?

A.    I believe that was in the summer of 2007.

Q.    What did you do -- well, who brought it to your attention?

MR. SIMPSON:    Hold on here.    I'm going to object, because I understand this is a subject of a different lawsuit and I'm not sure what relevance, if any, it would have in this suit and given that it's ongoing -- there's another lawsuit ongoing, as I understand it, against Johnson, Rodenburg & Lauinger and he's not here to be deposed in that suit, I think it's improper to go into that and I'm not sure if that invokes attorney-client privilege or not.    I'm going to instruct him not to answer.

MR. HEENAN:    Understand that that's one we might need to further address in light of the fact that your client has asserted bona fide error as a defense in this case.

MR. SIMPSON:    I understand.

38

Q.    (MR. HEENAN CONTINUING)    How about any other circumstances, Mr. Dendy, where you've had occasion to question the veracity or legitimacy of an affidavit provided by a client?

A.    It doesn't happen often, but from time to time I'll see an affidavit in a particular matter that appears like the balance might not be correct, something like that, so in that circumstance I'll ask the client to take another look at it and ensure that the affidavit is correct.

Q.    Describe for me when the last time, other than the Martha Kunkle, that you questioned the validity or accuracy of an affidavit provided to you?

MR. SIMPSON:    Let me just, I guess, give him a cautionary warning.  If you can do it without identifying -- assuming it's not related to this case, if you can do it without identifying the client so that you don't go into attorney-client privilege.

THE WITNESS:    I understand.  I don't recall the last time I questioned one.  Like I said, it doesn't happen very often, but from time to time you'll notice something in the affidavit usually that a client has prepared that doesn't seem quite

right and I'll ask them to take another look at it and ensure that their affidavit is entirely correct before filing it.

Q.    (MR. HEENAN CONTINUING)  Do you have any awareness of the volume of affidavits that your debt buyer clients like CACV or Portfolio provide to courts throughout the country?

A.    No.

Q.    In Portfolio's deposition they said that it can be up to 200 affidavits a day that will be signed by particular employees.  Is that in line with what understanding you have, if any?

A.    I don't have any understanding about that. I'm not there when those affidavits are signed.

Q.    Are you aware of any instances in which a Montana District Court Judge has complained about the conduct of Johnson, Rodenburg in Montana courts?

A.    I received a letter this spring from one particular judge that complained of my conduct.

Q.    Who was that judge?

A.    That was Judge Fagg.

Q.    What specifically did Judge Fagg complain about?

A.    I don't recall the exact wording of the letter, but it was a case where a pro se defendant,

40

I believe, had filed an answer pro se and didn't serve our office with a copy of the answer, so I had submitted default judgment papers and the Court responded with the letter from Judge Fagg indicating that he was concerned about the default judgment filing as an answer was filed in that case.

Q.    Is that the only instance, that you're aware of, where a Montana judge has complained about the conduct of Johnson, Rodenburg?

A.    That's the only one I can recall.

Q.    Assuming a case -- assuming the defendant doesn't respond and a default judgment is entered, how much time does that take you, as the attorney, to handle that claim?  Maybe it would be easier, Mr. Dendy, if you explained under those circumstances what your involvement is in a case that proceeds to default judgment.

A.    In a typical case where there's been no dispute prior to initiation of litigation and there's absolutely no contact after initiation of litigation, that proceeds straight to a default judgment, my typical involvement with the file would be reviewing the file before the summons and complaint are filed with the court, reviewing the file again before the praecipe goes out to the

41

sheriff for service of the summons and complaint and then reviewing the file again at the time the default judgment papers are submitted to the court.

Q.   Johnson, Rodenburg, through its software system and its support staff, the complaint and summons is drafted by someone else; correct?

A.   No.   The forms that the summons and complaint are drafted on are drafted by attorneys and then support staff fills in the particular caption and information for a particular case on the forms that we provided.

Q.   Just so we're clear, though, you don't start from scratch every time a new complaint is filed?

A.   No.

Q.   There's a form complaint that's been created by the attorneys at the Johnson, Rodenburg firm and the support staff fills in the blanks?

A.   Typically, unless it's a really unusual case.

Q.   And then like in the same manner with the default judgment, those are forms that have been prepared that support staff fills in and you review?

A.   That's correct.

Q.   Under that circumstance, you talked about

42

reviewing the complaint and summons once before filing, again before serving and then again before entering the default judgment.  How much time, typically, would that take you in a garden-variety default judgment case?

A.    In a garden-variety case, probably five minutes to review the summons and complaint and ten minutes to review the judgment documents and another few minutes to review the file at the time the praecipe goes out to the sheriff.

Q.    Was a summary judgment motion prepared in this case?

A.    No, I don't believe one was.

Q.    I know that one wasn't filed, but you're not aware of one being drafted?

A.    Not that I remember.

Q.    Is it possible?

A.    I don't recall ever seeing a summary judgment motion draft in this particular file.

Q.    Is that something that your paralegal would also be involved in, drafting summary judgment motions?

A.    Yes, the paralegal has a hand in drafting summary judgment motions, but those are more in-depth than a default judgment and the brief and a

substantial amount of work on the summary judgment motion is done by myself usually.

Q.   How about written discovery, is that something that the paralegal would be involved with?

A.   Typically, the paralegal does the rough draft of the written discovery and then I review that and make any changes or additions that I need to make before they go out.

Q.   The typical requests for admissions that Johnson, Rodenburg uses in lawsuits in Montana courts, again, is that a form that's been created by the Johnson, Rodenburg attorneys that is changed by a paralegal or by yourself?

