IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

June Tift and Timothy
McCollough,

       Plaintiffs,

  -vs-

Johnson, Rodenburg & Lauinger
and CACV of Colorado, LLC,

       Defendants.

Cause No. CV-07-
166-B:G-RFC-CSO

2009 APR 8 PM 3 53

PATRICK E. DUFFY, CLERK
BY ___#143___ pc
DEPUTY CLERK

TRANSCRIPT OF VIDEOTAPED

DEPOSITION OF GRACE LAUINGER

Taken At
216 North Second Street
Bismarck, North Dakota
July 22, 2008

(APPEARANCES AS NOTED HEREIN)

**EMINETH & ASSOCIATES**
**Court Reporters**
BISMARCK, NORTH DAKOTA
(701) 255-3513



**Registered**
**Professional**
**Reporters**

ORIGINAL

2

**A P P E A R A N C E S**


MR. JOHN HEENAN
    HEENAN LAW FIRM
    Attorney at Law
    2601 First Avenue North, Suite 305
    P. O. Box 2278
    Billings, Montana 59103

                FOR THE PLAINTIFFS.

                - - - - - - - -

MR. FRED SIMPSON, JR.,
    BOHYER, SIMPSON & TRANEL, P.C.
    Attorneys at Law
    283 West Front, Suite 201
    P. O. Box 7729
    Missoula, Montana 59807

                FOR THE DEFENDANT,
                JOHNSON, RODENBURG &
                LAUINGER.

                - - - - - - - -

ALSO PRESENT:  MS. LISA LAUINGER

                - - - - - - - -

3

CONTENTS

Page No.

GRACE LAUINGER

Examination by Mr. Heenan                    5

Examination by Mr. Simpson                  67

Further examination by Mr. Heenan          68


CERTIFICATE OF DEPONENT                     70

CERTIFICATE OF COURT REPORTER
    AND NOTARY PUBLIC                       71

--------


DEPOSITION EXHIBITS MARKED:

| No. | Description | Page No. |
|---|---|---|
| 6 | Collection-Master sample screens | 21 |
| 7 | File regarding Chase Manhattan Bank vs. Tim McCollough | 23 |
| 8 | Affidavit of Sale | 29 |
| 9 | October 29, 2007 letter to Tim McCollough from Grace Lauinger, with enclosures | 53 |
| 10 | August 6, 2007 e-mail to Grace Lauinger from Bob Dunker | 53 |

--------

4

(Pursuant to Notice to Take the Videotaped Deposition of GRACE LAUINGER, in the above-entitled cause, the following examination came on for taking before Linda L. Gingery, a Registered Professional Reporter and a Notary Public in and for the State of North Dakota, at 216 North Second Street, in the City of Bismarck, County of Burleigh, State of North Dakota, on the 22nd day of July, 2008, commencing at 9:13 a.m., counsel appearing on behalf of the respective parties as hereinbefore indicated:)

--------

(The following proceedings were had and made of record:)

MR. EMINETH:   This is the videotaped deposition of Grace Lauinger being taken by the plaintiffs in the matter of June Tift and Timothy McCollough, plaintiffs, versus Johnson, Rodenburg and Lauinger, defendants, Cause No. CV-07-166 in Montana Thirteenth Judicial District Court, Yellowstone County.

The deposition is being held at 216 North Second Street in Bismarck, North Dakota, on Tuesday, July 22nd, 2008, commencing at the time indicated on the video screen, being 9:13 a.m.

My name is Al Emineth of the firm of

5

Emineth & Associates, located at 216 North Second Street in Bismarck, North Dakota 58501, and I'm the videographer. The court reporter and notary public is Linda Gingery, also of the firm of Emineth & Associates, located at the same address.

Will counsel please state their appearances?

MR. HEENAN: John Heenan, on behalf of the plaintiffs.

MR. SIMPSON: Fred Simpson, representing the defendant, Johnson, Rodenburg & Lauinger. And, just for the record, I wanted to note that this is actually in the U.S. District Court for the District of Montana, Billings Division.

MR. HEENAN: Thank you.

MR. EMINETH: The witness will now be sworn.

GRACE LAUINGER,

having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. HEENAN:

Q. Ma'am, could you please state your name and business address for the record?

A. Grace Lauinger, 1004 East Central Avenue,

6

Bismarck, North Dakota.

Q.   And how are you employed?

A.   I am an account manager.

Q.   Where?

A.   At Johnson, Rodenburg & Lauinger.

Q.   Can you describe for me, please, what an account manager is?

A.   Account manager is assigned a certain account, group of accounts, and they manage the accounts from the beginning to the end, from when we receive them in our office until we no longer have them in our office.

Q.   What type of accounts?

A.   Collection accounts.

Q.   And what do you mean by --

A.   Creditor accounts.

Q.   Okay.  What is Johnson, Rodenburg in the business of?

A.   It's a creditor's attorney.

Q.   Is it also a debt collector?

A.   Correct.

Q.   Is part of your job as an account manager overseeing support staff in the office at Johnson, Rodenburg?

A.   No.

7

Q.    So you don't have any supervisory role at Johnson, Rodenburg?

A.    No.

Q.    Okay.  Johnson, Rodenburg, as I understand it, has two offices in North Dakota?

A.    Yes.

Q.    And one is here in Bismarck and the other one is in Fargo?

A.    Yes.

Q.    Can you explain to me the reason for that?

A.    I don't know.

Q.    As I understand it, your daughter is an attorney at the Johnson, Rodenburg firm?

A.    Yes.

Q.    And she's here with us this morning?

A.    Yes.

Q.    And her name is Lisa Lauinger?

A.    Yes.

Q.    Are you related to anyone else that works at the Johnson, Rodenburg law firm?

A.    Yes, I guess.

Q.    And who is that?

A.    My husband.

Q.    Okay.  Who is your husband?

A.    Baldwin Lauinger.

8

Q.    And what is Mr. Lauinger's role at Johnson, Rodenburg & Lauinger?

A.    It varies.  I mean, he will come in and help with the mail or he'll clean the office or, you know, various jobs.

Q.    So he doesn't have a formal title?

A.    No.

Q.    He's not an attorney?

A.    No.

Q.    Would you describe for me, please, ma'am, briefly, your educational background and employment background?

A.    I have an associate of arts degree in business, and I was in banking for 26 years.

Q.    And what bank did you work at?

A.    Several.  The first one was Metropolitan Federal, which was sold to U.S. Bank.  I worked there, and then I went to Starion, which -- Starion.

Q.    And when did you join the Johnson, Rodenburg firm?

A.    Six years ago.

Q.    How did it come to be that you joined the Johnson, Rodenburg firm?

A.    I was looking for something different and I was asked by my daughter to join the firm.

9

Q.    Okay.    So your daughter was already there as an attorney?

A.    Correct.    Mm-hmm.

Q.    You've been disclosed as a witness in this case by Johnson, Rodenburg and it's been represented that you were involved with the firm's client, CACV, in gathering and verifying information regarding Mr. McCollough's debt.    Are you aware of that?

A.    Yes.    Mm-hmm.

Q.    Can you explain for me what your understanding is of what that means?    I'm not trying to trip you up or anything.    I'm just asking you kind of open-ended, can you explain what your role was in gathering and verifying information.

