Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 1 of 99

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
BILLINGS DIVISION

JUNE TIFT and TIMOTHY        )
McCOLLOUGH,                   )
                             )        **ORIGINAL**
                             )
                             )
          Plaintiffs,        )
                             )    Cause No.
    -vs-                      )    CV-07-166-BLG-RFC-CSO
                             )
JOHNSON, RODENBURG &         )
LAUINGER,                    )
                             )
          Defendant.         )
                             )


Taken at 222 North 32nd St., Suite 900
Billings, Montana
Thursday, September 4, 2008 - 10:35 a.m.


VIDEOTAPE DEPOSITION
OF

MARK "TIMOTHY" McCOLLOUGH


Reported by Diana Kern.  Transcribed from DVD by
Melody Jeffries Peters, RDR, CRR,
Jeffries Court Reporting, Inc., 1015 Mount Avenue,
Suite C, Missoula, Montana  59801,
(406) 721-1143, Freelance Court Reporter
residing in Missoula, Montana.

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 2 of 99

A P P E A R A N C E S

John C. Heenan, Esq., Heenan Law Firm, 2602 1st Avenue North, Suite 305, P.O. Box 2278, Billings, Montana   59103,

        appearing on behalf of Plaintiff Mark "Timothy" McCollough.


Fred Simpson, Jr., Esq., Bohyer, Simpson & Tranel, P.C., 283 West Front, Suite 201, P.O. Box 7729, Missoula, Montana   59807-7729,

        appearing on behalf of Defendant.

ALSO APPEARING:   Brad Tallman, video operator

I N D E X

WITNESS:                                          PAGE:

MARK "TIMOTHY" McCOLLOUGH

Examination by Mr. Simpson..................... 5


EXHIBITS:

Deposition Exhibit No. 1

    Marked for identification ................... 98

    (To be attached when provided)

Certificate of Witness ...................... 99

Certificate of Court Reporter ............... 99

Reading and signing letter .................. 101

Release letter .............................. 102

THURSDAY, SEPTEMBER 4, 2008

VIDEO OPERATOR:  Let the record show that this is the time and place designated for the videotaped deposition of Timothy McCollough in the matter of Timothy McCollough, Plaintiff, versus Johnson, Rodenburg, Lauinger, Defendants, in the U.S. District Court, District of Montana, Cause No. CV-07-166-BLG-RFC-CSO.

The date today is September 4th, 2008. The time on the video monitor is 10:35 a.m.  My name is Brad Tallman.  I'll be operating the video camera today.  The court reporter is Diana Kern.

And now I ask the counsel, please voice-identify yourself and state whom you represent.

MR. HEENAN:  John Heenan for Mr. McCollough.

MR. SIMPSON:  Fred Simpson, and I represent the Defendant Johnson, Rodenburg and Lauinger.

VIDEO OPERATOR:  Would the reporter please swear in the witness.

Thereupon,

MARK "TIMOTHY" McCOLLOUGH, a witness of lawful age, having been first duly

TIFT v. JOHNSON, et al    9/4/2008    MARK "TIMOTHY" McCOLLOUGH
Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 5 of 99

Page 5

sworn to tell the truth, the whole truth and nothing but the truth, testified upon his oath as follows:

EXAMINATION

BY MR. SIMPSON:

Q.   Please state and spell your full name.

A.   Full name, Mark Timothy McCollough, M-A-R-K, T-I-M-O-T-H-Y, M-C, capital C-O-L-L-O-U-G-H.

Q.   I understand you go by Tim; is that right?

A.   Yes.

Q.   May I call you Tim today?

A.   Feel free to.

Q.   Thank you.  Tim, we met, obviously before your deposition started, but again, for the record, I represent the Defendant in this case, which is the law firm of Johnson, Rodenburg & Lauinger.

Have you ever had your deposition taken before?

A.   No.

Q.   I imagine you've had a chance to discuss this with your counsel, Mr. Heenan, but I'd like to just cover some basic ground rules if we could.

As you can see, the court reporter is taking down verbatim everything that's being said in the room today; as well, we're being videotaped. But for purposes of the transcript that our court reporter is taking, uh-uhs and huh-uhs, responses of that nature don't show up very well. So if an answer calls for a yes or no, could you agree to try to respond in that fashion?

A. I'll try.

Q. Okay. Likewise, if I ask you a question that doesn't make sense or which you don't understand, please let me know and ask me to rephrase the question, because if you answer it, I will assume that you have understood it; is that fair?

A. That's fair. Please take into account that I'm not always fast with the answers. I had a head injury, and some days I can come up with the answer real easy, and some days it takes a little thought to remember and put it together.

Q. I appreciate you telling me that.

This is my one and only opportunity on behalf of my client to get to talk to you on kind of a one-on-one basis, so it is important that you respond as fully and completely to my questions as

you can.  Is that acceptable?

A.  I'll do my best.

Q.  Okay.  Are you currently taking any medications?

A.  Prescription?

Q.  Yes.

A.  I have a blood pressure medication I take when my blood pressure's up.

Q.  Okay.  Are you taking any other type of prescription medications?

A.  Not right now.

Q.  Have you been prescribed any type of medications that you're not taking?

A.  Not at the moment.

Q.  All right.  Who is your current primary care doctor?

A.  About the closest I've got to a permanent primary care doctor is the one who takes care of my head.  I've been looking for a regular doctor.  I haven't found one I like.

Q.  Who is the one that takes care of your head?

A.  Right at the moment, his name is Dr. Klein.  He's replaced my previous doctor, who just recently retired, left town; I'm not sure.

Q. One more thing about the -- kind of the procedure that we're going through here. This is not intended to be an endurance contest, and it's not intended to make you uncomfortable, so if you need to take a break, please let me know and we'll do that.

The only -- the only thing I'd ask is that if I've asked you a question, that you answer that first, and then we can go take a break.

A. All right.

Q. Okay. When was the last time you saw Dr. Klein?

A. I don't remember whether it was fall or -- Somewhere last year. I'm a little late in getting back to him. I've had some other emergencies come up, but -- Within a year and over six months, I think.

Q. What was the nature of the emergency you had that arose?

A. Wife got injured.

Q. I'm sorry to hear that. Is she doing better?

A. Waiting to find out.

Q. Okay.

A. She's had several surgeries, and we're

still in the healing stage to find out whether
it's going to get any better or not.

Q.   Are you helping to take care of her at
home then?

A.   Yeah.

Q.   Okay.  Before Dr. Klein, who was it that
you were treating with and you said you thought he
perhaps left town?

A.   Well, we weren't sure whether he got
sick or whether he just got burned out and -- So
we figured he left town, because no one's seen him
pretty much in a year now, year and a half.  The
name's Dr. Carlson.

Q.   I think some of the records that your
attorney provided us show that you'd seen
Dr. Carlson for a number of years.

A.   Yes.

Q.   Okay.  You don't know his present
whereabouts?

A.   No.  And the practice isn't really
willing to talk to us about him or what happened.

Q.   Okay.

A.   So it was evidently something very
private on his part.

Q.   Do you have any plan to see Dr. Klein in

the near future?

A.  Yes.  I've got one more month until I find out what happens with the wife, and hopefully I'll have an appointment after that.

Q.  You don't have one set up currently?

A.  No.  Since I don't know her -- her plans, I don't know whether I'm going to need to stay available all the time yet.

Q.  Okay.  Did you arrange to have somebody else assist your wife today?

A.  She can handle it for a while.

Q.  Again, if you do need to take a break or make a call to check on her, please let me know.

A.  All right.

Q.  What is your present address?

A.  1702 East 8th Street, Laurel, 59101 -- 59044.

Q.  How long have you lived at 1702 East 8th Street in Laurel?

A.  18 1/2 years.

Q.  So that was since -- since 1990?

A.  Yeah.  Moved in March 1st.

Q.  Do you own your residence?

A.  Yes.  If you don't count the bank.

Q.  Sure.  Like everyone else, yep.

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 11 of 99

Where did you live before that?

A. Ah --

Q. Where did you move -- When you moved into 1702 East 8th Street, where had you moved from?

A. I had a basement apartment with a gentleman, and I don't remember the address. I lived there since '83.

Q. Was it in the Billings or Laurel area?

A. It was in Billings.

Q. What -- what is your wife's name?

A. Dorleen, D-O-R-L-E-E-N.

Q. When did you and Dorleen get married?

A. March 14th of '90.

Q. I understand that that's your only marriage. You don't have any prior marriages.

A. No.

Q. Do you have any children?

A. She has two from a previous marriage.

Q. Are they your stepchildren, or have you adopted them?

A. They're my stepchildren.

Q. How -- how old are they?

A. I gotta do some math in my head for this one. Let's see. One was born in -- in '70. I

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 12 of 99

think the other one was born in '73.

Q.   Does either one of those children reside with you and Dorleen?

A.   No, no.   They're married, got their own -- own lives and --

Q.   Have they resided with you at any time, either one?

A.   The son resided with us about half the time the first two years of our marriage.   He was still in high school.   His father goes south to Arizona during the winter.

Q.   Does -- does anyone else currently reside with you and Dorleen?

A.   No.

Q.   Would you tell me where you were born, where you grew up, that sort of thing.

A.   I was born here in Billings, St. Vincent's Hospital, February 1st, '56.   I resided in Billings; Billings Heights; Concord, California; Billings; California; on the road; in Alaska; and back to Billings.

Q.   What year did you move to Concord?

A.   Father got his promotion and transfer in -- I think it was '62.

Q.   So you were about six years old at that

point.

A.   I think I was seven.

Q.   Did you live in Concord throughout --

A.   Through high school.

Q.   Through high school.  Did you graduate high school?

A.   Yes.

Q.   What year?

A.   '74.  And I put in some time back here in Billings when my grandfather died.  Then I went back out to California again.

I also got two years of college in out there before I came back here.

Q.   What -- what was the name of the college you attended?

A.   Los Madonas.

Q.   Is that -- Where is that located?

A.   On the border between Pittsburg and Antioch, California.  I'm not sure which city it's in.  They weren't sure when they built it.

