**AGREN·BLANDO COURT REPORTING & VIDEO**

ORIGINAL                                                    1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA, BILLINGS DIVISION

Cause No. CV-07-166-BLG-RFC-CSO

--------------------------------------------------------

VIDEO DEPOSITION OF BOBBY D. DUNKER        March 3, 2009

--------------------------------------------------------

TIMOTHY McCOLLOUGH,

Plaintiff,

vs.

JOHNSON, RODENBURG & LAUINGER,

Defendant.
--------------------------------------------------------
APPEARANCES:

        THE HEENAN LAW FIRM
                By John C. Heenan, Esq.
                    2602 1st Avenue North, Suite 305
                    P.O. Box 2278
                    Billings, Montana   59103
                        Appearing on behalf of Plaintiff.

        BOHYER, SIMPSON & TRANEL, P.C.
                By Fred Simpson, Esq.
                    283 West Front, Suite 201
                    P.O. Box 7729
                    Missoula, Montana   59807
                        Appearing on behalf of Defendant.

        BARRON, NEWBURGER, SINSLEY & WIER, PLLC
                By Manuel H. Newburger, Esq.
                    1212 Guadalupe, Suite 102
                    Austin, Texas   78701
                            and
        COLLECT AMERICA
                By Elizabeth E. Heartling, Esq.
                    4340 South Monaco, Second Floor
                    Denver, Colorado   80237
                        Appearing on behalf of
                        CACV of Colorado, LLC.

        Also Present:  Jay R. Wren, CLVS

AGREN·BLANDO COURT REPORTING & VIDEO

2

Pursuant to Notice and the Federal Rules of Civil Procedure, the video deposition of BOBBY D. DUNKER, called by Defendant, was taken on Tuesday, March 3, 2009, commencing at 9:01 a.m., at 1700 Lincoln Street, Suite 4100, Denver, Colorado, before Robin M. McGee, Registered Professional Reporter and Notary Public within and for the State of Colorado.

**AGREN·BLANDO COURT REPORTING & VIDEO**

3

I N D E X

VIDEO DEPOSITION OF BOBBY D. DUNKER

EXAMINATION BY:                                          PAGE

        Mr. Heenan                                    33, 65

        Mr. Simpson                                    5, 62

        Mr. Newburger                                    --

        Ms. Heartling                                    --

EXHIBITS                                      INITIAL REFERENCE

Exhibit 65    Subpoena in a Civil Case dated        6
              2-26-09

Exhibit 66    Affidavit of Sale dated              10
              8-31-07, Bates JRL 0064

Exhibit 67    Collect America, Ltd. Offer to       11
              Place Account for Litigation
              on Contingency Fee Basis dated
              12-18-06, Bates JRL 0010

Exhibit 68    E-mail chain ending in e-mail        22
              dated 8-6-07 from Bob Dunker
              to Grace Lauinger, Bates JRL
              0057

Exhibit 69    Terms and conditions for a           23
              credit card account, Bates JRL
              00133-140

Exhibit 70    Account Information Report            30

Exhibit 71    Affidavit in Support of              60
              Motion, Bates JRL 01890-1891

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

AGREN·BLANDO COURT REPORTING & VIDEO

4

P R O C E E D I N G S

(Exhibit 65 marked.)

(The following proceedings were not videotaped.)

MR. SIMPSON:  I just want to put a stipulation on the record between counsel, that we've agreed to reserve all objections except as to form of the question.                                                09:00:31 09:00:39 09:00:41 09:00:45

MR. HEENAN:  Correct.                          09:00:48

(The following proceedings were videotaped.)  09:00:48

THE VIDEOGRAPHER:  The time is 9:01.  We are on the record.  This is the deposition of Bobby D. Dunker, for the case of Timothy McCollough vs. Johnson, Rodenburg & Lauinger, Case No. CV-07-166-BLG-RF --        09:01:22 09:01:25 09:01:26 09:01:32

MR. HEENAN:  C, as in Charlie.                 09:01:35

THE VIDEOGRAPHER:  -- CSO in the U.S. District Court, District of Montana, Billings Division.  09:01:47 09:01:51

Today is March 3, 2009.  We are located at 1700 Lincoln Street, Suite 4100, Denver, Colorado.  09:01:55 09:01:58

The court reporter is Robin McGee.  The videographer is Jay R. Wren, CLVS.             09:02:03 09:02:06

The attorneys will identify themselves, beginning with the attorney on my left and the deponent's right.                                       09:02:07 09:02:10 09:02:10

MR. SIMPSON:  Yes.  My name's Fred Simpson.   09:02:13

I'm here representing the defendant, Johnson, Rodenburg & Lauinger.

MR. HEENAN:   John Heenan on behalf of the plaintiff.

MR. NEWBURGER:   Manuel Newburger.   I represent CACV of Colorado, LLC.

MS. HEARTLING:   Elizabeth Heartling.   I'm here also with CACV of Colorado, LLC.

BOBBY D. DUNKER, being first duly sworn in the above cause, was examined and testified as follows:

(Discussion off the record written record.)

EXAMINATION

BY MR. SIMPSON:

Q   Good morning.   Would you please state your full name.

A   Bobby Dennis Dunker.

Q   And may I call you Bobby today?

A   Yes, you may.

Q   Bobby, what's your business address?

A   4340 South Monaco Street, Floor 2, Denver, Colorado 80237.

Q   And sir, what is your occupation?

A   I'm a franchise legal specialist.

Q   And who are you employed by?

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

A    Collect America, Ltd.    09:03:43

Q    Is Collect America, Ltd. also known as CACV of Colorado, LLC?    09:03:45 09:03:48

A    CACV of Colorado, LLC is a wholly owned subsidiary of Collect America, Ltd.    09:03:51 09:03:54

Q    And do you work, then, with CACV of Colorado?    09:03:56

A    I'm an authorized agent of CACV of Colorado.    09:04:00

Q    Very good.  Sir, I'm handing you what we've labeled as Deposition Exhibit 65.  That's a subpoena that was issued for your attendance in this case.    09:04:02 09:04:06 09:04:09

Have you seen that document before?    09:04:12

A    Yes, I have.    09:04:13

Q    And you're here pursuant to that subpoena today?    09:04:14 09:04:17

A    Yes, I am.    09:04:17

Q    Very good.  Have you met with anyone to prepare for your deposition or your testimony today aside from Collect America's attorney?    09:04:18 09:04:20 09:04:23

A    No, I haven't.    09:04:26

Q    Have you reviewed any documents to prepare for your testimony today?    09:04:28 09:04:30

A    Yes, I have.    09:04:32

Q    What did you review?    09:04:32

A    I reviewed my computer file, a printout of the computer file.    09:04:33 09:04:37

AGREN·BLANDO COURT REPORTING & VIDEO

7

Q     And did you bring that with you?     09:04:39

A     No, I didn't.     09:04:40

Q     Okay.  What was contained in the printout of     09:04:41
the computer file?     09:04:43

A     It has information on the account that was     09:04:51
provided to us by the seller of the -- of the debt.  It     09:04:51
has payment information in it.  It has account activity,     09:04:57
such as phone calls, suits filed, payments made,     09:05:02
reporting to the credit bureau, the plaintiff's name and     09:05:10
address, Social Security number.     09:05:16

Q     Can you tell -- tell the jury, please, what     09:05:24
are your job duties?     09:05:26

A     My duty is -- is to work with my law offices,     09:05:29
to provide necessary documents in cases that are in     09:05:33
litigation. I help them manage the business that we send     09:05:40
to them.  I -- I oversee how many accounts -- how many     09:05:46
suits are being filed, are -- are they progressing     09:05:52
through the litigation process.  I'm responsible for     09:05:56
ensuring revenue is at certain levels and other     09:06:00
information related to those.     09:06:03

Q     And you may have told me earlier, but I've     09:06:05
forgotten.  What is your job title?     09:06:07

A     Franchise legal specialist.     09:06:10

Q     How long have you held the position of     09:06:13
franchise legal specialist?     09:06:14

AGREN·BLANDO COURT REPORTING & VIDEO

8

A    Almost a year.                                    09:06:17

Q    During the period of time that's at issue in     09:06:18
this suit, which is 2007, what was your position?     09:06:21

A    Legal account executive.                         09:06:27

Q    And what responsibilities did you have as the    09:06:29
legal account executive?                              09:06:32

A    Although the offices were different than what    09:06:34
I have now, they are substantially the same.          09:06:36

Q    The job duties that you had in 2007 are          09:06:43
substantially the same as you described a minute ago  09:06:46
that you do now?                                       09:06:48

A    Correct.                                         09:06:49

Q    And you're familiar with the law firm of        09:06:49
Johnson, Rodenburg & Lauinger, I take it.             09:06:52

A    Yes.  I have worked with that firm.             09:06:56

Q    How long have you worked with that firm?        09:06:57

A    I don't remember.                               09:06:59

Q    Were you working with that firm in 2007?        09:07:00

A    Briefly, yes.                                    09:07:05

Q    If you would, please explain to the jury the    09:07:10
business that CACV is in.                             09:07:13

A    It purchases charged-off credit card debt,      09:07:17
automobile deficiency debt, and -- and we assign it to 09:07:21
law offices for collections.                          09:07:27

Q    And when you say "charged-off credit card       09:07:29

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

debt," could you explain to the jury what you mean by    09:07:32
that term?    09:07:33

A    It means that the account is written off the    09:07:36
books as a performing asset.  Typically, there's a    09:07:41
six-month period of time from the time the last payment    09:07:47
is made on an account until the credit card company    09:07:51
charges it off or writes it off.    09:07:55

Q    And so as I understand it, CACV purchases    09:08:00
credit card debt that the credit card issuing companies    09:08:04
believe is no longer collectible or at least to the    09:08:08
point that it's not worth their while to -- to pursue    09:08:11
collection further?    09:08:14

A    I don't know.    09:08:15

Q    Okay.  CACV purchases credit card debt for an    09:08:16
amount less than what the debtor owes on the -- on the    09:08:22
debt.  Is that correct?    09:08:25

