IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MONTANA

BILLINGS DIVISION

LODGED
BILLINGS DIV.

2009 APR 9 AM 11 33

PATRICK E. DUFFY, CLERK

BY #148 pc

DEPUTY CLERK

|  |  |
|---|---|
| TIMOTHY McCOLLOUGH,<br><br>Plaintiff,<br><br>-vs.-<br><br>JOHNSON, RODENBURG &<br>LAUINGER,<br><br>Defendant. | ) Cause No. CV-07-166-BLG-RFC-CSO<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

ORIGINAL

## DEPOSITION OF KEN LUCERO

Taken at:

Nordhagen Court Reporting
1734 Harrison Avenue
Butte, Montana
November 10, 2008
1:25 p.m.



***NORDHAGEN COURT REPORTING***
***JONNY NORDHAGEN***
*1734 Harrison Avenue*
*Butte, Montana 59701*
*(406) 494-2083*

*Court Reporter*
*Conference Room*
*1734 Harrison Avenue*

APPEARANCES OF COUNSEL:


FOR THE PLAINTIFF:

        JOHN C. HEENAN

        Attorney at Law

        Heenan Law Firm

        P.O. Box 2278

        Billings, MT 59103


FOR THE DEFENDANT:

        JOHN E. BOHYER

        Attorney at Law

        Bohyer, Simpson & Tranel, PC

        P.O. Box 7729

        Missoula, MT   59807-7729

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

I N D E X

Witness:                                                    Page:

    KEN LUCERO

        Examination by Mr. Bohyer  .  .  .  .  .  4


                        E X H I B I T S

                        (None marked.)

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

KEN LUCERO

NOVEMBER 10, 2008; BUTTE, MONTANA

- - -

BE IT REMEMBERED THAT, pursuant to notice, the deposition of Ken Lucero was taken at the time and place and with the appearances of counsel hereinbefore noted before Jonny B. Nordhagen, Court Reporter - Notary Public for the State of Montana.

The following proceedings were had:

KEN LUCERO,

having been called as a witness by the

defendant, being first duly sworn, was

examined and testified as follows:

EXAMINATION

BY MR. BOHYER:

Q.     Ken, my name is John Bohyer.  We were introduced just before the deposition began.  I represent a law firm called "Johnson, Rodenburg & Lauinger" in a lawsuit filed by a Mr. McCollough down in Billings.

Your name has come up as an individual who may have some facts regarding debt collection.  And I want to know about that, in terms of your dealings with Johnson,

Page 4

Rodenburg & Lauinger, if any; and also whether you know anything about Mr. McCollough's lawsuit. Okay?

A. Hm-hmm.

Q. So that's the general parameters we're going to go through here today.

Have you ever had your deposition taken?

A. No.

Q. Nothing like this where you've got a court reporter?

A. Never, ever.

Q. Okay. Give me a little background about yourself, if you would, Ken. Where did you grow up?

A. Here in Butte.

Q. All righty. You graduated from Butte Central or Butte High?

A. Didn't graduate.

Q. How far did you get through school?

A. GED. Well, I got to the 11th grade, but then I took my GED.

Q. You got tired of high school and thought, Well, I'm just going to finish this way?

A. Right.

Q. When was that that you took your GED? Do you remember?

A. '72.

Page 5

Q.    After you got your GED, what did you start doing?

A.    I don't understand.

Q.    Did you go to work?  Did you join the military?

A.    Well, I was in the penitentiary when I got my GED.

Q.    Back in 1972, you were over at Deer Lodge?

A.    Right.

Q.    And what were you over there for?

A.    Second degree assault.

Q.    And when did you get out?

A.    '73.

Q.    So you were there for about a year?

A.    About 15 months.

Q.    Was that your only stint at Deer Lodge?

A.    Yeah.  But you know what?  That got overturned, too.

Q.    Why don't you tell me about that?  What happened?

A.    Well, I just put in for a retrial – Chief Justice Harrison it was then – and they denied me.  And then I wrote a handwritten letter.  They got to looking at the books and found out what I was telling them was the truth.  Because the attorney I had was also a county

Page 6

attorney in a lot of other cases against me that hadn't come to court. So he wasn't a decent attorney. I didn't want him for an attorney. So they handed down a writ of habeas corpus, and they turned me loose on it, and they said it's vacated and annulled. So as far as I'm concerned, that's not even on my record.

Q.    So there never was a conviction, as far as you're concerned?

A.    Right.

Q.    Was that your only run-in with the law, then?

A.    No, I've had quite a few.

Q.    Well, why don't we go through a few of those. Can you tell me the other ones that you recall?

MR. HEENAN: I'm going to object to the relevance of this line of questioning. This is a limited rebuttal witness to talk about receipt of requests for admissions in a lawsuit that was filed against him by Johnson - Rodenburg. So I guess I just fail to see the relevance of this line of questioning.

