```
1              IN THE U.S. DISTRICT COURT
               FOR THE DISTRICT OF MONTANA
2                    BILLINGS DIVISION
               CAUSE NO. CV-07-166-BLG-CSO
3
   ------------------------------------------------
4
   TIMOTHY McCULLOUGH              :
5                                  :
          Plaintiff                : **COURT TRANSCRIPT**
6                                  :
       vs.                         :
7                                  :
   JOHNSON, RODENBURG & LAUINGER:
8                                  :
          Defendant                :
9
   ------------------------------------------------
10
               April 14, 2009
11
   ------------------------------------------------
12 R E P O R T E D   B Y:

13    VIRGINIA LEYENDECKER, Certified Shorthand

14 Reporter, (NJ License No. 1701) and Notary Public, on

15 the above date, commencing at 8:30  a.m., at the

16 James F. Battin United States Courthouse, 316 North

17 26th Street, Billings, Montana.

18

19 BEFORE: Hon. Carolyn S. Ostby

20

21

22

23

24

25

                    VK LEYENDECKER, LLC
                    20 Medicine Crow Road
              Columbus, Mt. 59019 - (406) 322-5061
```

```
 1     A P P E A R A N C E S:

 2          HEENAN LAW FIRM
            BY:   JOHN HEENAN, ESQUIRE
 3              For the Plaintiff

 4          BOHYER, SIMPSON & TRANEL, P.C.
            BY:   FRED SIMPSON, JR., ESQUIRE
 5          and JOHN BOHYER, ESQUIRE
                For the Defendant
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                    THE COURT:  Mr. Bohyer?
 2                    MR. BOHYER:  Good morning.  My
 3   name is John Bohyer and I represent Lisa Lauinger
 4   and Johnson, Rodenburg & Lauinger.  The judge has
 5   given me 15 minutes to do this, and I'm
 6   ordinarily prone to speak quickly, so if I need
 7   to slow down, typically the first person to tell
 8   me so is the court reporter.  So I will try to
 9   speak slowly, but I want to get some points out.
10                    I want to ask a few questions
11   about personal responsibilities in general.  And
12   in that regard, who among the jury panel has a
13   credit card?  Who among the panel believe, if you
14   charge up your credit cards, you should be
15   responsible to pay them?
16                    Is there anyone that believes
17   that if an individual charges them up and may
18   have a mental illness that maybe they shouldn't
19   have to pay?  Yes, ma'am.  Ms. Harris.
20                    MS. HARRIS:  Well, I guess, for
21   personal reasons, because my husband's brain
22   injured, and we are actually kind of in the
23   process of wondering if we should be monitoring
24   his credit card.
25                    MR. BOHYER:  For what purpose?
```

