```
 1                    IN THE U.S. DISTRICT COURT.
                    FOR THE DISTRICT OF MONTANA
 2                       BILLINGS DIVISION
                    CAUSE NO. CACV-07-166-BLG-CSO
 3
        ----------------------------------------------
 4
     TIMOTHY McCULLOUGH              :
 5                                   :
             Plaintiff              :  COURT TRANSCRIPT
 6                                   :
        vs.                          :  Pretrial Conference
 7                                   :
     JOHNSON, RODENBURG & LAUINGER:
 8                                   :
             Defendant              :
 9
         ---------------------------------------------
10
              April 7, 2009
11
         ---------------------------------------------
12   R E P O R T E D   B Y:

13     VIRGINIA LEYENDECKER, Certified Shorthand

14   Reporter, (NJ License No. 1701) and Notary Public, on

15   the above date, commencing at 11:00 a.m., at the

16   James F. Battin United States Courthouse, 316 North

17   26th Street, Billings, Montana.

18

19   BEFORE: Hon. Carolyn S. Ostby

20

21

22

23

24

25
```

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    A P P E A R A N C E S:

2        HEENAN LAW FIRM
         BY:   JOHN HEENAN, ESQUIRE
3            For the Plaintiff

4        BOHYER, SIMPSON & TRANEL, P.C.
         BY:   FRED SIMPSON, JR., ESQUIRE
5        and JOHN BOHYER, ESQUIRE
             For the Defendant

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    THE COURT CLERK:  The Court has
 2    set aside this time to hear the matter of
 3    CACV-07-166-VLG-CSO, Timothy McCollough v.
 4    Johnson Rodenburg & Lauinger for a final pretrial
 5    conference and motion hearing.
 6                    THE COURT:  Good morning.
 7                    MR. HEENAN:  Good morning, Your
 8    Honor.
 9                    MR. SIMPSON:  Good morning, Your
10    Honor.
11                    MR. BOHYER:  Good morning, Your
12    Honor.
13                    THE COURT:  First of all, I
14    apologize for the error in the setting of the
15    hearing time.  I know that confuses everything.
16                    Moving on, the way I would like
17    to proceed is to conduct the hearing on the
18    motions in limine, get those decided, and then we
19    will take a short recess and move into the
20    conference room for conducting the final pretrial
21    conference.
22                    So let's address ourselves, then,
23    to the motions.  My understanding is the only two
24    motions that are currently outstanding are two
25    motions in limine, one filed on behalf of the
```

1    plaintiff and another one on behalf of the

2    defendant.

3                     Do the parties agree those are

4    the only two motions that remain at issue?

5                     MR. SIMPSON:  Yes, Judge.

6                     MR. HEENAN:  Yes, Your Honor.

7                     THE COURT:  Let's take those in

8    the order filed.  I believe the defendant filed a

9    motion in limine first.

10                    I have read the briefs and

11   reached some tentative conclusions.  In the

12   interest of expediency, what I propose is to

13   address each of the items in each of these

14   motions and give you my preliminary thoughts,

15   rather than just hear arguments because, as I

16   said, I looked at the briefs.

17                    Then I will give you a chance to

18   be heard and then make a ruling.  As I said, the

19   conclusions that I reached are tentative, but

20   they are based on study of the briefs and the

21   authorities cited in the briefs.

22                    The defendant's motion is the

23   Court's Docket Number 100.  It was filed on

24   February 23, 2009, and the first item that the

25   defendant seeks to preclude evidence on is

1    Attorney Bruce Spencer filed a lawsuit on behalf
2    of CACV of Colorado, which was dismissed prior to
3    the filing of the lawsuit by Johnson, Rodenburg &
4    Lauinger.  That motion has been withdrawn, that
5    part of this motion, and so that part will be
6    denied as moot.
7              The next is evidence that JRL and
8    its attorneys have filed other debt-collection
9    lawsuits or evidence about those lawsuits, and I
10   will combine this with the next one, which is all
11   testimony by witnesses, Lucero and Henan.  As I
12   understand it, the plaintiff does not intend to
13   call Jeanie Kolh, so that part is moot.
14             Is that correct?
15             MR. HEENAN:  That's correct, Your
16   Honor.
17             THE COURT:  I will deal with
18   these together because these relate to the same
19   subject matter, and that is, JRL's conduct
20   against other punitive debtors.
21             Having looked at this, my intent
22   would be to deny this part of the motion.  And
23   the reason for that is that the Supreme Court has
24   made clear that in the context of punitive
25   damages a proper consideration is the defendant's

1       conduct toward others.  And in the *TXO v.*

2       *Alliance Resources Corporation* case, for example,

3       the Court specifically referred to the fact that

4       the team employed in that case was part of a

5       larger pattern and cited the Hazlett case, which

6       found that the existence and frequency of similar

7       past conduct was relevant.

8                        More recently, the United States

9       Supreme Court in the Philip Morris case noted

10      that Philip Morris did not deny that the

11      plaintiff may show harm to others in order to

12      demonstrate reprehensibility, and the Supreme

13      Court agreed that that was proper for the

14      plaintiff to show harm to others in order to show

15      reprehensibility.  So for those reasons, I think

16      that this evidence could be relevant.  And as I

17      said, I presently believe the proper course would

18      be to deny that part of the motion.

19                       That being said, and before I

20      hear from the parties, I want to make a couple of

21      other comments.  Any evidence that is offered in

22      this regard has to be based on personal

23      knowledge.  And I'm a little concerned because

24      testimony can't be based on speculation or

25      incomplete or conclusory data.  There has to be a

1          connection between the data of which or the

2          information of which a witness is aware and

3          opinions.

4                         For example, Mr. Eakin's expert

5          report talks about a cursory investigation.  I

6          want to alert the plaintiff that I have real

7          concerns about a cursory investigation as basis

8          for testimony.  And by the same token, with

9          respect to Ms. Henan and Mr. Lucero, while I'm

10         denying the motion, again, their testimony has to

11         be based specifically on their own knowledge.

12                        And this is Mr. McCullough's case

13         we are trying, not other people's cases.  I don't

14         want to hear a lot about other people's cases.  I

15         don't think it's relevant.  I think there are

16         some things that are relevant, as I identified in

17         cases of the United States Supreme Court, but I'm

18         not going to allow the case to get sidetracked on

19         the cases of others.

20                        So that's my current thinking.

21         Does JRL want to be heard with respect to that?

22                        MR. SIMPSON:  Yes, Your Honor.

23         To the extent the Court finds the testimony

24         relevant with respect to the reprehensibility

25         analysis, it's our position that proof would only

1    come on during the latter phases of the trial, if

2    we ever get there.  If the jury finds that

3    Johnson, Rodenburg & Lauinger acted with actual

4    malice, we then go to the phase of the trial

5    where the jury assesses the amount of the

6    punitive damages, and that's where we believe the

7    reprehensibility evidence, if that could be

8    construed as supporting that evidence, would come

9    in.

10              It should not, however, be used

11   to show that Johnson, Rodenburg & Lauinger acted

12   with malice towards Mr. McCullough because, as

13   the Court made clear in *State Farm v. Campbell*,

14   and *Willams v. Philip Morris*, the Court cannot

15   punish a defendant based on its conduct towards

16   others.  This proof is only relevant, if at all,

17   in the latter half when the jury determines the

18   amount, not when they determine whether in fact

19   the defendant is liable for some malicious

20   conduct in the first place.

21              THE COURT:  I think that's a

22   separate issue.  But I have given thought to that

23   because you did mention that in briefing.  I

24   don't think that's correct because I think that

25   this testimony, as I said, in the limited fashion

1      in which I envision it being relevant, is

2      relevant with respect to whether punitive damages

3      should be awarded at all with respect to malice,

4      the question of whether JRL knew there was a high

5      probability of damage or of harm to the

6      plaintiff.  And I think what they have done in

7      other cases may inform that and be relevant to

8      that.

9                    By the same token, I think you're

10     absolutely correct the Court has to be careful in

11     instructing to make certain the jury knows they

12     aren't to award damages for harm to others.

13     Because I think the Court has been very clear on

14     that.

15                   But I think the second phase, as

16     the statute sets it out, is so that the jury

17     doesn't have a lot of testimony or any testimony

18     about the financial wherewithal of the defendant

19     and the things that are articulated in the

20     statute.  So I think that's the purpose for the

21     second hearing.  And so that's the way I would

22     intend to go on.

23                   MR. SIMPSON:  May I be heard on

24     one other point on this issue?

25                   THE COURT:  Of course.

1              MR. SIMPSON:  With respect to the

2    number of lawsuits that my client has filed in

3    Montana and perhaps the number of default

4    judgements it's taken and the number of lawsuits,

5    perhaps, that any one of the individual attorneys

6    has filed in a single day, I don't think that

7    evidence goes to reprehensibility or malice.  In

8    fact, there's been no demonstration that that has

9    resulted in any kind of wrong to any other party,

10   and I'm not sure what evidence or what that

11   evidence would go to show.

12              Whereas Ms. Henan and Mr. Lucero

13   may purport to have direct knowledge of wrong

14   committed by my client against them, I don't

15   think the mere statistic that Charles Dendy has

16   filed so many lawsuits within this district

17   within the last 18 months goes to show any kind

18   of wrongful conduct whatsoever.  And I believe

19   that information may be used to build passion and

20   prejudice against my client based on the fact

21   they sued a number of people that reside in

22   Montana.

23              THE COURT:  Do you wish to

24   respond?

25              MR. HEENAN:  Just briefly, Your

1    Honor.  I would also point out I failed to note

2    in our brief but did file a notice of

3    supplemental authority, one of the issues this

4    jury needs to determine in deciding statutory

5    damages under the Fair Debt Collection Practices

6    Act is the extent to which the noncompliance is

7    intentional. That is  15 U.S.C. 1692 (k)(b)(2).

8                    As well as for a punitive damages

9    claim, as the Court has articulated, the

10   plaintiff has the burden of proving that the

11   defendant acted with an indifference to a high

12   probability of injury.  50 lawsuits a day would

13   constitute the filing of a lawsuit approximately

14   every eight minutes by these lawyers.  It's part

15   of a business model that this law firm employs

16   that the evidence will demonstrate.  They file a

17   large volume of lawsuits and know that there is a

18   very, very few limited amount of people that they

19   sue that are going to have the means or ability

20   to respond through counsel.  When people respond

21   through counsel, they immediately dismiss and

22   everyone else they file a judgement against.  I

23   think Your Honor has articulated the issue in the

24   pertinent Supreme Court case law and I hope you

25   follow what you said.

1                    THE COURT:  I am going to deny

2     this.  I think, in addition, this evidence with

3     respect to a number of lawsuits could be relevant

4     to a couple of other elements on the claims pled

5     here.  One is the Unfair Trade Practices.  That

6     cause of action concerns me a little because I

7     think that allowing a party who is sued to turn

8     around and bring a lawsuit against the opposing

9     party's counsel sets a dangerous precedent.  And

10    I don't think, in the normal course, that the

11    provision of professional services would give

12    rise to this kind of claim, the Unfair Trade

13    Practices claim.

14                    However, I have studied Montana's

15    cases which don't directly address this question

16    as well as cases from other courts around the

17    nation which have interpreted similar types of

18    statutes.  And a distinction has been drawn

19    between provision of professional services to a

20    client and the type of conduct that is alleged

21    here, for example, that to which Mr. Heenan just

22    made reference, filing a lawsuit on average of

23    once every eight minutes.

24                    And the distinction that other

25    state courts have drawn is between

1    entrepreneurial and commercial activities of a

2    lawyer as opposed to the giving of professional

3    advice and professional services to a client.  I

4    think that is a fact question which is why I

5    denied a motion for summary judgement on it.

6               But I think here there is

7    sufficient evidence that has been offered to

8    create an issue of fact as to whether this was

9    commercial and entrepreneurial activity by this

10   law firm as opposed to the provision of simple

11   professional legal services to a client in a more

12   typical sort of lawyer-client relationship.

13               So for those reasons, also, I

14   think under abuse of process where you have the

15   fact question that the Montana Supreme Court has

16   identified as to the ulterior purpose, that is,

17   using the suit as an instrument of coercion, I

18   think the evidence we are talking about now is

19   relevant to those factors.  So for all of those

20   reasons, with the caution that I have given to

21   the plaintiff, I will deny the Items 2 and 3 of

22   the defendant's motion in limine.

23               Turning, then, to 4, which is

24   evidence of the prior lawsuit, my intent is to

25   deny that, again, for the reasons that we have

1    already talked about.  I'm not certain, however,

2    how the plaintiff intends to bring this in.  And

3    whether or not it's allowed will depend on how it

4    is offered.

5              Does the plaintiff presently

6    intend to offer this somehow, this evidence with

7    respect to the prior lawsuit under the Fair Debt

8    Collection Practices Act?

9              MR. HEENAN:  To be honest, Your

10   Honor, I don't contemplate why I would need to

11   admit that evidence.  It might become relevant

12   under cross-examination of the Johnson, Rodenburg

13   & Lauinger lawyers.  I agree with the defendant

14   that it would constitute potentially 404-B

15   evidence and would ask the jury be given the

16   limited instruction if we delve into that issue.

17             THE COURT:  I will deny it now,

18   but the defendant certainly can make objections

19   that it believes is proper at trial to any offer

20   of that evidence.

21             The 5th is Judge Fagg's letter to

22   Charles Denby.  My intent here is to grant that

23   portion of the defendant's motion.  That's

24   hearsay.  I think it's prejudicial and only

25   marginally relevant if relevant at all.  So as

1    stated, my intent is to grant that portion of the

2    motion.

3                    Does the plaintiff wish to be

4    heard on that?

5                    MR. HEENAN:  Briefly, Your Honor.

6    The limited intent that we would rely on Judge

7    Fagg's letter, we wouldn't offer it as an exhibit

8    at trial, but I could foresee or want to

9    cross-examine Johnson, Rodenburg & Lauinger's

10   lawyer Denby with the fact that the judges in

11   Yellowstone County have a heightened scrutiny of

12   Johnson, Rodenburg & Lauinger filings, and

13   Johnson, Rodenburg & Lauinger knows that and the

14   judges here in Billings know that.

15                    THE COURT:  Does the defendant

16   wish to be heard?

17                    MR. SIMPSON:  I think that's just

18   an end run around the fact that the letter is

19   hearsay.  I think just asking that question is

20   going to be prejudicial to our client.

21                    Our client has no way of

22   effectively rebutting it other than to get into a

23   distended discussion of the circumstance under

24   which Judge Fagg wrote the letter and why my

25   client responded the way he did.

1                    THE COURT:  I think it could be

2     very confusing.  As I read the letter and the

3     response, there was an issue with respect to

4     whether Mr. Denby actually received the answer.

5     And so if we started going into that, it's going

6     to get us sidetracked and risk confusing the jury

7     with respect to the merits of that little

8     controversy, which really doesn't have anything

9     to do with the facts that the jury has to

10    consider in this case.

11                   And if you start, on behalf of

12    the plaintiff, start cross-examining these

13    lawyers on whether there is a heightened or

14    whether the judges in this county have been

15    cautioned with respect to that, then that's going

16    to force the defendants to get into this lengthy

17    explanation as to what happened and a question

18    about whether Judge Fagg did the appropriate

19    thing.  And I just think it's so marginally

20    relevant and it really risks confusing the jury

21    and unduly wasting time.  So I'm going to grant

22    that motion.

23                   The sixth item in the motion in

24    limine is the fact that JRL has insurance

25    coverage.  There is no objection to that.  So

1    that will be granted.

2                    And finally, the 7th and final

3    item is the film Maxed Out.  That's moot because

4    the plaintiff intends not to offer that.  So that

5    will be denied as moot.

6                    Is there anything else that the

7    defendant has to raise with respect to the motion

8    in limine?  Or does that address all the items of

9    concern?

10                   MR. SIMPSON:  I think the other

11   issues could wait until the final pretrial, Your

12   Honor.

13                   THE COURT:  Okay.  Let's turn,

14   then, to the plaintiff's motion in limine which

15   is Court Document 102 filed on February 23.

16                   The first item is the

17   availability of statutory attorneys' fees and

18   costs.  There is no objection to that so that

19   will be granted.  The second is the availability

20   of statutory trouble damages under the Unfair

21   Trade Practices Act.  Again, that is not opposed

22   so that will be granted.

23                   The third is any evidence

24   regarding June Tift or her claim.  Again, there

25   is no objection and that will be granted.

1                    On 4, this seeks to preclude any

2      evidence that CACV is responsible for the

3      defendant's conduct.  My intent is to deny this

4      because it's way too broad.  Obviously the jury

5      is going to have to hear something about CACV so

6      how the Court would enforce such a motion in

7      limine, if granted, I'm not sure.

8                    The defendant certainly can raise

9      objections at trial to any evidence that is

10     offered, or argument if the plaintiff feels that

11     it's inappropriate.  But I think that that is

12     just way too broad and my intent is to deny it.

13                    Does the plaintiff wish to be

14     heard further?

15                    MR. HEENAN:  Thank you, Your

16     Honor.

17                    Briefly, I agree that we made

18     that motion too broad.  The scope or the intended

19     scope was that CACV, they are not going to be on

20     the verdict form.  We would object and ask that

21     counsel be cautioned prior to the impanelling of

22     the jury not to raise arguments that awards

23     should be reduced or somehow a percentage should

24     be attributed to CACV.  That's the empty chair

25     defense, and that's what we were trying to reach.

1          THE COURT:  I don't think the

2     defendant is arguing that, are you?

3          MR. SIMPSON:  No, we are not.

4          THE COURT:  I'm going to deny

5     that part.

6          The deadbeat defense is the next.

7     My intent here is also to deny this.  Again, I'm

8     not sure exactly what all it includes after I

9     read the briefing.  And again, if the plaintiff

10    feels that there is an appropriate objection to

11    any evidence or argument offered at trial, you

12    certainly can raise those.  But my intent is to

13    deny this motion.

14          Do you wish to be heard?

15          MR. HEENAN:  No, Your Honor,

16    other than I frankly agree with you.

17          THE COURT:  Why did you file the

18    motion, then?

19          MR. HEENAN:  I thought the motion

20    had merit, certainly, when I made it, and I had

21    the benefit of being supplied with some unusual

22    motions in limine and these types of FPCA cases.

23          The more I thought about it and

24    coming into court and getting read for today, I

25    suspected that was a loser.  But I did prepare a

