1             IN THE U.S. DISTRICT COURT.
          FOR THE DISTRICT OF MONTANA
2                BILLINGS DIVISION
           CAUSE NO. CV-07-166-BLG-CSO
3
    ------------------------------------------
4
    TIMOTHY McCULLOUGH          :
5                               :
          Plaintiff             :  **COURT TRANSCRIPT**
6                               :
       vs.                      :      Volume I
7                               :
    JOHNSON, RODENBURG & LAUINGER:
8                               :
          Defendant             :
9
      ------------------------------------------
10
          April 14, 2009
11
      ------------------------------------------
12  R E P O R T E D   B Y:

13    VIRGINIA LEYENDECKER, Certified Shorthand

14  Reporter, (NJ License No. 1701) and Notary Public, on

15  the above date, commencing at 8:30  a.m., at the

16  James F. Battin United States Courthouse, 316 North

17  26th Street, Billings, Montana.

18

19  BEFORE: Hon. Carolyn S. Ostby

20

21

22

23

24

25

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

```
 1    A P P E A R A N C E S:

 2        HEENAN LAW FIRM
          BY:   JOHN HEENAN, ESQUIRE
 3             For the Plaintiff

 4        BOHYER, SIMPSON & TRANEL, P.C.
          BY:   FRED SIMPSON, JR., ESQUIRE
 5        and JOHN BOHYER, ESQUIRE
               For the Defendant

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>INDEX</u>

2

        WITNESS:
3
    **D. Michael Eakin**
4
Direct Examination by Mr. Heenan.................142
5    Cross-Examination by Mr. Simpson.................173

6

    **Kerri Henan**
7
Direct Examination by Mr. Heenan.................182
8    Cross-Examination by Mr. Simpson.................188

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1
2                       (The following discussion took
3       place in chambers:)
4                       THE COURT:  The record will
5       reflect it's about 8:39, and we are in chambers
6       with counsel.  I just had a couple of things and
7       then wanted to address any last questions that
8       counsel had before we begin.
9                       First, I will give each party the
10      preliminary instructions that I intend to read
11      after we have a jury seated.  And so I don't
12      think we will be here very long this morning.  So
13      you will have a chance to look at them.  If you
14      have any objections to them, let me know.  We
15      will take a break after we get our jury and so
16      let me know then and we can make a record on any
17      objections.
18                      With respect to witnesses, does
19      the defendant intend to call Dr. David
20      Yelvington?  It's on the may call list and, as I
21      was looking at it, I saw an objection that it is
22      an undisclosed witness, and I wonder if there was
23      an issue about that.
24                      MR. SIMPSON:  It will depend in
25      part, Your Honor, on the proof put on by the

1      plaintiff and how Mr. McCullough testifies with

2      respect to his past medical history.

3                     THE COURT:  What would be the

4      content generally of Dr. Yelvington?

5                     MR. SIMPSON:  Dr. Yelvington

6      examined the plaintiff in a psychiatric interview

7      setting.  I believe it was in 1993.  Dr.

8      Yelvington's record of that interview was

9      produced by the plaintiff in discovery in this

10     case.  It was one of the records we provided and

11     was relied upon by Dr. McElhinney in his IME

12     assessment of Mr. McCullough.  So the content of

13     his testimony would be as contained in the record

14     that was produced by the plaintiff.

15                    THE COURT:  Okay.  With respect

16     to plaintiff's exhibit, I believe it's 106.  It's

17     the big exhibit that's the list of cases.

18                    MR. HEENAN:  Yes, Your Honor.

19                    THE COURT:  I gave additional

20     thought and research to the question of including

21     the 2008 cases.  I think it went from January '07

22     to '08.  I'm going to allow you to use the entire

23     exhibit.  I apologize if you spent an awful lot

24     of time, but I wanted to take a look at that, lay

25     a foundation for it.  I'm not going to admit it

1    right now, but I wanted to let you know that you

2    can offer the whole thing, if you wish.

3                    MR. HEENAN:  Thank you, Your

4    Honor.

5                    MR. BOHYER:  We renew our

6    objection on the basis we did at the pretrial

7    conference.

8                    THE COURT:  Thank you.  And order

9    of witnesses for today is what?

10                    MR. HEENAN:  I anticipate calling

11    Charles Dendy by video.  That's less than a

12    20-minute video; Mike Eakin, live; CACV employee

13    Dunker, by video; again, I think it's 20 minutes

14    on the nose.  Kerri Henan live, should be a short

15    witness.  And I guess, depending on when we have

16    our jury picked, I'm going to see if we can't get

17    Dr. Veraldi in today as well.  Andy Patten is in

18    Butte for the Yellowstone Club stuff.  So he will

19    be here tomorrow morning.

20                    THE COURT:  I do have Mr. Eakin's

21    disclosure, and I want to again caution both

22    parties that undisclosed opinions won't be

23    allowed.  So if there's an issue, we will have to

24    look and see where it was disclosed.

25                    I believe that covered everything

1    that I had on my short list.  Does the plaintiff

2    have anything to raise at this time?

3                    MR. HEENAN:  Briefly, Your Honor.

4    In opening statement, I intend to use a Power

5    Point to explain the debt-buyer industry and

6    Johnson Rodenburg's role in the industry.  I

7    could have it printed out to show Your Honor, but

8    I wanted to alert you to it.

9                    THE COURT:  Have you showed it to

10   defense counsel?

11                   MR. HEENAN:  I haven't, but I

12   will.

13                   THE COURT:  Show it to them

14   first.  If there is any objection, let me know.

15                   MR. HEENAN:  Do you want me to

16   grab it?

17                   MR. SIMPSON:  Is this an

18   appropriate time to raise an objection?

19                   THE COURT:  Yes.

20                   MR. SIMPSON:  The part we object

21   to is essentially the bottom three tiers.

22                   THE COURT:  Starting with

23   judgement for 9,000?

24                   MR. SIMPSON:  Correct.

25                   MR. HEENAN:  There are two

1    different exhibits.  One is in general terms the

2    way Johnson Rodenburg conducts their practice,

3    and then the second is, after I introduce the

4    Complaint or show the jury the Complaint, I want

5    to tick through --

6                    THE COURT:  The underlying

7    Complaint?

8                    MR. HEENAN:  -- the underlying

9    state court action, the fact they sued him for

10   $3800, including interest, 5500, $500 in fees,

11   attempting to collect $9800 judgement so they

12   could collect that judgement.

13                   THE COURT:  Let's make sure we

14   have our record clear.  The plaintiff has brought

15   and given to the Court and defense counsel a

16   one-page sheet that is in essence kind of a flow

17   chart that begins at the top credit card account

18   $3,800 balance.  Part of it is cut off.  IRS tax?

19                   MR. HEENAN:  IRS tax deduction.

20                   THE COURT:  Okay.  So the

21   plaintiff's intent is to do what now with this?

22   Could you walk us through what your wish is with

23   respect to using this in opening?

24                   MR. HEENAN:  Sure.  I intend to

25   explain Johnson Rodenburg's business practice,

1    which is to use the court system to collect

2    debts.  They collect purchased debts.  So I

3    intend to explain to the jury where it is these

4    lawsuits that they're filing come from.  They

5    come from credit card companies which take an IRS

6    tax deduction from the amount of the delinquent

7    debt, sell that debt to debt buyers.  The debt

8    buyers in turn provide the spreadsheet

9    information -- name, address, amount claimed,

10   interest rate, date of last payment -- to Johnson

11   Rodenburg for collection.

12                Johnson Rodenburg, with that

13   information, filed lawsuits against these people.

14   Johnson Rodenburg gets judgements against these

15   people and, armed with the judgement, Johnson

16   Rodenburg is able to use the court system to

17   collect debts.  And the way they use the court

18   system is to sweep bank accounts, garnish wages

19   and get a lien on real property.

20                THE COURT:  What is the

21   defendant's objection?

22                MR. SIMPSON:  We have many

23   objections.  The first objection is with respect

24   to the block or the top that references an IRS

25   tax deduction.  There hasn't been any witness nor

1      any exhibit offered which proves that that in

2      fact occurs.  I would also --

3                          THE COURT:  Whose deduction is it

4      in any case?

5                          MR. HEENAN:  It's the credit card

6      company's deduction.

7                          THE COURT:  What relevance does

8      that have to the case?

9                          MR. HEENAN:  It's hugely relevant

10     because what is going to go lurking in the jury's

11     mind is, well, don't all the people that Johnson

12     Rodenburg sues owe the money?

13                         THE COURT:  Who's going to

14     testify?

15                         MR. HEENAN:  Mike Eakin will

16     explain the debt-buyer industry.

17                         THE COURT:  We talked about this

18     earlier.  We aren't trying the debt-buyer

19     industry.  We are trying one law firm that filed

20     a claim against your client.

21                         MR. HEENAN:  Absolutely.

22                         THE COURT:  I am going to caution

23     you.  I don't want anything said in opening

24     unless there is competent evidence that is going

25     to come in on it.  I don't remember seeing

1    anything in Mr. Eakin's disclosure about tax

2    deductions for debt buyers or for credit card

3    companies.  Now, I might be wrong, but I don't

4    remember seeing anything about that.  Was there

5    something in there?

6                    MR. HEENAN:  I don't think Mike

7    specifically addressed tax deductions.

8                    THE COURT:  Then he won't testify

9    about it.

10                   MR. HEENAN:  Okay.

11                   THE COURT:  You can ask him what

12   you want.  I'm just telling you that, as I said

13   before, experts are going to testify as to what

14   was disclosed.  If he has relevant knowledge

15   about this case as a fact witness, he can testify

16   about that.

17                   But it doesn't appear to me, from

18   what you've said, that tax deductions for credit

19   card companies fall into that category.  So if he

20   didn't disclose an expert opinion about that,

21   then he can't testify about it.

22                   MR. HEENAN:  So should I remove

23   this IRS tax deduction?

24                   THE COURT:  I would advise you to

25   do that.  What else?

1                    MR. HEENAN:  I will.

2                    MR. SIMPSON:  Your Honor, the

3       bottom three rows of the flow chart.

4                    THE COURT:  Starting with what

5       line?

6                    MR. SIMPSON:  The line that says

7       judgement for balance plus interest, slash, fees,

8       and I guess the other copy says judgement for

9       $9,800.

10                   As the Court is aware, there was

11      no judgement entered against Mr. McCullough in

12      the underlying case.  The underlying case was

13      dismissed with prejudice by stipulation of the

14      parties before, in fact, there had been any trial

15      and before there had been any motion for summary

16      judgement filed.  There is no proof in this case

17      that there was ever a judgement entered against

18      Mr. McCullough, that there's a sweep of his bank

19      act, a garnishment of his wages, a lien ON his

20      home or any collection by my client against Mr.

21      McCullough.

22                   So these bottom three rows are

23      completely irrelevant and likely to confuse and

24      mislead the jury.

25                       It's not been disclosed that

1          either Kerri Henan or Ken Lucero, the other two

2          fact witnesses that have been identified by the

3          plaintiff, had any of these things occur to them

4          either.  So these are irrelevant and not

5          supported by the proof.

6                    THE COURT:  What will be the

7          proof on this?

8                    MR. HEENAN:  The proof will be in

9          Johnson Rodenburg's own notes it says, Tim

10         McCullough owns his own home, need to sue.  I'm

11         certainly not going to say there was a judgement.

12         What I'm going to say, this is where they got cut

13         off because Mr. McCullough hired a lawyer.  But

14         this was their intent.

15                   It is highly relevant because in

16         a malice case like this, I need to be able,

17         through circumstantial evidence, put on what the

18         company's business practice is and what the

19         intent was when they sue Mr. McCullough.

20                   THE COURT:  What will be the

21         proof at trial with respect to garnishing of

22         wages, sweeping bank accounts and collecting 500

23         percent --

24                   MR. HEENAN:  That is how they use

25         the court system, to collect debt.

1               THE COURT:  Who will testify to

2     that?  I want to know what the evidence will be.

3               MR. HEENAN:  Johnson Rodenburg's

4     own lawyers are going to testify that that's how

5     they use the court system to collect debt.

6               THE COURT:  Okay.  Sounds to me

7     like there is proof that will come in with

8     respect to that issue.  So is there any --

9               MR. BOHYER:  I want to raise an

10    additional objection to that in terms of it being

11    more prejudicial than probative.

12              THE COURT:  This isn't evidence.

13    This is an opening statement as to -- let's talk

14    one at a time -- as to what the plaintiff intends

15    to prove.

16              MR. BOHYER:  My concern is I've

17    heard from plaintiff's counsel they don't intend

18    to try the debt-collection industry, if you will.

19    I appreciate Your Honor's repeated statements to

20    that effect.

21              But what's going to be offered

22    from the outset here is these are how debt

23    collection law firms operate.  There is nothing

24    prohibited by law, of course, on proper proof, of

25    a law firm representing a client on a

1    debt-collection claim pursuing that to judgement

2    and using the writs of execution and the like

3    which are provided by law to collect a debt.

4    That's the problem with this.

5              And so, despite the Court's

6    assurances, I have serious concerns that we are

7    not going to be able to catch each and every tick

8    that comes up with an indictment on our client as

9    essentially, quote, unquote, the debt-collection

10   industry.  That's why I think it's imperative

11   that we winnow this down to the facts of this

12   case.  And that exhibit, even with the Court's

13   and the prior objections made, in my views, leads

14   us down that road.

15             THE COURT:  Well, we will have to

16   deal with the proof as it comes in.  And counsel

17   will have to make their objections.  But I'm

18   satisfied from what the plaintiff has represented

19   that plaintiff does intend to offer proof that,

20   from what I can tell, would be admissible proof

21   on these issues.  I appreciate dealing with this

22   in advance.

23             MR. HEENAN:  I do too.  Thank

24   you, Your Honor.

25             THE COURT:  Anything else the

```
 1   plaintiff wishes to raise?

 2                    MR. HEENAN:  I also intend to

 3   show the jury, in opening statement, Your Honor's

 4   rulings and explain what those rulings were so I

 5   can tell them, so why are we here?

 6                    THE COURT:  No.  Those rulings

 7   are not in evidence.

 8                    MR. HEENAN:  Okay.

 9                    THE COURT:  You can't show them

10   something that is not in evidence.

11                    MR. HEENAN:  Well, can I tell

12   them what Your Honor's rulings were?

13                    THE COURT:  Yes.  But I don't

14   want you using that as evidence.

15                    MR. HEENAN:  But I can quote from

16   Your Honor's order, at least briefly.  The

17   concern I have is one of the issues the jury

18   needs to determine is what the statutory damages

19   are in light of your FDCPA liability ruling.

20   They need to know the context of what it is you

21   said.

22                    THE COURT:  Yes.  You can say

23   what the ruling was, but I don't want you going

24   further than that.  Is that clear enough?

25                    MR. HEENAN:  Well, what I intend
```

1    to do is say, like with the attorneys' fees, read

2    the jury your analysis and conclusion and say,

3    that's what the judge ruled.

4              MR. BOHYER:  We object

5    strenuously, for a couple of reasons.  One, there

6    may be some indication by the Court's rulings

7    that that is a fact that the Court has concluded

8    via the Court's analysis on a summary judgement

9    ruling.  So I think that's improper.

10             If there's a statement to the

11   jury that the Court has already ruled that the

12   defendant filed this case past the statute of

13   limitations or that the defendant violated the

14   Fair Trade Practices Act by maintaining the case

15   after the statute of limitations, I think that's

16   fair game.  Because that's what your ruling is.

17   Your factual analysis within the case is not the

18   Court's ruling.  It's the predicate for the

19   ruling.

20             THE COURT:  I think that's

21   correct.  I don't think that it's appropriate

22   because it's not in evidence and won't be

23   admitted into evidence, the text of those orders.

24   That is already determined.  And you can tell the

25   jury what was determined, but this jury doesn't

1     need to know everything that led to that.  That's

2     not going to be presented to them.

3                         MR. HEENAN:  I agree with that.

4     I just mean, in terms of, I mean, if all we can

5     say is, well, the judge found there were four

6     violations, the jury will be thinking, well,

7     what --

8                         THE COURT:  You can say what the

9     four were.

10                        MR. HEENAN:  That's all I wanted.

11                        THE COURT:  That's it.  But not

12    the analysis that led to that because it's not

13    relevant to what they need to determine.

14                        MR. HEENAN:  Understood, Your

15    Honor.

16                        THE COURT:  Anything else?

17                        MR. HEENAN:  I guess now would

18    maybe be the time to address it.  Ken Lucero

19    filed a counterclaim against Johnson Rodenburg in

20    the Butte state court action.  There's a

21    different insurance adjustor, different attorney

22    handling the case.

23                        Mr. Lucero settled his case last

24    week and entered into a mutual confidentiality

25    agreement with Johnson Rodenburg.  I took that

1     lawyer at face value that he wanted to get it

2     done.  We agreed it didn't have anything to do

3     with this case.  But as being maybe a little

4     overly cautious, I'm not going to ask him

5     anything about the lawsuit, certainly nothing

6     about a settlement, but I don't want to have this

7     trap set where Johnson Rodenburg settled so that

8     they can try and explain to the jury, through Mr.

9     Lucero, what an appropriate settlement in a case

10    like this is.

11                   MR. SIMPSON:  In the first place,

12    we are not the ones calling Mr. Lucero.  I think,

13    if Mr. Lucero settled his case, that's fair game.

14    We have of course objected to him offering any

15    testimony in this matter in the first place

16    because we don't believe his situation is

17    relevant to the proof in this case.  They are a

18    different situation.

19                   And if he is now going to testify

20    and the facts have changed and he settled the

21    case, I think the jury needs to know that.

22                   THE COURT:  I think we already

23    covered this.  And this is my understanding of

24    it.  The only thing that is relevant here with

25    respect to Mr. Lucero is what happened to him in

1    his lawsuit is not relevant.  And I think we

2    already discussed at the final pretrial

3    conference not getting into his lawsuit.  We are

4    trying Mr. McCullough's lawsuit, not Mr. Lucero

5    or Ms. Henan's lawsuit.

6              So if the plaintiff, as Mr.

7    Heenan just said, doesn't intend to ask about Mr.

8    Lucero's lawsuit, then anything about the

9    settlement would be outside the scope of direct

10   examination anyway and not, to use your words,

11   fair game.

12             MR. SIMPSON:  I believe, under

13   the Rules of Evidence, the bias or prejudice of a

14   witness is always relevant in cross-examination.

15   And with Ms. Henan and Mr. Lucero, the fact that

16   they filed counterclaims or claims against my

17   client for violation of the Fair Trade Practices

18   Act brings into question their motive to at best

19   shade the facts in their favor or in favor of Mr.

20   McCullough, who they may view themselves.  So I

21   think restricting us from mentioning the fact

22   that they sued our client unduly restricts our

23   ability to cross-examine.

24             THE COURT:  The fact it's been

25   resolved kind of eliminates that, doesn't it?

1              MR. SIMPSON:  I don't know what

2    the terms of the settlement were, so I don't

3    know.

4              THE COURT:  Well, I think that it

5    would be very confusing and only marginally, if

6    at all, relevant to get into the facts of another

7    lawsuit.  So we will just have to take it a

8    question at a time.

9              MR. BOHYER:  I think you're

10   right.

11             THE COURT:  I wanted to give you

12   my thought that, as a general approach, what

13   happened to these people if their dealings with

14   JRL is relevant.  What happened in their lawsuits

15   is not.

16             Now, perhaps, as Mr. Simpson

17   suggests, there is something about possible bias

18   and prejudice.  We will have to see how that

19   goes.  We are not going to go a long way down

20   that road because I think it's confusing and the

21   jury will get impatient because all of a sudden

22   we are arguing about someone else's lawsuit.

23   That's not why we are here, and I don't think

24   it's fair to either party.

25             Okay.  Anything else?

1                        MR. HEENAN:  That's it.

2                        THE COURT:  Defense?

3                        MR. SIMPSON:  Couple things.

4    First, we still have unresolved the question of

5    whether the plaintiff will be allowed to suggest

6    or ask the jury to award specific sums for

7    emotional distress or punitive damage.

8                        THE COURT:  He may.

9                        MR. SIMPSON:  The other issue is,

10   I understand the Court's ruling we are not

11   entitled to cross-examine Mr. McCullough with

12   respect to his settlement with CACV, but are we

13   allowed to cross-examine the fact that he settled

14   that case?

15                       THE COURT:  What relevance?

16                       MR. SIMPSON:  I think the jury

17   will wonder why CACV isn't here.  They are

18   clearly in the center of this.

19                       THE COURT:  I don't think that's

20   so clear.  I mean, your client has been sued.

21   They sued him.  There are other people involved.

22   There is the credit card company.  There is the

23   fact that he was sued before by a different law

24   firm.  There are a lot of different players here.

25                       I want this case tried on the

1    facts that are relevant to the claims at issue.

2    And getting sidetracked on settlements of other

3    claims against other parties, I think, again, is

4    not within the scope of relevance or, under Rule

5    403, is going to confuse the issues and mislead

6    the jury.  Again, we will take it a question at a

7    time.

8                    But in the hopes of being

9    helpful, I want counsel to know that that's my

10   general approach here.  I don't want to have a

11   lot of skirmishes about what happened to other

12   cases.  Because it just doesn't matter here.

13                    Anything else?

14                    MR. SIMPSON:  No, Your Honor.

15                    THE COURT:  On your prior

16   question about the motion about the position that

17   the defendant took with respect to limiting

18   argument of counsel, of course the plaintiff, and

19   while neither party is permitted to use surprise

20   evidence, any testimony that would come in or any

21   evidence offered about the specifics of damages

22   that were not disclosed won't be allowed.  But

23   with respect to an attorney in closing making a

24   suggestion to the jury as to an amount that he

25   believes the evidence supports, I'm not going to

1   preclude that.

2                    MR. SIMPSON:  Thank you.

3                    THE COURT:  Anything else?  Let's

4   get started.

5                    (Brief recess.)

6                    THE COURT:  Please call the case.

7                    THE COURT CLERK:  The Court has

8   set aside this time to hear the matter of

9   CV-07-166-VLG-CSO, *Timothy McCollough v. Johnson*

10  *Rodenburg*, for a jury trial.

11                   THE COURT:  Is the plaintiff

12  ready to proceed?

13                   MR. HEENAN:  We are, Your Honor.

14                   THE COURT:  Is the defendant

15  ready to proceed?

16                   MR. SIMPSON:  Yes, we are, Your

17  Honor.

18                   THE COURT:  Ladies and gentlemen,

19  the first part of a trial is jury selection.  And

20  juries, in our system of government, can't be

21  hand-picked.  They can't be appointed by any

22  particular person or persons.  They have to be

23  chosen at random under our Constitution and the

24  statutes that govern the procedures that the

25  Court follows.

 1                    So what that means is that long
 2     before you appear here in court, the federal
 3     court gets lists of licensed drivers in Montana
 4     and registered voters.  Then, if there are
 5     duplicates, if you are, and I hope you are, both
 6     a licensed driver and a registered voter, your
 7     name will only appear once.  Then a computer
 8     program is applied to those names and they are
 9     chosen at random.  So from that entire group, and
10     of course it's a large group of citizens in
11     Montana, you were chosen at random.
12                    Now, we will choose a jury of
13     seven people.  And this random process will
14     continue now and I'll explain it to you as we go
15     through it.  And so we will have 13 of you come
16     up and take seats in the jury box here, and after
17     that occurs, then I will explain to you further
18     how we will proceed.
19                    First I will ask the clerk to
20     administer an oath to you.  Sometimes you hear
21     lawyers refer to this part of the process as voir
22     dire.  It's a Latin phrase meaning to speak the
23     truth.  The reason it's called voir dire, you
24     will take an oath in just a minute to tell the
25     truth in response to questions that are asked.

 1                    Please administer the oath.

 2               (ALL PRESENT are duly sworn under oath.)

 3                    THE COURT:  Now, as I explained,

 4     this random process will begin.  The clerk of

 5     court here has all of your names in what we call

 6     the wheel here.  She will at random draw names

 7     out.

 8                    If your name is called, I'm going

 9     to ask you to come and sit in the jury box.  I

10     know there is no room for you there, but I ask

11     the jurors already in the jury box to stand back

12     by the security office and leave the number on

13     the chair on the chair, and I will explain how

14     those are used.

15                    THE CLERK:  Number one, Amy

16     Conlin.

17                    THE COURT:  Now, if you will go

18     up, I think the chair in the back has the number

19     one, closest to the bench here, and just sit in

20     the chair marked number one and just hold the

21     card for a minute.

22                    THE CLERK:  Number two, Vickie

23     Rae Harris; number three, Avonne Elvick Johnson;

24     number four, David Huntley; number five, Sally

25     Sjaastad; number six, Sandra Bey; number seven,

1       Kelly Lynn Bergsing; number eight, Linda

2       Thompson; number nine, Mavis Kloppel; number 10,

3       Randel Bonifay; number 11, Arlon Franz; number

4       12, Connie Rasmussen; number 13, Tanner Egan.

5                       THE COURT:  Now, this process

6       continues.  I'm going to ask the people who are

7       seated in the jury box here questions.  And the

8       questions will include questions about background

9       and attitudes and other information.  And the

10      purpose of this is to get a jury seated that is

11      both able and willing to consider the issues in

12      this case impartially.

13                      Now, my questions will be

14      primarily directed to, as I said, the people in

15      the box.  However, for those of you whose names

16      were not called and are in the back of the

17      courtroom, listen carefully to the questions I

18      ask.  It is possible that I will have to excuse,

19      for some reason, one of the jurors who are seated

20      in the jury box.  And if and when that happens,

21      I'll ask the clerk to pull another name out of

22      the wheel here, and it very well may be yours.

23                      If it is, to save time, instead

24      of going through the questions again, I will ask

25      you if you would have answered affirmatively to

1    any of the questions that I asked.  That will

2    save some time.  So I ask you to listen carefully

3    as we proceed.

4                    Now, the questions that we ask

5    are, as I said, to assist the Court and the

6    parties in getting a jury seated that's able to

7    impartially hear the evidence in the case, and to

8    allow the attorneys to exercise what we call

9    preemptory challenges or challenges for which no

10   cause need be given.  Our purpose is never to pry

11   or to embarrass anybody.

12                   If a question is asked that, for

13   whatever reason, you don't want to discuss in

14   front of all the people here in the courtroom,

15   tell me that and we will go back into my chambers

16   and discuss whatever it is there.  There is

17   nothing wrong with that.

18                   So again, we don't want to make

19   you uncomfortable.  We very much appreciate your

20   willingness to be here and serve.  Our system of

21   justice simply wouldn't work if there weren't

22   people such as yourselves who are willing to come

23   and participate in the process and sit on a jury

24   and fairly hear the evidence presented.

25                   So that said, let me tell you

1      that the lawyers here tell me that this case will

2      take three or four days to complete.  I'm quite

3      confident we will complete it by the end of the

4      week, but it will take the better part of the

5      week.

6                       Is there anyone in the jury box

7      for whom that would be a problem?  Ms. Conlin.

8                       MS. CONLIN:  I have a first

9      grader and she has a program on Friday.  I need

10     to leave and go back to Sidney on Thursday.

11                      THE COURT:  I'm going to ask you

12     a few more questions about that, and let me tell

13     you why.  Serving on a jury necessarily asks

14     people to take time out of their normal course of

15     life, their work, their family, and it's a

16     sacrifice.  But everybody is asked to make that

17     sacrifice.

18                      Sometime it's just too much.

19     Sometimes you can't do it.  And in that case,

20     then, you're excused.  But if it's just life

21     going on and you're having to set something else

22     aside, then we ask people to do that.  Otherwise

23     we wouldn't get a jury.

24                      So if it's a program that you're

25     not required to be there for -- I'm going to ask

1     you, do you need to be there?

2                     I understand we all want to be

3     there.  I have kids too.  We all want to be there

4     but we don't always need to be there.

5                     Is this something that your

6     presence is required?

7                     MS. CONLIN:  It's just for the

8     parents, and her father is not in the picture so

9     I would be her only person there.

10                    THE COURT:  What kind of program

11    is it?

12                    MS. CONLIN:  It's a first grade

13    play.

14                    THE COURT:  I will excuse you.

15    You're free to go.

16                    Would you call another name,

17    please?

18                    THE CLERK:  Carolyn Hamlin

19    Wenger.

20                    THE COURT:  Be careful, there is

21    a step up.  You kind of have to be a gymnast to

22    get back in there, I'm afraid.

23                    Ms. Wenger, as I said, this case

24    will take about three or four days to complete.

25    Does that pose any problems for you?

1                 MS. WENGER:  No.

2                 THE COURT:  Now, this action

3     arises out of debt-collection activities that

4     were directed at Mr. Timothy McCullough by the

5     Johnson, Rodenburg & Lauinger law firm.  Mr.

6     McCullough brought this action alleging that

7     Johnson, Rodenburg & Lauinger violated the Fair

8     Debt Collection Practices Act and Montana law in

9     its debt-collection activities against Mr.

10    McCullough.

11                 Have any of you heard or read

12    anything about this case?

13                 MR. BONIFAY:  I've seen a little

14    bit in the paper about it.  That it was going to

15    happen.

16                 THE COURT:  Mr. Bonifay?

17                 MR. BONIFAY:  Yes.

18                 THE COURT:  Was there anything

19    that you heard or read that would prejudice you

20    one way or the other, or cause you to give more

21    weight to one side or the other?

22                 MR. BONIFAY:  Not really.

23                 THE COURT:  Could you set that

24    aside and, if you're chosen here, base a verdict

25    solely on the evidence presented here in the

1      courtroom?

2                          MR. BONIFAY:  Absolutely.

3                          THE COURT:  I would now like to

4      introduce the attorneys here.  Mr. McCullough is

5      represented by John Heenan of the Heenan Law Firm

6      in Billings.  Would you please stand up?

7                          MR. HEENAN:  Thank you, Your

8      Honor.

9                          THE COURT:  Do any of you know

10     Mr. Heenan?  Have you had any dealings with him

11     whatsoever?

12                         Thank you, Mr. Heenan.

13                         The defendant is represented by

14     Mr. John Bohyer and Mr. Fred Simpson of the law

15     firm Bohyer, Simpson and Tranel in Missoula.

16                         Have any of you had any dealings

17     or do you know Mr. Bohyer or Mr. Simpson in any

18     regard?  Okay.

19                         Thank you.  You may be seated.

20                         Now I will ask the lawyers to

21     introduce to you their clients.  And I will ask

22     you similar questions with respect to whether you

23     know them.

24                         Please introduce your client, Mr.

25     Heenan.