A.   That's correct.

Q.   Is there a reason that in the requests for admissions that Johnson, Rodenburg serves on defendants in Montana courts, the defendants aren't apprised of how much time they have to respond to the requests for admissions?

A.   Not that I know of.

Q.   Explain to the jury, if you will, what the consequences are of failing to timely respond to requests for admissions.

A.   The Rules of Civil Procedure provide that if you fail to timely respond, the requested matters

44

to be admitted are actually deemed admitted.

Q.   Has it ever happened to you where someone files an answer or responds to the lawsuit and so requests for admissions are served on them and not responded to?

A.   Yes.

Q.   And under those circumstances what does Johnson, Rodenburg do?

A.   If it's appropriate, a motion for summary judgment might be prepared.

Q.   And explain to the jury what the consequences are of a summary judgment motion.

A.   If summary judgment is entered for the whole case, then judgment is entered in favor of the prevailing party.

Q.   So it's a way to basically win before trial?

A.   That's correct.

Q.   I was asking you earlier about the types of documents that Johnson, Rodenburg could request from the client and we went through that e-mail. It's also true that, if it wanted to, Johnson, Rodenburg could request documents directly from the original seller; true?

A.   I believe that's true.

Q.    And what I'm referring to is the power of the courts to issue subpoenas and you, as an attorney in Montana, know the process to subpoena documents; true?

A.    That's correct.

Q.    And in this case documents actually were subpoenaed from the original seller; is that correct?

A.    That's correct.  We attempted a subpoena.

Q.    And what were the results of the subpoena attempt?

A.    I don't believe any documents were received.

Q.    I apologize.  Bear with me just a second.

(Deposition Exhibit 14 was marked for identification.)

Q.    (MR. HEENAN CONTINUING)  Deposition Exhibit 14 is the subpoena that you served in this case to JP Morgan Chase attempting to obtain information with respect to Mr. McCollough; correct?

A.    Yes, it appears to be.

Q.    And on page 2 of that document Chase Bank USA's subpoena analyst responded that they didn't have any credit card accounts in Chase Bank USA systems for Mr. McCollough; correct?

A.    That's correct.

Q.    This is information that Johnson, Rodenburg could have learned prior to ever suing Mr. McCollough had they served a subpoena prior to instituting this lawsuit; true?

A.    Could you please rephrase the question?

Q.    Sure.    This subpoena was served on November 14th of 2007; right?    Do you see that there?

A.    That's correct.

Q.    Approximately seven months after the lawsuit was instituted against Mr. McCollough; correct?

A.    Let's see here.    April 7th.    That's correct.

Q.    And there's nothing that would have stopped Johnson, Rodenburg from attempting to obtain those documents prior to November 14th of 2007; true?

A.    That's true.

MR. HEENAN:    If we could just take a short break, I think I'm done.

MR. EMINETH:    Off the video at 2:58 p.m.

(Recess was taken.)

MR. EMINETH:    Back on video at 3:09 p.m.

47

MR. HEENAN:  Mr. Dendy, I don't have any more questions for you.  I thank you for being here today.

MR. SIMPSON:  I guess just to be on the cautionary side, as with the last deposition, we'll designate this one confidential under the protective order and we'll reserve until trial.

MR. HEENAN:  Sounds good.

MR. EMINETH:  This concludes the videotaped deposition of Charles Dendy taken at Bismarck, North Dakota, on July 22nd, 2008.  The time is 3:09 p.m.  We're off the video.

(Concluded at 3:09 p.m., the same day.)

--------

48

## CERTIFICATE OF DEPONENT

I, CHARLES DENDY, the deponent in the foregoing deposition,

DO HEREBY CERTIFY, that I have read the foregoing and attached 47 pages, and that the same are, with changes and corrections, if any, set forth on the following correction sheets (setting forth the reason assigned for each change or correction, and duly signed by me), a full, true, accurate and correct transcript of my deposition on oral examination given at the time and place therein indicated.

Dated this ___22nd___ day of _August_____,
2008.

_____
CHARLES DENDY

CERTIFICATE OF COURT REPORTER AND NOTARY PUBLIC

STATE OF NORTH DAKOTA    )
                         ) ss.
COUNTY OF BURLEIGH       )

BE IT KNOWN that I, Linda L. Gingery, a Registered Professional Reporter, took the deposition herein pursuant to Notice; that I was then and there a Notary Public in and for said County and State; that I exercised the power of that office in taking said deposition; that by virtue thereof, I was then and there authorized to administer the oath; that said witness, before testifying, was duly sworn to testify the truth, the whole truth and nothing but the truth relative to the cause specified therein;

That the said deposition, having been transcribed, was subsequently submitted to the said witness, who thereupon read the said deposition and made changes or corrections, if any, as appear noted therein, along with the reason for each thereof, and that the said deposition was thereupon subscribed to by the said witness; that the examination was conducted at the time and place therein specified on behalf of the respective parties as therein indicated; that the foregoing and attached typewritten pages contain a full, true, accurate and correct transcript of my shorthand notes, as they purport to contain, then and there taken;

That I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which said deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

WITNESS MY HAND AND SEAL this 3rd day of October, 2008.

_Linda L. Gingery_
Linda L. Gingery
Court Reporter and Notary Public
My commission expires:  2/19/10

LINDA L. GINGERY
Notary Public
State of North Dakota
My Commission Expires Feb. 19, 2010