A.    If I was asked to obtain documentation from our client, I would contact them, if we already didn't have documents on file, and I would ask them for the documentation that whatever party in our office was asking me to look for.    We contact our client and ask them for it.    And then I would provide that information to whoever asked me to obtain it for them, or if I was seeking it myself, I would ask for the information I'm seeking and view it myself.

Q.    Is part of your role as an account manager

10

to be the liaison or go-between with the various clients?

A.     Correct.  With my various clients, correct.

Q.     Okay.  Let's talk about that for a minute. As I understand it, Johnson, Rodenburg represents several large debt buyers; is that fair?

A.     Yes, I believe that's correct.

Q.     And the ones that I'm aware of or the bigger ones, Portfolio Recovery Associates, CACV, Unifund CCR, are those kind of the three big ones?

A.     I don't know.  I don't know the numbers.

Q.     Okay.  Who are the big clients that you deal with as a liaison?

A.     My big client is Collect America.

Q.     Okay.  Otherwise known as CACV?

A.     Mm-hmm.

Q.     And Collect America is one that you're kind of the contact person for?

A.     I'm the liaison.

Q.     How about Portfolio Recovery Associates?

A.     Yes, I'm the liaison.

Q.     How about Unifund CCR?

A.     No, I'm not.

Q.     Who is the contact person within Johnson,

11

Rodenburg primarily for Unifund CCR?

A. I don't know.

Q. But not you?

A. Right.

Q. How about Citibank South Dakota?

A. I am not.

Q. And, again, do you know who within Johnson, Rodenburg would be the contact person?

A. Yes.

Q. Who is that?

A. Sharon Meier.

Q. And what's Ms. Meier's role at Johnson, Rodenburg?

A. Account manager.

Q. How many account managers are there at Johnson, Rodenburg?

A. Four.

Q. So we've got yourself, Ms. Meier. Who else?

A. Violet Heim.

Q. H-y-m-e?

A. I think it's H-e-i-m. I think.

Q. Does Ms. Heim work in the Bismarck office?

A. Yes.

Q. And who are her primary clients that she

12

deals with?

A.    I don't know.

Q.    Okay.    Who is the fourth account manager?

A.    Stacy.

Q.    What's Stacy's last name?

A.    I don't know.    She is a new employee.

Q.    How long has Stacy been at Johnson, Rodenburg?

A.    I don't know.

Q.    Within the last year?

A.    Correct.

Q.    Who do you report to at Johnson, Rodenburg?

A.    In respect to what?

Q.    Do you have a boss or supervisor?

A.    Well, Lisa Lauinger would be probably the main contact, but we also report to the other attorneys, as well.

Q.    And who are the other attorneys?

A.    Charles Dendy.    Jessica Knutson.    And Joel Boon.    Boon, I think it is.

Q.    Is Jessica Knutson licensed to practice law in Montana?

A.    No.

Q.    Where is she licensed to practice law?

13

A.    North Dakota, and I'm not sure of any other states at this time.

Q.    Johnson, Rodenburg collects debts not just in North Dakota, but also Montana; right?

A.    Correct.

Q.    Any other states?

A.    South Dakota, Minnesota.

Q.    Which of the attorneys are licensed to practice law in South Dakota?

A.    Lisa Lauinger.

Q.    Anyone else?

A.    Not that I'm aware of.

Q.    And then how about Minnesota?

A.    Lisa Lauinger and Joel Boon.

Q.    So we talked about CACV being one of the clients that you're primarily responsible for.  What other clients are you primarily responsible for?

A.    Portfolio Recovery.

Q.    Who is your contact person at Portfolio Recovery?

MR. SIMPSON:  I'm not sure that this is at all relevant here, John.  What's the -- I guess what's the -- Portfolio is not part of this case.

MR. HEENAN:  Are you going to tell her not to answer?

14

MR. SIMPSON:  Well, I'm considering it, I guess.  How much more are you going to do on those?

MR. HEENAN:  Not much more.

MR. SIMPSON:  You can answer that one.

THE WITNESS:  Actually, I don't know, because I just received a new contact and I don't know her name.  I'd have it on my computer, but I don't know her name offhand.

Q.   (MR. HEENAN CONTINUING)  Okay.  What other clients are you primarily responsible for?

A.   I have many probably smaller ones.  I wouldn't have that information here.  I could provide that after I go to my office and look.

Q.   But the ones, as we sit here today, that you can think of, the only two are Collect America and Portfolio Recovery?

A.   At this time, right.  I mean, I have other smaller clients, but I don't know their names at this time.

Q.   How many collection accounts does CACV refer to the Johnson, Rodenburg firm?

A.   I don't know.

Q.   Many?

A.   I don't know.  I'm not involved in that process.

15

Q.    Okay.    Well, explain to me when exactly you become involved in the process.

A.    I become involved in the process when the demand letter is printed for me to sign and at that point I become involved in the process.    I'm not given a number of accounts that are coming to me.    I don't know how many are referred to me each time.

Q.    So who prints demand letters for you to sign?

A.    I believe Sharon Meier.

Q.    How come Ms. Meier doesn't sign the demand letters herself?

A.    Because they're my accounts.

Q.    How do you know -- well, explain to me how do you know -- or how are you assigned accounts?

A.    I am assigned the accounts of Collect America, Portfolio and my other account -- clients. However, the process prior to me getting the accounts involves probably several people.

Q.    So I guess like in a typical law firm someone gets handed a file and that's how you know you're responsible for that file.

A.    Mm-hmm.

Q.    Is it the same?

A.    I'm given the demands and they're printed

16

for my clients for me and that's when I know the accounts at that point.

Q.    So Ms. Meier is responsible for the accounts up until the point where she prepares a demand letter for you to sign and at that point you become responsible?

A.    No.  No.  There's a process that is followed.  I'm not real familiar with it.  I wouldn't be able to answer any questions in regards to it, but I do know that she prints the demand for me, and at that point I know that these are the accounts that have come from Collect America.

Q.    Explain to me, as best you can, what that process is.

A.    I don't know.

Q.    Who knows?

A.    Probably Lisa Lauinger.

Q.    What is the protocol for reviewing a file before sending off a demand letter?

A.    I'm not sure I understand your question.

Q.    Sure.  What, if anything, do you do before you sign the demand letters that Ms. Meier puts in front of you?

A.    I sign the demand and then we review the account to see if there's anything unusual about it

17

or if it's something that needs attention, but there is also a diary report that's generated sometime later, at which point we also look at that account.

Q.    How about prior to sending off the demand letter?

A.    It's reviewed by several people.

Q.    Attorneys?

A.    Correct.

Q.    An attorney always reviews the file before --

A.    Not attorneys.  Lisa Lauinger would review the file and it would also be reviewed by -- again, I'm not real sure of how this all takes place so I can't really answer your question, I guess.  It starts with Lisa and there are several other people probably involved in the process.  I'm not involved in that.

Q.    With respect to specifically the CACV accounts, who determines whether to send a demand letter in the first place?

A.    I don't know.

Q.    You're not involved in that process at all?

A.    Again, there are several people involved in the process.  It goes through several people

18

before it even reaches my desk, so there would be several people that would be involved in that process.

Q. Okay. Explain to me who those people are and what their --

A. I don't know. I'm not involved in that process.

Q. So you don't have any idea prior to --

A. I know that it comes through however to somebody's desk and it's reviewed at that time and then it goes through several people before it comes to my desk, at which point I review it.