Q.   What kind of courses did you take at Los Madonas?

A.   Mostly makeup, stage design and -- in the theatrical.

Q.   Did you receive any type of degree from

TIFT v. JOHNSON, et al.        9/4/2008        MARK "TIMOTHY" McCOLLOUGH
Case 1:07-cv-00166-CSO        Document 146        Filed 04/09/09        Page 14 of 99

Page 14

Los Madonas?

A. No. I needed to come back here to Billings for Grandma. I didn't stay the last quarter.

Q. Were you -- were you targeting an associate's degree?

A. No. Actually, I was targeting the information. I had been accepted at the American Conservatory Theater, and I was going to pick up where I left off there, and I never -- never made it to the American Conservatory Theater. My plans were to become a director.

Q. Do you hold -- Beyond your high school diploma, do you hold any degrees or certifications of any nature?

A. Yes.

Q. Can you tell me about those?

A. I've got an honorary doctorate, religious. I've got a boiler's license. At one time or another I was a certified chimney sweep. I'm trying to remember all the dumb things -- So many of them are just little things, I don't even know if they count.

Q. Tell me, I guess, just the ones you've mentioned already. Who issued the -- What was the

institution that issued the honorary doctorate?

A.   I don't remember.  I'd have to look it up to see.

Q.   What year was that?

A.   '90.  I got the certificates just before the head injury.

Q.   Is that a -- is that a degree that you practice under or --

A.   No, no.

Q.   Okay.

A.   I was ordained at pretty much the same time, and I've never been able to practice that either, because the head injury pretty well put a whammy on all of that particular plan.

Q.   Was it a particular religious institution that issued that, the ordained --

A.   The ordained?

Q.   Yeah.

A.   I was ordained at the World Christian Ministry.

Q.   Do they have a church in Billings?

A.   I have no idea.

Q.   Boiler's license, was that issued by a state or a union or what --

A.   State of Montana.

Case 1:07-cv-00166-CSO      Document 146      Filed 04/09/09      Page 16 of 99

Q.   State of Montana.   What did you use that for?   What kind of work were you doing with that?

A.   I was working for the school district and the -- Part of the time -- I spent two and a half years at the Montana University system as a maintenance engineer, so --

Q.   You have a driver's license, I take it.

A.   Yes.

Q.   Currently have a license?

A.   Yes.

Q.   Any other licenses that you hold that you're aware of?

A.   I still have the boiler's license.

Q.   You drive yourself around?

A.   Yes.

Q.   You operate a car?   Okay.

Have you attended any other kinds of formalized vocational education that we haven't discussed?

A.   Yeah.

Q.   What kind of things have you done?

A.   I was in the Navy.

Q.   Okay.   Tell me about your Navy career.   When did you start?   When did you leave?

A.   I went into the reserve in -- trying to

remember -- '84, '85.  Got out in '90.

Q.  Where were you stationed?

A.  Well, I went through boot camp at Great Lakes, Illinois; I went through seaman apprentice at Great Lakes.  I did additional training, military correspondence, and I was stationed at Whidbey Island and eventually detached from the air (inaudible) that I was attached to and went Seabees back here in Billings.

I did my ADTs in Fort Lewis, Whidbey Island, Pearl Harbor.

Q.  For the nonmilitary laypeople, what does ADT stand for?

A.  Active Duty for Training.

Q.  And were you active duty for a certain period of time?

You mentioned you were in the reserves, and that's why I ask.

A.  Standard ADT is 14 days plus weekends. They're nice enough to always schedule so you have a weekend off.  And they can extend that for certain courses and everything to -- up to a month or two.  Some of the -- You usually do the ADTs to do socialized training, and some of the classes run a little long.

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 18 of 99

Q.   It sounds like you got to do a little bit of traveling with that.

A.   A little bit.

Q.   What rank did you achieve?

A.   I was a third-class petty officer.

Q.   Were you honorably discharged?

A.   Yes.  Medically.  My hearing got too bad to --

Q.   Had you intended on staying with the -- with the Navy had your hearing not (inaudible) --

A.   Well, the idea was to come up with some sort of retirement.

Q.   So you were in the Navy roughly four and a half, five years?

A.   Yeah.  And while I was in there, I was Aviation Ordnance and then a UT, which is a utility man, a plumber.  Unfortunately, the Seabees, if you're a Seabee, you do it all, so --

Q.   Did you work on any ships, battleships, aircraft carriers?

A.   No.  No sea duty.  Never had sea duty.

Q.   Is Aviation Ordnance involved in arming aircraft?

A.   Anything from 45s to atomic bombs.

Q.   Kind of covers the whole range?

TIFT v. JOHNSON, et al.    9/4/2008    MARK "TIMOTHY" McCOLLOUGH
Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 19 of 99

Page 19

A.    The whole range.  I was attached to a P3 squadron, anti-submarine warfare.

Q.    Is that based out of Whidbey Island Naval Station?

A.    Yeah, that's Whidbey.  At least it was then; I'm not sure if it was now.  I left because they were refitting the place and changing the barracks around, and they didn't have anyplace for our air wing.

Q.    Any other kinds of formalized training, then, beyond the Navy that we haven't talked about?

A.    Yes.

Q.    What -- what is that?

A.    I worked for the government.

Q.    Can you tell me about that?

A.    Nope.

Q.    Why is that?

A.    Because it's all classified.

Q.    Can you tell me the years that you did that?

A.    Now we're going back into fuzzies [sic] areas.  That was -- I think that started in '74, and I think that was for about two years.

Q.    So you were right out of high school at

that point?

A.   Yeah.   When I started college is when I went in.

Q.   Can you tell me the name of the agency you worked for?

A.   I don't think they even exist anymore. I think they were absorbed by Homeland Security, so --

Q.   What was it called at the time?

A.   ISIS.

Q.   Is that an acronym?

A.   Yes.

Q.   What does it stand for?

A.   International Securities Investigation Service.

Q.   And that's a branch now, or it's been absorbed into the Homeland Security?

A.   I think so.   I haven't had any contact with them in a while.

Q.   Okay.   Do you draw any pension either from the --

A.   No.

Q.   -- Navy or ISIS?

A.   No.

Q.   All right.

A.    Insufficient time.

Q.    And it's your -- your testimony today that your work for that agency was classified, and you're not allowed to talk about it; is that right?

A.    Correct.

Q.    I guess to kind of sequentially talk about your background and so forth, if we start in 1974, talk about your jobs and your education up till -- you know, up till the present date, in 1974, was it -- did you have to move back to Billings to assist your grandmother?

A.    I think that was '76.

Q.    '76, okay.  So you were -- you graduated from high school in '74.  That was in Concord, California.

A.    Uh-huh.

Q.    That's a "yes"?

A.    Yes.

Q.    Okay.  Did you immediately enter college at that point?

A.    Think for a moment.  I believe -- Yeah, I believe I went into college.  It was the first year Los Madonas opened.

Q.    And did you do your two years there back

to back?

A.  Yes.

Q.  Were you taking a full load at that time?

A.  No.

Q.  And at the same time --

A.  I was working for the government.

Q.  You were working for I-S-I-S, ISIS?

A.  ISIS.

Q.  Okay.  You worked for ISIS for a period of two years?

A.  Roughly, yeah.

Q.  And at the same time you were attending college?

A.  Yes.

Q.  And then in 1976 -- Let me back up.  I'm sorry.  Were you doing any other kind of work at that time, during the period from '74 to '76?

A.  I don't remember doing anything else.

Q.  I understand your grandfather passed away and you returned to Montana.

A.  To help Grandmother out, yes.

Q.  How long a period of time were you back in Montana, then, when you moved back in 1976?

A.  One and a half, two years.

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 23 of 99

Q.   Did you have employment here during that time?

A.   Part of the time.

Q.   Do you recall what you were doing?

A.   I remember one of the things, I worked at a gas station for a while.  And I don't remember what else I was doing.

Q.   So you're here for about a year and a half.  We're up through -- partway through 1977 or into 1978.

A.   Uh-huh.  Sounds about right.

Q.   Where do you go at that point?

A.   I may have my dates wrong.  I'm trying to remember.  I left here and went back out to California because my mother got sick, and I had to take care of her.  And then she passed away from cancer, and during that period of time, I was working in a grocery store.  And after she passed away, I -- I went on the road.  I was a livestock foreman for Circus Vargas.

Q.   About what year was it that your mom passed away?  '79?

A.   '78.

Q.   How long were you on the road, then, as a livestock foreman?

A.   About four months, and I got tired of the politics on the road, and I contacted a friend and went up to Alaska.

Q.   So that's late '78, early '79, you went to Alaska?

A.   '79 I went to Alaska.

Q.   Did you go to work on the pipeline?

A.   No.  I worked out in the fishing industry.

Q.   Were you out in the Aleutians?

A.   Yes.  During the good years.

Q.   What type of work did you do in the fishing industry?

A.   Well, I started out, I worked for Pacific Pearl, Wakefield.  And I started out as a butcher for -- I butchered crabs.

Q.   Did you have some other jobs in that --

A.   No.

Q.   -- fishing industry?

A.   There wasn't anything in that time other than the fishing boats, and the money was too good.  They weren't going to give up those jobs for anything.

Q.   I heard they're tough to come by.

A.   They aren't now, but they sure were

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 25 of 99

then.

Q. Yeah. What -- what island did you live on up there?

A. Unalaska.

Q. Were you in Dutch Harbor?

A. Beyond Dutch Harbor. I was in Captain's Bay. When the Dutch Harbor operation quit, I moved -- I mean, Captain's Bay operation quit, I moved to Dutch Harbor. And when that one wound down, I came back to the south for several months. And when I went back up, I was in Sand Point, which is in the Shumagin Islands, and I can't spell that.

Q. Same -- same type of work there in Sand Point?

A. Well, I was a company man. I did dock work. I worked on the boats. They had their own fleet. At that particular point, Wakefield wasn't around anymore. It was all Pacific Pearl. And I worked -- They didn't have a, per se, canning plant. They were a freezer operation. They had typical storage units and a variety of different types of freezing methods, extraction line. They also did salmon and shrimp and herring and a variety of other fish. They were a complete

Case 1:07-cv-00166-CSO  Document 146  Filed 04/09/09  Page 26 of 99

operation at that point.