A    That is correct.    09:08:30

Q    Okay.  In this case, we're dealing with an    09:08:30
account of a gentleman named Tim McCollough.  You're --    09:08:32
you're aware of that?    09:08:34

A    I've heard of the name.    09:08:37

Q    Okay.  And you had some responsibility --    09:08:40
well let me back up.    09:08:41

Did CACV purchase a credit card debt of    09:08:43
Mr. McCollough to Chase Manhattan Bank?    09:08:47

AGREN·BLANDO COURT REPORTING & VIDEO

10

A     Yes.                                                    09:08:51

Q     Okay.  And give me a moment here.                       09:08:56

(Exhibit 66 marked.)                                          09:08:59

Q     (By Mr. Simpson)  Bobby, I'm handing you what           09:09:11
I've labeled as Exhibit 66.  Would you take a brief look      09:09:13
at that.                                                      09:09:17

Can you identify that document that's                         09:09:30
Exhibit 66?                                                   09:09:32

A     Yes.  It's an affidavit of sale that was                09:09:33
provided by Chase Bank to us.                                 09:09:36

Q     And that was concerning Mr. McCollough's                09:09:42
credit card debt with Chase Bank?                             09:09:46

A     That is correct.                                        09:09:49

Q     And what this document is is proof that CACV            09:09:49
of Colorado purchased Mr. McCollough's credit card debt       09:09:53
from Chase Manhattan Bank?                                     09:09:57

MR. HEENAN:  Object to form, but you can                      09:09:59
answer.                                                        09:10:00

A     That is correct.                                        09:10:01

Q     (By Mr. Simpson)  Okay.  And it -- what does            09:10:01
it -- what does it show that the purchase price was?          09:10:05

A     It does not show the purchase price.                    09:10:08

Q     Does it reference in Paragraph 3 a price, or            09:10:11
is that merely what Mr. McCollough owed to Chase              09:10:19
Manhattan Bank?                                               09:10:22

11

A    That is the amount owed at the time of    09:10:24
charge-off, is my understanding.    09:10:26

Q    Okay.  And what is that amount?    09:10:28

A    $4,066.80.    09:10:29

Q    And so is Exhibit 66, the affidavit of sale,    09:10:32
the document that CACV would use to show that it owned    09:10:35
Mr. McCollough's credit card debt?    09:10:41

A    Yes.    09:10:45

Q    Okay.  Are you aware that CACV of Colorado    09:10:46
hired my client, Johnson, Rodenburg & Lauinger, in    09:10:56
December of 2006 in an attempt to collect    09:10:58
Mr. McCollough's credit card debt?    09:11:03

A    Yes, I am aware of that.    09:11:05

Q    Were you involved in that decision to hire    09:11:07
Johnson, Rodenburg & Lauinger for that purpose?    09:11:11

A    No, I was not.    09:11:13

Q    Whose responsibility would that have been?    09:11:16

A    I don't remember.    09:11:20

(Exhibit 67 marked.)    09:11:20

Q    (By Mr. Simpson)  Bobby, I'm handing you what    09:11:22
I've labeled as Exhibit 67.  Please take a look at that    09:11:25
and let me know if that's a document that you're    09:11:31
familiar with.    09:11:34

A    I haven't seen this particular document    09:11:38
before.  I've -- I've seen the offer-to-place sheet on    09:11:40

12

other accounts.

Q    And -- and what is an offer-to-place account?

A    The document says we're -- we're giving this account to them to -- to review and -- and work the account, and it also lists our -- our work standards.

Q    And -- and does this Exhibit 67 appear to be the standard offer-to-place account that CACV was using in December of 2006?

A    Yes, it does.

Q    And is it in fact an offer-to-place account for Mr. McCollough's credit card debt with Chase Manhattan Bank?

A    That is correct.

Q    And this document, you mentioned it contains the work standards that CACV expects Johnson, Rodenburg & Lauinger to follow.  Is that right?

A    That is correct.

Q    And can you summarize for me, if you will, what those standards are, as you understand them?

A    We expect them to review the account to ensure that -- that it -- that it's permissible to file suit on the account.  We expect them to comply with -- you know, with federal and -- and state laws regarding the collection of debt.  If they decide to take the account, you know, we expect them to, you know, send a

demand letter, you know, and -- and -- and file suit on    09:13:34
a timely basis.    09:13:39

Q    And in fact, this requires Johnson, Rodenburg    09:13:41
& Lauinger, if it accepts the file, to commence    09:13:44
litigation in a fairly prompt fashion?    09:13:48

A    That is correct.    09:13:51

Q    Okay.  And in fact, is it within -- correct    09:13:51
that it has to file suit within 35 days if a settlement    09:13:56
isn't reached with the debtor?    09:14:00

A    That is our standard.    09:14:03

Q    Okay.  When CACV sends a file for placement    09:14:04
to a law firm like Johnson, Rodenburg & Lauinger, what    09:14:10
is the format of the material that it sends to the law    09:14:13
firm?    09:14:17

A    There is some information that's -- that's    09:14:20
transmitted electronically.  I can't remember everything    09:14:22
that's -- that's transmitted electronically.  You know,    09:14:28
part of it is sent electronically.  Part of it is -- is    09:14:31
paper documents that are mailed to them.  I can't    09:14:35
remember everything that we were mailing at that time to    09:14:37
this office.    09:14:42

Q    You mentioned a little earlier that you had    09:14:43
reviewed the electronic file notes for this file in    09:14:46
preparation for your testimony today.  Is that right?    09:14:50

A    Correct.    09:14:52

Q    Did you happen to review what information was    09:14:52
sent by CACV to Johnson, Rodenburg & Lauinger when the    09:14:54
McCollough file was -- was sent?    09:14:58

A    No.    09:15:01

Q    Okay.  Does it occur on occasion that only    09:15:01
electronic information is transmitted to the law firm as    09:15:05
opposed to some paper and some electronic information?    09:15:09

A    No.    09:15:13

Q    What forms of paper or what type of paper    09:15:15
would be sent?    09:15:18

A    The offer placement sheet.  We -- we have --    09:15:20
the terms and conditions would be sent out.  A business    09:15:24
record affidavit sometimes goes out.  I'm not positive    09:15:31
if that went out in this case or not.  I think it did.    09:15:36
A certificate of assignment.  I believe that's    09:15:40
everything.    09:15:44

Q    And when you say "the terms and conditions,"    09:15:45
are you referring to the terms and conditions of the    09:15:47
credit card agreement?    09:15:49

A    That is correct.    09:15:50

Q    Okay.  Is it correct that when the file is    09:15:51
sent, at least when this file was sent, Mr. McCollough's    09:15:56
entire payment history was not transmitted to Johnson,    09:16:03
Rodenburg & Lauinger?    09:16:10

A    I don't know that.    09:16:10

AGREN·BLANDO COURT REPORTING & VIDEO

15

Q    You don't know in this case?    09:16:10

A    We typically transmit the last payment date,    09:16:10
but I don't know if -- if that happened on this account.    09:16:11

Q    When did you first become involved in    09:16:19
Mr. McCollough's file on behalf of CACV?    09:16:23

A    I received a copy of a complaint that was    09:16:27
filed in Federal District Court by Mr. McCollough    09:16:31
against CACV of Colorado and Johnson, Rodenburg &    09:16:36
Lauinger.    09:16:38

Q    Do you recall having involvement in the file    09:16:41
prior to that time?    09:16:43

A    I did have involvement in the file prior to    09:16:45
placement with Johnson, Rodenburg & Lauinger.    09:16:49

Q    And do you recall involvement with    09:16:52
Mr. McCollough's -- with the collection lawsuit against    09:16:55
Mr. McCollough during 2007?    09:16:58

A    No.    09:17:02

Q    When you reviewed the file notes that you    09:17:05
discussed earlier, did you see your name in the file    09:17:07
notes during the time that the matter was in collection    09:17:10
efforts against Mr. McCollough?    09:17:14

A    I don't remember -- collection efforts    09:17:17
against Mr. McCollough while it was at Johnson,    09:17:21
Rodenburg & Lauinger?    09:17:23

Q    Yes.  Correct.    09:17:23

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

16

A    I don't remember for sure.    09:17:25

Q    Okay.  In this case, did CACV expect that    09:17:30
Johnson, Rodenburg & Lauinger would move ahead with a    09:17:39
lawsuit against Mr. McCollough, assuming that    09:17:43
Mr. McCollough didn't work out an arrangement to pay off    09:17:46
the debt?    09:17:52

A    Our expectations is -- is they would have    09:17:53
filed suit unless there was a problem with the file,    09:17:56
unless -- unless there was, you know, a reason not to.    09:17:59

Q    Were you aware of any reason not to, in    09:18:04
December of 2006, when the file was sent to Johnson,    09:18:07
Rodenburg --    09:18:11

A    I wasn't aware of it at that time.    09:18:12

Q    Would you agree with me that CACV knows that    09:18:17
the date that a debtor makes the last payment on an    09:18:20
account is an important date?    09:18:24

A    Yes.    09:18:29

Q    And -- and tell -- tell the jury, if you    09:18:29
would, why that date is important.    09:18:31

A    Because the statute of limitations is --    09:18:35
is -- is calculated roughly on that date.    09:18:37

Q    In fact, it's calculated based on that date,    09:18:44
is it not?    09:18:48

A    Assuming there's, you know, not some other    09:18:50
law or, you know -- you know, some states, you know, a    09:18:53

AGREN·BLANDO COURT REPORTING & VIDEO

17

payment made to a debt purchaser doesn't necessarily restart the tolling of the statute, so it depends on the state law at the time.

Q    And it's -- it's not only important to the law firm that's representing CACV, but CACV has an interest in making sure that it's aware of that date as well, isn't it?

A    That's correct.  It is one of the things we check for when we review accounts.

Q    And -- and why is that?

A    Because we don't want to send accounts to our law firms that are out of statute.

Q    And -- and is that because CACV might also be liable as a debt collector?

A    I don't know that.

Q    Okay.  Would you agree that CACV has a vested interest in assuring that it provides accurate information to its law firms like Johnson, Rodenburg --

A    Yes, we do.