MR. BOHYER: Okay.

THE WITNESS: It was also 30 years ago, too -- over 30 years ago.

Q.    (By Mr. Bohyer) Yes, that one, I agree. Let's go from that date forward. Okay?

A.    Okay.

Page 7

Q.    Give me an idea of some of the run-ins you've had.

MR. BOHYER:  And I'll give you a continuing objection on that.

THE WITNESS:  That was about the last one. Ever since I've got out, then I never had any problems, really.

Q.    (By Mr. Bohyer)  Okay.  So is what you're telling me that your run-ins with the law were all prior to the time you were in the 11th grade?

A.    Right.

Q.    You've not had any run-ins with the law since you've been an adult?

A.    I got out of prison January 10th of '73, and I haven't been in trouble since.

Q.    Okay, that's what I was getting at.

A.    Okay.

Q.    Then we're done with that line of inquiry.

A.    Everything before that was when I was younger.

Q.    All right.  So after you get out of Deer Lodge in '73 and your conviction is overturned and expunged or annulled, what did you start doing for a living?

A.    You're talking 30 years ago.

Q.    Just give me some rough ideas of what you've done for a living over the course of --

Page 8

A.    Well, I went to Wyoming.  I went to work there, and then I come back up here, then go back to Wyoming and went to work.  Whenever I'd get enough money, I'd come back, do a little drinking, and then turn around and go back, get another job, and work again.

Q.    Did you work in the oil fields in Wyoming, or coal mines, or what?

A.    No, I worked as an electrician.  I got my electrician license when I was in Deer Lodge.

Q.    There we go, okay.

A.    So I went down and worked as an electrician for awhile.  And then I worked in a coal mine for about 13 months.  I got laid off and come back up here.

Q.    Was that in Wyoming?

A.    Yeah.

Q.    All right.

A.    Worked at Pacific Iron and Steel, worked for Butte Tree and Lawn.  I've had a few jobs.  But Pacific Iron and Steel, I got hurt there in '80 -- no, wait a minute, you've got me all worked up here -- '97, October of '97.

Q.    What happened there?

A.    I hurt my back.

Q.    Lifting stuff?

A.    Right -- no, I was cutting iron.  You can't

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

have brass on -- pipe on iron pipe.  So I reached out to cut it, and it was too far away, so I leaned forward, grabbed it with my hand, and pulled my back.

Q.    All right.

A.    In '99, I had back surgery; 2004, went on disability.

Q.    Have you worked since 2004?

A.    I was working out at the landfill for about three hours a day.

Q.    And how long did you do that, sir?

A.    Two years, maybe.

Q.    Okay.  So you --

A.    Maybe a little longer.  I don't know for sure.

Q.    Okay.  You stopped doing that sometime in 2005 - 2006?

A.    No, I stopped doing it January of 2005.

Q.    Okay.  And since January of '05, have you been working at all?

A.    No.  I'm on disability.

Q.    And that's because of the back?

A.    Right.

Q.    Okay.  Ken, I want to ask you about what you know about Mr. McCollough's case.  Do you know anything about it?

A.    Nothing at all.

Page 10

Q.    Have you ever met the man?

A.    No, I haven't.

Q.    Have you spoken to him on the phone?

A.    No, I haven't.

Q.    Now, am I accurate you've got a suit going on against Portfolio Recovery as a result of a debt collection that they were involved in?

A.    Right.

Q.    Is that accurate?

A.    That's what John tells me, yeah.  As far as I know, I do, yes.

Q.    Who's your lawyer in that case?

A.    John Heenan.

Q.    Okay.  Now, I don't get to ask you about your conversations with Mr. Heenan regarding your case.  Okay?

A.    Okay.

Q.    So anything I ask you about that, I'm sure he'll say, "Don't answer that," and properly so.

A.    Okay.

Q.    What I want to know is what you know about Mr. McCollough's case.

A.    Nothing.

Q.    Nothing?

A.    Nothing at all.

Q.    Do you have knowledge of any facts regarding

Page 11

any communications that McCollough had with Johnson, Rodenburg & Lauinger?

A.    No.

Q.    Have you seen any of the paperwork going back and forth between Mr. McCollough and Johnson, Rodenburg & Lauinger?

A.    No.  The only time I ever seen his name is on the paper that I got for my deposition.

Q.    Okay.

A.    That's the first time I seen his name.  I didn't know who he was.  I still don't know who he is.

Q.    All right.  I've seen some of the, some of the paperwork from your suit with Portfolio, and I want to ask you a couple questions about that.

A.    Okay.

Q.    My understanding is, is that that dispute arose out of a debt that you had that arose out of a purchase of a pickup.