1                  MS. HARRIS:  He makes poor
2     choices.
3                  MR. BOHYER:  I want to make sure
4     everyone understands here.  My client is a law
5     firm.  My client is not somebody who owns debt.
6                  Can you make that distinction
7     between a credit card company or a debtor versus
8     somebody who hires a law firm to represent them
9     to go and collect a debt?  Does that make sense?
10    Ms. Thompson?  Does that make sense?
11                 MS. THOMPSON:  Mm-hmm.
12                 MR. BOHYER:  Who among you have a
13    lawyer?
14                 MS. RASMUSSEN:  Just with my mom.
15                 MR. BOHYER:  Do you expect your
16    lawyer to represent you to the best of his or her
17    ability?
18                 MS. RASMUSSEN:  Mm-hmm.
19                 MR. BOHYER:  Why?
20                 MS. RASMUSSEN:  That's what you
21    hire them for.
22                 MR. BOHYER:  That's what my
23    clients do.  My clients are lawyers.
24                 MS. RASMUSSEN:  To do the best
25    service that is needed.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

```
 1                      MR. BOHYER:  Anybody prior to
 2    today had to utilize the services of a lawyer?
 3    Quite a few of you.  How many of you, in terms of
 4    hiring a lawyer, have actually had to come to
 5    court with a lawyer?
 6                      MS. RASMUSSEN:  For my mom, yeah.
 7                      MR. BOHYER:  And, yes, sir?  Mr.
 8    Franz.
 9                      MR. FRANZ:  Divorce.
10                      MR. BOHYER:  Did you hire a
11    lawyer to do the best that he or she could do?
12                      MR. FRANZ:  Yes.
13                      MR. BOHYER:  Did they do so?
14                      MR. FRANZ:  Yes.
15                      MR. BOHYER:  What if they don't?
16    You're not happy about that.
17                      Am I accurate, Mr. Franz, you own
18    a construction company?
19                      MR. FRANZ:  My father does.
20                      MR. BOHYER:  You work with your
21    dad in the construction company?
22                      MR. FRANZ:  Yes.
23                      MR. BOHYER:  What type?
24                      MR. FRANZ:  Dirt construction.
25                      MR. BOHYER:  Do you ever have any
```

```
 1    issues with collecting debt with customers?
 2                 MR. FRANZ:  Very few.
 3                 MR. BOHYER:  On the few you've
 4    had, what have you had to do?
 5                 MR. FRANZ:  I never do anything.
 6    That is all taken care of in the bookkeeping
 7    department.  I have nothing to do with that.
 8                 MR. BOHYER:  You send Moose and
 9    Rocco out to help them find the wallet, so to
10    speak?  That's what my mother used to tell me,
11    Pay your bill.
12                 MR. FRANZ:  Most of our contracts
13    are with states or companies that --
14                 MR. BOHYER:  Okay.  Maybe that
15    was a poor attempt at humor.  Sometimes I try
16    that in front of a jury because it's kind of
17    nervous here, and I know my client is nervous
18    sitting here because she's never gone through
19    this.
20                 In terms of the overall process
21    of a jury trial, things can get somewhat
22    emotional.  And typically for people, no question
23    it's difficult for Mr. McCullough here.
24                 Can you appreciate, though, that
25    my client and the law firm, even though they are
```

1    lawyers, they may not be really comfortable
2    getting hauled into court either?  Does that make
3    sense to everybody?  Okay.
4                 Mr. McCullough's counsel had
5    asked you a few questions about punitive damages.
6    I want to ask you a few questions about damages
7    as well.
8                 Is there anyone on the panel who
9    believes that because Mr. McCullough sued my
10   client he's entitled to money at all?  Anybody
11   who believes, as we sit here today, I'm giving
12   the guy some money?  Okay.
13                That gets into burden of proof.
14   And the plaintiff has to prove to you, A, not
15   only did my client violate the law, but also that
16   it actually caused some sort of damage.  Does
17   that make sense?
18                Let's take, for example, someone
19   can run through a stop sign but doesn't actually
20   hit the car that is going the other way.  Might
21   have scared you a little bit, but it didn't hit
22   anybody.  Does that make sense to everybody?
23   Okay.
24                Does everybody on the jury panel
25   understand that anyone can file a lawsuit in

1   America?  It's one of the great things about our
2   country and our justice system.  You pay your
3   filing fee, a hundred bucks or 150, or maybe in
4   the federal system it's quite a bit more now.
5   You can sue the Queen of England, if you wanted.
6              And my clients aren't here by
7   choice.  They have been sued.  They have been
8   hauled into court.
9              Would you all agree with me that
10  a defendant -- this is a civil case, not a
11  criminal case.  No one is going to jail here --
12  but a defendant or a law firm such as my client,
13  they are entitled to come into court with a
14  lawyer, like me and Mr. Simpson, and defend
15  themselves.  We are entitled to put on evidence
16  and, at the end of the case, if the evidence
17  suggests, I'm going to ask you, and Mr. Simpson
18  will ask you, no money.  Does that make sense to
19  everybody?
20             Does anybody think they would
21  have a problem doing that?  Anybody?  Yes, sir.
22             A JUROR:  No.
23             MR. BOHYER:  Okay.  The judge had
24  already told you she had made some rulings on it.
25  I'm not going to get into a significant