```
1    jury instruction reflecting that type of language
2    that I'm going to ask Your Honor to consider in
3    the final pretrial conference.
4                    THE COURT:  Okay.  And the last
5    item in the plaintiff's motion is any attempt to
6    impeach or undercut the Court's prior orders.  My
7    intent also is to deny this.  I think it's vague.
8                    And also, I don't expect there to
9    be any evidence or argument about the orders
10   because orders didn't relate to the state law
11   claims or to damages under the Fair Debt
12   Collection Practices Act, and that's what we are
13   trying.  I also think it's unnecessary.
14                    Again, if there is evidence or
15   arguments offered that the plaintiff feels are
16   improper at trial, proper objections can be made.
17   But my intent would be to deny the motion in
18   limine to that effect.
19                    Do you wish to be heard?
20                    MR. HEENAN:  Briefly.  One of the
21   exhibits that's been provided by Johnson,
22   Rodenburg & Lauinger is this 2002 card member
23   agreement that Johnson, Rodenburg & Lauinger also
24   supplied the Court as part of the summary
25   judgement motion practice.  The Court made
```

1    findings of fact with respect to whether that

2    card member agreement had any foundation or was

3    admissible for consideration in a summary

4    judgement proceeding.

5                    I have concerns that once the

6    door's open to the jury that there is this card

7    member agreement out there, even though we

8    strongly believe there is no evidence whatsoever

9    to link this card member agreement to my client

10   or show that it has anything to do with him, the

11   jury is going to be tainted and will think this

12   is somehow a procedural move instead of what it

13   is, and that's Johnson, Rodenburg & Lauinger

14   didn't have a card member agreement and they

15   asked for attorneys' fees anyway.

16                    In that limited respect, I would

17   ask Your Honor to consider whether Johnson,

18   Rodenburg & Lauinger, whether it would be

19   appropriate for them to raise arguments about,

20   well, there was a card member agreement; here it

21   is.

22                    THE COURT:  I have two thoughts

23   with respect to that argument.  But let me hear

24   from the defendants, first.

25                    Do you want to respond?

 1                    MR. SIMPSON:  It's just limited

 2     to the card member agreement.  I think two

 3     things, number one, Mr. Denby's and I believe Ms.

 4     Lauinger's testimony at deposition was and will

 5     be at trial with respect to the claim for

 6     attorneys' fees, with very limited exception as

 7     to I believe only one credit card issue, which

 8     was not the credit card issue involved in this

 9     case, every card member agreement they have ever

10     seen, and they have seen a few, contains

11     attorneys' fees clauses.

12                    And I think that evidence is

13     relevant to rebut the exertion that including a

14     prayer for relief for $481 in attorneys' fees was

15     somehow done intentionally to harm Mr.

16     McCullough.  I think they are entitled to rebut

17     that assertion.

18                    And when they were eventually

19     supplied with a card member agreement, that's the

20     one they were supplied with.  Whether they can

21     demonstrate it was the correct one or the one

22     that applied to his claim, I think, as the Court

23     noted, is the question.

24                    But given that my client is being

25     subject to a claim for punitive damages, I think

1    they are entitled to put on the proof to show why

2    they did what they did, even as the Court

3    determines violates the FDCPA.

4              THE COURT:   I think there are two

5    things I would like to address.   One is the card

6    member agreement itself -- no, I'm going to go

7    the other direction.   The other item I had in

8    mind is the Fair Debt Collection Practices Act as

9    opposed to the state law claims that we're

10   trying.   The Practices Act is basically a strict

11   liability statute unless bona fide error can be

12   shown.   The state law claims are much different

13   than that.   And the jury will have to make the

14   determination as to whether the elements of each

15   of those three causes of action have been met.

16             So I think, to the extent that

17   the defendants offer testimony as to why they did

18   what they did, I think they are permitted to do

19   that along the lines that Mr. Simpson was just

20   talking about, about why did you include a claim

21   for attorneys' fees?   I think they can explain

22   that.

23             On the other hand, turning to the

24   second item, which is a card member agreement,

25   offering that into evidence, some showing is

1    going to have to be made that it is relevant to

2    the case.  As I recall, that was dated 2002, long

3    after this man got his credit card and several

4    years after he made his last payment.  So I just

5    don't know how you're going to argue that it's

6    relevant to this case, or that it somehow

7    informed what the defendants did in this case.  I

8    think there are two questions about that and one

9    of them arguably is relevant here.

10                   And I don't think that, for the

11   reasons that I explained with respect to the Fair

12   Debt Collection Practices Act, that some of the

13   findings that the Court made in ruling on summary

14   judgement on the Fair Debt Collection Practices

15   Act are different questions than the jury has to

16   address on the state law claims, and are not

17   binding on the jury because they are different

18   legal questions.

19                   So I'm going to deny Number 6 of

20   the plaintiff's motion in limine.

21                   Is there anything else in the

22   plaintiff's motion in limine that we should

23   address at this time?  Or have we fully addressed

24   all parts of the motion, Mr. Heenan?

25                   MR. HEENAN:  We addressed all

1      parts of the motion.

2                     MR. SIMPSON:  May I raise one

3      other issue at this point?  Just a question.

4                     THE COURT:  Yes.

5                     MR. SIMPSON:  I'm not sure if the

6      Court wants to address this now, it's under Legal

7      Issues in the pretrial order, that subpart Roman

8      Numeral VIII.  And part one of that, I don't know

9      if perhaps we should address this as motion in

10     limine, but the issue that I've raised is whether

11     the plaintiff should be able to present to the

12     jury a specific demand for dollar amounts for the

13     various items of damage that he is claiming in

14     this case.

15                     The grounds for my motion is that

16     through the preliminary pretrial statement and

17     the discovery responses, the plaintiff did not

18     provide any specific number for any category of

19     damage.  If he did, Mr. Heenan will correct me,

20     but my search, when we were putting the pretrial

21     order together, led me to believe that numbers

22     were not given until we got to the final pretrial

23     order, and I believe that is an issue of

24     surprise.  I don't know if the Court would like

25     to address that now or wait for the pretrial, but

1    I wanted to throw that out there, since it's

2    going to exclusion of evidence.

3                    THE COURT:  I think we can talk

4    about that further at the final pretrial

5    conference, which will begin shortly.  I will say

6    just generally that if evidence was sought and

7    not produced, it's not coming in.

8                    On the other hand, I don't think

9    there is any kind of general prescription from

10   the plaintiff asking for damages.  So until I

11   hear the context of the objection, it's pretty

12   tough for me to rule.  But we can talk about that

13   further.

14                   MR. SIMPSON:  Thank you.

15                   THE COURT:  Let's take a short

16   recess.

17                   MR. HEENAN:  Judge, can we raise

18   the issue of the settlement agreement in the

19   final pretrial conference as well?

20                   THE COURT:  Certainly.  And we

21   will have our court reporter there.  So if we

22   need to ask her, we won't make a record of the

23   whole final pretrial conference, but if we need

24   to make a record, either lawyer at any time can

25   ask that a record be made.

1              We will take a short recess and

2     regroup in our conference room.

3                   (Brief recess.)

4              THE COURT:  We are now looking at

5     the plaintiff's witness list, the plaintiff's

6     will call witness list, and talking about the

7     presentation of portions of the video deposition

8     of Charles Dendy.  There are objections that are

9     listed by the defendant to portions of that video

10    deposition.

11             My question to the defendant is,

12    given the Court's rulings this morning with

13    respect to the defendant's motion in limine, are

14    there any remaining objections to the designated

15    excerpts of Charles Dendy's video deposition?

16             MR. HEENAN:  I'm sorry.  This

17    list they supplied, they changed the -- oh, I'm

18    sorry.  They limited on objections.  I'm sorry.

19             MR. SIMPSON:  I think our first

20    objection to page eight line two, through page 10

21    line 10 was resolved by the Court's order on our

22    motion in limine.  Our objection on the testimony

23    at page 19, lines 11 through 15, I think that

24    still stands.  That may simply be a mistake on

25    the way it was designated.

1              THE COURT:  I don't have his

2      deposition.

3              MR. SIMPSON:  I do.  It simply

4      cuts off halfway through Mr. Dendy's answer.

5              MR. HEENAN:  That's a mistake on

6      my part, Your Honor.  I meant to do 20 through

7      15.

8              THE COURT:  Fifteen through 18?

9              MR. HEENAN:  19/11 through 20/14.

10             THE COURT:  Through 20 what?

11             MR. HEENAN:  Through 20/14.

12             THE COURT:  19 line 11, through

13     20 line what?

14             MR. HEENAN:  Well, for -- I don't

15     know why that is.  Because then, to look at it,

16     then it starts off again on 21 and goes through

17     27/16.  So I guess it's easier to say 19/11

18     through 27/16.

19             THE COURT:  Through 27/16?

20             MR. HEENAN:  Correct, Your Honor.

21             THE COURT:  Is there any

22     objection to that?

23             MR. SIMPSON:  Perhaps we could

24     take a short break to read -- well, I stated an

25     objection already, at page 25 line 22, through

1     page 26 line five on the grounds of relevance.

2                    THE COURT:  Why don't we do this.

3     Let's go off the record for a minute.

4                    (Discussion off the record.)

5                    (Brief recess.)

6                    MR. SIMPSON:  I think we've

7     sorted through the typographical questions we

8     had.  I think the record's clear, John is now

9     designating for Mr. Dendy to start at page 19

10    line 11 and go through page 27 line 16.

11                    THE COURT:  19 line 11 and go

12    through what?

13                    MR. SIMPSON:  Page 27 line 16.

14    That resolves the objection that I had that there

15    was an incomplete answer where the designation

16    only ended halfway through.

17                    I still, however, wanted to put

18    on the record our objection to the question and

19    answer at page 25 line 22, through page 26 line 5

20    on the grounds of relevance.  It's a question

21    about the practices of Portfolio Recovery

22    Associates and Portfolio is not a party to the

23    case and their conduct isn't at issue here.

24                    THE COURT:  No, but Mr. Dendy's

25    is.  Does it have anything to do with that?

1                    MR. SIMPSON:  I don't believe so.

2                    THE COURT:  Can I see the

3      testimony?  All right.  We are on page 25 through

4      26 line 5.  That doesn't seem relevant to me.

5                    What is your argument, Mr.

6      Heenan?

7                    MR. HEENAN:  Portfolio Recovery

8      Associates along with CACV and another company

9      called Unifund are all three of the biggest debt

10     buyers and three of Johnson Rodenburg's largest

11     clients.  It's my understanding that in this

12     industry, by contract, when the debt buyers

13     purchase these accounts they agree contractually

14     they won't get any evidence at all, and won't ask

15     for evidence.

16                    THE COURT:  The debt buyers agree

17     to that?

18                    MR. HEENAN:  Correct.  So the

19     debt buyers need attorneys like Johnson Rodenburg

20     that are willing to file lawsuits without

21     requiring any evidence.

22                    THE COURT:  This says they are

23     limited to how many times they can ask for

24     information.  That's different from what you just

25     said.

1                    MR. HEENAN:  We withdraw the

2       question.

3                    THE COURT:  So then I will grant

4       the objection to the showing of the video

5       deposition of Dendy from page 25 line 22, through

6       page 26 line 5.

7                    Any further objections?

8                    MR. SIMPSON:  Yes, page 32 line

9       11 through line 24, and our objection is

10      relevance.  And the Court's already ruled on the

11      issue.

12                   THE COURT:  Actually I think

13      you --

14                   MR. SIMPSON:  Maybe I'll consider

15      withdrawing that objection.  We withdraw it.

16                   THE COURT:  The objection to the

17      testimony on page 33 is withdrawn.  And --

18                   MR. SIMPSON:  One other, page 43

19      line 15, through page 44 line 18.  This goes to

20      the question of requests for admission.  We don't

21      believe that's relevant and I believe it asks for

22      a legal conclusion.

23                   THE COURT:  Through 44 line 18?

24                   MR. SIMPSON:  Yes.

25                   THE COURT:  I'm going to overrule

1       that objection and allow the plaintiff to show

2       page 43 lines 15, to 44 -- I'm sorry.  From page

3       43 line 15, through page 44 line 18.  I think

4       it's relevant to a variety of issues the jury

5       will have to decide.

6                       Okay.  Grace Lauinger, also, the

7       plaintiff intends to call by video deposition.

8       Is there any remaining objection to the

9       designated excerpts?

10                      MR. SIMPSON:  Yes, we have a

11      couple at page 30 line 25, through page 31 line

12      9.  This has probably already been addressed by

13      the Court's order on our motion in limine on the

14      number of lawsuits filed in a day.  This actually

15      goes to a number of demand letters sent out in a

16      day.  I wanted to maintain our objection for the

17      record.

18                      MR. HEENAN:  It should be 30/20

19      through 31/9.  Sorry.

20                      THE COURT:  So you're amending

21      your designation to page 30 line 20, through

22      31/9?

23                      MR. HEENAN:  Correct, Your Honor.

24                      THE COURT:  Yes, I think we

25      already addressed that.  So I will overrule that

1     objection.

2                    MR. SIMPSON:  I have one other to

3     Grace Lauinger, and that's to the testimony at

4     page 52 starting at line 19, ending at line 25.

5     And our objection there is relevance.  And this

6     is the same issue, how many accounts is Ms.

7     Lauinger handling, and that's the relevance

8     objection in the motion in limine.

9                    THE COURT:  For the same reasons,

10    I will overrule that.

11                   Moving on to Lisa Lauinger.  Any

12    remaining objections to the designated excerpts

13    of Lisa Lauinger?

14                   MR. SIMPSON:  There are, Your

15    Honor.  Starting at page 38, lines 4 through 23.

16    This goes, again, to the question of what

17    percentage of suits result in default judgements,

18    how many people in the lawsuits that you file

19    retain counsel, and that sort of thing.  Again,

20    that's our relevancy objection.

21                   THE COURT:  The excerpt is

22    through 23?  I will overrule that objection.

23                   MR. SIMPSON:  Hold on.  Yes.

24    Through -- correct.

25                   And then page 40 line 13, the

1     question beginning at line 13, What does Johnson

2     Rodenburg do in an attempt to collect on

3     judgements against people in Montana?  It

4     discusses debtor examinations.  Our objection

5     runs through page 43 line 5.  I don't believe

6     that evidence is relevant because there isn't any

7     similarity to the circumstances here because

8     Johnson, Rodenburg & Lauinger never obtained a

9     default judgement and never put Mr. McCullough

10    through debtor examination.  So I don't believe

11    this testimony is relevant.  It's not similar to

12    the conduct at issue here.

13                THE COURT:  Doesn't it go to

14    motive and profitability of the conduct that's at

15    issue?

16                MR. SIMPSON:  I guess, but

17    there's been no showing that the conduct in those

18    other cases is wrongful.  I think it's the mere

19    implication that by filing the lawsuits and

20    taking default judgements, which is the lawful

21    process, that my client is doing something wrong.

22    And that implication is harmful without my client

23    having --

24                THE COURT:  Again, that's for the

25    jury to decide based on the evidence that I

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    understand the plaintiff intends to present, that

2    they didn't have any information to know whether

3    they were legitimate suits or not.

4              Now, I don't know if that's what

5    the evidence will show, but that would be

6    consistent with what the plaintiff is arguing

7    here.

8              So I think that's a jury

9    question.  So I will overrule that objection.

10             MR. SIMPSON:  Then the final one

11   for Lisa Lauinger is page 50, line 7 through 19.

12   And this is the same issue we just discussed,

13   what's the number of lawsuits that you filed in a

14   day.

15             THE COURT:  Okay.  For the same

16   reason, I overrule that objection.

17             Then moving to McElhinney.

18             MR. SIMPSON:  Our primary

19   objection to Dr. McElhinney's deposition being

20   used is that Dr. McElhinney works and resides in

21   Billings and is within the Court's subpoena

22   power.  And he is not, to our knowledge,

23   unavailable to testify, and we in fact intend to

24   call him during our case in chief.

25             We have other specific objections

1    if the Court wants to hear those, but I think the

2    primary objection might moot the other ones until

3    he is actually called.

4                    THE COURT:  How are you permitted

5    to use the deposition under the rules if he is

6    available?

7                    MR. HEENAN:  A deposition can be

8    used for any purpose is my understanding.  So we

9    took his deposition.  And I think I'm entitled to

10   call Dr. McElhinney by deposition in our case in

11   chief.

12                   THE COURT:  Cite me the rule.

13                   Would you get my rule book?

14                   MR. SIMPSON:  We have one right

15   here.  Lauinger.

16                   MR. HEENAN:  32-A.

17                   THE COURT:  32-A what?

18                   MR. HEENAN:  Good question.  I

19   don't know.  I don't know.  I can't cite to

20   anything.

21                   THE COURT:  Okay.  Then I will

22   sustain that objection.

23                   Okay.  Kerri Henan and Ken

24   Lucero.  Do you have any questions, Mr. Heenan,

25   about the cautions I expressed with respect to

1      their testimony?

2                     MR. HEENAN:  No, Your Honor.  I

3      take them to heart and I only intend to illicit

4      extremely narrow questions that are relevant to

5      the -- that have a nexus with what occurred to

6      Mr. McCullough.

7                     THE COURT:  Who's Bob Dunker?

8                     MR. SIMPSON:  We have listed

9      parts of his testimony too.

10                    THE COURT:  I saw that.

11                    MR. SIMPSON:  He is the

12     representative of CACV of Colorado.

13                    THE COURT:  So the plaintiff has

14     designated excerpts of his deposition.

15                    Are there any remaining

16     objections that the defendant has to the use of

17     those excerpts at trial?

18                    MR. SIMPSON:  Yes.  Page 53 line

19     14, through page 54 line 5.  The first question,

20     page 53 line 14, Question, Does CACV more often

21     than not cover default judgements and lawsuits it

22     files in Montana?  I don't know.

23                    And then he's got some

24     approximations or speculations as to whether most

25     of them result in default judgements.  And how