```
 1                        MR. HEENAN:  Seated to my right
 2    is the plaintiff in this case, Mr. McCullough.
 3                        THE COURT:  Do any of you know
 4    Mr. McCullough?
 5                        Okay, thank you.
 6                        Mr. Simpson, would you please
 7    introduce your client.
 8                        MR. SIMPSON:  Thank you.  This is
 9    Lisa Lauinger of the law firm Johnson, Rodenburg
10    & Lauinger in Bismarck, North Dakota.
11                        THE COURT:  Do any of you know
12    Mrs. Lauinger?
13                        Thank you, you may be seated.
14                        Now I'm going to read to you a
15    list of people who I anticipate may be witnesses
16    called to testify in this case.  And I will ask
17    you the same question.  That is, whether any of
18    you know any of these witnesses.
19                        Mr. Charles Dendy is a lawyer in
20    the law firm of Johnson, Rodenburg & Lauinger.
21    Do any of you know Mr. Charles Dendy?  Grace
22    Lauinger?  Dr. Joseph McElhinney?
23                        Yes?
24                        A JUROR:  I know him kind of
25    professionally.  He has done evaluations for
```

1    clients of mine in the past.  I don't know him

2    personally.

3                     THE COURT:  So you've had some

4    professional connection with him.

5                     A JUROR:  Right.

6                     THE COURT:  Is there anything in

7    the association that you've had with him or the

8    knowledge that you have with him that would cause

9    you to give more weight to his testimony than to

10   others?

11                    A JUROR:  No.

12                    THE COURT:  I will ask you the

13   converse side of that.  Is there anything that

14   would cause you to give less weight to anything

15   in that that would make it difficult for you to

16   hear his testimony and give it the weight that it

17   deserves based on what is said here in the

18   courtroom?

19                    A JUROR:  No.

20                    THE COURT:  Kerri Henan.

21                    MR. HEENAN:  Henan, no relation.

22                    THE COURT:  Kerri Henan?  Ken

23   Lucero?  Any of you know Ken Lucero?  Robert,

24   sometimes called Bob, Dunker.  He is from Denver,

25   Colorado.  Do any of you know Mr. Robert Dunker?

1      Michael Eakin, who is a lawyer here in Billings.

2      Do any of you know Mr. Eakin?  And Mr. James

3      Patten, who is also a lawyer here in Billings.

4      Do any of you know Mr. Patten?  Doraleen

5      McCullough.  Do any of you know Doraleen

6      McCullough?  Dr. Donna Veraldi?  Do any of you

7      know Dr. Donna Veraldi?  And Dr. David

8      Yelvington?  Okay.

9                     Have any of you ever before

10     served as a juror in a civil or criminal case, or

11     as a Grand Juror in any court?  Okay.  There is a

12     couple of you.

13                    Ms. Thompson, first of all, where

14     did you serve as a juror, just so we are clear?

15                    MS. THOMPSON:  Here in Billings.

16                    THE COURT:  In state or federal

17     court?

18                    MS. THOMPSON:  I believe it was a

19     state court.

20                    THE COURT:  How long ago?

21                    MS. THOMPSON:  Probably 20 years

22     or more.

23                    THE COURT:  These questions may

24     be unfair, then.  Do you remember if it was a

25     cervical or criminal case?

1                    MS. THOMPSON:  Criminal.

2                    THE COURT:  Do you remember what

3        the charge was?

4                    MS. THOMPSON:  Child abuse.

5                    THE COURT:  This is a civil case,

6        not a criminal case.  So at the end of the trial,

7        I will instruct you on the law and there is a

8        different burden of proof that applies in a civil

9        case as opposed to a criminal case.  Could you

10       listen to the instructions on the law that I give

11       you and follow those instructions?

12                   MS. THOMPSON:  Yes.

13                   THE COURT:  Any other prior jury

14       service?

15                   MS. THOMPSON:  No.

16                   THE COURT:  Someone else?  Yes,

17       Ms. Rasmussen.

18                   MS. RASMUSSEN:  It was in Sidney,

19       about 20 years ago, and it was criminal.

20                   THE COURT:  Do you remember the

21       charge in that case?

22                   MS. RASMUSSEN:  No, I do not.

23                   THE COURT:  Similarly, could you

24       listen to the instructions that I give and follow

25       them?

1                        MS. RASMUSSEN:  Yes.

2                        THE COURT:  Mr. Egan?

3                        MR. EGAN:  In Butte, Montana,

4     about six years ago.  It was civil.

5                        THE COURT:  Was it state or

6     federal court?

7                        MR. EGAN:  State, I believe.

8                        THE COURT:  What kind of case was

9     it?

10                       MR. EGAN:  It was a land dispute.

11                       THE COURT:  What kind of dispute

12    was it, do you remember?

13                       MR. EGAN:  Yes, they had a

14    friendly handshake agreement, apparently, nothing

15    in writing, on who owned this part of the land

16    type deal.

17                       THE COURT:  Do you remember what

18    the verdict was?

19                       MR. EGAN:  Yes, it was for the

20    defendant.

21                       THE COURT:  Of course, this is a

22    separate case with separate claims and different

23    parties.  You understand that?

24                       MR. EGAN:  Mm-hmm.

25                       THE COURT:  So is there anything

1     in your prior experience in that civil case that

2     you would carry with you that would make it

3     difficult for you for any reason to listen to the

4     evidence in this case fairly?

5                         MR. EGAN:  No.

6                         THE COURT:  Anybody else?  Prior

7     jury service or Grand Jury service?

8                         Have you or anyone in your

9     immediate family ever participated in a lawsuit

10    either as a party or a witness in any kind of

11    suit?

12                        Yes, Mr. Bergsing.  What kind of

13    case was it?

14                        MR. BERGSING:  It was a lease

15    case over farming some land.

16                        THE COURT:  Were you a party?

17                        MR. BERGSING:  No, I wasn't.  I

18    was a witness.

19                        THE COURT:  Just generally, what

20    was your testimony?

21                        MR. BERGSING:  I had worked for

22    people leasing it and the lease was terminated so

23    I had to testify how many times I helped farm the

24    ground.

25                        THE COURT:  Is there anything in

```
1    that experience that would in any way make it

2    difficult for you to sit and listen to witnesses

3    in this case fairly?

4                   MR. BERGSING:  No, ma'am.

5                   THE COURT:  Anybody else?  Yes,

6    Mrs. Sjaastad.

7                   MS. SJAASTAD:  I was a witness in

8    a criminal case, but I was 17 so it was quite a

9    while ago.

10                   THE COURT:  Is there anything in

11   that experience that you would think would make

12   it difficult for you to listen to witnesses here?

13                   MS. SJAASTAD:  No.

14                   THE COURT:  Anyone else?

15                   A JUROR:  Custody.

16                   THE COURT:  How long ago was

17   that?

18                   A JUROR:  About 10 years.

19                   THE COURT:  Could you set aside

20   anything in that experience and base a verdict in

21   this case based on what the parties present to

22   you in evidence here?

23                   A JUROR:  Yes, I could.

24                   THE COURT:  Anybody else?  Okay.

25                   Have you or anybody in your
```

1      immediate family ever been sued for a debt?

2                      MR. BONIFAY:  I have.  I had my

3      wages garnished off my checks once.

4                      THE COURT:  Mr. Bonifay.  Wages

5      garnished.  When was that?

6                      MR. BONIFAY:  2005.

7                      THE COURT:  Are they still being

8      garnished?

9                      MR. BONIFAY:  No.

10                     THE COURT:  For how long were

11     they garnished?

12                     MR. BONIFAY:  It was only four or

13     five months.

14                     THE COURT:  For a consumer debt?

15                     MR. BONIFAY:  For a debt to the

16     hospital that didn't get paid.

17                     THE COURT:  As I told you, this

18     claim is about debt-collection activities.  And

19     there may be, I don't know exactly what the

20     parties will present as evidence, but there may

21     be evidence about debt collection and the

22     processes of debt collection.

23                     Is there anything in your

24     experience that would cause you to give undue

25     weight to one side or the other?  In other words,

1    would it be difficult for any reason for you to

2    set aside your own experience?

3                      MR. BONIFAY:  Probably so.  I

4    would think I could do it.  Yeah.  I could set

5    them aside.

6                      THE COURT:  You could set them

7    aside.  Okay.  Do you have any lingering

8    resentment or anything about the people that

9    garnished your wages?

10                     MR. BONIFAY:  Not really, no.

11                     THE COURT:  Anybody else ever

12   been sued for a debt or ever sued to collect a

13   debt?

14                     Have any of you or your immediate

15   family members ever received letters about a debt

16   from a collection agency?

17                     Ms. Wenger, tell me about that,

18   please.

19                     MS. WENGER:  I have a daughter

20   that had some debts turned over to a collection

21   agency.

22                     THE COURT:  What kind of

23   experience did she have with that?

24                     MS. WENGER:  Pretty easy.  I paid

25   them off.

```
 1                         THE COURT:  She had it easy.
 2    Maybe you didn't.  Is there anything in that
 3    experience that would personally make it hard for
 4    you to be fair to both sides here and listen to
 5    the evidence?
 6                         MS. WENGER:  No.
 7                         THE COURT:  Someone else
 8    indicated.  Yes, sir, Mr. Bergsing.
 9                         MR. BERGSING:  My wife got fairly
10    sick 12 or 13 years ago and we accumulated a huge
11    debt and I started receiving collection notices
12    and we ended up claiming bankruptcy.
13                         THE COURT:  What year did you
14    claim bankruptcy?
15                         MR. BERGSING:  I'm trying to
16    remember.  '97 or '8.  I'm not sure.
17                         THE COURT:  Have you had any debt
18    issues since that time?
19                         MR. BERGSING:  Not really.  It
20    was a medical type of bankruptcy.
21                         THE COURT:  I see.  Now, the
22    evidence in this case, as I've indicated, is
23    about debt-collection activities.  From your own
24    experience, do you believe that you would in any
25    way have a difficult time being fair to both
```

1    parties here?

2                      MR. BERGSING:  I shouldn't.  I

3    don't think I would.

4                      THE COURT:  Do you have a doubt

5    about that?

6                      MR. BERGSING:  Maybe.

7                      THE COURT:  Why?

8                      MR. BERGSING:  Just because it

9    was a very difficult time in my life.

10                     THE COURT:  It is now, what,

11   about 12 years ago?

12                     MR. BERGSING:  Yes.

13                     THE COURT:  Do you believe you

14   would be uncomfortable sitting in a case

15   listening to testimony about debt issues?

16                     MR. BERGSING:  No, I wouldn't be

17   uncomfortable.

18                     THE COURT:  As I told everyone

19   when we started this process, the purpose of this

20   process is to allow the Court to seek jurors who

21   can impartially listen to the evidence and base

22   the verdict on the evidence that comes in.

23   Sometimes, because of our own personal

24   experience, it might be difficult for us to sit.

25   But we are not expected to leave our common sense

1     or our own experiences and people and citizens at

2     the courthouse door.  You bring that with you.

3     But we don't want either to make people

4     uncomfortable or to have people that would just

5     have a hard time setting aside their personal

6     convictions.

7               So I guess I'm going to ask you,

8     Mr. Bergsing, I know you said they were difficult

9     and I understand that.  Do you believe you could

10    set those aside and be fair or do you think it

11    would be too much to ask?

12              MR. BONIFAY:  I think I could set

13    them aside.

14              THE COURT:  That you could?

15              MR. BERGSING:  Yes.

16              THE COURT:  All right.  Anybody

17    else or their immediate family receive letters?

18              Ms. Kloppel.

19              MS. KLOPPEL:  My husband became

20    disabled and before he got his disability, he got

21    some collections but that's all been taken care

22    of and that's been 10, 14 years.

23              THE COURT:  From that experience,

24    do you believe that you could set your own

25    experience aside and listen to the evidence that

1    the parties here present?

2                    MS. KLOPPEL:  Yes.

3                    THE COURT:  And not give undue

4    weight to one side or the other?

5                    MS. KLOPPEL:  No, I would not.

6                    THE COURT:  Anybody else or their

7    immediate family ever receive letters about a

8    debt from a debt-collection agency?

9                    Now, Mr. Bergsing was telling us

10   about his experience with bankruptcy.  Have any

11   of the rest of you either personally or an

12   immediate family member been through a bankruptcy

13   process or sought bankruptcy protection?

14                   I will start with you, Ms.

15   Thompson.

16                   MS. THOMPSON:  My husband went

17   through a bankruptcy, but that was prior to our

18   marriage.

19                   THE COURT:  Did you know him

20   then?

21                   MS. THOMPSON:  No.

22                   THE COURT:  You weren't

23   personally involved in any way?

24                   MS. THOMPSON:  No.

25                   THE COURT:  Mr. Bonifay.

1              MR. BONIFAY:  My parents went

2    through a bankruptcy when I was about 14.

3              THE COURT:  How long ago was

4    that?

5              MR. BONIFAY:  10 years ago.  I'm

6    24 now.

7              THE COURT:  Is there anything in

8    that experience that would make it difficult for

9    you to sit and listen to evidence that's

10   presented about debt-collection activities?

11             MR. BONIFAY:  That was a trying

12   time, but I think I could set it aside, yes.

13             THE COURT:  And be fair to both

14   parties here?

15             MR. BONIFAY:  Yep.

16             THE COURT:  Anybody else or their

17   immediate family members had any experience with

18   bankruptcy?

19             Have any of you or an immediate

20   family member ever been employed by a business or

21   a law firm that engages in debt collection?  Yes,

22   ma'am.

23             A JUROR:  I worked for an

24   accounting firm and we did the books for a

25   gentleman who did debt collection.

```
 1                      THE COURT:  Did you personally
 2    know that gentleman?
 3                      A JUROR:  I met him a few times.
 4                      THE COURT:  I gather you didn't
 5    know him well.
 6                      A JUROR:  No.
 7                      THE COURT:  Other than doing
 8    accounting for him, did you otherwise get
 9    involved in his debt-collection business?
10                      A JUROR:  No, but I do have some
11    personal feelings about his personal ethics.  But
12    that was related specifically to him.
13                      THE COURT:  Was that his ethics
14    with respect to debt collection or just on other
15    things?
16                      A JUROR:  Just the whole across
17    the board.
18                      THE COURT:  You understand he is
19    not a party here.
20                      A JUROR:  Right.  Right.
21                      THE COURT:  What he did or didn't
22    do isn't relevant to this case.  You understand
23    that?
24                      A JUROR:  No, I understand that.
25                      THE COURT:  And the jury will be
```

1    instructed what they have to do is carefully

2    listen to the evidence that both parties present

3    here, consider that evidence, and base a verdict

4    on that evidence.

5                      A JUROR:  Right.

6                      THE COURT:  Could you do that?

7                      A JUROR:  Yes.

8                      THE COURT:  Anyone else ever work

9    for?

10                     A JUROR:  I worked at Sears, in

11   the credit office, like 25 years ago.  And one of

12   the things I did was call people who were past

13   due on their credit card payments.

14                     THE COURT:  Did you have any

15   experiences there that would cause you to give

16   either more emphasis or less emphasis to

17   testimony about people who collect debts?

18                     A JUROR:  No.

19                     THE COURT:  Anybody else?

20                     Okay.  Let me explain to you what

21   our typical day will be.  We will begin at around

22   8:30.  We will take a midmorning break, 15, 20

23   minutes so we can all use the facilities, stretch

24   our legs.  Then we will take about

25   an-hour-and-15-minute lunch break, maybe hour and

 1      a half, depending on how the evidence is coming

 2      in.  We will take another mid afternoon break of

 3      about 15 to 20 minutes, and then we will conclude

 4      the day around five o'clock.

 5                     So we will, as you can see, take

 6      breaks periodically, but it does involve sitting

 7      and it does require jurors to be able to sit for

 8      more than an hour at a time and listen as the

 9      evidence comes in.

10                     Is there any member of the panel

11      here who has any kind of special disability or

12      problem that would make that difficult?  Okay.

13                     Do any of you have any immediate

14      family members or close friends who suffer from a

15      serious mental illness?

16                     I ask you that because there may

17      be testimony in the trial about mental illness.

18      So I need to ask if any of you have immediate

19      family members or close friends who suffer from a

20      serious mental illness.  Ms. Sjaastad.

21                     MS. SJAASTAD:  I have a brother

22      that has serious mental illness.

23                     THE COURT:  Do you mind telling

24      us what that is?

25                     MS. SJAASTAD:  Schizophrenia.

1                    THE COURT:  If there is testimony
2      about that type or other type of serious mental
3      illness here, is there anything in your
4      experience with your brother that would make it
5      difficult for you to hear the evidence in this
6      case and base your decision as a juror on what
7      happens in this case, setting aside your own
8      experience with your brother?
9                    MS. SJAASTAD:  No.
10                   THE COURT:  I didn't ask that
11     question very well.  Let me try it again.
12                   Could you set your own
13     experiences aside and base a decision on the
14     evidence that comes in about the parties in this
15     case?
16                   MS. SJAASTAD:  Yes.
17                   THE COURT:  There was someone
18     else.  Ms. Thompson.
19                   MS. THOMPSON:  My eldest son has
20     obsessive-compulsive disorder, also posttraumatic
21     stress syndrome.  My youngest son has ADD.
22                   THE COURT:  I will ask you the
23     same thing.  If there is evidence in this case
24     about serious mental illness or mental illness,
25     could you listen carefully, setting aside your

```
 1    own experiences and base a decision on the

 2    evidence that is offered here in the courtroom?

 3                    MS. THOMPSON:  Yes.

 4                    THE COURT:  Ms. Wenger.

 5                    MS. WENGER:  I have a sister with

 6    serious major depression.

 7                    THE COURT:  I would ask you the

 8    same question.  Is there anything in your

 9    experience with your sister that would make it

10    difficult for you to hear evidence about mental

11    illness?  That's a no?

12                    MS. WENGER:  That's a no.

13                    THE COURT:  You see the person

14    working so hard in front of me?  Her job is to

15    record everything that is said.  So we need to

16    say things out loud to help her out.

17                    Anyone else?  Did I miss anyone?

18    Mrs. Kloppel.

19                    MS. KLOPPEL:  My husband has

20    PTSD.

21                    THE COURT:  I would ask you the

22    same question.  Is there anything about your

23    experiences with your husband's illness that

24    would make it difficult for you to sit and hear

25    testimony?
```

```
1                      MS. KLOPPEL:  No.

2                      THE COURT:  And be fair to both

3      sides?

4                      MS. KLOPPEL:  Yes.

5                      THE COURT:  Anybody else?  Ms.

6      Harris?

7                      MS. HARRIS:  My husband has PTSD,

8      and I don't know if this counts, but he was

9      brain-injured in a horse accident.

10                     THE COURT:  How long was that?

11                     MS. HARRIS:  The injury?

12                     THE COURT:  Yes.

13                     MS. HARRIS:  Four years ago.

14                     THE COURT:  Would it be difficult

15     for you to sit and hear testimony about mental

16     illness?

17                     MS. HARRIS:  No.

18                     THE COURT:  You can follow

19     instructions that you're to base your decision in

20     this case about the evidence the parties present

21     here?