Q. Okay. So let me break that down. Who are the people that it goes to?

A. I don't know. It probably starts with Lisa.

Q. How do you know that there's more than Lisa?

A. Because I just hear that so-and-so may have done this or so-and-so may have done that. I'm not involved with that process. That isn't part of my job. So I'm not involved with that process in the office.

Q. I understand, but how do you know that there's more than just your daughter, Lisa Lauinger,

19

involved in the process?

A. Well, because Sharon prints the demands for me. She tells me she prints the demands. What she does, I have no idea. I believe that Desirae at some point is involved in it, but I don't know.

Q. Who is Desirae?

A. An employee of Johnson, Rodenburg & Lauinger.

Q. What's her last name?

A. That just changed. It was Lien, and it might be Zaste. I'm not sure of the correct -- her correct married name.

Q. What's her role at Johnson, Rodenburg?

A. I don't know her title.

Q. What's Desirae's role in the process, to the best of your understanding?

A. I don't know. I can't answer that. I don't know.

Q. What's Lisa Lauinger's role in the process, to the best of your understanding?

A. To the best of my understanding, Lisa is probably the first person that would receive that file.

Q. So Lisa is the one that receives the file directly from the client?

20

A.    I believe so.

Q.    The second part of your answer there said once those letters get to you, you review them.

A.    Mm-hmm.

Q.    Describe for me what you mean by that, please.

A.    There are several things.  I'll look at the file for any problems or -- I guess I'm not sure what you're looking for.

Q.    Well, I'm just wondering what it is that you do to review the file.

A.    Well, the file is set up on our computer so at that point we would be able to review our computer.

Q.    And if you could explain that a little bit more to me.

A.    Well, many times -- it's set up on our computer and you'll look right there if -- I mean, there might be nothing else in the paperless file, but if there was a problem, you would look in the paperless file.

Q.    What problems could there be?

A.    Well, we look to see if the statute of limitations has expired.  We look to see if the debtor resides in our states that we represent.

21

Q.    Any other problems that you would be looking for?

A.    Probably not.

Q.    What specifically do you look at within the paperless file to make sure that the statute of limitations hasn't expired?

A.    That is automatically generated into our file.  By the time I receive it, it's in the file.

Q.    And what specifically is automatically generated into the file?

A.    I don't know.  I'm not involved in that process.

Q.    Who is?

A.    I don't know.

(Deposition Exhibit 6 was marked for identification.)

Q.    (MR. HEENAN CONTINUING)  I'm going to hand you what's been marked as Deposition Exhibit 6. Does Johnson, Rodenburg use a particular type of software for the collection of debts?

A.    Yes.

Q.    And are you aware of what it's called?

A.    Collection-Master.

Q.    And describe for the jury, if you would, what Collection-Master is, please.

22

A.   It's a software program we use for the collection of debt.

Q.   And as I understand it from your prior testimony, it's all paperless?

A.   Collection-Master?

Q.   Correct.

A.   Yes.

Q.   And Johnson, Rodenburg uses Collection-Master to maintain paperless files on the accounts that it collects?

A.   Correct.

Q.   So when we were just discussing statute of limitations and you talked about the review you perform on the computer, is it fair that there's a screen within the Collection-Master software where the date of the debt is listed?  Like, for instance, on page 2 of Deposition Exhibit 6, which I'll represent to you is just a sample of the Collection-Master software that I took from the Web site, it looks like there's a box for date of debt. Is that similar to the screens you look at on the accounts you're working on?

A.   No.  I mean, this is one screen, but that's not where I look.  I look at -- that isn't where I would look.

23

Q.    Okay.   Where would you look?

A.    I'd look at a screen that downloads the date of the last payment and from that I'd look at a screen that verifies from that point the statute of limitations.

Q.    So the Collection-Master software has a program built into it to tell you when the statute of limitations would expire?

A.    I don't know how that process works.   I just know we base it on the date of the last payment received, that information provided to us.

Q.    What information specifically is provided to Johnson, Rodenburg by the client?

A.    I'm not involved in that process.

(Deposition Exhibit 7 was marked for identification.)

Q.    (MR. HEENAN CONTINUING)   I'm going to hand you what's been marked as Deposition Exhibit 7, which is, as I understand it, the paperless file with respect to my client Mr. McCollough's debt.

A.    Mm-hmm.

Q.    So is the information that you're talking about with respect to what you would look at to make sure that the statute of limitations wasn't up on there?

24

A.    Correct.

Q.    And can you show me where --

A.    Well, it wouldn't be on here.  It's on another screen on the main part.  It's not in the paperless.  It's on another screen.

Q.    Where does the information with respect to those dates come from?

A.    Our clients.

Q.    How is it transmitted from your clients to Johnson, Rodenburg?

A.    I don't know.  I'm not involved in that process.

Q.    Beyond looking at a screen on the Collection-Master software, do you do anything else to make sure that the statute of limitations hasn't expired?

A.    We look at the last payment date provided by our clients and we compare it to the date that's put in on the statute of limitations place and that's what we do.

Q.    Do you look at any actual documents?

A.    It depends.  It depends on the situation.

Q.    How often do you look -- how often does the client actually provide documents to Johnson, Rodenburg on the accounts that it collects?

25

A.    I don't know.

Q.    Is it often?

A.    I don't know.

Q.    If the client did provide documents, where would they be stored within the Collection-Master software?

A.    If we were provided documents, they would be scanned into the paperless.

Q.    Okay.  And if they were scanned into the paperless, would you review them prior to sending the demand letter?

A.    Sometimes.

Q.    Is there any protocol at Johnson, Rodenburg with respect to whether documents should be reviewed or not?

A.    I'm not sure I understand your question, because every situation is different.

Q.    Sure.  Is there any established protocol for every single instance where account managers are told to review documents prior to sending demand letters?

A.    Again, every situation is different and I can't say yes or no to a specific situation.

Q.    Well, let me address it this way.  Have you ever been provided a handbook by Johnson,

26

Rodenburg that covers that circumstance?

A.    We are trained.  We receive training, periodic training.

Q.    And what does that training consist of?

A.    In-house training, video training from other sources.

Q.    What type of video training?

A.    I don't have that here at this point.  It would be at the office.

Q.    Like you watch videos?

A.    It's from a training group that provides training, correct.  Sometimes it's by phone, training with our computers, and I don't know where they go to get that, but we are provided training.

Q.    In this case Johnson, Rodenburg has filed a document in court where they say that they accept files from creditor clients and based upon case specific information provided by creditor clients institute litigation in many cases in an effort to collect unpaid debts.

Is that kind of what you're talking about, the case-by-case circumstance?

A.    Repeat that question.

Q.    Sure.  Johnson, Rodenburg accepts files from creditor clients and based upon case specific

27

information provided by its creditor clients institutes litigation?

A.   Correct.

Q.   Can you describe for me with respect to CACV what case specific information is generally provided by the client?

A.   Well, there again, I believe that -- I believe that is downloaded through the computer, but I'm not involved in that process.