Q.  Were you sort of a jack-of-all-trades for that outfit?

A.  I went wherever they wanted me to and I ended up working every position you could think of.

Q.  Was the -- Was your work in Alaska -- It was seasonal in nature; is that fair?

A.  No.  I worked year-round.

Q.  You worked year-round, okay.

A.  Yeah, I worked the first 14 months before I got a break.

Q.  How many years, overall, did you spend in Alaska?

A.  Four, four and a half.  Came down in the fall of '83.

Q.  Any particular reason why you decided to get out of Alaska?

A.  The fishing industry had collapsed, and I hadn't seen anything worthwhile dating since -- for four and a half years.

Q.  Greener pastures here.

A.  That and trees.

Q.  Yeah.

A.  It's very disturbing when you look out

and the only thing you see is tundra.  We had more trees on Shumagin Island, Popoff, Sand Point than we did on anyplace else.  And they were planted back at the turn of the century, when it was the customs port for the Aleutians in Alaska.  A dozen trees does not make a forest.

Q.  During the span of the four to four and a half years you were in Alaska, you were working for Pacific Pearl and Wakefield?

A.  Then it was bought by Pelican Cold Storage.  So the last year, year and a half was with Pelican.

Q.  Did you have any other jobs aside from those jobs you've talked about in the fishing industry?

A.  I worked as a guard for the state trooper's office.

Q.  The Alaska State Patrol?

A.  State.

Q.  State troopers?

A.  State troopers.

Q.  Okay.

A.  They don't have enough roads to patrol.

Q.  What kind of job duties did you have as a guard, then, with the Alaska State Trooper?

A.   Well, when they brought in a prisoner, I'd be -- be on watch 24 hours.  They'd bring me my food and the prisoner's food.

Bathroom facilities were destroyed in the jail, so I'd have to escort him over to the Fish & Game office to use their bathrooms and bring him back.

Q.   How long a time span did you hold that position with the state trooper?

A.   Whenever they needed me for for the four years.  If they got a prisoner in, I got a call. No prisoner, no work.

Q.   So when you finally departed Alaska, that's, you said, 1983.

A.   Yeah.

Q.   You moved back to Montana at that point?

A.   Yes.

Q.   Billings?

A.   Billings.

Q.   What did you -- what did you find to do when you moved back to Billings?

A.   Well, let's see.  I started substituting for the school district and eventually got on as a custodian; transferred out to the Billings vo-tech before it went state-owned and they became the

College of Technology.  And I was there for two --
two and a half -- No, it's gotta be -- Let's see.
Went in -- It was about four -- Four years, I
suppose -- four and a half years with the vo-tech
before I got injured.

          And during that time period, I mowed
lawns and had my own little groundskeeping
operation going and --

          Q.  And this is the same period of time you
were also with the Navy.

          A.  The Navy reserve, yeah.

          Q.  Okay.

          A.  But it took a lot of years of
substituting before you could get into the school
district.

          Q.  And when you say "substituting," you
were actually --

          A.  Substitute custodian, substitute -- I'm
trying to remember the names of the -- type of --
study halls, lot attendant, whatever they had
open.

          Q.  And you eventually were successful,
then, in getting a full-time position with the
school district.

          A.  Yes.  It just ended up being in a

building that was being sold.

Q. So that -- that takes us, then, up to 1990, and you've mentioned a couple times today that you had a head injury in that year.

A. Yes.

Q. Okay. Before we get to that, that event, the medical records that you provided indicate that you had a bicycle accident at some point in your life where you had a skull fracture; is that correct?

A. That was -- Elementary -- no. Elementary school? Junior high period somewhere. Somewhere in the -- the '60s.

Q. Did it knock you out?

A. I don't really remember being out, but I was in pain. I chipped my wrist and cracked my skull and had a hell of a headache.

Q. Prior to the incident in 1990, did you have any other events where you had a serious head injury?

A. I don't think I could tell you.

Q. Not that you can recall here?

A. I have no idea.

Q. Tell me -- I imagine it's a difficult memory for you, but if you could tell me what you

recall about the incident in 1990, what the circumstances were, what happened.

A. We'd had a rash of break-ins out at the vo-tech, and I was doing lockdown, making sure every door was locked and all the machinery was shut off and the lights were shut off, and I was in the shop area -- automotive. Automotive. And -- Or maybe it was diesel. I don't remember. I remember the area; I just don't remember what it was classified. And I saw a shadow, and I turned around, and he stood up and hit me across the head with an iron bar.

Q. What was the -- what was the date of this attack?

A. May 9th.

Q. Did you -- did you lose consciousness in this event?

A. I don't know for sure.

Q. Did they ever find the attacker?

A. They wouldn't look. I went to the hospital after making the police report. I remembered some more stuff; we called down to the police department and gave them the extra information.

A while later, a month, I called up to

find out what was happening:  Did they have anybody?  Did they know anything?  And they said they weren't investigating it.  And I asked them why.  And they said there wasn't enough evidence, they said.  And I says, What kind of evidence do you need?  And they said, A dead body.  And I said, You mean a live body with a lump on its head that can tell you what happened and identify the person is less evidence than a dead body who can't tell you anything?  And they said, That's right.

Q.  You must have been pretty frustrated with that kind of handling.

A.  That's an understatement.

Q.  Yeah.

A.  And what made it even more frustrating is, within a year or two, the person who I was talking to made captain and retired as chief, for a very short period of time.

I have very little respect for the Billings Police Department.

Q.  At that point in time, when this attack occurred, were you working full-time as a janitor -- or custodian rather?  I'm sorry.

A.  Well, I would call it a custodian, but my classification was a maintenance engineer.  I

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 33 of 99

did repairs as well as cleaning, so they -- My classification was maintenance. Yeah, I was -- I was full time and --

Q. Were you able to return to work after that attack?

A. It took a little bit, and when I returned to work, I was only there for a short period of time. I had severe anger issues. I had massive pain. I was in a great deal of total confusion. I was able to set up a routine and follow it, but if I turned around somewhere in my path, I'd get lost and forget what I was doing.

It was very difficult to put up with people around me. Massive anxiety attacks. And the temper was getting worse.

Q. This -- this was a pretty serious blow that you sustained.

A. We found out later that the extent of it was considerable. And I was lucky we got married when we did, because we weren't planning on getting married till June, and if we had been -- At that time, I would have probably been in an institute right off the bat because of my temper.

Q. From our discussion today, I take it you've never been in an institution.

Case 1.07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 34 of 99

A.  No.

Q.  And you were married only, what, two short months before this attack?

A.  Yeah.

Q.  Okay.  What all did you find out?

You said that the extent of it was considerable.  What did you find out about it?

A.  That it was a twisting blow, so the brain was thrown backwards at an angle.  And since I had the crack back there and previous scar tissue and ridges in the bone, it had done severe damage there and slightly tore the cerebral cortex.  And since the blow was across the front, I had problems with the frontal lobe.

We had one doctor that basically said I was lucky to survive.

Q.  And for the written record, you indicated that you were struck on the right part of your forehead?

A.  Right -- right there (indicating).

Q.  Above your right eye.

A.  At an angle.  Every now and then, when there's swelling, you can -- you can still see the line coming through.

Q.  What kind of physical problems did that

Case 1:07-cv-00166-CSO Document 146 Filed 04/09/09 Page 35 of 99

injury cause you to have?

A. Well, I lost the strength in my right hand. I had to change how I hold things. And I built the muscles back up again.

Horrible memory loss that comes and goes. I've got it more -- a lot more under control nowadays. I became claustrophobic. I have a problems with heights. I have a severe problem with altitudes.

And it raised my blood pressure when I'd get upset. My blood sugars went up. I'm now a diabetic. I have massive migraines. When my migraines occur, my blood pressure goes up -- Well, I'm lucky to survive that, too.

I have a tendency nowadays to hemorrhage. My eyeballs burst vessels. The scabs that I've got on my body from one injury or another pop off like little volcanoes.

I've had bleeders in my stomach and elsewhere just from the blood pressure going up as high as it did during migraine.

I have problems with vision during a migraine, and the eye doctor says that the glands in my eyes are now drying out severely, so I suspect I'm gonna be needing glasses soon. That

may be old age, but the gland problem didn't exist previously.

What else?

Q.   Can I stop you for a second --

A.   Sure.

Q.   -- and ask you about a couple of things you already mentioned.

With respect to the memory problems that you're having, or you've been having since --

A.   I've had.

Q.   -- had, were those problems remembering events that occurred before the attack or events that occurred after the attack, or both?

A.   At that time, both.  The only thing that was clear in my head was the attack.  I had -- The wonderful point -- Well, after the injury, I basically had to learn to read and write again.

I used to speak many languages.  My hearing is bad enough at this particular point, I was lucky to learn English again.  I can't pick up the dialects and the tones in the language anymore, and I can't remember them.

Q.   What -- what different languages could you speak?

A.   French, German, Russian, Italian,

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 37 of 99

Portuguese, Spanish and subsequently Philippino, and Mexican, which is slightly different than true Spanish. And a smattering of little bits and pieces just to get me through customs in some places.

Q. How did you have the opportunity to learn these -- these various languages?

A. I picked them up just instantly. I used to have an incredible memory.

Q. And those things now are gone; is that correct?

A. Oh, totally, totally. I think I can speak about four lines in Spanish and maybe count to five in German.

Q. Who follows you medically for your blood pressure problems?

A. Well, I've got the blood pressure meters and all of that. At the present time, I do. Since I got rid of the doctor that was treating me, I haven't been able to find one that I like.

Q. Who -- who prescribed the blood pressure medication you mentioned earlier?

A. Well, the first one was Dr. Carlson, and then he wanted me to get a regular doctor, and I got -- I'm trying to remember her name. Forester,

Forsyth, something like that.  And she continued with the blood pressure medication.  And I just got a bottle of backup on hand for the big ones, and I try and behave myself.

Q.  Did you take it on a basis then when it was needed?

A.  As needed.  I save them for the migraines.

Q.  Okay.

A.  It builds up in my system, and my system starts rejecting it after a while, so I've got to be real careful about anything I put in.

Q.  I may have interrupted you when you were -- You were telling me the kinds of difficulties that this attack -- the injury from the attack caused you.  I want to make sure that there wasn't anything else, but I can go over the list that I wrote down --

A.  Please.

Q.  -- and let me know if I'm missing something or if you've got additional things.  We talked about a tear in the cerebral cortex, problems in your frontal lobe, lost strength in your right hand, memory problems.