Q    Okay.  And it makes every effort to provide correct information to its law firms.

A    Yes, we do.

Q    And when CACV sends a file for placement with a law firm, it would provide a last payment date.  Is that --

A    That is correct.                               09:20:07

Q    And in fact, it provided that information to   09:20:08
Johnson, Rodenburg & Lauinger for Mr. McCollough's file.  09:20:12
Is that right?                                      09:20:15

A    I can't -- I don't know exactly what was       09:20:17
transmitted to them.  It is our normal procedure to  09:20:19
transmit that information.                          09:20:22

Q    Was Jeffrey Gustin an employee of CACV of      09:20:29
Colorado in January of 2007?                        09:20:34

A    That is correct.                               09:20:37

Q    And is he still employed at CACV of Colorado?  09:20:38

A    Yes, he is.                                     09:20:41

Q    What -- what, if you know, are -- well, what    09:20:42
is his job position?                                09:20:46

A    He is a franchise legal specialist, as I am,    09:20:48
today.                                              09:20:52

Q    In 2007 -- and let's focus on January 2007 --   09:20:52
what was Mr. Gustin's position with the firm?       09:20:56

A    I am not sure at that time.                     09:21:00

Q    If I -- if I told you that he was in            09:21:02
litigation and recovery, would that help, or is that the  09:21:05
department you work in as well?                     09:21:08

A    Yeah.  I -- yeah.  He -- he has been in         09:21:10
Collect America's litigation recovery department since  09:21:15
his employment.  I do know that.                    09:21:18

Q    And that's the department you work in as well?    09:21:20 09:21:22

A    That is correct.    09:21:22

Q    Did you hold any supervisory capacity over Mr. Gustin as of January 2007?    09:21:23 09:21:26

A    I don't remember if it was in January of 2007. At one time I was, but I can't remember the time now.    09:21:30 09:21:32 09:21:36

Q    Okay. What -- what kinds of things would you have supervised Mr. Gustin in?    09:21:37 09:21:42

A    He -- he would have exchanged information with offices that -- that were under -- under our charge. So we were organized in teams, and I was the lead person for a team. So I would have designated him to, you know, get information from law firms, provide information to law firms depending on the case and -- and what was happening with it.    09:21:48 09:21:54 09:21:56 09:22:03 09:22:06 09:22:10 09:22:14

Q    Are you aware of whether Mr. Gustin had any communications with Johnson, Rodenburg & Lauinger regarding the McCollough file?    09:22:18 09:22:21 09:22:23

A    I remember seeing a note that there was an e-mail exchange between Mr. Gustin and -- and the law firm.    09:22:25 09:22:29 09:22:33

Q    And -- and did you review that note to prepare for your testimony?    09:22:33 09:22:35

A    Yes, I did.    09:22:37

Q    Do you recall what it said?    09:22:38

A    I don't --    09:22:40

MR. NEWBURGER:  Excuse me.  We object on the    09:22:42
grounds that communications between CACV of Colorado,    09:22:47
LLC and its law firm are privileged communications, and    09:22:47
CACV of Colorado, LLC does not waive the attorney/client    09:22:51
privilege.  The only party who has the ability or power    09:22:56
to waive the privilege is the client itself, and I am    09:23:01
not empowered to waive that privilege.    09:23:04

MR. SIMPSON:  So you're instructing him not    09:23:08
to answer?    09:23:08

MR. NEWBURGER:  I'm instructing the witness    09:23:09
not to answer on the grounds that communications between    09:23:09
attorney and client are privileged.    09:23:09

Q    (By Mr. Simpson)  Are you aware of    09:23:24
communications regarding the last payment date between    09:23:27
CACV of Colorado and Johnson, Rodenburg & Lauinger    09:23:30
regarding Mr. McCollough's last payment?    09:23:34

MR. NEWBURGER:  I hate to do this to you, but    09:23:44
I believe the subject matter of communications between    09:23:46
lawyer and client falls within the attorney/client    09:23:48
privilege as well, and therefore I must, again, object    09:23:51
on the grounds that the question calls for information    09:23:54
which is subject to the attorney/client privilege, and    09:23:57

21

CACV of Colorado, LLC does not waive that privilege, and    09:24:00
therefore the witness is instructed not to answer.    09:24:04

Q    (By Mr. Simpson)  Mr. Dunker, if I    09:24:06
represented to you that CACV told Johnson, Rodenburg &    09:24:09
Lauinger that the last payment made by Mr. McCollough    09:24:13
was on June 30, 2004, would you disagree with me?    09:24:17

MR. NEWBURGER:  Objection.  The question    09:24:21
still calls for privileged attorney/client    09:24:23
communication, and therefore we object on the basis of    09:24:25
attorney/client privilege, and the witness is instructed    09:24:29
not to answer.    09:24:32

Q    (By Mr. Simpson)  Mr. Dunker, you're aware    09:24:33
that Johnson, Rodenburg & Lauinger filed a lawsuit on    09:24:35
behalf of CACV of Colorado against Mr. McCollough to    09:24:38
collect on the Chase Manhattan credit card account in    09:24:43
April of 2007?    09:24:46

A    I remember that.    09:24:47

Q    Okay.  When did you first become aware of    09:24:49
that?    09:24:51

A    Yesterday.    09:24:52

Q    Okay.  And certainly, CACV intended that    09:24:53
Johnson, Rodenburg & Lauinger would pursue collection    09:24:59
efforts against Mr. McCollough by filing a lawsuit?    09:25:01

A    If it was legally permissible, yes.    09:25:04

Q    Do you recall having any communication with    09:25:10

22

Grace Lauinger, an administrative assistant with Johnson, Rodenburg & Lauinger, in August of 2007?

A    No, I do not.

Q    If I provided you a copy of an e-mail exchange that you had with Ms. Lauinger, would that perhaps refresh your recollection?

A    It may.

MR. SIMPSON:  Let's take a very short break.

THE VIDEOGRAPHER:  The time is 9:25.  We're going off the record.

(Exhibit 68 marked.)

(Recess from 9:25 a.m. to 9:57 a.m.)

THE VIDEOGRAPHER:  The time is 9:57.  We're back on the record.

Q    (By Mr. Simpson)  Bobby, just before the break, I handed you a document that we've labeled as Exhibit 68.  Have you had a chance to review that document?

A    Not yet.

Q    Would you take look at that for me, please.

MR. NEWBURGER:  For the record, while the witness is examining Exhibit 68, I object to the marking and introduction of this exhibit on the grounds that it is a document which is subject to the attorney/client privilege, and CACV of Colorado, LLC does not waive that

AGREN·BLANDO COURT REPORTING & VIDEO

23

privilege.

Q    (By Mr. Simpson)  Bobby, let me just ask you, is this -- the content of this, without getting into the content, is this a communication that you had with Grace Lauinger in August of 2007?

A    I believe it is.

Q    And it's -- there's two communications, one that's August 3, 2007, where Ms. Lauinger asks you a question, and then your response on August 6, 2007, where you respond to the question?

A    That is correct.

Q    Are you able to tell us the content of the communication?

MR. NEWBURGER:  Objection.  The question calls for information which is subject to the attorney/client privilege, and CACV of Colorado, LLC does not waive the privilege.  Therefore, the witness is instructed not to refer to or describe the content of the communication.

(Exhibit 69 marked.)

Q    (By Mr. Simpson)  Bobby, I'm handing you a document that's been labeled as Exhibit 69.  Can you identify that document for me?  For the record, that's the card member agreement.

A    This is the term -- terms and conditions for

24

a credit card account.

Q    And do you -- do you know if that's the copy of the terms and conditions for the credit card account that was transmitted to Johnson, Rodenburg & Lauinger by CACV of Colorado for Mr. McCollough's account?

A    I don't know.  There's insufficient identifying information on this document.

Q    Have you seen or are you familiar with what you would believe to be the correct card member agreement between Mr. McCollough and Chase Manhattan Bank?

A    I don't remember looking at it.

Q    Okay.  Are you generally familiar with card member agreements through your work at CACV?

A    I believe I am.

Q    Have you ever seen a Chase Manhattan card member agreement that did not provide for an award of attorney's fees in the event of a default by the card member?

A    I never have.

Q    So is it fair to say that all card member agreements from Chase Manhattan that you've seen provide for an award of attorney's fees?

A    That is correct.

Q    Okay.  Do you have any understanding as to

**AGREN·BLANDO COURT REPORTING & VIDEO**

25

whether the card member agreement between Mr. McCollough    10:01:11
and Chase Manhattan that was in effect in this case    10:01:14
provided for attorney's fees?    10:01:17

A    I believe it did.    10:01:19

Q    Okay.  At some point during the lawsuit    10:01:21
against Mr. McCollough, did CACV become aware that the    10:01:37
last payment date that it had for Mr. McCollough was    10:01:43
incorrect?    10:01:46

A    Which lawsuit?    10:01:47

Q    This -- the lawsuit filed by Johnson,    10:01:48
Rodenburg & Lauinger.  And thank you for clarifying    10:01:50
that.    10:01:52

A    Okay.  I'm not sure.  I -- I didn't look at    10:01:53
the account after the suit was filed by Johnson,    10:01:58
Rodenburg & Lauinger until yesterday, and I don't    10:02:01
remember everything I looked at yesterday.    10:02:03

Q    Was there a directive at some point to    10:02:07
Johnson, Rodenburg & Lauinger by CACV to dismiss the    10:02:09
lawsuit against Mr. McCollough?    10:02:13

A    I don't remember.    10:02:15

Q    Generally speaking, would CACV expect that    10:02:18
Johnson, Rodenburg & Lauinger would not dismiss a    10:02:22
lawsuit without CACV's direction?    10:02:25

A    That is correct.    10:02:28

Q    And so is it fair to say that in this case,    10:02:31

26

CACV didn't expect Johnson, Rodenburg & Lauinger to dismiss the lawsuit absent directive from CACV?

A     That is correct.

MR. HEENAN:  I'm sorry.  You already answered, but I object to form, foundation, but the witness has answered.