A.    Yeah.

Q.    And can you tell me, to the best of your recollection, sir, when did you buy the pickup?

A.    '97, I believe; maybe '96.

Q.    And, roughly, what was the purchase price?

A.    Five thousand bucks.

Q.    Did you pay the 5,000 bucks?

Page 12

A.    Yes.

Q.    All of it?

A.    Yes.

Q.    Do you know when?

A.    I think it was in October of '97.

Q.    And to whom did you pay that sum?

A.    To First National Bank.

Q.    Here in Butte?

A.    Yeah.

Q.    All right.

A.    Or that one down there on Dewey.  I don't know if it's First National or not.  It's on Dewey right across the street from Burger King.  I think it's First National or First -- it's First-something, I know that.

Q.    Did you get a clean title to it?

A.    Yes.

Q.    And the lien was released from it?

A.    Yes.

Q.    Do you have all that paperwork?

A.    No.

Q.    You don't have the title to the pickup?

A.    I don't have the pickup.

Q.    You probably sold the pickup.

A.    (Nodding head affirmatively.)

Q.    When did you sell the pickup, sir?

Page 13

A.    I sold it last year about June or July -- or, no, 2006 in June or July.

Q.    Okay.  Do you remember the name of the person you sold the pickup to?

A.    Larry was his first name, I think.  My next-door neighbor knew the guy, and the guy was helping him shovel the sidewalk.  The guy wanted to know about the pickup, because I just had it parked, so he just came and talked to me about it.  And I wanted 500 bucks for it, and I didn't get it.  I only got 100 bucks out of it.

Q.    Had you driven your pickup quite a bit?

A.    Oh, that was our main vehicle until I got my disability and my retirement.  It's a '97 GMC -- or '87 GMC.

Q.    Mr. Lucero, in the lead-up to the lawsuit that Portfolio filed against you on that debt, did you have any conversations with any of the folks at Johnson, Rodenburg & Lauinger, any of the lawyers there or the clerks?

A.    Now, I went looking for the liens release because I knew it had liens on it.  The guy wanted to buy it, and I wanted to find out how I could get lien releases on it.  So I called -- well, at that time, I didn't call anybody.  I went up to the license bureau where you get your license plates, and they gave me these names.  John just seen them today.  But they gave me these names of

Page 14

people to call.  They said CitiFinancial had the contract, so I had to get ahold of them.

I spent a whole day, I'll bet you, calling people, calling people.  They sent me all the way up to the lawyers.  And the lawyers told me that I had to call this woman at Portfolio.

Q.    Okay.

A.    So I started back down the line.  I finally got ahold of this woman and asked her about the liens, and she said she wanted over 8,000 bucks.

And I said, "There's no way you can get that kind of money."  I said, "I'm on social security."  And I said, "Besides that, I had an insurance that makes the payments when you get hurt, which is Balboa Insurance Company, or something like that.  So they made the payments when I was hurt, and then I went totally disabled."

Q.    So what then happened to the payments?  Do you know?

A.    The thing of it is, I got the loan with AVCO. I didn't get it with CitiFinancial; I got the loan with AVCO.  It went from AVCO to Associates.  And from there, I don't know where it went.  Because I called around -- because Associates tried to take it one time on me.

Q.    The pickup?

A.    Yeah, they tried to repossess it.  And I

Page 15

needed it because I had that back surgery.

Q.    Right.

A.    So I found out -- AVCO didn't tell me they sold out.  I went down to see them one time, and they were gone.

Q.    Out of business, or something?

A.    Out of business.

Q.    All right.

A.    And at the time, I was making the -- the insurance company was making the payment for me.

Q.    What happened to the insurance company?  I thought I read somewhere that they went out of business, or --

A.    I don't know.

Q.    All right.

A.    All I know is I went to -- they went to tow the truck.  And I said, "Who the hell's got the contract?"

And they said Associates had it.  So I went to Associates.  And I was four months behind on my payments. I said, "I didn't know you guys had that thing."

So they gave my these papers to take to the doctor. He filled them out and sent them in, and then they got their payments.

Q.    From the insurance company?

A.    Associates got their money from the insurance

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

company.

Q.     Was this one of those disability insurance contracts that said that they --

A.     If you get hurt on the job, then that insurance will pick up your payments until you're able to go back to work.

Q.     So as far as you knew, then, whatever the name of that disability insurance company was --

A.     It was "Balboa", or something like that.

Q.     "Balboa"?

A.     I think it was.

Q.     Okay.  So they started making the payments?

A.     Right.  What I had to do every month, I had to take a paper to my doctor.  He had to fill it out, and then he had to send it in to Associates.  I think that's where it was sent.  All I know is I had to take a paper to him, and then he filled it out, and I never heard nothing again.  And then pretty soon, they'd send me a receipt saying that the payment was made.

Q.     Who would send the receipt?

A.     Associates -- or somebody would send me a receipt.  I'm not real sure who it was.  But then that was going just fine.  Associates made me go down every month and get the paper to take to my doctor.  They would make me come get it, and I would have to take it to my doctor

Page 17

every month.  One day I went down to get a paper from them to take to my doctor, and they weren't there no more.