1   discussion of the law, other than to tell you
2   that she has already concluded that our client
3   violated the Fair Debt Collection Practices Act
4   by filing a lawsuit after a statute of
5   limitations ran.
6              Does everybody understand what a
7   statute of limitations is?
8              Ms. Thompson, what does that mean
9   to you?  I don't mean to put you on the spot
10  here.
11             MS. THOMPSON:  It means there is
12  a certain period of time within which an action
13  has to take place and, after that period of time,
14  it's no longer allowed.
15             MR. BOHYER:  Exactly.  You passed
16  the law school exam right there.
17             Now, some of the fact issues that
18  you're going to get to decide have to do with the
19  why and how our client filed that thing after the
20  statute of limitations.  That's one of the issues
21  I want to ask you, if you're willing to listen to
22  how this happened and why.
23             Everybody here understands the
24  difference between making a mistake or an error
25  and doing something on purpose, intentionally?

1                    How many of you have made the
2     proverbial mistake?  I will be first.  Run
3     through the stop sign and maybe hit the car.
4     Anybody going to admit they did it on purpose?
5     Okay.
6                    But that's what I'm getting at
7     here, the difference between making an error and
8     doing something on purpose, cheating.  Those are
9     some of the fact issues that you will listen to.
10                   Anybody have any preconceived
11    bias against lawyers?
12                   Go ahead, Ms. Harris.
13                   MS. HARRIS:  I guess, just to be
14    honest, I feel like there is probably more, that
15    you might have more options, more money, more
16    education, than others.
17                   MR. BOHYER:  Would you hold that
18    against lawyers that are defendants in a lawsuit
19    because they are educated and got through school?
20                   MS. HARRIS:  Maybe mostly the
21    ability to hire, because you have more money.
22                   MR. BOHYER:  Do you agree that
23    Ms. Lauinger and her law firm are entitled to a
24    fair trial?
25                   MS. HARRIS:  Yes.

```
 1                    MR. BOHYER:  That's what I'm
 2      getting at.  Can you, Ms. Harris, give that
 3      lawyer a fair shake?
 4                    MS. HARRIS:  Yes.
 5                    MR. BOHYER:  Even with that
 6      preconceived notion?
 7                    MS. HARRIS:  Mm-hmm.
 8                    MR. BOHYER:  You mentioned that
 9      your husband has a brain injury.  Is he a
10      rancher?  Is he able to work still?
11                    MS. HARRIS:  Limited.
12                    MR. BOHYER:  Put forth his best
13      effort at doing it?
14                    MS. HARRIS:  Mm-hmm.
15                    MR. BOHYER:  Does he pay his
16      bills?
17                    MS. HARRIS:  Yes.
18                    MR. BOHYER:  How does everybody
19      feel about personal responsibility in the country
20      right now with the economy?  I see some eyes
21      rolling.  That's why I asked the question.  Ms.
22      Kloppel?
23                    MS. KLOPPEL:  I think that the
24      auto companies need to take care of themselves
25      and we should not have to be paying for it.
```

1          MR. BOHYER:  Does that kind of
2     get everybody?
3                How about folks that buy the
4     million dollar house on the minimum-wage job?
5     Shaking the heads there.  All right.
6          MS. JOHNSON:  I think the banks
7     also have, it's not just the person, because the
8     banks, you know, were misleading in the
9     mortgages.
10         MR. BOHYER:  That's a shared
11    responsibility, in your view.
12         MS. JOHNSON:  Right.
13         MR. BOHYER:  I guess that just
14    gets back to my original -- and I don't
15    necessarily disagree with you, gets back to my
16    initial inquiry about personal responsibility.
17                Has anybody ever tried to collect
18    a debt?  Has anybody ever been in a business
19    relationship that had to get money from somebody?
20    Yes, ma'am.
21         A JUROR:  I worked in the credit
22    office so I had to call people to get them to pay
23    their debts on the credit cards.
24         MR. BOHYER:  Did you try to do
25    that fairly, to the best of your ability, and

```
 1   politely?
 2              A JUROR:  Oh, yes.
 3              MR. BOHYER:  Did you ever make a
 4   mistake?
 5              A JUROR:  In what they owed?
 6              MR. BOHYER:  Sure.
 7              A JUROR:  No, it was printed out
 8   in documents.
 9              MR. BOHYER:  Did you rely on the
10   printout that you were looking at?
11              A JUROR:  Yes.
12              MR. BOHYER:  What if the printout
13   was wrong?
14              A JUROR:  That could have
15   happened.
16              MR. BOHYER:  The point is, had
17   you done that, would you have been trying to
18   collect on it intentionally, on purpose, to do
19   something wrong?
20              A JUROR:  No.
21              MR. BOHYER:  Anybody else?
22              MR. BONIFAY:  I work for Conlin
23   Furniture doing deliveries, and sometimes we have
24   to pick up cash on deliveries.
25              MR. BOHYER:  COD?
```