```
1    often do people CACV sues appear through counsel
2    or pro se?
3                    I don't think it's relevant to
4    the issues in the case.  Perhaps the Court
5    already addressed that through our motion in
6    limine as well.
7                    THE COURT:  Give me a moment to
8    read it.
9                    Mr. Heenan, what difference does
10   it make if CACV condones or tolerates its lawyers
11   prosecuting lawsuits not allowed?  What issue
12   does that go to here?  Talking about page 55
13   lines 5 through 8.  Does it matter -- page 55
14   lines 5 through 8.
15                   MR. HEENAN:  Well, that leads
16   into, Your Honor, the next objection, which is
17   page 59.  Basically long story short, CACV tells
18   Johnson Rodenburg, We made a mistake.  That
19   wasn't was an unused cost.  Johnson Rodenburg
20   propounds those requests for admission and then
21   drafts up an affidavit for CACV to sign so they
22   can proceed with summary judgement against Mr.
23   McCullough.
24                   THE COURT:  How is that not
25   relevant, then?
```

1                    MR. SIMPSON:  Nobody ever signed

2        the affidavit.

3                    THE COURT:  But if your client

4        prepared it for them --

5                    MR. SIMPSON:  Our client prepared

6        it for them, but as Mr. Dendy will testify, Mr.

7        Dendy, when the information was in the file,

8        overlooked the information about the return of

9        unused costs not actually being the payment.

10                    This is, if you will, the

11        explanation as to why the requests for admission

12        were served and why he only found out directly

13        when he spoke to a client representative in

14        December of 2007 and was told, look -- that's

15        when he first learned subjectively, we are not

16        within the statute of limitations.

17                    At that point he has a discussion

18        with his client.  The client says, Dismiss the

19        case.

20                    Up until then, I think, in a

21        general sense, what does CACV condone in its

22        lawyers isn't really relevant.  That's not the

23        question.  The question is, what did our client

24        know and when did our client know it?

25                    MR. BOHYER:  The other thing I