22                     MS. HARRIS:  Yes.

23                     THE COURT:  Ms. Rasmussen.

24                     MS. RASMUSSEN:  My mom has

25     Alzheimer's, dementia.  She lives with me.
```

1                    THE COURT:  She lives with you?

2                    MS. RASMUSSEN:  Mm-hmm.

3                    THE COURT:  Again, would it be

4      difficult for you to sit and listen to testimony

5      about mental illness?

6                    MS. RASMUSSEN:  Not at all.

7                    THE COURT:  Anybody else?  Did I

8      miss anybody else?  Okay.

9                    I asked you about close friends

10     or family members.  Let me ask you if any of you

11     have been employed by a business or otherwise

12     worked with persons who have serious mental

13     illnesses.  I thought you might, Ms. Sjaastad.

14                   MS. SJAADSTAD:  I'm a vocation

15     rehabilitation counselor with the state, and in

16     our program we work with people with all kinds of

17     disabilities, including serious mental illness,

18     trying to get them back into employment.

19                   THE COURT:  Now, would you have

20     any difficulty following the instructions of the

21     Court about the law that applies here, and

22     listening to the evidence that is presented?  As

23     I said, when I read the lists of people who I

24     think may be witnesses here, we may hear from

25     medical professionals.  Could you listen to what

1    they have to say and base a verdict on what is

2    presented here in the courtroom?

3                    MS. SJAADSTAD:  Yes.

4                    THE COURT:  Anybody else?  Yes,

5    Ms. Johnson.

6                    MS. JOHNSON:  I work in the

7    nursing home and we do have people there with

8    mental illnesses that we work with.

9                    THE COURT:  I ask you the same

10   question, then.  Could you listen carefully to

11   the evidence that is presented here and base your

12   decision on the evidence as presented in the

13   courtroom here, setting aside your own

14   experiences with other people?

15                   MS. JOHNSON:  Yes.

16                   THE COURT:  Anyone else?

17                   A JUROR:  I teach young children

18   and I have worked with children with mental

19   illness.

20                   THE COURT:  I don't believe there

21   will be any testimony about children with mental

22   illness here.  So is there anything in your

23   experience that you think would make it difficult

24   for you here?

25                   A JUROR:  No.

1                     THE COURT:  Ladies and gentlemen,

2     lawsuits are broken down into various parts,

3     various laws apply to those parts and various

4     theories apply to different parts.  I will

5     instruct you on the law at the end of the case

6     about the different parts of law, different laws

7     that apply to the claims that are made.

8                     On one part of this case, I have

9     made some rulings in advance.  And you will hear

10    the parties talk about the rulings that I have

11    made in advance.  The Fair Trade Practices Act

12    that I mentioned to you was one of the claims the

13    plaintiff made here.  I made some rulings on that

14    part of the case.

15                    But that's a part of the case.

16    It's not the whole case.  And the rest of the

17    case will be presented to the jury for the jury

18    alone to decide based on the evidence that is

19    presented.

20                    The jury's job will be to listen,

21    as I've said here, to the evidence that is

22    presented, and to follow the Court's

23    instructions, but not make up your mind ahead of

24    time on what the verdict should be on the other

25    parts of the case until all the evidence is in.

1                    Would any of you have a hard time

2        doing that?  Could all of you agree to carefully

3        listen to the evidence on these other parts of

4        the case, even though the Court has made prior

5        rulings on some of the laws that apply?  Could

6        you all agree to keep an open mind with respect

7        to those questions that will be presented to the

8        jury?

9                    Now, a jury questionnaire will be

10       presented at the end with questions that the

11       jury's to answer.  Until all the evidence comes

12       in, I won't know exactly what those questions

13       are, but as I said, one of the questions that

14       could have been presented I've already answered.

15       But the other questions that are presented to you

16       are for the jury alone to decide, not the Court.

17                    So if selected as a jury, would

18       you be able to consider the evidence that is

19       presented and apply the law that I give you in

20       answering those questions?  Is there anybody who

21       believes they would have a difficult time doing

22       that?  Okay.

23                    Now, the instructions that I give

24       you will be that you're not to do independent

25       research.  Because as I told you, the law

1    requires that verdicts be based on the evidence

2    that the parties present to you here in the

3    courtroom.  Now, I'm not very technologically

4    savvy.  I've never sent a twitter.  I don't know

5    what a twitter really is.  But some of you may.

6    And the instructions will say that you can't

7    write blogs, can't send twitters, in fact not

8    even talk to other people, even your own family

9    members or your own fellow jurors, until the case

10   has been submitted to you for deliberation as a

11   jury.

12                Would any of you have difficulty

13   following these instructions?  Could you all

14   agree you could follow those instructions?  Okay.

15                Now, in just a moment, I'm going

16   to allow the lawyers for the parties to ask you

17   some questions.  But before I do that, I want to

18   ask a general question.  Based on what I asked

19   you so far and the information I've given you so

20   far, does any other reason suggest itself to any

21   of you as to why you could not sit as a fair and

22   impartial juror in this case?

23                Okay, seeing none, then, Mr.

24   Heenan, you may inquire.

25                MR. HEENAN:  Thank you, Your

1    Honor.

2                    Good morning, ladies and

3    gentlemen.  Again, my name is John Heenan and I

4    represent the plaintiff, Timothy McCollough.  I

5    think Her Honor has fairly well covered

6    everything or most everything that I was going to

7    cover.

8                    I guess it's important and I want

9    to thank you, again, on behalf of Mr. McCullough

10   for being here and participating in the process.

11                   One of the issues that is going

12   to come into play, and the judge has already

13   touched on it, but you're going to hear some

14   evidence, I think, about my client having a

15   mental condition.  And one of the claims that Mr.

16   McCullough is making is what is called emotional

17   distress, damages for how he reacted to

18   something.

19                   Is there anyone who is going to

20   have a hard time considering what a reasonable

21   person in Mr. McCullough's shoes would be

22   feeling, based on the evidence you hear?  Does

23   that make sense?

24                   Maybe that was a -- is there

25   anyone that is going to be able to get outside of

```
 1    your own head and think about Mr. McCullough and

 2    what he was feeling?  Anybody?

 3                    One of the other issues that this

 4    jury is going to need to consider is punitive

 5    damages.  And punitive damages are different then

 6    compensatory damages.  They are damages to punish

 7    someone for doing something wrong.

 8                    Is there anyone that would have a

 9    hard time following the judge's instructions and

10    considering the evidence and awarding punitive

11    damages if they are appropriate?

12                    There are some groups that say

13    there should be a cap or a limit on how much

14    juries are allowed to award for punitive damages

15    regarding --

16                    MR. BOHYER:  This is governed by

17    statute, Your Honor.  Objection.

18                    THE COURT:  Well, there is a cap.

19    But you may continue.  I will overrule the

20    objection.

21                    MR. HEENAN:  Is there anyone who

22    feels that a cap or a limit is appropriate?  Yes.

23                    MS. THOMPSON:  Yes, I feel a

24    limit is appropriate.

25                    MR. HEENAN:  What limit do you
```

1    feel is appropriate?

2                     MS. THOMPSON:  I think it is

3    individual to the case, but these ones where

4    people are allowed millions of dollars, I don't

5    agree with those.

6                     MR. HEENAN:  It sounds like

7    millions is too much in your mind.  Is that fair?

8                     MS. THOMPSON:  Yes.

9                     MR. HEENAN:  How about one

10   million?  Is that too much in your mind?

11                    MS. THOMPSON:  I think it would

12   depend on the individual case.

13                    MR. HEENAN:  So I guess what I'm

14   talking about is caps, where they say no matter

15   what the evidence is, a jury can't award more

16   than this dollar figure.

17                    Do you think there should be that

18   type of a cap that doesn't consider what the

19   evidence is?

20                    MR. BOHYER:  Your Honor, I renew

21   my objection.  There is a statute that governs

22   this.

23                    THE COURT:  I'm a little

24   confused.  You're getting into the law and there

25   is a cap.  I will again overrule the objection

1    since this is voir dire, but I don't want you to

2    suggest there is not.

3                    MR. HEENAN:   Thank you, Your

4    Honor.

5                    I'm not suggesting there is not.

6    I'm trying to know from you, ma'am, what in your

7    mind you think is an appropriate cap where the

8    jury can't, regardless of what the evidence is,

9    go past?

10                   MS. THOMPSON:   I don't know what

11   the legal cap is, so I guess I couldn't make a

12   judgement on that.

13                   MR. HEENAN:   How about just in

14   general terms?   Would you have a hard time

15   awarding punitive damages, period, because you

16   don't believe in them?

17                   MS. THOMPSON:   No.   No.   I think

18   in some cases they are justified.

19                   MR. HEENAN:   What types of cases?

20   Or what circumstances, in general terms?

21                   MS. THOMPSON:   I don't know that

22   I can outline a thing.   I think there are

23   situations where companies have ignored certain

24   protocols and the only way to keep them in line

25   is to have a punitive amount attached, but I

1     don't believe in the amount of some of the

2     judgements.

3                    MR. HEENAN:  I think I

4     understand.

5                    Mr. Huntley, do you agree with

6     Ms. Thompson about that, what she said?

7                    MR. HUNTLEY:  Well, I think some

8     of these, sometimes there should be a cap.  Some

9     of these settlements are so outrageous.

10                    MR. HEENAN:  What is outrageous

11    to you?

12                    MR. HUNTLEY:  You're getting into

13    millions and millions of dollars.  I think there

14    should be a cap sometimes.

15                    MR. HEENAN:  In terms of what you

16    consider to be an outrageous punitive award,

17    would it -- tell me what you think.  I don't want

18    to put words in your mouth.

19                    MR. HUNTLEY:  Some of the

20    lawsuits that are settled and monies that are

21    distributed, some of those are just way too much,

22    I think.  I don't know.  Sometimes a cap is

23    necessary, I think.

24                    MR. HEENAN:  From your

25    perspective, what is way too much?

1                    MR. HUNTLEY:  Well, I guess I

2     can't tell you that.  I don't know.

3                    MR. HEENAN:  What information

4     would you want to hear to be able to have a

5     better idea?

6                    MR. HUNTLEY:  I don't know.

7                    MR. HEENAN:  Would the

8     circumstances of the particular case be something

9     that you would want to know about?

10                   MR. HUNTLEY:  It depends on the

11    circumstances of the case.

12                   MR. HEENAN:  And the practices

13    that were at issue, would that be important to

14    you?

15                   MR. HUNTLEY:  Yes.

16                   MR. HEENAN:  Would you be able to

17    reserve judgement on having a bright line in your

18    head on what is too much --

19                   MR. HUNTLEY:  Yes.

20                   MR. HEENAN:  -- until the

21    evidence comes in?

22                   MR. HUNTLEY:  Yes.

23                   MR. HEENAN:  Does anyone disagree

24    with Ms. Thompson or Mr. Huntley?  Yes, ma'am.

25                   MS. WENGER:  I think that -- I'm

```
 1    a nurse.  And I think sometimes that high awards
 2    are very necessary when like loss of life or
 3    something like that occurs.
 4                    MR. HEENAN:  Why would you
 5    consider them highly necessary?
 6                    MS. WENGER:  Because I think that
 7    if there has been negligence or wrongdoing -- and
 8    this relates to medical, you know, more than
 9    anything else -- then it gets very difficult to
10    put a price on a lost child or something, and I
11    can understand high awards.  I guess I understand
12    them more than I'm a proponent of them.
13                    MR. HEENAN:  Let me ask you this,
14    ma'am.  If something is difficult to put a dollar
15    value on, does that mean that the person claiming
16    it isn't entitled to it?  I guess what I'm asking
17    you, like a loss of a life, that's a hard thing
18    to say, you know, a dead child is worth this much
19    money and a dead 80-year-old is worth this much
20    money.  But because it's hard to ascribe a dollar
21    value doesn't mean the person making the claim is
22    not entitled to it if the evidence supports it.
23    Is that fair?
24                    MS. WENGER:  That's fair.
25                    MR. HEENAN:  Do you agree with
```

```
 1    that?

 2                    MS. WENGER:  Yes.

 3                    MR. HEENAN:  Does anyone disagree

 4    with that, that some damages might be harder than

 5    others, but you have to consider the evidence?

 6                    I think that's all I have.  Thank

 7    you, Your Honor.

 8                    Thank you, ladies and gentlemen.

 9                    THE COURT:  Mr. Bohyer?

10                    MR. BOHYER:  Good morning.  My

11    name is John Bohyer and I represent Lisa Lauinger

12    and Johnson, Rodenburg & Lauinger.  The judge has

13    given me 15 minutes to do this, and I'm

14    ordinarily prone to speak quickly, so if I need

15    to slow down, typically the first person to tell

16    me so is the court reporter.  So I will try to

17    speak slowly, but I want to get some points out.

18                    I want to ask a few questions

19    about personal responsibilities in general.  And

20    in that regard, who among the jury panel has a

21    credit card?  Who among the panel believe, if you

22    charge up your credit cards, you should be

23    responsible to pay them?

24                    Is there anyone that believes

25    that if an individual charges them up and may
```

1    have a mental illness that maybe they shouldn't

2    have to pay?  Yes, ma'am.  Ms. Harris.

3                    MS. HARRIS:  Well, I guess, for

4    personal reasons, because my husband's brain

5    injured, and we are actually kind of in the

6    process of wondering if we should be monitoring

7    his credit card.

8                    MR. BOHYER:  For what purpose?

9                    MS. HARRIS:  He makes poor

10   choices.

11                   MR. BOHYER:  I want to make sure

12   everyone understands here.  My client is a law

13   firm.  My client is not somebody who owns debt.

14                   Can you make that distinction

15   between a credit card company or a debtor versus

16   somebody who hires a law firm to represent them

17   to go and collect a debt?  Does that make sense?

18   Ms. Thompson?  Does that make sense?

19                   MS. THOMPSON:  Mm-hmm.

20                   MR. BOHYER:  Who among you have a

21   lawyer?

22                   MS. RASMUSSEN:  Just with my mom.

23                   MR. BOHYER:  Do you expect your

24   lawyer to represent you to the best of his or her

25   ability?

 1                    MS. RASMUSSEN:  Mm-hmm.

 2                    MR. BOHYER:  Why?

 3                    MS. RASMUSSEN:  That's what you

 4     hire them for.

 5                    MR. BOHYER:  That's what my

 6     clients do.  My clients are lawyers.

 7                    MS. RASMUSSEN:  To do the best

 8     service that is needed.

 9                    MR. BOHYER:  Anybody prior to

10     today had to utilize the services of a lawyer?

11     Quite a few of you.  How many of you, in terms of

12     hiring a lawyer, have actually had to come to

13     court with a lawyer?

14                    MS. RASMUSSEN:  For my mom, yeah.

15                    MR. BOHYER:  And, yes, sir?  Mr.

16     Franz.

17                    MR. FRANZ:  Divorce.

18                    MR. BOHYER:  Did you hire a

19     lawyer to do the best that he or she could do?

20                    MR. FRANZ:  Yes.

21                    MR. BOHYER:  Did they do so?

22                    MR. FRANZ:  Yes.

23                    MR. BOHYER:  What if they don't?

24     You're not happy about that.

25                    Am I accurate, Mr. Franz, you own

1    a construction company?

2                    MR. FRANZ:  My father does.

3                    MR. BOHYER:  You work with your

4    dad in the construction company?

5                    MR. FRANZ:  Yes.

6                    MR. BOHYER:  What type?

7                    MR. FRANZ:  Dirt construction.

8                    MR. BOHYER:  Do you ever have any

9    issues with collecting debt with customers?

10                   MR. FRANZ:  Very few.

11                   MR. BOHYER:  On the few you've

12   had, what have you had to do?

13                   MR. FRANZ:  I never do anything.

14   That is all taken care of in the bookkeeping

15   department.  I have nothing to do with that.

16                   MR. BOHYER:  You send Moose and

17   Rocco out to help them find the wallet, so to

18   speak?  That's what my mother used to tell me,

19   Pay your bill.

20                   MR. FRANZ:  Most of our contracts

21   are with states or companies that --

22                   MR. BOHYER:  Okay.  Maybe that

23   was a poor attempt at humor.  Sometimes I try

24   that in front of a jury because it's kind of

25   nervous here, and I know my client is nervous

1      sitting here because she's never gone through

2      this.

3                        In terms of the overall process

4      of a jury trial, things can get somewhat

5      emotional.  And typically for people, no question

6      it's difficult for Mr. McCullough here.

7                        Can you appreciate, though, that

8      my client and the law firm, even though they are

9      lawyers, they may not be really comfortable

10     getting hauled into court either?  Does that make

11     sense to everybody?  Okay.

12                       Mr. McCullough's counsel had

13     asked you a few questions about punitive damages.

14     I want to ask you a few questions about damages

15     as well.

16                       Is there anyone on the panel who

17     believes that because Mr. McCullough sued my

18     client he's entitled to money at all?  Anybody

19     who believes, as we sit here today, I'm giving

20     the guy some money?  Okay.

21                       That gets into burden of proof.

22     And the plaintiff has to prove to you, A, not

23     only did my client violate the law, but also that

24     it actually caused some sort of damage.  Does

25     that make sense?

1                       Let's take, for example, someone

2      can run through a stop sign but doesn't actually

3      hit the car that is going the other way.   Might

4      have scared you a little bit, but it didn't hit

5      anybody.   Does that make sense to everybody?

6      Okay.

7                       Does everybody on the jury panel

8      understand that anyone can file a lawsuit in

9      America?   It's one of the great things about our

10     country and our justice system.   You pay your

11     filing fee, a hundred bucks or 150, or maybe in

12     the federal system it's quite a bit more now.

13     You can sue the Queen of England, if you wanted.

14                      And my clients aren't here by

15     choice.   They have been sued.   They have been

16     hauled into court.

17                      Would you all agree with me that

18     a defendant -- this is a civil case, not a

19     criminal case.   No one is going to jail here --

20     but a defendant or a law firm such as my client,

21     they are entitled to come into court with a

22     lawyer, like me and Mr. Simpson, and defend

23     themselves.   We are entitled to put on evidence

24     and, at the end of the case, if the evidence

25     suggests, I'm going to ask you, and Mr. Simpson

1     will ask you, no money.  Does that make sense to

2     everybody?

3                         Does anybody think they would

4     have a problem doing that?  Anybody?  Yes, sir.

5                         A JUROR:  No.

6                         MR. BOHYER:  Okay.  The judge had

7     already told you she had made some rulings on it.

8     I'm not going to get into a significant

9     discussion of the law, other than to tell you

10    that she has already concluded that our client

11    violated the Fair Debt Collection Practices Act

12    by filing a lawsuit after a statute of

13    limitations ran.

14                        Does everybody understand what a

15    statute of limitations is?

16                        Ms. Thompson, what does that mean

17    to you?  I don't mean to put you on the spot

18    here.

19                        MS. THOMPSON:  It means there is

20    a certain period of time within which an action

21    has to take place and, after that period of time,

22    it's no longer allowed.

23                        MR. BOHYER:  Exactly.  You passed

24    the law school exam right there.

25                        Now, some of the fact issues that

1      you're going to get to decide have to do with the

2      why and how our client filed that thing after the

3      statute of limitations.  That's one of the issues

4      I want to ask you, if you're willing to listen to

5      how this happened and why.

6                      Everybody here understands the

7      difference between making a mistake or an error

8      and doing something on purpose, intentionally?

9                      How many of you have made the

10     proverbial mistake?  I will be first.  Run

11     through the stop sign and maybe hit the car.

12     Anybody going to admit they did it on purpose?

13     Okay.

14                     But that's what I'm getting at

15     here, the difference between making an error and

16     doing something on purpose, cheating.  Those are

17     some of the fact issues that you will listen to.

18                     Anybody have any preconceived

19     bias against lawyers?

20                     Go ahead, Ms. Harris.

21                     MS. HARRIS:  I guess, just to be

22     honest, I feel like there is probably more, that

23     you might have more options, more money, more

24     education, than others.

25                     MR. BOHYER:  Would you hold that

1    against lawyers that are defendants in a lawsuit

2    because they are educated and got through school?

3                    MS. HARRIS:  Maybe mostly the

4    ability to hire, because you have more money.

5                    MR. BOHYER:  Do you agree that

6    Ms. Lauinger and her law firm are entitled to a

7    fair trial?

8                    MS. HARRIS:  Yes.

9                    MR. BOHYER:  That's what I'm

10    getting at.  Can you, Ms. Harris, give that

11    lawyer a fair shake?

12                    MS. HARRIS:  Yes.

13                    MR. BOHYER:  Even with that

14    preconceived notion?

15                    MS. HARRIS:  Mm-hmm.

16                    MR. BOHYER:  You mentioned that

17    your husband has a brain injury.  Is he a

18    rancher?  Is he able to work still?

19                    MS. HARRIS:  Limited.

20                    MR. BOHYER:  Put forth his best

21    effort at doing it?

22                    MS. HARRIS:  Mm-hmm.

23                    MR. BOHYER:  Does he pay his

24    bills?

25                    MS. HARRIS:  Yes.

```
 1                      MR. BOHYER:  How does everybody
 2     feel about personal responsibility in the country
 3     right now with the economy?  I see some eyes
 4     rolling.  That's why I asked the question.  Ms.
 5     Kloppel?
 6                      MS. KLOPPEL:  I think that the
 7     auto companies need to take care of themselves
 8     and we should not have to be paying for it.
 9                      MR. BOHYER:  Does that kind of
10     get everybody?
11                      How about folks that buy the
12     million dollar house on the minimum-wage job?
13     Shaking the heads there.  All right.
14                      MS. JOHNSON:  I think the banks
15     also have, it's not just the person, because the
16     banks, you know, were misleading in the
17     mortgages.
18                      MR. BOHYER:  That's a shared
19     responsibility, in your view.
20                      MS. JOHNSON:  Right.
21                      MR. BOHYER:  I guess that just
22     gets back to my original -- and I don't
23     necessarily disagree with you, gets back to my
24     initial inquiry about personal responsibility.
25                      Has anybody ever tried to collect
```

1      a debt?  Has anybody ever been in a business
2      relationship that had to get money from somebody?
3      Yes, ma'am.
4                     A JUROR:  I worked in the credit
5      office so I had to call people to get them to pay
6      their debts on the credit cards.
7                     MR. BOHYER:  Did you try to do
8      that fairly, to the best of your ability, and
9      politely?
10                    A JUROR:  Oh, yes.
11                    MR. BOHYER:  Did you ever make a
12     mistake?
13                    A JUROR:  In what they owed?
14                    MR. BOHYER:  Sure.
15                    A JUROR:  No, it was printed out
16     in documents.
17                    MR. BOHYER:  Did you rely on the
18     printout that you were looking at?
19                    A JUROR:  Yes.
20                    MR. BOHYER:  What if the printout
21     was wrong?
22                    A JUROR:  That could have
23     happened.
24                    MR. BOHYER:  The point is, had
25     you done that, would you have been trying to

1    collect on it intentionally, on purpose, to do

2    something wrong?

3                    A JUROR:  No.

4                    MR. BOHYER:  Anybody else?

5                    MR. BONIFAY:  I work for Conlin

6    Furniture doing deliveries, and sometimes we have

7    to pick up cash on deliveries.

8                    MR. BOHYER:  COD?

9                    A JUROR:  Yeah, and there have

10   been situations where the customer has a

11   discrepancy in what they owe and what we say they

12   owe, and we have to figure it out with the

13   warehouse, sometimes just call them up and figure

14   out what is going on with it.

15                   MR. BOHYER:  So that is typically

16   worked out.

17                   MR. BONIFAY:  Mm-hmm.

18                   MR. BOHYER:  Ms. Wenger?

19                   MS. WENGER:  I'm on the board of

20   directors for a local healthcare organization and

21   we make the decisions about whether or not to

22   turn outstanding accounts over to collections.

23                   MR. BOHYER:  That's from a

24   nursing home?

25                   MS. WENGER:  No.  It's for

1     Riverstone Health.

2                     MR. BOHYER:  I'm sorry.  Are

3     those accounts placed for collection sometimes?

4                     MS. WENGER:  We are in the

5     process of changing our policy.  We have always

6     had a policy that they have just gone to bad

7     debt, and now we are in the process of changing

8     that.

9                     THE COURT:  Two minutes.

10                    MR. BOHYER:  Folks, I expect

11    you're going to hear some evidence about mental

12    illness.  I want you to know that on behalf of

13    our clients we need to ask some questions about

14    those issues to get the facts before you and so

15    you can have a measure, kind of, of what was

16    before and what was after our client's

17    involvement.  Does that make sense to everybody?

18                    Can you view that with a fair

19    mind and say, at least internally, gee, I'm not

20    going to hold that against either the lawyer or

21    the client because they're asking about the

22    issue.  Okay?

23                    One of the last things I wanted

24    to ask you, there are times during a trial a

25    lawyer will -- and I already did -- stand up and

```
 1    object.  Do you understand the lawyer is there to
 2    protect their client?
 3                     And I've been doing this for 23
 4    years now, and I always live in mortal fear that
 5    during a trial I will do something, or, in this
 6    case, my partner, Mr. Simpson, will do something
 7    that is going to offend the jury.  In finishing
 8    this, what I want to do is say, can you separate
 9    me from the client?  Understand that I'm trying
10    to work, and Mr. Simpson is trying to work, for
11    the client.  So if I do something that might rub
12    you the wrong way, that's not Lisa Lauinger and
13    it's not the law firm.  Is that fair?  Okay.
14                     Anybody believe they couldn't be
15    fair to my clients?  Okay.
16                     Your Honor, we may have a couple
17    in chambers.  I'm done.  Thank you.
18                     Thank you, ladies and gentlemen.
19                     THE COURT:  Do both parties pass
20    the jury for cause?
21                     MR. HEENAN:  We do, on behalf of
22    the plaintiff.
23                     MR. BOHYER:  We have one issue to
24    raise.
25                     THE COURT:  If you will excuse us
```