Q.   Okay.

A.   So I have no idea at that point.

Q.   Kind of CACV's computer and Johnson, Rodenburg's computer hook up and somehow the information is transferred?

A.   I'm not the person that would be able to answer that for you.

Q.   Who is the person that would be able to answer that?

A.   Lisa may, but I don't know.

Q.   Let's go through this Exhibit 7 together, please.  Up at the top there is the open date, which would be November 1st of 1994?

A.   Correct.

Q.   So what's that mean?

A.   That information to me would be

28

information that our client had given to me that states this account was open November 1st of 1994.

Q.   And then purchase date?

A.   That would be the date our client -- to the best of my knowledge, that our client purchased this debt, October 17th, 2002.

Q.   Because your client is not the original creditor?

A.   Correct.

Q.   Meaning that Mr. McCollough never used a credit card from Collect America or had any kind of business dealings with Collect America, to your understanding?

MR. SIMPSON:  Objection.  Foundation.

Q.   (MR. HEENAN CONTINUING)  You can answer, if you can, ma'am.

A.   I don't know that information.

Q.   What's the purchase date?

A.   Up here?

Q.   Yeah.

A.   October 17th, 2002.

Q.   And then how about COMM, what's that stand for?

A.   I don't know.

Q.   That 1.03, what's that mean?

29

A.    I don't know.

Q.    With respect to documents that are provided by the original creditor, in this case Collect America, does Collect America provide Johnson, Rodenburg with documents that would actually show that they did purchase the account?

A.    Yes.

Q.    And what would those documents be?

A.    An affidavit of sale.

Q.    So the affidavit of sale comes along with the file?

A.    No.

Q.    When does the affidavit of sale come?

A.    I don't know.

(Deposition Exhibit 8 was marked for identification.)

Q.    (MR. HEENAN CONTINUING)  I'm going to hand you what's been marked as Deposition Exhibit 8.  Is that the affidavit of sale that you're describing?

A.    Correct.

Q.    Is this document, was this part of the documents that were provided by Collect America to Johnson, Rodenburg?

A.    I would not be able to answer that based on this copy.  I would only be able to answer it if

30

I were able to look on my computer and compare it to what I received on my computer that was scanned in.

Q. I'll represent to you that this document that's been marked as Exhibit 8 has been provided to us from Johnson, Rodenburg. Do you know where this document came from?

A. It's showing scanned in on, I believe, appears to be what was scanned in on September 21st, 2007, and that would have been provided by our client.

Q. Who would have actually received this document at Johnson, Rodenburg?

A. The mail people.

Q. Who would have requested it?

A. No one particularly. They automatically send them out.

Q. Do you know what the process is at all for how the client obtains these affidavits?

A. I don't.

Q. The demand letters that you send out, what's the most demand letters that you've ever sent out in a day?

A. I don't know.

Q. More than ten?

A. In a day?

31

Q.    Yeah.

A.    Any given day?

Q.    The most in a day.

A.    More than ten.

Q.    More than 100?

A.    Not every day.

Q.    I understand.

A.    Okay.  I don't know.  I don't know the numbers.

Q.    Is a large part of your job sending out demand letters?

A.    No.

Q.    Are the demand letters a form?

A.    Form letter?

Q.    Correct.

A.    Yes.

Q.    Are the demand letters reviewed by an attorney before sending out?

A.    I don't know.

Q.    After you sign them, where do they go?

A.    To be mailed.

Q.    Who mails them?

A.    A mail person.

Q.    Who is the mail person?

A.    Right now it's Stephanie.

32

Q.   Okay.   I want to keep going on Exhibit 7. Because most of this doesn't make much sense to me and so I guess I'll just kind of ask you to walk me through it and explain what the various codes mean.

As part of this Collection-Master and the paperless file, are codes employed by the employees at Johnson, Rodenburg?

A.   I'm not -- I'm not sure I understand what you're asking.

Q.   Okay.   And I should tell you from the outset, if there's any questions that you don't understand, do like you just did and stop me and make me ask it in a way that you do understand.

Like along the side here, these initials EDI, KH, LL, GEL, do those stand for something?

A.   EDI would mean that it came -- I'm thinking that it would mean that it came across or were notes that were put in by our client.   KH, I have no idea who that is.

Q.   Let me just -- what does EDI stand for, if you know?

A.   External data information.   I don't know.

Q.   Okay.

A.   I'm not sure.

Q.   Okay.   I'm sorry.   And then KH?

33

A.    I don't know.

Q.    So it looks like KH is the one that added the new information?

A.    It appears that way.

Q.    But we don't know who KH is?

A.    Correct.

Q.    And then how about LL?

A.    Lisa Lauinger.

Q.    Okay.  So what is Lisa Lauinger's role at this point within the timeline?

A.    I don't know.  I don't know.

Q.    And GEL?

A.    That's me.

Q.    And what did you do on January 4th of 2007?

A.    January 4th of 2007, I wrote a letter to our client.

Q.    Stating what?

A.    I don't have it in front of me.  At this point I'm not sure exactly what I said.

Q.    January 5th of 2007, what's LDL?  See where I'm looking on page 2 there, at the top?

A.    Oh, Lisa Lauinger.

Q.    So is she LL and LDL?

A.    Correct.

34

Q.    Okay.    And it looks like she entered a note that said, "This is the Collect America batch that we are having problems with"?

A.    Correct.

Q.    What did she mean by that?

A.    I don't know.

Q.    What's your understanding of a batch of these Collect America accounts that had problems?

A.    I don't know.    You need to ask her.

Q.    You don't have any understanding whatsoever of problems with Collect America accounts?

A.    Well, reading this, I would assume that there was some information that maybe wasn't correct, but I don't know that.

Q.    Okay.    So like page 3 at the top, legal demand letter, do you see where I'm looking there?

A.    Mm-hmm.

Q.    Is that the legal demand letter that you would have signed?

A.    Correct.

Q.    Okay.    Once you sign a legal demand letter, what happens from there, generally?

A.    The demand is mailed.

Q.    Okay.    And what if the defendant doesn't

respond, what's the next step?

A.    We would proceed however our client asks us to proceed.

Q.    And how did your client ask you to proceed in the McCollough matter?

A.    They asked us to proceed with suit.

Q.    And where is that noted in these notes?

A.    It isn't noted in these notes.

Q.    Why not?

A.    Because our client sends us e-mails or -- well, maybe I should take -- how I know to file suit is our client will give us -- will e-mail us with how they want us to handle accounts, you know, maybe from January 1st to this date and file suit on all the files that you receive from us.  So our client provides us with the information on how we should proceed on our accounts.

Q.    So is it fair to say the direction from the client isn't on a case-by-case basis, but more on a time frame or batch of cases basis?

A.    No --

Q.    Does that make sense to you?

A.    -- that isn't fair to say that, because some situations may -- they may ask us not to proceed with suit, but, generally speaking, they do

36

provide us with a general overall sense of how we should proceed.

Q. So like specifically with Mr. McCollough, was there a conversation back and forth with CACV about we want to sue him, or was it just your understanding that CACV wanted to sue anyone that didn't respond to the demand?

A. I don't know in this case. I don't know.

Q. Okay. How about at the present moment, what's your understanding of CACV's direction to Johnson, Rodenburg with respect to filing lawsuits?

MR. SIMPSON: I'll object that it calls for attorney-client privileged information, and direct the witness not to respond.