A.  Memory problems.

Q. Claustrophobia.

A. Claustrophobia, problem with altitude, problem with heights.

Q. You mentioned you're diabetic.

A. Diabetic now. Temper problems and --

Q. Migraines, obviously.

A. Oh, yeah, the migraines. Those are the killers. I've -- I -- The doctor, O'Neil (phonetic), started me on a calendar. We kept a calendar ever since. Since the head injury, I've only had four days without pain of some kind and 12 days without even a mild headache.

Then there's -- Let's see. Altitude. Anxiety attacks; I have a real problem with crowds.

Q. Have you ever heard of the -- The doctors use a term called the pain scale. They said if your pain scale -- If it runs from 1 to 10 and 1 is no pain and 10 is the maximum pain, where would you put yourself on that right now?

A. Right now? About 3 1/2.

Q. What's bothering you today, aside from the fact that you have to be here?

A. My blood pressure's up; my sugar's up. I can tell that right now. It was up yesterday.

It's up today.  My sinuses are bothering me.  That was a wonderful thing.  I had so many medications in there that now I've got allergies out every part of my body.  Really broke down my system with all the stuff I was taking for a while.  And at this particular point, my head hurts so damn -- my teeth hurt.

Q.  What, I guess, to the extent we can separate out the physical kinds of things that you've told me about that resulted from this attack and the injury, what kind of emotional affect did it have on you?

I imagine it was a pretty serious issue.

A.  For how long a period?

Q.  Well --

A.  It varies.  The idea of not working, of staying home -- The first two years were pure hell.  The first four years were cabin fever that -- that wouldn't quit.

Part of that changed by accident.  I had a -- I have a friend that works with my wife, and he had a rooster that he needed to get rid of and a couple of turkeys that he didn't have the heart to butcher, and he gave them to me, hoping that I'd take care of them.

And the rooster no longer had chickens, so it tried to discuss his situation with the turkey, and she wasn't going for it, so we went and got some chickens from the Hutterites, and my attitude changed.  I wasn't as mad; I wasn't as depressed.  I had something I had to do every day, no matter how sick I felt.

And most of the time, it works; sometimes it doesn't.  But every day I gotta get up and go out and feed the birds and gather the eggs.

Then a cousin gave me a goat because she was moving from where she was, and she couldn't keep the goat anymore.  And I've added more chickens and turkeys to the mix, and I replace them every year.

And the doctor started saying it was the greatest therapy he's ever seen, and I've been using it as therapy ever since.

Q.  I congratulate you on that.

What year did that start?

A.  I can't tell you.  I don't remember what year it started, but I've been doing it on a constant basis since then.  And it has made a major difference in the cabin fever and the

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 42 of 99

feeling useless and the not contributing.

Q.  And so I was going to ask you anyway, what -- if somebody was to come over to Tim McCollough's house and say, what do you do on a daily basis, hang out with Tim for a day, what would that person see?

A.  What time of year?

Q.  Let's take this time of year.

A.  This type of weather, I try and get some of the projects done around the house and the yard.  I get to take as many breaks as I want.  I don't have to be around people.  I can talk to the animals all day long.

During the winter, it's too bloody cold in Montana to do anything.

During the summer, I can't handle the heat anymore.  That's another one of the wonderful side effects.  I'm real sensitive to temperature.

I'm real sensitive to people's emotions around me.  If they get excited, I pick it up, and it changes how I react.  They get mad, it makes me mad, and so I've learned.  It's -- I gotta do things in certain times of the year I can't do in others.

Q.  It sounds like the livestock, the fowl

you have -- the chickens, the turkeys -- that takes up a good portion of your day on a regular basis.

A.   Probably, truthfully, about 45 minutes for the whole day, but I can stretch it out.  I really can.

Q.   I can tell it's something you really enjoy.

A.   It's not something I enjoy.  It's something I need right now.

Q.   Uh-huh.

A.   The truth of the matter is, I'd love to be able to pick up and go away for a weekend and spend some time with my grandkids, but I've got to be home in order to feed and take care of the animals.

Q.   How many -- Well, do you have chickens right now?

A.   Yes.

Q.   How many do you have, roughly, ballpark?

A.   I've got, roosters and laying hens, a total of about around 80.  And I've got another 50 young ones that aren't old enough to lay or big enough to eat.  And I've got just under 50 turkeys.

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 44 of 99

Q. Oh, I bet people come to your house around Thanksgiving.

A. Oddly, most of the people that I -- I have in the family already get their own birds from me, so they don't have to come to me.

And I sell the rest of the birds off to help pay for the feed. I don't know why they named them turkeys; they're pigs. They eat like that. They eat more than the goat does.

Q. And you still have a goat.

A. Well, it's a different goat. Last year I bought the wife a milking goat. She wanted to try and make cheese.

Q. How's that worked out?

A. Well, it worked out pretty good for a while, and then we had to freshen up the goat again, and she had a miscarriage. So no kid, no milk; no milk, no cheese. But my hands were getting stronger for a while.

Q. Milking the goat?

A. Milking the goat. They don't joke about the strength of a milker's hands. It's true. It builds up real good.

Q. So, what, you spend an hour or two a day maybe on these kind of chores around the house; is

that right?

A.   Outside.

Q.   Outside?

A.   Outside.

Q.   What other kinds of activities do you like to engage in on a regular basis?

A.   I'm the cook.

Q.   So does that mean, as the cook, you also get to run to the store and do the shopping?

A.   Right there in Laurel, yeah.

Q.   Yeah?  Do you have any clubs or societies that you belong to?

A.   I used to.  I used to be a member of the Caledonian Society.

Q.   What is the -- what is the Caledonian Society?

A.   Scottish, Scottish.  Bagpipes and haggis.

Q.   Do you play the pipes?

A.   I tried once.  Every cat in the neighborhood committed suicide.  I was asked to stop.

Q.   How long ago did you discontinue your relationship with the Caledonian Society?

A.   I think it's been about three years.

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 46 of 99

Q.  Why did you do that?

Just wasn't something you were interested in anymore?

A.  Truthfully, I'm not sure whether it was just -- I just had an inopportune moment, and we couldn't make it to the regular functions, and I forgot to pay the dues.  So I stopped getting the newsletter, and I forgot about it.  It was something the wife got me in after the head injury in order to get me into thinking about things again.

Q.  Do you do any traveling these days?

A.  I had to run out to California in February, help Father out real quick, nursing home.  He had a fall, shattered his ankle.

Q.  Sorry to hear that.

How long were you in California?

A.  A week.  And roughly one week on the road.

Q.  Do you try to visit your dad once a year, or more than that maybe?

A.  That was the first time I'd seen him in -- I think the last time I saw him, he was up here, and that was five years earlier.  That was for my son's wedding -- our son's wedding -- the

son.

Q.  In, let's say, the last five years, other than the trip to California that you made this last year to see your father, any other trips outside the state that you --

A.  Outside the state, no.

Q.  Do you do any traveling around Montana?

A.  Three years ago, we spent Christmas at Bozeman.  That was the year after the son's wedding, the year before?  Somewhere in there. Year before.  Year after.  Somewhere in that area.

Q.  You know, we've been going for about an hour here.  Do you want to take about a five-minute break?

A.  No.

Q.  Keep going?

A.  Let's keep going.  The sooner this is over, the happier I'll be.

Q.  All right.  I'm trying not to push you too hard, so --

You mentioned earlier you've not ever been admitted to an institution.  Have you ever been a patient in a hospital, where you've actually been admitted to a hospital?

A.  Yes.

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 48 of 99

Q. For what -- When and where and for what reasons?

A. At the beginning?

Q. Start at the beginning.

A. I was born --

Q. Okay, well --

A. As a kid, there was a period of time I was in the hospital every week between my brother and I and who was going to have tonsillitis that week. It was a regular competition.

Back in those days, they quarantined the house when you had measles and things like that, and the pox and all that. Let's see. I had -- I shattered my ankle three times during puberty, and I had to have surgery. And, no, I don't remember what year. I believe -- I believe I was in high school -- freshman maybe -- when the surgery took place. I broke the ankles in junior high. I had grown a kneecap on the side of the ankle, three of them.

Q. That's interesting.

A. I thought it was kind of strange.

So I had the tonsillectomy, the knee, the ankle operation, and -- I got injured in Alaska, but we didn't have a hospital. And then

that injury.

Q.  What was the nature of the injury that you had in Alaska?

A.  A blankety-blank idiot, a college student from Notre Dame, was driving forklift and came around the corner trying to make up time, and I took a forklift in the chest.

Q.  Ew.

A.  He had a pallet on the end of the tongue, so I didn't get the actual fork in me, but he broke three ribs and split the sternum.  I was wrapped up for a while.

Q.  After this attack in 1990, were you actually admitted to the hospital as a patient at that time?

A.  I don't remember.  I think the wife took me home.  But either way, we spent the better part of the night there.  I was just never in the room.

Q.  Any -- any hospitalizations since that time?

A.  Yeah, they did -- They were giving me medication at one point, and they went in and did a liver biopsy.  I think I was in the hospital for two days with that.

Q.  You mentioned earlier that you had some

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 50 of 99

pretty serious issues with anger and controlling your temper after the accident --

A.    Yeah.

Q.    -- or the assault, rather, in 1990.  I think one of the records -- and I want to get your take on this -- one of the records that you have provided to us from one of your counselors or your psychiatrists back in the early '90s said you mentioned that you had restraining orders issued against you at some point in time.  Does that sound accurate?

A.    Yeah, sounds accurate.

Q.    What happened?  Tell me the circumstances.

A.    After I returned back to work, I was treated to the point that the doctor removed me from work because I was getting more and more violent.  And it's my understanding that the administrators that were playing the silly games had restraining orders so I couldn't go back to the school.

Q.    You were upset with people at work because they weren't taking --

A.    I can't explain it in a very nice way. After I became injured, they did a lot of things

trying to get me to either quit or come up with a reason to fire me.

Partially, I'm sure, it was because I was angry, and I was in pain, and my disposition wasn't happy.

And part of it was because they'd gone through three head men in the position, and we'd been taking notes on all the dumb stuff that was going on. We -- we found a whole lot of supplies were being stolen out of the school, and we pretty well had a good idea who was doing it, and they were in power.