Q     (By Mr. Simpson)  Are you aware of any directive by CACV of Colorado to dismiss the lawsuit prior to December of 2007?  And when I say "the lawsuit," the lawsuit against Mr. McCollough.

MR. HEENAN:  Same objection.

A     I am not aware of one.

Q     (By Mr. Simpson)  You're aware that CACV of Colorado was originally a defendant in this lawsuit filed by Mr. McCollough?

A     That is my understanding.

Q     Are you aware that Mr. McCollough claimed that CACV was liable for the same kind of misconduct that he's claiming that Johnson, Rodenburg & Lauinger engaged in?

A     Yes.

Q     Are you aware that CACV settled Mr. McCollough's claim against it?

A     Yes, I am.

Q     Do you know the terms of the settlement?

AGREN·BLANDO COURT REPORTING & VIDEO

27

A    No, I don't.                                          10:03:52

Q    Do you think CACV made any mistakes with              10:03:59
respect to its claim to pursue the debt against           10:04:03
Mr. McCollough or its handling of that -- that claim?     10:04:08

A    On -- on any particular date, or all dates?          10:04:14

Q    Throughout the entire time that it -- after          10:04:18
it had purchased Mr. McCollough's debt to Chase           10:04:21
Manhattan, do you think CACV made any mistakes in         10:04:23
judgment in its pursuit of --                             10:04:28

A    I do --                                              10:04:30

Q    -- collection?                                       10:04:30

A    -- believe there was a mistake made.   There         10:04:30
was a lawsuit filed in 2005 that should not have been     10:04:33
dismissed.                                                10:04:38

Q    And why is that?                                     10:04:39

A    Because -- because it was -- it was a viable         10:04:42
suit.   Mr. McCollough, I believe, incorrectly alleged    10:04:46
that the statute of limitations had expired on that       10:04:49
lawsuit.  And -- and my review of the file indicates      10:04:52
that we were within a five-year statute of limitations.   10:04:57

Q    And had CACV decided to dismiss that initial         10:05:00
lawsuit based on Mr. McCollough's representation about    10:05:04
the statute of limitations?                               10:05:07

A    I believe so.                                        10:05:09

Q    And it's your testimony, then, today, as I          10:05:11

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

understand it, that CACV would have maintained its initial suit had Mr. McCollough not misrepresented the statute of limitations?

A    If I'd have been in charge of that account, the -- it would have been prosecuted until we obtained judgment.

Q    Very good.  The trial in this case, in Mr. McCollough's case against Johnson, Rodenburg & Lauinger, is set to occur beginning on April 14, 2009 in Billings, Montana.  Fair to say that you're not planning on being in Montana that week?

A    I have no -- no reason to be in Billings, Montana that week.

Q    Anywhere in the state of Montana that week?

A    I have no reason to believe I'll be anywhere but in Denver, Colorado that week.

Q    Okay.  So is it fair to say you're not available to attend trial?

A    That is correct.

Q    I wanted to touch again on what documents you might have reviewed to prepare for your testimony today. Can you identify those by any particular name that the company uses?

A    It would have been called an account information report.

Q    Was there something called STARS notes?    10:06:17

A    STARS is our computer system.  That report    10:06:20
would have been generated out of that platform.    10:06:24

Q    And so have you reviewed the STARS notes?    10:06:27

A    Yes.    10:06:30

Q    Okay.  And would you be willing to share    10:06:30
those with me today?    10:06:32

A    I didn't bring them with me.    10:06:34

MR. NEWBURGER:  And for the record, I do have    10:06:38
them.  We've been trying to make sure we redacted    10:06:39
attorney/client privileged information, but I do have    10:06:44
them with me.  I think I'm obligated by the rules to    10:06:46
acknowledge that fact.    10:06:49

If we could just be sure that they're    10:06:51
redacted -- I don't know that we've got an objection to    10:06:53
letting you guys see them, but I won't -- I won't let    10:06:56
them go with attorney/client privileged communications    10:06:59
un-redacted.  And what I think we can do is if    10:07:02
Ms. Heartling can finish going through to be sure that    10:07:07
privileged communications are redacted, I can put them    10:07:07
onto a USB drive and let the firm here print them for    10:07:09
you, if that's acceptable.    10:07:14

MR. SIMPSON:  It is.  I appreciate that very    10:07:16
much.  Let's take a very short break.  I think I'm    10:07:18
nearly completed with my questions.    10:07:22

AGREN·BLANDO COURT REPORTING & VIDEO

30

THE DEPONENT:  Okay.                                    10:07:25

THE VIDEOGRAPHER:  The time is 10:07.  We're    10:07:26
going off the record.                                   10:07:29

(Recess from 10:07 a.m. to 10:28 a.m.)          10:07:31

(Exhibit 70 marked.)                            10:27:34

THE VIDEOGRAPHER:  The time is 10:28.  We're    10:28:06
back on the record.                                     10:28:09

Q      (By Mr. Simpson)  Bobby, I've handed you    10:28:10
what's been labeled as Exhibit 70.  Could you take a    10:28:12
look at that document for me, please, and -- and tell me  10:28:15
what that is.                                           10:28:18

A      It's an account information report.          10:28:19

Q      And are -- are these the notes that you      10:28:21
reviewed to prepare for your testimony today?           10:28:24

A      That is correct.                             10:28:27

Q      And is this a document that CACV maintains in  10:28:28
the ordinary course of its business?                    10:28:32

A      Yes, it is.                                  10:28:38

Q      And who does -- does this refer to           10:28:38
Mr. McCollough's file with CACV?                        10:28:39

A      Yes, it does.                                10:28:43

Q      Okay.  And some of the data has been         10:28:44
redacted.  Is that your understanding?  And that's shown  10:28:50
in black highlighting.                                  10:28:53

A      That is correct.                             10:28:55

Q       Okay.  And is this essentially the entirety          10:28:55
of CACV's electronic file regarding Mr. McCollough?          10:29:02

A       I didn't print it out.  I can't testify to          10:29:11
that.                                                        10:29:13

Q       Does it document actions by CACV in                  10:29:13
attempting to collect on the debt that Mr. McCollough        10:29:18
had to Chase Manhattan that was assigned to CACV?            10:29:21

A       CACV is not a debt collector.  We -- we             10:29:26
don't -- we don't deal directly with defendants.  It         10:29:30
represents actions that would have been taken by             10:29:34
attorneys representing us.                                    10:29:36

Q       In an effort to collect the debt that               10:29:40
Mr. McCollough had?                                          10:29:42

A       That is correct.                                     10:29:44

Q       Okay.  And who has authority to enter               10:29:44
information into the notes here that have been produced       10:29:49
as Exhibit 70?                                               10:29:54

A       There are lots of people that have that             10:29:57
authority.  I have that authority.                           10:29:59

Q       Do the attorneys working on CACV files have         10:30:01
that authority?                                              10:30:04

A       It depends.  The -- the attorney in this case       10:30:07
does not have direct access to our computer.  There's --     10:30:13
there's a link between their computer system and our         10:30:17
computer system to -- you know, to get information into       10:30:23

it.

Q     If, for instance, there's a reference that a summons was issued on a particular date and a lawsuit was filed, is that information input by somebody at CACV, or can somebody at Johnson, Rodenburg & Lauinger make an entry that provides that information to the system?

A     Both of those things are true.  Some -- if somebody were to put in the -- a date in the correct field in their computer system, that would have been transmitted to our computer system and recorded in the note lines.

Q     And can you determine by looking at the notes who made a particular entry?

A     In some cases, yes.  The -- the note lines that come from our STAR comes from our attorneys and this attorney.  There's no name associated with it. It -- it's called a system note line because it -- it's coming from another computer system.

Q     Okay.  And if somebody at CACV makes an entry, is that person's name documented in the file?

A     That is correct.

Q     Okay.  Are you aware of any method or source of information that Johnson, Rodenburg & Lauinger would have to determine a last payment date other than

information provided by CACV? 10:31:52

A    No, I don't.  I'm not aware of one. 10:31:56

Q    So is it your understanding that Johnson, 10:32:00
Rodenburg & Lauinger would rely on CACV to provide that 10:32:02
information to it? 10:32:08

A    That is my understanding. 10:32:08

Q    Okay.  Did -- is that your understanding with 10:32:08
respect to the McCollough account? 10:32:12

A    That is correct. 10:32:15

MR. SIMPSON:  Okay.  Bobby, I have no further 10:32:15
questions for you.  I very much appreciate your time 10:32:18
here today.  I anticipate that Mr. McCollough's counsel 10:32:21
will now have some questions for you. 10:32:24

THE DEPONENT:  Okay. 10:32:27

EXAMINATION 10:32:27

BY MR. HEENAN: 10:32:28

Q    Mr. Dunker, have you ever been deposed 10:32:29
before, like you're being deposed here today? 10:32:32

A    Yes, I have. 10:32:35

Q    When? 10:32:36

A    I can't remember the exact date.  It was 10:32:41
about three years ago in Florida. 10:32:43

Q    Was it in your capacity as a CACV employee, 10:32:50
or was it an unrelated matter? 10:32:53

A    I don't remember if it was CACV of Colorado 10:32:58

34

or -- or another entity.    10:33:02

Q    Is that the only other time you've been    10:33:13
deposed?    10:33:15

A    Yes.    10:33:16

Q    Have you ever testified at a trial before?    10:33:18

A    Yes.    10:33:21

Q    When have you testified at a trial?    10:33:22

A    I can't remember all the dates.    10:33:25

Q    How many times?    10:33:27

A    I'm not sure.  Maybe 20.    10:33:31

Q    All in your capacity as a CACV employee?    10:33:37

A    CACV does not have employees.  I would have    10:33:43
testified as an authorized agent of CACV of Colorado, or    10:33:48
I would have testified as an agent of CACH, LLC.    10:33:52

Q    Who is your employer?    10:34:02

A    Collect America, Ltd.    10:34:04

Q    And Collect America, Ltd. is a Delaware    10:34:05
corporation?    10:34:09

A    I don't remember.    10:34:09

Q    Is Collect America, Ltd. a separate legal    10:34:10
entity from CACV of Colorado?    10:34:14