Q.    They were just closed up?

A.    They just disappeared.  So then I went looking to see who might have the company.  I got a friend that had a loan through Associates.

Q.    Yes, sir.

A.    So I asked him, and he said, "Well, I think Citibank bought them out."

So I called Citibank, and Citibank had no idea who had the contract.  And I said, "Well, I've got to find out because if they repossess my truck, I'm going to be screwed."

Then he says, "Well, we don't have it, and we don't know any place where you can go."

And I thought, Well, I've got a change of address, they'll send me a bill.

I had to have a change of address because of workmen's comp and all this here stuff, right?

Q.    Now, what time period are we talking about now?

A.    We're talking about between 1998 when I got hurt to like 2000.

Q.    All right.  That's when all this stuff started happening?

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

A.    Right.

Q.    Okay.

A.    Okay.  So I couldn't get ahold of nobody. Nobody ever sent me a bill, or nothing.  And I thought, Well, what the hell is going on here?

And I kept worrying that somebody's going to come get that truck, somebody's going to come and take the truck.  Well, nobody ever come and got the truck.

Q.    How much was owed on the truck at that time? Do you know?

A.    I have no idea because they started making the payments, and they were making the payments for over a year, I think.

Q.    Did you get copies of any sort of a notification of payment from Balboa?

A.    Somebody was sending me something saying the payment was made.  I can't tell you who it was now.  I mean, Jesus, that's been eight - nine years ago.

Q.    Yes, it's been a long time.  Do you have copies of any of those papers?

A.    No, no.

Q.    Or did you provide those to your lawyer?

A.    I don't have any kind of, I don't have any kind of papers.

Q.    Okay.  So you're telling me that that was

Page 19

going on around 2000, or so?

A.    From '98 to 2000, because we had to move.  We lost our house and had to move into a motel room.  That's when they tried to take the truck.

Q.    Who's "they"?

A.    Associates.  That's when I found out Associates had the truck -- or had the contract.  And then after Associates left, I didn't know who had it.  I called Citibank, and they didn't have nothing to do with it.  So then I went up to the license plate place and asked them. I said, "There's a few liens on this truck.  I want to sell it, but I don't know who's got it."

So they looked up in their computer, and they said, "CitiFinancial."

And they gave me a number in Deer Lodge to call.  I talked to a woman there, and then she gave me a number for CitiFinancial.  And I mean I talked all day long on the phone trying to find out who the hell to talk to to get --

(pause.)

Q.    And you finally got it figured out?

A.    Well, I had to go all the way up to the lawyers.  And then the lawyers said, "No, we sent them papers back to Portfolio."  They said, "You've got to talk to this woman at Portfolio."

I had her name and everything, but I gave it to the

Page 20

guy that bought the truck -- or not the guy that bought the truck. The guy that bought the truck was in trouble with this other guy. He owed him money, so he gave him the truck. The truck's in Anaconda right now.

Q.    So you said you had to go up through the lawyers at CitiFinancial?

A.    I went from CitiFinancial. I started calling all the way up the line -- I don't know if I was going up the line, or what, but I was talking to all different kinds of people. And they kept sending me another phone, another phone, another phone. They finally said, "You've got to talk to these lawyers."

I said, "Lawyers? What the hell am I talking to lawyers for?"

They said, "Well, we don't know, but you've got to call them."

So I called them.

Q.    Was this the Johnson, Rodenburg & Lauinger?

A.    I have no idea. That was back in 2006. You know, I was getting pissed. I was on the phone all day long. All I wanted was lien releases.

Q.    So any idea who you talked to? Was it a man? A woman?

A.    I have no idea. I know it was a woman towards the end because she said she wanted 8,000 bucks.

Page 21

And I said, "There ain't no way I can give you 8,000 bucks.  Come and get the truck."

And she said, "We don't want the truck; we want the money."

And I said, "I don't got the money.  Do what you got to do."

Q.    As of that, Ken, when you were talking with the woman, the lawyer, toward the end --

A.    Well, I don't know if it was the lawyer -- no, the woman was at Portfolio.

Q.    Okay, I'm sorry.

A.    Now, somebody at the lawyer's office - I can't remember if it was a guy or woman - they told me I had to call this Portfolio.

Q.    So you finally get ahold of this lady at Portfolio?

A.    Right.

Q.    And she's the one that tells you that you owe her about eight grand?

A.    Right -- I think it was a little over eight grand.

Q.    So it's at that point that you say, "Well, I don't have $8,000.  Come get the truck"?

A.    I said, "I'm on disability."  I said, "I ain't got $8,000."  I couldn't even pay $8,000.  I said, "I put

Page 22

the truck up as collateral.  Come and get the truck.  I still got the truck."

"We don't want the truck; we want the money."