1          A JUROR:  Yeah, and there have
2     been situations where the customer has a
3     discrepancy in what they owe and what we say they
4     owe, and we have to figure it out with the
5     warehouse, sometimes just call them up and figure
6     out what is going on with it.
7          MR. BOHYER:  So that is typically
8     worked out.
9          MR. BONIFAY:  Mm-hmm.
10          MR. BOHYER:  Ms. Wenger?
11          MS. WENGER:  I'm on the board of
12     directors for a local healthcare organization and
13     we make the decisions about whether or not to
14     turn outstanding accounts over to collections.
15          MR. BOHYER:  That's from a
16     nursing home?
17          MS. WENGER:  No.  It's for
18     Riverstone Health.
19          MR. BOHYER:  I'm sorry.  Are
20     those accounts placed for collection sometimes?
21          MS. WENGER:  We are in the
22     process of changing our policy.  We have always
23     had a policy that they have just gone to bad
24     debt, and now we are in the process of changing
25     that.

1                    THE COURT:  Two minutes.
2                    MR. BOHYER:  Folks, I expect
3      you're going to hear some evidence about mental
4      illness.  I want you to know that on behalf of
5      our clients we need to ask some questions about
6      those issues to get the facts before you and so
7      you can have a measure, kind of, of what was
8      before and what was after our client's
9      involvement.  Does that make sense to everybody?
10                    Can you view that with a fair
11     mind and say, at least internally, gee, I'm not
12     going to hold that against either the lawyer or
13     the client because they're asking about the
14     issue.  Okay?
15                    One of the last things I wanted
16     to ask you, there are times during a trial a
17     lawyer will -- and I already did -- stand up and
18     object.  Do you understand the lawyer is there to
19     protect their client?
20                    And I've been doing this for 23
21     years now, and I always live in mortal fear that
22     during a trial I will do something, or, in this
23     case, my partner, Mr. Simpson, will do something
24     that is going to offend the jury.  In finishing
25     this, what I want to do is say, can you separate

1   me from the client?  Understand that I'm trying
2   to work, and Mr. Simpson is trying to work, for
3   the client.  So if I do something that might rub
4   you the wrong way, that's not Lisa Lauinger and
5   it's not the law firm.  Is that fair?  Okay.
6              Anybody believe they couldn't be
7   fair to my clients?  Okay.
8              Your Honor, we may have a couple
9   in chambers.  I'm done.  Thank you.
10             Thank you, ladies and gentlemen.
11             THE COURT:  Do both parties pass
12  the jury for cause?
13             MR. HEENAN:  We do, on behalf of
14  the plaintiff.
15             MR. BOHYER:  We have one issue to
16  raise.
17             THE COURT:  If you will excuse us
18  for a moment while we step into chambers.
19
20
21
22
23
24
25

```
 1        C E R T I F I C A T E   O F   O F F I C E R.
 2
 3        I, Virginia Leyendecker, a Certified Shorthand
 4   Reporter and Notary Public, do hereby certify that
 5   the foregoing is a true and accurate transcript of
 6   the testimony as taken stenographically by and before
 7   me at the date, time and location aforementioned.
 8        I do further certify that I am neither a relative
 9   nor employee, nor attorney or counsel to any parties
10   involved; that I am neither related to nor employed
11   by any such attorney or counsel, and that I am not
12   financially interested in the action.
13
14
15
16   /s/Virginia E. Leyendecker, CSR
17   Notary Public
18   My Commission expires May 3, 2010
19   NJ C.S.R. License No. XI-1701
20
21
22
23
24
25
```