```
1    would add to that, Your Honor, with respect to an
2    affidavit that is prepared and not filed or
3    executed, that's not abuse of process.
4              THE COURT:  No, but it may be
5    malice.  It may be disregard or it may tend to
6    show disregard for a high probability of injury.
7    Because, as I understand what the facts may show
8    here, although Mr. Dendy subjectively will
9    testify that he didn't know, there were two
10   things in his file that, had he properly
11   investigated, the jury could find that he would
12   have known, maybe three.  The prior lawsuit
13   which, as I understand it in this software
14   program, there was something in there about the
15   prior lawsuit that was dismissed.  As I
16   understand, he made no investigation to see what
17   that was about.
18              The answer, where the
19   plaintiff -- excuse me.  The plaintiff here the
20   defendant there -- answered and said, I haven't
21   made a payment here for eight years, or whatever.
22   As I understand it, I don't know what the
23   evidence will show, but from the evidence I saw
24   in the motion, he made no effort to investigate
25   that; and then the snafu or whatever it is
```

1    between Grace Lauinger and him, where the law

2    firm knew for months, and he did nothing.

3                    So what I'm saying is, isn't,

4    then, the fact that with all that stuff in the

5    file Dendy, or whoever on his behalf, drafts an

6    affidavit for CACV to sign, containing

7    information that had he investigated any one of

8    those things he probably would have known?  So

9    the jury arguably could conclude from that

10   evidence that he acted completely disregarding

11   the high probability of injury to this plaintiff.

12                   MR. BOHYER:  But if the document

13   is neither unsigned nor filed, how is that

14   evidence of either the abuse of process or the

15   actual prosecution?

16                   THE COURT:  I don't know that it

17   is.  But if the jury on other evidence finds

18   either an Unfair Trade Practice, malicious

19   prosecution or an abuse of process, it goes to

20   the question of whether the jury should award

21   punitive damages.

22                   MR. BOHYER:  It's akin, is it

23   not, to preparing a draft of a document that you

24   later retract?

25                   I don't see how that can sustain

1    even evidence of malice or repeated conduct if

2    the document is not executed by the client and

3    the lawyer does not take the next step of placing

4    the process with the Court.  The process hasn't

5    been abused.

6                    MR. HEENAN:  If I might respond

7    briefly, Your Honor.

8                    THE COURT:  You may.

9                    MR. HEENAN:  We wouldn't be

10   submitting the draft affidavit to show an abuse

11   of a process but rather the intent of this law

12   firm for what they had in store for Mr.

13   McCullough next until he appeared through

14   counsel.

15                    THE COURT:  Okay.  I'm going to

16   overrule the objections.

17                    Although, Mr. Heenan, with

18   respect to what CACV condones, is it -- let me

19   see if I understand here.  You contend that's --

20   let me ask.  Does the evidence show or will the

21   evidence show that Dendy presented this to CACV?

22   What did he do with the affidavit?

23                    Let me ask this.  Will the

24   evidence show that he drafted this affidavit?

25                    MR. SIMPSON:  He or somebody in

1     his firm.  It was in their file.

2                    THE COURT:  Will he testify that

3     he did it?

4                    MR. SIMPSON:  I would have to ask

5     him.  I don't recall.

6                    THE COURT:  He or somebody.

7                    MR. SIMPSON:  He or somebody at

8     his direction drafted it.

9                    THE COURT:  Is there any evidence

10    that he or somebody at his direction sent it to

11    CACV?

12                   MR. SIMPSON:  That's what I'm not

13    sure about.  I don't believe so.  I don't think

14    it was in Mr. Dunker's file.  I may stand

15    corrected on that point later, but I don't

16    believe it was presented to CACV because our

17    client, as part of the process, did serve the

18    discovery requests to Mr. McCullough and, as I

19    understand it, was waiting to receive the

20    responses back before proceeding with the motion

21    for summary judgement.

22                   So they have things in the works

23    in the draft stage, but they are not ready to go

24    for filing the motion, supporting brief and

25    supporting affidavit because they don't have the

1    responses back.

2              By the time they get the

3    responses back, shortly thereafter they talk to

4    their client again, the client rep at CACV, and

5    that's when it clicks that this case is

6    definitely outside the statute of limitations,

7    dismiss it right now.

8              THE COURT:  We are not talking

9    about whether the affidavit is relevant.  We are

10   talking about CACV.

11             And so, Mr. Heenan, if there is

12   no evidence that this affidavit was ever

13   submitted to CACV, then what relevance does it --

14   what difference does it make to any determination

15   the jury has to make what CV condones or

16   tolerates?  I'm missing the connection.

17             MR. HEENAN:  As I understand what

18   Johnson Rodenburg's defense is, we rely

19   completely on our client.  Well, the client here,

20   CACV says, No, by contract we tell the lawyers to

21   independently investigate whether it's proper to

22   file suit.

23             That's directly what this line of

24   questioning goes to.  Does CACV condone or

25   tolerate its lawyers prosecuting lawsuits not

1    allowed?  Absolutely not.

2                    THE COURT:  Excuse me for

3    interrupting.  Let me ask the defendant, then.

4                    As I understand it, Mr. Heenan is

5    correct that part of the defense here is that

6    these lawyers can rely on CACV.  Is that correct?

7                    MR. BOHYER:  Certainly.  It's

8    part of our case that our client, as with any

9    lawyer, our client relied on what the client told

10   them.

11                   THE COURT:  Then I will overrule

12   the objection.

13                   MR. SIMPSON:  Just to be clear,

14   the record on the affidavit, Mr. Heenan had

15   labeled the affidavit as Exhibit 71.  I then

16   followed up and asked Mr. Dunker, Have you seen

17   71 before?  He answered, I've seen something like

18   it, but I don't have any remembrance of seeing

19   this particular one.

20                   And I asked, did you ever sign an

21   affidavit on Mr. McCullough's account that you

22   are aware of?  And he says, I don't remember.

23                   THE COURT:  So let's go on, then,

24   to the next objection, which is 54 starting at

25   line 11.  Is that correct?

1               MR. SIMPSON:   Correct, through 55
2     line 4.  Our objection is it calls for a legal
3     conclusion to the extent Mr. Dunker is being
4     asked what obligations Johnson Rodenburg has when
5     a file is sent to it for service.
6               THE COURT:  That does call for a
7     legal conclusion and an objection was properly
8     made.  So I'm going to sustain that.
9               The thing is, as he answered it,
10    he answers it with respect to CACV, but the
11    question is, does it call for a legal conclusion?
12    I don't see that you followed up or you amended
13    your question in any way to ask a proper
14    question.
15              So I'm going to sustain the
16    objection and exclude page 54 line 11, through 55
17    line 4.
18              Okay.
19              MR. SIMPSON:  One last one, Your
20    Honor.  That is at page 61 starting at line 3
21    through line 18.  And our objections are
22    relevance, more prejudicial than probative, and I
23    also stated in argument on the record that the
24    question was argumentative.  In particular, the
25    phraseology that somebody at Johnson Rodenburg

 1    knew the information to be false.

 2                    THE COURT:  Isn't that a disputed

 3    fact, Mr. Heenan?

 4                    MR. HEENAN:  I don't think so,

 5    Your Honor.  Your Honor resolved that with

 6    respect to the Fair Debt Collection Practices

 7    Act, claiming Johnson Rodenburg, there was

 8    evidence in its files that it was a time-barred

 9    claim.

10                    THE COURT:  That's totally

11    different.  Because that's not the issue that

12    this jury is going to decide.  They aren't trying

13    the Fair Debt Collection Practices Act.  They are

14    deciding the state law claims.  And the

15    knowledge, the subjective knowledge, particularly

16    with respect to your claim for punitive damages

17    and having to prove actual malice, is very

18    important.

19                    So you can argue that Johnson

20    Rodenburg knew or had reason to know, or should

21    have known had they acted properly, that it was

22    false.  But that's not your question.  You said

23    that they knew.  You didn't add 'or should have

24    known' was false.  And so I think that that

25    assumes facts that are disputed or not in

1      evidence, that they knew that it was false, the

2      lawyer that prepared that affidavit.  Is that

3      correct?

4                          MR. HEENAN:  Bear with me just a

5      minute, Your Honor.

6                          Material facts which were

7      established by the Court in its November order by

8      August 6, 2007, JRL had information from its

9      client demonstrating that the lawsuit was

10     time-barred.

11                         THE COURT:  That's right.  But

12     what you have is that these attorneys knew that

13     it was false.  The fact that they had information

14     in their files goes to that issue of whether they

15     should have known that it was false had they

16     properly investigated.  But that doesn't say that

17     they knew, that these lawyers knew that this was

18     false.  That's what your question asked.

19                         MR. HEENAN:  I understand your

20     point, Your Honor.

21                         THE COURT:  So I'm going to

22     sustain that objection and preclude the offering,

23     then, of 61 line 3 through line 18.

24                         Okay.  Now, have you decided

25     whether you're going to -- let me give you this

1    back.

2                    MR. HEENAN:  You might still need

3    it, Your Honor, because we raised our own

4    objections.

5                    THE COURT:  With respect to the

6    may call, have you determined whether you're

7    going to call any of those?  What's the current

8    status on that?

9                    MR. HEENAN:  I think they are

10   both may calls, Your Honor.

11                   THE COURT:  When you say "both,"

12   I have four on my list.

13                   MR. HEENAN:  Mrs. McCullough and

14   Dr. Veraldi.  I do still intend to call Dr.

15   Veraldi.  I'm not sure about Mrs. McCullough.

16                   THE COURT:  You moved Mike Eakin

17   and Ken Lucero to the will call list.

18                   Let's go, then, to the

19   defendant's will call.

20                   The defendants currently intend

21   to call four witnesses, three live, one through

22   video.  There is no objection to the designated

23   excerpt of Mr. Dunker.

24                   MR. HEENAN:  There is.  I was

25   supplied with this this morning and didn't have

1    an opportunity to lodge my objection.  So if we

2    could do that, I would like to do that now.

3                   THE COURT:  Why didn't he get

4    them?  Because I think we got them.

5                   MR. SIMPSON:  It was our intent

6    that he have those.

7                   MR. HEENAN:  There were several

8    different versions that all kind of came through,

9    and the last one that I had had, like one line

10   5/15 through 6/15 and 7/11 through 9/07, and we

11   had no objections to those.

12                   LAW CLERK:  That's what I have

13   now.

14                   MR. HEENAN:  I have no objections

15   to those.  But there is a newer version.

16                   LAW CLERK:  That's the one I

17   don't have.

18                   MR. SIMPSON:  This is the one

19   that should have been filed with the pretrial

20   order.

21                   THE COURT:  This makes me cranky.

22   And a crankier judge would say, Tough.  You don't

23   get to do it.

24                   I won't do it, but I do want to

25   implore counsel, it is so important to exchange

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1      these lists ahead of time.  These already take

2      hours.  We don't need to cause it to be twice the

3      amount of time because they haven't been

4      exchanged.  When you come in with new excerpts,

5      that forces the other party to have to take time

6      here with the clerk and the court reporter and my

7      time, and it takes everybody's time, then.  And

8      it's just not the most efficient way to proceed,

9      which is why the local rules and the order

10     require these things to be exchanged and provide

11     that if they are not, and if objections aren't

12     made to what is designated, that's it.

13                So did you get, Mr. Heenan, this

14     list, that is the first time I've seen it, with

15     all these exhibits and designations?

16                MR. HEENAN:  It was e-mailed to

17     me this morning.  And there was, to be fair to

18     defense counsel, preparing the final pretrial

19     order, there was a lot of back and forth, here's

20     the latest, and we went back through and looked

21     at all the e-mails.  And to my knowledge, that

22     was the first time this morning we got this

23     document.  But we wouldn't certainly stand on any

24     objection that it's untimely.

25                THE COURT:  You're going to waive

1     any objections that you have to these exhibits?

2                    MR. HEENAN:  No, I would like to

3     preserve my objections, but I mean the two

4     portions designated that I was aware of we didn't

5     have any objection to.  But I wouldn't try to

6     push the issue of that's all they get to

7     introduce.

8                    THE COURT:  Well, there are 15

9     more.  And I want to get them resolved now

10    because I want whoever is going to edit the video

11    to be able to edit it properly so we don't have

12    all of us and the jury sitting there.

13                    We will keep going.  As I said, I

14    have a criminal matter at two and I suspect it

15    might not be done by two, but you can resolve

16    those issues.

17                    MR. HEENAN:  I looked at it

18    during the break, so I'm ready to go on it.  I

19    looked at it during the break.  When they were

20    going through Dr. McElhinney, I used that time to

21    be able --

22                    THE COURT:  I didn't hear that.

23    I was busy being cranky.

24                    MR. BOHYER:  I would like to

25    thank the Court for your indulgence.

1                      THE COURT:  Do you have any
2      objections to any of these?
3                      MR. HEENAN:  Yes, Your Honor,
4      page 9 line 24.
5                      THE COURT:  I need a copy.  Nine
6      line 24?
7                      MR. HEENAN:  You have to bear
8      with me a little bit, Your Honor, because I won't
9      have the copy in front of me.
10                     9/24 through page 11 line 8.
11     Rule 602, personal knowledge, foundation, hearsay
12     and relevance.
13                     THE COURT:  Through what line?
14                     MR. BOHYER:  11 line 8.
15                     THE COURT:  There's not a time
16     frame here.  Where does it start?
17                     MR. HEENAN:  Page 9 line 24, Your
18     Honor.
19                     THE COURT:  Your first objection
20     was lack of knowledge.  He seems to know.  He
21     says, Did they purchase it?  And he says, Yes.
22                     MR. HEENAN:  Specifically with
23     respect to this exhibit, he has no personal
24     knowledge of the exhibit.
25                     I'm really sorry to do this, but

1    would it be okay to make a copy of that

2    deposition?  Because I highlighted some.  Is that

3    all right if I run down to the clerk's office?

4               MR. SIMPSON:  Here.

5               THE COURT:  Go ahead and keep it.

6               The question is, Can you identify

7    the document?  And he says, Yes.  And then the

8    question is, And what this document is is proof

9    that CACV purchased Mr. McCullough's debt.  And

10    he says, That's correct.

11               So what's the objection again?

12               MR. HEENAN:  Bear with me just a

13    second, please;

14               This is the assignment agreement,

15    page 49 line 18, my questioning regarding it:  Do

16    you personally know Cindy Bergener, who is the

17    affiant?  No, I don't.  Have you ever had other

18    occasions to see affidavits from Cindy Bergener?

19    I don't remember.

20               This is an affidavit between

21    someone else at Johnson Rodenburg and someone at

22    Chase Manhattan.  This witness had no personal

23    knowledge about --

24               THE COURT:  I thought Exhibit 66

25    was the sale document itself, transferring the

1    asset.

2                      MR. SIMPSON:  I believe it is.

3                      MR. HEENAN:  It is.

4                      MR. SIMPSON:  CACV and Chase

5    Manhattan, not Johnson Rodenburg and Chase

6    Manhattan.

7                      THE COURT:  Is Exhibit 66 an

8    offered exhibit here?

9                      MR. HEENAN:  By the defendant,

10   and we raised the same objections.

11                     THE COURT:  What is the exhibit

12   number?

13                     MR. HEENAN:  Exhibit 66.

14                     THE COURT:  Oh, of course.

15   That's what the rule requires.  But I don't have

16   Exhibit 66 in the defendant's.  I go from 55 to

17   70 in the defendant's exhibits.

18                       Mr. Simpson, did you offer this

19   one?

20                     MR. SIMPSON:  It's 506, the

21   affidavit of sale.

22                     THE COURT:  Why does it have a

23   different exhibit number?

24                     MR. SIMPSON:  It was produced in

25   different forums.

1                      THE COURT:  I see.

2                      MR. HEENAN:  If I may, Exhibit

3     506 is only some portion.

4                      THE COURT:  505.  Oh.

5                      MR. HEENAN:  It references a

6     contract that is not part of the exhibit.  And so

7     it's not the entire document, or what's

8     represented to be the entire document.

9                      MR. SIMPSON:  505 is the bill of

10    sale and then the affidavit of sale is 506.

11                     THE COURT:  The testimony that we

12    are discussing to which objection has been made

13    is the question to Mr. Dunker of Exhibit 66,

14    which I'm told is the same as defendant's offered

15    Exhibit 506.

16                     MR. BOHYER:  Correct.

17                     THE COURT:  Is that correct so

18    far?

19                     MR. SIMPSON:  Yes.

20                     THE COURT:  And all Exhibit 506

21    is is a one-page affidavit of sale.  The affiant

22    is Cindy Bergener and she signed it on August 31,

23    2007.  And I'm now informed that Mr. Dunker has

24    testified in this same deposition that he doesn't

25    know who Ms. Bergener is.  Was that it?  Or

```
 1    doesn't know her?

 2                    MR. HEENAN:  If I may, Your

 3    Honor, page 51, my question to Mr. Dunker:

 4         Q. As I understand your testimony, Mr.

 5    McCullough's account was apparently purchased

 6    prior to your employment at Collect America.

 7         A. That is correct.

 8         Q. So you don't have any personal

 9    knowledge of that purchase?

10         A. No.

11         Q. Do you know who at Collect America

12    would have personal knowledge of that purchase?

13                    A. I don't know off the top of my

14    head.        Q. Do you have any -- have you ever

15    worked at Chase Manhattan Bank?

16         A. No, I have not.

17                    THE COURT:  Okay.  It appears to

18    me this witness has no personal knowledge of

19    this, so I sustain the objection.

20                    Does the defendant want to be

21    heard?

22                    MR. SIMPSON:  It's a document

23    maintained by CACV and it was transmitted by CACV

24    to Johnson Rodenburg and was part of CACV's file

25    on Mr. McCullough's credit card account.  This
```

1    was part of the information that ultimately ends

2    up in my client's file.

3                         And I think, if my client is

4    going to be subject to a claim of abuse of

5    process and malicious prosecution, it needs to

6    say, Here are the documents we ultimately

7    received during our work on this case.  And I

8    think they would say they would routinely rely on

9    the documents provided by their clients.

10                        THE COURT:  Who is Mr. Dunker?

11   What is his position?

12                        MR. SIMPSON:  He is a legal

13   franchise specialist with CACV of Colorado.

14                        MR. HEENAN:  If I might, Your

15   Honor.  Page 52 and 53 further builds:

16        Q. Is it fair to say you don't have any

17   personal knowledge of Chase Manhattan documents

18   regarding Mr. McCullough?

19        A. I don't think that's correct.  They

20   provide documents to us I've reviewed.

21        Q. My question is, do you have personal

22   knowledge -- I mean, do you know what documents

23   Chase Manhattan would have provided to Mr.

24   McCullough?

25        A. I don't know what they provided.

1              Q. Do you have personal knowledge of what

2      documentation was provided by Chase Manhattan to

3      Mr. McCullough with respect to this account?

4              A. No.

5              Q. Do you have personal knowledge as to

6      how Chase Manhattan maintained documents

7      regarding Mr. McCullough's account?

8              A. No, I don't.

9              THE COURT:  Well, Mr. Simpson, if

10     there's a proper foundation and it comes in

11     through a witness with knowledge, I understand

12     your argument and would agree with it.  But it

13     has to have a foundation and has to come in

14     through somebody who has knowledge of it.

15             And this witness, in your

16     designated excerpt, has offered testimony that,

17     based on what Mr. Heenan has read from subsequent

18     pages in the deposition, demonstrates he has no

19     personal knowledge of it.  The question wasn't

20     whether this is a document that is regularly kept

21     in the course of business or any of that kind of

22     thing.

23             I assume this document found its

24     way into JRL's file.  Is that correct?

25             MR. BOHYER:  That is correct.