```
 1    for a moment while we step into chambers.
 2                    (Brief recess.)
 3                    (The following discussion took
 4    place in chambers:)
 5                    THE COURT:  The record will
 6    reflect that we are in chambers, just counsel
 7    present.
 8                    Mr. Bohyer?
 9                    MR. BOHYER:  We have a challenge
10    for cause with respect to Juror Number 10, Randel
11    Bonifay, based on not only his parents'
12    bankruptcy but him being sued on a debt
13    collection and having his wages garnished for a
14    period of five months.
15                    THE COURT:  That doesn't -- none
16    of those experiences preclude someone from
17    serving as a juror.  And I did ask him whether
18    anything in those experiences would cause him to
19    give undue weight to one side or cause him to be
20    unfair to one side or the other, and his answer
21    was no.
22                    You had plenty of opportunity to
23    follow up and ask questions about that and you
24    chose not to.  So I'm a little confused about the
25    challenge for cause now, when he said, despite
```

1     those experiences, he could be fair.

2                    MR. BOHYER:  Well, it's a

3     discretionary one, Your Honor.  I raise it on the

4     record, based upon the Court's inquiry.

5                    THE COURT:  Does the plaintiff

6     wish to respond?

7                    MR. HEENAN:  No, Your Honor.

8                    THE COURT:  I will refuse that

9     challenge for cause.

10                   MR. BOHYER:  I think that was the

11    only one.

12                   THE COURT:  Okay.

13                   (Brief recess.)

14                   THE COURT:  Court is in session.

15                   In just a moment, I'll have the

16    clerk read the names of the people who will be

17    seated as the jury in this case.  And while she

18    is getting prepared to do that, I want to express

19    my appreciation to all of you who have

20    participated with us in the process.  As I told

21    you at the outset, the purposes of the question

22    is never to pry or embarrass but to do the best

23    we can in the process to ensure a fair trial for

24    the parties, which they are entitled to here in

25    court.

1                You were very responsive and

2       forthcoming and I thank you for that.  For those

3       of you sitting in the back, too, you also

4       performed a valuable service here by your very

5       presence because we never know exactly how many

6       jurors we are going to need, but we need to call

7       enough that we know that we can seat a jury that

8       can comfortably and impartially hear the case and

9       that we have a random jury.  In order to do that,

10      we have to call more than we need so that we

11      ensure, as I explained earlier, the randomness of

12      the process in selecting the jury.

13               So I express my appreciation

14      personally and the appreciation of the federal

15      court for your willingness as citizens to come

16      and participate in the process by your presence.

17               Will the clerk please read the

18      names of the jurors.

19               THE CLERK:  Avonne Johnson, Sally

20      Sjaastad, Sandra Bey, Kelly Bergsing, Mavis

21      Kloppel, Connie Rasmussen and Tanner Egan.

22               THE COURT:  If your name was not

23      read, you're free to go.  If your name was read,

24      we will take a 10-minute recess and then please

25      come back and be seated in the jury panel and we

1      will start the next part of the trial.  We will

2      be in recess.

3                        (Brief recess.)

4                        THE COURT:  Would you swear the

5      jury, please.

6                        (Whereupon the members of the

7      jury are duly sworn.)

8                        THE COURT:  You're not all

9      required to be in the back row.  If any of you

10     want to come to the front row, you certainly may.

11     Also, we want you to be comfortable.  I think the

12     clerks have water for you in there.  If you want

13     to bring in a bottle of water to drink as you

14     listen, you may.  If there is anything else we

15     can do to make you comfortable, and if we can do

16     it, mention it to the clerk and we will do what

17     we can.

18                        Ladies and gentlemen, you are now

19     the jury in this case.  It's my duty, as I

20     mentioned earlier, to instruct you on the law.

21     These are preliminary instructions to help you

22     understand the principles that apply to civil

23     trials, and help you understand the evidence as

24     you listen to it.

25                        You will be allowed to keep this

1      set of instructions throughout the trial, to

2      which you may refer.  We will give them in

3      writing to you.  This set of instructions is not

4      to be taken home and must remain in the jury room

5      when you leave in the evenings.  At the end of

6      trial, I will give you a set of instructions, the

7      final set of instructions, which will govern your

8      deliberations.

9                  You must not infer from these

10     instructions or anything I may say or do as

11     indicating that I have an opinion to what your

12     verdict should be.  It is your duty to find the

13     facts from all the evidence in this case.  To

14     those facts you will apply the law as I give it

15     to you.  You must follow the law as I give it to

16     you whether you agree with it or not, and you

17     must not be influenced by any personal likes,

18     dislikes, opinions, prejudices or sympathy.  That

19     means you must decide the case solely on the

20     evidence before you.  You will recall that you

21     took an oath to do so.  In following my

22     instructions, you must follow all of them and not

23     single out some and ignore others.  All are

24     important.

25                  The evidence you are to consider

1    in deciding what the facts are consists of,

2    number one, the sworn testimony of any witness;

3    number two, the exhibits that are received into

4    evidence; and number three, any facts to which

5    the lawyers have agreed.

6              In reaching your verdict, you may

7    consider only the testimony and exhibits received

8    into evidence.  Certain things are not evidence

9    and you may not consider them in deciding what

10   the facts are.  I will list these for you.

11   Number one, arguments and statements by lawyers

12   are not evidence.  The lawyers are not witnesses.

13   What they say --

14             I'm going to clarify.  There will

15   be lawyers who testify as witnesses.  And those

16   witnesses, you must hear their testimony and give

17   it the weight you think it deserves.

18             This instruction applies to the

19   lawyers who are appearing here as representatives

20   for the parties.  The arguments and statements

21   that they make on behalf of their clients who are

22   parties here are not evidence.  Those lawyers are

23   not witnesses.  What they say in their opening

24   statements and closing arguments and at other

25   times is intended to help you interpret the

1    evidence, but it is not itself evidence.  If the

2    facts as you remember them differ from the way

3    the lawyers state them, your memory of them

4    controls.

5                    Number two, questions and

6    objections by the lawyers representing these

7    parties are not evidence.  Attorneys have a duty

8    to their clients to object when they believe a

9    question is improper, under the Rules of

10   Evidence.  You should not be influenced by the

11   objection or by the Court's ruling on it.

12                   Number three, testimony that has

13   been excluded or stricken or that you have been

14   instructed to disregard is not evidence and must

15   not be considered.  In addition, sometimes

16   testimony and exhibits are received only for a

17   limited purpose.  If I give you a limiting

18   instruction, you must follow it.

19                   And number four, anything that

20   you may have seen or heard when the Court was not

21   in session is not evidence.  You are to decide

22   the case solely on the evidence received at the

23   trial.

24                   Evidence may be direct or

25   circumstantial.  Direct evidence is direct proof

1    of a fact, such as testimony by a witness about

2    what that witness personally saw or heard or did.

3    Circumstantial evidence is proof of one or more

4    facts from which you could find another fact.

5    You should consider both kinds of evidence.  The

6    law makes no distinction between the weight to be

7    given to either direct or circumstantial

8    evidence.  It is for you to decide how much

9    weight to give to any evidence.

10                    There are Rules of Evidence that

11   control what can be received into evidence.  When

12   a lawyer asks a question or offers an exhibit in

13   evidence and a lawyer on the other side thinks it

14   is not permitted by the Rules of Evidence, that

15   lawyer may object.  If I overrule the objection,

16   the question may be answered or the exhibit

17   received.  If I sustain the objection, the

18   question cannot be answered and the exhibit

19   cannot be received.

20                    Whenever I sustain an objection

21   to a question, you must ignore the question and

22   must not guess as to what the answer might have

23   been.  Sometimes I may order that evidence be

24   stricken from the record and that you disregard

25   or ignore the evidence.  That means when you're

1    deciding the case you must not consider the

2    evidence that I told you to disregard.

3                    In deciding the facts of this

4    case, you may have to decide which testimony to

5    believe and which testimony not to believe.  You

6    may believe everything a witness says or part of

7    it or none of it.  Proof of a fact does not

8    necessarily depend on the number of witnesses who

9    testify about it.  In considering the testimony

10   of any witness, you may take into account the

11   following:  Number one, the opportunity and

12   ability of the witness to see or hear or know the

13   things testified to; number two, the witness's

14   memory; number three, the witness's manner while

15   testifying; number four, the witness's interest

16   in the outcome of the case and any bias or

17   prejudice; number four, whether other evidence

18   contradicts the witness's testimony; number six,

19   the reasonableness of the witness's testimony in

20   light of all the other evidence; and, number

21   seven, any other factors that bear on the

22   believability.  The weight of the evidence as to

23   a fact does not necessarily depend on the number

24   of witnesses who testify about it.

25                   Now I want to say a few words

1     about your conduct as jurors.  First, you are not

2     to discuss the case with anyone, including

3     members of your family, people involved in the

4     trial or anyone else.  This includes, as I

5     mentioned earlier during voir dire, discussing

6     the case in Internet chat rooms, blogs, Internet

7     bulletin boards or twitters or e-mails.  Nor are

8     you to permit others to discuss the case with

9     you.  If anyone approaches you and tries to talk

10    with you about the case, please let me know about

11    it immediately.

12                    Second, do not read any news

13    stories or articles or listen to any news

14    stories, articles, radio, television or online

15    reports about the case or about anyone who has

16    anything to do with it.

17                    Third, do not do any research

18    such as consulting dictionaries, searches on the

19    Internet or other materials.  Do not make any

20    investigation about the case on your own.

21                    Fourth, if you need to

22    communicate to me, simply give a signed note to

23    the bailiff to give to me.

24                    Fifth, do not make up your mind

25    about what the verdict should be until after you

1    have gone to the jury room to decide the case and

2    you and your fellow jurors have discussed the

3    evidence.  Keep an open mind until then.

4                    Finally, until the case is given

5    to you for deliberation and verdict, you're not

6    to discuss the case with your fellow jurors.

7                    During deliberation, you will

8    have to make your decision based on what you

9    recall about the evidence.  You will not have a

10   transcript of the trial.  So I urge you to pay

11   close attention to the testimony as it is given.

12   If at any time you cannot hear or see the

13   testimony, evidence, questions or arguments,

14   please let me know immediately so I can correct

15   the problem.  As I said earlier, if you wish to

16   move down to the front row, you certainly may do

17   that.

18                    If you wish, you may take notes

19   to help you remember the evidence.  If you do

20   take notes -- are they in the jury room?

21                    THE CLERK:  We haven't gone in

22   there yet.

23                    THE COURT:  They will provide you

24   with tablets or pens or pencils.  If you do take

25   notes, keep them to yourself until you and your

1      fellow jurors go to the jury room to decide the

2      case.  Do not let note-taking distract you.  When

3      you leave for the day, or for lunch, your notes

4      should be left in the courtroom here.  No one

5      will read your notes.  And they will be destroyed

6      at the conclusion of the case.

7                     Whether or not you take notes,

8      you should rely on your memory of the evidence.

9      Notes are only to assist your memory.  You should

10     not be overly influenced by your notes or those

11     of your fellow jurors.

12                    Now, the next phase of the trial

13     will begin.  Trials proceed in this way:  First,

14     each side may make an opening statement.  An

15     opening statement is made by the lawyers and is

16     not evidence.  It is simply an outline to help

17     you understand what the party expects the

18     evidence will show.  A party is not required to

19     make an opening statement.

20                    The plaintiff will then present

21     evidence and counsel for the defendant may

22     cross-examine.  Then the defendant may present

23     evidence and counsel for the plaintiff may

24     cross-examine.

25                    After the evidence has been

1     presented to you, the attorneys will make closing

2     arguments.  I will then instruct you on the law

3     that applies to the case.  After that, you will

4     go to the jury room to deliberate on your

5     verdict.

6                     So we will now begin with the

7     opening statements.  And Mr. Heenan, do you wish

8     to open for the plaintiff?

9                     MR. HEENAN:  Yes, please, Your

10    Honor.

11                    THE COURT:  You may proceed.

12                    MR. HEENAN:  Thank you, Your

13    Honor.

14                    May it please the Court, counsel,

15    ladies and gentlemen of the jury.  In North

16    Dakota, there is a regional debt collection firm

17    called Johnson Rodenburg.  Johnson Rodenburg has

18    two offices, one in Bismarck and one in Fargo.

19    From those offices in North Dakota, Johnson

20    Rodenburg operates as a debt collector.  As a

21    typical debt collector, the employees at Johnson

22    Rodenburg make phone calls to people, trying to

23    collect debts.  They write letters to people

24    trying to collect debts.

25                    Johnson Rodenburg is also a law

1    firm.  It's owned by lawyers.  It employs

2    lawyers.  Specifically, it employs lawyers who

3    are admitted to practice law in the various

4    states that it collects debts in.  One of those

5    states is Montana.  Johnson Rodenburg has four

6    lawyers who have sat for the Montana Bar and are

7    admitted to practice law in the state of Montana.

8                      Johnson Rodenburg, as part of its

9    collection activity business, uses the court

10   system.  What do I mean by, "uses the court

11   system"?  Johnson Rodenburg sues people; dozens a

12   day, hundreds a month, thousands a year, in all

13   of the states that it collects debts in.

14                      Why does Johnson Rodenburg use

15   the court system?  The court system has very

16   powerful tools for people who are trying to

17   collect money from someone else.  Let me explain

18   some of those tools.

19                      Once you get a judgement against

20   someone, it's an automatic lien on the real

21   property they own.  So if a lawsuit is filed, a

22   judgement is obtained.  There's an automatic lien

23   on the person's property.  Once there's a

24   judgement, Johnson Rodenburg is able to garnish

25   wages, able to file paperwork with the court and

1      take a portion of the person's wages that they

2      have sued.  Johnson Rodenburg is able to submit

3      people to what's called a debtor's examination,

4      where the people they have sued are required to

5      come into court and are given an oath, just like

6      you ladies and gentlemen have done, and then they

7      are examined about their personal finances,

8      trying to uncover sources of collection.

9                  Once there's a judgement, Johnson

10     Rodenburg is able to attach that judgement to

11     people's bank accounts.  They can go in and what

12     is called sweep the account, take the money out

13     of it.

14                 So who are all the people Johnson

15     Rodenburg sues as part of its collection

16     activity?  I want to kind of explain.  Johnson

17     Rodenburg collects purchased debt.  It's a

18     specialized industry of the overall collection

19     industry.  It's call purchased debt industry.

20                 Brad, if I could have that up?

21                 I think everybody in voir dire

22     said they have credit cards.  Presumably we all

23     have balances on that credit card.

24                 Let's assume that a person

25     doesn't make their payment.  The credit card

1      company tries to collect.  They will try to

2      collect for months or even years.  At some point,

3      if they decide their efforts at collection aren't

4      working, they are not getting the person to pay

5      back the money, they will sell them to a company

6      called a debt buyer.

7                      The credit cards don't sell one

8      account at a time.  They sell them in batches,

9      bundles.  There are hundreds, sometimes

10     thousands, sometimes tens of thousands, of people

11     on these lists.  And the debt buyers bid on and

12     purchase these lists of old charged-off credit

13     card debt.  The debt buyers, as the evidence will

14     show, purchase this debt for pennies on the

15     dollar.  The credit cards have been unable to

16     collect it for months or years themselves, so

17     they turn around and sell it to the debt buyers.

18                     The debt buyers oftentimes get no

19     more information than you would see on a

20     spreadsheet or would fit on a sticky note;

21     personal name, address, Social Security number,

22     phone number, the amount of the charged-off debt,

23     the interest rate.  That's it.  No documents.

24                     The debt buyer in turn takes the

25     spreadsheet information in those batches and

1     sends it to Johnson Rodenburg for collection.
2     Johnson Rodenburg takes those people's names,
3     addresses, Social Security numbers, the
4     spreadsheet information, and puts together
5     lawsuits with the information they need to fill
6     in the blanks to sue people.
7                    So Johnson Rodenburg files a
8     lawsuit.  They file the lawsuit for the face
9     value of the credit card balance, not what the
10    debt buyer paid for it.  Johnson Rodenburg also
11    adds interest.  Johnson Rodenburg also adds fees,
12    attorneys' fees, and then they sue people.  And
13    when they sue people, because Johnson Rodenburg
14    are lawyers and they know the law, they know that
15    the overwhelming majority of the people they sue
16    aren't going to have lawyers, and they will win.
17                   Subsequently Johnson Rodenburg
18    gets a judgement against the people.  Usually
19    it's a rather fast process.  They get a judgement
20    for the face value of the debt plus whatever
21    interest and fees they have tacked on.  And once
22    Johnson Rodenburg has that judgement, then they
23    are able to use the tools of the legal system to
24    collect from the person.  And again, those tools,
25    they are able to sweep people's bank accounts, go

1        in and take out whatever money is in there.  They

2        are able to garnish people's wages, file

3        paperwork and get a portion of every paycheck

4        they get and they are able to get a lien on their

5        home.

6                   So how does Johnson Rodenburg use

7        the courts?  I told you they file lawsuits.  They

8        file lots of lawsuits.  They are lawyers, so that

9        makes sense that they file lawsuits.  Johnson

10       Rodenburg's set up for quantity.  They are set up

11       for volume.  You're going to hear that they are a

12       factory that makes lawsuits, that makes

13       judgements.

14                  And how do they do that?  Johnson

15       Rodenburg uses a sophisticated computer program

16       called Collection Master.  Collection Master is

17       able to interface with the debt buyers'

18       computers, and I'm not going to do justice to the

19       technology of how this works, but Johnson

20       Rodenburg's Collection Master hooks up with the

21       debt buyers' computers, they download the

22       spreadsheet information about the people, and

23       that gives them enough information to sue people.

24                  Johnson Rodenburg employs a staff

25       of non-lawyers who are able to crank out

1    lawsuits.  You're going to hear that Johnson

2    Rodenburg has one person full time, not an

3    attorney, whose sole job it is to draft these

4    Complaints for the lawyers at Johnson Rodenburg

5    to sign and file.

6                The overwhelming majority of the

7    lawsuits Johnson Rodenburg files result in what

8    is called default judgement --

9                MR. SIMPSON:  I object.  I think

10   this goes beyond the scope of the Court's

11   pretrial ruling with respect to other litigation.

12               THE COURT:  Overruled.

13               MR. HEENAN:  What a default

14   judgement is, you win because the other side

15   doesn't show up.  Just like in a basketball game

16   when only one team shows up; when the other team

17   doesn't show up, then the team that made it to

18   the arena wins the game.

19               That's how Johnson Rodenburg wins

20   the overwhelming majority of its lawsuits is

21   through default judgement.  You will hear some of

22   the reasons for why people don't respond.  A lot

23   of people are unable to respond.  They are not

24   familiar with the court system.  They don't know

25   how it works.  They might have physical problems

1    that prevent them from researching the law,

2    finding out what you're supposed to do when you

3    get sued.

4              Of the small fraction of people

5    that actually do respond to the lawsuits that

6    Johnson Rodenburg files, a very, very, very small

7    percentage of them appear through counsel.  Most

8    of the people are trying to represent themselves.

9    And the logistics of it are such that Johnson

10   Rodenburg knows they are not going to be able to

11   get lawyers.  When you're suing someone, for

12   instance, Mr. McCullough who is sued for $3800,

13   you're going to be hard pressed to hire a lawyer

14   who is able to defend your case and not charge

15   you much more than the $3800 you've been sued on.

16   And Johnson Rodenburg knows that.  Johnson

17   Rodenburg knows how to win cases without having

18   any evidence in its file to prove that the person

19   owes anything.

20             How can you win a case without

21   evidence?  Let me explain one way.

22             Exhibit 4-2, please.  One of the

23   ways Johnson Rodenburg, when people do respond

24   and they are trying to defend themselves and

25   represent themselves, the judge will give them a

1    trial date.  People assume, okay, I will show up

2    at my trial.  I will defend myself.  Well, in the

3    interim, Johnson Rodenburg sends out what are

4    called requests for admissions.  And requests for

5    admissions are a tool that lawyers use in

6    lawsuits to ask the other side to admit things

7    that they think ought to be admitted, to

8    basically carve out what is for dispute at trial

9    and get rid of the stuff that everybody can agree

10    should agree on.

11               Please blow up this portion.

12               THE COURT:  Are all of the

13    monitors working?

14               A JUROR:  This one is not, 68.

15               THE COURT:  Michael, can you

16    check and see what the problem is there?  Excuse

17    me for interrupting.

18               Thank you, Michael.

19               You may proceed, Mr. Heenan.

20               MR. HEENAN:  Thank you, Your

21    Honor.

22               One of the tools that Johnson

23    Rodenburg employs when the party they have sued

24    is trying to defend themselves, they send out

25    what are called requests for admissions.  They

1    ask the person they have sued to admit certain

2    things.  And Johnson Rodenburg, in its requests

3    for admissions, puts together this kind of

4    detailed explanation of what a request for

5    admission is.  And it's largely what I've

6    characterized as legal mumbo jumbo.  Not

7    contained anywhere in this language is the most

8    important part.  If you don't respond to a

9    request for admission within 30 days, then it's

10   considered admitted automatically and you lose.

11   So they send out the requests for admission.

12   They don't tell the people they have sent them

13   to, who aren't lawyers, what happens if they

14   don't respond within 30 days.  They wait 30 days,

15   if there is no response to these requests, then

16   they will file paperwork with the judge and say,

17   aha, we won.  See, Judge, they admitted it.

18                   That's the way, or one of the

19   ways, Johnson Rodenburg wins lawsuits without

20   having any evidence whatsoever in its own file.

21                   Now, one of Johnson Rodenburg's

22   biggest suppliers of people to sue is a company

23   called CACV of Colorado.  CACV is a debt buyer.

24   They purchase the debts in bundle from the credit

25   card companies for pennies on the dollars.