Q. (MR. HEENAN CONTINUING) See this 4-17, 2007, who's MBE?

A. Marian Emter.

Q. And who is Marian Emter?

A. She works in the office.

Q. Is she an attorney?

A. No.

Q. Who drafted the summons and complaint in this case? See up there on April 3rd of 2007 where it says summons and complaint? Who is NK?

A. Nori.

37

Q.    What is Nori's last name?

A.    I don't know.

Q.    Is she an attorney?

A.    No.

Q.    What's XSC stand for?

A.    It's an X code we use to indicate that we are proceeding with suit.

Q.    What's an X code?

A.    It's a code that allows our client -- some of our clients -- well, all of our clients, you know, on our response to them, our report to them to -- that will generate to them that we are starting suit on this file, that the summons and complaint has been started.

Q.    So an X command sends information to the client electronically?

A.    Some clients.

Q.    Collect America?

A.    I don't know with them.

Q.    Are the summons and complaints that Johnson, Rodenburg -- well, let me ask it specifically.  I'm going to show you what's previously been marked as Deposition Exhibit 2, which is the complaint that was filed against Mr. McCollough in the Montana District Court.

38

Is that complaint a form that's generated through the Collection-Master software?

A.    I believe so.

Q.    Who -- who would have, in this instance, inputted the various information on the McCollough complaint?

A.    Marian Emter.

Q.    What are Mr. Dendy's initials in the Collection-Master software?

A.    CD.

Q.    So the complaint was filed on April 17th and then April 23rd this EDI -- which, again, EDI is external data that is coming from the client?

A.    EDI is some of the notes that they place in the paperless that we can see.  I don't believe we can see all of their notes.

Q.    But EDI is not a person within Johnson, Rodenburg?

A.    No.  No.

Q.    It's information that comes from Collect America?

A.    Yes.

Q.    And what they're doing there is approving the costs for filing a lawsuit; is that your understanding?

39

A.   I don't know.

Q.   Okay.  The next page looks like Mr. McCollough filed an answer and you reviewed the answer that he filed; is that true?

A.   Yes.

Q.   And what did Mr. McCollough advise in his answer?

A.   I don't have the answer before me, but according to my notes, I indicated that he said that the statute of limitations is up and he hasn't had any dealings with any credit card in over eight and a half years.

Q.   And what did you do with that information?

A.   I gave it to our attorney.

Q.   And who specifically?

A.   Charles Dendy.

Q.   How did you give it to Mr. Dendy?

A.   Put it in his in box.

Q.   Physical paper in box?

A.   Correct.

Q.   And did Mr. Dendy ever comment on it?

A.   I don't know.

Q.   Not to you?

A.   I don't know.  I don't remember.

Q.   You don't remember any conversations with

40

Mr. Dendy?

A.    I don't remember.

Q.    Page 5 of that exhibit, July 23rd, 2007, that's you again, GEL; correct?  See where I'm looking, ma'am?

A.    Yes.  Mm-hmm.

Q.    And it looks like you wrote, "not responding as set for Levi to do discovery"?

A.    Yes.  I was saying I'm not responding, That the attorney is handling it, the attorney and paralegal.

Q.    Okay.  Who is Levi?

A.    I believe he's a paralegal.

Q.    At the Johnson, Rodenburg firm?

A.    Mm-hmm.

Q.    What's Levi's last name?

A.    I don't know.  It slipped my mind.

Q.    Who is LF?

A.    Where do you see that?

Q.    Page 6, November 13th of --

A.    That would be Levi, Levi French.

Q.    Okay.  So that helps you remember what Levi's --

A.    Mm-hmm.

Q.    French?

41

A.    Yes.

Q.    Does Johnson, Rodenburg ever send subpoenas to the original creditor?

A.    I don't know.

Q.    Does Johnson, Rodenburg ever review a potential defendant's credit report before filing a lawsuit against them?

A.    I don't know.

Q.    Do you, personally, ever review a potential defendant's credit report?

A.    No.

Q.    Are you responsible at all for obtaining documents from the client?

A.    Yes.

Q.    Can you explain to me with respect to CACV how you are able to obtain documents from the client?

A.    I e-mail them for documentation and they would forward them to us by mail or by scanned-in copy through e-mail.

Q.    When would you request documentation?

A.    When I'm asked to request it.

Q.    By who?

A.    The attorney or if the debtor is requesting documentation, and it depends at what

42

point I'm at with the file, I would provide it to them.  It just depends.

Q.  And what documentation do you request from the client?

A.  Any available documentation.

Q.  Which for our jury would mean what?

A.  Could mean a signed application.  It could mean statements.  It could mean the -- the agreement.

Q.  The actual credit card agreement?

A.  Correct.

Q.  Does Johnson, Rodenburg use forms for default judgments that it enters when defendants don't appear?

A.  I'm not involved in that process.

Q.  Okay.  So after -- explain to me, after the demand letter is sent out, what exactly is your involvement in the process?  We talked about gathering documents.

A.  It really varies.  It really varies on each account.  On this particular account, looked at the demand and sent our client a letter.  Summons and complaint was sent out.  After we received the summons and complaint back from the sheriff, I reviewed that.  And then at that point it appears

43

there was an answer so it was given to our attorney for his review.

Q. So after the answer was filed, it got turned over to the attorney?

A. The attorney is also involved in reviewing the summons and complaint. Once it's prepared, I don't see that summons and complaint.

Q. What do you mean by that?

A. The file is diaried for suit. The summons and complaint is prepared. The attorney is given the summons and complaint for review.

Q. How is the attorney given the summons and complaint for review?

A. It's handed to him.

Q. Physical summons and complaint?

A. Mm-hmm.

Q. Okay.

MR. SIMPSON: Is that a yes?

THE WITNESS: Yes. Sorry.

Q. (MR. HEENAN CONTINUING) If Mr. McCollough hadn't filed an answer to this lawsuit, what would your involvement have been?

MR. SIMPSON: Objection. Calls for speculation. You can answer, if you --

THE WITNESS: I don't know.

44

Q.    (MR. HEENAN CONTINUING)    Because it varies so much?

A.    Yes.    Each situation is different.    Each situation is separate.

Q.    And so there's no overarching protocol or procedures in place that would provide uniformity in responding to these different situations?

A.    It depends on the client.    It depends on the situation.    Some cases yes and some cases no.

Q.    Well, let's talk about what's kind of the normal case.    What's the normal case for Johnson, Rodenburg?

MR. SIMPSON:    Objection.    Ambiguous.

THE WITNESS:    Am I to answer to that?

MR. SIMPSON:    If you know what a normal case is, sure.

THE WITNESS:    I can't even begin to speculate, because every situation is different.    I don't know.    I don't know.    I mean, I'm not -- I'm not even certain what you're looking for.

Q.    (MR. HEENAN CONTINUING)    Okay.    Well, let me begin with this premise.    Would you agree with me that almost all of the lawsuits that Johnson, Rodenburg files result in default judgments?

A.    I don't know.

45

Q.    Why not?

A.    Because I'm not involved in the other clients.  I don't know how many files we have.  I don't know how many default judgments go through.  I don't know how many are not.  I don't know.  I'm not the person that keeps track of all of these things within the law firm.

Q.    Who is that person?

A.    I don't know.  I don't know if anybody is.

Q.    So there's no one person within Johnson, Rodenburg that keeps track of the various cases and how they are resolved?