Q. Did you ever have any run-ins with the police during this period of time?

A. In a roundabout way. We were called in on a weekend to open up the building. The police was gonna meet us there. There had been a reporting of vandals up on the roof.

And we unlocked the place for the -- for the police, and we led them to the ladder that extended to the roofs. And one of the police officers was kind enough to turn around, Aw, this couldn't be that guy that got thumped, is it?

And I had the pleasure of informing him that I was the guy that got thumped.

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 52 of 99

Q.  So even then they weren't taking you seriously.

A.  No.

Q.  You don't have any criminal convictions, do you?

A.  No.  My family has a long standing with law.  My brother's a San Francisco sheriff.  I was the guard for the state troopers.  My father was one of the very first reserve officers here in Billings.  My grandfather was a reserve sheriff, and before that he was a small-arms drill instructor for the state troopers before they became the highway patrol.

Q.  I was about to say, you have a long family history of (inaudible) --

A.  We have a rather strange history in and out of medical and grocery stores and the law, back and forth.

Q.  Take a short, just off-the-record, break here.

VIDEO OPERATOR:  We are going off the record.  The time is 11:43 a.m.

(Whereupon, the proceedings were in recess at 11:43 a.m. and subsequently reconvened at 11:54 a.m., and the following proceedings were

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 53 of 99

entered of record:)

VIDEO OPERATOR:  We're back on the record.  The time is 11:54 a.m.

Q.  (BY MR. SIMPSON)  Tim, I've handed you what's been marked here as numbers pages -- Bates No. 93, 94, 95 and 96, and I'll represent to you that these were portions of a calendar which were attached to your discovery responses to our written discovery requests.

A.  Yeah.  This is one of the calendars I keep on my log journal of everything I do.

Q.  So you have the original there from which this copy was made.

A.  Yes.

Q.  Okay.  And for purposes of clarity, it appears that pages 93 and 94, if you want to look at those, those match up to June of 2007; is that correct?

A.  Yeah, that'd be correct.

Q.  All right.  And do pages 95 and 96 match up with July of 2007?

A.  That's correct.

Q.  Whose handwriting is contained on this --

A.  Mine.

Q. -- calendar?

A. Mine. I'm the only one, 99 percent of the time, that writes on it. This is part of my daily chores.

Q. Okay. Do you -- do you have a system whereby you fill in dates some designated period of time in advance?

A. Doctor appointments, I fill in in advance. And you'll find a notation in here like SSI, M-O-R-G, BPC; I fill those in advance. That's when my disability check comes in, when the mortgage goes out and when the wife gets paid.

Q. Okay. And your -- Dorleen does not typically make notations on your calendar?

A. No. It's very, very rare. Her handwriting's so bad, I can't read it.

Q. All right. If we were to look, for instance, at the date June 2nd --

A. All right.

Q. -- what's the -- what's the first entry on top there?

A. Turkey rodeo. I round up my birds at night. I've had many of them killed by dogs and kids with pellet guns, and it gets to be a rodeo trying to round them up. You herd them in. The

dog goes one way, and you scoot them the other and try -- try and get them to go back into the coops at night.

Q.   Okay.   Is that -- How often do you do the turkey rodeo?

A.   When the weather allows me to let them out, I gotta round them up.

Q.   Now, is the word following that -- It looks like it says "milk"?

A.   Yep.

Q.   What's the -- what's the significance of that?

A.   The goat.

Q.   Milk the goat, okay.

What is the next entry on June 2nd?

A.   Call Dadums (phonetic).

Q.   That's your father?

A.   No, that's Dorleen's father.

Q.   Okay.   Do you call Dorleen's father or does she?

A.   She does, but I keep track of the phone calls and in and out, as well as -- I keep track when the wife goes to work or when we get a holiday or a vacation day.

Q.   Are there any references on your June

TIFT v. JOHNSON, et al.    9/4/2008    MARK "TIMOTHY" McCOLLOUGH
Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 56 of 99

Page 56

2007 calendar that we have here to the lawsuit that the Johnson Rodenburg firm filed against you?

A.   Yeah.   I've got three things circled. Let's see.   On the 7th I was served and --

Q.   That was the -- For the ladies and gentlemen of the jury who may not know what that means, that was the date that you were served with the summons and complaint to start that lawsuit?

A.   Yes.

Q.   Okay.   I'm sorry to interrupt.   Keep going.

A.   You'll notice, the next two days, I was sick with a headache and all over.

On the 13th --

Q.   Can you -- can you -- Okay.   So at the bottom --

A.   Bottom --

Q.   -- June 8th, sick.

A.   -- bottom.   I try to put all the health stuff on the bottom.   It doesn't always work, but I try.

Q.   Would you have made that notation, "sick, headache"?

A.   If I hadn't been upset, I wouldn't have gotten sick.

Case 1.07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 57 of 99

Q. And you -- and you made that notation on the 8th and 9th?

A. I started on the 8th, and I continued it over onto the 9th.

Q. So you made that at the time you were feeling bad?

A. Yes. Always, always.

Q. All right.

A. If I get bad enough, I may have to go back one day because I wasn't able to do it that day, but always right then, yes.

Q. Okay. What's the -- what's the next reference on here?

A. It'd be the 13th, and that would be the courthouse, filing papers in that suit, and the anxiety was up, and there's a notation at the bottom, "just holding on." I was evidently quite upset.

Q. So at that -- Excuse me. On June 13th, that was the date that you filed papers --

A. At -- Went to the courthouse and filed papers. To my surprise, the previous lawsuits were in one court; this was in another, so I had to learn a different way of writing the papers, and I had to go back to the courthouse to finish

the filing on the 14th.

          By that point, I had a bad headache, and evidently I had a headache for the next three days after that.  Two days -- three days after that.  Two days after that, plus that day.

          Q.  So the other reference on the calendar, then, is the 14th --

          A.  Is the finish filing papers.

          Q.  Okay.  You mention in your answer there that the previous lawsuits had been in a different court.

          A.  Well, there's a difference between -- It wasn't exactly small claims.  Justice court versus --

          Q.  District court?

          A.  District court, yeah.

          Q.  Tell me -- Let me back you up a couple steps.  How many other lawsuits have you been involved in as either a plaintiff or a defendant before this lawsuit with the Johnson, Rodenburg firm?

          A.  Before this one?

          Q.  Yeah.

          A.  Three.

          Q.  Can you identify each one of those and

what your role in those other lawsuits was?

A. One of them was the first time this particular case had been brought to me by -- Spencer? Spencer. And then there was --

Q. Was that in justice court or district court, or can you recall?

A. Which one's the smallest amount of money?

Q. Justice court.

A. Then it was in justice court.

Q. Okay. And who was the judge on that, do you recall? Was that Judge Hernandez?

A. Yes.

Q. Okay. So that's one.

A. That's one.

Q. Okay. What's the second one?

A. I'm not sure. Was it before or after that one? I sued somebody because their dogs got in and killed my goat and chickens and things like that.

Q. Okay. So that was for a loss of livestock.

A. Yes.

Q. Okay.

A. And then we went to court with another

case, and it was dropped.

Q. What was -- what was your -- What was that lawsuit?

A. We had a credit card that we didn't have. Somebody had stolen our ID, to put it as simply as possible. They brought us to court for a credit card we never had. Evidently someone had taken out one of those "You are preapproved," out of the mailbox. And we have a letter dating back to that period from the post office saying a lot of people were missing things and stuff out of the mail; please watch your mail.

Q. Do you remember when that lawsuit was? And if you can get within a year --

A. I'd say just after the one, Spencer. I think Spencer was the first one. That was the second one. And I think it was within -- within a year.

Q. Did you hire an attorney --

A. No. That was still in justice court, and we simply informed them that, you know, this wasn't any number off of a credit card we ever had and that I'm disabled and -- and, dang, no money to get. And they dropped it. Haven't heard anything from them since.

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 61 of 99

Q.   So that one was dismissed.

A.   Yeah.

Q.   Okay.

A.   But while Spencer was still in -- in the hands of Hernandez, Judge Hernandez, I received notice from a second company representing -- on the same card at double the amount, wanting to be paid, and we were still waiting for the final decision -- final papers to come down from Hernandez.  So we hadn't even finished the first case when CVC [sic] of Colorado had already gone on to another law firm.

And I wrote them back telling them, Hey, Spencer's already got this in court, and it's already been dropped.

And I don't remember whether they sent anything else back or -- or just dropped it from that point.  And then a little while later, here comes --

Q.   Well, let me ask you about that.  You said you wrote them.  And who was it that you wrote?

A.   There should be a copy of the letter in the file.  I gave everything to the lawyer.  I don't remember the name of the company.  I think

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 62 of 99

it started with an N.  Ny- -- Ny- -- Nyruin.  It sounded something like Nibar or something like that.  I don't remember.

Q.  I'll represent to you that I'm not questioning whether you did it or not.  I just haven't seen that letter.

A.  Oh, I don't have a copy of the letter I sent them.

Q.  Okay.

A.  At least I don't remember where I put one.  I probably did -- I make copies of everything.  I'm great at keeping records.  I'm lousy at keeping them organized.

Q.  So your -- what your testimony is is that this suit with Spencer was ongoing.

A.  Yeah, well, we'd already -- He'd already dropped the thing.  We were still waiting for the papers from the judge's office --

Q.  Okay.

A.  -- when the second law firm came into it before we'd officially had the final papers from the first law firm.

Q.  So who did you send the letter to at that point in time?

A.  The second law firm, I think.  I might

have sent it to Spencer saying they've already, you know, gone on to the next one. But I think I sent it to the first -- or to the second outfit saying, Hey, you know, we've already gone through this, you know, with another law firm.

MR. SIMPSON: Counsel, are you aware of that letter?

MR. HEENAN: I'm not.

MR. SIMPSON: Okay.

Q. (BY MR. SIMPSON) Did you ever call anyone at the Johnson, Rodenburg, Lauinger firm in North Dakota to say, Hey, you guys made a mistake?

A. No. I sent them the documents certified saying that you made a mistake, and I think the only -- I think I did call them once saying the papers are on the way.

Q. Now, is this after the lawsuit against you had been served in June of 2007, or was it prior to the time when you contacted Johnson, Rodenburg?