A    Yes.    10:34:16

Q    And your employer is Collect America, Ltd.,    10:34:19
correct?    10:34:24

A    That is correct.    10:34:24

AGREN·BLANDO COURT REPORTING & VIDEO

35

Q    But you're an authorized agent of both CACV    10:34:28
of Colorado and CACH?    10:34:32

A    That is correct.    10:34:34

Q    From where do you get the authority to act as    10:34:37
an agent of CACV of Colorado?    10:34:41

A    Collect America is on the board of directors    10:34:44
for that company, and I've been authorized by the board    10:34:47
to -- to act in a limited behalf on CACV of Colorado.    10:34:50

Q    Explain for me, if you will, what you mean by    10:34:58
"a limited behalf."    10:35:00

A    I'm authorized to -- to gather information    10:35:03
and disseminate certain information on the account.  I'm·    10:35:07
authorized to settle accounts within certain guidelines.    10:35:10
And ...    10:35:16

Q    What guidelines would those be?    10:35:21

MR. NEWBURGER:  Excuse me.  I object to that    10:35:29
question on the grounds that the information sought is    10:35:32
confidential and proprietary and falls under ·the trade    10:35:34
secret privilege.  My client's settlement guidelines are    10:35:38
not discoverable.    10:35:42

MR. HEENAN:  So you're instructing the    10:35:44
witness not to answer?    10:35:45

MR. NEWBURGER:  I'm instructing the witness    10:35:47
not to answer.    10:35:48

Q    (By Mr. Heenan)  Is there a document that    10:35:49

sets out your authority to serve as an agent of CACV of    10:35:55

Colorado?    10:35:55

A    Yes.    10:35:56

Q    Describe that document, please.    10:35:58

A    I -- I don't have it memorized.  It's -- it's    10:36:01

a one-page document signed by the chairman of the board,    10:36:04

authorizing me to act on behalf of CACV of Colorado.    10:36:07

Q    Who's the chairman that signed that document?    10:36:14

A    P. Scott Lowery.    10:36:18

Q    P. Scott Lowery in his capacity as the    10:36:27

chairman of the board of CACV of Colorado?    10:36:29

A    I believe that's correct.    10:36:34

Q    Who else is on the board of CACV of Colorado    10:36:36

that participated in giving you authority to act as an    10:36:39

agent?    10:36:43

A    I don't know.    10:36:45

Q    You don't know who's on the board?    10:36:48

A    I don't know all the board members.    10:36:50

Q    Who are the board members that you do know?    10:36:51

A    P. Scott Lowery.    10:36:53

Q    Anyone else?    10:36:56

A    No.    10:36:57

Q    Who else is an authorized agent of CACV of    10:36:57

Colorado besides yourself?    10:37:08

A    I know Magic West is.  Jeffrey Gustin is.    10:37:12

Lori Byrd, Thomas Weber, Jessica Snodgrass.  To my knowledge, that's it.

Q    And each of those individuals that you just named would have limited authority similar to yours as set forth in a one-page document?

A    I haven't seen their documents.  I don't know the extent of their authority.

Q    Do you have authority from CACV of Colorado with respect to litigation conduct?

A    I'm not sure what you mean.

Q    Sure.  And I apologize.  And let me -- if I ask a question that you don't understand or is a bad question, stop me and make me ask it a different way, because you have the right to understand what I'm --

A    I'm under oath, so ...

Q    Sure.  How about more narrowly tailored?  Do you have authority from CACV of Colorado to file a lawsuit?

A    No.  I'm not a lawyer.

Q    Okay.  Do you have authority on behalf of CACV of Colorado to ask a lawyer to file a lawsuit on behalf of CACV of Colorado?

A    As long as it's legally permissible, yes.

Q    And then how about with respect to prosecuting a lawsuit?  Do you have authority to

AGREN·BLANDO COURT REPORTING & VIDEO

38

determine whether it's appropriate to dismiss a lawsuit?    10:39:06

    A    Yes, I do.    10:39:14

    Q    Are those decisions that you have to run by    10:39:16
anyone else?    10:39:19

    A    Absent extraordinary circumstances, no.    10:39:22

    Q    CACV of Colorado has no employees?    10:39:34

    A    That is correct.    10:39:37

    Q    How about CACH?    10:39:39

    A    That is correct.  No employees.    10:39:41

    Q    What's the reason for that, if you know?    10:39:44

    A    I don't know.    10:39:48

    Q    When was the last time that you testified in    10:39:54
a trial?    10:39:56

    A    I can't remember.    10:40:04

    Q    Well, you -- it's your testimony that you've    10:40:07
testified approximately 20 times?    10:40:09

    A    Correct.  Over the course of the last three    10:40:12
years.    10:40:14

    Q    Okay.  Tell me the times that you can    10:40:15
remember where you testified.    10:40:17

    A    I can't remember.    10:40:21

    Q    None of them?    10:40:24

    A    I -- I've traveled to trials, and sometimes    10:40:25
they settle before I'm called to the stand, so I just    10:40:28
don't remember the last time I -- I was -- sat on a    10:40:33

witness stand.

Q    Tell me if you can remember the places where you've testified.

MR. SIMPSON:  I'll object as outside the scope of direct.  Go ahead and answer.

MR. HEENAN:  I thought we agreed on the outside the scope of direct because I was going to issue my own deposition notice.

Q    (By Mr. Heenan)  But go ahead.

A    Okay.  I have testified in Baltimore, Maryland; Upper Marlboro, Maryland.  I have testified in New York City, New York.  I have testified in St. Louis, Missouri.  I've testified in Springfield, Missouri.  I have testified in Poplar Bluffs (sic), Missouri.  I have testified in Newark, New Jersey.  I have testified in Burlington, New Jersey.  I have testified in Nashville -- excuse me -- not Nashville.  I've testified in a suburb of -- of Nashville, Tennessee; Memphis, Tennessee.  I have testified in Knoxville, Tennessee. There's a couple of others, that I can't remember the names of the cities.

Q    Do you remember any of the parties other than CACV in those cases that you testified in?

A    No, I don't.

Q    How about the lawyers who were involved in

those trials?

A    I remember some of them.

Q    Tell me the ones you can remember, please.

A    In the trials in Maryland, Scott Wheat represented us.  I testified in a trial where David Weiner represented us in New Jersey; David Margolin in New Jersey; Anthony Migliaccio in New York; Juan Andreo and George Palmer in Florida; Frank Zigler of Buffalo & Associates in Tennessee; Renee Simonetti in Tennessee; Drew Davis of Gamache & Meyers in Missouri; and Don Horowitz of Gamache & Meyers in Missouri.

Q    Can you describe for me, please, your employment background.  How long have you been with Collect America?

A    I've been employed there since July 15th of 2002.

Q    How about prior to your employment at Collect America?

A    Before that I worked for Security Life of Denver Insurance Company.

Q    Let me back up.  What -- what job titles or positions have you held with Collect America?

A    I didn't -- I was a -- hired as a paralegal in the litigation and recovery department in July of 2002.  I've had different titles.  I can't remember all

the titles.  My job has changed somewhat, but -- but it's still at the core of my job.  It's, you know, a liaison with -- with offices that work on our -- on behalf of CACV of Colorado and CACH.

Q    And to one degree or another, that's always been your role at Collect America?

A    Correct.  My specific duties have changed as we brought in additional people and -- and specialized some people, you know, but I -- I, you know, oversee the process to a certain degree.

Q    Do you supervise other employees?

A    Not currently.

Q    Are you supervised by someone at Collect America?

A    Yes, I am.

Q    Who's your supervisor?

A    Bethany Parker.

Q    And what's her title?

A    She's managing director of litigation and recovery.

Q    As part of your job as a franchise legal specialist, are you involved with obtaining documentation or communicating with the creditors who sell this debt?

A    I do not communicate directly with the

creditors. We have a procedure. There -- there's a place within our system to order documents, and I do order documents from time to time.

Q    Describe for me, if you will, that procedure, please.

A    You type a code into the computer system, and it opens up what we call a media screen, and -- and we enter -- and we enter the documents that we want to request.

Q    And when you enter them, where does -- then what happens?

A    Someone in our client services department reviews -- reviews the request and sends the request to -- to whoever we purchased the -- the debt from.

Q    So you don't have direct communications with the debt seller?

A    That is correct.

Q    That goes through Collect America's client services department?

A    For purposes of ordering the documents, yes.

Q    What documents does CACV get when it purchases a debt from a credit card company?

A    It varies by forwarder. The initial document that would be provided would be a bill of sale. Then other items, you know, it varies by contract, and some

forwarders -- you know, each forwarder has a little bit    10:48:02
different documents available.    10:48:07

Q    What do you mean by that?    10:48:12

A    Some forwarders provide -- like in an    10:48:14
automobile deficiency case, they would provide a copy of    10:48:21
the loan file.  Some credit card companies provide a    10:48:22
transaction history.  Some provide statements.  Some    10:48:30
provide affidavits.  Some will only provide affidavits.    10:48:37

Q    What do you mean, "will only provide    10:48:44
affidavits"?    10:48:47

A    The typical affidavit that we request is    10:48:51
called an affidavit of sale.    10:48:53

(Discussion off the written record.)    10:48:55

THE VIDEOGRAPHER:  The time is 10:49.  We're    10:49:08
going off the record.  This is the end of Tape 1.    10:49:11

(Discussion off the record.)    10:51:59

THE VIDEOGRAPHER:  The time is approximately    10:52:02
10:52.  We're back on record.  This is the beginning of    10:52:04
Tape 2.    10:52:08

Q    (By Mr. Heenan)  Mr. Dunker, do some debt    10:52:10
sellers, credit card company debt sellers, per the    10:52:14
contract with CACV not provide any documentation related    10:52:19
to the debt?    10:52:25

MR. NEWBURGER:  Excuse me.  Objection to    10:52:27
that.  To the extent you're calling for the content of    10:52:28

the contracts between sellers and CACV, those contracts   10:52:31
are confidential and proprietary.  They are subject to   10:52:36
the trade secret privilege, and I'm instructing the   10:52:39
witness not to answer as to the content of specific debt   10:52:42
buying contracts.   10:52:46