Q.    Okay.

A.    I said, "Well, you're going to have to do what you got to do because I don't have it."

Q.    Did you tell the lady that the debt had been paid?

A.    No.  I didn't know whether it had been paid or not because Balboa was supposed to be making the payments but I wasn't getting any doctor's things to take to my doctor.

Q.    So you weren't getting any notification from Balboa, either, that they were paying the bill?

A.    No, I wasn't getting nothing.

Q.    All right.

A.    Everything went dead.  I figured whoever had the contract would eventually get ahold of me.  Because they had the address, but I had change of addresses every place I went.  We were in a motel for a year, and then we went up on LaPlatta for three years, and we went down to -- I got kicked out of that house because I couldn't make the payments, so we went down -- we bought a $1500 trailer.  My sister-in-law loaned us the money to get that.  We moved into a trailer for three years, and then

Page 23

we finally bought this house with my retirement.  So I moved, I moved from Caledonia to the motel to LaPlatta to a trailer court to the house.  I moved five times.  And I always left a change of address because I had to get my checks from workmen's comp or any kind of paperwork.

Q.    Well, sure, you've got to get your mail.

A.    So I said if they send something, it's got to come to me.  If it's the wrong address, they'll -- I'll get it at my address.  I never could get anything ever.

Q.    All right.  And to this day, you still haven't seen any paperwork with respect to whether or not the debt was paid off by Balboa?

A.    No.

Q.    And you haven't gotten anything from CitiFinancial?

A.    No.

Q.    All right.

A.    Oh, I got something from CitiFinancial -- or from the lawyers.

Q.    The lawyers, okay.

A.    Yeah, a bunch of paperwork.

Q.    So when you got the paperwork from the lawyers, did you talk with the lawyers at all?

A.    Uh-uh.

Q.    All right.

Page 24

A.    I didn't know what to do.  I got shook up, I know that.  Because the paperwork -- I got this stuff from the lawyers in 2006, and it's dated 2005, I mean a year later.  And I'm thinking, What the hell is all this shit coming now for?  It's a year later.  It's no good.

But I come to find out it was good.

Q.    This was the lawsuit that Portfolio filed against you on the debt.  Is that what you're talking about?

A.    I think so.

THE WITNESS:  Wasn't it?

MR. HEENAN:  You need to answer as best you can.  I can't really help you.

THE WITNESS:  I don't know, it's just a bunch of paperwork.  And pretty soon, I got a thing from the judge saying I had to appear in front of him on a certain date, and then I got worried and I took some of the paperwork over to Vicevich that he signed.  He gave me this paper, and he said, "Go ahead, it's going to cost you 70 bucks to file this."  He said, "File it, and it will give you time to discuss what kind of payments you're going to make."

And I thought, I'm not making no payments on that thing.

Q.    (By Mr. Bohyer)  You talked to Vucurovich?  Is

Page 25

that who you're talking about?

A.   No, no, Vicevich.  He's a lawyer here in town.

Q.   Vicevich, I don't know him.  I know Mark Vucurovich.

A.   No, Vicevich.

Q.   What's his first name?

MR. HEENAN:  David.

THE WITNESS:  Dave Vicevich.  He used to be at the Finlen Hotel, but now he's on Montana Street.

Q.   (By Mr. Bohyer)  All right, okay.  And after that point, that's when the rest of this lawsuit involving you started to go on?

A.   What do you mean?

Q.   Well, the lawsuit was filed against you, you appeared in that case, there were some more papers that went back and forth between you and the lawyers representing --

A.   Just one paper, just one paper.  I had 70 bucks that -- I sold the truck.  I got 30 bucks out of that truck because 70 bucks went to filing that paper. And I finally got ahold of Legal Aid, and they stepped in and helped me.  So now I'm at this point.

Q.   Still wondering what's going on.

A.   Yeah, still wondering what's going on.

Q.   All right.

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

A.     Here this truck is -- here this loan was in '98, and they're still coming back on me.

Q.     Let me switch gears a little bit.  You've already told me that you don't know anything about Mr. McCollough's lawsuit, correct?

A.     Right.

Q.     And you've never spoken with him?

A.     No, never have.

Q.     Do you have any personal knowledge of any of his dealings with Johnson, Rodenburg & Lauinger, the lawyers involved in that suit?

A.     No.

Q.     You don't have any knowledge?

A.     No.

Q.     Have you seen any documents regarding his suit?

A.     No.  The only time I ever seen his name was on that deposition.  That's how I, that's how I knew who it was.  I mean it don't take much to see his name.  It says "Plaintiff".

Q.     Can you tell me roughly, Ken, when the last time you heard from Balboa was in terms of them making payments after you went on disability?  I think you told me the first time you hurt your back was '98 or '99.

A.     '98, and I had surgery in '99.  The first time

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

I hurt my back was October of '97, then I hurt it in '98, and then I had surgery in '99.  It must have been the end of '99 or the first of 2000.