```
 1                    THE COURT:  Maybe you can get it
 2   in through somebody that it's a part of their
 3   records.  But I'm not going to allow a witness
 4   who has no knowledge of it to testify about it.
 5                    So I'm going to sustain the
 6   objection to --
 7                    MR. BOHYER:  We can put it in
 8   through one of JRL's witness.  We will go about
 9   it that way.
10                    THE COURT:  I sustain the
11   objection to page 9 line 24, through page 10 --
12   no, through 11 line 8.
13                    Okay.  Any other objections to
14   excerpts?
15                    MR. HEENAN:  Yes, Your Honor.
16   Page 24 line 25, through page 25 line 4.
17                    THE COURT:  What is the
18   objection?
19                    MR. HEENAN:  Objection, hearsay,
20   602.  The question is, Do you have any
21   understanding as to whether the card member
22   agreement between Mr. McCullough and Chase
23   Manhattan that was in effect in this case
24   provided for attorneys' fees?  Answer, I believe
25   it did.
```

1                          THE COURT:  24 line 13.

2                          MR. SIMPSON:  His objection

3       starts at line 25, I think.

4                          MR. BOHYER:  Yes, page 24 line

5       25.

6                          MR. HEENAN:  The question starts

7       at page 24.

8                          THE COURT:  I'm going to sustain

9       that objection.

10                         Any other objection?

11                         MR. HEENAN:  Page 27 line 2,

12      through page 28 line 6.

13                         THE COURT:  What is the

14      objection?

15                         MR. HEENAN:  Foundation, Rule

16      602, undisclosed opinion testimony and relevance.

17                         THE COURT:  What's the relevance

18      of that?

19                         MR. SIMPSON:  He wants to get

20      into evidence that CACV had previously sued Mr.

21      McCullough through Bruce Spencer, and then wants

22      to pin my client with the fact that it didn't go

23      investigate why Mr. Spencer dismissed it.

24                         Mr. Spencer was misled by Mr.

25      McCullough's answer into believing the statute of

1    limitations was up.  And the relevance goes to

2    show that Mr. McCullough wasn't honest in his

3    answer that he originally filed in the Spencer

4    lawsuit, and he wasn't honest with respect to his

5    answer in this case or in the underlying

6    debt-collection action case.  When he says he

7    hadn't made a payment in eight and a half years,

8    that's not true.

9                    THE COURT:  When did Dunker go to

10   work for CACV?

11                   MR. HEENAN:  It was subsequent to

12   2001.  We asked him about that.

13                   MR. BOHYER:  I think he says in

14   there it's 2002.

15                   THE COURT:  The problem I have is

16   the question asks, did CACV make any mistakes in

17   its judgement and its pursuit of.  You yourself

18   filed a motion to preclude any testimony about

19   that.

20                   The defendant here isn't CACV.

21   So whether CACV made any mistakes, and especially

22   whether Mr. Dunker thinks they made any mistakes,

23   is irrelevant.  And this all has to do with his

24   opinion on whether any mistakes were made.  And

25   he wasn't involved in it, as I understand it.  He

1    questions what somebody else did.

2                    But I'm going to sustain that

3    objection because it is opinion testimony and I

4    think it is irrelevant.

5                    Any other objections?

6                    MR. HEENAN:  Page 30 line 5,

7    through page 30 line 25.

8                    MR. BOHYER:  What was the end of

9    it, John?

10                   MR. HEENAN:  Line 25.

11                   THE COURT:  They designated 38

12   through 25.

13                   MR. HEENAN:  Oh, sorry, Your

14   Honor.  38 through 30/25.

15                   THE COURT:  While I'm getting

16   ready to look at that, I'll say if the plaintiff

17   takes the position and offers evidence that JRL

18   should have investigated, and the defendant wants

19   to present evidence about what they would have

20   learned if they investigated and somebody has

21   knowledge about that, I think they can testify

22   about that.  But Mr. Dunker's opinion is what I'm

23   precluding.

24                   MR. BOHYER:  Fair enough.

25                   MR. HEENAN:  If I might, Your

1    Honor, reference page 65, my examination of Mr.

2    Dunker:

3              Q. This deposition Exhibit 70, these

4    notes, did you input all this information

5    yourself?

6              A. No, I didn't.

7              Q. Other people inputted this information

8    as well?

9              A. That is correct.

10             Q. Like with respect to a payment made in

11   2001, you didn't input that information because

12   you didn't work at Collect America in 2001.  Is

13   that true?

14             A. That is correct.

15             Q. Do you have any personal knowledge

16   other than these notes that a payment was made in

17   2001 by Mr. McCullough?

18             A. No.

19             THE COURT:  But they don't ask

20   him that.  They ask if it was a document that

21   CACV maintains in its ordinary course of

22   business.  And he says that it is.

23             And there is no indication that

24   I've seen that he is not capable or qualified or

25   competent to testify that this is a document that

```
 1    CACV maintains in its ordinary course of

 2    business.

 3                    I will overrule the foundation

 4    objection.

 5                    But your other objections are

 6    what?

 7                    MR. HEENAN:  Relevance and Rule

 8    106.  This Exhibit 70 was redacted by CACV's

 9    counsel prior to providing it at this deposition.

10                    THE COURT:  What's the

11    defendant's response?

12                    MR. SIMPSON:  I think the

13    contents are relevant because they substantiate

14    that CACV did have information in its file that

15    there was a payment made by Mr. McCullough in

16    June of 2004.  It was erroneous, but it was

17    documented in the notes.

18                    We didn't do the redacting so I

19    can't speak to that.  I don't know any more than

20    Mr. Heenan what was said in those portions.  But

21    obviously --

22                    THE COURT:  It is what you've

23    got.  I overrule the objection on redaction.

24                    Then you had one other.  What was

25    the other?
```

1                    MR. HEENAN:  Relevance.  These

2      were notes maintained internally by CACV.  There

3      was no evidence they were ever provided to

4      Johnson Rodenburg.

5                    THE COURT:  How are they

6      relevant?

7                    MR. SIMPSON:  Because some of the

8      information in the notes was conveyed to Johnson

9      Rodenburg.

10                   THE COURT:  So that is relevant.

11     But what CACV had, why is that relevant if it

12     wasn't conveyed?

13                   MR. SIMPSON:  I guess it depends

14     on the format that it was conveyed.  They didn't

15     copy the notes in the file and say, this is a

16     photocopy of our notes, and ship them to Johnson

17     Rodenburg.  But the particular point of

18     information that there is an entry under June 30,

19     2004 that says, Payment received from Mr.

20     McCullough, now that was the information that was

21     relayed in January of 2007 to Lisa Lauinger that

22     Mr. McCullough made this payment in June of 2004.

23     I think that's relevant to show not only did our

24     client believe it but there was documentation in

25     its client file also proving that point.

1                        THE COURT:  They didn't know

2      that.  CACV is not the defendant here.  What they

3      knew has no relevance.  What they told JRL is

4      very relevant.  That you're permitted certainly

5      to offer into evidence.

6                        But what CACV knew or had in its

7      file that it didn't give to JRL, I don't see how

8      that could possibly be relevant.

9                        So is Mr. Heenan correct that

10     this Exhibit 70, as an exhibit, was not something

11     that was given to JRL?

12                       MR. SIMPSON:  Information that

13     was contained -- I'm not trying to --

14                       THE COURT:  Right.  I know there

15     might have been bits of information conveyed to

16     them in another form, but was this document given

17     to them?

18                       MR. SIMPSON:  It was not.

19                       THE COURT:  Okay.  Then I sustain

20     that objection to the offered excerpt on page 30.

21                       MR. HEENAN:  Page 31 line 5,

22     through page 33 line 9, relevance, hearsay,

23     foundation.

24                       If I might, what Johnson

25     Rodenburg is trying to establish is that it

1    appears in these notes Mr. McCullough made a

2    payment in 2001, which would have put it within

3    the statute of limitations the first time they

4    sued him.  It wouldn't put him in the statute of

5    limitations the second time.  And also, CACV,

6    there is no evidence that CACV ever conveyed any

7    information about a 2001 payment to Johnson

8    Rodenburg.

9                   MR. SIMPSON:  Could I see the

10   transcript briefly, Your Honor?

11                  THE COURT:  Certainly.

12                  MR. HEENAN:  It's also hearsay,

13   Your Honor.

14                  MR. SIMPSON:  Was your objection

15   starting at 31/5?

16                  THE COURT:  Yes, 31/5 through

17   33/9, which was your entire excerpt for that

18   portion.

19                  MR. SIMPSON:  Part of this is

20   directly relevant, particularly at the end of

21   page 32, Your Honor, because while the plaintiff

22   wants to argue that my client didn't make a

23   reasonable investigation, when it comes down to

24   it, CACV doesn't -- you can testify right there

25   that my client doesn't have other sources.  They

1        intend that in fact my client will rely on the

2        representations they make.  I think that's

3        pointed out by Mr. --

4                      THE COURT:  But what CACV

5        intends, why does that have any relevance?  This

6        is JRL's conduct and what JRL did.

7                      And for the same reasons I think

8        I sustained some of your objections to his

9        excerpts, what CACV does isn't relevant here,

10       except insofar as they interacted with your

11       client.  So run that by me again.

12                      MR. SIMPSON:  Well, on the one

13       hand the plaintiff wants to argue that pursuant

14       to the offer to place the account which contains

15       the clause that says CACV makes no warranty,

16       which I'm sure is going to be blown up larger

17       than life and put in front of the jury, at the

18       same time CACV and my client understand that CACV

19       is going to actually be the entity in most cases

20       that provides the information that my client is

21       entitled to rely on.  And Mr. Dunker's testimony,

22       I think, helps establish that point.

23                      Even though there is no expressed

24       warranty as to the information, CACV intends and

25       my client understands that's where the

```
 1    information will come from.
 2                   THE COURT:  I haven't read this.
 3    But of course that's -- you don't dispute that,
 4    do you?  I mean, if JRL was going to get
 5    information anywhere, they were going to get it
 6    from CACV.  Who else would they get it from?
 7                   MR. HEENAN:  Here's my
 8    understanding of the industry.  Credit card
 9    companies sell the accounts on a spreadsheet with
10    no information whatsoever that would be evidence
11    in a court of law.  The debt buyers purchase
12    those accounts without that information.
13    Oftentimes they agree they would not ask for
14    information from the credit card company.
15                   THE COURT:  Can I stop you?  I
16    find myself having a hard time listening to you
17    because I don't care what happens in the
18    industry.  We are trying Mr. McCullough's case
19    against JRL.  What happens in the industry
20    doesn't matter unless it happened here.  Let's
21    focus on what happened here.
22                   MR. HEENAN:  The debt buyers
23    turned over those spreadsheets to Johnson
24    Rodenburg.  The debt buyer has no more evidence
25    than Johnson Rodenburg does.  Johnson Rodenburg
```

1    files suits without any evidence.

2                    THE COURT:  Okay.  So 24 is 31

3    line 5.  We have to go earlier for that to make

4    any sense.

5                    Well, 31 line 5 is still talking

6    about Exhibit 70, right?  Which we established

7    JRL has never seen.

8                    MR. HEENAN:  Correct, Your Honor.

9                    THE COURT:  So based on the

10   previous ruling, I'm going to exclude all the

11   offered excerpts on 31 because it relates to

12   Exhibit 70, which JRL never saw.

13                   Is that true with all the rest of

14   it, then, that this all relates to that Exhibit?

15                   MR. HEENAN:  Yes, Your Honor.

16                   THE COURT:  Okay.  I will give

17   you a chance, Mr. Simpson, to look at that and

18   confirm.

19                   But for the same reason, then,

20   because there is no indication that JRL ever saw

21   Exhibit 70 and that testimony that is offered as

22   an excerpt is all about Exhibit 70, I'm going to

23   sustain the objection based on relevance.

24                   MR. SIMPSON:  Your Honor, would

25   you take a look, please, at page 32 line 23?  And

1     I believe that goes beyond Exhibit 70.

2                    THE COURT:  Okay.  So Mr. Heenan,

3     why is page 32 line 23, through page 33 line 9

4     not admissible?

5                    MR. HEENAN:  We withdraw our

6     objection.

7                    THE COURT:  It's moot, then,

8     because the objection is withdrawn and the

9     defendant may use page 32 line 23, through page

10    33 line 9.

11                   MR. SIMPSON:  So the record is

12    clear, Your Honor, we are not permitted to offer

13    or to present page 31 line 5, through page 32

14    line 22?

15                   THE COURT:  Correct.  Any other

16    objections?

17                   MR. HEENAN:  Yes, Your Honor, we

18    would object to page 62 line 17, through page 63

19    line 9, as well as page 63 line 12, through page

20    64/21 for the same objections.  These all concern

21    these internal CACV notes that were never

22    provided to Johnson Rodenburg.

23                   THE COURT:  Is that accurate, Mr.

24    Simpson?

25                   MR. SIMPSON:  62/17, let me ask

1      you a couple of follow-ups on Exhibit 70.  Yes,

2      that's correct, through page 63 line 9, that's

3      about -- the answer is reflected in Exhibit 70.

4                     THE COURT:  I will sustain that

5      objection.  63/12 through 64/21?

6                     MR. SIMPSON:  With respect to

7      most of that, I would agree, although I ask the

8      Court to consider our question at page 64 line

9      16, through 64 line 21.

10                    THE COURT:  This is also about

11     that same document.

12                    MR. SIMPSON:  But I think the

13     record establishes that he is competent to

14     testify to the contents of the document at least

15     as a business record and what is reflected in the

16     document at the point --

17                    THE COURT:  Wait.  He is able to

18     say what is a business record, but he follows

19     that up.  The question is, does he know what it's

20     based on.  He says, I know the person who put it

21     there, but I didn't have a conversation that

22     would indicate why she put it there.

23                    So he doesn't have any personal

24     knowledge about that.  So I'm going to sustain

25     that objection as well.

1              MR. BOHYER:  For the record, the

2     page number again, please?

3              THE COURT:  I sustain the

4     objection to 63 page 12 -- page 64 line 21.

5              Anything else?

6              MR. HEENAN:  No, Your Honor.

7              THE COURT:  Then we have Mr.

8     Dendy, Dr. McElhinney.  I assume, given the

9     earlier ruling, that the plaintiff may call Dr.

10    McElhinney.  I assume the defendant can ask

11    questions there and that the plaintiff would have

12    no objection so we don't have to bring him back

13    twice.

14             MR. HEENAN:  Based on the Court's

15    ruling, Your Honor, I don't anticipate calling

16    Dr. McElhinney.  I will just question him through

17    cross-examination in the defense's case.

18             THE COURT:  Okay.

19             MR. HEENAN:  As I understand it,

20    Johnson Rodenburg designated a limited portion of

21    Grace Lauinger's deposition and we raised an

22    objection to that as well.

23             THE COURT:  That's on the may

24    call that I have.  Do you intend to offer that?

25             MR. SIMPSON:  Yes.  I was

1    double-checking here.

2                  THE COURT:  There's a hearsay

3    objection made.  Does the defendant agree it's

4    hearsay?

5                  MR. SIMPSON:  No, I don't.  And

6    we most likely would offer that.

7                  THE COURT:  I think I have Grace

8    Lauinger.  Yes, I do.

9                  I'm not sure how this is hearsay,

10   Mr. Heenan.  What they are asking her to do is

11   look at a document and see if it refreshes her

12   memory, and she says it does.

13                 MR. HEENAN:  Then she reads into

14   the record what an e-mail to her from someone at

15   CACV says.

16                 THE COURT:  Because that part

17   refreshes her recollection and is part of the

18   business records of JRL, right?

19                 MR. HEENAN:  There's an e-mail

20   that is part of the file from --

21                 THE COURT:  That JRL maintains.

22                 MR. HEENAN:  Yes, but the e-mail

23   was from someone at CACV, so it's a statement by

24   a CACV employee that's being introduced through

25   someone at Johnson Rodenburg.

1            THE COURT:  Is it an e-mail that

2    is maintained during the regular course of

3    business at JRL in handling these files?

4            MR. HEENAN:  That I don't know.

5    I know it was provided in discovery as part of

6    the file.

7            MR. SIMPSON:  Certainly.  But not

8    only that, I don't believe it falls within the

9    definition of hearsay because the statements in

10   it aren't being offered in terms of the truth.

11           THE COURT:  I will overrule the

12   objection.

13           MR. SIMPSON:  Just for purposes

14   of order of proof, I guess I ask the Court's

15   permission to simply play that portion of Grace

16   Lauinger's testimony as effectively cross-exam

17   after Mr. Heenan plays the other portions.

18           THE COURT:  Any objection?  Why

19   don't you just include it?  Then it will be done.

20           MR. HEENAN:  Sure.

21           MR. SIMPSON:  That would be

22   great.  Thank you.

23           THE COURT:  Anything else on

24   witnesses?

25           MR. BOHYER:  Hopefully not.

1              THE COURT:  Let's turn to

2     exhibits, then.

3                   I'm going to meet with a

4     probation officer.  We will have to take a short

5     break.

6                   (Brief recess.)

7              THE COURT:  I think we concluded

8     with the witnesses.  What I would like to do,

9     unless someone has an issue to raise, is to turn

10    to the exhibits.  And we will turn first to

11    plaintiff's will offer exhibits.

12                   There is no objection made to

13    Plaintiff's Exhibits 1, 2, 3, or 4.  So Exhibits

14    1, 2, 3 and 4 are admitted.

15                   There's an objection on relevance

16    to Exhibit 6, the Collection Master sample

17    screen.

18                   What is the relevance of this,

19    Mr. Heenan?

20                   First, let me hear the objection.

21              MR. SIMPSON:  It doesn't have

22    anything directly to do with this case.

23              THE COURT:  Mr. Heenan, what is

24    the relevance?

25              MR. HEENAN:  Collection Master,

1    the software system that Johnson Rodenburg

2    employs in the collection of debts and the use of

3    the legal system in its collection efforts,

4    Exhibit 6 is illustrative of what the software is

5    and will just help the jury understand what the

6    software is and what it does.

7                    THE COURT:  Where did this come

8    from?

9                    MR. HEENAN:  Collection Master's

10   web site.

11                   THE COURT:  Don't we have

12   something from the law firm that shows the same

13   thing?

14                   MR. SIMPSON:  If there is one

15   from our client with respect to Mr. McCullough, I

16   will not object to that.

17                   THE COURT:  I thought there was

18   something like this.

19                   MR. HEENAN:  Exhibit 111 -- we

20   withdraw that.  Exhibit 111 is the actual

21   collection screen for Mr. McCullough.

22                   THE COURT:  So Exhibit 6 is

23   withdrawn, therefore refused.

24                   Exhibits 7, 10, 13, 14 and 30 are

25   admitted without objection.