```
 1    Sometimes CACV gets information from the credit
 2    card companies, sometimes they don't.  But when
 3    they get the spreadsheet, people's names,
 4    addresses, amount owed, they turn it over to
 5    Johnson Rodenburg for collection.  And you're
 6    going to see, contained in one of the batches
 7    that CACV sent to Johnson Rodenburg in 2006 was
 8    my client, Timothy McCollough.  CACV sent Johnson
 9    Rodenburg Mr. McCullough's name, his address, his
10    Social Security number, his phone number, the
11    amount they said he owed on a Chase Manhattan
12    credit card, the interest rate and the date of
13    last payment.  Now, that was all, again,
14    information that fits on a sticky note.  No
15    actual documents.  What do I mean by documents?
16    What do I mean by evidence?  As you're going to
17    hear, the actual credit card contract that the
18    person has that applies to their credit card,
19    that would be evidence that would prove what the
20    person owes the debt, account statements showing
21    that they use the card, when they used it, how
22    much they charged on it.  That would be evidence
23    that the person owes the debt.
24                    As you're going to hear, these
25    accounts, when they get purchased by the debt
```

 1     buyers, are cheaper the older they are.  That's

 2     because of the statute of limitations.  What that

 3     means is, sometimes an account becomes so old

 4     that you can't collect on it anymore.  You can't

 5     sue someone for it because it's past the statute

 6     of limitations.  When we talk about what evidence

 7     would be important for the statute of

 8     limitations, a payment receipt, some kind of a

 9     stub showing that someone made a payment so the

10     person can see, okay, the person made a payment

11     three or four years ago so we are within the

12     statute of limitations.  You're going to hear

13     within Montana, the statute of limitations is

14     five years, five years from the date of last

15     payment.

16               So Mr. McCullough, as part of

17     this batch from CACV, his name and that limited

18     spreadsheet information was turned over to

19     Johnson Rodenburg.

20               Exhibit 103, please.  Now,

21     there's a contract between this debt buyer CACV

22     and Johnson Rodenburg about what Johnson

23     Rodenburg's obligations are when they get these

24     people's account information for collection.

25               Blow up this part here, please.

1                    Let me explain a little bit.

2       CACV doesn't actually have any employees.  It's a

3       subsidiary of a national debt collector called

4       Collect America, Limited, and apparently there is

5       some arrangement between Collect America, Limited

6       and CACV as to who owns the actual accounts.  CA,

7       LTD is Collect America, the debt buyer.  They

8       forward to local counsel, which here is Johnson

9       Rodenburg, an offer:  Will you sue the person for

10      us?  And go on to page two, please.  And they

11      tell Johnson Rodenburg, When you get the file,

12      when you get the information that we have, you as

13      lawyers assess the completeness of that

14      information and the materials and then let us

15      know whether you want any additional materials or

16      information.

17                   In this case, Johnson Rodenburg

18      didn't request anything about Mr. McCullough.

19      They didn't ask for a contract that applied to

20      him.  They didn't ask for any account statements

21      showing when or if he even used this credit card.

22      They didn't request any documentation showing

23      when he would have stopped paying on the credit

24      card, if he even used it.  They didn't request

25      any information as to who even owned this credit

1     card.  They asked for no more information.

2                     And then Exhibit 67, please.

3                     So Collect America offered to

4     place Mr. McCullough's account.  Pull up that

5     part, please.  Top part.  They told Johnson

6     Rodenburg the original creditor was Chase

7     Manhattan, the debtor's name was Tim McCullough,

8     type of debt, credit cards.  Take that down,

9     please, and blow up this bottom part.

10                    Now, remember, Collect America

11    wasn't Mr. McCullough's credit card company.

12    They are nobody's credit card company.  They have

13    no firsthand knowledge of how these people use

14    credit cards, how much they use the credit cards

15    for, they have no firsthand knowledge.  So

16    Collect America tells Johnson Rodenburg, We make

17    no warranty as to the accuracy or validity of the

18    information we provide, and no warranty made

19    concerning the collectability.  It's kind of like

20    a quick claim.  Like in real estate, you don't

21    sell the person the house.  You just agree that

22    you don't own it.  What they are saying is, We

23    make no representations.  That's up to you,

24    Johnson Rodenburg, as collectors and lawyers.

25    You need to do your own investigation.

1                    So they send off Mr. McCullough's

2        account.  They provide no information whatsoever.

3        They tell Johnson Rodenburg, Don't rely on what

4        we are telling you.  You have an obligation

5        independently to make sure it's appropriate to

6        sue this person.

7                    Johnson Rodenburg, as you will

8        hear, makes no independent effort to verify that

9        it's legally appropriate to sue Mr. McCullough.

10       They don't request information from the credit

11       card company.  They don't request information

12       even from their own client saying, Hey, do you

13       have anything more you can give us, any evidence

14       that we might need to show a judge after we sue

15       the person to show that he owes the debt?  They

16       don't ask for any of that.  They just sue Mr.

17       McCullough.

18                    Exhibit 2-1, please.  When

19       Johnson Rodenburg sues Mr. McCullough, they

20       demand $3800 -- let me back up.  When they sue

21       Mr. McCullough, it was past the statute of

22       limitations.  It was in violation of Montana law

23       for them to sue him at that point.  That's not

24       going to be an issue for you to decide.

25                    Johnson Rodenburg not only sued

1      Mr. McCullough for the face value of the credit

2      card, $3800, but then they also tacked on $5500

3      in interest and approximately $500 in attorneys'

4      fees.

5                          As you're going to hear, in

6      Montana, unless you have a contract that gives

7      you the right to claim attorneys' fees, it's

8      illegal to demand them.  And Johnson Rodenburg

9      didn't have any contract, didn't have any

10     contractual right to claim attorneys' fees, yet

11     they tacked them on anyway and asked for about

12     $500.

13                         Now, remember that Johnson

14     Rodenburg doesn't know anything about the people

15     that it sues.  These people in these batches,

16     they just file these lawsuits and collect

17     judgements and collect the judgements.  They

18     don't know whether someone is a farmer, whether

19     they are a single mother, whether they are a

20     widower, unable to work, they don't know or care

21     to know the people's stories or circumstances.

22     So when they sued Mr. McCullough, they didn't

23     know anything about him.

24                         Here's what Johnson Rodenburg

25     would have found out if they bothered to ask what

1    was going on with Mr. McCullough.  Tim was a

2    custodian here in the Billings School District.

3    He worked out at the vo-tech.  In May of 1990, he

4    was cleaning one evening and he was struck in the

5    head by an intruder.

6                    After Mr. McCullough was struck

7    in the head, he had all sorts of mental problems.

8    He was diagnosed with posttraumatic stress

9    syndrome.  He was diagnosed with stress disorder,

10   anxiety disorder.  He has terrible migraines all

11   the time.  He rarely leaves his house, by choice,

12   because he can't deal with any stress whatsoever.

13   And Johnson Rodenburg didn't know that and they

14   didn't care to know that.  So when Johnson

15   Rodenburg sued Mr. McCullough, they had no idea

16   what was going to happen when they employed a

17   process server, a deputy sheriff, to come out to

18   Mr. McCullough's house and hand him a Complaint

19   and say, You've just been served.  You've just

20   been sued.

21                    Let me tell you what else Johnson

22   Rodenburg didn't know because they didn't bother

23   to conduct an investigation.  The CACV had

24   already sued Mr. McCullough two years previously

25   through a different law firm.  They sued Mr.

1    McCullough.  He defended himself, or tried to,

2    and just before trial CACV dismissed the case.

3    And Mr. McCullough hadn't gotten the dismissal

4    paperwork in the mail before he gets a letter

5    from another debt collection law firm saying, You

6    owe this money.  When are you going to pay this

7    money?

8                    Mr. McCullough writes a letter

9    back to this debt collection law firm.  He says,

10    I already got sued, the case got dismissed,

11    please leave me alone.  It's the last he hears

12    from that debt collection law firm but it's not

13    the last he hears from this account.

14                    Then he gets hit from a second

15    law firm from Johnson Rodenburg who is the third

16    law firm assigned to this account trying to

17    collect the same old debt.  And Tim, despite his

18    mental condition, despite his problems, he knows

19    that he needs to respond.  He knows he needs to

20    defend himself.  So he goes down to the

21    courthouse and files an answer.

22                    Please bring up his answer.

23                    Here's what he writes:  Forgive

24    my spelling.  I have a head injury.  Writing does

25    not come easy.  The statute of limitations is up.

1    I have not had any dealings with any credit cards

2    in well over eight and a half years.  I am

3    disabled.  I get $736 a month from Social

4    Security.  My mortgage is $724 a month.  I'm now

5    a diabetic.  I have no money, no insurance but

6    Medicare.

7                    Next page, please.

8                    When workman's comp stopped

9    paying, I ran out of money.  Chase would not work

10   with me.  They passed it on to debt collectors.

11   They lied to me, insulted me, used bad language.

12   They called around the clock so I could not rest.

13   They got me so wound up and confused the healing

14   of my head injury stopped.  They were hurting me

15   so I had to stop dealing with them so I could

16   recover.  I'm still recovering.  The pain they

17   caused and the new medical bills are worth more

18   than the money they want.  This is the third time

19   they brought me to court on this account.  The

20   first two times with Judge Hernandez.  When will

21   it stop?  Do I have to sue them so I can live

22   quietly in pain?

23                    So Mr. McCullough files his

24   answer, sends it to Johnson Rodenburg.  Johnson

25   Rodenburg lawyers look at his answer and don't do

1    anything about it.  They do not follow up.  They
2    don't say, Hey, this guy says he is on Social
3    Security disability and we are never going to be
4    able to collect Social Security disability
5    payments under the law.  They don't do any
6    follow-up on that.  Is he really on Social
7    Security disability?  If they would have done
8    some follow-up, they would have found, yeah, he
9    is on Social Security disability.  He's been on
10   disability since the head injury back in 1990.
11   Johnson Rodenburg doesn't follow up and say, hey
12   what is this guy talking about statute of
13   limitations?  Maybe we should get this
14   documentation.  They didn't do any of that.
15                  THE COURT:  Two minutes, counsel.
16                  MR. HEENAN:  Thank you, Your
17   Honor.
18                  And they certainly don't drop the
19   case.
20                  I'm going to speed things up a
21   little bit here.  So not only do they not drop
22   the case, they continue to pursue it.  They send
23   him these requests for admissions that we just
24   looked at and talked about.  They are trying to
25   win anyway.

1                       CACV, their client, sent them an

2        e-mail and said, We made an mistake.  They say,

3        We made a mistake.  We told you he made a payment

4        in 2004.  Actually that was wrong.  That was

5        costs or unused costs.

6                       So their own client is saying, We

7        made a mistake.

8                       Johnson Rodenburg doesn't drop

9        the case.  They are pushing it.  They send him

10       these requests for admission.  Tim comes to me.

11       He shows me the information.  He hires a lawyer.

12       I make an appearance in the case and immediately

13       Johnson Rodenburg dismisses it.

14                      And as you're going to see, and I

15       won't have time to show you now, internally the

16       Johnson Rodenburg lawyers sent an e-mail to the

17       effect of, oh, shoot, we got caught.  There's a

18       lawyer on the other side.  We need evidence.  We

19       need documents.  CACV writes back and says, We

20       told you, there is no evidence, no documents

21       about this guy.

22                      Now, let me explain, given the

23       short length of time.  We went through a process,

24       prior to you ladies and gentlemen coming here for

25       trial, called summary judgement and we presented

1        to Her Honor the facts, as you're going to hear

2        in the trial, and she made certain rulings.  And

3        she found that Johnson Rodenburg violated the

4        federal Fair Debt Collection Practices Act four

5        different ways by suing Mr. McCullough on a

6        time-barred debt which was illegal to bring, by

7        continuing to process the time-barred debt even

8        though their own client gave them information

9        showing it was time-barred, and by trying to

10       collect on attorneys' fees which were

11       inappropriate to collect under Montana law, and

12       by using this request for admission form which

13       Her Honor found to be unfair and deceptive and a

14       violation of the federal law.

15                    So why are we here?  Because

16       Johnson Rodenburg's also a lawyer.  They are a

17       law firm.  And they are required to play by the

18       rules of law they have to play by in Montana.  So

19       we are going to put on evidence to show you that

20       they did not follow the rules here, with Mr.

21       McCullough or as a business practice in the

22       people they are suing in this state.

23                    Number two, based on the judge's

24       findings, the judge's rulings that this law firm

25       broke the law, you're going to be asked to award

1     some damages.  We will explain to you the nature

2     of those damages.  One of them is going to be

3     punitive damages, damages to punish this law firm

4     for the conduct towards Mr. McCullough and in the

5     context of the business practice in the state of

6     Montana and all the lawsuits they are filing

7     against people in the state of Montana.

8                      The one lawyer that sued Mr.

9     McCullough, as you're going to hear, he sues

10    approximately 2,000 people a year.

11                     THE COURT:  That's time, Counsel.

12                     MR. HEENAN:  Thank you, Your

13    Honor.

14                     THE COURT:  You may open for the

15    defendant.

16                     MR. SIMPSON:  Thank you, Your

17    Honor.

18                     Good morning.  You're all sitting

19    in the back, no doubt, to be as far away from the

20    lawyers as possible.

21                     I tend to speak a little softly

22    at times, so hopefully the microphone will allow

23    you to hear me.  If you have trouble hearing me,

24    please raise you're hand and I will speak up.

25                     So who is my client?  You have

1    heard a little bit about them, but you only heard

2    one side of the story.  There is Lisa Lauinger.

3    She is a partner at the Johnson, Rodenburg &

4    Lauinger firm.  Her office is in Bismarck.  She

5    has a small office there with three other

6    attorneys, and you will meet tomorrow or the next

7    day Charles Dendy, who is the other attorney who

8    worked with her on this file in this

9    debt-collection matter against Mr. McCullough.

10              But they are a law firm just like

11   any other.  They have an emphasis, as many

12   lawyers do, and their emphasis is on protecting

13   the rights of creditors, people who are owed

14   money from other people.  That's what Lisa and

15   Charlie and the other folks in their firm

16   specialize in.  We will hear more about that when

17   Lisa and Charlie testify, but that's their area

18   of practice.

19              As you heard Mr. McCullough's

20   counsel say in opening, this is a law firm, but

21   we want you to know these people.  They are doing

22   their job.  They are representing a client, just

23   like I'm representing a client and Mr. Heenan is

24   representing a client.

25              So let's talk about what they did

1    in this case and what really happened here.  You

2    heard part of the story, but there is quite a bit

3    more.  In this case, my client, Johnson,

4    Rodenburg & Lauinger, represented a company

5    called CACV of Colorado.

6                    Now, CACV, as you heard, is a

7    company that buys debts.  In this case it bought

8    a debt that Mr. McCullough owed on his Chase

9    Manhattan credit card account.  CACV bought that

10   from Chase Manhattan and they eventually sent the

11   file to my client, and they said, "Would you

12   please try to collect on this debt?"  And they

13   said, "Chase Manhattan was owed money by Mr.

14   McCullough.  We have the right to get the

15   payments that Mr. McCullough owes.  So please try

16   to collect on that for us."

17                    The first thing or one of the

18   things you will see today, I believe, is

19   testimony from a witness named Bobby Dunker.  Mr.

20   Dunker is an agent of CACV.  He's located at

21   their office in Denver.  Since he wasn't able to

22   travel here for trial, we had to go to his office

23   or offices in Denver, and we have his testimony

24   by videotape.  So you will get that played on the

25   screens in front of you.

1              Mr. Dunker has some important

2     testimony to offer in this case.  He will

3     confirm, of course, that CACV hired my client in

4     about December of 2006 or January of 2007 to work

5     representing CACV in the matter against Mr.

6     McCullough, and that in fact CACV expected that

7     Johnson Rodenburg, as its lawyer, would pursue

8     its interest in an attempt to collect the debt by

9     filing a lawsuit, unless there was some reason

10    not to.  And he will testify that when the matter

11    was referred to Johnson, Rodenburg & Lauinger, he

12    wasn't aware of any reason why Johnson, Rodenburg

13    & Lauinger shouldn't file a lawsuit.

14              Why is that important?  It's

15    important because in this case Mr. Dunker will

16    testify that CACV has a vested interest in

17    assuring that when it sent a file to one of its

18    lawyers it makes sure it gets the date of the

19    last payment correct because that's the date that

20    starts the statute of limitations running.

21              We heard a little bit earlier on

22    voir dire about statute of limitations, what it

23    is.  It's simply the length of time the law gives

24    a party to file a lawsuit after whatever it is

25    that occurs that leads to the lawsuit.

1              In this case we know on a credit

2     card act it's a five-year period from the date of

3     the last payment.  CACV knows it's important

4     because it doesn't want to be a party, a party

5     plaintiff, to a lawsuit if the lawsuit is filed

6     beyond the statute of limitations.  So CACV,

7     according to Mr. Dunker, makes every effort to

8     ensure that the information it provides its

9     lawyers is correct, including the date of the

10    last payment.

11             You'll hear from Mr. Dendy,

12    Charles Dendy, that the file was transmitted from

13    CACV to Johnson Rodenburg in electronic form so

14    it's just over the computer.  It's sent over the

15    Internet.  They get the information and it

16    downloads into their system.  And the people at

17    Johnson Rodenburg's office can look at the

18    computer screen and they can tell, well, we know

19    who the debtor is.  We know who Mr. McCullough

20    is.  We know what his address is.  We know that

21    he had this debt to Chase Manhattan Bank.  Here

22    is the account number, the amount of the debt.

23    And, guess what?  It has the date he made the

24    last payment.  That is one of the things that

25    pops up on the screen.  We know that's an

1    important date.

2                     So what happens?  Well, the file

3    is sent and -- if you could bring up 501, please.

4    If I could highlight the paragraph in the middle.

5                     Now, this is a letter from Grace

6    Lauinger.  She happens to be not only Lisa's

7    mother but she, at the time, was an account

8    manager at the office in Bismarck.  And when the

9    file was received, they took a look at the

10   information in the file, including the

11   information about the date of the last payment.

12   And they said, Hey, you know, we got the file,

13   and it looks like the statute of limitations on

14   this claim against Mr. McCullough has already

15   expired.  It's right here in print.  We received

16   this file and it appears the statute of

17   limitations expired on this file as of August 21,

18   2005.  If you can provide us with an instrument

19   in writing, we may be able to extend the statute

20   of limitations.  Thank you.

21                    That's dated January 4, 2007.  So

22   within a week or two of the time that my clients

23   received the file, they already spotted the

24   problem.

25                    What do they do?  Like any other

1    lawyer, they go back to the client with this

2    letter and say, Hey, what's going on here?

3                      Pull up 502, please.   CACV writes

4    back -- if you could just highlight the lower

5    part.  We don't need the top part there.  There

6    we go.

7                      This is from Jeffrey Guston at

8    CACV and it's an e-mail to Lisa, and it's dated,

9    as you can see at the top, January 23, 2007.  And

10   here it is about Mr. McCullough's account.  This

11   debtor, referencing Mr. McCullough, made a June

12   30, 2004 PD, and that stands for postdated check

13   payment, for $75,000.

14                     THE COURT:   I think you misread

15   that.

16                     MR. SIMPSON: $75 -- if it was

17   75,000, we wouldn't be here today -- do you need

18   any of this info from me on this one?

19                     There it is right there.   There

20   is the client response.  My client has not

21   gotten, as it was suggested to you earlier, no

22   information.  My client is looking at the file

23   and it's going to its client and saying, We need

24   more information.  It looks like this is beyond

25   the statute of limitations.

1              You could bring up Exhibit 7,

2      page two.  This is Plaintiff's Exhibit 7, page

3      two, and if you go down to the entry, right

4      there.

5              This is a copy of some file notes

6      from Johnson, Rodenburg & Lauinger's file system.

7      And this note logs a reference by a person at

8      CACV, and we can tell that.  It says EVI over in

9      the corner, and that means it's been typed in by

10     someone who doesn't work at Johnson, Rodenburg &

11     Lauinger.  And it says, E-mailed Lisa.  Statute

12     of limitations not expired due to the postdated

13     check made to us.  Please continue suit.

14             So here it is.  Not only do we

15     have the e-mail but we have this electronic file

16     entry, the statute of limitations isn't expired

17     due to this check sent to us June 30, 2004.

18     Let's move the suit along.

19             What's next?

20             Bring up 504, please.  Highlight

21     the text in the third paragraph.

22             This is a letter dated February

23     8, 2007.  It's actually a letter that Lisa

24     drafted, and Grace, as the account manager,

25     signed it.  This is a letter to Mr. McCullough.

1    This is my client's first contact with Mr.

2    McCullough.  And I don't know if you want to

3    refer to this as a demand letter or what you want

4    to call it, but it's essentially a notice to Mr.

5    McCullough saying, Hey, we have been hired to

6    attempt to collect the debt that you owe to Chase

7    Manhattan Bank.  If you made payments, let us

8    know.  If you dispute the validity of all or any

9    portion of this debt, you must notify this office

10   within 30 days of receipt of the notice or we

11   will assume the debt is valid.  If you notify us

12   within writing within 30 days of receipt of this

13   notice, we will obtain information from the

14   creditor and mail you a copy.

15              Mr. McCullough will testify he

16   doesn't dispute that he got this letter.  He

17   can't remember if he saw this exact one or not,

18   but you will hear from my client this was the

19   letter that was sent.  It didn't come back and

20   Mr. McCullough received the letter and he didn't

21   do anything.  He didn't call my client.  He

22   didn't write.  He didn't say, Hey, I dispute this

23   debt.  Send me some proof.  I think you're beyond

24   the statute.

25              He put the letter in the round

1    file.  The letter goes out February 8, 2007.

2    Nothing happens.  30 days go by.  Well, my client

3    has a client, CACV, and they are expecting to

4    file a suit so in fact they do.

5                    This is Exhibit 2.  Here it is.

6    This is the offending document, if you will.  My

7    client sets forth what it's seeking on behalf of

8    its client, CACV of Colorado.  It says, Hey, we

9    want the amount of money that you owed on your

10   Chase Manhattan credit card account.  We want

11   costs and attorneys' fees.  There it is.  That's

12   it.

13                    You will hear from Charlie Dendy.

14   I think I told you this earlier.  And he will

15   tell you what he did before filing the suit and

16   before he signed the complaint.  Other people in

17   the office who are not lawyers helped draft this,

18   but when it comes down to it, Charlie and Lisa as

19   the lawyers are responsible for what goes into

20   this.  They recognize that.  It's their

21   obligation to the court system, their ethical

22   responsibility of what is going in here.

23                    They double-check the file.

24   Charlie will tell you he always checks the

25   information in its file, in the company's

1    electronic file.  And one of the things he always

2    looks for is the date of the last payment because

3    he wants to make sure that he doesn't file a

4    lawsuit outside the statute of limitations.  He

5    knows that is a big no-no and he doesn't want to

6    do that.

7                    We already know that the

8    information that CACV gave to the firm was wrong.

9    So, as we have heard earlier, if you rely on bad

10   information, mistakes can be made.

11                   Well, the lawsuit is filed and

12   it's dated April 17, 2007.  It's served on Mr.

13   McCullough not long thereafter.  Nothing happens

14   for the next couple of months until Mr.

15   McCullough files an answer.

16                   If you can bring that up, please.

17   That is Exhibit 3.

18                   Mr. McCullough goes down to the

19   courthouse and files the answer.  He mentions the

20   statute of limitations.  He also mentions that

21   Chase would not work with him and they passed it

22   on to collectors that lied to him, insulted him,

23   used bad language and called him around the

24   clock.  You will hear from Mr. McCullough.

25                   That's not my client.  Johnson

1    Rodenburg didn't lie to him.  They didn't use

2    vulgarity.  They didn't threaten him.  In fact,

3    they didn't hear from him.  He didn't call them.

4    He didn't write to them.  He didn't explain that

5    he had a problem with this debt until the very

6    first thing that he files is this answer.

7                    Again, we have a little bit of a

8    lull.  My client has other files to work on, as

9    in every case.  But eventually, in October,

10   Charlie decides he needs to get the file moving.

11   He has dates he has to work within within the

12   court system.  So he sends out interrogatories,

13   which are written questions, and he sends out

14   requests for admission.

15                   You've already seen some of those

16   displayed up on the screen.  That's a process

17   that is used in every lawsuit.  Lawyers want to

18   find out what does the other side know, what is

19   the other side contending in the case.

20                   We swapped them in this case.

21   You may even see some of the interrogatories and

22   requests for admission that we exchanged.  It's

23   part of the court process.

24                   So Mr. Dendy does that in this

25   case.  He sends interrogatories to Mr.

1      McCullough.  And he sends requests for admission.

2                      Well, about this time, Mr.

3      McCullough decides he's not going to represent

4      himself anymore so he hires Mr. Heenan.  Mr.

5      Heenan answers the discovery.  He serves answers

6      to the interrogatories and he serves answers to

7      the requests for admissions.

8                      He told you a little bit in his

9      opening about how if more than 30 days go by and

10     you don't respond to the requests for admission

11     that is somehow going to cause you to lose the

12     lawsuit.

13                     That didn't happen here.  Mr.

14     McCullough got a lawyer and answered the requests

15     for admission, denied the ones he wanted to deny

16     and answered the interrogatories the way he

17     wanted to answer.

18                     A short while later, we are up to

19     December 7, 2007.

20                     Bring up Exhibit 7, page seven,

21     please.

22                     Charlie is having a discussion

23     with his client representative, if you will,

24     Collect America, a woman named Leslie Smith.

25     This is, again, we are referring to Johnson