MR. SIMPSON:  Objection.  I think that mischaracterizes her testimony.

Q.    (MR. HEENAN CONTINUING)  Are you aware of anyone?

A.    That keeps numbers?

Q.    Or just keeps charge of all the cases that are filed.

A.    Each collector is given their clients and they're responsible for those clients to follow the file through.

Q.    Okay.  So who is each collector?

A.    The names that were given to you before; Sharon, Violet, Stacy, and myself.

46

Q.    Okay.  So is account manager synonymous with collector within Johnson, Rodenburg?

A.    We are the account managers.

Q.    And the account managers or collectors are assigned different accounts and you oversee it through the litigation?

A.    We oversee the account, but we aren't necessarily involved in every step of the account.

Q.    How many accounts does each account manager handle at a time?

A.    I don't know.

Q.    How many accounts do you have right now?

A.    I don't know.

Q.    Why not?

A.    Because that information isn't important to my job.

Q.    Why isn't it important to your job?

A.    It has no bearing on my job.  It doesn't have anything to do with my job.  I am given the accounts which my clients forward to me and those accounts I handle.

Q.    How do you know which accounts you are even responsible for if --

A.    Because they are -- because we are given our clients.  The diary codes are put in when the

47

demand is set up and we are responsible to monitor that account through the entire process.

Q.    How are you able to monitor the account?

A.    Through diary codes.

Q.    Explain what diary codes are, please.

A.    Diary codes are -- I don't know how to explain it to you.  I have no idea how to explain it to you.  I don't know.

Q.    Well, your testimony, as I understand it, is the diary codes is how you manage your accounts?

A.    Correct.

Q.    But you're unable to explain to me --

A.    Well, they're put in the computer and they come out on a report for us to review the file on a daily basis.

Q.    So reports are generated on a daily basis for all of your accounts?

A.    Correct.  On the ones that we need to handle that day.

Q.    How do you know whether you need to handle an account that day?

A.    Because it's generated on a diary report.

Q.    How is it generated on a diary report?

A.    Through our computer system.

Q.    So the computer system tells you what

48

accounts you need to handle that day?

A.    We manually put those diary codes in, according to what needs to be done on that account that day, on a specific day.

Q.    So you manually input data and then a report is generated --

A.    Mm-hmm.

Q.    -- every day that tells you what accounts need to be handled that day?

A.    Correct.

Q.    So in terms of if the computer didn't tell you, you don't have any independent awareness of what needs to be done on a particular account on a particular day?

A.    That's not true.

Q.    Why not?

A.    Because I may have a file that I need to keep track of, that I'll track myself.  However, that's me.  I can't speak for the other collectors.

Q.    There's no protocol or written policy in place at Johnson, Rodenburg that tells you which accounts you need to handle personally?

A.    Yes.  The diary report is the report that tells me what accounts need to be handled personally.

49

Q.    And I still don't understand, and I apologize.  How does the diary report tell you which accounts need to be handled personally?

A.    That day?  Because the accounts that need to be handled personally are the accounts of our clients.  We are given clients and those accounts are what we handle, but the diary report will tell us a specific thing that needs to be done on that day to that file.

Q.    So --

A.    And there are many diary codes.

Q.    So like when you come to the office in the morning, you print a diary report and it tells you what you need to do that day?

A.    When I come to the office, the diary report is already printed for me and, yes, it is a report that I go through and look at each file, depending on what the diary tells me to do, is what I do.

Q.    Tell me all of the things that the diary could tell you to do, that you can think of.

A.    There are many.  There are many.  My diary report will show summons and complaint that needs to be prepared.  That's handled by someone else.  It may be to check on if a judgment has been entered

50

yet.  It may tell me to review the file for assets. It may tell me to -- there's lots of diary codes.

Q.  So, for instance, like you said about the summons and complaint prepared, so if the diary report tells you that in a particular account a summons and complaint need to be prepared, you hand that -- you delegate that task to someone else?

A.  That already has been delegated to someone else and they get that diary report.  It's just for me to oversee to make sure that that account is being handled.  My diary report is there for me to see that that account is being handled in the way that we need it handled.

Q.  What's the way that you need it handled?

A.  It depends on each file.

Q.  What would it depend on?

A.  Lots of things.  Has the debtor responded to the demand?  Does he need documentation?  Have we received our documentation?  Have I ordered the documentation?  Lots of things.  Hundreds of things.

Q.  Who would delegate the task of preparing a summons and complaint?

A.  There is a person that does that in our office.

Q.  Who is that?

51

A.    Sarah.

Q.    What's Sarah's last name?

A.    I don't know.

Q.    Why not?

A.    I don't know her last name.

Q.    What's Sarah's job title?

A.    I don't know.

Q.    Do you interact with Sarah on a daily basis?

A.    Rarely.

Q.    Rarely?

A.    Mm-hmm.

Q.    It's your understanding that Sarah's job is to prepare summons and complaints?

A.    Yes.

Q.    Is she an attorney?

A.    No.

Q.    Does she prepare any other legal documents?

A.    I don't know.

Q.    How long has Sarah been at Johnson, Rodenburg?

A.    I don't know.

Q.    Longer than you or shorter than you?

A.    Shorter than I.

52

Q.    Who did Sarah's job before Sarah?

A.    I believe Marian Emter.

Q.    And what's Marian Emter's role now?

A.    Various job duties.

Q.    Is she involved in litigation?

A.    No.

Q.    Why would it be important on the diary report to get a summons and complaint prepared?

A.    Why would it be important?  Because our client has asked us to do that.

Q.    On a typical diary report, how many different accounts are you asked to do something on, on a particular day?

A.    I don't know.

Q.    Why not?

A.    Because it varies every day.

Q.    How about on the most?

A.    I don't know.  I don't add them up.

Q.    And you have no idea how many accounts you're handling right now?

A.    No.

Q.    More than a thousand?

A.    I would assume so.

Q.    More than five thousand?

A.    I don't know.

53

Q.   Why would you assume it's more than a thousand?

A.   Because I would just assume it's more than a thousand.

Q.   Are you sometimes asked as part of the diary report to do actions on more than a hundred accounts?

A.   Yes.

Q.   So it sounds like you're fairly busy?

A.   Mm-hmm.   Yes.

MR. SIMPSON:   Can we take a short break, John?

MR. HEENAN:   Sure.

MR. EMINETH:   We're off the video at 10:22 a.m.

(Deposition Exhibits 9 and 10 were marked for identification.)

MR. EMINETH:   We're back on video at 10:33 a.m.

Q.   (MR. HEENAN CONTINUING)   Ms. Lauinger, we just took a break and you had the opportunity to visit with your counsel and your daughter and, as I understand it, there's an answer that you wanted to correct?

A.   Well, I don't remember the question that

54

you asked.  You asked if I review, I believe, credit bureau reports prior to starting suit.

Q.    Mm-hmm.

A.    And I don't remember if you asked for all the clients or for this client in particular.  Some clients will require that we have assets before we actually start suit, so in those cases I would review the credit report, but on this particular client in this particular case, no.

Q.    Collect America is not one of the clients that requires an asset search?

A.    Up to this point, no.  Correct.

Q.    Okay.  When you do look at a credit report, do you review information contained on the credit report to see if there's potential statute of limitations problems?