A. I don't remember.

Q. When you say you sent them the papers, by certified mail --

A. Yes.

Q. -- was that the response papers in the

lawsuit or was that the letter that you mentioned, or was it something else?

A.    The letter went to the second law firm. I don't remember sending a letter, just the response to the --

Q.    To the complaint?

A.    I don't remember for sure.  At this point, my brain is garbled.  I know I sent out this stuff, but I can't tell you when and where.

Q.    Okay.  Do you have any recollection of any -- any conversations you had with anyone at the Johnson, Rodenburg law firm?

A.    I remember calling up there just to let them know that the documents were coming or that I had filed some papers.  I remember I called them once, and I don't really remember what it was about.  I knew it had to be either after I filed or after they sent back a second set of letters or something.  I remember I -- I called up to let them know something was on its way.  That's all I remember of that.

Q.    I take it you didn't -- Well, did you note that anywhere on your calendar?

A.    I have no idea.  I try and go through it, but after a little while, my brain -- Let's

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 65 of 99

see.  Law papers came -- I've got that marked down in July.  Let's see.  Talked to lawyer.  Did I mark down anything?  Talked to lawyer.  Next one, call.

I may have just marked down that I talked to Prepaid Legal.  They may have helped me, tell me what I had to do.  I'm a member of Prepaid Legal, and I marked down, but I don't remember -- (inaudible) -- who I talked to.

Q.  Do you have any recollection of who?

A.  I remember I made the phone call sitting in the parking lot at Senior High waiting for the wife.

Q.  Did the person that you spoke with at the law firm say anything to you?

A.  As far as I know, I never talked to anybody about the reception on the telephone, and nobody said anything.  The person I was contacting wasn't there at the time, so -- so I know I didn't talk to anybody I went and talked to, so --

Q.  Okay.

A.  It was just -- just notification that the papers were on the way.  Please notify such-and-such or --

Q.  Do you have the entirety of your 2007

calendar there?

A. Yes.

Q. Do you have any objection to us, after this is over, making a copy of the rest of that calendar?

A. I don't care.

Q. Okay. I'm gonna get back to the lawsuit that Johnson Rodenburg filed, but I had a couple other things in more detail that I wanted to ask you about. What is the nature of your disability, and what is the reason that you --

A. Are still on it?

Q. -- are on a disability? Yeah.

A. Well, if I do anything that raises my heart rate, I get a migraine. If I do anything that causes adrenaline, I get a migraine. If I do anything that causes anxiety, I get a migraine. If I do anything that changes my routine, I get an anxiety attack, which gives me a migraine.

Several years ago we sat down with the calendar and just went through it, and on an average one year, I was sick a hundred five times. And I can't guarantee what day of the week and what -- Who's gonna hire me?

Q. So do you receive, then --

A.  SSI disability.

Q.  -- disability payments?

Okay.  Did you have a lawyer that represented you in that proceeding?  Was there a proceeding where (inaudible) --

A.  I had a lawyer that helped me with -- with Workers' Comp.  And I believe he helped -- I don't remember for sure.  I believe he helped me with -- get the paperwork going for -- for SSI.  That's Tom Lynaugh here in Billings.

Q.  Okay.  Dorleen, you mentioned she works.

A.  Yes.

Q.  Aside, then, from the SSI and her paycheck, do you have other sources of income, any others that -- that you routinely receive money from?

A.  Nothing.

Q.  Okay.  Getting back to the -- the lawsuit that led us here today, did you, in fact, at one point in time open a credit card account with Chase Manhattan Bank?

A.  To the best of my recollection, no.  I don't remember opening an account with Chase.  I believe I had a credit card with a different outfit and Chase bought them.  I don't ever

remember applying for a Chase card.  It's possible, but I don't remember.

Q.  Have you ever discussed with Dorleen this question about whether you or she opened an account with Chase or how it came to be that they had your name on a credit card account?

A.  We've discussed it, and neither one of us remember how we got it.

Q.  Did you, in fact, have a credit card account through Chase where you were making purchases and expenditures on this Chase card?

A.  I think so.

Q.  I'm not trying to persuade.  Did you --

A.  I -- I -- I -- I remember making purchases, but I don't really -- I couldn't tell you which card; it's been too long.  And it wasn't something I was trying to remember.  I'm sure I used it, but it's not something I applied for.

Q.  Are you -- Is it your position that this was an account that somebody improperly created in your name?

A.  No.  It's just like the banks buy one bank after another until they're a bigger bank, and they bought somebody else out.  But every time you do that, the rules change and everything else

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 69 of 99

changes, and I don't have a vote in those rules.

Q.   So the -- I guess for purposes of kind of confining the issues we're talking about, it's not your position that this was a --

A.   I'm not denying I had the card.

Q.   Okay.

A.   I just don't ever remember applying for it.

Q.   Fair enough.  And I imagine there's a lot of folks like that.

A.   And I did pay on it for quite a while, but between the head injury and finances and them getting impatient and passing it on to bill collectors instead of continuing to deal with me, and, of course, raising the penalty fees, and the interest rate tripling and the endless phone calls from the bill collectors, once again the head injury and -- I was going downhill.  I had been healing, and it just promptly turned around; I was getting worse.

Q.   Did you have other credit cards as well?

A.   Yes.

Q.   How many others?

A.   It's kind of hard to say.  They came and went, too, being bought out.  I think -- I had a

First Card, First USA card, a Wells Fargo; I think there was another one.

First Card and First USA bought out several of the other cards, and it all became one bigger bill. I'm not sure. At one point we had these little itty-bitty accounts that didn't amount to anything. They just got bought out by bigger companies.

Norwest card became Wells Fargo. Somewhere in there I believe Chase was Chemical Bank. I'm not sure. I know somebody bought Chemical Bank.

Q. When -- when you'd have these credit cards, did you ever read the -- any of the paperwork that came with them from the card issuer?

A. Originally, yes. Can I tell you what they mean today? No.

Q. Do you have any recollection whatsoever about what any of those agreements said?

A. Pay the bill.

Q. Do you remember seeing anything about whether they could ask for attorney's fees against you if you didn't pay the bill?

A. I have no idea.

Q.  Okay.  I want to show you another document that's been produced in this case.  It's been labeled JRL 0015.  It's a letter dated February 8, 2007, and it's addressed to you at 1702 Eleanor Roosevelt Road.

A.  Same street, same street.  County side and the city side change in front of the house.  Same address, different street sign, depending on which side you come from.

(Reviews document.)  Yeah, I remember that.

Q.  You recall receiving that letter?

A.  Yeah.

Q.  Does that appear to be a correct copy of the letter you -- you received in February of 2007?

A.  I couldn't tell you or not.  I remember receiving a letter, but I couldn't tell you whether it was a correct copy or not.  That's too long ago.  My brain don't work for paperwork like this.

Q.  Would you have noted your receipt of a letter like that on your calendar?

A.  No.  About the best I do would put it in the file [sic], which I did.  There should be a

copy of it in my file.

Q. And that -- The gist of that letter is that the Johnson, Rodenburg firm is notifying you that they've been asked to try to collect on this Chase credit card account.

A. Yeah, and the price doubled, and it's also the same one I've been contacted by two law firms before; yeah.

Q. You mentioned earlier that you thought you contacted this -- this law firm --

A. No, I contacted the one before this.

Q. Okay. Did you respond to this letter?

A. No, I did not.

Q. Okay. Was there a particular reason why you didn't?

A. Statute of limitations were up. They could bark all they want; I wouldn't -- I wouldn't move.

Q. Okay. Did -- did you take any action other than --

A. Not until they filed suit against me.

Q. Okay. Is it -- is it correct, then, that the next thing that occurs in the sequence of events is that you're served with the lawsuit in June?

A.  I'm not sure.  I might have received another -- Did I receive any -- I didn't bring any of that file with me.  There might have been another letter between here and there, but the next -- anything that amounted to anything was being served, yeah.

Q.  Okay.

A.  Because I'm not sure whether that was their first or second or --

Q.  I understand that your -- one of your contentions in this lawsuit is that you have suffered emotional distress because of the conduct of my client, Johnson, Rodenburg and Lauinger.  Is that your understanding?

A.  Yes.

Q.  Okay.  Describe for me and for the jury, if you will, what it was that my client did that caused you emotional distress.

A.  Well, a perfect example is having to file the papers:  both physical and emotional distress.  Migraines, headaches, sick all over, nausea, everything that goes with a migraine.

Having to deal with having to come up with it in a timely manner, having to deal with again and again and again.  It just builds up to a

Case 1:07-cv-00166-CSO       Document 146       Filed 04/09/09       Page 74 of 99

giant frustration.

And the fact that this had already been cleared up in the first case, I was getting very ticked off. And I wasn't the only one they were doing this to that just pissed me off. It's the one thing that really gets me going is, I don't give up. I don't quit.

If I quit, I wouldn't have recovered this far. Doctors say you've only got two years of recovery with a head injury, and after that -- it's bull. You can recover forever if you keep on fighting, if you keep on working at it, if you don't give up. It's just that you don't notice improvements after two years. That's why you give up.

These people were ticking me off. I wasn't gonna give up. They were hurting me; they were hurting other people. They went out of the way to do this garbage. I know I'm not the only one they were out there doing, and I'm not gonna quit fighting. I -- They got me mad. I was not gonna give in.

Q. It's the fact -- I want to understand you correctly. It's the fact that they sued you on a debt that -- or on an issue that you thought

Case 1.07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 75 of 99

had already been resolved; that was what made you frustrated.

A.   Yeah.

Q.   Okay.

A.   And if they're coming after me three times, CVLC [sic] of Colorado, then it's time to fight.  And first thing I did was go after them.

Q.   So you just mentioned three times.  We talked earlier about the one time that the Spencer law firm --

A.   Uh-huh.

Q.   -- had sued you.  When was the other -- when was the other time?

A.   Oh, the other time was the documents arrived during -- before the Spencer trial was over by the other law firm that I -- passing -- While you've got one in court, you don't pass it off to another law firm.

And they added, what, another $2,000 to it, and, all of a sudden, here it comes back at a ridiculous amount and almost $10,000 for something -- I was getting more and more ticked off all the time.  And the fact that -- It was always my understanding that when you go into a law firm, you have evidence and have an idea of

what happened before.  You've got some documentation on your side; otherwise, you wouldn't be suing.  It'd be a waste of time, and the courts would get upset with you.