Q     (By Mr. Heenan)  Have you personally seen a   10:52:50
contract between Chase Manhattan Bank and CACV of   10:52:53
Colorado with respect to Mr. McCollough's credit card?   10:52:57

A     No, I haven't.   10:53:01

Q     I got off track.  Prior to working at Collect   10:53:15
America, you worked at a life insurance company?   10:53:19

A     That is correct.   10:53:23

Q     As a paralegal?   10:53:24

A     My job title was a life insurance death   10:53:26
claims examiner.   10:53:29

Q     And how long did you do that?   10:53:34

A     Almost three years.   10:53:37

Q     And then how about prior to your job as a   10:53:40
claims examiner?   10:53:44

A     I worked for Franklin D. Azar & Associates as   10:53:46
a paralegal case manager.   10:53:49

Q     And what is that?  A law firm?   10:53:52

A     That is correct.   10:53:54

Q     And how long did you work there?   10:53:55

A     A little over two years.   10:53:57

45

Q     Do you have a paralegal degree or some type     10:54:01
of education that --     10:54:05

A     I have a paralegal certificate from Denver     10:54:07
Paralegal Institute.  It's -- it's since been bought by     10:54:10
another entity, I believe Denver Community College.     10:54:15

Q     When did you obtain that certificate?     10:54:20

A     April of 1995, if I remember correctly.     10:54:24

Q     Are you a lawyer?     10:54:31

A     No, I'm not.     10:54:32

Q     But is it fair to say that in your current     10:54:34
job, you interact frequently with law firms?     10:54:38

A     On a daily basis.     10:54:42

Q     Describe for me, if you will -- as I     10:54:44
understand it, your title is franchise legal specialist?     10:54:48

A     That is correct.     10:54:52

Q     Who is -- like when I think of a franchise, I     10:54:56
think of -- you know, there's a Subway company, and     10:55:01
they're the -- they're the franchisor.  And then, you     10:55:07
know, I can -- I can buy a Subway shop in Montana and be     10:55:07
the franchisee.     10:55:11

Can you describe for the jury what that     10:55:13
franchise system is with Collect America and CACV?     10:55:14

A     I've never really been involved in -- in --     10:55:22
in procuring franchises, so I really can't testify to     10:55:26
that.     10:55:32

Q      What's your understanding of who is the          10:55:33
franchisor?                                            10:55:35

A      Franchisor?  I'm sorry.  I can't quite          10:55:38
remember the legal terminology.                        10:55:42

Q      Sure.  And the extent of my -- my legal         10:55:44
knowledge doesn't really go much beyond, I know that   10:55:49
there's a -- you know, like for Subway restaurants,    10:55:54
there's a Subway corporate, and they're called the    10:55:56
franchisor, and if I open up a Subway shop in Montana, 10:55:59
I'm the franchisee.                                    10:56:05

A      I believe Collect America would be the          10:56:08
franchisor.                                            10:56:11

Q      And who are the franchisees?                    10:56:12

A      I can't remember all of them offhand.           10:56:14

Q      Okay.  Well, just do your best to tell me       10:56:17
what you can remember.                                 10:56:20

A      Okay.  Bronson & Migliaccio, LLP; J.A.          10:56:22
Cambece; The Law Office of Richard Clark; The Law Office 10:56:33
of Andrew Marancik; The Law Office of David Sean Dufek; 10:56:39
Neuheisel Law Office; Pezzuto Law Office; Daniels &    10:56:48
Norelli, P.C.; G. Reynolds Sims & Associates, P.C.; The 10:56:55
Law Office of Jerry Laskin.  Or is it Alan?  Pardon me. 10:57:01
Alan Laskin.  I can't think of any others.             10:57:12

Q      Is there a franchisee in Montana or that's      10:57:17
responsible for Montana?                               10:57:21

AGREN·BLANDO COURT REPORTING & VIDEO

47

A    No, there isn't.    10:57:24

Q    And so what does Collect America do, then, with respect to debts in Montana?    10:57:25 10:57:30

A    We -- we have other non-franchise counsel that represents us in Montana.    10:57:38 10:57:43

Q    Is Johnson, Rodenburg & Lauinger the primary counsel that represents Collect America in Montana?    10:57:47 10:57:50

A    I don't know.    10:57:54

Q    Are there others?    10:58:01

A    I don't know.    10:58:02

Q    What law firms are you aware of that prosecute claims on behalf of CACV in Montana?    10:58:06 10:58:11

A    The only one that I'm aware of is Johnson, Rodenburg & Lauinger.    10:58:17 10:58:19

Q    How about with respect to North Dakota and South Dakota?  Are you aware of any law firms other than Johnson, Rodenburg & Lauinger?    10:58:23 10:58:26 10:58:31

A    I don't know if we're currently using any other firms besides Johnson, Rodenburg & Lauinger in North Dakota and South Dakota.    10:58:33 10:58:35 10:58:38

Q    Who would have been the person at Collect America that was responsible for obtaining documentation from Chase?    10:58:48 10:58:52 10:58:57

A    From Chase?  I can't remember.  It -- it's changed, you know, since that time.    10:59:01 10:59:05

Q    But it wasn't you?                                    10:59:08

A    Yeah.  I never dealt directly with Chase.            10:59:12

Q    Okay.  This Deposition Exhibit -- let's              10:59:14
see -- bear with me a second here -- 66, do you have any    10:59:19
personal knowledge of what that document is or where it     10:59:51
came from?                                                   10:59:56

A    I requested this document.                           10:59:57

Q    Through your media department?                       10:59:59

A    Correct.                                             11:00:02

Q    Okay.  And when you requested it, then what          11:00:02
happened?                                                    11:00:05

A    I don't know.                                        11:00:05

Q    Do you know where it came from?                      11:00:06

A    It came from Chase.                                  11:00:09

Q    Who at Chase?                                        11:00:11

A    I don't know.                                        11:00:12

Q    Did it come directly from someone at Chase to        11:00:12
you?                                                         11:00:15

A    No.  It would have been handled by our client        11:00:16
services department.                                         11:00:19

Q    Do you know who in the client services              11:00:21
department would have received it?                           11:00:23

A    No, I don't.                                         11:00:26

Q    Was that document presented to you or -- or          11:00:32
either electronically somehow made available to you         11:00:34

through your client services department?    11:00:39

A    Yes.  They would have -- they would have    11:00:42
attached this document to the media screen in STARS.    11:00:45

Q    Do you have an awareness of whether Collect    11:00:50
America has to pay for documentation from creditors?    11:00:54

A    Generally, we do.    11:00:59

Q    What's your understanding of -- like with    11:01:02
this type of documentation, do you know how much it    11:01:06
costs?    11:01:08

A    No, I don't.    11:01:10

MR. NEWBURGER:  Object --    11:01:13

THE DEPONENT:  Sorry.    11:01:14

MR. NEWBURGER:  Objection.  The question    11:01:15
calls for information which is confidential and    11:01:16
proprietary and subject to the trade secret privilege.    11:01:18
I know he said he did not know, bur nevertheless I want    11:01:22
the objection on the record.    11:01:26

Q    (By Mr. Heenan)  Do you personally know Cindy    11:01:29
Burgener?    11:01:33

MR. SIMPSON:  Objection.  Outside the scope    11:01:34
of direct.    11:01:36

(Brief interruption by the reporter.)    11:01:37

A    No, I don't.    11:01:40

Q    (By Mr. Heenan)  Have you ever -- well,    11:01:42
strike that.    11:01:47

AGREN·BLANDO COURT REPORTING & VIDEO

50

Have you ever had occasion to see other 11:01:50
affidavits from Cindy Burgener? 11:01:52

MR. SIMPSON:  Same objection. 11:01:56

A    I don't remember. 11:01:57

Q    (By Mr. Heenan)  What documentation was 11:01:58
Johnson Rodenburg provided with respect to a last 11:02:05
payment date by Mr. McCollough? 11:02:10

A    I'm not positive.  I believe it would have 11:02:13
been transmitted electronically. 11:02:15

Q    I understand that there was a date that was 11:02:19
transmitted electronically, but my question is, what 11:02:22
documentation, if any, was Johnson Rodenburg provided 11:02:25
regarding the last payment date? 11:02:31

A    I don't know. 11:02:33

Q    Does it happen that Johnson Rodenburg is not 11:02:37
provided any documentation with respect to a last 11:02:42
payment date? 11:02:46

A    It's possible. 11:02:47

Q    How much did CACV pay for Mr. McCollough's 11:02:52
credit card account? 11:02:57

MR. NEWBURGER:  Objection.  The information 11:03:00
called for is confidential and proprietary and subject 11:03:02
to the trade secret privilege.  Therefore, the -- we 11:03:06
object to the question, and the witness is instructed 11:03:11
not to answer. 11:03:12

AGREN·BLANDO COURT REPORTING & VIDEO

51

Q  Do you have an awareness of how much Collect  11:03:13
America -- and I'm not asking you for how much they  11:03:28
paid.  I'm asking you if you have any knowledge or  11:03:32
awareness of -- of the purchase price by Collect America  11:03:35
of this account?  11:03:40

A  I have no knowledge.  11:03:42

Q  You weren't involved with that?  11:03:43

A  No.  That's -- that's not something I deal  11:03:45
with.  11:03:47

Q  And as I understand your testimony,  11:03:49
Mr. McCollough's account was apparently purchased prior  11:03:55
to your employment at Collect America.  11:03:58

A  That is correct.  11:04:01

Q  So you don't have any personal knowledge of  11:04:01
that purchase?  11:04:06

A  No.  11:04:07

Q  Do you know who at Collect America would have  11:04:09
personal knowledge of the purchase?  11:04:11

A  I don't know off the top of my head.  11:04:13

Q  Do you have any -- have you ever worked at  11:04:20
Chase Manhattan Bank?  11:04:22

A  No, I have not.  11:04:24

Q  Have you ever been authorized to be an agent  11:04:25
or make representations on behalf of Chase Manhattan  11:04:31
Bank?  11:04:34