Q.    All right.

A.    Associates never had anything like that.  So when I took it to them from AVCO, they said, "We don't" -- they had to honor it because it was in the contract.  So Balboa had to make the payments.  I mean I was temporarily disabled.  So it had to be late '99 - early 2000.

Q.    Okay.  When did you go back to work, then, after you had the surgery?

A.    I went back to work part-time at Super 8, too, come to think of it.  I forgot about Super 8.  But I was part-time at Super 8 in the year 2000.

Q.    So you would have gone back to work then?

A.    I went back part-time.  I didn't -- I wasn't making enough money to make the payment.  But by then, Associates was already gone.

Q.    So you go back to work part-time at Super 8.  Where else were you working at that time?

A.    No place.

Q.    Okay.

A.    No, wait, hold on now.  I was also a part-time janitor.

Q.    And where were you doing that?

Page 28

A.    At the Thornton building down here on Broadway, I think it is.  I can't remember where it's at.  But I couldn't handle that because of my back, so I quit that.

Q.    So you stopped doing that?

A.    Right.

Q.    And did you continue on at the Super 8?

A.    I wasn't at the Super 8 yet -- or, yeah, I was.  Okay, I was at the Super 8 then.  I'm so nervous as it is.  I was at Super 8, and I was working at the, the -- janitor.

Q.    Yes, sir.

A.    I quit that one, and I kept on at Super 8.  I reinjured my back in 2001, I think.

Q.    And that was at Pacific Hide & Fur?

A.    No.  Now, listen, that was at -- I reinjured my back at Super 8, too, and they got rid of me on account of it.  After that, I went to work at the landfill three hours a day.  And then I got on disability, and I quit the landfill.

Q.    The reason I was asking questions about that, Ken, is I'm wondering:  When you went back to work part-time, either as the janitor or the landfill or at the Super 8, did you have to tell Balboa, "Hey, I'm back working now," so that they stopped making the truck

Page 29

payments?

A.    I didn't know who to get ahold of, where to get ahold of them, or nothing.  I tried Citibank, and I couldn't go -- where was I going to go from there?  If I owe a bill, you would think they would send me a bill and tell them that they now -- that they got the contract now.

Q.    All right.  So I guess --

A.    Where was I going to get ahold of anybody?

Q.    Is it fair to say when we boil this down that you originally got the loan for the truck?

A.    Right.

Q.    You borrowed, did you tell me, $5,000 for that?

A.    Now, listen, when we first bought the truck, we didn't pay it off.  The old lady had a settlement for something.  I know what it was, but I'm not going to tell you.

Q.    No, that's fine.

A.    She paid the truck off in total, the total $5,000.  She put $2,000 down.  When she got her settlement, she paid the truck off.  We went down, and we got a loan on it for $5,000.

Q.    Okay.

A.    That one was paid off.  We went down and got another loan on it for $5,000, and that's when I got hurt

Page 30

-- actually, I got hurt before we got the second loan because I got hurt in '97. And that's when they told me I had to fill out the thing for Balboa Insurance. They said it would be a good idea because I got hurt once and I might get hurt again.

Q.    So that wasn't really on the original truck loan; it just happened to be that the truck was serving as collateral for the loan when you got it after you paid it off the first time, and then you went to AVCO and got a second --

A.    Got a loan, paid it off, got another loan on it.

Q.    Okay, I understand that.

A.    Now you see what's going on?

Q.    Yes.

A.    I've had two loans on it.

Q.    So it's that second loan I'm focusing on.

A.    Right.

Q.    You did get the loan from AVCO, true?

A.    Right.

Q.    And you made some payments on it?

A.    Right.

Q.    Do you have a rough idea of how many before you got hurt?

A.    Well, if we got the loan in March, I got hurt

Page 31

in July.

Q.   So you made two or three payments on it?

A.   Right.

Q.   On the $5,000 debt?

A.   Right.

Q.   And then as far as you knew, Balboa started paying on the disability insurance?

A.   Right.

Q.   All right.

A.   Because I had to get that paper to take to my doctor.  And first it was AVCO.  And then when AVCO went out of business, then it went to Associates.

Q.   Who's the doctor that was filling out the paper?

A.   Dr. Buehler.

Q.   Buehler?

A.   Buehler.

Q.   Do you know how you spell that?

A.   B-E-H -- do you got a phone book around here somewhere?

Q.   Is he an MD, a general practice doctor here in Butte?

A.   No, he's an orthopedic --

Q.   Orthopedic surgeon, okay.

A.   He's in Montana Orthopedics.

Page 32

Q.    We'll find that.  So you take this paper to him every month to fill out that you're still disabled?

A.    Right.

Q.    And then he sends it off somewhere?

A.    He didn't send it to me.  He sent it back to Associates, I'm sure.

Q.    Do you have any idea how long that went on?

A.    Well, it had to go until 2000 while I was disabled.  I know I wasn't working at the time I was doing that paperwork.