```
 1                    Exhibit 51, and let's just do 51,
 2      52 and 53.  Because they are the same objections
 3      made by the defendant to each of these exhibits.
 4                    It appeared to me, Mr. Heenan,
 5      these are things taken off the Internet.  Number
 6      one, I don't know how you're going to lay a
 7      foundation for them, and, number two, what
 8      relevance do they have to the lawsuit?
 9                    MR. HEENAN:  With respect to
10      relevance, Your Honor, they all concern Johnson
11      Rodenburg's filing of lawsuits without any actual
12      evidence admissible in a court of law that the
13      people they sue owe the debts.
14                    THE COURT:  I know they have to
15      do with somebody doing that, but they don't have
16      to do with JRL doing that, right?
17                    MR. HEENAN:  JRL follows a
18      pattern in this collection industry of here's how
19      you're able to, without any evidence, win a
20      lawsuit and get a judgement.  And the pattern is
21      propound requests for admission and hope the
22      other side doesn't respond, gather affidavits
23      from your client, even though they may lack
24      personal knowledge as to the things claimed in
25      their affidavits --
```

```
 1                       THE COURT:  Let me stop you.
 2    What is the foundation for this?
 3                       MR. HEENAN:  With respect to
 4    Exhibit 51, Johnson Rodenburg is a member of this
 5    NARCA, National Association of Retail Collection
 6    Attorneys.  So presumably, through
 7    cross-examination, I can establish they are a
 8    member of that organization.  They read this
 9    newsletter, they consider --
10                       THE COURT:  Did they admit they
11    had seen this newsletter in their deposition?
12    Did you ask them?
13                       MR. HEENAN:  I don't think I had
14    this newsletter when I took their depositions.
15                       THE COURT:  So right now there is
16    no foundation for it.
17                       MR. HEENAN:  Correct, Your Honor.
18                       THE COURT:  Is the same thing
19    true with 52 and 53?
20                       MR. HEENAN:  51, 52 and 53 were
21    also reviewed by Mr. Patten, and I think there's
22    going to be foundation that's how he forms the
23    basis of his opinions with respect to this
24    industry as a whole.
25                       THE COURT:  That doesn't mean
```

1     these things come into evidence just because he

2     looked at them.

3                    MR. HEENAN:  That's true.

4                    THE COURT:  I am going to sustain

5     the objections to 51, 52 and 53 on foundation.

6     If you can somehow lay a foundation, we will

7     address the other.  But I will sustain the

8     objections at this time to 51, 52 and 53.

9                    67 and 71 are admitted.

10                    100, a time sheet for McCullough

11     defense.  This is Mr. Heenan's time sheet.  There

12     is a relevance objection.  I assume that's

13     because the jury doesn't decide attorneys' fees.

14                    Mr. Heenan, I may consider this

15     if, after this is all over, there is an issue

16     with respect to awarding attorneys' fees, but

17     what would be the purpose of showing this to the

18     jury?

19                    MR. HEENAN:  One of the elements

20     of damages in a malicious prosecution act is your

21     attorneys' fees for defending a malicious

22     lawsuit.  So these fees would be outside of what

23     is claimed as part of the prosecution of this

24     current lawsuit.

25                    THE COURT:  This doesn't say

1    anything about fees.

2                    MR. HEENAN:  We withdraw Exhibit

3    100, Your Honor.

4                    THE COURT:  Exhibit 100 is

5    refused as withdrawn.

6                    Exhibits 101 and 102 are

7    admitted.

8                    Exhibit 103, agreement for

9    collection of accounts.  There is, again, a

10   relevance objection.

11                   What is the objection to this

12   exhibit, Mr. Simpson?

13                   MR. SIMPSON:  It doesn't make any

14   fact at issue more or less probable.  It's simply

15   the general agreement, if you will, under which

16   my client agreed to provide professional services

17   to Collect America and CACV.

18                   THE COURT:  Mr. Heenan?

19                   MR. HEENAN:  Page two Exhibit

20   103-2, Local counsel agrees that it will fully

21   represent the interests of the client in the

22   pursuit of the referred claims.  Such

23   representation shall include the verification of

24   account information sent by CALTB to local

25   counsel.

1              We think it has relevance, the

2     same as the other contract with CACV, because it

3     imposes on Johnson Rodenburg an independent duty.

4                   THE COURT:  And it was pursuant

5     to this agreement that the McCullough lawsuit was

6     filed.

7                   MR. SIMPSON:  Well, there was

8     this agreement and there was the offer to place

9     account, which was more specific to Mr.

10    McCullough's case, and that's already been

11    offered and admitted as Plaintiff's 67.

12                  THE COURT:  But this agreement

13    did apply to the work that the law firm did for

14    CACV.

15                  MR. SIMPSON:  I believe that's

16    true.

17                  THE COURT:  Then I will overrule

18    the objection and 103 is admitted.

19                  MR. BOHYER:  Would you entertain

20    a cumulative objection, Your Honor, given there

21    was a specific one that deals with McCullough?

22                  THE COURT:  I will entertain it

23    and overrule it.

24                  MR. BOHYER:  Thank you.

25                  THE COURT:  104 is admitted

1      without objection -- no, no.  I misspoke.  There
2      is an objection.  104, subpoena to Chase Bank
3      dated 8/26/08.
4                  Now, this isn't a subpoena that
5      your client sent in the underlying case.  How
6      could this not be relevant?
7                  MR. SIMPSON:  This is a subpoena
8      that I sent to this case.
9                  THE COURT.  I thought this was a
10     subpoena that your client sent.  I'm sorry.
11     That's '08, not '07.
12                 What does this have to do with
13     this thing, Mr. Heenan?
14                 MR. HEENAN:  I think it shows had
15     Johnson Rodenburg requested this information
16     prior to suing Mr. McCullough, it would have come
17     to learn that the credit card company had no
18     information about him or his account.
19                 THE COURT:  I'm going to sustain
20     the objection.  You can offer that in some way
21     but I don't think the subpoena that defense
22     counsel sent is relevant.  I'm not trying Mr.
23     Simpson here.
24                 MR. HEENAN:  Understood.
25     Probably same roughly with Exhibit 105.

```
 1                           THE COURT:  Yes.  105 is refused.

 2                           Then we go to 106, which is a

 3         response by the defendant to discovery request of

 4         the plaintiff.  And it is the list of legal

 5         actions filed by JRL between January of '07 and

 6         June of '08.

 7                           What is the objection?

 8                           MR. SIMPSON:  Relevance and it's

 9         more prejudicial than probative, and it's likely

10         to confuse and mislead the jury.

11                           THE COURT:  How would it confuse

12         them?

13                           MR. SIMPSON:  I think they would

14         be confused wondering why they are looking at

15         cases filed by Unifund, First Resolution

16         Investment, City Bank, National Credit Adjustors,

17         Credit Bank, Sears Roebuck against people who

18         have nothing to do with this case.

19                           THE COURT:  These are all cases

20         filed by the defendant.  Correct?

21                           MR. SIMPSON:  That's true.

22                           THE COURT:  I'm going to overrule

23         the objection.

24                           MR. BOHYER:  Even as to those

25         cases that were filed after the underlying
```

1    lawsuit was dismissed in the fall of '07?

2                    THE COURT:  I think the time is

3    an issue.

4                    Tell me, Mr. Heenan, why action

5    taken, for example, in June of '08, which I think

6    is around the time this lawsuit was filed -- when

7    was this lawsuit filed?  I don't remember.

8                    MR. SIMPSON:  The underlying suit

9    was dismissed in December of 2007 and I believe

10   Mr. Heenan filed this lawsuit in either December

11   of 2007 or January of 2008.

12                   THE COURT CLERK:  It's an '07

13   case so it's '07.

14                   THE COURT:  Yes, thank you.

15                   Mr. Heenan, the law that we were

16   discussing at the hearing on the motion in limine

17   talks about the relevance of past conduct of the

18   defendant.  Why is anything that the defendant

19   did in June of 2008 relevant to the jury's

20   consideration here with respect to what they did

21   to Mr. McCullough?

22                   MR. HEENAN:  I don't know that

23   their business practice has changed at all, but

24   if it has, then arguably it wouldn't be relevant.

25   The whole point in our minds is this business

1        model of filing all these lawsuits without

2        information.

3                     In discovery, I tried to narrowly

4        tailor the time frame of the discovery to cure

5        any type of overbroad or unduly burdensome

6        objections, so I asked for 2007 to present.

7        Johnson Rodenburg resisted it and then ultimately

8        produced the information in June.  So this is the

9        document that I was provided in response to the

10       discovery.

11                    THE COURT:  What I'm going to do

12       is sustain the objection as to timeliness and

13       allow it from January of 2007 until the date the

14       lawsuit was dismissed.  However, Mr. Heenan may

15       ask whether their practices have changed, and

16       that could open the door.

17                    MR. BOHYER:  Well, the problem,

18       Your Honor, is they will be led down the primrose

19       path.  That's not opening the door.

20                    THE COURT:  We will deal with

21       that when we come to it.  But right now, I will

22       sustain the objection to that portion of Exhibit

23       106.

24                    What day was it dismissed?

25                    MR. SIMPSON:  Around the 10th or

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    11th of December.

2               As a practical matter, Your

3    Honor, it may be difficult by looking at Exhibit

4    106 to split this up and present it in such a way

5    that the jury's not left wondering why half the

6    lines are blacked out.

7               THE COURT:  Do you want to

8    withdraw your objection to timeliness, then?

9               MR. SIMPSON:  No.

10             MR. HEENAN:  I think technically,

11    Your Honor, I can also just introduce the same

12    thing as the defendant's response to

13    Interrogatory Number 10.  It's been designated in

14    the pretrial order as one of the discovery

15    responses that we intend to rely on.

16             THE COURT:  It still has to be

17    admissible.  The fact it was produced in

18    discovery doesn't alone make it admissible.

19             MR. HEENAN:  Sure.

20             THE COURT:  Because it includes

21    actions they took after they finished dealing

22    with Mr. McCullough.  Do you know -- I guess you

23    can tell because of the case numbers, at least

24    those that are in '08, but you would have to go

25    through and delete the '08s, which would leave

1     gaps.

2                     MR. HEENAN:  I would be happy to

3     do that, Your Honor.

4                     THE COURT:  Do that and we will

5     just say everything from '08 forward.  So I will

6     sustain the objection and limit it to legal

7     actions in the year 2007.

8                     107, Clifton Rodenburg.

9     Objection 402, 403.

10                    Mr. Heenan, I looked at this and

11    I don't recall ever hearing anything about

12    Clifton Rodenburg before, and it says that he is

13    an attorney and partner in the law firm of

14    Gackle, Johnson, Rodenburg and Trator (ph).  What

15    does this have to do with this lawsuit?

16                    MR. HEENAN:  It's my

17    understanding that Gackle, Johnson, Rodenburg and

18    Trator was the predecessor to Johnson, Rodenburg

19    & Lauinger.  It's my understanding Mr. Rodenburg

20    isn't going to be attending the trial so I would

21    like the jury to be able to see what Mr.

22    Rodenburg looks like.  It has his picture on the

23    first page there.

24                    But it also shows, at least with

25    respect to Mr. Rodenburg, how his collection

1    model is designed.  And I think it's relevant to

2    show that's the collection model that is in

3    business and up and running and was up and

4    running with respect to Mr. McCullough and how

5    they prosecuted the claim against him.

6                    MR. SIMPSON:  Your Honor, in the

7    first instance, Mr. Rodenburg's conduct isn't

8    part of this lawsuit.  I would also note --

9                    THE COURT:  Is it the same one?

10                    MR. SIMPSON:  It is the same

11   Rodenburg, yes.

12                    THE COURT:  They are the

13   defendant.

14                    MR. SIMPSON:  The firm, yes.  But

15   this is too remote in time, I believe.  Hopefully

16   I can say this without waiving attorney-client

17   privilege, but I believe it was published in the

18   mid eighties.  This is quite remote in time to

19   the conduct alleged to have occurred in this case

20   and I don't believe there was any testimony in

21   any of the Johnson Rodenburg depositions as to,

22   do you follow this advertising material, if you

23   will, in your service for debt-collection

24   clients.

25                    THE COURT:  What is your

1      foundation, Mr. Heenan?

2                      MR. HEENAN:  I would have to

3      establish that through one of the Johnson

4      Rodenburg attorneys and whether they use

5      advertising as part of their collection practice

6      and whether, specifically, this advertising.

7                      THE COURT:  I will reserve on

8      this.

9                      I want to go back to 106.  I'm

10     going to reserve on 106 as well, but I ask you to

11     prepare an alternative exhibit as we discussed.

12     I want to look at that a little bit more, Mr.

13     Heenan.

14                     MR. HEENAN:  Yes, Your Honor.

15                     THE COURT:  108.  This is --

16                     MR. HEENAN:  Your Honor has ruled

17     on that through the motion in limine.

18                     THE COURT:  Yes.  So I'm going to

19     refuse this for the same reasons articulated in

20     ruling on the motion in limine.

21                     109.  This involves Ms. Henan's

22     lawsuit, as does 110, Mr. Lucero's.  And I

23     indicated, when we had the hearing on the motion

24     in limine, that I would allow them to testify.

25                     But why does the jury in this

1      case need to see documents from these other

2      cases?  Why can't we just hear from the

3      plaintiffs what happened?  I'm concerned this is

4      going to be confusing.

5                      MR. HEENAN:  You're right.  We

6      withdraw these as exhibits.  I may need to

7      provide them to the witnesses to refresh their

8      recollection as to the lawsuit.

9                      THE COURT:  Okay.  So then 109

10     and 110 are withdrawn.

11                     That leaves 111, which we

12     discussed before there is no objection.  111 is

13     admitted.

14                     That concludes the plaintiff's

15     will offer.  I'll reserve on a plaintiff's may

16     offer.

17                     Do you know whether you intend to

18     offer these at this time?

19                     MR. HEENAN:  112, Your Honor,

20     would only be offered if and when the jury

21     concluded that punitive damages were appropriate.

22     So it would only be as part of that second phase.

23                     113 I do intend to at least

24     cross-examine on and potentially admit as an

25     exhibit at trial.