```
 1    Rodenburg's electronic file notes.  He has
 2    documented --  you can tell.  That's his initials
 3    over in the left-hand column -- Lesley called,
 4    said need to dismiss as soon as possible.  Have
 5    statute-of-limitations problem.  Said last
 6    payment was in 2000, not in 2003 as we thought.
 7    She had to ask -- looks like supervisor -- as
 8    last was showing same statute of limitations we
 9    are.  Supervisor said what shows as last pay was
10    not, was just costs being returned to someone.
11    Actual last pay date was 2000.
12                   This is the time that Charlie
13    gets it in his head, oops, we have a problem.
14                   So what happens?  Charlie calls
15    Mr. McCullough's attorney, Mr. Heenan.  "We have
16    got a problem.  It's beyond the statute of
17    limitations.  We are going to dismiss the
18    lawsuit."
19                   Well, there is no objection.
20    This is the Order of Dismissal of Prejudice, and
21    this was signed by Judge Watters.  This is in the
22    court case that Johnson Rodenburg filed on behalf
23    of its client against Mr. McCullough.  It's
24    dismissed with prejudice, which means nobody can
25    ever file this lawsuit on this credit card debt
```

1    again against Mr. McCullough.

2                    What does it mean?  It means Mr.

3    McCullough walks away without having paid his

4    credit card debt.  That's it.  It's done.  The

5    case is over.

6                    Now, you're going to hear that

7    midway through the handling of this case, in

8    about August of 2007, Grace Lauinger exchanged

9    some e-mails with Bobby Dunker at the CACV office

10   in Denver.  In one of those e-mails, a very brief

11   snippet says, By the way, June 30, 2004 payment

12   that we were relying on was actually return of

13   unused costs.  It wasn't a payment by Mr.

14   McCullough.

15                   Well, Grace puts it in the file

16   and, as we all do, Charlie overlooked it.  He

17   will tell you that he overlooked it.  He had no

18   reason, he had no reason, to hide that.  He had

19   no reason to do anything other than act on it as

20   he saw.  But as you've just seen, he didn't know

21   about the problem until December.

22                   So was it a mistake?  Should he

23   have done it?  No.  Did he mean to do it?  Did he

24   mean to continue the lawsuit after he got that

25   information?  No way.  He had no reason to do so.

1     There was absolutely nothing malicious about it.

2     You will hear Charlie testify about that.  It was

3     simply an oversight.

4                    You will also hear there was a

5     claim for attorneys' fees included in the

6     Complaint.  You've seen the Complaint.  There was

7     one line that says, Please give us attorneys'

8     fees of $481.  Charlie will tell you that he did

9     that because the Chase Manhattan credit card

10    agreements that he saw, and he's seen a number of

11    them, always contain a clause that says, If we

12    have to sue you, Mr. Credit Card User, because

13    you don't pay your debt, and we win, we get our

14    attorneys' fees back.

15                   In that situation, that's

16    permissible under Montana law.  Charlie did not

17    have the card member agreement in his file when

18    he filed the lawsuit.  Should he have had it?

19    Yep.  But you know what?  It's in every one that

20    he's seen.

21                   And Mr. Dunker, from CACV, will

22    testify to the same thing.  To his knowledge,

23    Chase Manhattan credit card card member

24    agreements, which are a written contract, provide

25    for award of attorneys' fees.  Well, he should

1    have had it in his file at the outset, but you

2    know what?  He didn't.  It was a mistake.

3                    Now, I want to talk to you for

4    just a minute about Mr. McCullough's claim of

5    damages.  He says in this case that he was

6    emotionally distressed because of the way my

7    client treated him by filing a lawsuit against

8    him.  And I think what you'll hear is that Mr.

9    McCullough was no more distressed than anybody

10   else who has a lawsuit filed and served against

11   them.

12                   You're probably going to hear

13   that Mr. McCullough has a longstanding history of

14   mental illness.  We don't bring that up to make

15   light of his situation, but it's important

16   because when the claim is one of emotional

17   distress, you as the jury need to know what his

18   condition is beforehand so you can assess that

19   against what it is now.

20                   In fact, you may hear from one or

21   two psychologists that evaluated Mr. McCullough

22   during the course of this case.  Each side,

23   actually, hired a psychologist to evaluate Mr.

24   McCullough.  The plaintiff hired Dr. Veraldi and

25   we asked Dr. Joseph McElhinney, who is a

1       psychologist in town, to conduct an evaluation.

2                       What you will hear from Dr.

3       McElhinney is he looked at Mr. McCullough's

4       medical records from past psychiatric treatment.

5       He asked Mr. McCullough to complete a set of

6       written psychological tests, which he did, and

7       then he spent some time in an interview format

8       where he got to ask Mr. McCullough questions.

9       And you're going to hear from Dr. McElhinney that

10      while Mr. McCullough has had some mental illness

11      over the year it's his professional opinion that

12      Mr. McCullough is not suffering from any kind of

13      emotional distress because of the lawsuit that

14      was filed against him.

15                      You will hear from Mr. McCullough

16      in fact that if he was emotionally distressed he

17      didn't do anything about it.  He didn't seek any

18      medical help.  He didn't alter his daily routine.

19      In fact, he kept on about life as it had been

20      before.

21                      One thing I want you to keep in

22      mind here, I'm almost done, but as the judge has

23      I think already told you, the plaintiff has the

24      burden of proof.  It's just a fancy legal term

25      meaning, he's the one coming in asking for

1      relief.  It's his burden to persuade you that the

2      evidence is in his favor.  Because of that, that

3      means he gets to go first at each stage at the

4      trial.  He got to go first in the voir dire.  He

5      was first in the opening.  He gets to go first

6      calling his witnesses.

7                     I think it might be human nature

8      to kind of give the guy who goes first, you get

9      that information in your mind and think, that's

10     got to be right.  We get to put on our side of

11     the story too, and I ask you not to make up your

12     mind until you hear from us as well.  Because

13     there is evidence from both sides of the case.

14     So please keep an open mind until you hear from

15     us as well.

16                     My client and I very much

17     appreciate your time serving here as jurors.  We

18     know you all have things you would rather be

19     doing, spending time with friends, family,

20     working, things of that nature.  But since you

21     are here, I promise you we will do our best to

22     put our witnesses on in a prompt manner and get

23     the questions asked that you need to answer the

24     questions in this case.  Thank you very much.

25                     THE COURT:  You've heard the

1       opening statements of the attorneys.  It's almost

2       noon so we will take our lunch break now and we

3       will return here at 1:30 and the plaintiff will

4       then begin presenting the evidence that he wishes

5       you to consider.

6                        We are about to take the first

7       recess during the trial itself.  Before doing

8       that, I want to remind you about your conduct as

9       jurors.  I read you an instruction earlier about

10      it.  I'm going to remind you of it now.  I won't,

11      every time we take a recess, read you each of the

12      admonitions, but I will remind you of them

13      because it's very important that you follow them.

14                       So do not discuss this case with

15      anyone.  Do not permit others to discuss the case

16      with you.  If anyone approaches you and tries to

17      talk to you about the case, let me know about

18      that immediately.  Do not read any news stories

19      or articles or listen to any news stories,

20      articles, radio, television or online reports

21      about the case or about anyone who has anything

22      to do with it.  Do not do any research or make

23      any investigation about the case.  If you need to

24      communicate with me about anything, simply give a

25      signed note to the bailiff or the clerk to give

1    to me.

2                         Do not make up your mind about

3    what the verdict should be until after you've

4    gone to the jury room to decide the case and you

5    and your fellow jurors have discussed the

6    evidence.  Keep an open mind until then.

7                         Finally, until the case is given

8    to you for your deliberation and verdict, do not

9    discuss the case with your fellow jurors.

10                        We will be in recess until 1:30

11   and resume with the evidence at that time.

12                        (Lunch recess.)

13                        THE COURT:  I understand the

14   parties wish to discuss something.

15                        MR. HEENAN:  Yes.  Plaintiff

16   desires to introduce discovery responses from

17   Johnson Rodenburg and then have Instruction

18   Number 14 given to the jury.  It's my

19   understanding the defendant objects to that.

20                        THE COURT:  What's the nature of

21   the objection?

22                        MR. SIMPSON:  They need to come

23   in through a witness, Your Honor.

24                        THE COURT:  May I see them,

25   please?

1                    MR. HEENAN:  Yes, Your Honor.

2                    THE COURT:  So we are talking

3      about two requests for admission and one

4      interrogatory?

5                    MR. HEENAN:  Yes, Your Honor.

6                    THE COURT:  What is your

7      authority that they have to come in through a

8      witness?  Aren't these sworn by the defendant as

9      discovery responses are obligated to be?

10                    MR. SIMPSON:  The

11      interrogatories, I believe, are.

12                    THE COURT:  And so aren't they an

13      admission?  Why wouldn't the party be able to

14      just read them to the jury?

15                    MR. SIMPSON:  I don't have any

16      authority, Your Honor.

17                    THE COURT:  All right.

18                    MR. HEENAN:  I do think it's

19      appropriate to give Instruction Number 14, Your

20      Honor.

21                    THE COURT:  Is that one of the

22      ones that we gave as a preliminary instruction?

23                    MR. HEENAN:  It is, Your Honor.

24                    THE COURT:  I thought so.  These

25      are ones that I give if it becomes appropriate,

1    which, if you intend to read these, it would be.

2                    MR. HEENAN:  I do.

3                    THE COURT:  Is there any

4    objection to Instruction Number 14, which has

5    previously been given to the party?

6                    MR. SIMPSON:  No.

7                    MR. BOHYER:  So long as it's read

8    to the jury, Your Honor, it's not an exhibit.  So

9    in terms of publishing it to the jury, I assume

10   you don't mean to put it up on the screen and

11   they get to look at it during examination.  It's

12   not an exhibit.

13                   MR. HEENAN:  I think I get to

14   publish it, but I'm not going to move it into

15   evidence.  But I think the jury is allowed to

16   read it on the screen as I read it to them.

17                   THE COURT:  No, I think you

18   should read it to them.

19                   MR. SIMPSON:  For clarification,

20   my understanding is there is no additional

21   comment.  Rather, Mr. Heenan will read the

22   questions and answers, and that's it.

23                   THE COURT:  Correct.

24                   MR. HEENAN:  Correct.  Same

25   practice with exhibits that have been admitted

1      into evidence.  It's my understanding I'm allowed

2      to publish them for the jury by reading them to

3      them.  I don't need to put a witness in to show

4      the jury an exhibit that's been admitted.

5                    THE COURT:  Unless there's a

6      foundation objection of some kind.

7                    MR. BOHYER:  The problem is it

8      turns into another opening statement.  If we are

9      just going to set up one exhibit after another

10     and read them, if there are witnesses here with

11     respect to say, yes, that is the document, even

12     though the Court admitted it, it doesn't change

13     the procedure of the trial.

14                   THE COURT:  That's correct.  But

15     these discovery responses are not exhibits.

16                   MR. BOHYER:  Correct.  He has

17     switched gears there and started talking about

18     exhibits.

19                   MR. HEENAN:  Let me explain.

20                   THE COURT:  You're not allowed to

21     testify about exhibits.

22                   MR. HEENAN:  Not at all.  For

23     example, when we show Mr. Dendy's video, he

24     references an exhibit that is already admitted

25     into evidence.  So when we turn off his video, I

1   would like to read or publish for the jury -- I

2   don't know that I even want to read it.  I just

3   want to show the jury what the exhibit is that

4   has been admitted.

5             THE COURT:  No, you can show the

6   video, and that's it.  You can't testify about

7   documents or give documents.  You have to do that

8   through witnesses.

9             MR. HEENAN:  I can't just show

10  the jury the exhibits that's been admitted

11  without any commentary on it?  Just put it up on

12  the screen and let them read it before I move on

13  to my next witness?

14            THE COURT:  Is there any

15  objection?  I think it would increase jury

16  understanding.

17            MR. BOHYER:  My objection to it

18  is it adds undue weight to one exhibit over

19  another.  I understand if he is questioning, for

20  example, it's the video of Mr. Dendy and there is

21  an exhibit that is referred to that the jury,

22  when he asks, okay, I'm going to show you exhibit

23  whatever it is, here is the exhibit, and then the

24  questions are there.  Once the examination is

25  done, those exhibits have to go.

1                    THE COURT:  Except the practical

2       matter is he is showing it by video.  So we can't

3       show them the exhibit.  So in order for them to

4       understand what the exhibit was, as I understand

5       what he is asking, if he can just show them, This

6       is the exhibit that Mr. Dendy was talking about,

7       with no other comment.

8                    MR. HEENAN:  Rather than stop the

9       video and turn it off, I would prefer, I think it

10      will be faster, if -- it's a 20-minute video --

11      when it's done, we just show the jury what the

12      exhibits were that he was referencing and then

13      move on.

14                   THE COURT:  Any objection to

15      that?

16                   MR. SIMPSON:  No, Your Honor.

17                   MR. BOHYER:  Withdraw the prior

18      one on that.  Thank you.

19                   THE COURT:  Anything else?

20                   MR. HEENAN:  No, Your Honor.

21                   THE COURT:  Just alert me when we

22      go to read the discovery responses.

23                   MR. HEENAN:  It will be my first

24      one.

25                   THE COURT:  And then you will

1    call Mr. Dendy by --

2                    MR. HEENAN:  That's correct.

3                    THE COURT:  And that is all

4    queued up and ready to go?

5                    MR. HEENAN:  I hope so.

6                    THE COURT:  Would you get the

7    jury, please.

8                    (Jury enters courtroom.)

9                    THE COURT:  The record will

10   reflect counsel and the jury and the parties are

11   all present.  As I previously explained to you,

12   the way trials proceed is that, after the opening

13   statements, the plaintiff presents evidence that

14   the plaintiff wishes you to consider.  And we are

15   beginning that process now.

16                    Mr. Heenan has advised me that he

17   will begin by presenting to you some discovery

18   responses, and I will give you an instruction to

19   help you understand that.  Evidence will now be

20   presented to you in the form of answers of one

21   side to written interrogatories and requests for

22   admissions submitted by the other side.  These

23   answers were given in writing and the

24   interrogatories were answered under oath, before

25   the actual trial, in response to questions that

1    were submitted in writing under established court

2    procedures.  You should consider the answers,

3    insofar as possible, in the same way as if they

4    were made from the witness stand.

5                    You may read them, Mr. Heenan.

6                    MR. HEENAN:  Thank you, Your

7    Honor.

8                    Request for admission, Please

9    admit that Mr. McCullough never made a payment on

10   an alleged Chase Manhattan Bank credit card

11   account in June of 2004.  Response, Defendant JRL

12   lacks personal knowledge sufficient to either

13   admit or deny Request For Admission Number 3 and

14   therefore denies the same.

15                   Request for Admission Number 4,

16   Please admit that Mr. McCullough never made a

17   payment on an alleged Chase Manhattan Bank credit

18   card account after 2001.  Response, Defendant JRL

19   lacks personal knowledge sufficient to either

20   admit or deny Request For Admission Number 4 and

21   therefore denies the same.

22                   Interrogatory Number 13, if your

23   response to the above request for admission is

24   anything other than an unqualified admit, please

25   set forth in detail each and every fact upon

1    which you base your response.  Answer, Defendant

2    JRL has no firsthand knowledge of what payments

3    may or may not have been made by Timothy

4    McCollough in 2001.

5                   THE COURT:  All right.  You may

6    call your next witness, and I understand you're

7    going to do this through a video deposition.  Is

8    that right?

9                   MR. HEENAN:  That's correct.  At

10   this time we will call Charles Dendy by video

11   deposition.

12                  THE COURT:  Ladies and gentlemen,

13   a deposition is sworn testimony of a witness

14   taken before trial.  The witness is placed under

15   oath to tell the truth, and lawyers for each

16   party may ask questions.  The questions and

17   answers are recorded both in writing by a court

18   reporter, such as we have here, and in this case

19   by videotape.  When a person is unavailable to

20   testify at trial, the deposition of that person

21   may be used at trial.

22                  The deposition of Charles Dendy

23   was taken on July 22, 2008.  You should consider

24   deposition testimony presented to you in court in

25   lieu of live testimony, insofar as possible, in

```
1    the same way as if the witness had been present
2    to testify.
3                     MR. HEENAN:  My apologies, Your
4    Honor.  I don't know if I might move out of order
5    and call Mike Eakin live.
6                     THE COURT:  Okay.  Mr. Eakin,
7    please come forward and be sworn.
8              DENNIS MICHAEL EAKIN, having been duly sworn,
9    was examined and testified as follows:
10                    THE CLERK:  Please have a seat
11   and state your full name and spell it for the
12   record.
13                    THE WITNESS: My name is Dennis
14   Michael Eakin.  Last name is spelled E-a-k-i-n.
15   DIRECT EXAMINATION
16   BY MR. HEENAN:
17   Q.      Please state your business address for the
18   record.
19   A.      Yes.  2442 1st Avenue North, Billings,
20   Montana.  That's the office of Montana Legal
21   Services.
22   Q.      What is your occupation, Mr. Eakin?
23   A.      I'm an attorney.
24   Q.      At Montana Legal Services?
25   A.      Yes.  I've been an attorney there for
```

1     approximately 32, going on 33 years; about 28, 29

2     of it here in Billings.

3     Q.      How long have you been a lawyer?

4     A.      Going on 33 years.

5     Q.      So your entire professional career has

6     been at Montana Legal Services?

7     A.      Yes, it has.

8     Q.      What courts are you admitted to?

9     A.      I'm admitted to the U.S. Supreme Court,

10    the 9th Circuit, the courts in Montana.  I also

11    practice in the Northern Cheyenne Tribal Court,

12    Crow Tribal Court.  I'm admitted to Koote Nai

13    Salish Tribal Court.  In the past I have been

14    admitted to the U.S. Tax Court and the courts of

15    Texas.  I let those memberships lapse simply

16    because I was not practicing there and I have

17    three kids.

18    Q.      What's more nerve-racking, Mike?  Sitting

19    in that chair as a witness or standing in front of

20    the 9th Circuit or Supreme Court?

21    A.      I've been in front of Appellate Courts on

22    a number of occasions.  This is the first time

23    I've been called as a witness.  I'm much more

24    nervous here today, doing this, than I would be in

25    front of the 9th Circuit.

1    Q.       Explain, if you will, what Montana Legal
2    Services does.
3    A.       We provide civil representation and advise
4    clients with legal problems, all civil legal
5    problems.
6    Q.       What does 'civil' mean?
7    A.       Civil is basically as opposed to criminal.
8    It can be anything from consumer law, which is the
9    area I practice, Indian law, another area where I
10   practice.  We also have people who do housing law,
11   landlord-tenant law, public benefits law, trying
12   to get people Social Security disability or other
13   public benefits, domestic relations; just
14   something where it's generally two-part, two
15   individual parties going against each other as
16   opposed to the government saying, You broke one of
17   our laws and we want to put you in jail, which
18   would be a criminal case.
19   Q.       So Legal Services doesn't represent any
20   criminals or defendants in criminal actions?
21   A.       No defendants in criminal actions.  There
22   may be one or two that have had misfortunes and
23   are -- we don't represent anyone currently in the
24   prison system, but folks incarcerated when they
25   were 20 and are now 45 or 50 and have

1    landlord-tenant problems are eligible for Legal

2    Services.

3    Q.      Who is eligible for Legal Services?

4    A.      We have income guidelines that do provide

5    actual representation in court that generally the

6    person has to have income of less than 125 percent

7    of the federal poverty level.  We can provide --

8    Q.      What does that mean in terms of a real

9    dollar figure for someone?

10   A.      Probably approximately a thousand dollars

11   per month for an individual and approximately 600

12   a month for each other dependent.  So single

13   person, it's going to be close to 12,000 a year;

14   25 to 30,000 like for a family of four.

15   Q.      Is it a fair characterization to say Legal

16   Services represents the poorest people in our

17   communities?

18   A.      Yes.

19   Q.      How does Legal Services get paid?  By

20   these clients?

21   A.      No.  Most of our funding comes from grants

22   from the National Legal Services Corporation,

23   which is funded by Congress.

24   Q.      Are there limitations placed on Legal

25   Services with respect to assisting poverty-level

1      people in consumer actions?

2      A.        Yes, there are.  We are not permitted to

3      do any class actions, and we are not permitted to

4      take fee-generating cases.  And even if a case is

5      not normally considered fee-generating and we

6      provide representation and we prevail, we are not

7      permitted to collect attorneys' fees from the

8      other side.

9                 There is an occasional exception,

10     if there is funding for an Indian tribe, and that

11     money is used to provide representation.

12     Q.        Is Montana Legal Services well funded?

13     A.        No.  Recently, we have had to lay off a

14     number of people, including approximately three

15     attorney positions, because of decrease in

16     funding.  Besides the federal funding, which has

17     been fairly consistent, we also receive funding

18     from interest on lawyers' trust accounts, and

19     interest rates have been at an all-time low, which

20     may be good for some folks, but if you're relying

21     on interest, it costs to cut off funding, and we

22     have had to lay off staff.

23     Q.        In light of the decrease to Legal

24     Services, does that impact the ability of Legal

25     Services to help consumers?

```
1    A.        Certainly.  One of the positions that was

2    lost was an attorney in the consumer law position.

3    Q.        Tell the jury what 'consumer law' means.

4    A.        Generally it's going to be an individual

5    that has been dealing with a business entity in

6    some manner.  It often is credit card debt, credit

7    card-related.  It can be car-related.  We run into

8    a lot of problems with people that have problems

9    with a car they bought.

10   Q.        Is that commonly called lemon law?

11   A.        Lemon law, yes.  Also, if a person allows

12   a car to be repossessed, very often there is a

13   deficiency after the car is repossessed and sold,

14   and a creditor will come after the consumer for

15   payment on the contract even though the car has

16   been returned or sold.

17   Q.        So tell me.  At Legal Services, your niche

18   is this area of consumer law.

19   A.        Yes.

20   Q.        And that's been over the extent of your 30

21   plus years as a lawyer.

22   A.        Yes.  I've been practicing consumer law.

23   I came and started with The Consumer Project,

24   which was a VISTA project back in 1976.

25   Q.        As part of your consumer law practice, do
```

1    you have occasion to put on continuing legal

2    education programs?

3    A.      Yes, we do.

4    Q.      And specifically, tell the jury what a

5    continuing legal education program is.

6    A.      It's a program where lawyers are updated

7    about new developments or about a new area of the

8    law or old area of the law that has new

9    developments in that law that the State Bar here

10   and in most states requires a certain number of

11   hours of continuing education each year.  In

12   Montana, it's 15 hours per year that you have to

13   be instructed in some area of law.

14   Q.      And basically, you've taught other lawyers

15   about the area of consumer law?

16   A.      Yes, I have.

17   Q.      And specifically, have you taught other

18   lawyers about debt-collection law?

19   A.      I did give continuing legal education

20   presentation on debt collection, yes.

21   Q.      Through the State Bar?

22   A.      Yes.

23   Q.      Which is the entity that licenses us as

24   Montana lawyers, right?

25   A.      Correct.