A.    I don't believe that the credit bureau report provides that information to me.  We would rely on our client.

Q.    Well, for instance, if a credit report indicated that a person hadn't made a payment in over seven years, that would be important for you to know, wouldn't it?

A.    You need to understand our credit reports that we pull do not provide that information.  It's

55

a shorter version of the full credit report.  We do not pull the full credit report.

Q.    Okay.  So --

A.    It's just a shorter version.

Q.    Just so the record is clear, Johnson, Rodenburg doesn't pull a full credit report which would indicate all the various debt that would be on there?

A.    Right.  I would like to clarify that.  I never have.  I don't know if anyone else in the office has for any reason, but I have never pulled a full one.

Q.    That's fair.  Over the break were you able to think of what Sarah's last name is?

A.    I didn't even think about that.  She's a relatively new employee so I don't know.

Q.    Okay.  I asked you kind of a bad question about the -- a normal case.  What I was referring to or trying to ask you about -- well, let me ask you this:  An attorney in Helena, Bruce Spencer, has already been deposed in this case.  Were you aware of that?

A.    No.

Q.    Mr. Spencer does debt collection work in Montana and he testified that over 95 percent of the

56

lawsuits that he brings on behalf of his clients result in default judgments.

MR. SIMPSON:  Objection to the extent it mischaracterizes his testimony.

MR. HEENAN:  And it may.  I need to go back.

Q.    (MR. HEENAN CONTINUING)  Well, do you have any similar awareness that most of the lawsuits that Johnson, Rodenburg files result in default judgments?

A.    I don't know that information.

Q.    Is that because the Collection-Master software automatically tells you in the diary report if a person doesn't answer, that the next step is to enter a default?

A.    No, it doesn't automatically enter that. That is something that I would enter or an attorney or assistant in the office would enter what the next step needs to be done after the file is reviewed.

Q.    Okay.

A.    It doesn't automatically -- necessarily automatically get entered.

Q.    Well, for our jury, a lot of this is stuff we know, but when you file a lawsuit, the other side has 20 days to respond --

57

A.    Correct.

Q.    -- is that your understanding?

A.    Yes.

Q.    So in the accounts that you manage, when a lawsuit is filed, what's the next step?

A.    If the debtor has not responded by an answer or an appearance and if our client asks us to proceed to judgment, my next step would be to diary the account for judgment.

Q.    And then once the account is diaried for judgment, what happens?

A.    The diary report is pulled up for that day, because I diary it for the day that the judgment needs to be done.  The diary report is pulled up for the person that does the judgments.  They do the judgments on that day.  They give them to the attorney to review.

Q.    Who does the judgments?

A.    Desirae.

Q.    I'm going to hand you what's been marked as Deposition Exhibit 9.  What is Deposition Exhibit 9?

A.    It's a letter that was prepared by Charles Dendy providing verification of this debt to Tim McCollough.

58

Q.    And how do you know that it was prepared by Charles Dendy?

A.    Because it's got "CD" on the bottom.

Q.    Okay.  Why are you the one that signed this letter?

A.    Because I'm the account manager and it would --

Q.    Does Johnson, Rodenburg have a protocol for when account managers sign correspondence and when attorneys sign correspondence?

A.    It depends on the situation.  In this case I would sign the letter.  On a summons and complaint the attorney would sign it.  On a judgment the attorney would sign it.  It depends on the situation.

Q.    Other than papers that are filed in the court in litigation, are there any other documents that attorneys sign?

A.    Certainly.  Attorneys send letters out on files to other attorneys, to debtors, depending on the situation and when it needs to be given to the attorney for him to handle versus what we handle.

Q.    And what's the delineation for what the attorney handles and what the account manager handles?

59

A.    Each situation is different.  If it is something that I believe the attorney -- when I'm reviewing the file and I believe it needs to be brought to the attorney's attention, I give it to the attorney and he may handle the file until -- if we continue with judgment until the file is either -- judgment is either entered or the file is closed. He may handle that all the way through.

Q.    Is there a way in the Collection-Master software for you to know that one of your accounts has been turned over to an attorney?

A.    I would turn it over to the attorney and I would diary it to be reviewed -- for me to review to make sure that it is continuing to be handled.

Q.    Okay.  So at that point you would kind of monitor or work with the attorney to make sure that the --

A.    Correct.

Q.    -- account is being handled?

A.    Correct.

Q.    I'm going to hand you what's been marked as Deposition Exhibit 10.  You had testified earlier, ma'am, about working with Collect America to obtain documents?

A.    Mm-hmm.  Correct.  Yes.

60

Q.    And page 2, it looks like, on July 13th by e-mail you requested from Mr. Dunker a copy of the application, charge-off statement and two other statements, plus affidavit, if available?

A.    Mm-hmm.  Yes.

Q.    Who is Mr. Dunker?

A.    He was my contact at Collect America at that time.

Q.    I gather from your answer that he's no longer your contact?

A.    Correct.

Q.    Who is your contact at Collect America now?

A.    Lori.

Q.    And what's Lori's last name?

A.    I don't know.

Q.    When did Mr. Dunker cease being your contact at Collect America?

A.    I don't know.

Q.    Do you know if he's still employed?

A.    I don't know.

Q.    How did it come to be that you stopped working with Mr. Dunker and started working with Lori?

A.    I don't know.

61

Q.    You just started getting e-mails from a different person?

A.    Correct.  I was just informed that someone else was my contact.

Q.    And who informed you that?

A.    I don't know.  I don't remember.

Q.    Someone at Johnson, Rodenburg or someone --

A.    No, someone at Collect America.

Q.    Okay.  Do you normally correspond with Collect America via e-mail or phone or --

A.    E-mail.

Q.    And page 1 of Deposition Exhibit 10, Mr. Dunker advised you on August 6th of 2007 that the $75 that they were saying Mr. McCollough had paid on June 30th of 2004 was incorrect; is that true?

MR. SIMPSON:  Objection.  The document speaks for itself.

Q.    (MR. HEENAN CONTINUING)  You can answer.

A.    Rephrase your question.

Q.    Sure.  It was a bad question.  What's your understanding of what Mr. Dunker advised you on August 6th of 2007?

A.    Well, I was in question on what he had

62

referred to at the bottom of the page and so he just responded back that it was actually unused costs returned by another office, not payment from the debtor.

Q.    What did that mean to you?

A.    That meant that the $75 that he was referring to on 6-30-04, that that was unused costs.

Q.    And did that indicate to you with respect to Mr. McCollough's account that there was a statute of limitations problem?

A.    I don't remember.

Q.    Is that information that you would have relayed to the attorney, Mr. Dendy, handling the case?

A.    I don't remember.

Q.    So you are not aware whether or not you apprised Mr. Dendy of what the client had reported?

A.    I don't remember.

Q.    Is that information that would be available or would refresh your recollection if you looked at the account notes that are, I believe --

A.    Well, it was scanned.  This was scanned into the paperless, the e-mail from --

Q.    Okay.  I think I can make this --

A.    I'm not sure if this is the e-mail here,

63

but the e-mail -- this e-mail was scanned into the paperless.