So I figured, Well, they've got to have all the information from the previous lawsuits.  They've got to already have the answers.  And they've just, you know, tripled their, you know, interest rates and raised their prices up and everything.  I got ticked.

As far as I was concerned, the law firm was as guilty as the company they were representing.  It was ridiculous.

Matter of fact, the law firm should be more guilty.  They knew better.  They're the ones who are supposed to know the law.  It was just pure aggravation.

And between the headaches, that got me even more upset.  So I contacted Prepaid Legal, and they made some suggestions for me, and I met my lawyer.  And after a while, he contacted me, and we went with it.  And I get to right some wrongs.  I feel useful again.

Q.  You previously made a claim in this lawsuit against CACV of Colorado; is that right?

A.    Yes.

Q.    Okay.    I understand you've settled that claim.

A.    Yes.

Q.    What was the settlement?

MR. HEENAN:    I'll object and instruct you not to answer that.    It's a confidential settlement.

MR. SIMPSON:    Okay.    We'll have to get the judge on that, but --

Q.    (BY MR. SIMPSON)    You felt that CACV had wronged you.

A.    Yes.    But like I said, as much as CVAC [sic] -- they're just a bunch of greedy, money-grubbers -- the wrong -- the real wrong came from the law firm, because it had already been settled. They are the ones who are supposed to know the law.    That's the one that ticked me off.

Q.    You say it had already been settled. How was it settled?

A.    It had already gone to court in the first case.

Q.    Did you appear in a courtroom?

A.    No.    Actually, they dropped the whole thing the day -- the day before.    I showed up to

go to court, and I hadn't been notified yet.

Q. So it was -- it was just voluntarily dismissed.

A. Yeah.

Q. Okay.

MR. HEENAN: Object to form: Foundation.

Q. (BY MR. SIMPSON) You didn't pay anything to resolve your earlier lawsuit.

A. No.

Q. Okay.

A. And the papers I've got say it was dismissed. Not dismissed without prejudice, but dismissed.

Q. Are those -- Those would be court papers?

A. Those were the court papers that were sent to me.

Q. Okay. You mentioned -- As far as the symptoms of your emotional distress from the lawsuit that was filed against you, you mentioned the migraine headaches and that it made you upset, obviously.

A. Oh, yeah. Do you understand what a migraine is?

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 79 of 99

Q. Yeah.

A. I came up with a description that anybody who's never had a migraine can understand what a migraine is.

Q. Did your migraines become more frequent after the lawsuit was filed?

A. Yes. And then they subsided for a while, and then there was more garbage, and they came back. It's the yo-yo effect. You add in the adrenaline, and here they come.

Give me a chance to get them under control, they slow down and go down. I may not have a major one, just a minor one. And then comes the stress, and here they come again.

Q. Has this lawsuit caused you stress?

A. Oh, yes.

Q. How -- Can you quantify for me whether your migraines increased twofold, threefold?

How often -- how often -- more often were you getting them after this suit was filed against you?

A. On an average, I'll have a -- Calm year, I'll have one migraine a month of any decent size. I'll have a major one maybe twice a year. A major one lasts more than one day. Virtually every time

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 80 of 99

I've had to deal with this, I've been sick for two, three days at a time.  So I've had some major migraines every single time I've had to deal with this.

I will go home this afternoon and do everything I can to prevent a migraine from happening tomorrow, but I'll have a migraine tomorrow.  There's -- It's always that way when I change my routine and get wound up.

Q.  Did your migraines become more intense after this lawsuit was filed?

A.  Well, they lasted more than one day, so they were bigger than normal.

Q.  Would the best -- would the best evidence of the frequency and duration of your migraines be the calendar that you've kept?

A.  Probably, yeah.

Q.  Okay.

A.  I marked down most of the big ones, and I marked down even the little ones and even the sinus headaches, and you'll see them marked separately, so -- But, yeah, if I'm flat-out sick with a headache or it's marked big headache, it's -- it's a migraine.

Q.  Did you -- Aside from the migraines, did

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 81 of 99

you have other symptoms of emotional distress that you attribute to this lawsuit?

And when I say "this lawsuit," the one that was filed against you by Johnson, Rodenburg & Lauinger.

A.   What do you --

MR. HEENAN:  And I'll object to form. Vague with respect to "emotional distress."

A.   Yeah, I need -- What do you want?  Other than the migraines?  Upset stomach, nausea, throwing up.

Q.   (BY MR. SIMPSON)  Things of that nature.

A.   That's all migraine.  I mean, all of that goes with the migraine.  There's none of it that you can separate from the migraine.  I mean, you sit in the dark; you either put on some numbing sounds in the background; you put sunglasses on so that -- Drop the curtains, close everything up; that's all migraine.  Look at the pretty colors, yeah.

Q.   Did you seek any medical help from any doctors because of this emotional distress and the migraines?

A.   No.

Q.   Have you sought any psychological

assistance or counseling because of emotional distress from the lawsuit?

A.  No.  I had my regular dates, and I deal with myself.  I've had 18 years of practice.

Q.  What -- How did this lawsuit affect your daily routine, your activities that you do on a daily basis?

Did you change your routine because of the lawsuit?

A.  Some days, I can't change.  And some days I can't get up, and some days I just have to trudge through -- establish a routine in order to break the migraine.  And I can't remember.  I can look at the calendar and tell you whether I did something or I didn't do something, but I can't tell you whether that changed my routine.

Q.  One of the -- one of the responses that you've provided to us in your written discovery responses says one of the items of damage that you're asking for in the case is the legal fees that you incurred in defending the prior lawsuit.  Is that your understanding?

A.  I think so, yeah.  I think I asked for that, yeah.

Q.  Did you, in fact, pay Mr. Heenan that

amount -- I think it was 1500-and-some dollars --
to defend you in that prior suit?

THE WITNESS:  Was that how much you got
paid?

MR. HEENAN:  Well, just answer the best
you can.  If you don't know, you don't know.

A.  I don't remember how much he got paid.

Q.  (BY MR. SIMPSON)  You paid him, though.

A.  Yeah, he got paid in the previous suit.

Q.  By you.

A.  Yes, came -- came out of my settlement.

Q.  Okay.

A.  I paid to him some money in advance as a
retainer, I think --

MR. HEENAN:  Well, I'll -- I can either
just object or explain better for you.

Q.  (BY MR. SIMPSON)  I'm just trying to
find out if it was something that you actually
paid at one point or the other to Mr. Heenan.

A.  Yes, he's been paid for that.

MR. HEENAN:  I --

A.  Look at the records.  I can't tell you.

Q.  (BY MR. SIMPSON)  I don't have those
records.

MR. HEENAN:  If I can, just for point of

TIFT v. JOHNSON, et al.    9/4/2008    MARK "TIMOTHY" McCOLLOUGH
Case 1.97-cv-00166-CSO    Document 246    Filed 04/09/09    Page 84 of 99

Page 84

clarification and -- There was a confidential settlement with CAVC. I've instructed Mr. McCollough not to disclose the nature or terms of that settlement.

THE WITNESS: I don't remember.

MR. HEENAN: Okay. But with that said, I can represent that I was paid out of that settlement as well, but that doesn't consider defense costs.

Mr. McCollough and I have an attorney-client fee agreement where he's agreed to pay me on an hourly basis. And the figure set forth in the written discovery is what's represented there, but he has not paid me that amount of money to defend that case, if that makes sense to you.

MR. SIMPSON: I'm a little confused.

A. Welcome to the club.

Q. (BY MR. SIMPSON) Okay. It came out of the settlement.

A. Welcome to the club.

Q. It came out of your settlement with CAVC to pay Mr. --

MR. HEENAN: Not for defense costs. Totally separate things.

A.   Totally separate things, whatever.   I knew I've paid him something, but that's all I remember right now.

Q.   (BY MR. SIMPSON)   Okay.   Aside from the money that you've had to pay him, tell me, if you will, what other out-of-pocket expenditures you made because of the lawsuit filed by -- against you by Johnson, Rodenburg & Lauinger.

A.   Oh, I can think of I did the original filing to defend myself.   And, of course, there's transportation to and from.

Q.   To and from where?

A.   Courthouse, to file the papers, going over it twice.

Q.   Okay.

A.   I was out the money spent making copies and getting the documents together.   And I probably ended up taking a lot more medication at home to help control me, and that comes out of my pocket as I don't have insurance anymore.

Q.   What -- what kind of medication did you have to increase?

A.   At that time, I'm not sure what I was taking.   I had a blood pressure medication; I had a -- I had the option of a muscle relaxant and

anti-inflammatory and some herbal remedies I use.

Q. Can you -- can you describe for me how much of an increase in these medications you had?

A. Not at this time. I couldn't tell you what I was taking then.

Q. Do you -- do you have a way of looking at your records --

A. No, I don't keep records of that.

Q. And I -- I realize this may sound like minutia, but I don't want to sit at trial and have you say, Okay, I figured out now that I took five times as much.

A. I don't know. There's just no way for me to even keep track of how many pills I took --

Q. Okay.

A. -- of what type, when.

Q. Have you --

A. I've never written that down.

Q. Have you decreased the amount of medications you've taken since the lawsuit against you was dismissed?

A. Off and on, off and on. Every time I have to deal with another emergency, up they go again, and this last year's been filled with emergencies.

Q.  You mentioned -- you mentioned an unfortunate situation with your wife's injury.

Has there been another emergency that's affected you?

A.  Well, that's an ongoing one.  She was injured two days before Thanksgiving, and she just had the surgery a month and a half ago.

Q.  You mentioned the issue with your father's (inaudible) --

A.  Well, I had to go out to California, my father's situation.  And the wife's had four surgeries so far since --

Q.  Since last November?

A.  Since November.

Q.  Okay.

A.  Three on her ankle, all done at one time, and a knee replacement, which was previously scheduled.

The ankle happened just before the knee replacement.  They thought it was a sprain, so they allowed her to go through with the knee replacement, and then they found out that it wasn't a sprain.  So it's been a battle for nine, ten months now.