52

A      No, I have not.    11:04:35

Q      So is it fair to assume, then, that you don't    11:04:38
have any personal knowledge of Chase Manhattan documents    11:04:41
regarding Mr. McCollough?    11:04:46

A      I don't think that's correct.  They provide    11:04:50
documents to us that I've reviewed.    11:04:52

Q      But my question is, do you have personal    11:04:56
knowledge at -- I mean, do you know what documents Chase    11:04:58
Manhattan would have provided to Mr. McCollough?    11:05:03

A      I don't know what they provided --    11:05:08

MR. NEWBURGER:  Excuse me.  Excuse me.  I    11:05:11
know we weren't to make evidentiary objections, but    11:05:11
since the witness works for my client, I think he's    11:05:16
entitled to a single question, and what you just asked    11:05:19
him was multiples.  Can you -- can you give him a single    11:05:22
one?  I don't care if you break it up.  I'm not -- I'm    11:05:26
trying to avoid instructing him not to answer your    11:05:29
question, so if you can break it up into a couple of    11:05:29
different -- a couple, I think we can avoid an issue.  I    11:05:32
don't -- I don't want his answer to be untruthful or    11:05:36
misleading, and that's my concern.    11:05:38

Q      (By Mr. Heenan)  Do you have personal    11:05:41
knowledge of what documentation was provided by Chase    11:05:42
Manhattan to Mr. McCollough with respect to this    11:05:47
account?    11:05:50

53

A    No.                                               11:05:51

Q    Do you have personal knowledge as to how         11:05:56
Chase Manhattan maintained documents regarding         11:05:59
Mr. McCollough's account?                              11:06:04

A    No, I don't.                                      11:06:06

Q    With respect to Deposition Exhibit 69, a         11:06:13
credit card agreement, do you have any personal        11:06:18
knowledge that that's the credit card agreement that was   11:06:23
provided to Mr. McCollough?                            11:06:27

A    No.                                               11:06:29

Q    Does CACV regularly file lawsuits in Montana     11:06:43
on purchased debt?                                     11:06:48

A    Yes.                                              11:06:49

Q    Does CACV, more often than not, recover          11:06:53
default judgments in the lawsuits it files in Montana?  11:07:00

A    I don't know.                                     11:07:03

Q    Is that, in your capacity as a franchise         11:07:06
legal specialist, something you track?                 11:07:09

A    Not formally.                                     11:07:14

Q    How about informally?                            11:07:23

A    I have a rough idea in my head that most of      11:07:23
the judgments we obtain are default judgments.         11:07:24

Q    How about with respect to the lawsuits that      11:07:28
CAC -- CACV files?  How frequent or infrequent does the   11:07:31
person that's sued appear and defend themselves through   11:07:38

legal counsel?    11:07:43

A    I'm not sure.    11:07:44

Q    Would you agree with me that it's    11:07:47
infrequently?    11:07:49

A    Yes.    11:07:51

Q    What does CACV stand for?    11:08:04

A    Nothing.    11:08:08

Q    It doesn't have anything to do with Collect    11:08:09
America?    11:08:10

A    No.    11:08:12

Q    What obligations does Johnson, Rodenburg &    11:08:27
Lauinger have with respect to claims that are placed for    11:08:29
collection and suit by CACV of Colorado?    11:08:39

MR. SIMPSON:  Objection.  Calls for a legal    11:08:44
conclusion.    11:08:45

Q    (By Mr. Heenan)  You can answer.    11:08:47

A    Okay.  We -- we expect a lot out of our    11:08:48
attorneys, so we expect that they review the claims    11:08:54
and -- and -- and make us aware of -- of -- of any    11:08:57
potential problems with the case.    11:09:03

Q    Anything else?    11:09:08

A    I'm not sure what you mean.    11:09:12

Q    Well, you said, "We expect a lot."  I'm just    11:09:13
wondering if there's anything else that you think of --    11:09:16

A    They're our attorneys.  You know, they have a    11:09:19

55

fiduciary duty to us, so we expect them -- we rely on    11:09:21
their expertise in -- of the law in Montana, in this    11:09:26
case, to -- you know, to correctly and successfully     11:09:31
prosecute a case.    11:09:35

Q    Does CACV condone or tolerate its lawyers    11:09:37
prosecuting lawsuits that aren't allowed under the    11:09:45
applicable law?    11:09:50

A    Absolutely not.    11:09:51

Q    Does CACV impose on the law firms that it    11:09:56
hires to do litigation an independent obligation to    11:10:02
investigate and verify that it's proper to file a    11:10:08
lawsuit?    11:10:11

A    That is correct.    11:10:12

Q    Can you tell me what specific documentation    11:10:23
Johnson Rodenburg would have had in its possession at    11:10:27
the time it sued Mr. McCollough?    11:10:33

A    I don't know.    11:10:35

Q    Are you able to tell from those notes that    11:10:36
you have?    11:10:38

A    No, I'm not.    11:10:39

Q    Does CACV use or interface with the    11:10:47
Collection-Master software?    11:10:52

A    I'm not sure what you mean.    11:10:59

Q    Well, as I understand it, Johnson Rodenburg    11:11:00
uses a software program called Collection-Master.  Are    11:11:04

56

you aware of that?

A    Okay.  I'm not familiar with the program that Johnson Rodenburg & Lauinger uses to manage the litigation.

Q    Is it fair -- are you aware that -- is there a process where Johnson Rodenburg is able to access or look at CACV's notes?

A    If they ask for them, we would provide them.

Q    Did they ask for them in this case?

A    I don't know.

Q    This will make things simpler, I think, Mr. Dunker.  Let me show you --

MR. HEENAN:  I'm not going to introduce it, but ...

Q    (By Mr. Heenan)  I'll represent to you that these are the notes that Ms. Lauinger provided me with respect to Mr. McCollough's claim.  And as I understand it -- and forgive my ignorance -- like this EDI is -- is information that's external to Johnson Rodenburg.  Are you aware of that?

A    I've never seen this system before.

Q    Okay.  Do you know what NFA stands for?

A    That's an acronym at Collect America for non-franchise attorney.

Q    Okay.  Do you know what EDI stands for?

A    At Collect America, it would mean electronic    11:12:59
data interface.    11:13:03

Q    And tell the jury what that means.    11:13:04

A    I would describe it as a bridge between    11:13:08
Johnson, Rodenburg & Lauinger's computer system and --    11:13:11
and our computer system.    11:13:13

Q    And through that bridge, Johnson Rodenburg's    11:13:22
able to look at documentation from CACV's software?  Is    11:13:23
that fair?    11:13:33

A    I -- I don't know exactly what is transmitted    11:13:39
from us to Johnson, Rodenburg & Lauinger.  Some    11:13:43
information is transmitted electronically.  Some    11:13:45
information is -- is mailed or -- or sent UPS.    11:13:48

Q    How about LC?  Do you know what those    11:13:57
initials mean?    11:14:00

A    LC is an acronym for local counsel.    11:14:01

Q    Is LC different than NFA?    11:14:05

A    As far as I'm concerned, no.    11:14:10

Q    Do you know who the individual or individuals    11:14:31
in the client services department would be that may have    11:14:34
requested documentation or received documentation on    11:14:39
this case?    11:14:42

A    I don't know.  This -- these documents were    11:14:44
requested some time ago, and I simply don't remember who    11:14:48
would have done it at that time.    11:14:52

58

Q    These notes that have been marked as    11:14:54
Deposition Exhibit 70, is that information that Johnson    11:14:56
Rodenburg would have had in its possession at the time    11:15:04
it prosecuted this lawsuit?    11:15:07

MR. SIMPSON:  Objection.    11:15:09

A    I don't --    11:15:09

MR. SIMPSON:  Foundation.  I'm sorry.    11:15:09

Q    (By Mr. Heenan)  Go ahead.    11:15:12

A    I don't know.    11:15:13

Q    Are you aware of anyone at Collect America or    11:15:14
CACV sharing these documents with Johnson Rodenburg    11:15:18
prior to today?    11:15:22

A    I am not.    11:15:23

Q    Are you involved at all in the purchase of    11:15:31
debt?    11:15:34

A    No, I'm not.    11:15:34

Q    What department is involved in that?    11:15:35

A    I'm not sure what the name of it is.    11:15:40

Q    When do you become involved in the process?    11:15:53

A    I become involved in the process when -- when    11:15:57
an account is -- is referred -- sent to an office    11:16:02
that's -- that's in what's -- that's assigned to me.    11:16:06
Right now it's assigned by area.  At -- at this time, it    11:16:11
was one time Johnson, Rodenburg & Lauinger was assigned    11:16:15
to me.    11:16:20

Q    Sorry.  I wasn't tracking your answer, sir.    11:16:22

A    Okay.  I become involved when an account is    11:16:26
assigned to an office that -- that -- that's under my    11:16:30
supervision.    11:16:34

Q    And so Johnson Rodenburg is an office that's    11:16:38
under your supervision?    11:16:41

A    Not currently.  They used to be.    11:16:43

Q    Okay.  How come they're not currently?    11:16:45

A    Because we've changed and reorganized.    11:16:48

Q    I don't think I have any more questions.    11:17:13
Bear with me just a second.    11:17:14

A    Okay.    11:17:16

Q    Does CACV of Colorado defer to its lawyers    11:17:53
with respect to whether it's appropriate or proper to    11:17:58
seek attorney's fees in a lawsuit?    11:18:01

A    Yes.    11:18:03

Q    Does CACV of Colorado defer to its lawyers    11:18:04
with respect to whether it's appropriate or proper to    11:18:08
propound requests for admission?    11:18:14

A    Yes.    11:18:17

Q    As part of your job, are you ever called upon    11:18:21
to sign affidavits?    11:18:25

A    Yes.    11:18:28

Q    And under what circumstances?    11:18:33

A    I'm not sure what you mean.    11:18:41

Q    Sure.  Well, under what circumstances are you    11:18:42
called upon to sign affidavits on behalf of CACV?    11:18:48

A    Typically, you know, if -- if -- if an office    11:18:53
is under my supervision, I would sign an affidavit.    11:18:57

Q    So with respect to -- well, for our jury,    11:19:03
explain what an affidavit is.    11:19:10