Q.    All right.  And up until 2000, you said you go down to Associates, presumably, to get another one of those papers, and they're closed up?

A.    And they're gone.  I mean there was no sign, there was nothing.

Q.    And is that really the last you heard from anybody until the lawsuit?

A.    That's the last I heard of anything until this lawsuit, because nobody -- I mean I lived in that motel at the time, and then we moved up in Walker -- well, Centerville, and then we went to a trailer.  And we was there three years and a trailer three years, so that's six years there; and then we was a year in this house, so there's seven years right there.

Q.    And you were getting mail at all these places?

Page 33

A.    And I was getting mail at all these places.

Q.    Just nothing on that debt?

A.    Just nothing on that, nothing on that truck. And I was always worried about it because I thought, They're going to come and get that truck, and we're going to be screwed.

Q.    Ken, your lawsuit with Portfolio, is that one still going on?

A.    Yes.

Q.    Delvenia Rush, does that name ring a bell for you?

A.    Who?

Q.    Delvenia Rush.

A.    No, I don't think so.

Q.    Okay.  I think that's the gal at Portfolio that you probably talked to back East somewhere.  It doesn't ring a bell?

A.    It doesn't ring a bell to me.

Q.    Ken, you said that it's been since 2005 since you've worked?

A.    I quit January of 2005.

Q.    And what are you doing these days?  We're now three - almost three four years later.

A.    Sitting in my recliner because I hurt so bad, I can't do nothing.

Page 34

Q.      Have you had any further surgeries, or anything?

A.      No, I weigh too much.  They told me I've got to lose weight in order to get a fusion.

Q.      Buehler tells you he wants to do one?

A.      No, he won't -- he's not my -- I just switched doctors.  I've got a doctor up in Helena now.

Q.      That's fine.  Aside from the lawsuit involving Portfolio, have you been involved in other lawsuits?  And I don't mean criminal stuff.

A.      Okay.  Super 8 laid me off when I reinjured my back.  They knew I was disabled when I took the job.

Q.      Yes, sir.

A.      And I sent the paperwork into Helena to that whatever it is where they determine whether they created a crime or not.

Q.      The Human Rights Bureau?

A.      Yeah.

Q.      Okay.

A.      And I didn't send in everything that I should have.  And then Super 8 come back and told me that they didn't know I was disabled at the time that I was working for them.  They said that I didn't have a -- I could pursue it myself.  So I had all these questions I wanted to ask, and I wrote them all down.  And I went down to see

Page 35

Vicevich because he was recommended to me by somebody.  I asked him all these questions, and he said, "I don't know, we'll find out."

So then he started the ball rolling with a suit, I guess.  I don't know.  He never did file any paperwork that I know of, but we finally settled.

Q.    You finally settled with Super 8?

A.    Right.

Q.    When was that, roughly?

A.    2001.

Q.    And other than that lawsuit against Super 8, have you had other litigation?

A.    Not that I know of.

Q.    Never sued anybody or never been sued?

A.    Not that I know of.  I mean we had CBU Collections drain our account one day.

Q.    For what?

A.    Well, we had a bill with them, and we were paying 50 bucks a month.  And we just couldn't do it no more.  I mean the interest was more than what we was paying, and it was going higher and higher and higher.  And the old lady called them up, and I called them up.  I told them we were on disability and we just couldn't make the payment that one month.

And they said, "Well, you'll make the payment."

Page 36

And I said, "Well, we can't."

And the old lady called them up and told them I was on disability and we couldn't make that payment, do what they had to do.  They drained our accounts.

Q.    What was the name of that outfit?

A.    CBU Collections.

Q.    CBU Collections?

A.    Right.

Q.    Was that here in Butte?

A.    Yeah.  So they got ahold of Legal Aid, and they got it all squared away, and they give us our money back.

Q.    Any other litigation or collections aside from that?

A.    Just this thing.

Q.    All right.  Is there anything that I didn't ask you that you wanted to tell me about regarding this?  Anything I missed that you think is important?

MR. HEENAN:  Object to form; vague and overbroad.

But you can answer.

THE WITNESS:  What's that?

MR. HEENAN:  I just made an objection for the record.

THE WITNESS:  I'd just like to see Portfolio

Page 37

go out of business.  I really would.  I mean they're a bunch of jerks.  Because they could have come and got the truck, and they wouldn't do it.  They was more worried about the money than they was the truck.

Q.    (By Mr. Bohyer)  Did you tell the people at Portfolio, Ken, about the efforts that you had gone to to try to get ahold of Associates?

A.    I told that woman, I said, "I called Citibank, and Citibank said they had nothing to do with it.  They told me they didn't know where it was at.  They had no idea.  They didn't give me CitiFinancial."