```
1                        THE COURT:  I will reserve on
2      both of those.
3                        Let me ask with respect to the
4      tax return.  The net worth of a defendant is
5      certainly relevant if the jury decides to award
6      punitives, but is the net income?
7                        MR. HEENAN:  I would ask to be
8      able to answer that question if and when
9      appropriate.
10                       THE COURT:  Okay.  Fair enough.
11                       Okay.  I think that concludes all
12     of the plaintiff's exhibits.  Let's turn to the
13     defendant's.
14                       The first is Number 70.
15     McCullough's account information report with
16     CACV.
17                       Is this the document that we
18     discussed earlier with respect to Mr. Dunker that
19     he had no knowledge of?
20                       MR. HEENAN:  Yes, Your Honor.
21                       THE COURT:  I don't know that he
22     had no knowledge, but never had conveyed to JRL.
23                       MR. BOHYER:  He tried to have
24     knowledge.
25                       THE COURT:  During part of the
```

1    deposition, he had knowledge.  So for the same

2    reasons that we previously discussed, I will

3    sustain the objections to 70, and it is refused.

4                      501 is admitted without

5    objection.

6                      502, let's talk about 502 through

7    504, which is correspondence.  They are

8    foundation objections.  And I will reserve on

9    these.

10                      502 through 504 -- excuse me.

11    501, there is no objection.  That was admitted.

12    So 502, 503 and 504.

13                      MR. HEENAN:  Your Honor --

14                      THE COURT:  Oh, you didn't object

15    to 504.  Thank you.  504 is admitted.

16                      MR. BOHYER:  Your Honor, may I

17    inquire as to what the reservation as to

18    foundation is on 502 or 503?

19                      THE COURT:  Because I don't know

20    what foundation will be laid, but I assume one

21    can be.

22                      MR. BOHYER:  Lisa Lauinger will

23    testify.

24                      THE COURT:  As soon as one is, I

25    assume it will come in.  This is part of the

1    business transaction.

2                  MR. HEENAN:  I withdraw the

3    objections, Your Honor, in light of the Court's

4    ruling.

5                  THE COURT:  Okay, then, 502 and

6    503 are admitted without objection.

7                  That brings us to 505, the bill

8    of sale.  Now, is this another document that was

9    never conveyed to JRL?

10                  MR. SIMPSON:  This was.  These

11   are some of the exhibits we talked about when we

12   were discussing Bobby Dunker's deposition, 505

13   and 506.

14                  THE COURT:  Oh, these are the

15   ones they prepared.

16                  MR. SIMPSON:  I can certainly

17   tell you that 506 was in the file.  And I believe

18   505 was.  My only hesitation there is it doesn't

19   have our Bates number of JRL at the bottom.

20                  THE COURT:  I would reserve on

21   these two.

22                  MR. BOHYER:  505 and 506?

23                  THE COURT:  Yes.

24                  That brings us to 507,

25   plaintiff's credit statements and important

1        notice about credit card account.

2                    What is the objection to this?

3        You have several.  Can you explain them to me?

4                    MR. HEENAN:  Yes, Your Honor.

5        These are documents that were purportedly --

6        while the credit card contract no one testified

7        where it came from, that it has anything to do

8        with Mr. McCullough, Mr. Dunker testified that he

9        had no personal knowledge about what that

10       document was or whether it had anything to do

11       with Mr. McCullough.  Same with these credit

12       statements.  So there's a lack of personal

13       knowledge.  There is no foundation.  They are

14       hearsay.  I don't know who prepared these

15       documents.  They are not authenticated.

16                    MR. SIMPSON:  Your Honor, I think

17       I can simplify it.  507 is somewhat redundant of

18       what is contained in Exhibit 508.  I believe the

19       only real difference is that 508 actually

20       contains a cover letter from Grace Lauinger at

21       Johnson Rodenburg to Mr. McCullough, which

22       included a copy of those documents.

23                    And so we can withdraw 507, but

24       we would assert that 508 was relevant because

25       this was information provided to our client by

1    CACV, having to do with Mr. McCullough's credit

2    card account.  And it shows certainly what the

3    information was that was provided to my client,

4    what they had in their file.  And this in fact

5    was sent along to Mr. McCullough as verification

6    of the debt.

7                    THE COURT:  So 507 is refused

8    because it was withdrawn.

9                    And 508, do you have a question

10   about whether this was in fact a letter that

11   Grace Lauinger sent to your client?

12                   MR. HEENAN:  It's not the letter,

13   Your Honor.  It's just it's a backhand way to get

14   the same information and without a foundation of

15   what those account statements were.  They

16   prepared them, they purport to concern Mr.

17   McCullough, but there is no foundation from

18   anyone that can say that they either got them

19   from Chase Manhattan, certainly no one that can

20   say they prepared them at Chase Manhattan.

21                   What makes it concerning is when

22   subpoenas get served to Chase Manhattan, they

23   say, We don't have any information about this

24   account.  I have no way to test the veracity of

25   the account statements, and I'm concerned the

1    jury will think these are the statements that

2    apply to Mr. McCullough and I don't have any

3    ability to test that.  And based on the responses

4    to two subpoenas, I have strong doubts that those

5    documents were prepared by Chase Manhattan or had

6    anything to do with Mr. McCullough.

7                    THE COURT:  Let's deal with

8    foundation first.  Grace Lauinger.  Let me see.

9                    Does Mr. McCullough recall

10   getting this?  Is he going to testify this is a

11   true and correct copy of --

12                   MR. HEENAN:  He is not going to

13   object to the letter or that he got some stuff,

14   some documents, attached with the letter.  The

15   concern I have is that the documents that are

16   attached with the letter, there is no way to test

17   where those documents -- Grace Lauinger says she

18   doesn't know where they came from.  All she can

19   say is CACV.

20                   Mr. Dunker, who is the one

21   witness at CACV who was deposed, says he doesn't

22   know where the documents come from.  He asked

23   someone else at CACV but he couldn't tell me who

24   the person was.

25                   Unless someone can come in and

1    say, These are the documents I got from Chase

2    Manhattan, then I have foundation concerns,

3    especially in light of the responses to the

4    subpoenas.

5                THE COURT:  What's the

6    defendant's position?

7                MR. SIMPSON:  Well, these are

8    records that were provided to my client.  They

9    will testify these were records they received

10    from CACV relevant to Mr. McCullough's credit

11    card account, and this is the kind of thing they

12    would ordinarily receive in a case like this.

13                To an extent, Mr. McCullough can

14    use this to his advantage because it shows the

15    date of the last payment being in August of 2000,

16    not in 2004.

17                But I certainly think that my

18    client is entitled to show, look, it wasn't like

19    we didn't have anything on Mr. McCullough at any

20    time during the course of this case.  We have a

21    credit card statement.  Here it is.

22                MR. HEENAN:  These documents,

23    it's my understanding, Johnson Rodenburg didn't

24    have when they sued Mr. McCullough but obtained

25    them sometime after they actually filed the

1    lawsuit.

2                    THE COURT:  Well, and then Grace

3    Lauinger writes Mr. McCullough and says, here's

4    verification of this matter.  But this is the

5    2002 credit card statement.  So it couldn't have

6    had anything to do with him.

7                    MR. HEENAN:  No.

8                    THE COURT:  And you don't want

9    these admitted?

10                   MR. HEENAN:  I just think -- I

11   don't, Your Honor, because I think it confuses

12   the jury because it makes it appear that this is

13   a procedural argument that we are raising when

14   it's not.  It's an instance of suing people with

15   no documents and not being able to get any

16   documents.

17                   THE COURT:  So your objection to

18   foundation I will reserve on.  But it appears,

19   through your client and JRL, there likely will be

20   a foundation.

21                   With respect to your hearsay and

22   other objections, I will reserve on that.  We

23   will see how the evidence comes in.

24                   MR. SIMPSON:  May I offer one

25   other point on that, with respect to hearsay?

1                    THE COURT:   Sure.

2                    MR. SIMPSON:   We are not offering

3       them to show they are true but to show my

4       client's state of mind to rebut the allegation of

5       malice.

6                    THE COURT:   509 is admitted

7       without objection, as are 510, 511, 512 and 513.

8                    514, there is a relevance

9       objection.  You know, I understand we are going

10      to have some experts testify as to the

11      conclusions they reached after examining the

12      plaintiff.  Typically the tests that they

13      administer, the underlying tests, are not

14      admissible, although their opinions based on them

15      are.

16                   What is the purpose of this and

17      how is that relevant?

18                   MR. SIMPSON:   I think some of

19      these things will go to how the jury should

20      assess Mr. McCullough's credibility as a witness.

21      And these are statements certainly that he made

22      during the course of this litigation with respect

23      to his opinions or feelings on a number of

24      different issues, and I think the jury is

25      entitled to hear what he said with respect to

1    these various questions, whether he agreed with

2    them or not.  I think these are directly

3    relevant.  I mean, if he is making a claim that

4    he was emotionally distressed, here is some

5    direct proof.

6                    MR. HEENAN:  I think Johnson

7    Rodenburg certainly is allowed to ask questions

8    of Mr. McCullough with respect to his personality

9    assessment and inventory, but we object to it

10   being offered as an exhibit and given to the jury

11   when they deliberate.

12                   MR. BOHYER:  It's an admission of

13   a party, Your Honor.

14                   THE COURT:  I'm not sure it is.

15   I will reserve on that.  You can certainly

16   cross-examine him about it.  I'm concerned about

17   allowing a personality assessment tool used by an

18   expert be submitted to the jury.

19                   MR. BOHYER:  Let me make sure I

20   understand.  You're reserving on the admission of

21   the exhibit, but let me be clear.  We are

22   entitled to ask Mr. McCullough whether or not he

23   answered the specific questions one way or the

24   other?

25                   THE COURT:  You can cross-examine

1    him on it.

2                    MR. BOHYER:  Thank you.

3                    THE COURT:  That concludes the

4    will offer.  I will reserve on all the may

5    offers, unless there is any item there on that

6    anybody wishes to raise at this time.

7                    MR. SIMPSON:  I think with

8    respect to the foundation objections, plaintiff's

9    medical records including Exhibits 515, 516, 517,

10   518, 519, I believe those all came from or were

11   produced in this case by Mr. McCullough in

12   response to discovery.  I don't recall that he

13   made objection to foundation at the time.  So if

14   he did, I apologize, but I don't think he did.

15   And if he didn't, I think they are waived under

16   the local rules.

17                   THE COURT:  Is there any

18   question, really, about the foundation that these

19   are in fact true and correct copies of the

20   plaintiff's medical records?

21                   MR. HEENAN:  No.

22                   THE COURT:  Are you withdrawing

23   your foundation objection to 515 through 519?

24                   MR. HEENAN:  Yes, Your Honor.

25                   THE COURT:  What is your

 1    objection?

 2                     MR. HEENAN:  It's hearsay.  I

 3    think experts can be examined about the

 4    plaintiff's medical records.  He can be examined

 5    about his medical records, but designating as an

 6    exhibit and sending to the jury my client's

 7    medical records that he didn't produce, were

 8    produced by doctors under his treatment --

 9                     THE COURT:  Let's talk about

10    that.  In personal injury actions, medical

11    records are introduced all the time.  What I was

12    saying about the personality profile, as I

13    understand it, there were some IMEs or some

14    examinations done by psychologists in preparation

15    for this lawsuit, and they administered some

16    tests.  But they weren't medical records of

17    ongoing care of the plaintiff during the time

18    frame that is at issue here.  I think that's

19    quite different, isn't it?

20                     MR. HEENAN:  Well, in a personal

21    injury case, I can't, without my client's

22    treating physician, just hand the jury a bunch of

23    my doctor's medical records and say, see, this

24    proves causation.

25                     Same here.  I don't think you can

1      just mark a bunch of medical records and say,

2      see, this proves that on this day Mr. McCullough

3      had this problem or didn't have this problem.

4                    There needs to be -- the treating

5      physician himself has to lay the foundation or

6      talk about what the records say.  Otherwise, it's

7      hearsay.

8                    THE COURT:  I'm going to reserve

9      on those.  They are on the may offer list in any

10     event.  So we will see.

11                    MR. HEENAN:  If we could, Your

12     Honor, address 524, the settlement agreement.

13     Just because we didn't make a motion in limine.

14     I understand Your Honor's rulings.  We provided

15     Johnson Rodenburg's counsel with the settlement

16     agreement, but I'm fearful that if we wait until

17     those questions come up there would already at

18     that point be prejudice.

19                    So I move in limine or ask Your

20     Honor to consider in limine whether Johnson

21     Rodenburg can examine or raise the issue of the

22     settlement agreement with CACV.  We briefed it in

23     the context of whether it's discoverable.

24                    THE COURT:  I think that's

25     already been addressed in the order.  Because

1    when I ordered that it be produced, I also issued

2    basically a protective order that only defendant

3    and its attorneys could look at it and they

4    couldn't disseminate it anywhere else and

5    couldn't use it without prior leave of Court.

6                I think in essence there is

7    already a limine order.  That was my intent.  Do

8    you understand it that way?

9                MR. SIMPSON:  Yes, Your Honor.

10               MR. HEENAN:  Thank you.

11               MR. SIMPSON:  I think the issue

12    Mr. Heenan raised is a good one.  We would like

13    clarification as to whether we are entitled or

14    allowed at this point to cross-examine Mr.

15    McCullough about the fact that if -- well, I

16    guess this ties in with the other issue I raised

17    with the hearing this morning about whether Mr.

18    Heenan and Mr. McCullough are going to be allowed

19    to ask for set dollar amounts in damages.

20               I guess here is my example.  If

21    Mr. McCullough says, or Mr. Heenan says, in

22    closing, I think Mr. McCullough should be awarded

23    a million dollars in compensatory damages, I

24    think, number one, I think that's an unfair

25    surprise because I haven't been provided in

1    discovery any number as to what various

2    categories of damages were being sought.  It was,

3    you know, left to the sound discretion of the

4    jury, or words to that effect.

5                        But if that is allowed, if the

6    plaintiff is allowed to go ahead with that, I

7    think it's fair game for me to say to Mr.

8    McCullough, you also sued CACV of Colorado,

9    didn't you?  And you made the same claims against

10    them and you settled that claim for a total of

11    $10,000.

12                        THE COURT:  No, you can't do

13    that.  I'm not going to allow you to do that.  If

14    they somehow open the door, you can, during a

15    recess, let me know and we will discuss it again.

16    But I think it's an offset.

17                        I decided, because of the prior

18    rulings, that you were entitled to know what that

19    was and what the offset would be.  But that is a

20    settlement agreement.  And I don't believe that

21    you are entitled to cross-examine in the way you

22    just articulated.