```
1    Q.       And in that presentation that you gave --
2                    MR. SIMPSON:  Your Honor, I
3    object.  Mr. Eakin's presentation materials were
4    not disclosed in his expert witness disclosure.
5                    THE COURT:  Overruled.
6    BY MR. HEENAN:
7    Q.       In the presentation that you gave, other
8    lawyers would attend?
9    A.       Yes.
10   Q.       In fact, other Montana collection lawyers
11   would attend that program.  Is that --
12   A.       Yes.  That is correct.
13   Q.       Why would it be the collection lawyers
14   would want to show up to hear what a Legal
15   Services consumer lawyer has to say?
16                   MR. SIMPSON:  Objection.  Calls
17   for speculation.
18                   THE COURT:  Sustained.
19   BY MR. HEENAN:
20   Q.       Let me ask you this way.  Have you given
21   just one presentation on debt collection?
22   A.       No, I've given several presentations on
23   debt collection.
24   Q.       Has a Johnson Rodenburg attorney ever
25   attended one of those presentations?
```

1    A.        Not to my knowledge, but I did not take

2    role.

3    Q.        Have you, as part of your practice, had

4    occasion to participate in putting together legal

5    guides for people?

6    A.        I'm not sure --

7    Q.        Let me get a little more specific.

8    A.        Sure.  What you mean --

9    Q.        It's my understanding that you were an

10   editor of the National Consumer Law Center

11   Surviving Debt book.  Is that true?

12   A.        I did help edit the first edition of that

13   book.  I was not an author.

14   Q.        Thank you.  What was that book, Surviving

15   Debt?

16   A.        It was a book that intended to give

17   laypersons a guide on what to do if they found

18   themselves in debt and had recently lost an income

19   for some reason, such as unemployment or

20   disability, what sort of actions that they might

21   be facing, what steps they could take.

22   Q.        In your practice, is it fair to say that

23   you only represent debtors, not debt collectors?

24   Is that true?

25   A.        That is true.

1    Q.        Do you have any idea how many debtors you

2    have assisted in your 32 years?

3    A.        Not really.  I would have to take a wild

4    guess.  I did look in the Legal Services program

5    that we have been using for the last 12 years, and

6    in that time we -- the program as a whole has

7    advised approximately 5400 people in collection

8    matters.  We have also advised about 3500 people

9    on bankruptcy.  There may be some overlap between

10   those two.

11             And over those 12 years, I've been

12   supervising the consumer law unit.  So that the

13   actual number in the last 12 years, I've done, I

14   believe, in the neighborhood of 800 collection

15   cases.  That varies from a simple phone call to

16   arguing in the 9th Circuit.  It runs a very much

17   larger number of advice phone calls than arguing

18   on appeal in federal court.

19   Q.        Is it fair to say that you don't have

20   enough resources to be able to jump in and defend

21   everybody who has been sued in a debt-collection

22   case?

23   A.        That is true, yes.

24   Q.        What do you do about the people that you

25   can't jump in and defend?

1    A.       We often just give advice over the phone.

2    Or the next step up in the level of service we

3    deliver is drafting court documents that they can

4    file by themselves, an answer, and tell them, "You

5    can file this and then you're on your own."

6             It prevents a default judgement

7    from being taken.

8    Q.       In your experience defending and helping

9    people who are facing debt-collection actions, is

10   it your experience that they have the money, they

11   just don't want to pay?

12   A.       Just the opposite.  Almost all want to pay

13   what they consider their legitimate debts and

14   simply do not have the money to do so.

15   Q.       What do you mean, "legitimate debts"?

16   A.       That there are times when they will come

17   in and, like a deficiency on the car case, where

18   they owed $10,000 on a car and if it were sold at

19   an auction --

20             MR. SIMPSON:  I object.  This is

21   beyond the scope of Mr. Eakin's disclosure.

22             THE COURT:  Is this within the

23   scope of the disclosure, Mr. Heenan?

24             MR. HEENAN:  I think so, Your

25   Honor.  He is just explaining right now his

1    background.  I can move on, if Your Honor wants

2    me to.

3                    THE COURT:  Why don't you move

4    on.

5                    MR. HEENAN:  Sure.

6    BY MR. HEENAN:

7    Q.      Mike, how did it come to be that you're

8    here testifying, sitting in the hot seat?

9    A.      You asked me to be here.

10   Q.      Did I offer to pay you or has anyone

11   offered to pay you for your time?

12   A.      No, I'm not being paid for my time.

13   Q.      Do you have any personal or financial

14   interest in the outcome of this lawsuit?

15   A.      I have no financial interest in the

16   outcome of this lawsuit.  Obviously I have a

17   career defending consumers and I have a personal

18   interest in this, just a general interest in

19   consumer litigation, just like I might pick up a

20   newspaper and read about something I'm interested

21   in.  It doesn't mean I have a personal financial

22   stake or anything that would affect my day-to-day

23   operations.

24   Q.      Is it fair to say, over the last 28 years

25   in Billings and 32 years in Montana Legal

1      Services, you've developed a familiarity with the

2      debt-collection laws that are active in Montana?

3      A.      Most of them, yes.

4      Q.      Have you become aware of the Johnson,

5      Rodenburg & Lauinger debt-collection law firm?

6      A.      Yes, I have.  It's a firm I did not see

7      too often, or I can't remember seeing them in the

8      nineties, but saw them, you know, starting in the

9      early 2000s and increasingly since then.

10     Q.      Increasingly from 2000 to present?

11     A.      It may have reached the peak and leveled

12     off in the last two years, three years.

13     Q.      Let me have you explain to the jury what

14     you mean by "seeing them."  How do you, as a Legal

15     Services lawyer, see Johnson Rodenburg?

16     A.      See them when somebody calls up and says,

17     "Gee, I've been served with court papers."  And

18     you start asking questions and you ask who was the

19     lawyer representing the plaintiff, and they'll

20     say, "Oh, it's a Mr. Charles Dendy of the Johnson

21     Rodenburg firm from Fargo," or actually I think it

22     would be Bismarck.

23     Q.      Does your firm have the ability to -- does

24     Legal Services have the ability to track how many

25     times people are calling in regard to Johnson

1    Rodenburg or Mr. Dendy?

2    A.        We do have that ability.  We have not

3    always used it.  We have been using it much more

4    consistently in the last two to three years,

5    probably in the last two years, as we developed an

6    interest in not only what debt collectors were out

7    there but also who was representing the debt

8    collectors.

9    Q.        In the last two or three years that you

10   have been tracking who is representing the debt

11   collectors, how many times has Johnson Rodenburg

12   shown up on your radar?

13                 MR. SIMPSON:  Objection, Your

14   Honor, undisclosed testimony.

15                 THE COURT:  I don't recall that.

16   Can you point me where it was, Mr. Heenan?

17                 MR. HEENAN:  Although Johnson

18   Rodenburg has been collecting debts in Montana

19   for some time, the --

20                 THE COURT:  I don't need you to

21   read it.  I need you to tell me if he disclosed

22   the number of times in the last two to three

23   years that Johnson Rodenburg has shown up on, as

24   you put it, their radar screen.

25                 MR. HEENAN:  I don't know that he

1      provided a specific number, Your Honor.  In fact

2      he didn't.

3                      THE COURT:  I sustain the

4      objection.

5      BY MR. HEENAN:

6      Q.      Without saying a specific number, what has

7      Johnson Rodenburg done in general terms to show up

8      on your radar screen?

9      A.      They are one of the most consistent

10     collection firms that we see in the state.  That a

11     client you're talking to on the phone or at the

12     first interview is often surprised that you would

13     be able to pick out a law firm in North Dakota

14     that is representing someone, but it's from the

15     same.  And very often you're able to figure out

16     that a certain particular collector or debt buyer

17     pursuing actions in Montana, or particularly the

18     eastern half of Montana, are going to be

19     represented by Johnson Rodenburg.

20     Q.      Do you have an opinion, Mike, about why it

21     is that the number of lawsuits that you've seen

22     out of Johnson Rodenburg has risen dramatically

23     over the last, say, seven or eight years?

24                      MR. SIMPSON:  Objection.

25     Foundation.

1                      THE COURT:  Sustained.

2    BY MR. HEENAN:

3    Q.      Are you aware that Johnson Rodenburg's

4    filings have risen dramatically over the last

5    seven or eight years?

6    A.      From what I have seen, they have risen

7    significantly over the last seven or eight years.

8    Q.      Do you have an opinion for why that would

9    be?

10                     MR. SIMPSON:  Same objection.

11                     THE COURT:  Sustained.  You can

12   ask him if he knows.

13   BY MR. HEENAN:

14   Q.      Do you know why that would be?

15                     THE COURT:  The question is, do

16   you know why that is?

17                     THE WITNESS:  I think I know why.

18   BY MR. HEENAN:

19   Q.      Let me strike that last question and let

20   me ask you this.  Over the last seven or eight

21   years, have you seen the amount of debt-buyer

22   lawsuits rise in Montana?

23   A.      Yes, I have.

24   Q.      Has that been a slow growth, a rapid

25   growth?  How would you characterize it?

1    A.        I would characterize it as a rapid growth.

2    Q.        What about the amount of lawsuits that

3    Johnson Rodenburg files?  Would that be slow

4    growth, steady growth, rapid growth?  How would

5    you characterize it?

6    A.        It would be rapid growth consistent with

7    the growth of debt-buyer lawsuits.

8    Q.        Now, as part of your practice defending

9    people, defending consumers who are the subject of

10   these debt-buyer lawsuits, have you gained a

11   familiarity with the industry, the debt-buyer

12   industry?

13   A.        I've certainly read about the debt-buyer

14   industry and have seen -- from what I've read, see

15   it consistent with what I see in my practice.

16   Q.        How so?

17   A.        That the debt-buyer industry is increasing

18   and that the debt-buyer lawsuits are increasing,

19   that debt buyers often buy debt.

20                  MR. SIMPSON:  I object.  Again,

21   foundation, and this calls for hearsay as well.

22                  THE COURT:  Sustained.

23                  Just ask your next question.  I

24   think it's also getting to be a narrative.

25   BY MR. HEENAN:

1    Q.      As part of your practice as a lawyer, have

2    you developed opinions, through your experience in

3    defending these debt-buyer lawsuits, about how the

4    debt-buyer industry runs?

5    A.      Yes, I have.

6    Q.      What is your opinion?

7    A.      That often --

8                    MR. SIMPSON:  Objection.

9    Foundation.

10                   MR. HEENAN:  He has been

11   disclosed as an expert witness.

12                   THE COURT:  If I want argument, I

13   will call for it.

14                   MR. HEENAN:  Sorry, Your Honor.

15                   THE COURT:  The objection is

16   foundation?

17                   MR. SIMPSON:  He hasn't explained

18   the basis for his opinion as to why the

19   debt-buyer lawsuits --

20                   THE COURT:  I would ask you to

21   lay a little bit more foundation.

22                   MR. HEENAN:  Sure, Your Honor.

23   Thank you.

24   BY MR. HEENAN:

25   Q.      What would be the basis for your opinion

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    about the debt-buyer industry?

2    A.      That in the practice, in defending

3    lawsuits, you can very often see what documents

4    are presented to prove a debt and --

5    Q.      How do you see what documents are

6    presented?

7    A.      If you have time, you make discovery

8    requests.  If it's some very simple small debt

9    action, you wait for trial and --

10   Q.      What is a discovery request?

11   A.      Okay.  Rules of Civil Procedure that

12   lawyers operate by allow you, before trial, to

13   request certain documents from the other side.

14   You can ask, send out certain questions to the

15   other side that must be answered, and request them

16   to admit certain things, produce documents, answer

17   questions.

18   Q.      So in the context of defending people that

19   have been sued by debt buyers, you're able to see

20   what documents they have in hand.  Is that fair?

21   A.      Yes.

22   Q.      And what's been your experience in terms

23   of what documents they have in hand?

24   A.      It varies.

25   Q.      How does it vary?

1    A.        There are times when they have significant

2    documents and there are times that there are, they

3    do not have many documents.  Although often --

4    Q.        When we say -- sorry, Mike.

5    A.        Often I don't always see an answer, lack

6    of documents, as much as a request to dismiss

7    without prejudice.

8    Q.        What do you mean by that?

9    A.        That the lawsuit will be voluntarily

10   dismissed rather than go through the expense of

11   discovery and actually coming up with the

12   documents that have been requested.

13   Q.        So we were talking about what basis you

14   have for the debt-buyer industry.  And one of the

15   things you're aware of is that you request the

16   debt buyers to provide you with documentation to

17   support the lawsuit?  Is that fair?

18   A.        Yes.

19   Q.        And sometimes they provide you with

20   documents?

21   A.        Yes.

22   Q.        And sometimes they dismiss the case?

23                  MR. SIMPSON:  Objection.

24   Leading.

25                  THE COURT:  Overruled.

1                    THE WITNESS:   That is correct.

2     BY MR. HEENAN:

3     Q.      How about specifically with Johnson,

4     Rodenburg & Lauinger?  Have you had occasion to

5     deal with the Johnson, Rodenburg & Lauinger law

6     firm in the context of helping your clients?

7     A.      Yes, I have.

8     Q.      And what has been your experience with

9     respect to what they do when you ask them for

10    documents?

11    A.      Once again, it varies.  Sometimes there

12    are documents there.  Sometimes it's not so much

13    the lack of documents as a voluntary dismissal of

14    an action, which could also be based on just

15    having to, you know, actually go to trial

16    sometimes will make a case not worth pursuing.

17    Q.      Why wouldn't it be worth pursuing?

18                    MR. SIMPSON:   Objection.  Calls

19    for speculation, Your Honor.

20                    THE COURT:   Sustained.

21    BY MR. HEENAN:

22    Q.      Do you have any personal knowledge or

23    basis to know why Johnson Rodenburg might dismiss

24    a lawsuit?

25    A.      That I --

1    Q.      Say yes or no.

2    A.      Yes.

3    Q.      What is that?

4    A.      Basically one of two reasons:  One is the

5    time and effort to pursue something that may not

6    lead to a recovery.  The time could be better

7    spent on a case or cases that could lead to a

8    recovery; that if something actually goes to

9    trial, you have to take time to prepare.  So the

10   cost of preparing, the cost of travel, if it's in

11   a town other than where you reside, it's money

12   that you have to invest to obtain that judgement.

13   Q.      Is it fair to say you have individuals and

14   represented dozens of Legal Services clients that

15   are dealing with collection actions brought

16   against them by Johnson Rodenburg?

17   A.      Dozens, yes.

18   Q.      Have you ever seen a Johnson, Rodenburg &

19   Lauinger lawyer in a Montana courtroom prior to

20   today?

21   A.      Yes.

22   Q.      When?

23   A.      There was a motion in the state District

24   Court across the street about a month ago.  And

25   Mr. Dendy had asked to appear by phone, and I

1       objected on that particular case and the judge

2       denied the motion to appear by phone.  So I did

3       finally get to meet Mr. Dendy in person.

4       Q.      Prior to about a month ago, you had never

5       seen a Johnson, Rodenburg & Lauinger lawyer?

6       A.      No, I had not.

7       Q.      What, in your experience, is the result of

8       the lawsuits that Johnson Rodenburg files in

9       Montana?

10      A.      That a vast majority result in default

11      judgements in favor of the Johnson Rodenburg

12      client.

13      Q.      What is a default judgement?

14      A.      A default judgement is a judgement entered

15      by the Court after the defendant has had time to

16      answer and did not file an answer with the Court.

17      Q.      How long does the defendant have to answer

18      a lawsuit?

19      A.      Generally 20 days after the service of the

20      summons.

21      Q.      Why is it that so many of these lawsuits

22      that Johnson Rodenburg brings results in default

23      judgements?

24              MR. SIMPSON:  Objection.

25      Foundation, calls for speculation.

1                    THE COURT:   Sustained.

2    BY MR. HEENAN:

3    Q.       Have you had occasion to assist people who

4    have had default judgements taken against them by

5    Johnson Rodenburg?

6    A.       Yes, I have.

7    Q.       Have you come to learn what the

8    circumstances are of those people were in terms of

9    how they ended up having a default judgement taken

10   against them?

11   A.       Yes.

12   Q.       What are some of the circumstances that

13   you're personally aware of, Mike?

14                    MR. SIMPSON:   I object.   This

15   goes into topics that we discussed in pretrial

16   discussions with respect to other litigation.

17                    THE COURT:   Overruled.

18                    THE WITNESS:   That very often

19   after judgement I see, and very often the clients

20   first contact us after a judgement has been

21   entered, and we see them when they have had money

22   either garnished out of a paycheck or taken out

23   of a bank account and they want to know how to

24   deal with that situation.

25                    In talking to the clients about

1    the situation, we generally -- and asking why no

2    defense was put up, the answer is generally,

3    "Because I could not afford a lawyer."

4    BY MR. HEENAN:

5    Q.      What can Johnson Rodenburg do once it

6    obtains a judgement against someone?

7    A.      A judgement creditor, someone who has a

8    judgement, can garnish wages.  They can garnish up

9    to one fourth of someone's take-home pay.  They

10   can execute on bank accounts.  And although

11   Montana allows you to exempt money from a bank

12   account that comes from an exempt source, such as

13   75 percent of wages or Social Security benefits --

14   Q.      Let's explain.  What's exempt sources?

15   A.      Exempt sources, Montana law says there are

16   certain monies that generally, to meet basic

17   necessities of life, that a judgement creditor,

18   someone with a judgement, cannot take.  Those

19   exempt sources for income are 75 percent of wages,

20   unemployment benefits, disability benefits.  Also,

21   there are certain properties that cannot be taken,

22   such as a car worth less than $2500, most

23   household goods.

24   Q.      What about Social Security benefits?

25   A.      Those are exempt under both Montana and

1    federal law.

2    Q.      And exempt means that you can't collect

3    them.  Is that fair?

4    A.      That is fair.

5    Q.      Is it an easy process for someone who has

6    a default judgement taken against them to just

7    say, You're not entitled to my wages because they

8    are Social Security and they are exempt.

9    A.      Very often a creditor will not go after

10   them if they know that, have been told that and

11   are on notice.  Sometimes if they aren't on notice

12   they will execute on a bank account.  The bank

13   does not keep track of where particular money

14   comes from and the person's entire Social Security

15   will be taken from the bank account.

16   Q.      Is it fair to say they can sweep or take

17   all the money out of the account and it's up to

18   the person drawing Social Security benefits to

19   have to get them back?

20   A.      The person then has to file a request with

21   the Court to get the money back.  And the Court is

22   supposed to hold a hearing within 10 days,

23   although that's two weeks when you don't count

24   weekends.

25   Q.      Is that an easy process for someone to

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    come in and file the paperwork?

2    A.      When you have the forms available and can

3    run it off on a word processor, it's fairly easy

4    for the lawyer to do.  It is not easy for a person

5    not represented by a lawyer to do.

6    Q.      In your opinion, is Johnson Rodenburg able

7    to convert potentially worthless debt-buyer claims

8    into valid enforceable judgements to collect on?

9                MR. SIMPSON:  Your Honor,

10   objection.  Relevance and foundation.

11               THE COURT:  Sustained.

12   BY MR. HEENAN:

13   Q.      Do you have an opinion about whether

14   Johnson Rodenburg is able to take claims that

15   aren't legally viable and turn them into

16   judgements?  Yes or no?

17   A.      Yes.

18   Q.      What is that opinion?

19               MR. SIMPSON:  Your Honor --

20               THE COURT:  Wait.  I sustained

21   the objection.  So you have to lay some

22   additional foundation as to what he knows about

23   that.

24               MR. HEENAN:  Thank you, Your

25   Honor.

```
 1    BY MR. HEENAN:

 2    Q.      Do you know anything about Johnson

 3    Rodenburg's practice of -- well, do you know

 4    anything about Johnson Rodenburg's collection

 5    activities in Montana?

 6                    THE COURT:  He has already

 7    testified about that.  You asked him about

 8    converting invalid claims into judgements.

 9    That's what you need to lay a foundation on.

10                    MR. HEENAN:  Thank you, Your

11    Honor.

12    BY MR. HEENAN:

13    Q.      Do you have personal experience --

14    A.      As --

15    Q.      -- as to whether Johnson Rodenburg

16    prosecutes claims that aren't viable under the

17    law?

18    A.      As a lawyer, I know it is possible to

19    obtain a judgement on a debt that otherwise would

20    be barred by statute of limitations.  In Montana,

21    statute of limitations is an affirmative defense,

22    so it is incumbent upon a defendant to plead that

23    the statute of limitations has run; that if the

24    defendant doesn't, even though the law says this

25    debt is too old to be collected if you say it's
```

1        too old, that a plaintiff seeking to recover money

2        can still file the lawsuit.  And if a default

3        judgement is obtained, they would have a judgement

4        on a debt that was too old to collect.

5        Q.      That judgement would be the same as any

6        valid, legal, enforceable judgement?

7        A.      It is a valid, legal, enforceable

8        judgement.

9        Q.      Does Johnson Rodenburg treat the people it

10       sues differently based on whether or not they

11       appear through counsel?

12                       MR. SIMPSON:  Objection.

13       Foundation, Your Honor.  If Mr. Eakin doesn't

14       represent people who don't appear through

15       counsel, he wouldn't have adequate knowledge to

16       know.

17                       THE COURT:  Sustained.  I think

18       you need to lay a little more foundation.

19                       MR. HEENAN:  Sure, Your Honor.

20       BY MR. HEENAN:

21       Q.      Sometimes, Mike, do you make an appearance

22       on behalf of people that Johnson Rodenburg has

23       sued?

24       A.      Yes.

25       Q.      Explain to the jury.  What does that mean,

1    to make an appearance?

2    A.        It basically means to file notice with the

3    court that you are going to be the lawyer for the

4    defendant.

5    Q.        So that notice is a notice that makes the

6    Court aware that you're involved and it makes the

7    other side, here Johnson Rodenburg, know that you

8    are involved?

9    A.        Yes, anything you file with the Court, you

10   mail a copy to the other side.  Sometimes it's a

11   notice of appearance, particularly if actions have

12   already been going on for a while.  If it's a

13   first appearance, answering a Complaint just by

14   filing the answer with your name on it, in

15   Montana, that would constitute a notice that you

16   are appearing on behalf of the defendant.

17   Q.        And sometimes do you assist people who

18   have been sued by Johnson Rodenburg without making

19   that notice of appearance?

20   A.        We draft answers that they can file

21   themselves so that they can represent themselves.

22   Q.        And do you have occasion to continue to

23   monitor those cases where you don't make an

24   appearance for someone but you're helping them out

25   behind the scenes?

1    A.      On occasion we do.

2    Q.      Based on these experiences, do you have an

3    opinion about whether Johnson Rodenburg treats

4    people differently when they are trying to

5    represent themselves versus when they have a

6    lawyer?

7    A.      I think the bigger problem is that they

8    don't; that often they treat the pro se litigant

9    as if the litigant, the person they are trying to

10    collect the debt from, they proceed as if he has

11    full legal knowledge and treat him as having to

12    know rules of law, where very often they would,

13    you know, treat a pro se litigant a bit different.

14              One example is even when I send

15    out requests for discovery, generally I put in

16    time limits that are the time limits to answer the

17    discovery.  Sometimes I've seen Johnson

18    Rodenburg's requests for discovery where there are

19    no time limits stated.  So even though they

20    would -- I think most lawyers provide that

21    information.  They do not provide that information

22    to pro se litigants.

23    Q.      When we say "pro se," we are talking about

24    someone who is representing themselves?

25    A.      Yes.

1           MR. HEENAN:  I have no further

2    questions.  Thank you for your time, Mike.

3                THE COURT:  You may

4    cross-examine.

5                MR. SIMPSON:  Thank you.

6    CROSS-EXAMINATION

7    BY MR. SIMPSON:

8    Q.     Mr. Eakin, my name is Fred Simpson.  How

9    are you this afternoon?

10   A.     Good.

11   Q.     You and I have never seen each other in a

12   courtroom before, have we?

13   A.     No, we have seen each other in a law

14   office.

15   Q.     Just because we haven't seen each other in

16   a courtroom doesn't mean you're not in a Montana

17   courtroom on occasion, nor does it mean that I'm

18   not, does it?

19   A.     No.

20   Q.     There was some testimony about your

21   funding at Montana Legal Services.  You're funded

22   in large part by the tax payers, aren't you?

23   A.     True.

24   Q.     You're not here for free today.  You're

25   being paid by the taxpayer, correct?

1    A.        It depends if I list this as annual leave

2    or personal leave on my time sheet.

3    Q.        Mr. Eakin, when you prepared your report

4    in this case, your September 2, 2008 report -- do

5    you recall that?

6    A.        Yes.

7    Q.        You didn't do a complete investigation at

8    that time, did you?

9    A.        I think I mentioned that I had done a

10   cursory investigation of the number of defaults.

11   Q.        And you're here in the courtroom today

12   offering the jury your expert opinion based on

13   your cursory investigation?

14   A.        It's based on the cursory investigation

15   that had been done at that time.  I more recently

16   took a bit more detailed look at that.

17             It is also based on the reading

18   that I do in debt-collection work.  It's also

19   based on discussions with other collection lawyers

20   that I talk to on a fairly routine basis about

21   percentages of defaults that they take.  And I

22   think the cursory investigation was related to the

23   percentage of defaults in collection cases.

24   Q.        The person you're here for today is Mr.

25   McCullough, true?

1    A.        True.

2    Q.        You wrote your report.  You had never met

3    him, had you?

4    A.        No.

5    Q.        You'd never spoken to him?

6    A.        No.

7    Q.        You didn't know what he thought about this

8    case.  You hadn't done complete investigation, had

9    you?

10   A.        At the time I wrote the report, I believe

11   I had read his pro se answer that he had filed

12   with the Court, so I had some idea of what he

13   thought about the lawsuit in which he was being

14   collected.

15   Q.        At the time you authored your report, you

16   weren't aware of what information my client had in

17   its file as to the statute of limitations, were

18   you?

19   A.        No.

20   Q.        You recall some questions by Mr. Heenan

21   about your opinion that the debt-buyer number of

22   lawsuits has rapidly increased in the last decade

23   or so?

24   A.        Yes.

25   Q.        That might also be because people aren't

1    paying their debts, true?

2    A.       That could be, yes.

3    Q.       There was quite a bit of discussion about

4    what can happen when a default judgement is taken

5    against a debtor.  Do you recall that testimony?

6    A.       Yes.

7    Q.       First of all, you're aware that my client

8    never took a default judgement against Mr.

9    McCullough, correct?

10   A.       Yes, I know he did not take, that Johnson

11   Rodenburg did not take a default judgement against

12   Mr. McCullough.

13   Q.       So it never tried to garnish his wages or

14   Social Security income.  It never did anything to

15   try to execute on any assets he might have.  True?

16   A.       Not against Mr. McCullough.

17   Q.       Default judgements in general, those are

18   allowed by the State of Montana, aren't they?

19   A.       Yes.

20   Q.       In fact, to get a default judgement, the

21   creditor, the plaintiff, has to go to the Court

22   and apply to the Court for the default judgement.

23   True?

24   A.       They do not have to physically go to the

25   Court.  They have to submit sufficient paperwork

1    to get it done.

2    Q.      Right.  It's not like something they

3    create at their office, sign it themselves and

4    ship it out and, voila, there's a default

5    judgement.  You have to go to the Court either

6    through --

7    A.      It's something created in the law office

8    and mailed to the court for the judge to sign.

9    Q.      So the judge has sanctioned default

10   judgements, correct?  Judges do it?

11   A.      Yes.

12   Q.      You had some criticism of my client's

13   practice on occasion of not treating pro se

14   litigants the same as litigants who have

15   attorneys.  Is that right?

16   A.      Yes, and it would be something that, you

17   know, not the same way I treat other lawyers, but

18   apparently the way Johnson Rodenburg would treat

19   other lawyers, possibly, speculation, because they

20   practice in numerous states.

21   Q.      You're aware that Johnson Rodenburg has a

22   client it's representing, true?

23   A.      Yes.

24   Q.      And Johnson Rodenburg's primary duty is to

25   its client, is it not?

1    A.        It also has a duty to the Court.

2    Q.        True.  But it does have a duty to

3    represent its client zealously and to the full

4    balance of the law, correct?

5    A.        I'm not sure I agree with the term

6    zealously.  I think in Montana the Rules of Ethics

7    have changed and they have dropped the word

8    'zealous representation.'

9              They do have an obligation to

10   represent their client diligently and try to seek

11   legal of their client.

12   Q.        When you're at Montana Legal Services

13   representing your client, you're putting your best

14   effort forth to represent your client, not the

15   other side, true?

16   A.        Within limits, yes.

17   Q.        And in fact, the Rules of Civil Procedure

18   apply equally to the parties whether they have

19   lawyers or not, true?

20   A.        Yes.

21              MR. SIMPSON:  No further

22   questions.

23              THE COURT:  Is there redirect

24   examination?

25              MR. HEENAN:  No, Your Honor.

1                    THE COURT:  Thank you, Mr. Eakin.

2      You may step down.

3                    MR. HEENAN:  May he be excused?

4                    THE COURT:  Yes.  Is there any

5      objection to him being dismissed?

6                    MR. SIMPSON:  No, Your Honor.

7                    THE COURT:  Yes.  He is excused.

8      Please call your next witness.

9                    MR. HEENAN:  Thank you, Your

10     Honor.  We are going to try a second run at this

11     and call Charles Dendy by video.

12                   THE COURT:  The jury will recall

13     the previous instruction I gave you with respect

14     to deposition testimony.

15                   MR. HEENAN:  Your Honor, I

16     apologize.  Can we have a short break, five

17     minutes?

18                   THE COURT:  All right.  This is

19     why we took a longer lunch break.

20                   MR. HEENAN:  I know.  I'm sorry,

21     Your Honor.

22                   THE COURT:  We will take a short

23     break and hope they let us know very quickly that

24     things are ready to go.

25                        We will take a short recess and

1   do remember the admonitions I had previously

2   given you.

3                    (Brief recess.)

4                    THE COURT:  We are again in

5   session.  I understand the video is queued and

6   ready to go.  You may proceed.

7                    MR. HEENAN:  Thank you, Your

8   Honor.

9                    (At which time the videotaped

10  deposition of Charles Dendy is played for the

11  jury.)

12                   MR. HEENAN:  At this time, Your

13  Honor, I would like to publish for the jury

14  Exhibits 14 and 15 which are already admitted

15  into evidence.

16                   THE COURT:  I understand there

17  are no objections.

18                   MR. SIMPSON:  No objection.

19                   THE COURT:  You may do so.

20                   MR. HEENAN:  First Exhibit 13.

21  Bring up Subject line.  Bring up the body of the

22  e-mail.

23                   THE COURT:  Ladies and gentlemen

24  of the jury, so you understand, these are the

25  documents about which Mr. Dendy just testified in

1    his deposition.  But since we were showing the

2    video deposition, we couldn't show these

3    documents at the same time.

4                    So you may proceed.  Go ahead,

5    Mr. Heenan.  I think this was read.

6                    MR. HEENAN:  Thank you, Your

7    Honor.

8                    Exhibit 14, please?  Oh, wait.

9    Stay on 13.  Please put up the response reference

10   by Mr. Dendy.  Thank you.

11                   Now Exhibit 14, please.  Bring up

12   that whole thing.  And then page two, please, of

13   the subpoena.  Bring up all that.  Thank you.

14                   THE COURT:  Okay.

15                   MR. HEENAN:  Plaintiff will now

16   call Kerri Henan live, Your Honor.

17                   THE COURT:  Please come forward

18   and be sworn.

19                   KERRI HENAN, having been duly sworn, was

20   examined and testified as follows:

21                   THE CLERK COURT:  Please have a

22   seat, state your name and spell it for the

23   record.

24                   THE WITNESS:  My name is Kerri

25   Henan.  K-e-r-r-i, H-e-n-a-n.

1

2    DIRECT EXAMINATION

3    BY MR. HEENAN:

4    Q.      Hi, Kerri.  Thanks for being here today.

5    Let's dispense with the first question.  You and I

6    aren't related, right?

7    A.      No.

8    Q.      I have one more vowel than you do in your

9    name, but we might share some Irish roots.

10   A.      Maybe.

11   Q.      Were you sued by Johnson Rodenburg?

12   A.      I was.

13   Q.      When?

14   A.      I think last fall -- no.  Was it 2007?  It

15   was last year part, yeah, 2008.

16   Q.      Would it refresh your recollection if I

17   handed you a copy of the Complaint?

18                   MR. HEENAN:  May I approach the

19   witness, Your Honor?

20                   THE COURT:  You may.

21                   THE WITNESS:  Oh, it was the

22   first of 2008, January.

23   BY MR. HEENAN:

24   Q.      And on behalf of whom did Johnson

25   Rodenburg sue you?

1    A.        From a Portfolio Recovery Associates.

2    Q.        Had you ever heard of Portfolio Recovery

3    Associates?

4    A.        No.

5    Q.        What is your understanding of why Johnson

6    Rodenburg, on behalf of Portfolio Recovery

7    Associates, sued you?

8    A.        They were behind Capital One Bank credit

9    card balance that was due, they said.

10   Q.        So it's your understanding that Portfolio

11   said they had the right to collect on this Capital

12   One Bank card?

13   A.        Correct.  That's the way I understood it.

14   Q.        Did you have a Capital One credit card?

15   A.        I did at one time, yes.

16   Q.        How long ago?

17   A.        It had to be when I was married, and that

18   was -- and I've been divorced for 16 years, so it

19   went clear back to that time.

20   Q.        So you can remember because it was when

21   you were still married.

22   A.        Yes.  Yes.  And this here, I've kind of

23   had to do some research to see when I had the

24   Capital One card.

25   Q.        Because it was back when you were married

1    16 years ago?

2    A.      Yes.

3    Q.      Was that a credit card that was yours

4    alone?

5    A.      No, no.  It was with both of us.

6    Q.      And when you say, "both of us," you and

7    your ex-husband?

8    A.      Correct.

9    Q.      Was that credit card dealt with somehow in

10   the divorce?

11   A.      It was, but, you know, I never looked to

12   see how it was dealt with, but yeah.

13   Q.      Did you choose to stop -- well, let me ask

14   you.  Did you stop paying on the Capital One Bank

15   card sometime in the divorce process?

16   A.      It was after the divorce.  I just couldn't

17   keep up with the payments.

18   Q.      What do you mean you couldn't keep up with

19   the payments?

20   A.      Well, it was just one of those things

21   where there was -- my daycare cost at that time

22   was more than my house payment, so my child

23   support check went strictly to pay for my -- paid

24   for my daycare for my children.  And it was just a

25   matter of basics, just the basic everyday needs of

1    having the house payment, paying for the food,

2    whatever, income versus expenses, you try to pay

3    everything you can and the amount of money that I

4    could pay towards them wasn't exactly what they

5    were looking for.

6    Q.      Did Capital One contact you trying to

7    collect this account?

8    A.      I'm sure they did.  I don't remember that.

9    But I'm sure they did.  I can't believe they

10   didn't.

11   Q.      Was it a long time ago?

12   A.      Yeah, long time ago.

13   Q.      When was the first time that you heard of

14   this Portfolio Recovery?

15   A.      When I was handed, when someone came to

16   the door and handed me a paper saying, "You've

17   been served."

18   Q.      So that would have been the first time

19   that you heard of Portfolio Recovery or this

20   Johnson Rodenburg?

21   A.      Yes, yes.

22   Q.      Had you ever been sued before?

23   A.      No.

24   Q.      Describe, please, what it felt like to get

25   sued.

1              MR. SIMPSON:   Your Honor,

2    objection, relevance.

3              THE COURT:   Overruled.   Briefly.

4    BY MR. HEENAN:

5    Q.      You can answer.

6    A.      Basically, when I got it, I remember just

7    feeling really flushed.   I mean, it was an

8    embarrassing moment to be served, to have someone

9    come to your door.   And I think there was --

10   between the date that this had been filed in court

11   and the time that they served me, I think there

12   was a two-week time.   So I knew somebody had been

13   probably around my house at that time for that

14   couple of weeks, and that brought a lot of

15   embarrassment to me.   I was like, oh, my gosh.

16   There has been someone around my neighborhood

17   looking for me for that long time.   It was

18   embarrassing.

19   Q.      Your children were home?

20   A.      My son was at home.   In fact, I think he

21   was the one who answered the door.   It was also

22   late at night when they finally caught up with me.

23   It was after eight o'clock.

24   Q.      Is that because you were ducking them?

25   A.      No, no.   I work close to 80 hours a week

1    between my two jobs, so I'm not home.  I'm just

2    not home.  So that's when they caught me.

3    Q.      After you had been served by this process

4    server with this lawsuit, what did you do?

5    A.      Well, I didn't know what to do, to be

6    honest.  I was embarrassed and I didn't want to do

7    anything.  I was hoping it would somehow go away.

8    And I talked to a couple of people and they gave

9    me your name, so I contacted you for help.

10   Q.      And you hired me?

11   A.      I did.

12   Q.      And what happened after you hired me to

13   represent you?

14   A.      You went through your process of the

15   depositions and whatever, and in the end of the

16   case, because it was past the time limit, the case

17   was, you know, released.  I don't know the exact

18   word, but it was gone finally.

19   Q.      Gone forever.

20   A.      Yeah.

21              MR. HEENAN:  I don't have any

22   more questions.  Thank you, Your Honor.

23              THE COURT:  You may

24   cross-examine.

25

1

2     CROSS-EXAMINATION

3     BY MR. SIMPSON:

4     Q.      Ms. Henan, hello.

5     A.      Hi.

6     Q.      I represent Johnson, Rodenburg and

7     Lauinger.  My name is Fred Simpson.

8                   You don't know anything about Mr.

9     McCullough's lawsuit against Johnson, Rodenburg &

10    Lauinger, do you?

11    A.      Not other than we have some similarities,

12    but other than that. . .

13    Q.      How did you learn of those similarities?

14    A.      I was in John's office in --

15                   MR. HEENAN:  Objection.

16    Attorney-client privilege.

17                   THE COURT:  Sustained.

18                   MR. SIMPSON:  Your Honor, may I

19    approach the bench?

20                   THE COURT:  You may.

21                   You know, it's 3:30.  We had a

22    brief recess earlier, but let's take our

23    afternoon recess.  We will take a little shorter

24    recess than we normally do, since we had one

25    break.  So we will be in recess ten minutes.