Q.   So the e-mail that you received from Mr. Dunker on August 6th of 2007 was scanned in and made part of the file?

A.   Correct.

Q.   And Mr. Dendy would have had access to that information after you had scanned it in?

A.   Correct.

Q.   Going back to Deposition Exhibit 9, why did you mail this letter to Mr. McCollough?

A.   I'm under the understanding that Charles Dendy felt that it was important that we provide Mr. McCollough with documentation that we had in our file.

Q.   The documentation that was provided by you and attached to that letter --

A.   Mm-hmm.

Q.   -- where did it come from?

A.   It would have been forwarded to us by our client.  The documentation would have been forwarded to us by our client.

Q.   So Mr. Dunker provided this information to you?

A.   I don't know who did.

64

Q.    How did it get to Johnson, Rodenburg?

A.    I don't know.

Q.    It was given to Mr. Dendy?

A.    I don't know if it was e-mailed.  I don't know if it was mailed.  It would have been scanned into the file at the time we received it and at that point it would have been available for Charles Dendy and myself to view it.

Q.    Who would have scanned it into the file?

A.    I don't know.  There are several different people that would have scanned it in -- could have scanned it into the file at that time.

Q.    So you don't have any personal knowledge of who the person was that actually obtained --

A.    No, not necessarily.  I don't remember.

Q.    Do you have any personal knowledge of whether this information actually came from Collect America?

A.    Yes.

Q.    How?

A.    Because that is the only place that we obtain documentation from our clients -- client, Collect America, is through them.  We don't have access to any other site that we can find documentation from.

65

Q.    Specifically, there's a credit card agreement that's attached to that letter that you sent to Mr. McCollough.  You don't have any personal knowledge that that's his credit card agreement, do you?

A.    I don't.

Q.    Because Collect America said that they couldn't find any documents for Mr. McCollough.  Does Johnson, Rodenburg maintain credit card contracts in its office?

A.    I don't know.  I request them from our client.

Q.    So they always come from the client?  On the accounts that you manage, they always come from the client?

A.    I always request them from our client.  I don't know what anyone else does on my files.  I can't speak for anyone else.

Q.    I understand.  Maybe you answered this and I apologize.  What's your understanding for why you signed this letter and not Mr. Dendy?

A.    It was -- I just believe that he felt that it was important that the documentation be sent out at that time and since I'm the account manager, my name was put in to sign this letter.

66

Q. So is it fair to say you signed it because Mr. Dendy asked you to? I'm not trying to trip you up. I'm just trying to understand.

A. I don't know whether he asked me to, but this is something that an account manager would send out, is documentation, so, you know, if he prepared the letter just because the documentation he had in front of him, he was reviewing the documentation, he would have prepared the letter and attached it and I would have just signed it.

Q. Are you typically the one that sends out verification letters on the accounts that you manage?

A. Verification of debt?

Q. Correct.

A. Most of the time.

Q. What's your understanding of what it means to verify a debt?

A. Well, if the debtor asks for verification of a debt, that we provide them with as much documentation as we have available to us.

Q. Is there any standard that you're told from Johnson, Rodenburg as to what information to include or not include?

A. If I had a question on that, I would ask

67

the attorney and the attorney would advise me.

Q. Okay. Is there any reason why Mr. McCollough wasn't apprised of the fact that the $75 payment hadn't really been made as advised by Mr. Dunker?

MR. SIMPSON: Objection. I think that question mischaracterizes what eventually developed.

Q. (MR. HEENAN CONTINUING) Well, let me ask it this way: We just went through Deposition Exhibit 10. Mr. Dunker advised Johnson, Rodenburg on August 6th that that was actually unused costs, not payment from the debtor; right?

A. Correct.

Q. The letter that you sent to Mr. McCollough was two-and-a-half months after receiving that correspondence from Mr. Dunker; correct?

A. Correct.

MR. HEENAN: I don't have any more questions. I thank you for your time.

EXAMINATION

BY MR. SIMPSON:

Q. I just, Grace, want to ask you to take a look back at Exhibit 7, if you would, and I think there was a question asked of you by Mr. Heenan earlier about whether there was any particular

68

directive in this case to file a summons and complaint against Mr. McCollough.  And I would ask you to look at JRL, page 2.  JRL 00, page 2, and see if that refreshes your memory on that point, about halfway down the page.

A.    Yes.  On -- yes.

Q.    What information are you referring to?

A.    It shows that our client had e-mailed Lisa said, "statute of limitations not expired due to the PD check that was made to us."  Payment check that was made to us.  Please continue with suit -- or "please continue suit."

Q.    Okay.

A.    And those are notes from our client that asked us to continue with suit.

Q.    Thank you.

A.    And then also further down it also indicates that again, e-mailed Lisa, statute of limitations not expired, please continue suit.

MR. SIMPSON:  Thank you.

FURTHER EXAMINATION

BY MR. HEENAN:

Q.    Who is Lisa?

A.    Lisa Lauinger.

Q.    Who is NFA?

69

A.    I'm assuming what they're saying there at forwarding attorney.  Those are our clients' notes.

MR. HEENAN:  No further questions.

MR. SIMPSON:  We'll read and sign.

MR. EMINETH:  Okay.  This is the end of the video deposition of Grace Lauinger taken at Bismarck, North Dakota, on July 22nd, 2008.  The time is 10:54 a.m.  We're off the video.

(Concluded at 10:54 a.m., the same day.)

--------

70

CERTIFICATE OF DEPONENT

I, GRACE LAUINGER, the deponent in the foregoing deposition,

DO HEREBY CERTIFY, that I have read the foregoing and attached 69 pages, and that the same are, with changes and corrections, if any, set forth on the following correction sheets (setting forth the reason assigned for each change or correction, and duly signed by me), a full, true, accurate and correct transcript of my deposition on oral examination given at the time and place therein indicated.

Dated this __22ND__ day of __August__, 2008.



GRACE LAUINGER



71

CERTIFICATE OF COURT REPORTER AND NOTARY PUBLIC

STATE OF NORTH DAKOTA   )
                         ) ss.
COUNTY OF BURLEIGH       )

BE IT KNOWN that I, Linda L. Gingery, a Registered Professional Reporter, took the deposition herein pursuant to Notice; that I was then and there a Notary Public in and for said County and State; that I exercised the power of that office in taking said deposition; that by virtue thereof, I was then and there authorized to administer the oath; that said witness, before testifying, was duly sworn to testify the truth, the whole truth and nothing but the truth relative to the cause specified therein;

That the said deposition, having been transcribed, was subsequently submitted to the said witness, who thereupon read the said deposition and made changes or corrections, if any, as appear noted therein, along with the reason for each thereof, and that the said deposition was thereupon subscribed to by the said witness; that the examination was conducted at the time and place therein specified on behalf of the respective parties as therein indicated; that the foregoing and attached typewritten pages contain a full, true, accurate and correct transcript of my shorthand notes, as they purport to contain, then and there taken;

That I am neither attorney or counsel for, nor related to or employed by, any of the parties to the action in which said deposition is taken; and, further, that I am not a relative or employee of any attorney or counsel employed by the parties thereto or financially interested in the action.

WITNESS MY HAND AND SEAL this _3rd_ day of _October_, 2008.

_Linda L. Gingery_
Linda L. Gingery
Court Reporter and Notary Public
My commission expires: 2/19/10

LINDA L. GINGERY
Notary Public
State of North Dakota
My Commission Expires Feb. 19, 2010