Q.  Have those things increased your blood

Case 1:07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 88 of 99

pressure --

A.   Oh, yeah.

Q.   -- causing the migraines?

A.   Definitely, definitely.

Q.   We've talked about the attorney's fees that Mr. Heenan received from the settlement, which is one of the items of damage in this case.

We've talked about your costs that you incurred defending the case as far as court filing fees, copy charges, mileage to the courthouse.

Can you quantify in rough terms how much those costs would be?

A.   I don't even remember what those costs are.

Q.   Would it be fair to say they're $500 or less?

A.   Probably.

Q.   Are there other -- And we've obviously talked about emotional distress.  Are there other damages in this case that you're seeking from my client that we haven't discussed?

A.   Other damages.  In what format?

Q.   Well, you tell me.  Ones that you can think of that are either out-of-pocket expenditures that you've made or some injury that

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 89 of 99

you've been caused by my client that you're seeking money from?

A. Oh, you mean my pain and suffering and mental distress and aggravation.

Q. Things of that nature, sure.

A. Sure. How about that?

Q. Okay.

A. Those are always good answers. Yeah, that -- that works all right down the line.

Q. Okay.

A. Mental distress, aggravation, pain and suffering, continuous aggravation.

Q. Okay.

A. The biggest thing aggravating me is the fact that I had to get a lawyer in order to get them to straighten their act out in the first place. And if I have to get a lawyer, somebody else has got a lawyer. How many people have they done this to?

Q. Do you have --

A. I -- I really -- My religious -- I have a righteous indignation.

Q. You mentioned earlier that you understand they've apparently engaged in improper lawsuits with other people. What personal

Case 1:07-cv-00166-CSO    Document 146    Filed 04/09/09    Page 90 of 99

knowledge do you have of that?

A.   That they've engaged in something?

Q.   Uh-huh.  Is it things -- Is that what other people have told you, or do you have some personal knowledge and source of that information?

MR. HEENAN:  Well, and I'll -- Let me raise an objection to the extent it's based on conversations with your counsel.

Q.   (BY MR. SIMPSON)  And I'm not asking you about what you and Mr. Heenan have talked about. If that's -- that's your source --

A.   Other than -- other than that?

Q.   Yeah.

A.   I'm just going off experience with debt collectors and lawyers in general that have done this in the past.

I don't really particularly believe anybody that goes after you with a lawsuit that's been settled, after the statute of limitations has already gone past, when you're disabled -- which, the best of my knowledge, that means they can't collect from me anyway -- Those are all against the law.  You think the law firm would know.

That pretty well makes them bad guys, crooks or idiots.  They can choose which title

they like.

VIDEO OPERATOR:  I need to take 30 seconds to change recording media.

MR. SIMPSON:  You bet.

VIDEO OPERATOR:  Going off the record to change tape.  The time is 12:42 p.m.

(Whereupon, the proceedings were in recess at 12:42 p.m. and subsequently reconvened at 12:51 p.m., and the following proceedings were had and entered of record:)

VIDEO OPERATOR:  All right.  With that tape change, we are -- I'm sorry.  No, we're not.  Okay.  Stand by again.

All right.  Now we're back on the record after a tape change.  The time is 12:51 p.m.

Q.   (BY MR. SIMPSON)  Tim, yesterday I received from your counsel your -- Plaintiff's Responses to Defendant's First Combined Discovery Requests.  One of the questions, Interrogatory No. 17, wasn't answered.  There's just a blank space there.  I expect it was an oversight rather than some kind of intentional omission on your -- your part.

So let me just read the question to you --

A.   All right.

Q.   -- and -- and you can answer it the best you can.

And there's actually -- It's kind of two parts.  The question, Interrogatory 17, says, Please fully describe how each of Plaintiff's -- that's you -- disabilities described in the previous interrogatory make him vulnerable to debt collector abuse and/or harassment.

The disabilities that were described in the previous interrogatory, your answer states, I was on Workers' Compensation for approximately four years.  I applied for Social Security disability, and they backdated it to 1992.  I don't know what the basis for the disability diagnosis was.  Doctors at Behavioral Health Center all had a role in my diagnosis, I believe.

So then, again, back to No. 17, Please describe how your disabilities -- which we just described -- make you more vulnerable to debt collector abuse or harassment.

A.   Make me more -- Well, the memory; I couldn't remember whether the debt was there or not.  I couldn't remember what was -- they were talking about.

With the anger issues -- The debt collectors tried -- and I'm not saying your company. I'm just saying the debt collectors tried threats, vulgarity, lies, anything they could think of in order to get me to come up with what they wanted, whether it existed or not.

Between all of those things, it always triggered all of my problems. I was susceptible because I couldn't remember and because their attitudes and their language triggered other problems.

Q. Are you aware of any -- Were there any threats made to you by Johnson, Rodenburg and Lauinger?

A. Not that I remember, but if it wasn't in the letters, then I don't know.

Q. You'd agree with me that the letter that we looked at earlier that was from February of 2007 didn't contain any vulgarity.

A. No.

Q. Okay.

A. No. I didn't say that they contained any vulgarity. I said you -- That wasn't your question.

Q. Okay. What -- Aside from filing the

suit against you then, was there anything else my client did that caused you to suffer damage?

A.    I'm not sure how to answer that.  Other than causing me the physical/emotional strain; other than causing me the small but somewhat important financial burden; other than getting my goat up about here we go again; the constant reshuffling of my brain to remember these things again and again:  where'd my brain put it this time.  More importantly, where'd I put the paperwork this time.

One little conversation, one little filing goes a long way and comes back again and again and again.  My brain is slightly short-circuited because of the head injury, and I suffer flashbacks of anger, memory; where'd I put this; where'd I put that.  Anxiety can pop up anywhere just because one thing triggers something else down the line, so --

And it's not necessarily just when they did this.  It's all the aftereffects that go on in my head.

I have a tendency to remember strange things at strange times, totally out of place, as anybody who knows me knows that my sense of humor

pops out in the strangest ways, not always predictable and not always on subject.  It rotates, changes, goes a different direction.  And I don't always have control of it, my temper, my memory.

Some days are great.  Some days, even with the headache, I can go about the world.  And some days, I can barely open my eye and wonder why.  So it -- I can't say there's a direct -- The head injury -- There isn't always a direct -- It can be anywhere.

Q.  There's not always a direct connection?

A.  No.  It -- it -- it can pop up a week after everything's taken care of and trigger the anxiety, the headache, the anger.  It can -- it can show up anywhere.

Once the trigger has been put in place, it comes back again and again and again and again and at very inopportune moments.

Q.  So if I'm understanding you correctly, it's your testimony, then, that you -- you are still suffering from emotional distress because of the (inaudible) --

A.  It brings about anger attacks, yes.  It brings about anxiety.  I've been anxiety -- My

blood pressure's been up, my sugar's been up for the last month taking care of all the stuff getting ready for this deposition and the medical examination and all of that. This has not been a fun time.

And it will come back and haunt me. A month from now, all of a sudden, Gee, that was the answer I wanted. That was -- that's what I wanted to say.

It doesn't go away just because this is over. This -- But I'm not gonna give it up. I'm not gonna quit. This -- I was wronged. I'm not the only one that's wronged. Something's gotta be done to straighten this system out, and I'm gonna fight. I'm gonna make some noise.

Q. You brought up the medical exam, and I do appreciate you cooperating and getting in to see -- Dr. McIlhaney (phonetic); is that right?

A. I think that was his name.

Q. Okay. Did you feel you were able to fully answer his questions?

A. I tried. I don't think he was -- I get a little strange in some of my answers. It was one of those days I had a really good sense of humor going for me; I couldn't hold it in. But I

tried to stay on point, and he did understand the triggers that cause -- cause certain things.

He did say that the naturopathic clinic over here was something that a lot of his clients use, and he does recommend them. So I have to check into them, see how they do. Because I prefer natural drugs to the Western-style drugs. I get along better with them.

And we talked. He seemed to -- I think I got most of the -- most of the answers in a way or format that he can handle. I'm sure I screwed up somewhere, but I'm trying not to think about that.

Q. One other just kind of housekeeping matter, for the record, we've marked here as Exhibit 30 your 2007 calendar; is that correct?

A. That's correct.

Q. Okay. And --

A. Would you like me to sign it?

Q. No. Your attestation that that's your 2007 calendar's sufficient.

A. Uh-huh.

Q. That, as we discussed earlier, is primarily your handwriting on that calendar.

A. Yes. If there's my wife's handwriting,

TIFT v. JOHNSON, et al.     9/4/2008     MARK "TIMOTHY" McCOLLOUGH
Case 1.07-cv-00166-CSO     Document 146     Filed 04/09/09     Page 98 of 99

Page 98

it would only be in one or two spots, and you can

definitely tell the difference.

        Q.   Okay.   I have no further questions of

you, Tim.   I do very much appreciate your time.

        MR. HEENAN:   I'll reserve.

        MR. SIMPSON:   Read and sign?

        MR. HEENAN:   Read and sign.

        VIDEO OPERATOR:   The time is 1:01 p.m.

That ends the deposition.

EXHIBITS:

        (Deposition Exhibit No. 1 marked for

identification.)

        (Deposition concluded at 1:01 p.m.

Witness excused; signature reserved.)

                *     *     *

                    C E R T I F I C A T E

STATE OF MONTANA        )
                        : ss.
County of Missoula      )
            I, Melody Jeffries Peters, RDR, CRR,
Freelance Court Reporter and Notary Public for the
State of Montana, residing in Missoula, Montana,
do hereby certify:

            That I was authorized to and did report
the deposition of MARK "TIMOTHY" McCOLLOUGH in
this cause;

            That the reading and signing of the
deposition by the witness have been expressly
reserved;

            That the foregoing pages of this
deposition constitute a true and accurate
transcription of my stenotype notes of the
testimony of said witness.
            I further certify that I am not an
attorney nor counsel of any of the parties; nor a
relative or employee of any attorney or counsel
connected with the action, nor financially
interested in the action.

            IN WITNESS WHEREOF, I have hereunto set
my hand and seal on this the 3rd day of November,
2008.

                    *Melody Jeffries Peters*
                    _____
                    Melody Jeffries Peters, RDR, CRR
                    Freelance Court Reporter
                    Notary Public, State of Montana
                    Residing in Missoula, Montana.
                    My Commission expires:  3/11/2011