A    An affidavit is a sworn statement or    11:19:12
declaration stating facts about a particular account or    11:19:15
a case.    11:19:21

Q    And you're aware that it's tantamount to    11:19:23
coming into court and testifying?    11:19:26

A    Yes.    11:19:28

Q    So it's very important that what you're    11:19:29
signing off on is accurate.  Is that true?    11:19:35

A    That is correct.    11:19:38

Q    And you take that obligation very seriously,    11:19:38
don't you?    11:19:41

A    I absolutely do.    11:19:41

Q    With respect to Mr. McCollough, would you    11:19:48
have been the person who may have signed an affidavit?    11:19:50

A    I don't remember.    11:19:56

    MR. HEENAN:  I'll get this marked as 71.    11:19:59

    (Exhibit 71 marked.)    11:20:01

Q    (By Mr. Heenan)  Is one of the other things    11:20:19
CACV defers to its legal counsel is the drafting of    11:20:24

AGREN·BLANDO COURT REPORTING & VIDEO

61

affidavits?    11:20:31

A    Yes.    11:20:32

Q    Would it concern you to know, Mr. Dunker, that Johnson Rodenburg prepared an affidavit for someone at CACV to sign containing information that Johnson Rodenburg knew was false?    11:20:41 11:20:43 11:20:50 11:20:55

MR. SIMPSON:  Objection.  Argumentative.  You can answer.    11:20:57 11:20:58

A    I'm sorry.  What was the question?    11:21:00

Q    (By Mr. Heenan)  Sure.  Would it concern you to know that Johnson, Rodenburg prepared an affidavit for presumably your signature containing information that Johnson Rodenburg knew to be false?    11:21:01 11:21:03 11:21:09 11:21:13

MR. SIMPSON:  Same objection.    11:21:18

A    That would be very disturbing.    11:21:19

Q    (By Mr. Heenan)  And it's nothing that you or anyone at CACV would condone or tolerate?    11:21:21 11:21:22

A    That is correct.    11:21:26

MR. HEENAN:  I don't have any further questions.  Thank you.    11:21:30 11:21:36

MR. SIMPSON:  Let me ask you a couple of follow-ups.    11:21:36 11:21:36

THE DEPONENT:  Okay.    11:21:36

FURTHER EXAMINATION                                11:21:36

BY MR. SIMPSON:                                     11:21:36

Q    Have you ever seen Exhibit 71 before?         11:21:37

A    I've seen something like it, but I don't have 11:21:40
any remembrance of seeing this particular one.     11:21:43

Q    And did you ever sign an affidavit on         11:21:46
Mr. McCollough's account that you're aware of?     11:21:48

A    I'm not -- I don't remember.                   11:21:51

Q    And are you aware of whether anyone at CACV   11:21:52
ever signed an affidavit?                           11:21:54

A    I am not.                                       11:21:56

Q    Okay.  And if CACV was provided with an       11:21:57
affidavit that contained incorrect information, what 11:22:02
would be its procedure at that point?               11:22:04

A    We would not sign it.  We would return it to   11:22:07
the attorney's office with suggested corrections.   11:22:09

Q    Very good.  And let me ask you just a couple   11:22:16
of follow-ups on Exhibit 70.                         11:22:18

A    Okay.                                           11:22:21

Q    If you would, please turn to -- you can see    11:22:22
how the dates track --                               11:22:26

A    Yes.                                            11:22:28

Q    -- chronologically in reverse order.  If you   11:22:28
would, would you turn to the date that contains -- or 11:22:31
the page that contains the dates for September 10, 2001 11:22:34

And it's about the fifth to the last page in that set of documents.

A    Okay.  I found that page.

Q    Is there an entry near the bottom of that page for September 10, 2001 regarding a payment by Mr. McCollough?

A    Yes, there is.

Q    And what's -- what's the information contained there?

MR. HEENAN:  Object to form, but you can answer.

A    On 9-10-2001 at -- at 5:04 p.m., the -- the system note line stating that a "posted payment of $250 from M. Tim McCollough.  No more post dates in system for this debtor."

Q    (By Mr. Simpson)  And so is that a record that Mr. McCollough made a payment of $250 that was received by CACV on that date?

A    That is correct.

Q    And then if you would, could you advance in that document until you find the date of June 30, 2004?

A    Okay.  I -- I'm at that page.

Q    Do you see an entry on June 30, 2004 -- excuse me -- entered by the system as posting an unscheduled payment of $75 from Mr. McCollough?

A     Yes.  I do see that.     11:24:10

Q     Do you know if that information was conveyed   11:24:20
to Johnson, Rodenburg & Lauinger?     11:24:23

A     I don't know.     11:24:27

Q     Who would know that?     11:24:29

A     I -- I suspect it would take someone in     11:24:37
information technology to confirm what was, you know,     11:24:40
actually transmitted to Johnson, Rodenburg & Lauinger.   11:24:46

Q     One last date I'm going to ask you about,     11:24:53
October 17, 2005.     11:25:03

A     Okay.  I believe I'm on the right page.     11:25:10

Q     And I think that date only appears on one     11:25:16
page.  Near the top of the page, is there a reference to   11:25:17
the statute of limitations at that point?     11:25:18

A     Yes, there is.     11:25:25

Q     And do you have an understanding as to what   11:25:27
that reference is, what -- what's the context that the   11:25:29
statute of limitations is being referenced in?     11:25:32

A     Well, the note line says "SOL expired," so   11:25:36
someone thought that the statute of limitations was     11:25:40
expired.     11:25:43

Q     Do you know if -- if that was based, as we   11:25:44
discussed earlier, upon Mr. McCollough's representation   11:25:47
that the statute had expired?     11:25:50

MR. HEENAN:  Object to form.     11:25:56

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

A    I know the person that put that in there, but I -- I don't -- I don't remember having a conversation with her that would indicate to me why she put that in there.

MR. SIMPSON:   Okay.   No further questions. Thank you very much.

MR. HEENAN:   Let me just follow up briefly.

FURTHER EXAMINATION

BY MR. HEENAN:

Q    This Deposition Exhibit 70, these notes, did you input all this information yourself, sir?

A    No, I did not.

Q    Other people inputted this information as well?

A    That is correct.

Q    Like with respect to a payment made in 2001, you didn't input that information because you didn't work at Collect America in 2001.   Is that true?

A    That is correct.

Q    Do you have any personal knowledge other than these notes that a payment was made in 2001 by Mr. McCollough?

A    No.

MR. HEENAN:   No further questions.

MR. SIMPSON:   We're done.

AGREN·BLANDO COURT REPORTING & VIDEO

66

THE VIDEOGRAPHER:  The time is 11:27.  This    11:27:14
is the conclusion of the deposition.    11:27:17

(The deposition concluded at 11:27 a.m.,

March 3, 2009.)

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

AGREN·BLANDO COURT REPORTING & VIDEO

67

I, BOBBY D. DUNKER, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

_____
Signature of Deponent

( ) No amendments
( ) Amendments attached

Subscribed and sworn to before me this _____ day of _____, 2009.

Notary Public: _____

Address: _____

_____

My commission expires _____

Seal:

RMM

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

AGREN·BLANDO COURT REPORTING & VIDEO

68

STATE OF COLORADO    )

                     )   Ss.        REPORTER'S CERTIFICATE

COUNTY OF DENVER     )

          I, Robin M. McGee, do hereby certify that I am a Registered Professional Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

          I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

          I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

          In witness thereof, I have affixed my signature and seal this 12th day of March, 2009.

          My commission expires July 31, 2009.

          _____
          Robin M. McGee, RPR
          216 - 16th Street, Suite 650
          Denver, Colorado   80202

NOTARY PUBLIC
ROBIN M. McGEE
STATE OF COLORADO

Court Reporting · Videography · Digital Reporting · Transcription · Scanning · Copying
DENVER (303) 296-0017 · BOULDER (303) 443-0433 · COLORADO SPRINGS (719) 635-8328 · GREELEY (970) 356-3306

**AGREN·BLANDO COURT REPORTING & VIDEO**

69

AGREN BLANDO COURT REPORTING & VIDEO, INC.
216 - 16th Street, Suite 650
Denver, Colorado  80202
4450 Arapahoe Avenue, Suite 100
Boulder, Colorado  80303

March 12, 2009

Bobby Dunker
4340 South Monaco, Second Floor
Denver, Colorado  80237
VIA E-MAIL

Re:  McCollough vs. Johnson, Rodenburg & Lauinger
     Cause No. CV-07-166-BLG-RFC-CSO
     Deposition of BOBBY D. DUNKER

The aforementioned deposition is ready for reading and signing.  Please attend to this matter by following BOTH of the items indicated below:

_____ Call 303-296-0017 and arrange with us to read and sign the deposition in our office

_____ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached

_XXX_ Read the attached copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

_____ By _____ due to a trial date of _____

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to Agren Blando for filing with the original deposition.  A copy of these changes should also be forwarded to counsel of record.

Thank you.

AGREN BLANDO COURT REPORTING & VIDEO, INC.

cc:  All Counsel

AGREN·BLANDO COURT REPORTING & VIDEO

70

AGREN BLANDO COURT REPORTING & VIDEO, INC.
216 - 16th Street, Suite 650
Denver, Colorado  80202
4450 Arapahoe Avenue, Suite 100
Boulder, Colorado  80303

                    BOBBY D. DUNKER
        Re:  McCollough vs. Johnson, Rodenburg & Lauinger
                Cause No. CV-07-166-BLG-RFC-CSO

The original deposition was filed with

Fred Simpson, Esq., on approximately

the 12th of March, 2009.

_____  Signature waived

_____  Unsigned; signed signature page and amendment
       sheets, if any, to be filed at trial

_____  Reading and signing not requested pursuant
       to C.R.C.P. Rule 30(e)

_XXX_  Unsigned; original amendment sheets and/or
       signature pages should be forwarded to
       Agren Blando, to be filed in the envelope
       attached to the sealed original

Thank you.

AGREN BLANDO COURT REPORTING & VIDEO, INC.

cc:  All Counsel