And, to me, as soon as they said "CitiFinancial", I figured that was a part of Citibank.  You know, CitiFinancial/Citibank.  But I didn't know where else to go.

Q.    All right.  And did you talk to the gal at Portfolio only the one time?

A.    That was all.  I mean she never called me back, and I never called her back.  She said she wanted her money, and I said, "Well, you'll have to do what you've got to do."

And I think that was in June or July, like I say.

Q.    Of 2004?

A.    2006.

Q.    2006, okay.

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

A.    And then the next thing I knew, we get these papers served on us in December.  And then the thing says November 2005.  And I'm thinking, What the hell's going on here?  That's a year old -- over a year old.

Q.    To your knowledge, Ken, did you talk to the lawyers at Johnson, Rodenburg & Lauinger at any time?

A.    Now, I think that, I think that -- I don't know for sure, but it must have been the lawyers that CitiFinancial sent me to when I was calling.  Like I was going up -- every time I called somebody, "Well, you've got to call here," "You've got to call here," "You've got to call here," "You've got to call here."

Q.    Do you remember where these lawyers were that you talked to?

A.    I have no idea.  All I did is have phone numbers, and I just -- they would give me a name and a number, and I'd call it -- or they wouldn't even give me a name; they'd give me a number.  I'd write that number down, and I'd call the number.  The next thing I know, they're giving me another number to call.  Like I say, I was on the phone all day.

Q.    And that was in mid 2006?

A.    Mid 2006 because that guy wanted to buy that truck.

Q.    Did you keep any of the numbers, write down

Page 39

any of the names, have any of those notes anywhere?

A.   I wrote down every number, and I gave it to the guy that bought the truck so that he could get things squared away.  He had a lawyer, that Dahood over in Anaconda.  He went to them.  And I don't know who his lawyer was over there, but he had to pay a couple thousand dollars to get the liens on that truck.

Q.   And how do you know that?

A.   Because I never signed the title when I sold the truck to the one guy.  I told him I wasn't going to sign it because I thought it was illegal.

Q.   Why did you think it was illegal?

A.   Because they told me it was illegal to sell it, that I couldn't sell it with a lien on it.

Q.   Because there were liens on it?

A.   Right.

Q.   Okay.

A.   So I gave him the title, but I didn't sign it. So then the guy got the liens taken off it, was going to get a license, and everything.  And I went to Glacier Bank here on Harrison Avenue, and me and my wife signed the title for them because it was in both of our names.

Q.   And when was that?  Do you have any idea?

A.   Oh, what are we talking about, 2006 or 2007.

Q.   Is that the last you heard about the truck

Page 40

itself?

A.    I said, "How did you get the liens off of this thing?"

He said his lawyers was Dahood, and he said he had his lawyer call up, and it cost him a couple thousand dollars to get the liens.

Q.    All right.  Do you remember the guy's name now?

A.    No, I don't.

Q.    All right.

A.    I sold it to that one guy, but that guy gave it to the other guy.  Do you see what I'm saying?

Q.    So was it the second guy that you ended up signing the title for?

A.    Right, right.  And he's in Anaconda.  I don't know what his name is.  I think this guy's name is Larry, if I'm not mistaken, the guy here in Butte, but I don't know his last name.  And it could even be -- it might not be Larry; it might be Rick now that I think about it.  I can't remember.

Q.    It's okay.

A.    I mean you're asking me questions two years back.

Q.    Right.  And one last time, any of those numbers or names, did you write them down anywhere that

Page 41

you might have saved them?

A.    No.  I wrote them all down, and I gave them all to that guy so he could give them to his lawyer. Well, I gave them to him so he could call.

Q.    And that's the last you seen of --

A.    That's the last I seen of the numbers.

Q.    Ken, I appreciate your time.  That's all the questions I have.

(The deposition concluded at approximately 2:00 p.m.)

* * * * *

Page 42

Nordhagen Court Reporting
1734 Harrison Avenue, Butte Montana
1-800-823-2083, QA@BRESNAN.NET

STATE OF MONTANA         )
                         : ss.
County of Silver Bow     )


        I, Jonny B. Nordhagen, Court Reporter – Notary Public in and for the County of Silver Bow, State of Montana, do hereby certify:


        That the witness in the foregoing deposition, Ken Lucero, was by me first duly sworn according to law in the foregoing cause; that the deposition was then taken before me at the time and place herein named; that the deposition was reported by me in machine shorthand and later transcribed by computer, and that the foregoing forty-two (42) pages contain a true record of the witness, all done to the best of my skill and ability.

        IN WITNESS WHEREOF, I have hereunto set my hand and affixed my notarial seal this 16th day of November, 2008.



                              _____
                              Jonny B. Nordhagen

                              Notary Public for the State of
                              Montana residing at Butte,
                              Montana.  My commission
(NOTARIAL SEAL)               expires May 8, 2010.

Page 43