23                        MR. BOHYER:  The other issue I

24    think is much more fundamental, Your Honor,

25    because with discovery propounded asking for what

1       the damages are that are being sought against our

2       client, without those numbers being provided, a

3       defendant is prejudiced unfairly by not being

4       able to discuss settlement options with their

5       client in advance.  We have gone through that.

6       Actually, Fred went through it with Judge Molloy

7       here fairly recently on another case, on this

8       specific issue where the discovery is propounded.

9                     THE COURT:  Was the discovery

10      asked?

11                    MR. HEENAN:  If I might, Your

12      Honor, first of all, and correct me if I'm wrong,

13      but Mr. McCullough was asked in his deposition,

14      how much money do you want?  And his answer was,

15      whatever a jury awards.  I have no specific.  I

16      want justice, was basically his answer.

17                    And so I don't anticipate that

18      his answer is going to change at trial, because

19      that's what he wants.  In discovery, questions

20      were raised about what are your damages.  We

21      articulated all the categories of damages,

22      attorneys' fees, everything else.  We gave

23      specific dollar values to the economic damages.

24      With respect to noneconomic damages like punitive

25      damages, we said that's for the jury to decide

1       after hearing all the evidence.

2                       So I don't think I can introduce

3       any testimony from someone that says, this kind

4       of case, you know -- for example, if Mr. Patten

5       said, this is a million dollar case, I think

6       that's improper.  But I don't think there is

7       anything that precludes me in closing argument

8       from advocating for a dollar amount that is going

9       to do the justice that Mr. McCullough has

10      requested from the beginning.

11                      THE COURT:  That's my

12      understanding.

13                      Are you saying Judge Molloy ruled

14      something different?

15                      MR. BOHYER:  Yes, and we also got

16      an award from Judge Stadler on a state court case

17      on the same thing.  Here's what occurs, Judge.

18      If the defendant does not know what they're being

19      sued for, we went through a settlement conference

20      on this thing.  Settlement demands are made, if

21      you will.  But until we know how much our client

22      is being -- how much is going to be claimed in

23      front of the jury on this via the discovery

24      process, that's our only means to know.  Both

25      Judge Molloy -- what was the name of the case?

1     It was --

2                    MR. SIMPSON:   There was no

3     written order.  Sorry to jump around.  It wasn't

4     a written order.  It was at the final pretrial

5     conference in a case called *Reiner v. Hammonton*

6     *Inn v. Northwest Painting*.

7                    And I raised the issue in the

8     pretrial order that the plaintiff had not

9     provided any numerical figures for the various

10    categories of damage that she was seeking in that

11    case.  And my understanding from Judge Molloy's

12    oral ruling at the pretrial conference was the

13    plaintiff was free to argue to the jury she

14    should be awarded damages for the various

15    elements but that they couldn't, then, come into

16    trial and ask for, for instance, a million

17    dollars for pain and suffering or emotional

18    distress or other elements where those numbers

19    hadn't been provided in discovery.

20                    I received a written ruling out

21    of a state court in Kalispell on an issue where

22    we had moved to compel answers providing numbers

23    for the various items of general damage that the

24    plaintiff was seeking.  The Court, Judge Stadler,

25    ruled in that case that he wouldn't grant the

1      motion to compel, but if the plaintiff wasn't

2      going to provide figures in discovery, the

3      plaintiff would be precluded from asking for any

4      specific figure at trial.

5                    MR. BOHYER:  The discovery

6      requests are designed to illicit information upon

7      which we can advise our client.  Based upon what

8      is now disclosed in the final pretrial order, our

9      client is looking at potentially an excess claim,

10     which it was not before.

11                   While it is true that the award

12     of the emotional distress or other general

13     damages is subject to the jury's sound

14     discretion, that is a different question or a

15     different issue than us asking the plaintiff to

16     please advise us how much you've been damaged in

17     this regard and what do you intend to seek.

18                   MR. HEENAN:  If I might, Your

19     Honor, the written discovery propounded to Mr.

20     McCullough, he answers those questions.  He

21     answered the questions the same as he answered in

22     his deposition:  I don't know.  I want justice.

23     It's for whatever the jury thinks my claim is

24     worth after hearing all the evidence.

25                   That doesn't preclude me, as his

1        advocate, from, in closing argument, suggesting

2        to the jury what they might consider to be

3        justice or what might remedy some of the

4        wrongdoing that is on display in this case.

5                        THE COURT:  But if it's simply an

6        answer in a deposition, I think that is somewhat

7        different than if you're asking in an

8        interrogatory, Please state your claim for these

9        categories of damage that you're seeking.  And

10       then, certainly, counsel is assisting his client

11       in talking about what the claim is and in saying,

12       this is what we are seeking.

13                        So because counsel certainly is

14       involved at that point, doesn't the party have an

15       obligation, then, if they have sufficient

16       information, to state, this is what we are

17       seeking.  And why isn't it a legitimate argument

18       that it's then a surprise if not knowing that you

19       were seeking a million dollars at the time of the

20       final pretrial order, all of a sudden, wow, we

21       are looking at an excess claim here?

22                        MR. HEENAN:  That

23       mischaracterizes the settlement posture of this

24       case.  And Johnson Rodenburg was put on notice

25       early on, prior to the mediation, that they had

1     an opportunity to resolve it within limits --

2                      THE COURT:  We are not talking

3     about settlement.  We are talking about the

4     discovery requests.

5                      Did the defendant make a

6     discovery request to the plaintiff here that

7     said, Please state the amount of damages you're

8     claiming for each category of damage you seek.

9                      MR. HEENAN:  I don't know without

10    having it in front of me.

11                     MR. SIMPSON:  I would represent

12    to the Court we did, Your Honor.  I looked

13    through the responses and supplemental responses.

14    And if there was a response that said a number, I

15    missed it.  It's my understanding and my belief

16    that the categories of damages were specified.

17    It's possible that it said we want a thousand

18    dollars for statutory damages, but frankly that's

19    not the gist of it.

20                     The concern I have is that, where

21    it says relief sought now in the pretrial order,

22    that Mr. McCullough wants a million dollars for

23    emotional distress damages and a million dollars

24    for punitive damages.  My recollection is that

25    those figures were never provided to us in

1    discovery.  No figures were provided.

2                    MR. HEENAN:  Even the million

3    dollars --

4                    THE COURT:  Okay.  I don't have

5    enough information to say anything other than

6    what I already said.  If you want me to preclude

7    them, I need to see the discovery requests and

8    all the responses.

9                    MR. BOHYER:  We will provide

10   them.

11                   THE COURT:  That would be

12   helpful.  Then we can talk about it again at the

13   morning of trial.

14                   MR. BOHYER:  I don't know if we

15   can get a copy of the record from that final

16   pretrial from Judge Molloy and the Reiner case,

17   but if we can, we will do it.

18                   THE COURT:  Okay.  I had

19   indicated earlier that I would give you the

20   preliminary instructions.  I'm going to wait

21   until the morning of trial now because they are

22   going to change because of what we talked about

23   with instructing on the agreed facts and what I

24   will read to the jury.  But they will be all

25   stock instructions, just burden of proof.  These

1     will be read after the jury is empanelled, before

2     we actually start or actually when we start the

3     trial itself.  And they will just be burden of

4     proof, what is evidence --

5                     MR. BOHYER:  Judge, do you have

6     the numbers on those or not?

7                     THE COURT:  I have our numbers.

8                     MR. BOHYER:  Go ahead.

9                     THE COURT:  Direct and

10    circumstantial evidence, rulings on objections.

11    It's --

12                     MR. BOHYER:  It's the standard

13    ones.

14                     THE COURT:  Yes.  Their conduct

15    as jurors, what they can do and not do as conduct

16    of jurors, taking notes, just all 9th Circuit

17    stock.

18                     MR. HEENAN:  Is it your intent at

19    that time to give, Your Honor, status of the case

20    instruction or some type of an explanation of

21    what you've done and what is left for the jury to

22    resolve?

23                     THE COURT:  As I said, I'm going

24    to talk to them about that in voir dire to some

25    extent.  And that's one of the things that I want

1        to rework given what we have done here today.

2        Because there was some stuff in the agreed facts

3        and the statement of the case, as you agreed on,

4        that talked about the Court's ruling.  We are

5        going to do that a little bit differently now

6        based on our discussions today.  So yeah, I will

7        tell them that.

8                    MR. BOHYER:  Judge, do you intend

9        in that instruction to advise the jury that the

10       FDCPA conclusion that you reached is a strict

11       liability position?

12                   THE COURT:  No, I don't think I

13       need to.  Because then I need to talk about bona

14       fide area of defense and that kind of thing.  I

15       think what they need to know is under the Fair

16       Debt Collection Practices Act, I have determined

17       that the act was breached in these ways.  And

18       their only role, then, on that claim is to

19       determine the damages.  And --

20                   MR. BOHYER:  If any.

21                   THE COURT:  If any.  Let's talk

22       about damages, but I don't think we need it on

23       the record.

24                   Is there anything else that

25       anyone wants to put on the record?

1                    MR. SIMPSON:  I move to exclude

2      witnesses under 615.

3                    THE COURT:  Okay.  They will be

4      excluded.

5                    Anything else?

6                    MR. BOHYER:  There was something

7      I addressed and you said, "Remind me before we

8      leave today."  What was that?

9                    MR. SIMPSON:  Oh, we would like

10     the Court's leave to file any Original deposition

11     transcripts.

12                    THE COURT:  Okay.  Yes, you may

13     do so.

14                    MR. SIMPSON:  Do we need an NEF

15     or such other order?  The clerk's office is here,

16     I see.

17                    THE COURT CLERK:  Yeah, when you

18     file them, you will get an NEF.  We will have to

19     file them in the office.

20                    MR. SIMPSON:  Do we need a cover

21     page thing pursuant to the order?

22                    THE COURT CLERK:  Yes, and then

23     we will attach.

24                    MR. BOHYER:  John, will you file

25     the Originals that you have?

1          MR. HEENAN:  Sure.

2          THE COURT:  Okay.  Anything else?

3          MR. SIMPSON:  With respect to the

4    settlement agreement, do we have the Court's

5    permission to disclose that to our client's

6    insurer that is defending?

7          THE COURT:  Yes.  But they are

8    subject to the same.

9          MR. BOHYER:  We will advise that.

10   I'm sure, when we ARE dealing with counsel, they

11   understand the ramifications.

12         THE COURT:  Anything else?

13         MR. SIMPSON:  When will we get

14   the list of potential jurors?

15         THE COURT:  Should have them very

16   soon.

17         THE COURT CLERK:  I think she

18   tries to get them out the Wednesday before.  We

19   keep getting changes up until the morning of the

20   trial.  So I think she faxes them out Wednesday

21   to all the counsel.

22         THE COURT:  So tomorrow.

23         MR. BOHYER:  You fax them out.

24         THE COURT CLERK:  Yes, I think

25   she faxes them.  Heather does that, and I'm not

1     exactly sure, but I think she does.

2                     MR. BOHYER:  How big of a pool

3     are you drawing here?

4                     THE COURT:  40.

5                     MR. SIMPSON:  There is one other

6     issue that John had raised, and I don't want to

7     beat around the bush.  I listed Mr. Heenan as a

8     may call witness.  Frankly, I don't know that I

9     would intend to call him except that it may

10    depend on what testimony he elicits from Mr.

11    Lucero and Ms. Henan.

12                    Apparently he is their counsel as

13    well, and I believe there is a good chance they

14    will testify they don't have personal knowledge

15    of what happened in the other cases, they don't

16    even know anything about the McCullough case or

17    each other's case.  Their source of information

18    is likely Mr. Heenan.  I haven't worked up any

19    line of testimony, but I wanted to put this issue

20    out there because it would be disruptive if it

21    happened in the trial.

22                    THE COURT:  I appreciate that.  I

23    don't anticipate that those people will be

24    testifying about anybody else's claim.

25                    MR. HEENAN:  They won't, Your

1    Honor.

2                    THE COURT:  If you open the door,

3    then we have a problem.  If all they testify is

4    what they know about their own experience with

5    JRL, we shouldn't reach those.

6                    MR. BOHYER:  I trust we are

7    entitled to ask those witnesses what the source

8    of their information is.

9                    THE COURT:  You can ask if they

10   have testified based on their own knowledge or if

11   they testified based on knowledge they obtained

12   from others.

13                   MR. HEENAN:  If they are trying

14   to open the door to somehow invade the

15   attorney-client privilege to say, What did Mr.

16   Heenan tell you about how your case is like -- I

17   mean, all I want Ms. Henan and Mr. Lucero to say

18   is, Here's what happened to me.  Here's the exact

19   thing that happened to me.

20                   So on cross-examination, they are

21   allowed to say, how did you know what happened to

22   you is like what happened to Mr. McCullough, I

23   don't know if that even matters.

24                   THE COURT:  It doesn't matter

25   because they haven't said it was.

1          MR. BOHYER:  We are not looking

2    to lead down the primrose path.  I took Mr.

3    Lucero's deposition, and I'm not casting

4    aspersions at all, but he is not a real

5    sophisticated individual.  And in response to

6    questions, I can certainly envision the man

7    making statements that are much broader than

8    responding to a narrow question.

9          So that's kind of what we are

10   looking at here.  Because it's apparent that some

11   of the information they had about how they were

12   allegedly treated badly is akin to what happened

13   to Mr. McCullough here, that the source of that

14   information is indeed John Heenan.

15          THE COURT:  We will have to take

16   this as it comes.  I think I made it clear what

17   is permissible and what is not.

18          MR. BOHYER:  We wanted to get it

19   out there.  We will not raise that issue in front

20   of the jury without bringing it to the Court's

21   attention at sidebar.

22          THE COURT:  Anything else on the

23   record?

24          Hearing nothing, we will close

25   out the record.

1       C E R T I F I C A T E    O F    O F F I C E R.

2

3       I, Virginia Leyendecker, a Certified Shorthand

4    Reporter and Notary Public, do hereby certify that

5    the foregoing is a true and accurate transcript of

6    the testimony as taken stenographically by and before

7    me at the date, time and location aforementioned.

8       I do further certify that I am neither a relative

9    nor employee, nor attorney or counsel to any parties

10   involved; that I am neither related to nor employed

11   by any such attorney or counsel, and that I am not

12   financially interested in the action.

13

14

15

16   /s/Virginia E. Leyendecker, CSR

17   Notary Public

18   My Commission expires May 3, 2010

19   NJ C.S.R. License No. XI-1701

20

21

22

23

24

25