```
 1     Please remember the admonitions I gave you
 2     earlier.
 3                    And I will see counsel in
 4     chambers.
 5                    (The following discussion took
 6     place in chambers:)
 7                    THE COURT:  Okay.  We are now in
 8     chambers with counsel present, but out of the
 9     hearing of the jury.
10                    Mr. Simpson?
11                    MR. SIMPSON:  I think Ms. Henan's
12     knowledge is directly relevant to her testimony
13     here.  I asked her how she came to learn of this
14     and she was about to tell us she learned it
15     through Mr. Heenan.  This is exactly the problem
16     that I raised in pretrial conference and in the
17     pretrial order, that by allowing her to testify
18     regarding the similarities of her case to Mr.
19     McCullough she is opening the door to what he
20     learned.
21                    THE COURT:  She didn't testify,
22     as I recall, to any similarities until you asked
23     her.  You're the one who asked her about the
24     similarities.  I don't recall that Mr. Heenan
25     did.  Mr. Heenan asked her about her lawsuit and
```

1    her getting sued.  But he didn't ask her, as I

2    remember, anything about Mr. McCullough.

3                    Is that correct, Mr. Heenan?

4                    MR. HEENAN:  That is correct,

5    Your Honor.

6                    THE COURT:  So you opened the

7    door to this, not him.  So I'm confused about why

8    you're objecting now, when you asked it, after

9    complaining about it earlier and I admonished Mr.

10   Heenan not to go there.

11                   MR. SIMPSON:  Well, we objected

12   to the line of testimony in the first place,

13   believing in the end he is going to argue, look,

14   they were doing to her exactly what they are

15   doing to him, and she got up and said, unknown to

16   us, there is a statute of limitations now with

17   her claim as well.  And she is clearly being

18   offered to show like conduct, information we

19   didn't know about, and now I asked her what the

20   basis of the information is.  I didn't ask her

21   what her attorney told her.

22                   THE COURT:  She was disclosed

23   earlier, as I recall.  Is that correct?

24                   MR. HEENAN:  Correct.

25                   THE COURT:  So she is not a

1      surprise witness.  You could have taken her

2      deposition, you could have done whatever you

3      wanted to do.  So you can't come complaining

4      about surprise now.

5                         I admonished Mr. Heenan, "Don't

6      start asking her about Mr. McCullough's lawsuit

7      or it's going to open the door to a lot."

8                         He didn't.  Now you've asked her

9      about that and now you want to know how she

10     knows.  She knows because her attorney told her.

11                        I sustained the objection.  Do

12     you have any other objections you wish to make?

13                        MR. SIMPSON:  No.

14                        THE COURT:  Is there anything

15     further on this subject?

16                        MR. HEENAN:  No, Your Honor.

17                        THE COURT:  I do have one other

18     thing.  In preparation for the witnesses,

19     plaintiff's expert witnesses, I again reviewed

20     the reports.  And with respect to Mr. Patten's

21     report, a couple of things came up that I wanted

22     to talk with counsel about.

23                        He renders an opinion in the

24     rebuttal report about the Rules of Professional

25     Conduct.  The Rules of Professional Conduct

1    themselves, in the Preamble, make clear they are

2    not a basis for civil liability.  And I don't

3    believe, based on the Preamble and the decisions

4    of the Montana Supreme Court, that they are a

5    standard for civil liability or evidence of a

6    standard of civil liability.  So I would suggest

7    that that testimony not be offered.

8                    If you wish to be heard, Mr.

9    Heenan, I will hear you.

10                   MR. HEENAN:  No, Your Honor.  We

11   will take what you're saying to heart.

12                   I would say, though, with respect

13   to the Johnson Rodenburg lawyers, they applied

14   for a license to practice law in the state of

15   Montana.  As part of that application process,

16   they promised contractually to follow the Rules

17   of Ethics.  And I do think that's fair game on

18   cross-examination.

19                   MR. BOHYER:  Since I'm going to

20   take Mr. Patten on the cross, may I respond?

21                   THE COURT:  Yes.

22                   MR. BOHYER:  The problem I have

23   first and foremost I want to address, I think

24   Rule 11 is also in the initial report too.

25   Johnson, Rodenburg & Lauinger is --

1                    THE COURT:  We are not talking

2    about the Rules of Civil Procedure.

3                    MR. BOHYER:  I'm sorry.  I meant

4    the Rules of Professional Conduct.  Pardon me.

5    I'm tired.

6                    So it's in both of those, so I

7    want to make sure I'm on that page.  As well part

8    of the problem here --

9                    THE COURT:  One moment.  Will you

10   get my book like this?  I think it's on the

11   bench.

12                   MR. BOHYER:  Part of the problem

13   is that, for example, any suggestion, evidence,

14   argument, opinion, about violations of the Rules

15   of Civil Procedure, Rules of Professional Conduct

16   or the like are addressed to the Court in which

17   that case is pending.

18                   With respect to a Rule 11 motion,

19   with respect to the violation of Rule 36 for not

20   including the warning language in there, none of

21   those motions were addressed to the judge who

22   could address that issue in that case.

23   Essentially what you've got here is an end around

24   on the judge who had jurisdiction of the original

25   case by now asking for a tort damage on a Rule 11

1      or Rule 36 violation that is addressed by the

2      rules, even in terms of sanctions, to the Court

3      that has jurisdiction of that case.

4                      THE COURT:  We will deal with

5      that in the examination and, if necessary, in the

6      instructions.

7                      The issue that I wanted to raise

8      here was with respect to the Rules of

9      Professional Conduct.  And in the Preamble, it

10     clearly says that a violation of the rules should

11     not give rise itself to a cause of action against

12     a lawyer, nor should it create any presumption in

13     such a case that a legal duty has been breached.

14     The Rules of Professional Conduct are not

15     designed to be a basis for civil liability.

16                     And so that was the purpose of

17     it.  I understand the issue you're raising with

18     respect to the Rules of Civil Procedure.  I think

19     that is a different question than the Rules of

20     Professional Conduct.

21                     As I said, we'll deal with that

22     as testimony is offered, and, if necessary, and I

23     know instructions have been offered on that and

24     we will deal with that at the time of settling

25     the instructions as well.

1                    MR. HEENAN:  If I might, Andy

2      Patten was going to testify tomorrow.  I went and

3      pulled Tom Lewis's expert trial testimony in the

4      Seltzer case and I'm going to bring copies for

5      counsel and the Court.  I intend to follow the

6      road map that was proved in Seltzer.

7                    THE COURT:  On another but

8      related point, it appeared again, I think, from

9      Mr. Patten's rebuttal report and I think also in

10     his initial report, that he is going to be asked

11     questions about the reasonableness of Mr.

12     Heenan's fee in the underlying case.

13                   MR. HEENAN:  We are not going to

14     go there, Your Honor.  That is all out.  I'm

15     not -- that's, I think, an issue for the Court

16     after.  Pursuant to the --

17                   THE COURT:  The fees in the

18     underlying case?  I thought you were asking,

19     according to the final pretrial order, you were

20     asking for that as an item of damage here.

21                   MR. HEENAN:  True.  I guess let

22     me hear what Your Honor was going to say.

23                   THE COURT:  My question was

24     whether there's a dispute about that and how far

25     down the road we need to go.  He has, in the

1     final pretrial order, indicated he is seeking

2     $1,520 for attorneys' fees incurred by Mr.

3     McCullough in the lawsuit which JRL brought.

4                     And my question was, is there any

5     dispute about that item?  In terms of the amount,

6     not perhaps the collectability of it, but in

7     terms of the amount.

8                     MR. BOHYER:  The actual dollar

9     amount?

10                    THE COURT:  Yes.

11                    MR. BOHYER:  In terms of the

12    reasonableness, yes.  I think there's a dispute

13    both with respect to the amount and the

14    reasonableness.  I would have to go back and look

15    at the bill, and there are time entries in there,

16    but it's not easy to go through it and parcel it

17    out.

18                    MR. SIMPSON:  I think the bill

19    was withdrawn as an exhibit, with the time

20    entries.

21                    MR. HEENAN:  It was withdrawn.

22                    THE COURT:  So we won't have an

23    issue about that.

24                    MR. HEENAN:  No, Your Honor.

25                    THE COURT:  Those were the only

1     things that I had.  Anything else?

2                        MR. SIMPSON:  There is one more

3     issue as to Ms. Henan on her cross.  I don't

4     think I have many questions on it, but, again, I

5     ask the Court's permission to inquire of her.

6     She is in fact a plaintiff against Johnson

7     Rodenburg.

8                        THE COURT:  Isn't she the one who

9     just settled?

10                        MR. HEENAN:  No, a different one.

11                        THE COURT:  I think he can ask

12    her that.  Any objection to that?

13                        MR. HEENAN:  No, but then I'm

14    going to stand up and say, You're the class

15    representative of a class action of all the

16    people that Johnson Rodenburg --

17                        THE COURT:  No, we are not going

18    to go there.

19                        MR. HEENAN:  I think it opens a

20    can of worms.

21                        THE COURT:  It does, but I think

22    he can ask her that, to show possible bias.  I

23    don't know for what purpose you would ask her

24    that, other than to bring up a bunch of evidence

25    that is not relevant.

```
1                      MR. HEENAN:  With the distinction
2      of the difference.  She is a class representative
3      so she is not filing a lawsuit trying to recoup
4      statute of limitations, that kind of stuff.  She
5      is prosecuting a case on behalf of a class of all
6      the people that have been sued in the state of
7      Montana.  It would not be a fair question to say,
8      You, Ms. Henan, have a lawsuit.  She has to say,
9      No, I on behalf of everybody in Montana that's
10     been sued.
11                     THE COURT:  Well, why don't you
12     ask her if she is -- what do you want to get in,
13     that she is a plaintiff's representative in a
14     class action lawsuit?
15                     MR. HEENAN:  That's fair.
16     Because she doesn't have the same financial
17     interest that she would.
18                     MR. SIMPSON:  It hasn't been
19     certified yet, has it?
20                     MR. HEENAN:  It hasn't been
21     certified.
22                     THE COURT:  But it's been brought
23     as a class action.  Whether or not it's allowed
24     to proceed is another question.  That's why I
25     don't think any of that is relevant here.
```

1                    I do think that the fact that she

2       herself is involved in a lawsuit against JRL is

3       legitimate cross-examination.  But if you wanted

4       to reflect that she's not the plaintiff but that

5       she is a plaintiff's representative --

6                    MR. HEENAN:  That's all I would

7       ask, Your Honor.

8                    MR. BOHYER:  I want to get this

9       straight.  You intend to ask her if she is a

10      plaintiff's representative?

11                   THE COURT:  No, my suggestion

12      was, if you want to cross-examine on that, rather

13      than saying, You're the plaintiff, he should

14      technically be correct and say, You're the

15      plaintiff's representative.  Which means she is

16      also a plaintiff.

17                   MR. SIMPSON:  She is a plaintiff.

18                   THE COURT:  She is.  She does

19      stand to benefit financially.

20                   MR. HEENAN:  Potentially.

21                   THE COURT:  Just like every other

22      member of the class.

23                   MR. SIMPSON:  To cut it short,

24      why don't I say, You've made a claim against

25      Johnson, Rodenburg & Lauinger for violation of

1    the Fair Trade Practices Act.  It's true.

2                    THE COURT:  Any objection to

3    that?

4                    MR. HEENAN:  But then can I stand

5    up and say, As a representative of a class of the

6    people.

7                    THE COURT:  What difference does

8    it make?  Whether it's as a representative, she

9    herself has a claim.  Correct?

10                    MR. HEENAN:  Correct.

11                    THE COURT:  So how is it possibly

12   relevant here that it's a class, that she's

13   representative of a class?

14                    MR. HEENAN:  I guess it's not

15   anything I want to fight about so I won't ask

16   that.

17                    MR. SIMPSON:  I will leave it

18   alone.

19                    MR. BOHYER:  I think the whole

20   inquiry, if she blurts out, Yeah, I'm in a

21   class --

22                    THE COURT:  I made my rulings.

23   You can do what you want.

24                    MR. SIMPSON:  We won't make it

25   more complicated than it has to be.

1                    THE COURT:  Someone has been
2       arrested on a criminal charge and I can't wait
3       until after the trial to see them.  So I'm going
4       to have to recess a little bit early and do an
5       initial appearance on a criminal Complaint before
6       five.
7                    MR. BOHYER:  I want to raise one
8       issue we only learned about at lunchtime today.
9       I believe it was this morning, Your Honor, in
10      chambers prior to trial.  Mr. Heenan had brought
11      up that in fact Ken Lucero, who will be a
12      witness, settled with whatever claim he had
13      against Johnson, Rodenburg & Lauinger last week.
14                    MR. HEENAN:  Correct.
15                    MR. BOHYER:  Obviously I was
16      concerned that Mr. Simpson and I didn't know
17      that.  I learned from our client at lunch that
18      they were prohibited, as a condition of
19      settlement, from advising us as their lawyer.
20                    MR. HEENAN:  That's not a fair
21      characterization at all.
22                    MR. BOHYER:  I'm telling you, we
23      were advised that was a condition of settlement.
24                    I have a real problem with that.
25      Confidentiality agreements in settlements are one

1    thing, but to prohibit the lawyers in a case that

2    is going to trial from knowing about it, and our

3    client reluctantly told us, not wanting to mess

4    up the settlement that has already been done.

5                    I have serious concerns, Judge,

6    with the evidence that is coming in and is going

7    to come in through Ms. Henan and Mr. Lucero that,

8    despite your rulings about this not being about a

9    bunch of other cases, we have already heard about

10   it.  And I know that --

11                   THE COURT:  Already heard about

12   what?

13                   MR. BOHYER:  About other cases.

14   And while I have tried to --

15                   THE COURT:  I'm not following

16   what you mean.  You mean the jury has already

17   heard?

18                   MR. BOHYER:  Yeah.  And I'm

19   concerned and I want to make sure that our record

20   is preserved here.  I understand that the Court

21   has made its rulings, but it is quite apparent,

22   both from the opening statement, from the

23   testimony of Ms. Henan, from the testimony of Mr.

24   Eakin, and I'm assuming from Mr. Lucero and Mr.

25   Patten tomorrow, that there is going to be a

1    variety of evidence that is going to come in,

2    indeed already has, about the practices of our

3    client in other cases.

4              THE COURT:  Let's be clear when

5    we are talking about other cases.  The evidence

6    that the plaintiff seeks to offer with respect to

7    lawsuits that your client has brought against

8    others I have not entirely precluded.

9              MR. BOHYER:  True.

10             THE COURT:  Lawsuits that those

11   people have on their own against JRL or others,

12   that's what I have said we are not going into.  I

13   have allowed you, if you want, to show bias of a

14   witness by asking about it.  It's your choice how

15   you want to handle that.

16             But I'm not clear, Mr. Bohyer,

17   what you're asking for relief of the Court at

18   this time, if any.

19             MR. BOHYER:  I guess I am.  And

20   that's a reconsideration of the ruling, Judge,

21   and that's, again --

22             THE COURT:  What ruling?

23             MR. BOHYER:  Of any evidence of

24   these other lawsuits by Ms. Henan, Mr. Lucero.

25             THE COURT:  I already said they

1     are not going to testify about their lawsuits.

2     Your client sued them.  That is allowed.  Is that

3     what you're asking me to reconsider?

4                     MR. BOHYER:  Yes, I am.  The

5     reason I'm doing it, and, again, I ask the

6     Court's review of that *State Farm v. Campbell*

7     case, because it is apparent to me in that case

8     the trial judge allowed evidence of other conduct

9     by State Farm, in both Utah and other

10     jurisdictions, to allow the plaintiff to prove

11     that the defendant acted in conformity in that

12     case.

13                     THE COURT:  We've already covered

14     this ground.

15                     MR. BOHYER:  I want to make sure

16     I've got my record preserved.

17                     THE COURT:  Anything else you

18     want to say to preserve your record?

19                     MR. BOHYER:  No.

20                     THE COURT:  That request for

21     relief is denied.

22                     MR. HEENAN:  Nothing further.

23                     THE COURT:  I understand the only

24     other evidence we are going to hear on this, Mr.

25     Heenan, is Mr. Lucero.

1                    MR. HEENAN:  Correct, Your Honor.

2                    THE COURT:  Anything else?

3                    MR. SIMPSON:  No.

4                    MR. HEENAN:  Off the record.

5                    (Discussion off the record.)

6                    (Brief recess.)

7                    THE COURT:  Court is in session.

8                    That took a little longer than I

9     thought it would.  In that regard, I want to tell

10    you, from time to time during the trial, it may

11    become necessary for me to talk to the attorneys

12    out of the hearing of the jury, either by having

13    a conference here at the bench or by calling a

14    recess.  Please understand that while you are

15    waiting, we are working.  The purpose of these

16    conferences is not to keep relevant information

17    from you but to decide how certain evidence is to

18    be treated under the Rules of Evidence, and to

19    avoid confusion and error.  Of course, we will do

20    what we can to keep these conferences and the

21    length of the conferences to a minimum.

22                    I may not always grant an

23    attorney's request for a conference.  Do not

24    consider my granting or denying a grant for a

25    conference as any indication of my opinion of the

1    case or what your verdict should be.

2                    You may continue, Mr. Simpson.

3                    MR. SIMPSON:  Thank you.

4    BY MR. SIMPSON:

5    Q.      Other than information you may have

6    learned in your conversations with Mr. Heenan, is

7    it fair to say you don't know anything about Mr.

8    McCullough's case?

9    A.      That's very correct.

10   Q.      It's true you had a Capital One credit

11   card back in the 1990s?

12   A.      Correct.

13   Q.      And it's also true that you fell behind on

14   the card, you fell behind in your payments?

15   A.      True.  Correct.

16   Q.      You failed to abide by the original terms

17   of your agreement with Capital One, true?

18   A.      Correct.

19                    MR. SIMPSON:  I have no further

20   questions.  Thank you.

21                    THE COURT:  Any redirect

22   examination?

23                    MR. HEENAN:  No, Your Honor.  I

24   ask that the witness be excused.

25                    THE COURT:  Any objection?

```
 1                    MR. SIMPSON:  No, Your Honor.
 2                    THE COURT:  Thank you, Ms. Henan.
 3     You may be excused.
 4                    Call your next witness.
 5                    MR. HEENAN:  Plaintiff will call
 6     Robert Dunker by video.  It's a 20-minute video.
 7                    THE COURT:  Ladies and gentlemen,
 8     I previously advised you about testimony taken by
 9     video deposition, and this time you will see a
10     deposition of Mr. Robert Dunker.  His videotape
11     deposition was taken on March 12, 2009.
12                    In the prior deposition, would it
13     help if we turned it up a little bit, or were you
14     able to hear okay?
15                    A JUROR:  We can hear.
16                    THE COURT:  Okay.  You may
17     proceed.
18                    MR. HEENAN:  Can we turn it on so
19     the jury can see, please.
20                    (At which time the videotaped
21     deposition of Robert Dunker is played for the
22     jury. )
23                    MR. HEENAN:  At this time, Your
24     Honor, I would like to publish for the jury
25     Exhibit 71, which has been admitted into
```

1    evidence.

2                    THE COURT:  Any objection?

3                    MR. SIMPSON:  No, Your Honor.

4                    THE COURT:  You may do so.

5                    MR. HEENAN:  If you could

6    highlight the whole thing, please.  And next

7    page, please, the whole thing.  Thank you.

8                    THE COURT:  Call your next

9    witness.

10                    MR. HEENAN:  Grace Lauinger by

11    video deposition.

12                    THE COURT:  Okay.

13                    MR. HEENAN:  This video, my

14    understanding, is 20 minutes.

15                    THE COURT:  Again, ladies and

16    gentlemen, I've previously advised you with

17    respect to video deposition testimony and that

18    you're to receive it and give it the same weight,

19    to the extent you're able, as you would give it

20    if the witness were here testifying live at

21    trial.

22                    Is it Grace Lauinger you said

23    you're calling?

24                    MR. HEENAN:  Yes, Your Honor.

25                    THE COURT:  Ms. Grace Lauinger's

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    testimony was taken by video deposition on July

2    22, 2008.

3                      You may proceed.

4                      MR. HEENAN:  Thank you, Your

5    Honor.

6                      (At which time the videotaped

7    deposition of Grace Lauinger is played for the

8    jury.)

9                      MR. HEENAN:  At this time I would

10   like to publish for the jury Exhibits 7 and 10

11   referenced in Ms. Lauinger's deposition, please.

12                      THE COURT:  Any objection?

13                      MR. SIMPSON:  No, Your Honor.

14                      THE COURT:  You may do so.

15                      MR. HEENAN:  Thank you, Your

16   Honor.

17                      Start with Exhibit 7.  Pull off

18   the top part, please.  Thank you.  Next page,

19   please.  Next page, please.  Next page, please.

20   Next page, please.  Next page, please.  Next

21   page, please.  Next page, please.

22                      And then Exhibit 10, please.

23   Pull up this bottom part, please.  Thank you.

24   And the response, please.  Thank you.

25                      THE COURT:  Ladies and gentlemen,

1    it is now 20 to five.  I have another matter that

2    has come up that I cannot put off until tomorrow,

3    so I'm going to recess early because I have to

4    conduct court in another matter briefly before

5    five o'clock.

6                    The good news is that we are

7    making good progress and so would it be difficult

8    for any of you to be here at 8:30 rather than

9    nine in the morning?  Okay.

10                   Is that satisfactory with counsel

11    and the parties as well?

12                   MR. HEENAN:  Yes, Your Honor.

13                   MR. SIMPSON:  Yes, Your Honor

14                   THE COURT:  Let's start at 8:30

15    tomorrow morning.  So do please be here ready to

16    go by 8:30 tomorrow morning.

17                   And, again, do remember the

18    importance of the admonitions I gave you earlier.

19    Don't discuss the case with anyone.  Don't do any

20    research on your own.  Keep an open mind until

21    all the evidence has been presented to you and

22    you've discussed the case with your fellow jurors

23    during deliberations.

24                   We will be in recess until 8:30

25    tomorrow morning.

1          C E R T I F I C A T E   O F   O F F I C E R.

2

3          I, Virginia Leyendecker, a Certified Shorthand

4     Reporter and Notary Public, do hereby certify that

5     the foregoing is a true and accurate transcript of

6     the testimony as taken stenographically by and before

7     me at the date, time and location aforementioned.

8          I do further certify that I am neither a relative

9     nor employee, nor attorney or counsel to any parties

10    involved; that I am neither related to nor employed

11    by any such attorney or counsel, and that I am not

12    financially interested in the action.

13

14

15

16    /s/Virginia E. Leyendecker, CSR

17    Notary Public

18    My Commission expires May 3, 2010

19    NJ C.S.R. License No. XI-1701

20

21

22

23

24

25

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061