1              IN THE U.S. DISTRICT COURT.
             FOR THE DISTRICT OF MONTANA
2                 BILLINGS DIVISION
             CAUSE NO. CV-07-166-BLG-CSO
3
    ------------------------------------------------
4
   TIMOTHY McCULLOUGH            :
5                                :
             Plaintiff           :  **COURT TRANSCRIPT**
6                                :     Volume II
        vs.                      :
7                                :
   JOHNSON, RODENBURG & LAUINGER:
8                                :
             Defendant           :
9
      ------------------------------------------------
10
             April 15, 2009
11
      ------------------------------------------------
12   R E P O R T E D   B Y:

13     VIRGINIA LEYENDECKER, Certified Shorthand

14   Reporter, (NJ License No. 1701) and Notary Public, on

15   the above date, commencing at 8:30  a.m., at the

16   James F. Battin United States Courthouse, 316 North

17   26th Street, Billings, Montana.

18

19   BEFORE: Hon. Carolyn S. Ostby

20

21

22

23

24

25

```
 1    A P P E A R A N C E S:

 2        HEENAN LAW FIRM
          BY:  JOHN HEENAN, ESQUIRE
 3             For the Plaintiff

 4        BOHYER, SIMPSON & TRANEL, P.C.
          BY:  FRED SIMPSON, JR., ESQUIRE
 5        and JOHN BOHYER, ESQUIRE
               For the Defendant
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              <u>INDEX</u>

2

        WITNESS:
3
        **Ken Lucero**
4
        Direct Examination by Mr. Heenan.................4
5       Cross-Examination by Mr. Bohyer..................17
        Redirect Examination by Mr. Heenan..............22
6

7       **James Patten**

8       Direct Examination by Mr. Heenan.............23, 41
        Voir Dire by Mr. Bohyer.........................40
9       Cross-Examination by Mr. Bohyer.................71
        Redirect by Mr. Heenan.........................115
10

11      **Donna Veraldi, Ph.D.**

12      Direct Examination by Mr. Heenan...............123
        Cross-Examination by Mr. Bohyer................146
13

14      **Timothy McCullough**

15      Direct Examination by Mr. Heenan...............168
        Cross-Examination by Mr. Simpson...............210
16

17      **Lisa Lauinger**

18      Direct Examination by Mr. Heenan...............221

19

        **Charles Dendy**
20
        Direct Examination by Mr. Simpson..............236
21      Cross-Examination by Mr. Heenan................269
        Redirect Examination by Mr. Simpson............288
22

23

        Admission of Exhibit 106.......................225
24

25

1                      THE COURT: The record will

2      reflect all of the jurors, counsel and the

3      parties are present.

4                      Plaintiff may call his next

5      witness.

6                      MR. HEENAN:  Thank you, Your

7      Honor.  Plaintiff will call Ken Lucero.

8                      THE COURT:  Mr. Lucero, please

9      come forward and be sworn.

10                  KEN LUCERO, having been duly sworn, was

11     examined and testified as follows:

12                      THE CLERK:  Have a seat, state

13     your full name and spell it.

14                      THE WITNESS:  My name and what?

15                      THE CLERK:  Tell us your name and

16     spell it for the record.

17                      THE WITNESS:  Kenneth Lucero,

18     K-e-n-n-e-t-h, L-u-c-e-r-o.

19     DIRECT EXAMINATION

20     BY MR. HEENAN:

21     Q.      Ken, can you please state your address as

22     well?

23     A.      1710 Evans, Butte, Montana.

24     Q.      Have you ever testified in a case before,

25     Ken?

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1     A.      No, never.

2     Q.      We need to go kind of slow so the jury can

3     hear you and the court reporter can type in what

4     is being said.

5     A.      Okay.

6     Q.      Mr. Lucero, were you sued by Johnson,

7     Rodenburg & Lauinger?

8     A.      Yes, I was.

9     Q.      And you were sued by Johnson, Rodenburg &

10    Lauinger on behalf of a company called Portfolio

11    Recovery Associates?

12    A.      Yes.

13    Q.      And Portfolio Recovery Associates --

14                    MR. SIMPSON:  Objection.

15    Leading.

16                    THE COURT:  Overruled.

17    BY MR. HEENAN:

18    Q.      Portfolio Recovery Associates asserted

19    that they had purchased your debt from another

20    company.  Is that correct?

21    A.      Yes.

22    Q.      Do you recall the company that they said

23    they purchased the debt from?

24    A.      No.

25    Q.      Would it refresh your recollection if I

```
 1    showed you the lawsuit?

 2    A.        Maybe.

 3                        MR. HEENAN:  Your Honor, this has

 4    been marked as Plaintiff's Exhibit 110.  It's not

 5    in evidence, but I would ask that it be published

 6    for the jury for illustrative purposes only.

 7                        THE COURT:  Any objection?

 8                        MR. BOHYER:  Objection to

 9    relevance and 403.

10                        THE COURT:  I will sustain and

11    you can show it to him.

12                        MR. HEENAN:  Thank you, Your

13    Honor.  May I approach?

14                        THE COURT:  You may.

15    BY MR. HEENAN:

16    Q.        Take a look at that, Ken, and see if you

17    recall who Portfolio said they had purchased an

18    account from.

19    A.        From City Financial.

20    Q.        Right.

21    A.        Yeah.

22    Q.        So Portfolio said they were suing you

23    because you owed money to City Financial.

24                        THE COURT:  Please don't lead

25    him, okay?
```

 1                    THE WITNESS:  Yes, that's right.

 2                    MR. HEENAN:  Sure, Your Honor.

 3    BY MR. HEENAN:

 4    Q.      Had you ever borrowed money from City

 5    Financial?

 6    A.      No, never.

 7    Q.      Did you have an account with City

 8    Financial?

 9    A.      No.

10    Q.      Did you owe City Financial any money?

11    A.      No.

12                    MR. BOHYER:  Objection relevance,

13    Your Honor.

14                    THE COURT:  Overruled.

15    BY MR. HEENAN:

16    Q.      What was your recollection when you were

17    served with this lawsuit?

18    A.      I got a little worried.

19    Q.      Why is that?

20    A.      Because I didn't know what it was all

21    about.  I mean, cops come to my door and knock on

22    the door and serve me all these papers, and,

23    looking at them, I don't know what it's all about.

24    Q.      So what did you do after you had been

25    served with all these papers by the police?

1   A.        I don't know.  I tried to get hold of

2   Legal Aid.  I couldn't get hold of them.  So I

3   know this attorney in Butte.  I took them down to

4   him and he filed a paper for me.

5   Q.        Who was the attorney that you knew?

6   A.        Vicevich.

7   Q.        He is a private attorney in Butte?

8   A.        Yes.

9   Q.        And how did you know Vicevich?

10  A.        I had a case with him for my Social

11  Security.  I was trying to get Social Security

12  disability and he had the case.

13  Q.        And he helped you to get Social Security

14  disability?

15  A.        No, I didn't get it that time.  I had to

16  refile.

17  Q.        So did Mr. Vicevich step in and defend you

18  in the lawsuit that had been brought against you

19  by Johnson Rodenburg?

20  A.        No, he just filed this answer, they call

21  it, and he told me to go file.  It would cost me

22  70 bucks to do it.  And he said that he couldn't

23  help me unless I had a thousand bucks up front.

24  Q.        Did you have a thousand bucks up front?

25  A.        No, I didn't.

1   Q.      So basically, he, for free --

2                   THE COURT:  Please don't lead

3   him.

4                   MR. HEENAN:  Sure.  Sorry, Your

5   Honor.

6   BY MR. HEENAN:

7   Q.      Did Mr. Vicevich say that he could help

8   you going forward?

9                   MR. BOHYER:  Objection.  Hearsay.

10                  THE COURT:  Overruled.

11  BY MR. HEENAN:

12  Q.      Did Mr. Vicevich say he could defend you?

13  A.      No.

14  Q.      Did he say there was a way that he could

15  defend you?

16  A.      No.

17                  MR. BOHYER:  Objection, hearsay,

18  Your Honor.

19                  THE COURT:  I will overrule that,

20  but --

21                  MR. BOHYER:  May I have a

22  continuing objection?

23                  THE COURT:  You may.

24  BY MR. HEENAN:

25  Q.      Did you know how to answer a lawsuit?

1    A.       No, I didn't.

2    Q.       Would you have been able to answer the

3    lawsuit without Mr. Vicevich's assistance?

4    A.       No.

5                    MR. BOHYER:  Objection,

6    speculation.

7                    THE COURT:  Overruled.

8    BY MR. HEENAN:

9    Q.       So with Mr. Vicevich's help, did you

10   answer the lawsuit?

11   A.       Yeah, I guess I did.  He gave me papers

12   and said to file it.  And he said that I could

13   work something out with them while they had that

14   paper.

15   Q.       What did you do with the paper?

16   A.       I filed it with the District Court.

17   Q.       And then what was the next thing that

18   happened in the lawsuit?

19   A.       I got some more papers and I didn't know

20   what to do with them so I tried to get hold of

21   Legal Aid.  And I went to their office in Butte,

22   and there was a phone number I was supposed to

23   call --

24   Q.       When you say "the papers," let me stop you

25   there.

1                    MR. HEENAN:  May I approach the

2    witness?

3                    THE COURT:  You may.

4    BY MR. HEENAN:

5    Q.     The papers that you're talking about, Ken,

6    were those papers from Johnson Rodenburg?

7    A.     Yeah, they were.

8                    MR. HEENAN:  If you would please

9    bring up Exhibit 4-2, which is in evidence.

10   BY MR. HEENAN:

11   Q.     I want you to look at your screen there,

12   Ken.

13                   MR. HEENAN:  If you can blow up

14   just that language.

15                   MR. BOHYER:  I object to this.

16   This is reference to Mr. McCullough's suit.

17   There --

18                   THE COURT:  There is no question

19   pending.

20   BY MR. HEENAN:

21   Q.     See this language here, Mr. Lucero?

22   A.     Uh-huh.

23   Q.     Is that the same exact language that

24   Johnson Rodenburg sent you in the papers that

25   you're talking about?

1                    MR. BOHYER:  Objection.  Facts

2     not in evidence, Your Honor.

3                    THE COURT:  Overruled.

4     BY MR. HEENAN:

5     Q.      Mr. Lucero, if it helps you, you can

6     refresh your recollection by just looking at the

7     requests for admission that Johnson Rodenburg sent

8     you.

9     A.      I just kind of went over it a little bit

10    and didn't understand what it was so that's why I

11    tried to get hold of Legal Aid.

12    Q.      Was this language confusing to you?

13    A.      Oh, yeah.  I don't understand none of this

14    court stuff.

15    Q.      Was it clear to you from that language

16    what would happen if you didn't respond to these

17    requests within a certain time period?

18    A.      I wasn't sure, but I thought I should do

19    something about it.  The first papers I got were a

20    year old.  I wasn't sure if it was any good or

21    not.  But they kept sending the stuff, so I

22    thought I should get something done.

23                    So I tried to get hold of Legal

24    Aid.  So I called that 900 number -- or 800

25    number.

1    Q.        800, not 900.

2    A.        Right, but it was the 866 number.

3    Q.        For Legal Services?

4    A.        Right.

5    Q.        Because you didn't know how to deal with

6    this.  Is that fair?

7    A.        Right.  Right.

8    Q.        Were you able to get Legal Services to

9    assist you?

10   A.        Yes, I did.

11   Q.        Did you respond within 30 days to these

12   requests for admission?

13   A.        I don't think so.

14   Q.        Did you know that you needed to respond

15   within 30 days?

16   A.        I didn't understand them.  That's why I

17   got hold of Legal Aid.

18   Q.        In the meantime, did Johnson Rodenburg

19   file some more papers?  Did they file a motion?

20   A.        I think they did.  I'm not sure.

21   Q.        Let me show you something else, to see if

22   it refreshes your recollection.

23   A.        I was getting paperwork in the mail all

24   the time from them, from different lawyers, I

25   thought.

1                    MR. HEENAN:  May I approach the

2    witness?

3                    THE COURT:  You may.

4                    MR. HEENAN:  Thank you, Your

5    Honor.

6    BY MR. HEENAN:

7    Q.     What are those documents I just handed

8    you, Mr. Lucero?

9    A.     The thing here says Affidavit in Support

10   of a Motion.

11   Q.     Who is the affidavit by?

12   A.     Portfolio, looks like.  The plaintiff, you

13   mean?

14   Q.     Who signed the affidavit?

15   A.     Oh, who signed it?  Charles Dendy.

16                   MR. BOHYER:  Excuse me.  May I be

17   provided a copy of this?

18                   THE COURT:  Yes.  Would you show

19   counsel what you showed the witness, please.

20                   MR. HEENAN:  Sure, Your Honor.

21   It's Exhibit 110.  For the record, Your Honor,

22   these are Exhibits 110-7 and 110-3.

23                   THE COURT:  That exhibit was

24   withdrawn.

25                   MR. HEENAN:  That's right, Your

1     Honor.  I'm not going to offer it.

2     BY MR. HEENAN:

3     Q.      So who, again, was this affidavit signed

4     by?

5     A.      By Charles Dendy.

6     Q.      And what did Charles Dendy write in his

7     affidavit?

8     A.      Serving requests for admission upon the

9     defendant by mail March 29, 2007 and have received

10    no answer to these requests within 30 days as

11    required by law.

12    Q.      And then the second page that you're

13    holding, what is that document?

14    A.      Says Motion For Summary Judgement.

15    Q.      And what is the basis for the motion for

16    summary judgement?  What does it say right there?

17    A.      I don't understand.

18    Q.      Sure.  What is Johnson Rodenburg saying in

19    support of their motion?

20    A.      It's based upon the fact the requests for

21    admissions hereto served on the defendant are now

22    deemed admitted pursuant to law.

23    Q.      Thank you, Mr. Lucero.  So after you

24    received these documents, Legal Services came in

25    to represent you?

1     A.       I think it was after these, yeah.

2     Q.       Did the Court set a hearing on the motion

3     that Johnson Rodenburg had filed?

4     A.       Yeah, I think they did.

5     Q.       In Butte?

6     A.       Yep.

7     Q.       And did Legal Services appear at that

8     hearing on your behalf?

9     A.       Yeah, they did.

10    Q.       And you were there too?

11    A.       Right.

12    Q.       Right?

13    A.       Right.

14    Q.       And Johnson Rodenburg appeared in court

15    for that hearing?

16    A.       No, they didn't.

17    Q.       What was the judge's reaction when Johnson

18    Rodenburg didn't show up for the hearing?

19                    MR. BOHYER:  Objection,

20    relevance, Your Honor.

21                    THE COURT:  Sustained.

22                    MR. HEENAN:  I don't have any

23    more questions -- I'm sorry.  I do.

24    BY MR. HEENAN:

25    Q.       What was the disposition of that case?

```
 1    Did they drop the case against you?

 2    A.      Yes, they dropped it in July.

 3                    MR. HEENAN:  No further

 4    questions.

 5                    THE COURT:  You may

 6    cross-examine.

 7                    MR. BOHYER:  Thank you, Your

 8    Honor.

 9    CROSS-EXAMINATION

10    BY MR. BOHYER:

11    Q.      Mr. Lucero, good morning.

12    A.      Good morning.

13    Q.      Do you recall that we met once before?

14    A.      In Butte, wasn't it with you?

15    Q.      Yes, sir.  You remember that.

16    A.      You did my deposition.

17    Q.      I did.  I'm trying to recall, sir, did you

18    tell me whether you had ever been deposed before?

19    A.      What do you mean "deposed"?

20    Q.      Sitting in the conference room there with

21    a court reporter.  Was that the first time you had

22    ever done that?

23    A.      Yeah, that was the very first time.

24    Q.      That wasn't the only time you were

25    involved in a court proceeding, was it?
```

1      A.       No.

2      Q.       You had been in court before and testified

3      in that kind of thing.

4      A.       Just for myself.

5      Q.       Yeah.  But Mr. Heenan had asked you some

6      questions about your familiarity with the court

7      process, and I think I heard you say no, you

8      weren't familiar with it.

9      A.       Oh, well.  I mean this is a civil matter.

10     I was talking, what do you call that?  It was a

11     felony matter, whatever you want to call it.

12     Q.       My point, though, Mr. Lucero, when you

13     said you're not familiar with the court proceeding

14     and this kind of thing, you actually are familiar

15     with it, aren't you?

16                        MR. HEENAN:  I object.  That

17     mischaracterizes the witness' testimony.

18                        THE COURT:  Overruled.

19     BY MR. BOHYER:

20     Q.       I'm sorry.  I didn't hear your answer,

21     sir.

22     A.       It's been over 30 years since something

23     like this has happened.

24     Q.       The only point I'm asking, sir, is in fact

25     you're familiar with this court process, aren't

```
 1    you?

 2    A.        Yeah, I guess.

 3    Q.        When I was walking in this morning, I saw

 4    you sitting in the library with Mr. McCullough.

 5    Did you speak with him about this case?

 6    A.        No, I didn't.

 7    Q.        When I had spoken with you last summer,

 8    and I don't recall, sir, if it was July or August,

 9    but when we took your deposition there, I had

10    asked you if you'd ever met Mr. McCullough and you

11    told me you had not.  True?

12    A.        No, I didn't.  I still haven't.

13    Q.        Aside from you seeing that one blow-up

14    document today here from Mr. McCullough's case,

15    you told me you had never seen any of the

16    paperwork from his case, true?

17    A.        I never did, no.

18    Q.        And in fact, I think you told me that you

19    had never reviewed any of that or spoken to him.

20    A.        No, I never did.

21    Q.        That remains true today?

22    A.        That still remains true.  I didn't know I

23    was sitting next to him.

24    Q.        Lisa Lauinger, do you know her?

25    A.        No, I don't.
```

1    Q.      Have you ever spoken to her?

2    A.      I don't know.

3    Q.      You never talked with my clients on your

4    case, did you?

5    A.      With your client?  Who do you mean?

6    Q.      Do you know who my client is?

7    A.      Portfolio, isn't it?

8    Q.      No.

9    A.      Who is it?

10   Q.      I represent Johnson, Rodenburg & Lauinger.

11   A.      I never even knew I had a case here until

12   Mr. Heenan told me.  I thought I had a case

13   against Portfolio.

14                   MR. HEENAN:  Object to

15   attorney-client privilege.

16                   I don't want you to testify about

17   what you and I talked about.

18                   THE WITNESS:  Okay.

19   BY MR. BOHYER:

20   Q.      Your case was Portfolio against Ken

21   Lucero, true?

22   A.      That's what I thought, yes.

23   Q.      It wasn't Johnson, Rodenburg & Lauinger.

24   They were the lawyers, right?

25   A.      That's what I thought.

1    Q.       In fact, over the years and when this suit

2    finally got filed against you, your beef was with

3    Portfolio, true?

4    A.       I don't know that I had a beef with

5    anybody.  They sent me the paperwork.

6    Q.       My point, sir, is that the issues that you

7    had weren't with my clients.  They were with

8    somebody who was trying to collect the debt.

9    True?

10   A.       Right.

11   Q.       Some questions were asked of you earlier

12   by plaintiff's counsel that Johnson Rodenburg had

13   sued you.  Do you understand, Mr. Lucero, that

14   Johnson Rodenburg, they don't own that debt?  It's

15   not theirs they are collecting.  They are

16   collecting that for a client.

17   A.       I think so, yeah.

18   Q.       Okay.  Would you agree with me, sir, that

19   every client, including yourself, is entitled to

20   have a lawyer when they go into court?

21   A.       Right.

22                   MR. BOHYER:  Mr. Lucero, I

23   appreciate your time.  Thank you, sir.

24                   THE COURT:  Is there any

25   redirect?

1                          MR. HEENAN:  Just briefly, Your

2     Honor.

3     REDIRECT EXAMINATION

4     BY MR. HEENAN:

5     Q.      Mr. Lucero, I want you to -- hold on.

6     Who's the person who signed the Complaint against

7     you, Mr. Lucero?

8     A.      Down here?  Lisa -- I can't pronounce that

9     last name.

10    Q.      Spell it out.

11    A.      L-a-u-i-n-g-e-r.

12    Q.      Lauinger.

13    A.      Lauinger.

14    Q.      Who is the person who signed these

15    requests for admission?

16    A.      Charles Dendy.

17                         MR. HEENAN:  No further

18    questions.  Thank you.

19                         THE COURT:  Thank you, Mr.

20    Lucero.  You may step down.

21                         May this witness be excused?

22                         MR. HEENAN:  Yes, Your Honor.

23                         MR. BOHYER:  Yes, Your Honor.

24                         THE COURT:  You're free to go,

25    Mr. Lucero.

1                        Please call your next witness.

2                        MR. HEENAN:  Plaintiff would call

3     James Patten.

4                        THE COURT:  Please come forward

5     and be sworn.

6             JAMES PATTEN, having been duly sworn, was

7     examined and testified as follows:

8                        THE CLERK:  Please have a seat.

9     State your full name and spell it, please.

10                       THE WITNESS:  James Patten,

11    P-a-t-t-e-n.

12    BY MR. HEENAN:

13    Q.        Mr. Patten, good morning.

14    A.        Good morning.

15    Q.        Would you state your business address for

16    the record.

17    A.        2817 2nd Avenue North, Billings.

18    Q.        How are you employed, sir?

19    A.        I'm an attorney.

20    Q.        Where?

21    A.        The firm name is Patten, Peterman,

22    Bekkedal and Green.

23    Q.        That's a law firm here in town?

24    A.        Yes.

25    Q.        Private law firm?

1    A.       Yes.

2    Q.       You're one of the partners in that law

3    firm?

4    A.       I am.

5    Q.       Can you please summarize for the jury your

6    educational background.

7    A.       I have a degree from the University of

8    Montana in economics, and a law degree from George

9    Washington University.

10   Q.       When did you get your law degree?

11   A.       1978.

12   Q.       Have you been a practicing attorney since

13   then?

14   A.       Yes.

15   Q.       How many years is that?

16   A.       31.

17   Q.       All here in Billings?  Take us through the

18   evolution of your practice.

19   A.       Originally I practiced for three years

20   working for a group of farmers and ranchers,

21   dealing with environmental issues.  Then I opened

22   an office, and, shortly after that, started -- one

23   of the major parts of my work was collection of

24   primarily commercial accounts.

25                    And then, as the 1980s progressed,

1    economy went and got worse and collection of

2    commercial accounts tapered off and was replaced

3    with bankruptcy.  And that's pretty much what I've

4    done since.

5    Q.      What is kind of the distinction between

6    commercial accounts and consumer?  What does it

7    mean, a commercial account?

8    A.      What I mean by commercial account is a

9    business account, where a home contractor owns a

10   lumber yard, or something like that.

11   Q.      What would your role be as a lawyer

12   collecting on accounts?

13   A.      We file suit and prosecute a claim to try

14   to collect it for the lumber yard, in my example,

15   or whoever the owner of the account was.

16   Q.      To get a judgement?

17   A.      To get a judgement and then try to collect

18   on that judgement.

19   Q.      So I'm sorry.  I stopped you.

20   A.      Then that work kind of tapered off and it

21   was replaced with bankruptcy work, and that's

22   primarily what I've done since, is focused on

23   bankruptcy.

24   Q.      And what does it mean, bankruptcy work?

25   A.      People filing for bankruptcy or businesses

1    filing for bankruptcy or creditors in bankruptcy

2    cases.

3    Q.      Can you explain what a creditor is and

4    what a debtor is?

5    A.      The debtor in bankruptcy is the person

6    that owes the money and the creditor is the person

7    to whom the money is owed.

8    Q.      Is it fair to say sometimes you're

9    representing the people that owe the money or the

10   businesses that owe the money, and sometimes

11   you're representing the people or businesses that

12   are trying to collect the money?

13   A.      Yes.

14   Q.      Would it be fair to say you have a

15   specialization in debtor/creditor relations?

16   A.      Yes.

17   Q.      What would that mean?

18   A.      In connection with bankruptcy cases, a lot

19   of times there's work before the bankruptcy case

20   is actually filed, where you're suing somebody and

21   they file for bankruptcy, or our clients get sued

22   before they file for bankruptcy, and we represent

23   both parties, you know.  We represent creditors

24   and debtors in pre-bankruptcy kinds of lawsuits.

25   And we represent institutions and foreclosures and

```
 1    repossession and things like that, too.

 2    Q.      As part of your practice, have you ever

 3    filed lawsuits on behalf of creditors?

 4    A.      Yes.

 5    Q.      Many?

 6    A.      Hundreds, I would say.

 7    Q.      Is it fair to say sometimes the creditors

 8    are seeking a smaller amount of money, sometimes a

 9    larger amount of money?

10    A.      Yes.

11    Q.      In terms of what you need to do as a

12    lawyer representing a creditor, does that matter?

13    A.      In terms of what we do in preparing the

14    lawsuit to be filed?

15    Q.      Correct, whether it's a big one or small

16    one.  I mean, does matter how much work you have

17    to put into it?

18    A.      No, not really.  As an attorney, we are

19    obligated to engage in a diligent review of the

20    claim, to make sure that we can substantiate it.

21    So whether we are suing for $500 or $500,000, we

22    look at the documents that are provided to us, to

23    try to verify that there's a debt that's owed and

24    that we are suing for the correct amount of money

25    and that we are making proper claims.
```

1     Q.        Now, what do you mean by "verifying"?

2     A.        If we are representing a bank and we are

3     suing on a bank loan, then we have a copy of a

4     promissory note, which is the debtor's written

5     contract to pay the creditor.  And we look at the

6     promissory note to make sure the debtor signed it

7     and is obligated under it.  We will ask our client

8     for a printout of the account history or the

9     payment history to show what the bank, in this

10    instance, calculates it's owed.

11              When we were doing the commercial

12    collections, we would get copies of all the

13    invoices.  And if there was a credit application

14    that might provide for a particular rate of

15    interest or attorneys' fees, things like that, we

16    would get the credit application.  We would get

17    the invoices, we would get signed charge sheets.

18    Q.        Let me ask.  Is it important to be able to

19    look at a document regarding attorneys' fees?

20    A.        Yes.

21    Q.        Why?

22    A.        Without a signed agreement for attorneys'

23    fees, then the creditor is not entitled to recover

24    attorneys' fees.

25    Q.        Why is that?

```
 1   A.      It's the law.
 2   Q.      Is it a law that is subject to debate?
 3                MR. BOHYER:  Objection.  Legal
 4   conclusion.
 5                THE COURT:  Sustained.
 6   BY MR. HEENAN:
 7   Q.      Did I ask you to take a look at the
 8   circumstances and the documents in Mr.
 9   McCullough's case against Johnson Rodenburg?
10   A.      Yes, you did.
11   Q.      Did you agree to do that?
12   A.      Yes, I did.
13   Q.      And are you being compensated for your
14   time and services?
15   A.      I am.
16   Q.      What is that compensation?
17   A.      $225 an hour.
18   Q.      Is that any more or less than you charge
19   any other client?
20   A.      At this time it's less.
21   Q.      You charge current clients more?
22   A.      Yes.
23   Q.      Is providing expert testimony a
24   significant part of your practice?
25   A.      No.
```

1    Q.        Is it even a small part of your practice?

2    A.        Less than a small part of my practice.

3    Q.        Did you review the documents that I sent

4    you?

5    A.        I did.

6    Q.        And have you come to some conclusions,

7    having reviewed those documents, about the facts

8    and circumstances of this case?

9    A.        Yes, I have.

10   Q.        We started to, Mr. Patten, but I want --

11   how is a lawsuit initiated?

12   A.        A lawsuit is initiated by filing a

13   Complaint, which is a piece of paper which sets

14   out what the plaintiff alleges -- what facts the

15   plaintiff alleges would support whatever remedy

16   the plaintiff is asking for.

17   Q.        What's the lawyer's role in filing a

18   Complaint?

19   A.        The lawyer's role is to engage in, I

20   think, a reasonable or diligent effort to make

21   sure the facts alleged are true, that there is a

22   reasonable basis for the claims in the Complaint,

23   and that lawyers are seeking the truth through the

24   Complaint.

25   Q.        In the context of a collection action, how

1     would a lawyer verify the information before

2     filing a Complaint?

3     A.       A lawyer would look at the credit

4     application or the contract, if there was one.  A

5     lawyer would look at the documents that would

6     prove or establish the claim.  If there are

7     invoices or charge slips or things like that, the

8     lawyer would look at what claims are being

9     asserted, if there was a legal basis for them.

10    Q.       What do you mean by, "if there was a legal

11    basis for them"?

12    A.       You asked about attorneys' fees.  So if

13    there was a legal basis to claim for attorneys'

14    fees, if you're asking for the correct or allowed

15    amount of interest and that, generally, the amount

16    claimed is accurately calculated.

17    Q.       And how would you verify that the account

18    claimed is accurate?

19    A.       If you have an accounting -- for instance,

20    I had an example about a bank.  We would get

21    printouts from the bank that shows the beginning

22    loan balance and the payments that had been made

23    and the interest that has accrued, and we see what

24    the amount on that particular date is.  We verify

25    that the interest rate charges corresponds with

1       what is on the promissory note.

2                       When we were doing the commercial

3       collections, we would look at the invoices and

4       look at the statements and the bills that were

5       mailed and make sure that they tracked and, again,

6       that the interest rate was correct.  And if there

7       was a basis to claim attorneys' fees, we would

8       verify there was a contract that would allow

9       attorneys' fees.

10      Q.      And when you say verifying there's a

11      contract, would you want to actually have the

12      contract in the file?

13      A.      Yeah, we would always -- in the commercial

14      collection cases, it would show up in two ways.

15      One of them would be a credit application where

16      the debtor signed it saying, I agree to pay all

17      costs of collection, including attorneys' fees, or

18      some language to that effect.  Or they would sign

19      an invoice that had language at the bottom of it

20      by their signature that would allow for the

21      recovery of attorneys' fees.

22      Q.      Would it be acceptable to just have your

23      client say, Don't worry about it.  There is a

24      contract.  Ask for attorneys' fees.

25      A.      And then ask for attorneys' fees?

```
 1    Q.       Correct.

 2    A.       No.

 3    Q.       Why not?

 4    A.       Because we wouldn't have fulfilled our

 5    obligations to do a diligent research to show

 6    there was a basis for the claim we were making.

 7    Q.       Do you have an opinion about whether it's

 8    appropriate to rely solely on unsubstantiated

 9    information provided by a client?

10                     MR. BOHYER:  Objection.  Legal

11    conclusion.

12                     THE COURT:  Overruled.

13                     THE WITNESS:  Yes.

14    BY MR. HEENAN:

15    Q.       What is that opinion, sir?

16    A.       That you cannot rely on unsubstantiated

17    statements from your client.

18    Q.       Why not?

19    A.       Well, the rules are you have to make a

20    diligent inquiry to determine the accuracy of what

21    you're alleging in the Complaint.  And if you

22    simply adopt the unsubstantiated statements of

23    your client, and it depends on the circumstance,

24    of course, but if you just adopt the

25    unsubstantiated statements of your client, I don't
```

1    think you fulfilled the obligations to make your

2    diligent inquiry.

3    Q.        So if you can't just rely on what the

4    client's telling you, what do you need to do to

5    satisfy that burden?

6    A.        Well, it's going to depend on the

7    circumstance, obviously.  But if we are talking

8    about debt collection, you need to see evidence of

9    the debt.

10   Q.        The actual documents?

11   A.        Or a copy of it.

12   Q.        As part of your collection practice, have

13   you ever had occasion to prosecute for claims on

14   assigned debt or purchased debt?

15   A.        Not on a purchased debt.  On assigned debt

16   I have.

17   Q.        Explain to the jury what that is.

18   A.        What I mean by "assigned debt," if the

19   debt has been assigned to somebody else, by the

20   original creditor, assigned to somebody else to

21   actually try and collect on that debt.  And so the

22   commercial collections that I did a long time ago

23   were assigned to an entity called the Montana

24   Association of Credit Management.

25   Q.        Explain to the jury in the context of who

1          your client was and who they were getting the

2          assignment from.

3          A.        My client then was called the Montana

4          Association of Credit Management and it was a

5          group of credit managers of different businesses

6          around the state.  And instead of each company

7          doing their own collection, they created this

8          association and they would assign their claims to

9          the association.

10                        The association had a staff.  The

11         association would try to collect the debts on

12         their own, and, at some point, then, the

13         association would send the file to our office and

14         we would file suit and collect it through the

15         courts.

16         Q.        Okay.  So when the association would send

17         the file to you, what documents would be in there

18         before you could file a lawsuit?

19         A.        There would be an actual written

20         assignment, the original written assignment

21         where --

22         Q.        Let's tell the jury what the written

23         assignment is.

24         A.        It's a piece of paper that the creditor

25         would sign, saying, I'm assigning this claim to

1      the Montana Association of Credit Management to

2      collect.  So that --

3      Q.      Why is that important?

4      A.      Well, it gives the Montana Association of

5      Credit Management the authority to collect.

6      Q.      Why is that important?

7      A.      It's the law.  Otherwise you have to

8      either own -- you have to be a party to the

9      contract or you have to, you know, have acquired

10     the contract or you would have had to have the

11     contract rights assigned to you before you could

12     go and try to collect on it.

13     Q.      So the original of the written assignment

14     agreement is what you would require to have in

15     your file prior to filing suit?

16     A.      Yes.

17     Q.      Any other documents you require to have in

18     the file prior to filing a lawsuit?

19     A.      If there was a credit application or a

20     credit agreement, we would have that.  We would

21     have all the invoices.  We would have all of the

22     statements --

23     Q.      Why would the credit agreement or contract

24     be important?

25     A.      Well, that would set out the terms of the

1    interest rate that could be charged and whether

2    attorneys' fees could be charged, and it would set

3    out the basic contract between the debtor and the

4    creditor.

5    Q.      Would it be appropriate to include in a

6    lawsuit interest without any documents showing you

7    what the rate is?

8    A.      At the legal rate, yes.

9    Q.      What is the legal rate?

10   A.      The legal rate is 10 percent.  So if it

11   was more than 10 percent, you would need a written

12   contract that allowed for more than 10 percent.

13   Q.      Any other reason why it would be important

14   to have the actual contract or a copy of it in

15   your file?

16   A.      To make sure that you were suing the right

17   person, that the person that you were suing was

18   the one who entered into the credit arrangement to

19   begin with.

20   Q.      Any other reasons?

21   A.      Not that I can think of.

22   Q.      Well, are there any other documents that

23   you would want in your file prior to filing a

24   lawsuit?

25   A.      We would have the invoices so we could see

1    that in fact charges were made on an account or a

2    description of what service or goods was charged

3    and was subject to being collected.

4    Q.      Why would that be important?

5    A.      Again, sometimes, if the invoices were

6    signed, and back then it was kind of the practice,

7    then the invoices themselves might have the terms

8    of the contract on it.  So the invoice themselves

9    may have the interest rate or the allowance of

10   attorneys' fees.

11   Q.      Would it also show how much money the

12   person owed that you were suing?

13   A.      It would show how much they charged at

14   this point in time.  Then we would also have the

15   running account totals that would show the

16   invoices were paid or not paid, what the total was

17   adding up to.

18   Q.      How many of the invoices would you want in

19   the file prior to filing a lawsuit?

20   A.      We would want all of the invoices for the

21   time period that we were collecting on.  So if the

22   account was current through a certain date and

23   went into default after that date, we would want

24   the invoices after that date.  So we would want

25   all of the invoices that backed up the debt that

```
 1      the creditor was claiming.

 2      Q.      What do you mean by backed up the debt

 3      that the creditor was claiming?

 4      A.      Would verify that.  That was -- our

 5      reasonable inquiry into the facts was to look at

 6      the invoices and make sure they matched up with

 7      what the creditor claimed was on it.

 8      Q.      What if the creditor didn't provide you

 9      with any of those documents?  Would it be

10      appropriate to file a lawsuit?

11      A.      No.

12      Q.      Now, you've reviewed the depositions and

13      the documents in this case.

14      A.      Yes.

15      Q.      You're aware that Johnson Rodenburg had no

16      documentation, as you've just described, when they

17      sued Mr. McCullough.

18      A.      Yes.

19      Q.      Do you have an opinion about whether that

20      was appropriate?

21      A.      Yes.

22      Q.      What is your opinion?

23      A.      That it was not appropriate.

24      Q.      Why?

25      A.      Because it did not -- it showed that
```

1    Johnson Rodenburg did not do its reasonable

2    inquiry into the facts to show that indeed Mr.

3    McCullough owed the money as claimed by Johnson,

4    Rodenburg & Lauinger.

5    Q.      Do you have an opinion about what Johnson

6    Rodenburg should have done prior to suing Mr.

7    McCullough?

8    A.      Yes.

9                    MR. BOHYER:  Objection.

10   Foundation.

11                   May I voir dire the witness?

12                   THE COURT:  You may.

13                   MR. BOHYER:  Briefly, Your Honor.

14                   THE COURT:  Briefly.

15   VOIR DIRE

16   BY MR. BOHYER:

17   Q.      Mr. Patten, in terms of the experience you

18   have in collecting consumer debt, it's my

19   understanding that you haven't done any of that

20   for at least 20 years, or close to it.

21   A.      On the collection side or on the --

22   Q.      Yes, sir.  On the collection side.

23   A.      That would be correct.

24   Q.      In fact, if I'm not mistaken, you haven't

25   collected any credit card debt on behalf of banks

1     or credit unions, to your recollection, ever?

2     A.      That's correct.

3                     MR. BOHYER:  I object on the

4     basis of foundation, Your Honor.

5                     THE COURT:  Overruled.

6     BY MR. HEENAN:

7     Q.      You can answer.

8     A.      Could you re-ask the question?

9                     MR. HEENAN:  I think I'll have

10    the court reporter read it back.

11                    (Designated question is read.)

12                    THE WITNESS:  They should have

13    obtained the documentation from the credit card

14    issuer that showed the existence of a debt.

15    BY MR. HEENAN:

16    Q.      What specific type of documentation should

17    they have obtained?

18    A.      Copies of the credit card statements that

19    went out.

20    Q.      Why would that be important?

21    A.      Well, that would show that, as they

22    alleged in their Complaint, the credit card

23    statements went out -- the theory, the legal

24    theory and legal principle that Johnson, Rodenburg

25    & Lauinger sued Mr. McCullough under, and under my

1    experience in defending claims from that law firm,

2    is what is called an account stated.

3    Q.      What is that?

4    A.      It's when you send out a statement

5    periodically that shows either additional charges

6    or payments made on an account.  And when that

7    goes out periodically without dispute, and there's

8    activity on that account, payments and additional

9    charges, then it entitles in this case the credit

10   card company to a legal claim for the amount that

11   is owed on that account.

12              So the monthly invoices or

13   statements that would go to the borrower, Mr.

14   McCullough in this case, would show his charges

15   and his payments, would establish what is required

16   for an account stated, which is the legal basis

17   that they recovered on.

18   Q.      To prosecute a claim under an account

19   stated theory, would one statement be sufficient,

20   two?  How many would be sufficient before it's

21   appropriate to sue someone under an account stated

22   theory?

23   A.      I think at least the last one that showed

24   the dollar amount that they are suing under would

25   be required.  I think all of them would be

1      preferred.

2      Q.       Why would all of them be preferred?

3      A.       That way you could track whether the

4      interest rate's being charged right and what the

5      activity on the account was.

6                       MR. HEENAN:  Exhibit 67, please.

7                       This is already in evidence, Your

8      Honor.

9                       THE COURT:  Thank you.

10     BY MR. HEENAN:

11     Q.       Have you reviewed this document, Mr.

12     Patten?

13     A.       I have.

14     Q.       What is it?

15     A.       It is an --

16                      MR. HEENAN:  Blow that up,

17     please.

18                      THE WITNESS:  -- offer to place

19     an account for litigation.

20     BY MR. HEENAN:

21     Q.       And it's regarding my client, Mr.

22     McCullough?

23     A.       Yes.

24                      MR. HEENAN:  Thank you.  And then

25     the bottom part, please.

1   BY MR. HEENAN:

2   Q.      Who's the offer between?

3   A.      Johnson, Rodenburg & Lauinger and Collect

4   America.

5                   MR. HEENAN:   This language,

6   please.

7   BY MR. HEENAN:

8   Q.      In this case, you're aware that Collect

9   America, the client, told Johnson Rodenburg it

10  made no warranty regarding the collectability of

11  the accounts.

12  A.      Yes.

13  Q.      Do you have an opinion, in light of that

14  disclaimer, whether it was appropriate for Johnson

15  Rodenburg to sue Mr. McCullough without any

16  documents?

17                  MR. BOHYER:   Objection.   Legal

18  conclusion.

19                  THE COURT:   Overruled.

20                  THE WITNESS:   Yes.

21  BY MR. HEENAN:

22  Q.      What is your opinion, sir?

23  A.      Actually, Mr. Heenan, you underlined

24  something there and I think I should have

25  underlined it before.   Collect America makes no

1    warranty as to the accuracy or validity of the

2    data provided.

3                    So it is telling Johnson,

4    Rodenburg & Lauinger, we make no warranty as to

5    the accuracy of the information we have given you,

6    and they provide them with no documents to review.

7    So Johnson, Rodenburg & Lauinger can't engage in a

8    diligent research to verify that in fact the money

9    is owed by Mr. McCullough.  And it can't rely on

10   what its client is telling them because the client

11   is telling them that you can't rely on what we are

12   telling you.

13                    MR. HEENAN:  Exhibit 111-2,

14   please.  This is also in evidence, Your Honor.

15   BY MR. HEENAN:

16   Q.      You're aware that Johnson Rodenburg uses

17   this Collection Master software?

18   A.      Yes.

19                    MR. HEENAN:  Blow up that part,

20   please.

21   BY MR. HEENAN:

22   Q.      You've reviewed these internal Johnson

23   Rodenburg Collection Master notes as part of your

24   review of this case?

25   A.      Yes.

1    Q.        You're aware that Johnson Rodenburg

2    internally knew this is the Collect America batch

3    that we are having problems with?

4    A.        Yes.

5    Q.        Do you have an opinion, in light of that

6    internal knowledge that Mr. McCullough's accounts

7    were part of a batch of accounts that were

8    problematic, whether it would be appropriate to

9    sue Mr. McCullough without any evidence?

10   A.        I don't recall and I don't remember,

11   frankly, what the problems were that they were

12   having with it.  So I wouldn't have an opinion

13   based on that particular light.

14   Q.        That's very fair and I appreciate your

15   honesty.

16                   MR. HEENAN:   Thank you.

17   BY MR. HEENAN:

18   Q.        What is the statute of limitations?

19   A.        For an account stated, it's five years.

20   Q.        Lawyers kind of throw around the term

21   statute of limitations.  What does it mean in

22   layman's terms?

23   A.        It means that after in this case five

24   years has run from the time -- you have to file

25   suit within five years from when the last payment

```
 1    was made, or else it's too late to file suit.

 2    Q.       And that's the law.

 3    A.       Yes.

 4    Q.       What is a lawyer's obligations regarding

 5    the statute of limitations in terms of an inquiry

 6    or due diligence prior to filing a lawsuit?

 7    A.       To make an inquiry to make sure that the

 8    statute of limitations has not run.

 9    Q.       And what would that inquiry consist of?

10    A.       Looking at, for example, in looking at the

11    invoices or the statement of account with the

12    monthly invoices that came in, when the last

13    payment was made.

14    Q.       Why is it important to know when the last

15    payment was made?

16    A.       Because that's what starts the five-year

17    clock.  So if you've seen on the credit card

18    statements, they always say at the bottom or

19    someplace on there, Payment, X number of dollars,

20    Thank you.  If you look through all of them, you

21    find that last payment that was made and you

22    calculate five years from that date.

23    Q.       Do you have an opinion about whether it

24    would be appropriate for a lawyer -- strike that.

25             Do you have an opinion in the
```

1    context of this case whether it was appropriate

2    for Johnson Rodenburg to sue Mr. McCullough based

3    on an e-mail from someone at CACV stating that a

4    payment had been made in 2004, without any

5    documentation?

6    A.       Yes, I have an opinion.

7    Q.       What is that opinion?

8    A.       It is not appropriate.

9    Q.       Why not?

10   A.       Because they don't know.  And first of

11   all, CACV has already --

12                 MR. BOHYER:  Your Honor, I object

13   to this line of nondisclosure.  I don't believe

14   this is in the report.

15                 THE COURT:  Was this disclosed,

16   Mr. Heenan?

17                 MR. BOHYER:  I may have

18   overlooked it, but I don't see it.

19                 MR. HEENAN:  Your Honor, I

20   thought so.  I thought Mr. Patten spoke to

21   statute-of-limitations issues.

22                 MR. BOHYER:  I mean with

23   specifics with respect to the question asked.

24   The statute of limitations is discussed in there,

25   but this opinion is not.

1                        THE COURT:  If you could show me,

2        Mr. Heenan, where it's disclosed, then I will

3        allow you to continue.  Otherwise the objection

4        is sustained.

5                        MR. HEENAN:  I will just move on,

6        Your Honor.

7                        THE COURT:  Okay.

8                        MR. HEENAN:  Exhibit 3, please.

9        BY MR. HEENAN:

10       Q.      You're aware Mr. McCullough filed a pro se

11       answer to this lawsuit?

12       A.      Yes.

13       Q.      What does pro se mean?

14       A.      Filed it without an attorney.

15       Q.      And you're aware that Mr. McCullough --

16                       MR. HEENAN:  Number 1, please.

17       BY MR. HEENAN:

18       Q.      -- asserted, The statute of limitations is

19       up.  I've not had any dealings with any credit

20       card in well over eight and a half years.

21       A.      Yes.

22       Q.      Do you have an opinion about what a lawyer

23       should have done receiving a pro se answer like

24       this specifically saying that the statute of

25       limitations is up, haven't had any dealings in

1    eight and a half years?

2                    MR. BOHYER:  Objection, Your

3    Honor, nondisclosure.  I don't believe this is in

4    the report either.

5                    THE COURT:  Mr. Heenan, can you

6    tell me where I could find that?

7                    MR. HEENAN:  Yes, Your Honor.  We

8    are moving on to the requests for admission,

9    where they ask Mr. McCullough to admit that he

10   had never --

11                   THE COURT:  Let's talk about the

12   question that is pending, which is a dispute upon

13   receiving an answer such as the exhibit that is

14   before the jury now.  That's the specific

15   question to which objection has been made.

16                   MR. HEENAN:  I will move on to

17   the request for admission.

18                   THE COURT:  Okay.

19                   MR. HEENAN:  Thank you, Your

20   Honor.  Exhibit 4-2, please.

21   BY MR. HEENAN:

22   Q.      Have you reviewed this document, Mr.

23   Patten?

24   A.      Yes, I have.

25   Q.      What is it?

1    A.       Requests for admission.

2    Q.       That were served on Mr. McCullough?

3    A.       Yes.

4    Q.       While he was defending himself?

5    A.       Yes.

6    Q.       What are requests for admission?

7    A.       That is part of the legal process whereby

8    a party can ask another party to admit certain

9    facts.

10   Q.       What is the purpose for a request for

11   admission?

12   A.       Well, it's to get the facts admitted so

13   they are no longer in dispute.  In this case, and

14   in my experience with the Johnson, Rodenburg &

15   Lauinger firm, they use requests for admission in

16   order to position themselves to file a summary

17   judgement motion.

18   Q.       Why would they want to position themselves

19   to file a summary judgement motion?

20   A.       That, then, avoids a trial and you

21   essentially deal with the case -- you show there

22   are no facts in dispute and that you're entitled

23   to a judgement as a matter of law and you avoid

24   the time and trouble of a trial.

25   Q.       Is it also a way to win a case without any

1    evidence?

2    A.      Yes.

3    Q.      How so?

4    A.      If the facts are admitted, then you don't

5    have to prove them.

6    Q.      I want to direct your attention, Mr.

7    Patten, to this initial language.  Have you

8    reviewed this language before, Mr. Patten?

9    A.      I have.

10   Q.      Have you seen it other places?

11   A.      I have.

12   Q.      In what places have you seen it?

13   A.      I've seen it in all of the requests for

14   admission that I receive on behalf of my clients

15   from the -- I know from Mr. Dunker, Mr. Dendy.  I

16   don't know if the other attorneys use the same

17   language, but I know Mr. Dendy's forms have the

18   same language.

19   Q.      Do you have an opinion about whether this

20   form language is appropriate?

21   A.      Yes, I do.

22                   MR. BOHYER:  Objection, Your

23   Honor.  Legal conclusion.

24                   THE COURT:  Overruled.

25

```
 1    BY MR. HEENAN:

 2    Q.      What is your opinion, sir?

 3    A.      That it's not appropriate.

 4    Q.      Why?

 5    A.      In that it fails to notify Mr. McCullough

 6    or the defendant of the consequences of not

 7    answering, of not denying the requests for

 8    admission within 30 days, which is that they are

 9    then deemed admitted.

10    Q.      Why is that important?

11    A.      Well, the instructions that you've blown

12    up there appear to tell Mr. McCullough all of his

13    requirements in dealing with these, but they leave

14    out sort of the most central one.  That is,

15    admissions will be deemed admitted if not denied.

16    Q.      Is this language confusing to you as an

17    experienced lawyer?

18    A.      Kind of.

19    Q.      Is it your opinion that it's not so much

20    what it says but what it doesn't say?

21    A.      Yes.

22    Q.      That would be what?

23    A.      It doesn't say that if you don't deny the

24    admissions in 30 days they would be deemed

25    admitted.
```

1    Q.       You've reviewed -- well, let me ask you.

2    You were asked to offer opinions with respect to

3    Johnson Rodenburg's conduct as a debt collector

4    under the federal Fair Debt Collection Act?

5    A.       Yes.

6    Q.       One of the issues you looked at was this

7    requests for admission that Johnson Rodenburg sent

8    out to Mr. McCullough, sends out to other people

9    in Montana.  Correct?

10   A.       Yes.

11   Q.       And you rendered opinions regarding

12   whether that's appropriate.

13   A.       Yes.

14   Q.       What were those opinions?

15                    MR. BOHYER:  Objection.  Any

16   opinions with respect to the FDCPA are irrelevant

17   at this point.

18                    THE COURT:  Sustained.

19   BY MR. HEENAN:

20   Q.       You're aware that since you rendered your

21   opinions Judge Ostby has rendered some opinions.

22   Isn't that true?

23   A.       Yes.

24   Q.       They are now the law of the case.  Right?

25   A.       Yes.

1                    MR. BOHYER:  Objection.  Legal

2      conclusion.  Invades the province of the Court.

3                    THE COURT:  Overruled.  The jury

4      has been told that, Mr. Bohyer.

5                    Move along, Mr. Heenan.

6      BY MR. HEENAN:

7      Q.      You're aware the judge concluded this was

8      an unfair and deceptive practice by Johnson

9      Rodenburg?

10     A.      Yes.

11     Q.      Do you agree with the Court's decision?

12     A.      Yes.

13                   MR. BOHYER:  Your Honor, I object

14     to that.  That's not what the Court has advised,

15     and I move to strike that specific statement and

16     that the jury be instructed to disregard it.

17                   THE COURT:  Well, I'm going to

18     sustain that and move to strike.  Whether or not

19     the expert witness agrees with what the Court has

20     done, the jury will be instructed as to the

21     Court's rulings.  So I'll strike that.

22                   And could you move along, please.

23                   MR. HEENAN:  Thank you, Your

24     Honor.

25                   Page two, please, of Exhibit 4.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

```
1    BY MR. HEENAN:

2    Q.      I want to direct your attention to

3    paragraph 21 on these requests for admission.

4               You're aware internally, at the

5    time these requests for admission were sent to Mr.

6    McCullough, Johnson Rodenburg had received

7    information from its own client saying there had

8    not in fact been a payment made on June 30, 2004?

9    A.      Yes.

10   Q.      Do you have an opinion, in light of

11   Johnson Rodenburg's internal knowledge from their

12   client that this information was not in fact true,

13   whether it was appropriate to ask Mr. McCullough

14   to admit it to be true?

15   A.      Yes.

16   Q.      What is your opinion?

17   A.      That it was not appropriate.

18   Q.      Why not?

19   A.      They knew that it was not true and it is

20   an abuse of the rules that we operate under, I

21   think, to ask him to admit something that they

22   knew was not true, that went to the heart of the

23   case.

24   Q.      Is it zealous advocacy to ask someone to

25   admit something the lawyer knows to be false?
```

1                    MR. BOHYER:  I object.  This

2     violates an order with respect to the rules we

3     discussed yesterday.

4                    THE COURT:  Overruled.  I don't

5     think it has been specified.  You may

6     cross-examine about what he is referring to.

7                    Please rephrase or re-ask the

8     question.

9                    MR. HEENAN:  Thank you.

10    BY MR. HEENAN:

11    Q.     Is it zealous advocacy for the attorney to

12    ask the opposing party to admit something that

13    they know or should know to be false?

14                   MR. BOHYER:  Objection, Your

15    Honor, nondisclosure.

16                   THE COURT:  Mr. Heenan, was this

17    disclosed?

18                   MR. HEENAN:  I believe so, Your

19    Honor.  Right on page four, top paragraph.  I can

20    read it to the Court if you want me to.

21                   THE COURT:  I have it.  I

22    overrule the objection.

23                   THE WITNESS:  It's not zealous

24    advocacy.

25

1    BY MR. HEENAN:

2    Q.        Why not?

3    A.        Because there is no factual basis for it.

4    Q.        What do you mean by that?

5    A.        Johnson, Rodenburg & Lauinger knew that

6    there had not been a payment on June 30.  So it's

7    not -- it's not advocacy to use the discovery as a

8    means to get that admitted inadvertently, maybe,

9    by Mr. McCullough by not answering the request for

10   admissions within 30 days.

11                    The lawyers are required to pursue

12   the truth.  That is the rule that we operate

13   under.  And this is not pursuing the truth.  This

14   is doing the opposite.

15                    MR. HEENAN:  Thank you.  Exhibit

16   13-1, please.

17   BY MR. HEENAN:

18   Q.        Mr. Patten, you've reviewed this e-mail

19   from Charles Dendy after Mr. McCullough retained

20   counsel as part of your review of this case?

21   A.        Yes.

22   Q.        I want to focus your attention to this

23   middle paragraph.  What is Mr. Dendy requesting of

24   his client?

25   A.        He is requesting the documents that he

1   should have requested before the suit was filed.

2   Q.      Do you have an opinion about whether it's

3   appropriate to wait for someone to retain a lawyer

4   to request the documents that you should have

5   asked for in the beginning?

6   A.      Yes.

7   Q.      What is your opinion?

8   A.      That you should request the documents

9   before you file suit so you know there is a basis

10  for your suit, and not afterwards.

11                  MR. HEENAN:   Thank you.

12  BY MR. HEENAN:

13  Q.      What is a dismissal with prejudice?

14  A.      That means the case is dismissed and can

15  never be refiled, and whatever claims are alleged

16  in the Complaint are barred from being litigated

17  again.

18  Q.      Who is the dismissal with prejudice good

19  for?

20  A.      The defendant.

21  Q.      Why is that?

22  A.      It keeps the case from being refiled.   So

23  if it's a credit card collection, then it keeps

24  the defendant from having to ever litigate again,

25  whether he's liable to the credit card company or

```
 1    whoever.

 2    Q.      Do you have an opinion, Mr. Patten, about

 3    whether the conduct of Johnson Rodenburg towards

 4    Mr. McCullough was isolated?

 5    A.      Yes.

 6    Q.      What is your opinion, sir?

 7    A.      That it was not isolated.

 8                    MR. BOHYER:  Objection.  This was

 9    not disclosed, Your Honor.

10                    THE COURT:  Mr. Heenan?

11                    MR. HEENAN:  It is absolutely

12    disclosed, Your Honor.  It's the heart of Mr.

13    Patten's report.

14                    THE COURT:  Can you show me

15    where?

16                    MR. HEENAN:  Page six.  Well,

17    starting at page two, third paragraph, going

18    through page three --

19                    THE COURT:  I overrule the

20    objection.

21    BY MR. HEENAN:

22    Q.      Do you remember the question?

23                    THE WITNESS:  Could you read it

24    back?

25                    (Designated question is read.)
```

1

2      BY MR. HEENAN:

3      Q.        Why do you say that?

4      A.        I reviewed a number of files in my office

5      where my clients were sued by Johnson, Rodenburg &

6      Lauinger, and I thought about other cases that

7      I've had with that firm and there's an obvious

8      pattern, in my experience with dealing with the

9      firm.  And that is, they can't prove their case

10     because they don't ever, or rarely, are they able

11     to get the documents that back up their claim.

12     Q.        You also reviewed, as part of your review

13     of this case, the depositions of Ms. Lauinger and

14     Mr. Dendy with respect to what documents they have

15     obtained before filing suit in other cases.

16     A.        Yes.

17     Q.        If the evidence is that Johnson Rodenburg

18     had no more or no less documentation or evidence

19     prior to suing Mr. McCullough than they did in all

20     the other lawsuits that they filed, do you have an

21     opinion about whether that's an appropriate

22     business practice?

23     A.        Yes.

24     Q.        What is your opinion, sir?

25     A.        It's not an appropriate business practice.

1     Q.        Why not?

2     A.        The documents, and it was -- I don't

3     remember whose deposition.  There was a deposition

4     of an attorney out of Helena that I read, and as

5     between the Lisa Lauinger and Mr. Dendy, I don't

6     remember which one, but the same statistic came up

7     in both depositions.  And that is, of all the

8     cases that are filed, approximately 90 percent

9     result in a default judgement.  Approximately five

10    percent the defendant appears with an attorney and

11    approximately five percent the defendant appears

12    pro se, as Mr. McCullough did in this case.

13                    And so if a substantial number of

14    cases, in my experience, they can't prove because

15    they don't have the documentation for, if that's

16    applied to the 90 percent of the default

17    judgements, then there's a large number of default

18    judgements that they couldn't and wouldn't be able

19    to prove.

20    Q.        You used some terminology in terms of how

21    you characterized Johnson Rodenburg's business

22    model.  What is it, sir?

23    A.        I think it's a factory.

24    Q.        What do you mean by "a factory"?

25    A.        I think it's a factory that the product of

1    the factory is Complaints filed in court.  And

2    it's mass-produced.

3    Q.      What do you mean "mass-produced"?

4    A.      I think in Mr. Dendy's deposition he

5    testified that the effective number of Complaints

6    filed a year is about 50 a day out of that office.

7    So they are mass-producing Complaints,

8    mass-producing default judgements, most of which

9    don't have the documentation to back them up.

10   Q.      Why would they do that, if you know?

11                   MR. BOHYER:  Objection.

12   Speculation, Your Honor.

13                   THE COURT:  He said, "if you

14   know."  I will overrule it.

15                   If you know, sir.

16                   THE WITNESS:  I can only

17   speculate.

18   BY MR. HEENAN:

19   Q.      Do you have an opinion with respect to

20   whether that's a lucrative business model?

21                   MR. BOHYER:  Objection.

22   Relevance.

23                   THE COURT:  Overruled.

24   BY MR. HEENAN:

25   Q.      You can answer.

1    A.       I don't know.

2    Q.       What about with respect to Johnson

3    Rodenburg's use of non-attorney staff?  Do you

4    have an opinion about -- well, one, lawyers use

5    non-lawyers for help, right?

6    A.       Yes.

7    Q.       Do you have an opinion about whether the

8    way Johnson Rodenburg uses non-lawyers is

9    appropriate?

10   A.       Well, yeah.

11   Q.       What is it?

12   A.       I don't think there is anything

13   inappropriate by using non-lawyers.  But I think

14   the lawyers have to pay attention to what it is

15   that they're signing off on, and so I think the

16   lawyers have to review the documents and make sure

17   that, in the case of Complaints, they are well

18   grounded and in fact there has been some diligent

19   effort to corroborate the claims being made.  And

20   they can't avoid that obligation and they can't

21   let their staff avoid that obligation.

22   Q.       As part of your review of this case, you

23   became aware of Johnson Rodenburg's use of this

24   Collection Master software.  Correct?

25   A.       Yes.

1    Q.      And assume the evidence is that the

2    Collection Master software inputs this

3    information, last payment date, person's name,

4    interest rate.  Is it an appropriate review for a

5    Montana lawyer to look at those inputs without

6    documentation and sign a lawsuit?

7    A.      No.

8    Q.      Why not?

9    A.      Because you're not engaged in any diligent

10   review to make sure that there's a basis for the

11   claim.  You're just taking information that

12   somebody's given to you and they have told you

13   that it's not reliable and plug it into a

14   Complaint.

15   Q.      What if they don't tell you it's not

16   reliable?  What if the client doesn't say

17   anything?  Is it appropriate then?

18   A.      No.  I still think you need to look at the

19   documents to know that in fact Mr. McCullough owed

20   X number of dollars through the use of whatever

21   credit card it was, Chase or whatever, and that

22   his last payment was on a certain date.

23              MR. HEENAN:  Thank you, Mr.

24   Patten.

25              THE COURT:  Let's take a short

1        break.  It's been almost an hour and a half.

2                        We will be in recess for about 10

3        or 15 minutes.  And then I would like to see

4        counsel, please.

5                        (The following took place in

6        chambers:)

7                        THE COURT:  Before

8        cross-examination, I wanted to deal with the

9        question of the rules.  I had mentioned yesterday

10       my concern about making clear that the Rules of

11       Professional Conduct do not set the standard

12       here.  This is not even a malpractice action.

13       This is action under the three remaining counts.

14       And the Rules of Professional Conduct, I think we

15       can all agree, don't form the standard for

16       proving violation of any of those.

17                        Now, I don't know what rules

18       specifically the witness was referring to when he

19       was talking about them, but I ask that you

20       admonish him that it is the ruling of the Court

21       and that the Rules of Professional Conduct do not

22       form the standard here.  Now, he can talk about

23       his understanding of what attorneys' obligations

24       are.

25                        MR. HEENAN:  It's okay to talk to

1      him?  He is under oath now as a witness.  I don't

2      want to invade that.

3                       THE COURT:  Yeah.  You can open

4      the door to it, and you might.  But I'm just

5      saying, be cautious about it because I have

6      indicated that --

7                       MR. HEENAN:  I should try to

8      abide by Your Honor's ruling.  I didn't want to

9      go into that.

10                      MR. BOHYER:  I appreciate that,

11     but the word zealous appears only in the Rules of

12     Professional Conduct.

13                      THE COURT:  It appears in

14     Webster's Dictionary and a lot of others too.

15                      MR. BOHYER:  But in the context

16     of what we are dealing with, and I don't mean to

17     argue with the Court, but I have got to be given

18     a little latitude without it being suggested I'm

19     opening the door.

20                      He has remarked about a diligent

21     inquiry.  That appears in Rule 11.  That's what

22     we are talking about here.  And with Your Honor

23     suggesting that I might be opening the door to

24     it, I've got to be given some latitude without

25     being, on redirect, saying, well, you're opening

```
 1      the door on everything.

 2                      THE COURT:  I think you're

 3      confusing the Rules of Professional Conduct and

 4      the Rules of Civil Procedure.  I'm talking about

 5      the Rules of Professional Conduct.  Rule 11 is in

 6      the Rules of Civil Procedure.

 7                      I'm not limiting your latitude.

 8      I was just trying to follow up on your objection

 9      and my own statement yesterday with respect to

10      being cautious about testimony about violation of

11      the Rules of Professional Conduct.

12                      MR. BOHYER:  I will avoid the

13      Rules of Professional Conduct, Your Honor.

14                      MR. HEENAN:  Would you mind, Your

15      Honor, telling me what I need to say to Mr.

16      Patten?

17                      THE COURT:  That the Court has

18      ruled that the Rules of Professional Conduct do

19      not set the governing standard for violation of

20      any of the causes of action pled.

21                      MR. HEENAN:  So he can just talk

22      about what his own --

23                      THE COURT:  His own opinion is.

24                      MR. HEENAN:  His own standard of

25      practice.
```

1                    THE COURT:  Yes, and his

2      testimony based on his knowledge, education and

3      experience about what the standard of practice

4      is.

5                    MR. HEENAN:  Understood.

6                    THE COURT:  Thank you.

7                    MR. SIMPSON:  I have one question

8      on an unrelated issue.  I had served a subpoena

9      upon Dr. Yelvington for attendance at trial.  I

10     got a call, or rather my office got a call, from

11     him late yesterday.  I called him back.  He is

12     concerned he has a very busy schedule.

13                   He has one document produced by

14     plaintiff's counsel during the case.  I believe

15     the document is one to which objection has been

16     raised.  And I'm wondering if there's a way that

17     plaintiff's counsel might stipulate without

18     admission of that document through Dr. McElhinney

19     to avoid Dr. Yelvington having to testify.

20                   MR. HEENAN:  My whole position is

21     Dr. McElhinney can talk about the medical

22     records, Dr. Veraldi can talk about medical

23     records, Mr. McCullough can be asked about them,

24     but I just don't think they are evidence that

25     gets to go in to the jury.  I would maintain that

1     objection and so I won't stipulate to it being

2     admitted.

3                    THE COURT:   What document is it?

4                    MR. SIMPSON:   A medical record.

5     I don't have the date in front of me.   It was a

6     medical record that was produced by Dr.

7     Yelvington following his psychiatric clinical

8     interview of Mr. McCullough in the nineties.

9                    THE COURT:   Is this that one that

10    he administered the test that is a series of

11    questions?

12                   MR. SIMPSON:   No.   That was

13    administered by Dr. McElhinney.   This was a

14    record upon which Dr. McElhinney relied, or one

15    of the records that he relied upon, in forming

16    his opinion.

17                   My purpose in bringing Dr.

18    Yelvington here was to lay more foundation for it

19    and establish that it's not hearsay and that we

20    could move the Court for its admission that way.

21                   THE COURT:   Well, apparently

22    there is not a stipulation and I can't admit

23    documents without foundation.   So you will have

24    to make the decision that you think is right.

25                   MR. SIMPSON:   Okay.

1            MR. HEENAN:  Thank you.

2            MR. BOHYER:  Thank you.

3            (Brief recess. )

4            THE COURT:  You may

5    cross-examine.

6            MR. BOHYER:  Thank you, Your

7    Honor.

8    CROSS-EXAMINATION

9    BY MR. BOHYER:

10   Q.      Mr. Patten, good morning.

11   A.      Hi.

12   Q.      You and I know each other from years past,

13   correct?

14   A.      That's correct.

15   Q.      I think your exchange was that I think

16   when we last saw each other, you didn't have gray

17   hair and I had hair.

18   A.      I won't talk about you, but I know I

19   didn't have gray hair.

20   Q.      I'm trying to recall.  I don't think you

21   and I ever ran into each other in these types of

22   cases at all.  Am I accurate?

23   A.      Yes.

24   Q.      As you might imagine, I have quite a few

25   areas to go over, so please bear with me.

 1                   I think the very first thing I
 2     wanted to go over was one of the opinions that you
 3     expressed to the jury about Johnson, Rodenburg &
 4     Lauinger sending requests for admission to an
 5     opponent and not specifying to them what the risk
 6     is if the requests for admission aren't answered.
 7     Correct?
 8     A.      Yes.
 9     Q.      The actual requests that were provided in
10     this case, the document that was blown up to you
11     at the end, says, These requests will be deemed
12     admitted if not answered, doesn't it?
13     A.      I recall that it did.
14     Q.      So at least in that respect, then, Mr.
15     McCullough is advised, hey, if you don't answer
16     these, they are going to be deemed admitted.
17     True?
18     A.      Yes.
19     Q.      Now, I also understand, and for the jury's
20     purpose here, these documents, the requests for
21     admission, those are tools that lawyers use to
22     gain information about their opponent's case and
23     for their client's case.  Is that a fair
24     statement?
25     A.      In part, yes.

```
 1    Q.        In addition to being tools, those are the
 2    tools that are allowed by law for a party, whether
 3    it's Mr. McCullough or Johnson, Rodenburg &
 4    Lauinger to get that information.  Correct?
 5    A.        Yes.  Yes.
 6    Q.        And the use of discovery requests is part
 7    of an attorney's investigation into a case.  Would
 8    you agree with that?
 9    A.        Yes.
10    Q.        Now, as I understand it, at least from
11    listening to the direct exam, one of your big
12    issues with those requests for admission is that
13    it didn't tell them, didn't tell him specifically,
14    what's going to happen if he doesn't answer these
15    discovery requests.  Fair statement?
16    A.        Within 30 days.
17    Q.        Okay.  Correct me if I'm wrong.  It was
18    always because they didn't tell him what the
19    effect was.  Say, look, Mr. McCullough, if you
20    don't do this, the Court's going to deem these
21    things admitted.  That's a big issue in your mind,
22    true?
23    A.        The way that that instruction paragraph is
24    worded is a big issue in my mind, yes.
25    Q.        You'll agree with me there's nothing in
```

1       the Rule 36 that mandates that one party, when it

2       sends requests for admission to the other, there's

3       nothing in there, the law doesn't require that the

4       instruction be given to the opponent.

5       A.      Rule 36 does not, no.

6       Q.      And that's the rule that deals with

7       requests for admission.

8       A.      Yes.

9       Q.      Would you agree with me that my client is

10      entitled to rely upon Rule 36?

11      A.      I think your client is entitled to

12      appropriately put out instructions on Rule 36.

13      Q.      And one is, answer within 30 days.  Two

14      is, here's the effect if you don't answer.

15      A.      Yes.

16      Q.      Okay.

17              MR. BOHYER:  John, I want to show

18      you this, first.

19              Judge, may I approach the witness

20      with a discovery request from the plaintiff, not

21      to admit into evidence but for purposes of

22      cross-examination?

23              MR. HEENAN:  May I see that?

24              MR. BOHYER:  May I approach?

25              THE COURT:  There is no question

1    pending.  I'm a little confused.

2                    MR. BOHYER:  I'm about to ask the

3    question, but I want him to review the document

4    first.  It's dealing with requests for admission.

5                    THE COURT:  Okay.  You may.

6                    MR. BOHYER:  Thank you.

7    BY MR. BOHYER:

8    Q.      Mr. Patten, I've handed you some of the

9    discovery requests that Mr. McCullough in this

10   case has served upon my client.  Do you see those?

11   A.      Yes.

12   Q.      All right.  Now, Mr. Heenan went through

13   with you in some detail the instruction that my

14   client, when they sent the requests for admission

15   to Mr. McCullough, had given to Mr. McCullough,

16   okay?

17                    Would you please tell the jury --

18   let me rephrase that.

19                    It's true, is it not, when Mr.

20   McCullough and his counsel served requests for

21   admission on my client in this case, my client

22   wasn't advised of what the effect is if they don't

23   answer within 30 days?

24   A.      The service was on Kelly Gallinger and

25   Matthew Tourtellotte, attorneys.  And there is no

1    instruction, no statement, as to the consequence

2    of not answering.

3    Q.      So the opinions that you just gave the

4    jury that it's not proper for an attorney to send

5    out requests for admission to another party

6    without advising the other party of the

7    consequence is wrong.  Isn't that what you said?

8    A.      No.

9    Q.      Okay.  I will let the jury rely upon its

10   recollection.

11               Again, you will agree with me, at

12   least in the context of the discovery sent to my

13   client, they weren't provided any warning with

14   respect to what the effect was.

15   A.      I think you're overlooking that Mr.

16   Heenan's discovery went to attorneys and the

17   Johnson, Rodenburg & Lauinger discovery went to

18   Mr. McCullough, who was not an attorney.

19   Q.      Mr. Patten, the Rules of Civil Procedure

20   apply to parties, don't they?

21   A.      Yes, they do.

22   Q.      There aren't different obligations?

23   A.      Under the Rules of Civil Procedure?

24   Q.      Yes, sir.

25   A.      That's correct.

```
 1    Q.      So if I'm hearing you right, then, what
 2    you're saying is, there has to be a different
 3    standard imposed if somebody knows another party
 4    is not represented by a lawyer.
 5    A.      Yes.
 6    Q.      That's not required anywhere in the rules,
 7    though, is it?
 8    A.      Which rules?
 9    Q.      Rule 36.
10    A.      No.
11    Q.      There was also some discussion, Mr.
12    Patten, about our client getting requests for
13    admission and then, if the other party doesn't
14    answer them, having them deemed admitted.  Do you
15    remember that series of questions?
16    A.      Yes.
17    Q.      That actually didn't happen in this case,
18    did it?
19    A.      I seem to recall seeing a motion for
20    summary judgement in this case.
21    Q.      So are you operating on the assumption
22    here that Mr. McCullough did not answer the
23    requests for admission and that they were deemed
24    admitted?
25    A.      My recollection from what I reviewed of
```

```
1    the file is that there was a motion for summary

2    judgement based on the, in part, on the

3    admissions.

4    Q.      Let me make sure I understand this and so

5    the jury is clear.

6                     Is it your assumption that our

7    client filed a motion for summary judgement on the

8    CACV v. McCullough case?

9    A.      I recollect that they did.

10   Q.      Assume that that didn't happen and that

11   they dismissed the case.

12   A.      Okay.

13   Q.      Would that change your opinions at all?

14   A.      In connection with Mr. McCullough?

15   Q.      Yes, sir.

16   A.      It wouldn't change -- the reason the case

17   was dismissed, I don't think the case would have

18   been dismissed had Mr. McCullough not obtained

19   counsel who forced the issue.

20   Q.      Let me get back to the line of questioning

21   I was on.  It had to do with the requests for

22   admission.  And you've provided the jury with a

23   bunch of opinions about the requests for

24   admission.

25                     What I want to know is, are you
```

1    operating on the assumption that the requests for

2    admission against Mr. McCullough were not answered

3    and then deemed admitted by my client, and then

4    used to obtain relief from the Court?

5    A.       I think that's what your client was

6    seeking to do.

7    Q.       Okay.  That doesn't quite answer my

8    question.  My question is, are you assuming for

9    your opinion, Mr. Patten, that my client served

10   the requests for admission and that Mr. McCullough

11   did not answer them, and that my client, then,

12   tried to use those unanswered requests to obtain

13   relief?

14   A.       I've expressed a number of opinions, so my

15   opinion is that it's improper to send out those

16   requests for admission with the instructions as

17   stated without anything more.  So with respect to

18   that opinion, then, I'm not assuming they were

19   deemed admitted in this instance, although my

20   recollection is that they were.  And I might be

21   wrong on that.  But my recollection is there was a

22   summary judgement motion that was filed.

23   Q.       So with respect to the investigation,

24   then, that you performed for purposes of

25   formulating your opinion, your investigation led

1    you to believe that these requests for admission

2    were served upon Mr. McCullough, that they weren't

3    answered by him, that they were deemed admitted by

4    my client and that my client, then, sought

5    affirmative relief from the Court in the

6    underlying case.  Is that fair?

7    A.       Ask the beginning part of that question

8    again.

9                    MR. BOHYER:  Would you read it

10   back?

11                   (Designated question is read.)

12                   THE WITNESS:  No.  Let me try to

13   make it clear, and I apologize if I'm confusing

14   things.  I think that it's improper to send out

15   the requests for admission with those particular

16   instructions attached to it, without regard to

17   what happens later.  I think that's inappropriate

18   to do that.  It's also inappropriate to use the

19   deemed admissions to get a summary judgement.

20   BY MR. BOHYER:

21   Q.       I appreciate that.

22                   MR. BOHYER:  But Your Honor, I'm

23   going to ask that the witness be instructed to

24   answer the question.

25                   THE COURT:  I think he answered

```
1     it three times already and you've asked him again

2     and again, so I'm going to ask you to move on.

3     He told you he thought that's what happened.  He

4     told you more than once.

5                      MR. BOHYER:  You're assuming that

6     happened.  Very well.

7                      May I approach the witness?

8                      THE COURT:  For what purpose?

9                      MR. BOHYER:  To show him the

10    requests for admission that were answered.

11                     THE COURT:  Yes.

12    BY MR. BOHYER:

13    Q.      Have you had a chance to look at those,

14    Mr. Patten?

15    A.      Yes.

16    Q.      In fact, then, in the case that we are

17    here on, the requests for admission that my client

18    sent to Mr. McCullough were actually answered by

19    Mr. McCullough, weren't they?

20    A.      Through his counsel, yes.

21    Q.      They were signed by him too, were they

22    not?

23    A.      Yes.

24    Q.      Okay.  So the testimony that you gave

25    about sending out requests for admission to try to
```

```
 1    get a default judgement, that didn't happen here,

 2    did it?

 3    A.      No.

 4    Q.      You can hand those back to me.  Oh,

 5    actually, one more question on these, sir.  I will

 6    have to give you the actual request.

 7                 Would you take a look at Request

 8    For Admission Number 6, please.

 9    A.      Yes.

10    Q.      And please read to the jury what it is

11    that was asked.

12    A.      Defendant Timothy McCollough used said

13    Chase Manhattan credit card to purchase goods and

14    services.

15    Q.      Okay.  Now, he answered that one, didn't

16    he?

17    A.      Yes.

18    Q.      And please tell the jury what he said.

19    A.      He admitted.

20    Q.      He admitted that he used the card.

21    A.      Yeah.

22    Q.      Okay.  Thanks.  For purposes of putting

23    together your expert opinions, you conducted your

24    own investigation, correct?

25    A.      I looked at a number of documents.
```

1    Q.       You were provided a number of documents by

2    Mr. McCullough's counsel.

3    A.       Yes.

4    Q.       In addition to that, prior to giving

5    opinions here, you also met with Mr. McCullough's

6    attorney, didn't you?

7    A.       Yes.

8    Q.       One time?

9    A.       One or two times.  I think it was one.

10   Q.       How about three or four?

11   A.       In total?

12   Q.       Yes, sir.

13   A.       Yes, I think that would be right.

14   Q.       Could you give the jury an idea how much

15   time you had to spend with Mr. McCullough's

16   attorney before you came up with the opinions?

17   A.       I recollect that I met with Mr. Heenan and

18   he asked me to render an opinion.  We talked about

19   the case.  He left me with a volume of material.

20   I don't remember how much time was involved, maybe

21   an hour, hour and a half.

22   Q.       Was that the first meeting?

23   A.       Yeah.  I think I talked to him on the

24   phone, maybe, before that briefly.  I remember

25   going to his office visiting with him some more.

1     I remember preparing an opinion that I shared with

2     him.  I remember meeting with him and reviewing

3     that opinion and --

4     Q.     And the opinion you prepared for him --

5                    THE COURT:  I don't think he was

6     finished.

7                    MR. BOHYER:  Excuse me.  Go

8     ahead.

9                    THE WITNESS:  I think I may have

10    met with him one more time and that may have been

11    after the opinion was given and after your

12    expert's opinions were given.

13    BY MR. BOHYER:

14    Q.     So a total of three or four times.

15    A.     Yeah.

16    Q.     Roughly amount of time that you spent with

17    Mr. Heenan to get the opinions together?

18    A.     Three hours.

19    Q.     He also asked you to make some changes to

20    your opinions, did he?

21    A.     He asked me for some addition to the

22    opinion.

23    Q.     My question in that regard, then, Mr.

24    Patten, is, was that addition your opinion or was

25    it counsel's opinion?

1    A.        It was my opinion.

2    Q.        In the context of your investigation to

3    prepare your opinions for this case, could you

4    tell the jury whether or not you had met Mr.

5    McCullough?

6    A.        No, I did not meet him.

7    Q.        Did you even speak with Mr. McCullough?

8    A.        No.

9    Q.        How about his wife?

10   A.        No.

11   Q.        I need to switch gears here a little bit.

12   Am I accurate, Mr. Patten, in the past you've

13   actually been on opposite sides?  You've

14   represented one party in a case and my clients

15   have represented a different party?

16   A.        Lots of times.

17   Q.        Is there any baggage there between you

18   just because of being opponents in cases?

19   A.        I don't think so, but I think the last

20   phone conversation I had with Mr. Rodenburg was --

21   he was mad at me.

22   Q.        That happens sometimes among lawyers,

23   doesn't it?

24   A.        Yeah.

25   Q.        When you are retained to represent your

1    clients, you talked some about conducting diligent

2    investigations in terms of filing documents on

3    their behalf.

4    A.    Yes.

5    Q.    Do you do your best to represent your

6    clients?

7    A.    Yes.

8    Q.    Do you ever make errors?

9    A.    Certainly.

10    Q.    Have you made errors in court pleadings

11    that you filed that you later on corrected?

12    A.    I can't think of any, but I'm sure that I

13    have.

14    Q.    That happens after 30 years of practice,

15    doesn't it?

16    A.    You bet, yes.

17    Q.    I'm assuming that the errors you made

18    weren't intentional.

19    A.    I hope not.  I don't remember any, but

20    it's a fact of life.

21    Q.    It is, isn't it?  And when you make the

22    error with the court pleadings, is it your

23    obligation as the lawyer to try to correct that?

24    A.    I believe so, yes.

25    Q.    And if there's a case that gets filed

1    after a statute of limitations has actually run,

2    and the lawyer discovers that fact to be the case,

3    would you agree that the lawyer should then

4    dismiss the case?

5    A.       Yes.

6    Q.       Are you aware that happened in this case?

7    A.       I'm aware -- I recall, I might be wrong, I

8    recall they tried to dismiss it without prejudice.

9    Q.       Are you aware that the case was ultimately

10   dismissed?

11   A.       Yes.

12   Q.       Did you have a trial of any of the cases

13   that you have had against my clients?

14   A.       I recall one trial.

15   Q.       And was that a debt-collection action like

16   the underlying case here?

17   A.       Yes.

18   Q.       And what was the result of that case?

19   A.       There was a judgement entered for the

20   credit card company or whatever.

21   Q.       So the lawyers go through their discovery.

22   You go to court, whether it's a bench trial or a

23   jury trial, parties put on their facts and, in

24   that case, the finder of fact said, Debtor, you

25   owe the money.

1    A.      Yes.

2    Q.      No baggage from that trial.

3    A.      No.

4    Q.      Mr. Patten, I was reading through the

5    deposition that you had given in this case.  Do

6    you recall that?

7    A.      Yes.

8    Q.      And I actually didn't take that

9    deposition; my partner, Mr. Simpson did.  As I

10   recall, he had asked you a question about whether

11   you had ever had a case that ultimately was

12   dismissed on the basis of the statute of

13   limitations.  And initially, I think you had said

14   you didn't think so.  But then one was pointed out

15   to you.  Do you recall that?

16   A.      Yeah.

17   Q.      And that was actually a case that you had

18   filed on behalf of your own firm.  True?

19   A.      That's correct.

20   Q.      And ultimately not only the District Court

21   but the Supreme Court said, Yeah, your case was

22   filed after the statute of limitations.  True?

23   A.      Yes.

24   Q.      I'm assuming, there, that you believed in

25   your mind that you had information that you felt

```
 1    trustworthy to file that case.

 2    A.        Yes.

 3    Q.        Even though the Court ultimately found

 4    that the statute of limitations had run.

 5    A.        Yes.

 6    Q.        That happens in lawsuits, doesn't it?

 7    A.        Yeah, but in that case the issue of

 8    statute of limitations was sort of an issue, and

 9    the question was, when does it start in the

10    particular facts of that case.  So it wasn't -- I

11    mean, that was on the table from the beginning.

12    And that's what we argued about was whether the

13    statute of limitations had run.

14    Q.        On the underlying suit here, the statute

15    of limitations was on the table here too, wasn't

16    it?

17    A.        I think in a way different fashion,

18    though.

19    Q.        I think the point of the inquiry, Mr.

20    Patten, is that sometimes lawyers file lawsuits

21    based on information that they have, or believe

22    that they have, and they think that that case is

23    timely and, low and behold, later on, either the

24    lawyer discovers facts or the Court concludes

25    that, you know, I'm sorry, but your case is filed
```

1    after the statute.

2    A.       In the case you're referring to, the

3    Court -- there were no facts that were in dispute.

4    The Court said, Under these particular facts, the

5    statute of limitations has run.

6    Q.       Have you met my client, Lisa Lauinger, or

7    seen her prior to today?

8    A.       No.  No.

9    Q.       How about Mr. Dendy?

10   A.       No.

11   Q.       You had testified on direct that years

12   ago, and I can't believe it's this long ago, but I

13   think you said the early eighties that you did

14   some creditor work or collection work for the

15   Montana Association of Credit Management.

16   A.       Yes.

17   Q.       And those were business debt collections?

18   A.       Yes.

19   Q.       Can you give the jury an idea of how many

20   you filed of those over the years?

21   A.       I think there were hundreds, maybe

22   thousands.

23   Q.       Were you a factory?

24   A.       No.

25   Q.       Was your business the production of

1      Complaints?

2      A.      No.

3      Q.      Were you a solo practitioner?

4      A.      No.

5      Q.      How many other lawyers?

6      A.      There were three of us.

7      Q.      And I think you testified on direct that

8      your work with that entity ended in '81 or early

9      eighties.

10     A.      No.  It would have started -- I don't

11     remember exactly, but it would have started in

12     '82, maybe, when essentially we purchased a firm

13     from a retiring lawyer and it was his client.  And

14     with him and me and another attorney, then, we

15     did -- as I recall, it would have been five or six

16     years.  And it ultimately kind of waned and we

17     just couldn't justify it.  And I think the Montana

18     Association of Credit Management just dissolved.

19     It ceased to be.  So we quit doing it.

20     Q.      So it went away?

21     A.      Yeah.

22     Q.      Did I hear you accurately that you may

23     have filed up to a thousand on that?

24     A.      I think between all of us there could have

25     been a thousand, yes.

1    Q.        Did you believe you had good grounds for

2    the suits you filed?

3    A.        Yes.

4    Q.        Do you recall whether any of those suits,

5    sir, got dismissed because some of the documents

6    weren't quite accurate?

7    A.        No.

8    Q.        You don't recall?

9    A.        No, I don't think any were for that

10   reason.

11   Q.        The nature of that work differed from the

12   work my clients do only in the sense that you were

13   representing creditors on business debt as opposed

14   to consumer debt?

15   A.        I think so, yeah.

16   Q.        When you did your work with the Montana

17   Association of Credit Management and filed these

18   up to one thousand Complaints, did you use

19   formats?

20   A.        Yes.

21   Q.        Did you have paralegals that assisted you

22   in the preparation of the documents?

23   A.        No.

24   Q.        Were your Complaints form Complaints?

25   A.        In a sense.

1    Q.      In the sense that there's boiler plate or

2    identical language in each Complaint, and you fit

3    the specific facts of each case into that

4    Complaint and then filed it?

5    A.      Yes.

6    Q.      Similar to how my client handles their

7    Complaint?

8    A.      I don't know how they handled those, how

9    they created those Complaints.

10   Q.      Is the difference in terms of being a, I

11   think the word factory, whose product is

12   Complaints, is it simply the difference between

13   filing a thousand Complaints and 2700 over 18

14   months?

15   A.      I think the difference is we would review

16   documents and, while we maybe used the form, our

17   client didn't give us a sheet that said, we are

18   owed a thousand dollars and we just plugged that

19   in and went with it.  We had the documents.  We

20   reviewed them.  We went through them.  We had

21   calculators and punched the buttons ourselves and

22   did our best to make sure what we were claiming

23   was what was owed, that we had documents to back

24   it up, that we were ready to go to trial when the

25   case was filed.  We could have gone to trial the

1   next day and we had all our exhibits and all of

2   that.

3              So I think there's a difference

4   between that and simply taking information,

5   summary information, that is provided by a client

6   and just plugging it in and mass-producing

7   Complaints.

8   Q.      Okay.  So the difference isn't in just the

9   sheer number, at least from your view, of you

10  filing a thousand and my client filing several

11  thousand.

12  A.      Yeah.

13  Q.      Okay.  Would you agree with me, Mr.

14  Patten, that in the context of a lawsuit lawyers

15  might not have, or clients may not have, a

16  specific document when that lawsuit begins, but

17  they're actually entitled to request the other

18  party to produce one of those documents in that

19  lawsuit?  Are they not?

20  A.      At times, yes.

21  Q.      Not at times, in every case.  In a

22  litigated case, under the Rules of Civil Procedure

23  and on behalf of my client, I can ask another

24  client, Please produce these documents.  I'm

25  entitled to do that, aren't I?

1    A.      Yes, if they are reasonably expected to

2    have those -- you can ask for anything you want.

3    Whether it's proper or not is a different

4    question.  But you're not going to ask them for

5    documents they don't have, or at least you

6    shouldn't.

7    Q.      Okay.  I'm just talking about the process.

8    You're entitled to ask for documents that you may

9    not have?

10   A.      Yes.

11   Q.      Did I hear you accurately on direct, Mr.

12   Patten, that you have not handled any credit card

13   collections similar to my client?

14   A.      As a plaintiff?

15   Q.      Yes, on behalf of the creditor.

16   A.      Not that I can recall, certainly not in

17   the last 10, 15 years.

18   Q.      Am I accurate you never represented a bank

19   or a credit union to collect on credit card debt?

20   A.      Not that I recall.

21   Q.      You've never represented a debt buyer such

22   as CACV who held the debt in the underlying case?

23   A.      No.

24   Q.      On direct there were a few questions asked

25   about the software program that my client uses

1     called Collection Master.  Do you recall those

2     questions?

3     A.      Yes.

4     Q.      I understand you've never used that

5     software program.

6     A.      No.

7     Q.      True?

8     A.      No.

9     Q.      You're not familiar with it at all?

10    A.      Only the screens that are printed out that

11    were provided to me.

12    Q.      Do you utilize a paralegal in your

13    practice currently?

14    A.      Yes.

15    Q.      Does your paralegal help with basic

16    drafting, investigation and research?

17    A.      Yes, she does.

18    Q.      You had mentioned that much of your

19    practice now relates to bankruptcy.

20    A.      Yes.

21    Q.      And that I think, what did you say,

22    something in the neighborhood of in 95 percent of

23    the debtors that you represent in bankruptcy,

24    credit card debt is the issue, or one of them?

25    A.      95 percent of the consumer debtors that I

1    represent.

2    Q.      Sometimes debt is contested?

3    A.      Yes.

4    Q.      And sometimes it's owed?

5    A.      Yes.

6    Q.      Are creditors entitled to be paid what

7    they are owed?

8    A.      If it's not time-barred, yes.

9            MR. BOHYER:  Your Honor, can we

10   display 504?  It's been pre-admitted.

11           THE COURT:  You may.

12   BY MR. BOHYER:

13   Q.      Mr. Patten, are you able to see that?

14   A.      Yes.

15   Q.      This is, as you can see, a February 8,

16   2007 letter that was sent by my client, Johnson,

17   Rodenburg & Lauinger, on behalf of its client,

18   CACV, to Mr. McCullough.  Do you see that?

19   A.      Yes.

20   Q.      When you were deposed in this case, some

21   of the opinions that you rendered had to deal with

22   the diligence or completeness of the investigation

23   that my client undertook before filing the suit

24   against Mr. McCullough.  Correct?

25   A.      Yes.

1    Q.      And when you testified and put together

2    your opinion report, you were assuming that, after

3    my client sent Exhibit 504 to Mr. McCullough, you

4    were assuming that Mr. McCullough had actually

5    responded to that before my client filed a suit.

6    True?

7    A.      I don't remember.

8                   MR. BOHYER:  Do you have the

9    Original deposition there?

10                  THE CLERK:  No, I don't.

11                  MR. HEENAN:  I have no objection

12   using a copy, if it will speed it along.

13                  THE COURT:  Okay.

14                  MR. BOHYER:  Thank you, Counsel.

15   I appreciate it.

16   BY MR. BOHYER:

17   Q.      Here we are.  Mr. Patten, a question was

18   asked of you, Are you aware in this case,

19   before --

20                  THE COURT:  Could you please tell

21   me page and line?

22                  MR. BOHYER:  I'm sorry, Your

23   Honor.  Page 57, commencing at line 12.

24                  THE COURT:  Thank you.

25   BY MR. BOHYER:

```
1     Q.        A question was asked of you, Mr. Patten,

2     Are you aware that in this case, before serving

3     the lawsuit on Mr. McCullough, Johnson, Rodenburg

4     & Lauinger sent him a letter asking him if he

5     disputed the validity of the claim at CACV?

6                     And you responded, I think I

7     understand that.

8                     Next question was, And what's

9     you're knowledge of what response, if any, Mr.

10    McCullough made?

11                    You responded, I guess I was -- as

12    I sit here, I was thinking that he had responded

13    and asserted the statute of limitations as an

14    issue.

15                    Next question, He didn't respond

16    before the suit was served, though.  Is that your

17    understanding?

18                    Answer, I guess that I thought he

19    had.

20                    Did I read that correctly?

21    A.        Yes, you did.

22    Q.        So when you were giving your opinions, you

23    were operating on the assumption that he had

24    actually told my client, before the suit was

25    filed, hey, statute of limitations.
```

```
 1    A.        I think I was operating under the belief
 2    that he had done that, yeah.
 3    Q.        You know now that that's inaccurate, don't
 4    you?
 5    A.        Yes.
 6    Q.        At the time you put together your report,
 7    you had met with Mr. Heenan four times, three or
 8    four?
 9    A.        Yeah.
10    Q.        He had provided you with a stack of
11    documents?
12    A.        Yes.
13    Q.        Do know if you brought all those with you
14    today?
15    A.        I did not, no.
16    Q.        And you reviewed all those.
17    A.        Yes.
18    Q.        But in your investigation, you missed one
19    of the key facts, true?
20    A.        I don't know if it was a key fact, but I
21    missed it and I know there was a notebook like Mr.
22    Heenan has that was this thick with stuff.  And if
23    I got some facts turned around or I misunderstood
24    them, that's what I did.
25    Q.        That's my entire point.  Sometimes lawyers
```

1    get documents, whether it's a notebook, a box, or

2    a roomful.  They go through them and they put

3    their stuff together.  You gave your opinion to

4    the best of your ability, true?

5    A.      Yes.

6    Q.      They put their stuff together, they get

7    ready to file it with the Court, and lo and

8    behold, they get ready for court and they discover

9    it's wrong.  That happens?

10   A.      Yes.

11   Q.      In your case, you didn't do that

12   maliciously.

13   A.      No.

14   Q.      Or intentionally.

15   A.      No.

16   Q.      Or with the intent to abuse the process of

17   the Court.

18   A.      No.

19   Q.      An error.

20   A.      Yes.

21   Q.      In terms of rendering or operating on the

22   assumption that Mr. McCullough had actually

23   responded to the demand letter, Exhibit 504, you

24   would have learned the correct facts had you

25   spoken with Mr. McCullough, true?

1    A.       If I would have asked him that, yeah.

2    Q.       Likewise, you would have learned the

3    correct facts if you would have asked Mr. Heenan.

4    A.       Yes.

5    Q.       And likewise, if you had reviewed that

6    file in any greater detail, you would have

7    discovered that prior to the time the suit was

8    filed there was no response from Mr. McCullough,

9    true?

10   A.       Yes.

11   Q.       Now, with respect to Exhibit 504, the

12   demand letter that is sent out to Mr. McCullough,

13   or a debtor, in the situations where you have

14   those and you're representing a debtor, you either

15   respond to that or you have the client respond to

16   that, if they contest the debt.  True?

17   A.       Yes.

18   Q.       And you do that in part, in a

19   debt-collection matter, in part to head off the

20   problems that I guess we are here talking about

21   today.

22   A.       Yes.

23   Q.       I think the words that you used previously

24   were that if the debtor such as Mr. McCullough

25   responds prior to the suit and says, hey, the

1      statute of limitations is up, it nips it in the

2      bud and it saves everybody agony.

3      A.       I don't know if I said directly Mr.

4      McCullough, but I think I did say nip it in the

5      bud.

6      Q.       And that's what the purpose is of

7      responding to the letter?

8      A.       That's how I view the purpose of

9      responding.

10     Q.       Mr. Patten, you had answered during the

11     direct examination questions about lawyers'

12     obligations to conduct I think diligent inquiry

13     were the words you used.

14     A.       Yes.

15     Q.       I'm guessing, but I'm not positive, are

16     you referring to a specific rule in that regard?

17     A.       Yes.

18     Q.       Would that be Rule 11?

19     A.       It's one of them.

20     Q.       Generally speaking, without getting bogged

21     down with that in the specifics of the rule,

22     generally it provides that lawyers should conduct

23     a reasonable or diligent investigation before they

24     sign pleadings and file them with the Court.

25     A.       I think Rule 11 says reasonable inquiry

```
 1    into the facts.
 2    Q.      And if the lawyer doesn't do that in a
 3    specific case, the other party to that case has a
 4    remedy in that case, do they not?
 5    A.      Yes.
 6    Q.      And that remedy is that, and we can take
 7    Mr. McCullough's case here, the party in that case
 8    can go to the judge on that case and say, Your
 9    Honor, they didn't conduct a diligent inquiry and
10    I want you to sanction that defendant for doing
11    what they did.  True?
12    A.      You can do that, yes.
13    Q.      That's the purpose of Rule 11, isn't it?
14    A.      I'm not -- is what the purpose?  Is
15    sanction the purpose?  Or is it keeping attorneys
16    honest the purpose?
17    Q.      Keeping them to diligent inquiries.
18    A.      Keeping them to diligent inquiries, yes.
19    Q.      Can we agree it serves all of those
20    purposes?
21    A.      Yes.
22    Q.      Are you aware here that Mr. McCullough
23    never filed such a motion with the Court in which
24    the case was pending?
25    A.      I don't recall that he did.
```

1    Q.       There was no relief sought from that Court

2    saying, hey, Johnson, Rodenburg & Lauinger cheated

3    or they violated Rule 11.  Please sanction them.

4    A.       I don't recall that there was.

5    Q.       Certainly there was no order issued to

6    that effect, was there?

7    A.       Not that I remember, no.

8                    MR. BOHYER:  Your Honor, we refer

9    to 501 which has already been admitted.

10                   THE COURT:  Okay.

11   BY MR. BOHYER:

12   Q.       You had talked, Mr. Patten, in the direct

13   examination -- and before I go on --

14                   MR. BOHYER:  Can you blow up the

15   text a little bit?  It's kind of tough to read.

16   BY MR. BOHYER:

17   Q.       You had talked a bit during your direct

18   examination, Mr. Patten, about the obligations of

19   lawyers or law firms to conduct investigation to

20   try to inquire about facts.

21   A.       Yes.

22   Q.       Do you recall that?  And particularly, if

23   a lawyer has doubts about facts, they should

24   follow up on them if they have a doubt, even if

25   they haven't done anything to begin with.

1    A.        Correct.

2    Q.        That's what my client's doing here, isn't

3    it, in Exhibit 501?

4    A.        They asked the question.

5    Q.        That's right.  They did.  They are

6    investigating.  Would you agree with that?

7    A.        I would agree that it is an investigation,

8    yes.

9    Q.        You just disagree with either the extent

10   of it or the source documents.

11   A.        I would disagree with whether it's a

12   reasonable inquiry, because they simply accept

13   without any documentation what CACV gives them.

14   And CACV has already told them, You can't rely on

15   what we tell you.

16   Q.        That's not quite the language that was in

17   that.  It says, We don't warrant or verify the

18   accuracy of the information.  They don't say, You

19   can't rely on it.

20   A.        We may be parsing words.  That's what it

21   means to me.  When they don't warrant it, they are

22   saying we don't stand behind our representation.

23   Q.        You currently represent creditors such as

24   banks and credit unions and those kinds of

25   companies?

1        A.        Yes.

2        Q.        Have they ever verified to you the

3    specificity of a figure or a document that they

4    give you?

5        A.        They give me enough documentation that I

6    can verify by looking at it.

7        Q.        That's not quite my question, though.  Do

8    they ever specifically say, Mr. Patten, I hereby

9    verify these, absent a specific verification.

10       A.        You mean, do they say, we verify these

11   documents?

12       Q.        You bet.

13       A.        No.

14       Q.        And similarly, those clients don't come in

15   and say, We don't warrant anything.  True?

16       A.        No.  No, they don't.

17       Q.        So the lawyer in any given case, it

18   doesn't matter to me whether it's a debt

19   collection or a bank case or anything else,

20   clients don't necessarily warrant the specific

21   validity of any information.

22       A.        Well, I think, Mr. Bohyer, you need to

23   keep all of the circumstances in view here.  The

24   client isn't the original creditor.  So the client

25   has information, bare information, that it's

1    received from somebody else and it's passing on to

2    their attorney saying, We are not warranting that

3    stuff.  Which, as I read it, is saying, you can't

4    rely on what we are telling you.  We are not

5    backing up what we are telling you.

6                     So it's like somebody comes to you

7    and says, I bought a debt that was owed to my

8    neighbor and I want you to sue on that debt, and I

9    don't have any documents to prove the debt.  And

10   by the way, I don't warrant what I tell you.  You

11   can't really rely on what I'm telling you.  You

12   wouldn't bring a suit based on that.

13   Q.     You want to go and do some investigation

14   and kind of check it out.

15   A.     Yeah.

16   Q.     So shortly after Johnson, Rodenburg &

17   Lauinger gets the case into their office, and I

18   believe the date on Exhibit 501 is January 4.

19   A.     Yes.

20   Q.     Shortly after they get it in, they

21   recognized that there might be a statute problem.

22   Will you agree with me there?

23   A.     The question came up.  So yes.

24   Q.     Well, it not only came up, but Grace

25   Lauinger actually said, It looks like the statute

1    of limitations has expired.

2    A.      Yeah.

3    Q.      So she at least identified it.

4    A.      Yes.

5    Q.      Now, you understand that her position

6    there is an account manager and she is not a

7    lawyer?

8    A.      Right.

9    Q.      Okay.

10            MR. BOHYER:  Would you put up

11   502, please.  Will you blow up the section there

12   from Mr. McCullough's name on down.  Thank you.

13   BY MR. BOHYER:

14   Q.      Can you see that, Mr. Patten?

15   A.      Yes.

16   Q.      I'm not technically savvy, so pardon me.

17            This is a response from Mr.

18   Gusting back to Lisa Lauinger.  Do you see that?

19   A.      Yes.

20   Q.      And he tells her that the debtor also made

21   a 6/30/04 PD, and I think we've concluded that's a

22   postdated check, for 75.  Do you see that?

23   A.      Yes.

24   Q.      You may disagree with the extent of it,

25   but from our client's standpoint, they are going

1    about trying to get some additional information on

2    the statute of limitations.   True?

3    A.      Yes.

4    Q.      Now, if in fact, Mr. Patten, if in fact

5    Mr. McCullough had made a payment in late June of

6    2004, as CACV is telling our client, that's within

7    the statute.

8    A.      Yes.

9    Q.      Is it your opinion that an attorney such

10   as you or me can't rely upon the honesty of what

11   our client tells us?

12   A.      I think we can't rely on information that

13   is expressly not warranted to be accurate when the

14   client that we are getting information from may

15   not be the one that actually knows.

16               Remember, these debts were

17   purchased from somebody else.  And so I think you

18   also need to remember that when pushed to produce

19   the underlying documents, at least half of the

20   time, in my experience, CACV can't produce them.

21   So you're relying on somebody who's getting the

22   information from somebody else to begin with and

23   you know that they told you that it can't be

24   warranted and may not be accurate.  And you know,

25   when you really want the documents, that's a 50-50

1    chance you won't get them.

2    Q.      I want to go back to my question, though.

3    My question is, is it your testimony that an

4    attorney can't rely upon the honesty of their

5    client?

6    A.      I think it depends entirely on the

7    circumstance.

8    Q.      I think when you were deposed in this case

9    you told us, under oath, that you never --

10                    THE COURT:  I'm going to stop

11    you.  Deposition testimony is hearsay.  If you

12    need it to impeach, that's fine.  But I'm going

13    to ask you not to read from the deposition unless

14    it's a proper use of the deposition.

15                    MR. BOHYER:  Yes, Your Honor.

16    BY MR. BOHYER:

17    Q.      In fact, you never believe what your

18    clients tell you, do you?

19    A.      I don't, no.

20    Q.      Would you agree with me, Mr. Patten, as of

21    March of 2007, when the debt-collection suit was

22    filed against Mr. McCullough, that they did not

23    have information that it was time-barred but

24    rather they actually had information, including

25    Exhibit 502, that confirmed that it was timely?

1      A.        I would admit that they had information

2      that it was timely.

3      Q.        Are you aware even later on, after the

4      suit was filed, Johnson, Rodenburg & Lauinger,

5      Grace Lauinger, had inquired further of CACV to

6      get information on the statute of limitations?

7      A.        I recall that, yes.

8      Q.        Mr. Patten, so the jury is clear on this,

9      the debt that Johnson, Rodenburg & Lauinger was

10     filing suit upon against Mr. McCullough, that

11     wasn't Johnson Rodenburg's debt.  It was a debt of

12     a client that they were representing, true?

13     A.        Yes.

14     Q.        Would you agree with me there is no

15     ultimate purpose or ultimate motive other than

16     filing the suit to collect the debt, from the

17     lawyer's standpoint?

18     A.        I'm not sure I understand what you mean by

19     "ultimate motive."

20     Q.        Aside from filing suit on the debt, you've

21     not been provided any information that Johnson,

22     Rodenburg & Lauinger had any other dispute with

23     Mr. McCullough.

24     A.        No.

25     Q.        So aside from the purpose of filing the

1    suit to collect the debt on behalf of the client,

2    they didn't have any other motive for filing the

3    suit.  Would you agree with that?

4                    MR. HEENAN:  Objection.

5    Speculation.

6                    THE COURT:  If you know.

7                    THE WITNESS:  I think they have

8    to have a contingent fee interest it.

9    BY MR. BOHYER:

10   Q.      Aside from collecting a fee associated

11   with the lawsuit.

12   A.      A contingent fee that is associated with

13   that?

14   Q.      Yep.

15   A.      No.

16   Q.      In fact, you were not provided any

17   information that would suggest otherwise.

18   A.      No.

19   Q.      I apologize if I asked this previously,

20   but there were questions asked of you about

21   default judgements.  You're aware or would you

22   agree with me that no default judgement was

23   entered against Mr. McCullough?

24   A.      Yes.

25   Q.      In fact, no judgement at all was entered

1   against him.

2   A.        Correct.

3   Q.        Meaning, with respect to that request for

4   admission I showed you, where it said he made

5   purchases with the credit card, the debt was not

6   paid.

7   A.        I don't follow the question.

8   Q.        So the suit's filed.  There is an issue

9   about it being time-barred.  There is an admission

10  by Mr. McCullough, yeah, I had the Chase credit

11  card and made purchases with it, so by the time

12  the case is dismissed, there is no collection on

13  the debt and the debt remained unpaid.

14  A.        Yes.  That was time-barred.

15  Q.        In your practice presently, are you seeing

16  an increase in the number of bankruptcy filings

17  related to credit card debt?

18  A.        Not an increase.

19  Q.        Pretty steady?

20  A.        The law was changed a couple years ago and

21  there was a huge increase right before the law

22  changed.  And then it dropped off and it's kind of

23  building back up.  But for the last year or so we

24  haven't been filing as many of those kinds of

25  bankruptcy because we have been too busy doing

1      other kinds of bankruptcy.

2      Q.      The context of your bankruptcy practice

3      and those folks who have credit cards, do you end

4      up representing those people who have just

5      overspent their means?

6      A.      Yes.

7      Q.      They owe the money.  True?

8      A.      Yes.

9                      MR. BOHYER:  Mr. Patten, thank

10     you.  I appreciate your time.

11                     THE COURT:  Is there redirect

12     examination?

13                     MR. HEENAN:  Yes, Your Honor.

14     Briefly.  Fairly briefly.

15     REDIRECT EXAMINATION

16     BY MR. HEENAN:

17     Q.      Mr. Patten, Johnson Rodenburg's counsel

18     just showed you an e-mail from someone at CACV

19     saying on June 30, 2004 a payment had been made.

20     A.      Yes.

21     Q.      And that's apparently the information that

22     Johnson Rodenburg felt sufficient to file a

23     lawsuit against Mr. McCullough.

24     A.      I guess.

25     Q.      Who knows?

1    A.       Yeah.

2    Q.       I want to show you Exhibit 111-8, which

3    are these Collection Master notes.

4                     MR. HEENAN:  Blow up this part

5    right here, please.

6    BY MR. HEENAN:

7    Q.       If we look at Johnson Rodenburg's own

8    file, there is an entry for June 30, 2004, isn't

9    there?

10   A.       Yes.

11   Q.       It says, Returned unused costs, doesn't

12   it?

13   A.       Yes.

14   Q.       And later on, that's what CACV advises

15   Johnson Rodenburg after the lawsuit had already

16   been filed.

17   A.       They were advised what they claim was a

18   payment was a return of costs.

19   Q.       And that was actually in Johnson

20   Rodenburg's file all along?

21   A.       Yes.

22                     MR. HEENAN:  111-10, please.

23   BY MR. HEENAN:

24   Q.       You're aware that Mr. McCullough had

25   already been sued by a different law firm on this

1    debt, correct?

2    A.       Yes.

3                     MR. HEENAN:  Please bring up that

4    portion.

5    BY MR. HEENAN:

6    Q.       Again, I'm showing you Johnson Rodenburg's

7    own notes.  Contained within the file is an entry

8    from 2005.  Do you see that?

9    A.       Yes.

10   Q.       And the entry is, Debtor filed an answer,

11   says statute of limitations is expired and if they

12   are going by an open account then we are.  Advise

13   law firm.

14                    Do you see that?

15   A.       Yes.

16   Q.       If you were handed a file from someone

17   that had this type of information in the file,

18   would you want to do some follow-up about that?

19   A.       Yes.

20   Q.       What would you do?

21   A.       Well, if I had information in the file

22   that there were costs returned on June 30 of 2004

23   or '5, whatever the year was, and in my same file

24   I'm showing from the client that that's the date

25   of the last payment, it would make me wonder if

1    the return of costs was the last payment.

2    Q.      And then the same question with respect to

3    if a client who tells you not to rely on the

4    validity of what they told you provides you a file

5    and in that file there's information that the

6    person they want you to sue has already been sued,

7    asserted a statute of limitations defense and the

8    previous lawsuit went away, how would that impact

9    your due diligence before you filed a second

10   lawsuit against the guy?

11   A.      I would want to look at the underlying

12   documents of when the last payment was paid; not

13   somebody's records of when it was paid but the

14   document itself.

15   Q.      Not someone -- I want you to tell -- I

16   mean, that's a distinction.  That's a big

17   difference, isn't it?  The documents themselves

18   versus someone sending an e-mail.

19   A.      Yes.

20   Q.      Why so?

21   A.      Well, because you could look at the

22   document and judge for yourself how reasonable it

23   is to rely on it as opposed to just receiving

24   words through an e-mail from a client saying this

25   is what happened.

1    Q.       Mr. Bohyer asked you some questions about

2    all lawyers make errors.  That's true, right?

3    A.       Yes.

4    Q.       One of the criticisms that you've

5    expressed with respect to this case is Johnson

6    Rodenburg's demand for attorneys' fees against Mr.

7    McCullough without a factual basis.  Is that true?

8    A.       Yes.

9                    MR. BOHYER:  This is beyond the

10   scope of the cross.  I didn't ask anything about

11   fees.

12                   THE COURT:  That's true.

13   Sustained.

14   BY MR. HEENAN:

15   Q.       I want to show you --

16                   MR. HEENAN:  This isn't an

17   exhibit, but I don't have a paper copy so I don't

18   think the jury should see it, but you could bring

19   it up.

20   BY MR. HEENAN:

21   Q.       Counsel showed you some discovery requests

22   that I sent on behalf of Mr. McCullough to Johnson

23   Rodenburg.  Correct?

24   A.       Yes.  Yes.

25   Q.       Do you have those in front of you still?

1    A.       No, I returned them to Mr. Bohyer.

2                    MR. HEENAN:  Just don't read my

3    notes.

4    BY MR. HEENAN:

5    Q.       What's the caption of that document, Mr.

6    Patten?

7    A.       United States District --

8    Q.       What are we --

9    A.       Plaintiff's Second Combined Discovery

10   Request.

11   Q.       That was the second, as opposed to the

12   first.  Right?

13   A.       Yes.

14   Q.       I want to show you the first --

15                   MR. HEENAN:  Thank you, Counsel.

16   BY MR. HEENAN:

17   Q.       -- requests that will come up on your

18   screen.  Do you see those?

19   A.       Yes.

20   Q.       And can you read for the jury what the

21   language is that was contained in the first

22   discovery?

23                   MR. BOHYER:  We can't see what is

24   on there.

25                   MR. HEENAN:  I can't see it on

1    mine either.

2                    MR. SIMPSON:   Now we have it.

3    There it is.

4                    THE WITNESS:   You want me to read

5    the instructions verbatim?

6                    MR. HEENAN:   Yes.

7                    THE WITNESS:   To Defendant

8    Johnson, Rodenburg & Lauinger by and through its

9    counsel of record.  Please take notice that

10   pursuant to Rules 33, 34 and 36 of the federal

11   Rules of Civil Procedure you are hereby required

12   to answer under oath the following

13   interrogatories, requests for admission and

14   requests for production of documents within 30

15   days from the time of service is made upon you.

16   BY MR. HEENAN:

17   Q.      That is the language you're talking about

18   that as a Montana lawyer you consider to be fair

19   and appropriate when sent to the other side, these

20   requests for admission, at least to the extent

21   notifying the other side they have 30 days to

22   respond?

23   A.      I think, when you're dealing with

24   attorneys, you don't have to tell them what the

25   rules say, because they should know what the rules

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    say.

2    Q.       Do you have an opinion about the first

3    time you send out requests, even though they are

4    attorneys and they know the rules, you tell them

5    the rules anyway, and then, the second time, you

6    omit them, to save some paper?

7    A.       I think that may vary.  I think we have

8    the same instructions on the discovery that we

9    send out.  But I think there's a distinction when

10   you're dealing with an attorney and when you're

11   dealing with a pro se party.

12   Q.       Why so?

13   A.       Fairness.

14   Q.       Fairness in terms of what?

15                MR. BOHYER:  Your Honor, I object

16   to this on a legal conclusion given the witness's

17   admissions that the law doesn't draw a

18   distinction.

19                THE COURT:  Overruled.  But I

20   think this was all covered before.  But I will

21   allow him to answer.

22                MR. HEENAN:  I don't want to

23   cover the same ground twice.  I will move on,

24   Your Honor.

25   BY MR. HEENAN:

1    Q.        Mr. Patten, counsel asked you about there

2    wasn't in fact a judgement taken against Mr.

3    McCullough, right?

4    A.        Yes.

5    Q.        Do you have an opinion about why that is?

6    A.        Yeah.

7    Q.        What is your opinion?

8    A.        Because you got involved to defend him.

9                        MR. HEENAN:   No further

10   questions.   Thank you.

11                       THE COURT:   Thank you, Mr.

12   Patten.   You may step down.

13                       May this witness be excused?

14                       MR. HEENAN:   Yes, Your Honor.

15   Plaintiff will call Dr. Donna Veraldi.

16                       THE COURT:   Please come forward

17   and be sworn.

18            DONNA VERALDI, having been duly sworn, was

19   examined and testified as follows:

20                       THE CLERK:   Have a seat, please,

21   and state your full name and spell it.

22                       THE WITNESS:   My name is Donna

23   Mary Veraldi.

24   DIRECT EXAMINATION

25   BY MR. HEENAN:

1   Q.        Good morning, Dr. Veraldi.  Can you please

2   tell the jury what it is you do?

3   A.        I'm a clinical psychologist.  That means

4   that I do treatment and evaluation of people with

5   various mental health problems.

6   Q.        Can you briefly, please, summarize your

7   educational and professional background in that

8   regard?

9   A.        Yes.  I got my Ph.D. in --

10  Q.        Do you need a minute to get your papers

11  out?

12  A.        I think I'm okay.  I got a Ph.D. in

13  clinical psychology from the University of Montana

14  in Missoula, and I'm licensed as a psychologist in

15  both Montana and Minnesota.  And I have done a

16  variety types of jobs, although most of my work

17  has been private practice in clinical psychology.

18  Q.        What does that mean, private practice in

19  clinical psychology?

20  A.        That means I have my own office and I see

21  people on an individual basis or work for

22  different individuals.  I'm not full-time employed

23  by an agency.

24  Q.        As part of your practice, do you have

25  occasion to evaluate people who have applied for

1      Social Security disability benefits?

2      A.        Yes.  Since the eighties, I've worked as

3      what is called a medical expert, even though I'm a

4      mental health expert, for the Social Security

5      Administration and Office of Disability

6      Adjudication Review.

7                      So I go to hearings with

8      administrative law judges who are hearing Social

9      Security disability cases, and I serve basically

10     as their expert.  I read the mental health files

11     for them and provide opinions to them as to

12     whether or not Social Security claimants meet or

13     equal the mental health listings of impairment.

14     Q.        So in that context, who are you working

15     for, the judge?

16     A.        I am the judge's expert, but I'm supposed

17     to be a neutral expert in that type of process.

18     They just want to know the information from me.

19     Q.        Who qualifies for Social Security

20     disability?

21     A.        I'm sure there are a number of

22     qualifications.  You have to be a licensed

23     psychologist and --

24     Q.        I'm sorry.

25     A.        Oh, you mean --

1    Q.       Who do you consider and qualify?

2    A.       People who are so severely impaired, in

3    terms of either mental or physical impairment,

4    that they cannot sustain gainful employment.  They

5    cannot even do repetitive routine work at a

6    minimum level of pay.  Those are the people we

7    look to give Social Security benefits to.  Anybody

8    above that very minimal line is considered capable

9    of working and would not qualify for those

10   benefits.

11   Q.       Is it fair to say it's a pretty hard hoop

12   to jump through, a process to qualify for?

13   A.       It appears to me it is.  I see people at

14   one point in that process, but often people have

15   to apply for disability and then they have to go

16   through some hearings.  And at the point I see

17   them, they are at the level of administrative law

18   judge hearing.

19   Q.       Did I contact you and ask you to take a

20   look at my client, Mr. McCullough, in this case?

21   A.       Yes, you did.

22   Q.       And did you do so?

23   A.       Yes, I did.

24   Q.       And what did you do exactly?

25   A.       I reviewed a number of medical mental

1    health records that were provided to me.  I met

2    with Mr. McCullough.  I did what is considered a

3    clinical interview with him, where I asked him

4    relevant questions.  I also administered a number

5    of psychological tests to him.  I gave him a

6    Shipley Institute of Living Scale, a Beck

7    Depression Inventory II, a Personality Assessment

8    Inventory, a Trauma Symptom Inventory, a Millon

9    Clinical Multiaxial Inventory III, the Rorschach

10    with the Exner scoring, and I additionally

11    interviewed his wife.

12    Q.      Were you also provided information by me

13    about this lawsuit Mr. McCullough has against the

14    Johnson Rodenburg law firm?

15    A.      Yes, I was.

16    Q.      And was it explained to you what the

17    context of this lawsuit was?

18    A.      Yes, it was.

19    Q.      And what in general terms did I ask you to

20    do as part of this case?

21    A.      My job was to assess Mr. McCullough's

22    psychological status at the time that I evaluated

23    him.  I needed to take into account any

24    preexisting mental conditions and additionally

25    describe the probable impact from the stress and

1    pressure related to the debt-collection practices

2    that were being alleged by Mr. McCullough.

3    Q.      Is it fair to say -- let me ask you this.

4    When did you see Mr. McCullough?

5    A.      I saw him on July 18 of 2008 and July 21

6    of 2008.

7    Q.      So you saw him two times?

8    A.      I believe I either saw him two times or I

9    saw him and then perhaps gave him some additional

10   testing at another time.

11   Q.      Is it fair to say you hadn't seen him

12   until a year and a half after he received this

13   lawsuit from Johnson Rodenburg?

14   A.      Yes, a year after sort of the final

15   situation.  There had been a long time that had

16   passed.

17   Q.      And does that affect your ability to know,

18   I mean, in fairness, what the impact of the

19   lawsuit was to Mr. McCullough?

20   A.      Yes.  You have to collect information and

21   make a judgement.  But obviously I was not seeing

22   him in the midst of the reported stress or at the

23   height of the stress.  So I have to come in after

24   the fact and make a judgement.

25   Q.      As part of your review of Mr. McCullough,

1    you looked at his clinical history or medical

2    history.  Is that correct?

3    A.      Yes.  Primarily his mental health history,

4    psychiatric and psychological treatment.

5    Q.      In general terms, what was going on with

6    Mr. McCullough?  I want to walk through, please,

7    when do we first see some notes about Mr.

8    McCullough's mental condition?

9    A.      In about 1990.  And it appears to me that

10   Mr. McCullough always had what we call personality

11   disorders, ingrained patterns of behavior that we

12   consider to be rather dysfunctional, but

13   nonetheless he had gotten some education,

14   maintained employment.  He had just recently been

15   married.

16              But then an event happened, and

17   I'm not sure exactly what happened in the early

18   nineties, where he reportedly sustained a mild

19   traumatic brain injury.  And that's when his

20   mental health records start, because that was when

21   he started to have the significant enough problems

22   that he was seeking treatment and he was having

23   difficulty with employment.

24   Q.      Do you recall what Mr. McCullough was

25   diagnosed with in 1990?

1     A.        He was given a variety of diagnoses, but

2     most of them were based on the idea that he had a

3     mixed personality disorder, and that he

4     additionally had an organically based syndrome

5     that was causing him depression, possibly some

6     anxiety, and that he additionally, for a time, was

7     diagnosed with posttraumatic stress disorder.

8     Q.        Now, let's go through.  What is mixed

9     personality disorder?

10    A.        Again, personality disorders are ingrained

11    patterns of behavior.  We somewhat consider them

12    to be learned patterns of behavior that are part

13    of a person's ongoing functioning.  All of us have

14    personality characteristics that are just part of

15    us, and people who know us know that's how we are

16    put together.

17              When we diagnose a personality

18    disorder, we are saying that pattern of

19    functioning has become dysfunctional or maladapted

20    in some manner.  There are a number listed in our

21    diagnostic manual, and when we say somebody has a

22    mixed one, we are saying they have characteristics

23    of several different types.

24    Q.        In 1990, after this head injury, it was

25    noted that there were some changes in his

1    personality?

2    A.        It did seem to me that there were some

3    changes in both his personality and also his

4    thinking, cognition.  But, yes, there was some

5    belief that there were some changes.

6    Q.        And what would those changes be?

7    A.        Primarily that he seemed to no longer be

8    able to function at work.  And his main concern

9    was that he was so angry about whatever it was

10   that had happened at his place of employment that

11   he was getting these homicidal urges, as he

12   reported them, and he feared he was so angry and

13   so potentially prone to hurting people at work

14   that he could not trust himself going back to

15   work.  And indeed the people treating him also

16   recommended that he not return to that situation

17   for other people's safety.

18   Q.        How bad does it need to get before a

19   treating physician is not going to say the person

20   can return to work because of safety of coworkers?

21   A.        I believe that means they have given

22   serious weight to the statements Mr. McCullough

23   was making, that they believed there was

24   significant concern for safety of people around

25   him and that he couldn't control his impulses very

1   well at that time, that they were taking what he

2   was saying seriously.

3   Q.      And let's just get it out there.  What

4   were some of the statements he was making?

5   A.      He was saying, "I might harm people.  I

6   know how to do it.  I would feel okay about doing

7   it."

8           Some things to the effect that his

9   coworkers, both before and after the incident

10  where he sustained this injury, had not treated

11  him well, that people had not taken his injury

12  very seriously or acted upon it appropriately, and

13  that he basically couldn't guarantee their safety

14  if he was around them and that he wouldn't feel

15  bad if he were to harm or kill them.

16  Q.      So his doctors, based on what he was

17  saying, excluded him from going to work?

18  A.      From returning to that particular job,

19  yes, in particular.  And then, I believe, later

20  said that they just didn't feel he was capable of

21  returning to work.

22  Q.      And he was approved for Social Security

23  disability at some point in there?

24  A.      At some point I believe in the early

25  1990s, and, yes, they backdated it to this time

1     period.

2     Q.      What is the time frame?  Take us, then,

3     from 1990.  What is going on with Tim?

4     A.      All right.  It appears to me during the

5     nineties that Mr. McCullough was seeking mental

6     health treatment.  He met with Dr. Tompkins, a

7     psychologist, who evaluated him several times and

8     he got some brief treatment from him.  He also met

9     with a number of psychiatrists, but the one that

10    seemed to be willing to treat him was Dr. Carlson

11    for a long period of time.

12              He made some attempt to try

13    different medications that psychiatrists give to

14    people to stabilize their emotions, to control

15    their behavior, but he eventually felt that he was

16    being overly medicated and these were not

17    effective.

18              So the nineties sort of pass.  And

19    at a point he finishes his workman's comp

20    situation.  He gets on Social Security disability

21    so he doesn't have to go to work.  He remains in

22    his marriage, but he finds if he just withdraws to

23    his home and keeps his life very low stress that

24    he can function.  He doesn't run into people.

25              So it seems to me the homicidal

1    desire and desire to harm people either is

2    insulated because he is not around people or that

3    seems to be down a bit.

4                    Some of his posttraumatic distress

5    features seems to me to subside somewhat, doesn't

6    seem to be as depressed.

7                    So as we get into the 2000s, early

8    to mid -- first part of that 2001 to 2005, when

9    Dr. Carlson is following him --

10   Q.       What is Dr. Carlson diagnosing him with in

11   2003?

12   A.       You know, I will have to look back at

13   that.

14                    MR. HEENAN:  If I might approach,

15   Your Honor?

16                    THE COURT:  You may.

17   BY MR. HEENAN:

18   Q.       I'm showing you your evaluation.

19   A.       Okay.  That Dr. Carlson thought he was

20   somewhat of an enigma and that he thought he had

21   mild dementia still from that reported head

22   injury.  And he believed he had a generalized

23   anxiety disorder, but he had a probable

24   posttraumatic stress disorder, and then he was

25   following his depression.

1              But by about 2004, right in that

2      range, he was considered stable given his

3      condition, that this is a person who is not very

4      functional, can't work, but if he stays at home

5      where he does not have contact with very many

6      people, interacts with his wife, apparently the

7      family had the animals, chicken, turkeys, goats,

8      that he can take care of, if he kept a very

9      low-stress lifestyle, even though he wasn't taking

10     medication, his condition was relatively stable

11     for him.

12     Q.      So at that point, to keep his condition

13     stable, he essentially withdraws into his home and

14     never leaves.

15     A.      Rarely leaves, I think.  I think he really

16     limits his interaction with the outside world.

17     Q.      That's to keep his stress level low?

18     A.      That's what he says.  And that's

19     consistent with that history of treatment and what

20     he was saying to his providers.

21     Q.      When he was treated by Dr. Kline in 2006,

22     2007, what was he presenting with then?

23     A.      At that time, she, again, made reference

24     to his organic defective disorder, believing that

25     he had maybe some type of mood disorder based on

1    that head injury, and that he a mildly anxious

2    mood.

3              He seemed to have a depressive

4    disorder or episode during the summer of 2006,

5    and, in 2007, he was reporting that his moods were

6    labile or that he was having a lot more intense

7    and fluctuating emotions, but he at that time was

8    refusing any form of medication.

9    Q.    And his refusal to take any medication

10   coincided with his refusal to leave the house,

11   basically?

12   A.       Yes.  And at a point in time, all of our

13   medications have side effects.  And all of them

14   have to be tolerated in some way.

15             He felt the side effects were more

16   damaging than the benefits of the medication, and

17   I believe he said that the medication might work

18   initially, but then across time the effects did

19   not seem to be very helpful to him.

20   Q.    Based upon your review of the records and

21   your own evaluation of Mr. McCullough, going

22   through the tests that you described that I don't

23   know, frankly, what they all mean, but based on

24   your administration of those tests and your review

25   of him, did you render some conclusions about what

1      his current mental state was in July of 2008?

2      A.       Yes, I did.

3      Q.       And what were those conclusions, please?

4      A.       First I tested him specifically for

5      posttraumatic stress disorder and I did not find

6      he had enough of those symptoms to be diagnosed in

7      that way anymore.  I did not retest what we would

8      call his cognitive skills because I took that old

9      diagnosis that there was some mild cognitive

10     impairment going back to the early 1990s.

11                    I felt he had an adjustment

12     disorder with a depressed mood, and I believe

13     there was sufficient generalized anxiety with him

14     at that time.  He talked about being really

15     vigilant, really reactive to situations.  I felt

16     that's an appropriate diagnosis.

17     Q.       Let me stop you.  What is anxiety?  What

18     does that mean, someone who has anxiety?  What are

19     their symptoms?

20     A.       Anxiety, and most of you are familiar with

21     it, can affect people in various ways and degrees.

22     You get physically tense.  You get physiological

23     reactions because your body is getting ready for a

24     threat or an emergency.

25     Q.       I'm sorry.  What are physiological

1      reactions?

2      A.        You breathe harder.  Your heart starts to

3      pound harder.  Your palms sweat.  Because that is

4      basically your body getting ready for an

5      emergency.  You might feel tense and anxious and

6      worried and apprehensive, and, again, you might

7      think that there is danger out there and you have

8      to be alert and watchful for the danger.

9      Q.        Thank you.  What else did you diagnose him

10     with and what else did he present with?

11     A.        He continued to have what I would consider

12     a personality disorder.  I think he has always had

13     some problems in how he has functioned and I

14     diagnosed him specifically with a schizotypal and

15     narcicisstic features with his personality

16     disorder.

17     Q.        What is schizotypal?

18     A.        Schizotypal is sort of a diagnosis that

19     involves somebody who has a pattern of social and

20     interpersonal deficits where they never quite

21     connect to other people socially in a very good

22     way.  They look --

23     Q.        Is it too simple to say they interact

24     inappropriately with others?  Am I wrong?

25     A.        That would be a simplification of a long,

1    complex diagnosis.  It includes some

2    suspiciousness and unusual ways of thinking and

3    talking and explaining the world.  Such people

4    often look sort of eccentric.  They don't maintain

5    a lot of close friendships outside of their

6    family.  So that would be sort of a suspicious

7    person.

8                    And then the narcissistic aspect

9    of it is someone who is considered grandiose, who

10   exaggerates their accomplishments, who wants to be

11   admired, who tends to present episodes in their

12   life as if they did very, very well in them, even

13   if they didn't do particularly well.

14   Q.      Let's get this out there.  Is someone like

15   Mr. McCullough the best historian?

16   A.      I think he was.  There were times he told

17   me things that I thought I wouldn't rely very

18   heavily on, because either he misperceives what

19   happens or he tells it in a way to make himself

20   look as if he did something very exceptionally

21   well.

22   Q.      How about with respect to depression?

23   A.      At the time I tested him, I didn't see

24   enough symptoms that I felt I could give him

25   anything more than what I would call adjustment

1    disorder with a depressed mood.  I didn't think he

2    was having a more severe form of depression or

3    mood disorder at the time I saw him.

4    Q.      To be fair, that was a year and a half

5    after the events that are the subject of this

6    lawsuit?

7    A.      That's right.

8    Q.      How about paranoia?

9    A.      I thought that was part of the schizotypal

10   features in that he is suspicious.  He is

11   hypervigilant.  He is always watchful of people,

12   doesn't trust people easily.  He tends sometimes

13   to misinterpret what is happening around him and

14   maybe relate it as involving some harm to him, one

15   that might or might not be that case.  But yes, he

16   does have some paranoia.

17   Q.      How about schizophrenia?

18   A.      I didn't think that diagnosis was

19   justified.  Obviously schizotypal features, the

20   name is very similar to schizophrenia.  The two

21   overlap a lot.

22           But schizophrenia would require

23   certain other things.  To be a paranoid

24   schizophrenic, you would have to have delusions

25   that are bizarre.  Paranoid schizophrenics

1      typically have delusions about somebody inserting

2      thoughts into their head, perhaps being abducted

3      by aliens.  Sometimes they will tell you things

4      like someone has surgically removed all of their

5      organs, put somebody else's organs in their body

6      and sewed them up without any scars.

7                     To get into paranoid

8      schizophrenia, you have to get into really weird

9      sorts of information or somebody who is actively

10     having what we call auditory hallucinations, where

11     they are hearing voices or other things that

12     aren't actually there.

13                     And the question is there with Mr.

14     McCullough, but I didn't think he met the

15     diagnostic criteria.

16     Q.      In your opinion, Doctor, would Mr.

17     McCullough know that he had been sued by a law

18     firm?

19     A.      Yes, he would.

20     Q.      Would that affect him?

21     A.      It seemed to me to be a significant

22     factor, stress factor, in his life.  And that

23     would affect most people.

24                     I did a literature review to see

25     if there was anything that had been researched

1    about the effect of financial stress on people,

2    and indeed I found that financial stress will have

3    a significant impact both physically in terms of

4    headaches -- 40 percent of people who have

5    financial stress report increased headaches, other

6    bodily complaints.

7                    MR. BOHYER:  Your Honor, the

8    specificity of these opinions is not specified in

9    the report on page 13.  I will acknowledge that

10   the statement regarding financial stress is

11   there, but the specificity of these is certainly

12   not.

13                   THE COURT:  I ask the witness to

14   restrict her testimony to that which was

15   disclosed.

16                   THE WITNESS:  All right.

17                   THE COURT:  Have you completed

18   your answer other than that?

19                   THE WITNESS:  Yes, I have.

20                   THE COURT:  Ask your next

21   question, Mr. Heenan.

22                   MR. HEENAN:  Thank you, Your

23   Honor.

24   BY MR. HEENAN:

25   Q.     Do you have an opinion, Dr. Veraldi, about

1    what the impact would have been on Mr. McCullough

2    with respect to this ongoing collection of this

3    credit card?

4    A.       Well, yes.  The stress would have -- and

5    there certainly was indication from my testing and

6    in my report, that there was what we call

7    situational stress with Mr. McCullough, that

8    something about his life circumstances was making

9    him feel worse, and it wasn't his ongoing

10   problems.  It was some specific situation or

11   situations.

12            So we would expect that any

13   symptoms he had might get worse.  If he tends to

14   experience physical stress symptoms such as

15   headaches, those might get worse.  If he is prone

16   to anxiety, that will get worse.  If he is a bit

17   paranoid, that will get worse.  If he has trouble

18   relating to people, that will probably get worse.

19   It will take the symptoms that he has and make

20   them worse.

21   Q.       Having reviewed the history of the

22   collection of this Chase credit card against Mr.

23   McCullough, do you have an opinion about how this

24   second lawsuit by Johnson Rodenburg specifically

25   would have impacted Mr. McCullough?

1    A.        I don't think I could tell you

2    specifically each lawsuit by lawsuit.  I can tell

3    you in a general way that if you have chronic

4    stress that that is often worse than a specific

5    episode of stress because it doesn't go away.  So

6    if you have stress across time, it will feel as if

7    you can't escape it.

8                    Then, if you have specific

9    instances of stress, again, that gets your

10   adrenalin running and gets you ready to deal with

11   a threat.  So you might, then, have little

12   flare-ups where your symptoms get worse.

13                   Both will impact a person, and yet

14   the chronic stuff will start to make people feel

15   as if they can't escape and their situation is

16   hopeless.  That's a very difficult thing for

17   anyone to deal with psychologically.

18   Q.        In your report, you talked about Mr.

19   McCullough had been sued and then he prevailed and

20   unfortunately the problems didn't go away.

21                   In terms of this chronic stress,

22   how would it have impacted Mr. McCullough, if at

23   all, to think it was finally done and the lawsuit

24   was over only to get sued a second time?

25   A.        Again, to me that relates the sense of

1      hopelessness that you think you resolved

2      something, you think it has gone away and it comes

3      right back again.  And you wouldn't know how you

4      could resolve the situation.

5      Q.       In your opinion, Dr. Veraldi, was Timothy

6      McCollough more vulnerable to being a recipient of

7      a frivolous lawsuit than most people would be?

8      A.       I cannot tell you -- you mean more

9      frivolous to someone suing him or more frivolous

10     to the effects of a lawsuit?

11     Q.       No, frivolous with respect to the

12     substance of the lawsuit.  How about any lawsuit?

13     A.       Is he more vulnerable to someone suing

14     him?

15     Q.       Correct, than the average person.

16     A.       I don't know if I could tell you that

17     because that's probably outside my area of

18     expertise.  But he is somebody who is a more

19     vulnerable individual in negotiating the world.

20     So he may be more vulnerable to any types of

21     problems.  But I can't tell you he is more or less

22     likely to be sued than other people.

23     Q.       No, no.

24     A.       Oh, I'm sorry.

25     Q.       That's okay.  Is he someone who would

1    react differently than an average mentally healthy

2    person?

3    A.      Well, anyone with a personality disorder

4    doesn't cope very well.  So they tend to fall

5    apart more under stress.  It's harder for them to

6    pull themselves together and they tend to get

7    stuck in their emotional reactions to stress for a

8    longer period of time.  By definition, they often

9    don't come up as good at problem-solving as the

10   average person.  So when you put them under

11   stress, it hits them harder.

12                   MR. HEENAN:  No further

13   questions.  Thank you, Dr. Veraldi.

14                   THE COURT:  You may

15   cross-examine.

16                   MR. BOHYER:  Thank you, Your

17   Honor.

18   CROSS-EXAMINATION

19   BY MR. BOHYER:

20   Q.      Dr. Veraldi, good morning.  You and I

21   haven't met before.  My name is John Bohyer.  I

22   represent the defendants in this case, Johnson,

23   Rodenburg & Lauinger.

24   A.      Okay.

25   Q.      Okay?  You have your report in front of

```
1    you?

2    A.      Yes, I do.

3    Q.      Okay.  I want to go through some of the

4    diagnoses first, if I may, Dr. Veraldi.

5                    Actually let me switch gears

6    before I do that.

7                    In terms of the practice of

8    psychology that you're engaged in these days, is

9    it more forensic or is it clinical, treating

10   patients?

11   A.      It's more forensic.  I would consider

12   myself a forensic psychologist.

13   Q.      And what you're doing here today is part

14   of forensic psychology?

15   A.      Yes, it is.

16   Q.      Forensic psychologists, they investigate

17   things and they testify in court.

18   A.      Yes, anything to do with the legal system

19   or legal opinions is forensic psychology.

20   Q.      I apologize if this was asked on direct,

21   but the cost of your services to testify today?

22   A.      $175 per hour.

23   Q.      Is there a minimum half day or full day?

24   A.      No.

25   Q.      Did you meet with Mr. Heenan to discuss
```

1    Mr. McCullough's case?

2    A.       Yes, I did.

3    Q.       Can you tell me how many times?

4    A.       I met with him only once, and that was

5    after I evaluated Mr. McCullough.  But subsequent

6    to evaluating Mr. McCullough, I probably spoke to

7    him on the phone several times, I think.

8    Q.       Did Mr. Heenan have any input into the

9    opinions you framed?

10   A.       Only in the questions that he asked me to

11   address.

12   Q.       Fair enough.  Now, to your diagnoses,

13   please.  I'm on page 14 of your report.

14            You indicated on direct exam you

15   could not diagnose depression.

16   A.       Other than an adjustment disorder, no, I

17   didn't think there were enough symptoms here to

18   diagnose dysthymia, major depression, depressive

19   disorder, yeah.

20   Q.       There were questions asked of you that

21   indicated that you had seen him 18 months after

22   this was going on.  Do you remember those?

23   A.       Yes, 18 months after the sort of the final

24   lawsuit, I believe.  I believe there were some

25   ongoing things, yes, but it was 18 months after

```
 1    everything was -- after that period of time.

 2    Q.      So I think I heard you say that you saw

 3    him as the stress was coming down, not at the

 4    peak.  Correct?

 5    A.      That's probably the case, yes.

 6    Q.      And you would say -- and it was 18 months,

 7    your understanding, when the suit was finally

 8    wrapped up, 18 months prior?

 9    A.      That was my understanding, yes.

10    Q.      Assume for a moment the suit was actually

11    done seven or eight months prior.

12    A.      Okay.

13    Q.      So you will be closer in time to the peak

14    of that stress, aren't you?

15    A.      That would be.

16    Q.      So no depression diagnosed.  And then you

17    said, generalized anxiety disorder.  Did that

18    preexist 2006?

19    A.      Oh, yes.

20    Q.      Any of the diagnoses that you made here --

21    let me rephrase that.  Did all of the diagnoses

22    that you made here preexist 2006?

23    A.      Oh, yes, they did.

24    Q.      So the symptoms, the psychological

25    diagnoses, predated anything that my client had to
```

```
 1    do with Mr. McCullough?

 2    A.       I believe that they all did, yes.

 3    Q.       Did you treat Mr. McCullough?

 4    A.       No, I did not.

 5    Q.       In terms of your opinions about the

 6    debt-collection lawsuit causing stress to Mr.

 7    McCullough, did you see Mr. McCullough the day

 8    before the lawsuit was filed?

 9    A.       No, I did not.

10    Q.       Did you see him at any time while the

11    lawsuit was pending?

12    A.       To the best of my knowledge, no.

13    Q.       So would you agree with me you're making

14    some significant assumptions as to what he may or

15    may not have been going through during the

16    lawsuit?

17    A.       You're making some judgements about that,

18    yes.

19    Q.       Did you speak with any of Mr. McCullough's

20    treating physicians?

21    A.       No, I did not.

22    Q.       Would they be good sources of information

23    regarding his condition?

24    A.       I don't know that they would in addition

25    to their very good reports and notes that were
```

1    provided to me.

2    Q.      Do you treat any patients presently?

3    A.      Yes, I do.

4    Q.      Roughly how many?

5    A.      I would say, actual clinical treatment, I

6    probably see five clients a week one way or the

7    other.

8    Q.      Would you agree with me that Mr.

9    McCullough's stress level or mental state could

10   have been the same before the debt-collection

11   process as it was after?

12   A.      Stress levels don't remain the same level

13   for anybody for anything.  He could have had

14   periods before the debt collection where he had

15   episodes of higher stress.  He could have had

16   lower stress and then higher stress during the

17   process of the debt collection.  Stress goes up

18   and down.  So indeed, it could have been at

19   different levels at different times.

20   Q.      I guess the point I'm trying to make, you

21   don't know?

22   A.      No, I don't know during that time.  I

23   would have to make judgements after the fact.

24   Q.      Some questions were asked of you how

25   financial stress affects people.  I assume you

1    would agree with me, Dr. Veraldi, that folks who

2    get in over their head with debt are stressed,

3    irrespective if they are subject to a

4    debt-collection suit or not.

5    A.      Yes, that would be a form of financial

6    stress, yes.

7    Q.      Irrespective of whether or not they suffer

8    from some mental illness?

9    A.      That is also true.

10   Q.      In fact, in your interviews with Mr.

11   McCullough and your review of the records, you

12   noted that he was having financial stress with

13   debt as far as back as the 1990s.

14   A.      Yes.

15   Q.      And that he had been through situations

16   with credit card debt prior, even back then.

17   A.      That was my understanding was that there

18   were problems in the early nineties, when he left

19   his job, yes.  That's when he told me the problem

20   with the credit cards began.

21   Q.      Would you agree with me, Dr. Veraldi, Mr.

22   McCullough's stress and mental state could have

23   been from the fact that he incurred the debts, as

24   opposed to having to deal with the debt-collection

25   lawsuit?

1    A.        From what he told me, he said he had made

2    arrangements to pay off the majority of his credit

3    card debts and was able to resolve those.  So he

4    had indicated that while that was stressful that

5    was a situation he felt he had some plan at least

6    to manage.

7    Q.        Would you agree with me that it may be

8    difficult to determine what is going on with Mr.

9    McCullough?

10   A.        He is an enigma, yes.  It is often

11   difficult to know what all is going on.

12   Q.        In terms of the various testing that you

13   conducted for Mr. McCullough, how long did that

14   take, roughly?

15   A.        Well, various of it takes various times.

16   I would probably spend around an hour one side or

17   the other talking to him; less time than that

18   speaking to his wife.  The Rorschach takes about

19   an hour.  I administer it face-to-face.  The other

20   tests are paper-and-pencil tests administered in

21   my office and it takes some number of hours.

22   Q.        Would you agree with me that his validity

23   scales on these tests reflect a tendency on his

24   part to respond inconsistently?

25   A.        That was one test.  That was the

1    Personality Assessment Inventory, and yes, the

2    validity scale indicated that there was tendency

3    to respond inconsistently on that particular test.

4    Q.       And that brings into the question, then,

5    the reliability of the results you get from those

6    tests, true?

7    A.       It was at a level that said you should

8    interpret those tests with caution but that you

9    can still utilize that information.  Yes, that is

10   correct.

11   Q.       When we talk about the reliability or the

12   tendency to respond inconsistently, are we talking

13   about the truth and accuracy of the responses

14   provided?

15   A.       That's not so much having to do with truth

16   but it's sort of a pattern of responding.  There

17   are a number of validity scales on the Personality

18   Assessment Inventory and that one simply is not

19   saying whether or not he is telling the truth.  It

20   is picking up much more on, is he able to read the

21   questions, is he able to sustain his

22   concentration, does he tend to contradict himself

23   in his answers?

24              So mental health people are not

25   experts in truth and I won't put myself out as

1    that.  We don't have tests of that.

2    Q.       You want, of course, this jury to be able

3    to make its decision based on reliable

4    information.

5    A.       I can tell you about reliability and

6    validity.  I'm not an expert in truth versus lies.

7    Q.       I want to ask some specific questions

8    about history that Mr. McCullough provided to you,

9    recognizing that some of these are rather

10   sensitive, and I will try to be cognizant of that.

11   And this, I guess, would come into the nature of

12   reliability or accuracy.

13            You took a rather lengthy history

14   from Mr. McCullough.  True?

15   A.       Yes, I did.

16   Q.       At one point he told you, he reiterated to

17   you, a bunch of alleged injuries he had sustained

18   in his past?

19   A.       That's right.

20   Q.       One of those was that he had sustained

21   first- , second- and third-degree burns over 25

22   percent of his body?

23   A.       That's right.

24   Q.       And he told you, didn't he, that he didn't

25   get any medical treatment for that?

1    A.        That's right.

2    Q.        And that came as a surprise to you, I

3    guess.

4    A.        I didn't think that was a reliable report.

5    Didn't make sense to me.

6    Q.        That's because third-degree burns require

7    extensive treatment?

8    A.        That's my limited medical understanding.

9    That's what I understand about them, yes.

10   Q.        Rather than get the medical treatment, he

11   told you that he jumped into a brine freeze tank,

12   something like that?

13   A.        Yes.

14   Q.        I think he also told you that he sustained

15   multiple knife wounds in the past.

16   A.        That's correct.

17   Q.        And no medical treatment for those either?

18   A.        When I asked him, he told me the knife

19   wounds were not life-threatening.

20   Q.        Did you interpret that to mean he had not

21   obtained medical treatment for that?

22   A.        He did not obtain medical treatment, that

23   is right.

24   Q.        Did you question the accuracy or

25   reliability of the statements he made?

1    A.        I believe he was not a reliable historian,

2    but I believe those sorts of statements were what

3    we call diagnostic.  They fit with the

4    narcicisstic personality diagnostic criteria.

5    They were those sorts of statements.  And also

6    with the schizotypal stuff, he is either

7    misperceiving or he is exaggerating or grandiose

8    or something.  These don't make sense.

9    Q.        In terms of your use of the word grandiose

10   or grandiosity, can that mean both on the good

11   side and bad, the statements of grandiosity?  I'm

12   doing very well, I've made great achievements, or,

13   something very bad has happened to me.

14   A.        Yes, something very bad has happened to

15   me.  Most grandiose statements don't say, I've

16   done very badly.  There is always the need, in

17   making those statements, to make yourself look

18   very good.  Something very bad happened to me, but

19   I handled it very, very well.

20   Q.        So grandiose can mean both.  I am quite

21   accomplished.  I've done something very well.  Or,

22   something bad has happened to me and I've dealt

23   with it well.

24   A.        Yes.

25   Q.        He also indicated to you that he had been

1    shot twice?

2    A.       Yes.

3    Q.       And he had no medical treatment for that?

4    A.       Well, then, again, he would make the

5    statements and I would ask him about medical

6    treatment.  When I asked him about the two bullet

7    wounds, he said, "Oh, well, they didn't penetrate

8    my clothes because I was wearing heavy clothes."

9                    So when he would make these

10   statements and then I would question them, he

11   would back off.

12   Q.       He told you he had had 27 broken bones and

13   a split sternum over the years?

14   A.       Yes.

15   Q.       Did you consider that to be an accurate or

16   reliable statement?

17   A.       I would not have placed great weight on it

18   unless I saw corroborating medical records.

19   Q.       You made some reference, Dr. Veraldi, to

20   an alleged head injury.

21   A.       Yes.

22   Q.       And Mr. McCullough had told you that in

23   about 1990 someone hit him in the head with an

24   iron bar?

25   A.       That's right.

1    Q.      You looked at his medical records from

2    that time period, correct?

3    A.      That's right.

4    Q.      And you noted that the medical examination

5    did not substantiate a head injury?

6    A.      That's right.

7    Q.      Meaning that, when he goes into the ER,

8    they are looking at him.  You look at the records

9    and they don't find that he's been hit in the head

10   with an iron bar.

11   A.      Well, they don't find that because you can

12   get a mild traumatic brain injury without loss of

13   consciousness and no amnesia.  So what we find is

14   there can be medical evaluations of head injuries.

15   You don't see anything on CAT scans, MRIs, that

16   sort of thing.  The person doesn't come in

17   unconscious.

18           But then, with neuropsychological

19   testing, you might see some evidence of that, as

20   happened with Dr. Tomkins.

21           So he didn't have something severe

22   that could be found with medical evaluation, but

23   he did appear to have some alteration in his brain

24   functioning that was picked up by

25   neuropsychological testing, which is far more

1    sensitive.

2    Q.      Let me kind of explore that a little bit.

3    When you note the medical examination did not

4    substantiate an injury, you said there was nothing

5    picked up on the CAT scan or anything else.

6                 There wasn't a note that he had a

7    big bruise on his head?

8    A.      No.

9    Q.      There wasn't a note that he had a

10   laceration?

11   A.      No.

12   Q.      Would you expect to see a bump on the

13   head, or a bruise or a cut, if someone got whacked

14   over the head with an iron bar to cause brain

15   injury?

16   A.      You're asking me several questions.

17   First, medically I can't tell you what the

18   probable injury would be.  But as a person who

19   does neuropsychological testing, I can tell you

20   that people who often don't have any observable

21   medical injuries, when given neuropsychological

22   tests, will show some alteration in brain

23   functioning.

24                 The reason for that is our brains

25   have all these little connections in them.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    Sometimes you get wonked on the head and you get

2    this diffuse axonal damage.  It doesn't show up on

3    a CAT scan, you don't see lacerations, you don't

4    see bumps, but in testing people afterwards, you

5    see alteration in brain functioning.  So I only

6    know from what I do that I test people with

7    neuropsychological tests, even when the medical

8    records would say nothing happened, and they still

9    have alterations in functioning.

10    Q.      Would a report to you of getting hit in

11    the head with an iron bar and there not being any

12    indication of any medical evidence that this

13    occurred, would that also be consistent with how

14    he reported third-degree burns, knife wounds and

15    being shot?

16    A.      I have significant questions about his

17    being able to tell me what actually happened.  But

18    I believe in Dr. Tomkins, who did the

19    neuropsychological testing and said something

20    happened.  I don't believe Mr. McCullough's

21    report.  I believe his medical records.

22    Q.      The psychological records?

23    A.      Well, I consider that part of the medical

24    records.  I believe the psychological records.

25    Q.      I just want to make that distinction for

1    the jury.  Thank you.

2                    Would the symptoms that he

3    indicated you're looking at with Dr. Tomkins also

4    be consistent with mental disease?

5    A.      Some of them would be.  The significant --

6    the mild impairment on category trails B and some

7    of the Wexler subtests are more likely to be

8    related to cognitive problems than they are to be

9    related to mental health issues.

10   Q.      Dr. Veraldi, you also made notes in your

11   report that Mr. McCullough had trained as an

12   actor, as a stage actor.  Do you recall that?

13   A.      He told me he toured with a repertoire

14   company, I believe, yes.

15   Q.      He toured with, I think you've got here,

16   the American Conservatory Theatre and a

17   Shakespeare tour group.

18   A.      That's right.

19   Q.      Would his training as an actor give you

20   any reason to question the reliability of what he

21   tells you?

22   A.      Again, I can't tell truth from lie.

23   People lie to me all the time.  I've about a 50-50

24   percent rate of being able to tell truth from

25   lies, like all the mental health people.  So I

1    assume someone with training as an actor or as an

2    actress would probably learn how to put on shows

3    better.

4                    But to me, the greater concern is,

5    what is his mental health diagnosis and how does

6    he communicate with people?  That to me was the

7    greater concern.

8    Q.      You were also aware that he hadn't worked,

9    I think, since the early 1990s. I believe I heard

10   you say that on direct.

11   A.      That was my understanding, yes.

12   Q.      That has nothing to do with my client,

13   true?

14   A.      That's nothing to do with your client.

15   That happened with this other incident.

16   Q.      You also discussed him suffering some

17   headaches.  I think you discussed alcohol and drug

18   abuse, or drug use, excuse me, in the context of

19   that.

20                   He indicated to you that he would

21   drink beer to thin his blood.  True?

22   A.      Yes.

23   Q.      And he also indicated to you that he would

24   drink a couple of shots of tequila with chili

25   peppers for headaches.

1     A.        Yes.

2     Q.        I'm assuming, without knowing, I guess,

3     are shots of tequila a recommended course of

4     therapy to relieve headaches?

5     A.        We are getting outside my area of

6     expertise.  I'm guessing they probably aren't, but

7     I am not sure.

8     Q.        Have shots of tequila relieved headaches

9     for you over the years?

10    A.        I'm not much of a drinker.

11    Q.        Fair enough.  You also interviewed his

12    wife, Mrs. McCullough.  True?

13    A.        Yes, I did.

14    Q.        I want to refer you to that a little bit,

15    on page seven of your report.  Claims here are

16    being made with respect to some emotional distress

17    that he may have suffered as a result of his

18    encounter with my client.  Page seven for your

19    reference, Doctor.

20    A.        Okay.

21    Q.        I don't know how long your interview with

22    Mrs. McCullough took.  Can you reference that?

23    A.        Somewhere between, I'm guessing, 15

24    minutes and a half-hour.  It was not very long.

25    Q.        Would you agree with me that in the

```
1    paragraph where you address Mrs. McCullough's
2    interview that nowhere within your report does she
3    say that his stress level now is either worse or
4    that it is as a result of the debt-collection
5    process?
6    A.      That's correct.
7    Q.      When you interviewed Mr. McCullough, he
8    told you that he had little general distress.
9    True?
10   A.      I believe that he did tell me that, yes.
11   Q.      He told you that he had few complaints
12   about anxiety and tension.
13   A.      That's right.
14   Q.      And in fact, you specifically inquired
15   about stress and he reported to you that his life
16   is stable, predictable and uneventful.  Isn't that
17   true?
18   A.      That's true.
19              THE COURT:  How much more do you
20   have, Counsel?
21              MR. BOHYER:  I'm almost done,
22   Your Honor.  Less than five minutes.
23              THE COURT:  Okay.  Go ahead.
24   BY MR. BOHYER:
25   Q.      In terms of stress, is someone who is
```

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    reporting stable, predictable and uneventful

2    things in life, that is what you and I would agree

3    would be normal.

4    A.      Well, again, that's why I do the

5    psychological test.  Because I don't consider him

6    a very good reporter.  So his psychological

7    testing said something different than his reports

8    to me, and I believe in my psychological tests.

9    Q.      If a normal person says, I'm stable,

10   things are predictable and uneventful, stress is

11   okay in their life --

12   A.      Might and might not be.  Sometimes people

13   don't tell you what is actually going on with

14   them.

15   Q.      Fair enough.  You also conclude in your

16   opinions and reports that Mr. McCullough's

17   interpersonal maneuvers are an attempt to gain

18   recognition and social approval.

19   A.      That's right.

20   Q.      Would the interpersonal maneuvers include

21   this setting?

22   A.      Very possibly could.

23   Q.      If people don't approve of those

24   maneuvers, that causes him anxiety?

25   A.      That's my understanding from the testing,

1    yes.

2                    MR. BOHYER:  Dr. Veraldi, I

3    appreciate your time.  Thank you very much.

4                    THE COURT:  How much do you have,

5    Mr. Heenan?

6                    MR. HEENAN:  I have no questions,

7    Your Honor.  Let's take a lunch break.

8                    THE COURT:  This witness may

9    excused?

10                   MR. HEENAN:  Yes.

11                   THE COURT:  Thank you, Doctor.

12                   It is noon.  We will take our

13   noon recess.  Is 1:15 okay with counsel?  Is it

14   okay with members of the jury?  Let's be back

15   here at 1:15.

16                   Do remember the admonitions I

17   have given you before.  Don't discuss the case

18   with anyone, even your fellow jurors.  Don't do

19   any research, don't read any news reports, should

20   there be any, and do keep an open mind until all

21   the evidence has been submitted to you.

22                   We will be in recess until one

23   15.

24                   (Lunch recess.)

25                   THE COURT:  You may call your

1 next witness, Mr. Heenan.

2      MR. HEENAN:  Thank you, Your

3 Honor.  We would call Mr. McCullough to testify

4 now.

5      THE COURT:  Mr. McCullough,

6 please come forward and be sworn.

7     TIMOTHY McCULLOUGH, having been duly sworn,

8 was examined and testified as follows:

9      THE CLERK:  Be seated, please.

10 DIRECT EXAMINATION

11 BY MR. HEENAN:

12 Q.  Tim, will you please state your full name

13 and address for the record.

14 A.  M. Tim McCullough.  That's

15 M-c-C-u-l-l-o-u-g-h. I live at 1702 East 8th

16 Street, Laurel, Montana.

17 Q.  It's fair that I advised you before you

18 took the stand that if you're having a problem or

19 something that I'm asking that is confusing, stop

20 me.  Okay?

21 A.  Yes.

22 Q.  Are you employed, Tim?

23 A.  No.

24 Q.  How long since you were employed?

25 A.  1990.

1    Q.       What were you doing for employment in

2    1990?

3    A.       At that time I was working at the vo-tech

4    as maintenance custodian engineer.

5    Q.       Are you married?

6    A.       Yes.

7    Q.       How did you meet your wife?

8    A.       We ended up both working at the vo-tech

9    prior to the injury.

10   Q.       You were both janitors or custodians?

11   A.       We were custodians when it was School

12   District II, and when it was sold to the State of

13   Montana, we became maintenance engineers under

14   their classification.

15   Q.       What happened in 1990 that caused you to

16   cease your employment?

17   A.       We had been having a rash of break-ins and

18   we had been reporting them, but there wasn't any

19   evidence.  No one wanted to follow up on it.  We

20   had security people come in and verify something

21   was going on.

22                On May 9, 1990, I was doing a

23   lockdown, going around checking the doors and

24   making sure machines were shut off and the lights

25   in certain parts of the shops were taken care of

1    and everything.  We still had night classrooms up

2    in the front going on, so I was doing the shop

3    area.  And I saw a shadow and he stood up and hit

4    me.

5    Q.      That's the last thing you remember?

6    A.      Well, I don't remember passing out or

7    anything like that, but the next thing I actually

8    knew, everything was going around and I was on the

9    floor.

10   Q.      And then what happened after that in terms

11   of --

12   A.      I got up, worked my way to the nearest

13   office and called the police.

14   Q.      And then after that injury in May of 1990,

15   did you have any symptoms?

16   A.      Lots of them.

17   Q.      And let's go --

18   A.      Physical and mental.

19   Q.      Let's go through the physical symptoms

20   first.

21   A.      I used to have very strong hands.  I lost

22   the grip in my right hand.  I'm very dominant

23   right-handed.  I went down to something like an

24   eight-pound grip.  I have a problem with heights,

25   altitude, so going to the mountains isn't

1   something I do very often anymore.  I'm very

2   claustrophobic and I admit I was a bit paranoid in

3   my life --

4   Q.      Prior to the head injury?

5   A.      Prior to the head injury.

6   Q.      Had you ever been diagnosed or received

7   psychiatric treatment?

8   A.      No.  I've been evaluated for some of the

9   jobs I've had in my life and I never had any

10  problems passing those evaluations, so no, I never

11  saw anybody for treatment.

12  Q.      But you had, by your own admission, issues

13  of paranoia prior to the injury?

14  A.      According to the dictionary, paranoia is

15  the unsubstantiated fear that someone is out to

16  get you.  I've asked many of the doctors over the

17  years, what is it called if there's a possibility

18  that it's substantiated?

19  Q.      It's true that somebody is out to get you?

20  A.      Yes.  Is it paranoia or is looking over

21  your shoulder a good thing?

22  Q.      Did you think you looked over your

23  shoulder the same as anyone else or more?

24  A.      Probably a bit more.

25  Q.      That was even prior to the head injury?

1    A.       That was prior to, but that was part of my

2    background.

3    Q.       I don't want to get through your whole

4    employment background, but I do want to ask you

5    one question.  Were you ever an actor?

6    A.       Not really, no.  I stood in the background

7    at casts if they needed a fill-in.  I was studying

8    lighting design, engineering stage design.  That

9    was my expertise; behind the set, not up on the

10   stage itself.

11   Q.       You haven't received any type of formal

12   training or been employed professionally in some

13   capacity that would make you a professional

14   witness?

15   A.       Well, I did have the occasion to be a

16   background on like when they were making movies

17   here.  I did something like that out in

18   California.  I was background scene in a hobo camp

19   in Days of Glory with David Caradine, but they

20   even cut that out.  I never made it to the screen.

21   Q.       So go ahead.  I stopped you.  What other

22   physical symptoms did you have after the head

23   injury?  We talked about paranoia which is more of

24   a mental, right?

25   A.       Well, when you're always looking over

1    your -- you start getting a twitch looking behind

2    you all the time.  I don't sleep.

3    Q.       What do you mean you don't sleep?

4    A.       Well, for probably the first five years I

5    was lucky if I got two to three hours a night.

6    Even today, I go to bed and sleep somewhere

7    between three and four hours.  I don't go to bed

8    until three or five o'clock in the morning.  When

9    the sun comes up, I can go to sleep.  I always

10   spend the night listening.

11   Q.       What else in terms of physical symptoms,

12   blood pressure?

13   A.       My blood pressure goes crazy.  I get

14   migraines that are off the scale.  And my blood

15   pressure goes up.  My blood sugars go up.  The

16   cholesterol goes up.

17   Q.       Are you diabetic?

18   A.       I am now.  Everything I used to do with

19   the exercise and the work and all I can't do

20   anymore, because if I raise my heart rate, I get a

21   migraine.  So I do everything I can to stay quiet,

22   calm.

23   Q.       How about nonphysical repercussions from

24   this head injury or since 1990?

25   A.       Well, it started out there was some things

1    I remembered vividly, like the injury.  But parts

2    of my past are still not there.

3    Q.      You just don't remember?

4    A.      I just don't remember.  I can remember

5    certain things, but I can't remember all that

6    happened.  Just scrambled my memory for a long

7    time.  It took a long time to get most of it back.

8                    It was like every month of your

9    life was a different jigsaw puzzle and you took

10   all the pieces and threw it in the air, but if you

11   took the picture away and put it back together

12   again, there was a lot of bits and pieces to fit

13   it back together.

14   Q.      Let's talk about putting it back together.

15   What was that recovery process?

16   A.      A great deal of it was time.  A great deal

17   of it was, well, I had to learn how to read and

18   write again.  I had to go over -- I'm a really

19   good bookkeeper for all of my stuff, at least I

20   was back then, so I had an awful lot of

21   documentation to go through to try to put things

22   back together where I was with this, what

23   relatives, that.  Because of it, I ended up

24   gathering together all the family photos and

25   documents and bibles, everything I could to try to

1       put my family history and me in perspective.

2       Q.      What is your wife's name?

3       A.      Doraleen.

4       Q.      Did she have a role in your recovery?

5       A.      Oh, definitely.  First year she gave up

6       work in order to stay home and take care of me.

7       We pulled our pensions out of the state and school

8       district in order to use them to survive on.

9                      She bought me models to get my

10      hand-eye coordination again.  She bought me puzzle

11      books, crossword puzzles, find the word, to get me

12      to actually be able to start concentrating on that

13      aspect.  She went out of the way to make sure I

14      kept involved in the daily living.

15      Q.      What do you mean by that?

16      A.      Well, later on, after I had been at it a

17      while, she let me do some of the paperwork around

18      the house, sending this out, sending that out.

19      Q.      Like paying a bill?

20      A.      Well, you start out putting stamps on

21      things and stickers, making sure it's labeled.

22      And eventually, yeah, to paying the bills.

23      Q.      Okay.  Anything else that Doraleen was

24      doing to help you recover?

25      A.      She went and found anything that I was

1    interested in, anything that actually clicked.

2    Q.       Like what?

3    A.       Any dumb piece of information, trivia,

4    stuff that no one would consider anything, pieces

5    of history that were fun or funny or just totally

6    out of place.  She would buy those books and, hey,

7    you know, these are interesting, you know, missing

8    pieces from history.  And I read them.  I started

9    increasing my reading again and having fun for a

10   little bit.

11   Q.       Did you get better?

12   A.       For a while.  And then --

13   Q.       I mean, you're seeing a psychiatrist now.

14   A.       I'm seeing a psychiatrist.

15   Q.       You're having some --

16   A.       Improvements.  We go through an awful lot

17   of drugs and medications.  And at this particular

18   point the wife is contacting my brother, who is a

19   paramedic out in California at that time, and he

20   is keeping her informed about the drugs and the

21   levels I was taking.  And he informed the wife

22   that some of the drugs I was --

23                   I'm getting toxic.  I wasn't

24   always this big.  I was kind of slim.  I've blown

25   up and never gone down again.

1              He informed the wife that I was

2    taking drugs on a level they don't even give the

3    psycho patients at Backerville (ph) Mental

4    Hospital in California.

5              So I started questioning the

6    doctors and I wanted off some of those drugs.  I

7    was getting side effects that were not doing me

8    any good.  We have gone on to other doctors since

9    then, like Carlson.  I started out with a doctor

10   called O'Neil.

11   Q.    So you quit at some point taking the

12   meds --

13   A.    I quit at some point most of the drugs.  I

14   found I got along a lot better with natural

15   medicines; less side effects, easier to control, I

16   could take them more often.

17   Q.    Now, you heard Dr. Veraldi talk about some

18   of the stress-related issues or diagnoses that

19   she's given you.  When you stop taking the drugs,

20   what does that do with the stress?

21   A.    It ups it.

22   Q.    How so?

23   A.    Because it takes a long while to figure

24   out what actually works in the homeopathic.  You

25   have to balance this with that, find out, hey,

```
 1    there's a new drug that does that.
 2    Q.      So what else do you do besides homeopathic
 3    to manage your stress level?
 4    A.      It started by accident.  I had a friend
 5    who had a rooster and a couple of turkeys.  He had
 6    one extra rooster and two turkeys he couldn't
 7    butcher.  He loved them too much.  So he gave them
 8    to me, and my cousin gave me a goat.  She could no
 9    longer keep it.  She was within the city limits
10    and needed to get rid of it.
11                     So I ended up taking care of
12    animals and it kept enlarging and enlarging, and
13    I've got another goat.
14    Q.      You have some goats and some turkeys?
15    A.      Right now I have one female.  I'm supposed
16    to pick up a male later on in the year for
17    breeding purposes.  I milk it and my wife makes
18    cheese.  I have chickens and turkeys -- right now
19    I don't have any turkeys.  I'm waiting for the
20    chicks to arrive so I can start them.
21    Q.      To be fair, because I've been at out at
22    your house, you're not a farmer.  It's not a farm,
23    right?
24    A.      No.  I have just a hair underneath an
25    acre.  And I have birds.  It calming.  It's
```

```
 1    relaxing.  And I have to do it no matter how I
 2    feel.  I have to get up.  I have to go out and
 3    take care of the animals that day.
 4    Q.      Is there --
 5    A.      It's --
 6                    THE COURT:  Mr. McCullough, the
 7    court reporter can only take one of you talking
 8    at a time.
 9                    MR. HEENAN:  I'm sorry too, Your
10    Honor.
11                    THE COURT:  Let's just have Mr.
12    Heenan finish his question and then you start
13    your answer.
14                    Ask your next question, please.
15                    MR. HEENAN:  Thank you, Your
16    Honor.
17    BY MR. HEENAN:
18    Q.      So you're raising these chickens and
19    turkeys, in your mind, as a sort of therapy for
20    your stress?
21    A.      It's not just in my mind.  I started this
22    back with O'Neil, and he said it was the best
23    therapy I had ever had, and I just continued it
24    ever since.
25    Q.      What about with respect to staying at home
```

1     or not leaving the house?  Is that part of your

2     stress therapy?

3     A.       Yeah, I don't bump into a lot of people.

4     I don't have to worry about crowds getting me

5     upset.  If I don't come into Billings very often,

6     I don't have to worry about bumping into people I

7     don't want to bump into.  Because they are

8     associated with what happened after the head

9     injury at the school.

10    Q.       Do you go to the movies or concerts or on

11    vacation?

12    A.       Not per se.  I had to go out to California

13    last year because of a father in a nursing home.

14    I wouldn't exactly call it a vacation, even though

15    on the way we did stop by and visit my brother and

16    the wife's sister and father.

17    Q.       Is it fair to say that a normal day for

18    Timothy McCollough is wake up, take care of your

19    birds, don't leave the house?

20    A.       Well, I try and get some things done in

21    the yard.  I'm about 10 years behind on all my

22    plans.

23    Q.       I kind of noticed that too.

24    A.       And, you know, I watch movies to help

25    relax me.  I found with the initial head injury

1     and everything, if I put something on that I'm

2     familiar with, old movie or something like that,

3     it keeps me calm, keeps me relaxed, keeps my mind

4     off of other things.  It helps.

5     Q.     First let me cover something.  After this

6     head injury, did you receive workman's

7     compensation benefits?

8     A.     Up until '94.

9     Q.     Did you ultimately get approved for

10    worker's compensation benefits?

11    A.     Oh, I got approved for worker's

12    compensation right off the end, but I had to fight

13    them every inch of the way.

14    Q.     For all the medical?

15    A.     I had a lawyer, Tom Lynaugh, handle the

16    situation and they -- every three, four months

17    they would switch who was in charge of the case

18    and we had to start all over again.

19    Q.     How about with respect to Social Security

20    disability benefits?

21    A.     I didn't pay much attention to it until

22    around the time Lynaugh instructed me, asked me

23    whether I had Social Security benefits yet and I

24    said I never even applied.

25    Q.     So he helped you --

1     A.        He helped me set it up and they backdated

2     the benefits to '92.

3     Q.        What year was it that you ultimately were

4     approved for Social Security disability?

5     A.        The year it was actually approved, I

6     think, was '94, about two, three months before

7     worker's comp dropped me.

8     Q.        Do you have any understanding why it is

9     you were approved for Social Security disability?

10    A.        Yeah.

11    Q.        Why?

12    A.        Part of it is the fact that I was

13    instructed years ago to keep a calendar.  On an

14    average year, between headaches and sick because

15    of the headaches or the blood pressure or whatever

16    else, out of 365 days, I spent an average of 150

17    down with a headache.

18    Q.        What do you mean "down"?

19    A.        Well, when a migraine comes on, you don't

20    do anything to aggravate it or make it worse.  And

21    the number one thing you do is you lay down in the

22    dark.

23    Q.        How long would you be down with migraines?

24    A.        Depends on the size of the migraine.  It

25    could be anywhere from six hours to 12 days.

1    Q.       Any other reason besides the migraines

2    that you were approved for Social Security

3    disability?

4    A.       Anger.  They didn't want to take the

5    chance of me bumping into one of the people that I

6    considered an enemy.

7    Q.       Is it fair to say after the head injury

8    you considered a lot of people to be enemies, or

9    no?

10    A.       Not really a lot.  But maybe about 10.

11    And six of those I still consider an enemy.

12    Q.       Let's talk about personal responsibility,

13    okay?

14    A.       All right.

15    Q.       And financial responsibility.

16    A.       All right.

17    Q.       What were your finances like prior to

18    1990?

19    A.       Both the wife and I were working.  We were

20    living on a very good salary, both had benefits.

21    We were in good shape.

22    Q.       Paying your credit card bills on time?

23    A.       At that particular time, I don't think I

24    had very much on them at all.  Yeah, they were all

25    being paid on time.

1    Q.      At what point did credit cards become a

2    problem?

3    A.      After the head injury, we didn't have the

4    income like we had before and we leaned a little

5    more on the credit cards for groceries, the basic

6    needs.

7    Q.      What were those basic needs?  Groceries,

8    what else?

9    A.      In spite of my health, somewhere around

10   '75 -- '95, the wife had to go in for surgery.

11   What was originally thought two years earlier to

12   be an ulcer turned out to be the colon had

13   attached itself to the gallbladder and it was

14   dumping bile directly into her system for two

15   years.

16   Q.      So she had to undergo surgery to correct

17   that?

18   A.      She had to undergo surgery and we used the

19   credit cards to pay the bills.

20   Q.      To pay the medical bills?

21   A.      Yes.

22   Q.      Did you get behind on your credit cards

23   during this time period?

24   A.      Yes, I did.

25   Q.      And how behind?

```
 1   A.        It's kind of hard to say how behind.  I'm
 2   looking back, and I don't remember the exact
 3   numbers, but we had several credit cards at the
 4   time and we got behind on the bills.  The ones
 5   that were willing to work with us, they all got
 6   paid.
 7   Q.        What do you mean by that?
 8   A.        Well, they were informed that I was
 9   disabled.
10   Q.        The credit card companies.
11   A.        Yes.  And the cards were in my name.
12   Q.        Why would a credit card company care
13   whether you were disabled or not?
14   A.        Because --
15                   MR. SIMPSON:  Objection.  This
16   calls for speculation, Your Honor.
17                   THE COURT:  Sustained, unless
18   there is some foundation.
19   BY MR. HEENAN:
20   Q.        Did you have an understanding of why a
21   credit card company would care to know whether you
22   had been disabled?
23   A.        Well, initially it was because I wanted
24   them to understand I was still trying to pay the
25   bills.  Later on, partially due to I have Prepaid
```

```
 1    Legal --

 2    Q.      What is Prepaid Legal?

 3    A.      I pay 16 bucks a month and I have a lawyer

 4    on call with whatever firm Prepaid Legal is using

 5    that I can call up and get information, have my

 6    will done, reference to another lawyer, which is

 7    how I found you.

 8    Q.      But let me go back to these credit cards.

 9    You called the credit card companies.

10    A.      We worked out payment plans.

11                   THE COURT:  Wait.  There wasn't a

12    question.

13                   MR. HEENAN:  Bear with me a

14    second, Tim.  I'm kind of a slow talker.  You

15    have to wait a second.

16    BY MR. HEENAN:

17    Q.      You called the credit card companies to

18    advise them you were disabled.  You had been

19    approved for Social Security disability.  Is that

20    correct?

21    A.      That's correct.

22    Q.      What specifically did you tell the credit

23    card companies?

24    A.      I would try to work with them if they

25    would work with me and we would get these bills
```

1    paid off.

2    Q.      Were you aware, even when you were calling

3    the credit card companies and telling them you

4    would try to work with them and get these bills

5    paid off, that they couldn't collect anything from

6    you because you were Social Security disabled?

7    A.      Not at that time.  I found out a little

8    bit later.

9    Q.      How long later did you find out --

10   A.      Well, there was a point --

11   Q.      Wait a second.  How long later did you

12   find out that you might not have to repay anything

13   because you had Social Security disability

14   benefits?

15   A.      I'm not sure on the time line.  But there

16   was a time in there when I contacted one of those

17   outfits that are supposed to help people with good

18   credit.  And they were gung ho behind doing it

19   until they found out that I was disabled and my

20   sole income was Social Security.  Then they said I

21   didn't need them.  I went looking for information

22   why.

23   Q.      What did you find out?

24   A.      That if somebody's sole income is

25   disability, they can't take my money.  They can't

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

```
 1    force me to pay.  They can't seize my house.
 2    Because I'm under Montana Homestead Law.  I put
 3    that on before the injury.
 4    Q.      At that point, did you say, aha, go away
 5    credit card companies.  I don't owe you any money
 6    and I'm not going to pay.
 7    A.      No.
 8    Q.      What did you do?
 9    A.      I continued paying as best I could.  I
10    paid all up until '99.
11    Q.      Why would you do that?  Why would you keep
12    paying even if you thought you didn't have to?
13    A.      It wasn't a matter of didn't have to.  It
14    was the right thing.
15    Q.      So why did you stop paying in 1999?
16    A.       Well, it got to a point that they had
17    slapped over 40 percent interest on what I paid.
18    I'd been paying -- I paid back everything that I
19    ever borrowed, plus interest, and I still had an
20    outstanding debt because of 40 percent interest.
21    My health was going downhill.  They were calling
22    around the clock.
23    Q.      Let me stop you there.  You had a couple
24    of credit cards, right?
25    A.      Yes.
```

```
 1    Q.       And all the other credit cards but Chase

 2    Bank worked out payment plans and you dealt with

 3    them?

 4    A.       I worked with them, yeah.

 5    Q.       And you got them to go away by paying them

 6    what you could pay them.

 7                      MR. SIMPSON:  Objection, leading.

 8                      THE WITNESS:  Yes.

 9                      THE COURT:  Overruled.

10                      THE WITNESS:  I did my best that

11    everybody was taken care of that I owed money to.

12    BY MR. HEENAN:

13    Q.       There was one company that wouldn't work

14    with you?

15    A.       Yes.

16    Q.       Who was that?

17    A.       Chase.

18    Q.       What did Chase do?

19    A.       Chase turned over to collection.

20    Q.       What did they do?

21    A.       They didn't care anything about what my

22    situation was or the fact that I was disabled.

23    They called around the clock.  They insulted me.

24    They used horrible language.  They threatened --

25    Q.       Hold on.  When you say they called around
```

1    the clock, when would they call?  How many times a

2    day?

3    A.        Four or five times in the day, anywhere

4    from eight o'clock in the morning to 10 o'clock at

5    night.

6    Q.        How about horrible language?  What kind of

7    things would they say to you?

8    A.        They called me all sorts of different

9    words.  I'm not going to repeat those.  They told

10   me I was going to jail, that they were going to

11   seize this and seize that.  At that time I already

12   knew that they couldn't.

13   Q.        To be fair, this isn't Johnson Rodenburg

14   we are talking about?

15   A.        No, no.  This isn't Johnson Rodenburg.

16   Q.        These are other debt collectors?

17   A.        These are other debt collectors.  But my

18   health was going down.  It was actually costing me

19   more to maintain my health than they were asking.

20   It wasn't worth continuing.

21   Q.        Why didn't you just write them a check for

22   $3,000?

23   A.        What $3,000?  I didn't have $3,000.

24   Q.        If you did, would you have written them a

25   check and told them to go away?

```
 1    A.        After what they did to me, no, I probably

 2    wouldn't.  If I thought about it, I would have

 3    looked for a lawyer back then.

 4    Q.        Why is it that you owed them money?  Why

 5    would you not, even if you had the money, pay the

 6    debt collectors to go away?

 7    A.        I figured at that point I informed them

 8    that they were doing more damage than the money

 9    was worth.  It was costing me more to maintain

10    myself than for them to behave themselves and get

11    the money.

12    Q.        How about specifically -- you started to

13    answer.  These debt collectors trying to collect

14    the Chase credit card, how exactly did that impact

15    you or affect you and your recovery?

16                   MR. SIMPSON:  I object.  This is

17    not relevant to the claim against my client.

18    This has something to do with a party not a party

19    to the lawsuit.

20                   THE COURT:  Overruled.  But I

21    think we can go through it quickly.

22                   MR. HEENAN:  Thank you, Your

23    Honor.

24                   THE WITNESS:  Massive migraines

25    again, down in bed again, memory was starting to
```

1    skip out on me again.  I was just having a hard

2    time relating day to day.

3    BY MR. HEENAN:

4    Q.      Then at some point you get sued on this

5    Chase Manhattan account, right?

6    A.      Yes.

7    Q.      When was that?  2005 sound right?

8    A.      That sounds right.  Somebody out of Great

9    Falls, Spencer or Smith or something like that.

10   Q.      And did you file an answer?

11   A.      Yes, I did.

12   Q.      And what was the result of that lawsuit?

13   A.      Trial was scheduled, and the day

14   before -- well, not the day -- on Friday I dropped

15   the case.  On Saturday I showed up for the case --

16   I mean Monday.  I showed up for the case.  I had

17   not yet been notified that the case was dropped.

18   I was given a copy of paper from the courthouse

19   saying that the case had been dismissed.  And

20   that's how it was termed.  It had been dismissed.

21   It did not say with prejudice or without

22   prejudice.  I didn't know anything about that at

23   the time.

24   Q.      So after you saw the paperwork saying that

25   the case had been dismissed, did you think you

1    were done dealing with this Chase Manhattan

2    account?

3    A.      I did.  I was waiting for the final letter

4    from the judge, since I picked this paper up at

5    the courthouse.  And before even that arrived, I

6    got a letter from another law firm representing

7    the exact same case, asking for even more money.

8    Q.      Do you remember what that law firm was?

9    A.      It started with a C.

10   Q.      To be fair, it wasn't Johnson Rodenburg?

11   A.      No, it wasn't Johnson Rodenburg.

12   Q.      And this other law firm sent you a letter

13   asking for more money on this?

14   A.      And I promptly told them I just went

15   through court on this thing and they lost.  Go

16   away.

17   Q.      So did they go away?

18   A.      Yeah.  I got a total of two letters from

19   them.  I responded to the second one and I haven't

20   heard anything from them since.

21   Q.      What was the next thing that happened?

22   A.      About a year went by.

23   Q.      And then what happened?

24   A.      Oh, I got a couple of letters from Johnson

25   Rodenburg.  I didn't think anything of it.  Just

1    looked at the price.  Gee, the price has gone up

2    again.  It's almost $10,000.

3    Q.      How much was it the first time?

4    A.      Somewhere around three, 4,000, something

5    like that.

6    Q.      You didn't respond to those letters from

7    Johnson Rodenburg?

8    A.      I figured they are a law firm.  I mean,

9    they are supposed to have the information.  I had

10   already gone to court.  I already dealt with two

11   law firms.

12   Q.      Is it fair to say you didn't feel like you

13   had to dignify them with a response?

14   A.      No, they didn't deserve a response.  If

15   they didn't have the information, it wasn't my

16   fault.

17   Q.      Did you assume that at some point they

18   would get the information and go away?

19   A.      Well, it's always been my assumption that

20   before you go to court, you have to have the

21   proof.  So I figured, before it got to that point,

22   they would check out something.  I mean, the

23   outfit that they were representing, CACV, would at

24   least let them know that this has already gone to

25   court.

1    Q.       Did Johnson Rodenburg go away after those

2    letters that you got?

3    A.       I got served.

4    Q.       What do you mean you got served?

5    A.       I was in the backyard with the chickens,

6    the wife is in the house.  There was a knock at

7    the front door and she escorted the sheriff around

8    to the back where I was at and he served the

9    papers on me.

10   Q.       Told you you've been served?

11   A.       I've been served.

12   Q.       Now, you had already been sued once

13   before, so was it kind of no big deal because it

14   was just another lawsuit?

15   A.       I was mad.  I had adrenalin going.  I was

16   mad.

17   Q.       Was it a big deal to you?

18   A.       Yes, it was a big deal.  This has been

19   taken care of not once but twice.

20   Q.       What do you mean it had been taken care

21   of?

22   A.       The first time it was the court case and

23   the fact that I informed the other one and they

24   went away.  I had already dealt with two law

25   firms.  I didn't figure I needed to deal with a

1     third.

2                    Here we go again.  I go into the

3     courthouse.  I go up to where I'd gone before.

4     Q.     Let me --

5     A.     It doesn't work.

6     Q.     Let me stop you and let's go back to when

7     the sheriff serves you with the papers.  I want to

8     talk about how that made you feel.

9                    You talked about your adrenalin.

10    Anything else?

11    A.     When the adrenalin goes up, it triggers a

12    migraine.  So the blood pressure went up, the

13    blood sugars went out of balance.  I was in pain.

14                   MR. HEENAN:  Exhibit 30, please.

15    BY MR. HEENAN:

16    Q.     You testified a little bit ago, Tim, that

17    you keep a calendar.

18    A.     The one I've got is a bit larger than

19    that.

20    Q.     And that's the screen that's been marked

21    as Exhibit 30?

22    A.     Yes.  It doesn't show up very well.

23    Q.     On this calendar, did you mark the

24    instances after you had been served with the

25    lawsuit?

1    A.       I presume so.  I write down everything on

2    the calendar.  At least I try to.

3    Q.       Do you recall noting how you were feeling

4    after you had been served with the lawsuit?

5    A.       I usually mark down if I have a major

6    headache.  I have a minor headache every day.

7    Q.       On the calendar, you circled in red the

8    instances that are related.

9                    MR. HEENAN:  If we could have up

10   Plaintiff's Exhibit 30-6, please.  I knew there

11   was a method somehow to know what I was supposed

12   to be looking at.  It took me a minute to catch

13   on.

14                   THE WITNESS:  Is it possible to

15   dim this a little bit?

16                   MR. HEENAN:  Can we bring this

17   up, this part here?

18   BY MR. HEENAN:

19   Q.       You circled on this calendar everything

20   that had to do with Johnson Rodenburg?

21   A.       I believe so, yes.

22   Q.       And how you were feeling?

23   A.       Yes.

24   Q.       And you note it on here, Served, Chase.

25   A.       Yes.

1    Q.       Was that being served with the lawsuit by

2    Johnson Rodenburg?

3    A.       It would be, yes.

4    Q.       And you noted on there how you felt?

5    A.       Yeah, I had to take a nap.  I had a bigger

6    headache than normal, yes.  It's all on there.

7                       MR. HEENAN:  If we could back out

8    of that, please.  I want to pull up these whole

9    weeks.

10   BY MR. HEENAN:

11   Q.       Did you just take a little nap and your

12   head felt better, after you had gotten served?

13   A.       Four or five hours is a little better than

14   a little nap.  I laid down that long.  Whether I

15   slept that long is another question.

16   Q.       On my copy, it's hard to read on this one.

17   It looks at the bottom, head bad, headache.

18                       Was your head bothering you for a

19   couple days after you had been served with the

20   lawsuit?

21   A.       Three or four, yes.

22                       MR. HEENAN:  Thank you.

23   BY MR. HEENAN:

24   Q.       Was it frustrating to you to have been

25   sued?

1    A.        Very.

2    Q.        And explain, from your perspective, what

3    does that mean to be frustrated?

4    A.        It means the adrenalin is running again.

5    My anger is coming out again.  It means I snap at

6    the wife, yell at the dog and I'm not a nice

7    person.

8    Q.        It's a setback for you?

9    A.        Definitely.

10   Q.        In reaction to this lawsuit, you put

11   together an answer that we have looked at already,

12   the jury's already looked at.  Right?

13   A.        It was a little more difficult than that.

14   Q.        How so?

15   A.        I went to the court I normally go to and

16   I've been to before and they promptly tell me, we

17   are in a different court.

18   Q.        Let me stop you there.  The one you had

19   been to before the first time you had gotten sued?

20   A.        Yes.

21   Q.        That's justice court?

22   A.        Yes.

23   Q.        What happened?

24   A.        They said, this is the wrong one.  You've

25   got to go to a different floor.  I go up there and

1    they have a different form I have to fill out and

2    I have to fill out in a different form.  And from

3    there on it was cutting and pasting and copying in

4    order to get this close to a good-looking form

5    instead of sloppy handwritten undistinguishable

6    letters.  It took me two days.  I had to go to the

7    courthouse the next day in order to get it filed.

8    Q.      You paid your filing fee?

9    A.      Paid my filing fee.

10   Q.      Filed your answer?

11   A.      I filed my answer.

12   Q.      And you sent it to Johnson Rodenburg?

13   A.      Certified mail.

14   Q.      You told Johnson Rodenburg that you were

15   on Social Security disability?

16   A.      Yes.

17   Q.      You told Johnson Rodenburg that the

18   statute of limitations was up?

19   A.      Yes.

20              MR. SIMPSON:  Objection.  These

21   are leading questions.

22              THE COURT:  Overruled.  But try

23   not to lead.

24   BY MR. HEENAN:

25   Q.      What else did you tell Johnson Rodenburg

1    in your answer?

2    A.      I asked the wonderful question whether I

3    was going to have to sue them to have the thing go

4    away so they would leave me alone and I can stay

5    in peace.  I even bothered to call --

6    Q.      Hold on.  Let's talk about the answer

7    first.

8                          MR. HEENAN:  Can we have up

9    Exhibit 3?

10   BY MR. HEENAN:

11   Q.      We talked about statute of limitations.

12   What else did you tell them?

13   A.      I told them I was disabled, this is what I

14   got a month, this is what my mortgage cost, which

15   my check takes care of, and after all this time I

16   was now a diabetic and I didn't have any

17   insurance.

18                          MR. HEENAN:  Next page, please.

19   BY MR. HEENAN:

20   Q.      You told them about what you just

21   testified to?

22   A.      I told them about how worker's comp

23   stopped paying and how the collectors and how I

24   did my very best and those that worked with me got

25   paid and those that didn't didn't.

1    Q.      And the history of this Chase account.

2    Right?

3    A.      Yeah.

4                    MR. HEENAN:  Thank you.

5    BY MR. HEENAN:

6    Q.      And then you told them -- down here, what

7    did you tell them?

8    A.      This is the third time that I have been

9    brought to court.  They have brought me to court

10   on this account.  The first two times, Judge

11   Hernandez.  When will it stop?  Do I have to sue

12   them so I can live quietly in pain?

13   Q.      Now, you say two times.  This was the

14   second lawsuit, not the third.  Right?

15   A.      Well, it's the second time I've had to

16   deal with a law firm on it.  I considered the

17   second one a threat, which is as good as the suit.

18   Q.      So you sent that to Mr. Dendy?

19   A.      Yes.

20   Q.      What else did you do with regard to

21   contacting them?

22   A.      The day I sent the mail out I called his

23   office to advise him it was on its way and I was

24   past the statute of limitations.  I didn't get to

25   talk to him.  I left it on the voice mail,

1    answering machine, whatever it was.

2    Q.      Did you assume it would go away at that

3    point?

4    A.      Pretty much, yeah.

5    Q.      Did it go away?

6    A.      No.

7    Q.      Then what was the next thing that

8    happened?

9    A.      I received a letter from them and the

10   letter was nice and clear.  It was totally useless

11   and the adjoining papers were illegible.  I have

12   no idea what they said.

13                  MR. HEENAN:  Let's look at

14   Exhibit 511, please.  That's not it.  Sorry.

15   Exhibit 4, please.

16   BY MR. HEENAN:

17   Q.      This is the letter that you're talking

18   about?

19   A.      No, I don't think so.  Is there a second

20   page to this?

21   Q.      Yes.

22                  MR. HEENAN:  Page two, please.

23   BY MR. HEENAN:

24   Q.      These are requests for admission?

25   A.      No, this was before that.

```
1    Q.       Okay.  What was that letter?

2    A.       I think it was before that.  It had, it

3    said, Please review these documents and verify

4    they are true.

5    Q.       Did the documents make any sense to you?

6    A.       You couldn't read it.

7                     MR. HEENAN:  Now, let's pull that

8    Exhibit 4.

9    BY MR. HEENAN:

10   Q.       At some point did you receive the

11   requests for admission from Johnson Rodenburg?

12   A.       Yeah, and perfect timing was on my side on

13   this.  I had set up an appointment to see you.

14   And this arrived two days before the appointment.

15   Q.       Did you know what to do with them before

16   you saw me?

17   A.       No.

18   Q.       Did they make any sense to you?

19   A.       Well, I understood a couple of the

20   questions.  At least I think I could have answered

21   a couple of them without really having to work at

22   it too hard, and some of them I couldn't

23   understand altogether.

24   Q.       Did you understand what would happen if

25   you didn't respond to them?
```

1    A.       No.  It didn't have any consequences that

2    I remember on it, and it didn't have any time

3    frame on it.  So like I said, it was perfect

4    timing.  When I walked into your office, we talked

5    and then I presented to you, "This is what I just

6    got."

7    Q.       Did you hire me?

8    A.       On the spot.

9    Q.       What happened after you hired me?

10   A.       We sat down and --

11   Q.       I don't want you to talk about your

12   conversations.

13   A.       No.  No.  We sat down and we went over it

14   and I answered to the best I could and you sent it

15   to them.

16              MR. HEENAN:  Let's pull up

17   Exhibit 511, please.

18   BY MR. HEENAN:

19   Q.       Is this the response that you just

20   testified about?

21              MR. HEENAN:  Just go to page two,

22   please, or three.

23              THE WITNESS:  I think so, yeah,

24   that would be the response.

25   BY MR. HEENAN:

1    Q.       This is your signature?

2    A.       That's my signature.

3    Q.       I want to direct your attention to, well,

4    this Request Number 19 says, No documents were

5    attached to the requests for admission.

6                     Do you know what I'm talking about

7    there?

8    A.       Requests for admission denied no documents

9    were attached -- yeah, I never got anything that

10   said anything in the way of proof other than an

11   ink smear.

12   Q.       What is this ink smear?

13   A.       Evidently it's the credit card agreement

14   with Chase.  It's printed so bad you can't read

15   it.  I had absolutely no idea.  I wouldn't know

16   about the agreement with Chase anyway because I

17   never agreed to them.

18   Q.       Didn't you have a credit card contract

19   with Chase Bank?

20   A.       No, a credit card contract with Chemical

21   Bank.  Chase bought them.

22   Q.       When did you open up a Chemical Bank

23   credit card, if you can recall?

24   A.       Well, they would have been prior to '94 so

25   it could have been before '90.  It could have been

1     after that.  It was probably somewhere around

2     '90 -- that was when we moved into the house and

3     started looking at other things.

4     Q.     This whole lawsuit that Johnson Rodenburg

5     prosecuted against you from the time they served

6     you with the papers until it got dismissed, did it

7     cause you some anxiety?

8     A.     Oh, definitely.

9     Q.     How so?

10    A.     Once again, my temper goes up.  The

11    adrenalin went up.  The pain went up.  I was

12    snapping at the wife.

13    Q.     What pain went up?

14    A.     The migraines.  Like I said, I've got a

15    headache every day.  In the 19 years since the

16    injury, I've had four days, and I've got them on

17    my calendar, four days when I haven't had a

18    headache, when I haven't been in pain.

19    Q.     What else?

20    A.     More time down.

21    Q.     What do you mean, "more time down"?  On

22    the couch?

23    A.     On the bed.  I don't lay on the couch.  I

24    haven't got one.

25    Q.     What else?

1    A.       Well, I'm sure part of this has to do with

2    how bad the diabetes came on, how fast, because

3    when I'm in pain, I don't eat normal.  Food, I

4    can't taste it anyway.  That was another wonderful

5    side effect of the head injury.  I go by textures

6    nowadays and a few taste buds that are actually

7    working.  In order to help heal the pain, I eat

8    chili peppers like candy.  I go straight for the

9    Capzasin.

10   Q.       Describe for the jury the frustration you

11   felt and maybe still feel about the lawsuit that

12   Johnson Rodenburg brought against you.

13   A.       I thought it was frivolous.  I thought it

14   was an insult.

15   Q.       Why do you say that?

16   A.       Because they were informed a long time ago

17   what the problem was and they weren't willing to

18   help.  They weren't willing to work with me.  They

19   got me mad.

20   Q.       How about the anger?  Did it make you

21   angry that Johnson Rodenburg prosecuted against

22   you?

23   A.       I was being shoved around.  I don't like

24   bullies.  I never have.

25   Q.       Did you feel like Johnson Rodenburg was

1    bullying you?

2    A.      They weren't using the foul language, but,

3    yeah, here we go again.  Just one more.  It's the

4    straw that broke the camel's back.  I got mad.

5    I'm still mad.

6    Q.      You were in the courtroom yesterday and

7    you heard Johnson Rodenburg's characterization

8    that someone can run through a stop sign but

9    doesn't actually hit the car going the other way.

10   It might scare them a little bit.

11                Is that a fair characterization of

12   the lawsuit that Johnson Rodenburg brought against

13   you?

14   A.      I wasn't in the car and I got hit.

15   Q.      Say again?

16   A.      I wasn't in the car and I got hit.

17   Q.      What do you mean you got hit?

18   A.      Well, using their same analysis, they ran

19   over me.  They didn't slow down and they didn't

20   stop.  If I hadn't gotten you as a lawyer, I would

21   still be laying in the mud.

22                MR. HEENAN:  No more questions.

23   Thank you.

24                THE COURT:  You may

25   cross-examine.

```
1

2

3    CROSS-EXAMINATION

4    BY MR. SIMPSON:

5    Q.      Good afternoon, Mr. McCullough.  You

6    remember we met six, seven months ago at your

7    deposition?

8    A.      Yes.

9    Q.      And as you know, I represent Johnson,

10   Rodenburg & Lauinger.

11              It's true that you did have a

12   Chase Manhattan credit card, correct?

13   A.      Yes.

14   Q.      And you made purchases with that Chase

15   Manhattan credit card, correct?

16   A.      Correct.

17   Q.      And you did not pay back all the money you

18   owed on that account, correct?

19   A.      I will dispute that.  I paid back the

20   money I owed and some of the interest I owed, but

21   I didn't pay back all of the interest.  So there

22   was still money left on the account.

23   Q.      You understood that when you took out the

24   card you were required to pay the bill for your

25   credit card accounts, correct?
```

1    A.       I didn't take out the card.  It came after

2    me.  It bought the card I had.

3    Q.       You didn't stop using it at that time,

4    correct?

5    A.       At that particular time, I had to use it.

6    Q.       And you spent the money on it?

7    A.       I spent the money on it.

8    Q.       Fair enough.  You discussed with Mr.

9    Heenan that my client sent you a letter before the

10   lawsuit was filed.  Is that right?

11   A.       That's correct.

12                   MR. SIMPSON:  Bring up 504,

13   please.

14                   This has been admitted into

15   evidence already, Your Honor.

16   BY MR. SIMPSON:

17   Q.        Is that the letter you received?

18                   MR. SIMPSON:  If you could bring

19   up the text.

20                   THE WITNESS:  Yes, that's --

21   BY MR. SIMPSON:

22   Q.       That's the letter.  And I think you

23   testified earlier, but I want to confirm.  You

24   didn't respond to the letter, correct?

25   A.       No, I didn't.

1    Q.        The letter told you that if you dispute

2    the debt, the validity of the debt or any portion

3    of the debt, notify us within 30 days.  Right?

4    A.        Yes.

5    Q.        And in fact you didn't contact my client

6    because you knew the statute of limitations was

7    up.  Correct?

8    A.        That's correct.

9    Q.        In this case, in fact, you believe that in

10   addition to my client, you believe you were

11   wronged by CACV of Colorado, right?

12   A.        Yes.

13   Q.        And in fact, in your words, CACV was just

14   a bunch of greedy money grubbers, correct?

15   A.        That's correct.

16   Q.        And you're not claiming in this suit that

17   my client, Johnson, Rodenburg & Lauinger, used any

18   threats, vulgarities or lies in their dealings

19   with you, true?

20   A.        Well, I'd probably say due to the $75 you

21   said I had paid, I would say the lie is still out

22   there.

23   Q.        They never used any threats to you?

24   A.        They never used any threats.

25   Q.        They never used any vulgarity?

1    A.      Never used any vulgarity.

2    Q.      They never called to harass you to pay the

3    bill?

4    A.      No.

5    Q.      So it's a disagreement or mistake,

6    according to my client, as to when that payment

7    was made, right?

8    A.      Your client is a law firm.  I expect

9    higher standards from a law firm than I do from a

10   civilian.

11   Q.      I want to ask you about that.  When you

12   filed your answer in the first case that was filed

13   against you by Mr. Spencer, do you remember that?

14   A.      Some of it, yes.

15   Q.      You remember there was another suit filed

16   against you?

17   A.      Right afterwards.

18   Q.      The first lawsuit.  Do you recall there

19   was another lawsuit that was filed against you and

20   you filed an answer?  Do you remember that?

21   A.      I remember filing the answer with Spencer.

22   Q.      Right.  That's the one I'm talking about.

23   A.      Yeah.

24   Q.      You would expect that a law firm, as well

25   as a party like yourself that is unrepresented,

1    would only make true statements in their pleadings

2    to the Court.   Correct?

3    A.        That's correct.

4    Q.        In fact, you didn't make true statements

5    in your pleading in that case, did you?

6    A.        I don't know what you're talking about.

7    Q.        Let's take a look at Plaintiff's Exhibit

8    1.

9                    MR. SIMPSON:   I apologize for the

10   delay.   And can you bring up the lower half

11   there?

12   BY MR. SIMPSON:

13   Q.        First of all, can you identify this is in

14   fact the answer that you filed in that case?

15   A.        I can't read it so I can't tell you.

16   Q.        I will bring it up here.

17                   MR. SIMPSON:   Bring up his

18   signature too, please.

19                   THE WITNESS:   I can verify that's

20   my signature.

21   BY MR. SIMPSON:

22   Q.        That's your handwriting?

23   A.        It's my handwriting.

24   Q.        That's your answer in that earlier case,

25   correct?

1    A.        I believe so.

2    Q.        And that's *CACV v. Tim McCullough*, and you

3    said in that case, Statute of limitations is up.

4    I've had no dealings with any credit cards in

5    eight and one half years.

6                   Is that right?

7    A.        That's what I said.

8    Q.        That's what you said in that case?

9    A.        That's what I said.

10   Q.        And you represented that to the Court?

11   A.        And I represented that to the Court.

12   Turns out it was still past the statute of

13   limitations, merely got the dates wrong.

14   Q.        You in fact made an untrue statement in

15   that statement, didn't you?

16   A.        I made an accident.

17   Q.        You represent it was eight and a half

18   years, and it was less than eight and a half

19   years.

20   A.        It was five years.

21   Q.        It was five years or less?

22   A.        It was over five years.  I've got the last

23   check I wrote.  It was over five years.

24   Q.        If --

25   A.        I went back and dug it out.

1    Q.        It was in August of 2000 when you made the

2    last payment, true, on this account?

3    A.        No.  Checkbook I've got it was January or

4    February of 2000.

5                    MR. SIMPSON:  Well, Your Honor,

6    if there were checks reflecting payments, they

7    should have been produced and they were not.

8                    THE COURT:  That's something we

9    can deal with later.  Keep with your examination,

10   please.

11                   MR. SIMPSON:  Thank you.

12   BY MR. SIMPSON:

13   Q.        In fact, you said the same thing in the

14   answer you filed in this case, didn't you?

15   A.        Like I told you, I cut the thing up and I

16   pasted it on and I made copies.  I didn't change

17   very little at all.

18   Q.        So you said, again, in June of 2007, eight

19   and a half years, correct?

20   A.        Yes.

21   Q.        That wasn't true, was it?

22   A.        2007?  Seven years.  I'm going off of a

23   bad memory.  And at that time I didn't look at any

24   of the documents.

25   Q.        You didn't intend to mislead anybody, did

1    you?

2    A.      No.

3    Q.      So it's possible, mistakes are made, true?

4    A.      I've got a head injury.  What's your

5    client's excuse?

6    Q.      Well, you will hear about that.  You

7    didn't seek any care from any doctors because of

8    the migraines or emotional distress that you're

9    claiming in the case, did you?

10   A.      I've been dealing with this since 1990.

11              THE COURT:  Mr. McCullough, I

12   know sometimes it's difficult, but it's very

13   important that you listen to the question that is

14   asked and then limit your answer to just

15   answering that question.  And then, if there's a

16   necessity to follow up, Mr. Heenan will have an

17   opportunity to do that.

18              So would you please read the

19   question back?

20              (Designated question is read.)

21              THE WITNESS:  I have regularly

22   scheduled doctor appointments that I went to.  I

23   didn't change that.  I didn't add to it.  No, I

24   did not seek any additional at that time.

25   BY MR. SIMPSON:

1    Q.       And you didn't seek any counseling or

2    psychological assistance from your emotional

3    distress, true?

4    A.       Not at that time.

5    Q.       And you can't recall whether your claimed

6    emotional distress caused any change in your daily

7    routine, right?

8    A.       That's what the calendar is for.

9    Q.       And in fact, although you claim that you

10   increased the medications that you were on because

11   of the emotional distress, you don't have any

12   record of that, true?

13   A.       No, I do not keep track of the

14   medications.

15   Q.       You have a very detailed calendar that you

16   keep, true?

17   A.       As detailed as I can fit in the space,

18   yes.

19   Q.       You don't keep track of the medication

20   you're on?

21   A.       No.

22   Q.       You and Mrs. McCullough have had some

23   rough time over the last year or so, aside from

24   this lawsuit, true?

25   A.       Yes.

1    Q.       In fact, she's had a medical condition of

2    her own, true?

3    A.       Yes.

4    Q.       And that's caused you stress, hasn't it?

5    A.       Yes.

6    Q.       That's caused an increase in your blood

7    pressure and migraines, has it not?

8    A.       At times, yes.

9    Q.       I think I heard this correctly earlier,

10   but I want to make sure.  You said that you've

11   been keeping a calendar to track your headaches

12   since your head injury in 1990?

13   A.       Well, it doesn't go all the way back to

14   the first year.  They didn't have me start that

15   until I think the second or third year.

16   Q.       And I think you told me at your

17   deposition -- and maybe you testified the same

18   here earlier, but I wanted to make sure I

19   understood this -- you took a look at your

20   calendar and you figured out there have been only

21   four days where you haven't had some kind of pain

22   since the attack.  Is that right?

23   A.       I don't need the calendar for that.  You

24   don't forget the days you don't hurt when they are

25   that few and that far between.  I haven't had

1    those days exist since the first two years.

2    Q.      It's basically been continuous since 1990?

3    A.      At one level or another, yes.

4    Q.      The discussion that you had with Mr.

5    Heenan about the debt-collection efforts by Chase

6    Manhattan before my client was involved in this,

7    you didn't seek any treatment for that distress,

8    did you?

9    A.      I don't believe I, did no.

10                   MR. SIMPSON:  Just one moment,

11   please.

12                   Mr. McCullough, I know this is

13   trying for you so I'm going to tell you, I'm

14   finished.

15                   MR. HEENAN:  No redirect, Your

16   Honor.

17                   THE COURT:  Mr. McCullough, you

18   may step down.

19                   MR. HEENAN:  Plaintiff will call,

20   Lisa Lauinger.

21                   THE COURT:  Ms. Lauinger, will

22   you please come forward and be sworn.

23        LISA LAUINGER, having been duly sworn, was

24   examined and testified as follows:

25                   THE CLERK:  Have a seat, please.

1

2

3      DIRECT EXAMINATION

4      BY MR. HEENAN:

5      Q.        Good afternoon, Ms. Lauinger.

6      A.        Hello.

7      Q.        You're a lawyer at the Johnson, Rodenburg

8      & Lauinger law firm?

9      A.        Yes, I am.

10     Q.        And the Johnson, Rodenburg & Lauinger law

11     firm is a defendant in this case?

12     A.        Yes.

13     Q.        You yourself are not a defendant in this

14     case, right?

15     A.        No.

16     Q.        You're here as the representative of the

17     Johnson, Rodenburg & Lauinger law firm?

18     A.        Yes.

19     Q.        What percentage of the lawsuits that

20     Johnson, Rodenburg & Lauinger file in the state of

21     Montana result in default judgements?

22     A.        I have not pulled the numbers, as I stated

23     in my deposition.  Maybe an estimate of 90

24     percent.

25     Q.        So approximately nine out of 10 of the

1     lawsuits Johnson Rodenburg files result in a

2     default judgement.   Is that fair?

3     A.       That's what I thought.

4     Q.       Of the approximately one out of 10

5     lawsuits where there's a response, what percentage

6     of those people appear through counsel,

7     approximately?

8     A.       I don't know.  Maybe half.

9     Q.       What's the average amount that Johnson

10    Rodenburg sues someone for?

11    A.       The average amount?

12    Q.       What's the range?

13    A.       You mean the balance?  There is no set --

14    you mean like a dollar amount?

15    Q.       Correct.

16    A.       We don't have one.

17    Q.       What is the most amount of money that

18    Johnson Rodenburg would sue someone for?

19    A.       The most?

20    Q.       That you can recollect.

21    A.       I've seen credit card bills as high as

22    $50,000 on American Express.

23    Q.       How about, what is the least amount?

24    A.       Sometimes I've seen them for $50 on

25    accounts where they are smaller clients, smaller

1     creditors.

2     Q.      Johnson Rodenburg has filed some lawsuits

3     asking for $50,000, some for $50 on behalf of its

4     client?

5     A.      Yes.

6     Q.      If you had to give me an average, what

7     would it be?

8     A.      An average?

9     Q.      Correct.

10    A.      I have no idea.  I'm sorry.

11    Q.      That's okay.  Bear with me just a second.

12    I had occasion to look at Johnson, Rodenburg &

13    Lauinger's filings just here in Yellowstone County

14    last week and it looked like there were six

15    filings, and five of those six were over $10,000.

16                    MR. BOHYER:  I object to this.

17    Counsel is testifying --

18                    THE COURT:  Sustained.

19    BY MR. HEENAN:

20    Q.      Can you give me a ballpark what is the

21    average amount?

22                    MR. BOHYER:  Objection.  Asked

23    and answered.

24                    THE COURT:  Sustained.

25

```
 1   BY MR. HEENAN:

 2   Q.      Mr. McCullough was sued for approximately

 3   $9,000, including interest?

 4   A.      I think that's about right.

 5   Q.      How many -- well, strike that.

 6                   I want to show you what has been

 7   marked but not admitted as Exhibit 106.

 8                   MR. HEENAN:  Would you pull that

 9   up on the screen?

10   BY MR. HEENAN:

11   Q.      Is it on your screen, ma'am?

12   A.      Yes.

13   Q.      Are you familiar with this document that's

14   been marked as Exhibit 106?

15   A.      Somewhat.

16   Q.      You're aware that through the course of

17   this litigation Mr. McCullough asked Johnson,

18   Rodenburg & Lauinger to disclose how many lawsuits

19   it's filed in the state of Montana from January of

20   2007 through approximately July of 2008?

21   A.      Yes.

22                   MR. HEENAN:  At this time, Your

23   Honor, I move for the admission of Exhibit 106.

24                   THE COURT:  Any objection?

25                   MR. BOHYER:  Yes, relevance and
```

1    Rule 403.

2                   THE COURT:  The testimony, as I

3    understand it, is that this is a list of cases

4    filed by Johnson, Rodenburg & Lauinger in Montana

5    from what date?  January of '07 through --

6                   MR. HEENAN:  Can you bring up

7    page two, please?

8                   THE COURT:  What date, Counsel?

9                   MR. HEENAN:  July 19 of 2008,

10   Your Honor.

11                  THE COURT:  I will overrule the

12   objection except for the first three pages.  I

13   don't know that the pleading needs to be

14   submitted, but the document itself, I think

15   there's testimony as to what that is.  So I will

16   admit Document 106 beginning with 106-4.

17                  MR. HEENAN:  Thank you, Your

18   Honor.

19                  (Exhibit 106, beginning with

20   106-4, is admitted into evidence.)

21                  Put it on page four, please.  And

22   I would like to publish for the jury, please,

23   that exhibit.  Next page, please.

24                  MR. BOHYER:  Your Honor, this

25   one -- never mind.  I withdraw the objection.

1             MR. HEENAN:  Next page, please.

2     Next page, please.

3             THE COURT:  Now wait.  We are not

4     going to go through every one, are we?

5             MR. HEENAN:  Let's jump to the

6     end.

7     BY MR. HEENAN:

8     Q.     At the top here, Ms. Lauinger, that number

9     here.  You agree that the document, this list of

10    lawsuits that Johnson Rodenburg's filed in this

11    18-month time frame, is 143 pages long?

12    A.     I don't know how many pages it is.  It's

13    showing the Clerk of Court on my screen, Clerk of

14    Justice Court.

15    Q.     I don't want to go through every page.  Do

16    we need to do it?

17    A.     No, but I mean, it shows 147; 106 to 147

18    up at the top.  I don't know what that is.

19    Q.     Do you have an awareness of the total

20    number of lawsuits that Johnson Rodenburg has

21    filed in the state of Montana over that

22    year-and-a-half time period?

23    A.     I believe you said it was 2700.

24             MR. HEENAN:  No further

25    questions.  Thank you.

1                    THE COURT:  Does the defendant

2    wish to examine at this time?

3                    MR. BOHYER:  Not at this time.

4    We will reserve for our case.

5                    THE COURT:  You may step down.

6                    MR. HEENAN:  Plaintiff will rest,

7    Your Honor.

8                    THE COURT:  Ladies and gentlemen,

9    the plaintiff, by Mr. Heenan, rests.  What that

10   means is the plaintiff has now presented to you

11   the evidence that the plaintiff wishes you to

12   consider in his case.  So now it will be the

13   defendant's turn to present evidence to you.

14                    So now is a good time to take a

15   break, so we will be in recess for about 15

16   minutes.

17                    I will see counsel in chambers.

18                    (The following discussion takes

19   place in chambers:)

20                    THE COURT:  Before the defense

21   makes its motions, I want to state that

22   sometimes, when we try to be efficient by

23   pre-admitting exhibits, a question comes up if an

24   exhibit was pre-admitted but then never referred

25   to at the trial.

1                    And so I wanted to propose this

2      to counsel and give them an opportunity to

3      respond, that if a document is not referenced at

4      any time during the trial, even if it was

5      pre-admitted, I'm going to assume it was in fact

6      withdrawn and it will not be submitted to the

7      jury.

8                    Is that satisfactory with the

9      plaintiff?

10                   MR. HEENAN:  Yes, but in light of

11     the fact that I just rested, I would like an

12     opportunity to tick through my exhibit list and

13     make sure there's nothing that I need to cover.

14                   THE COURT:  That's why I wanted

15     to give you an opportunity.  Let me know before

16     the defendant rests.  I don't want to surprise

17     you with this, but I don't want it to come up at

18     the end when we are sending exhibits to the jury

19     either.

20                   MR. SIMPSON:  One question.  Does

21     that include exhibits that were referenced in the

22     opening?  Or do we need to have actually asked

23     questions of a witness with --

24                   THE COURT:  They were admitted

25     and I told you you can use them.  So I think if

1    they were referenced, I think they are properly

2    submitted, but I think the better practice is to

3    have a witness identify them or to otherwise get

4    them presented to the jury.  Otherwise the jury

5    has no frame of reference for them.

6                    I assume, when someone puts an

7    exhibit on their exhibit list and says, We intend

8    to offer this exhibit at trial, they are going to

9    use it in some way at trial.  It becomes a

10   question when they don't.

11                   THE CLERK:  The ones in the

12   opening statements will go to the jury even if

13   they are not talked about?

14                   THE COURT:  So far I think they

15   all have been.  Do you recall any that have not

16   been?

17                   MR. SIMPSON:  Not off the top of

18   my head.  Do you mind if I get my notebook?

19                   THE COURT:  Sure.

20                   (Discussion off the record.)

21                   THE COURT:  The defense indicated

22   earlier that after plaintiff rested the defendant

23   wished to make some motions.  You may do so at

24   this time.

25                   MR. BOHYER:  We would move for a

1    directed verdict on the abuse of process and

2    malicious prosecution claims because there is no

3    evidence in the record of malice at this point.

4    At most, there is evidence of an error.  There's

5    been no evidence that any of the partners in the

6    partnership had specific knowledge of the statute

7    of limitations prior to the time that the suit

8    was filed.

9              In addition, and with respect to

10   the abuse of process claim, there is no evidence

11   of ulterior motive that's been offered.  Indeed I

12   asked Mr. Patten if he saw in the file and he

13   said he did not.

14             And as I raised, and I don't

15   remember now if it was at the motions hearing or

16   in the final pretrial conference, there must be a

17   legal distinction between an abuse of process and

18   malicious prosecution.  And that legal

19   distinction, as I read it, is the ulterior

20   motive.  If there is no ulterior motive beyond

21   the lawsuit itself, then the abuse of process

22   claim has to be dismissed.

23             And to the extent that the Seipel

24   (ph) case from the Montana Supreme Court seems to

25   suggest otherwise, I would assert that that case

1     has to be limited to its facts, because Seipel

2     was decided about a week -- and I might be

3     wrong -- two weeks after the *Judd v. BNSF* case,

4     and Seipel does not overrule *BNSF v. Jud*d, nor

5     does it overrule the principles set forth in

6     *Seltzer v. Morton.*

7                    THE COURT:  Those motions are

8     denied.

9                    MR. BOHYER:  We would also move

10    for a directed verdict on plaintiff's emotional

11    distress claim as there has been no evidence of

12    severe emotional distress that was caused by the

13    conduct of our client.

14                   Plaintiff admitted on his

15    testimony that he had received no medical

16    treatment as a result of the suit.  He testified

17    that he has had four days since this alleged head

18    injury in 1990 when he has not had headaches or

19    pain, and that's also set forth on his calendar.

20    There has been no evidence that he has suffered

21    any sort of stress that's beyond the ordinary

22    stress that folks have when they have financial

23    issues.

24                   THE COURT:  That motion is denied

25    as well.

1              MR. BOHYER:  We would also move

2     for a directed verdict on punitive damages, since

3     there is no evidence of malice at this point.

4     There is nexus only.

5              THE COURT:  That motion is

6     denied.

7              MR. BOHYER:  We move for a

8     directed verdict on any attorneys' fees and

9     costs, as there has been no evidence offered in

10    this case of any incurred fees or costs.

11             THE COURT:  What about that, Mr.

12    Heenan?

13             MR. HEENAN:  That's correct, Your

14    Honor.

15             THE COURT:  I will grant that

16    motion.

17             MR. SIMPSON:  One other motion we

18    would like to make is for a directed verdict on

19    the claim under the Fair Trade Practices Act and

20    Consumer Protection Act.

21             Again, Mr. McCullough hasn't

22    demonstrated that he is a consumer or was in any

23    kind of a relationship with our client that would

24    cover such that our client's conduct would be

25    covered under the Act.  We don't believe he is

1    entitled to relief under the Act, and I don't

2    recall the exact discussion we had at the

3    pretrial conference, so I will leave it at that.

4    I'm sorry.

5                    THE COURT:  Do you wish to be

6    heard on that?

7                    MR. HEENAN:  Briefly, Your Honor.

8    I think in terms of time, I think I need to wait

9    until the defendant puts on their case, but I do

10   intend to ask for directed verdict with respect

11   to liability under the Consumer Protection Act,

12   in light of the Court's order finding Johnson

13   Rodenburg's practice with respect to their

14   requests for admission abusive, unfair and

15   unconscionable, as well as the Court's rulings

16   that the Consumer Protection Act applies to the

17   collection of debt.

18                   We have presented evidence this

19   was a debt-collection case, that Johnson

20   Rodenburg's conduct is subject to the Act, and

21   the Consumer Protection Act itself provides the

22   Courts should be liberally construed and should

23   be considered in light of federal statutes and

24   regulations.  I think this Court can take its

25   previous ruling under the FDCPA and, if it's so

1    inclined, hold the same unfair and deceptive

2    conduct which the Court found under the FDCPA is

3    also applicable under the Consumer Protection

4    Act.

5                    THE COURT:  I will take that as

6    an argument in opposition to the motion for

7    directed verdict under the Unfair Trade Practices

8    Act.  I would deny that.  To the extent you're

9    making a separate motion, you need to renew that

10   at the close of all evidence.

11                   MR. HEENAN:  I will do so.

12                   THE COURT:  With respect to the

13   emotional distress claim, I have one additional

14   question, Mr. Heenan.  I don't recall any

15   specific testimony about future emotional

16   distress.

17                   Is it the plaintiff's position or

18   is the plaintiff here claiming future emotional

19   distress?  Or are we talking only about past

20   emotional distress?

21                   MR. HEENAN:  I think, to be fair,

22   Your Honor, the stress went away when he got a

23   lawyer.  So yeah, I would agree with the Court on

24   that regard.

25                   THE COURT:  Then I'm going to,

1    with respect to the directed verdict, it wasn't

2    specifically made as distinguishing past and

3    future.  But I think, when we -- and I will deny

4    that motion, but when we instruct, I think we

5    will only be able to instruct, then, based on

6    what you said on past, not on future.  Okay?

7                     MR. HEENAN:  That's fair.

8                     MR. BOHYER:  With counsel's

9    reference there and the acknowledgement as to the

10   damage, I would ask for a directed verdict on any

11   future damages in general.  And if that's the

12   acknowledgement, maybe you're going to deal with

13   it via instruction, but I want to get it on the

14   record as a motion for directed verdict.

15                     THE COURT:  I'm not going to

16   direct a verdict on it.  It's a question of what

17   issues we submit to the jury.  Anything else?

18                     MR. HEENAN:  No.

19                     THE COURT:  I will give you some

20   time here.

21                     (Brief recess.)

22                     THE COURT:  Court is now in

23   session.  The defendant may call his first

24   witness.

25                     MR. SIMPSON:  The defendant calls

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    Charles Dendy.

2                        THE COURT:  Please come forward

3    and be sworn, Mr. Dendy.

4            CHARLES DENDY, having been duly sworn, was

5    examined and testified as follows:

6                        THE CLERK:  Have a seat, please,

7    and state your full name and spell it.

8                        THE WITNESS:  My name is Charles

9    Dendy.  D-e-n-d-y.

10   DIRECT EXAMINATION

11   BY MR. SIMPSON:

12   Q.     And your business address?

13   A.     1004 East Central Avenue, Bismarck, North

14   Dakota, 58501.

15   Q.     Charlie, are you married?

16   A.     Yes, I am.

17   Q.     How long have you been married?

18   A.     I don't recall at the moment.  And I lost

19   my wedding ring last week.

20   Q.     Do you have any kids?

21   A.     Yes, I have three children.

22   Q.     How old are they?

23   A.     They are five, three and about six months.

24   Q.     Getting a lot of sleep these days?

25   A.     Not too much, no.

```
1    Q.        Tell the jury what your occupation is.

2    A.        I'm an attorney at the law firm of

3    Johnson, Rodenburg & Lauinger.

4    Q.        Where were you born and raised?

5    A.        I was born in Shreveport, Louisiana and my

6    parents were in the air force.  I moved around a

7    lot, lived in Texas, Nebraska and eventually wound

8    up in Grand Forks, North Dakota.

9    Q.        When did you end up there?

10   A.        About 1989 or so.

11   Q.        Did you go to high school there?

12   A.        Yes, I went to high school at Grand Forks.

13   Q.        Did you finish high school there?

14   A.        Yes.

15   Q.        What year?

16   A.        That was '94.

17   Q.        I take it you went to college, obviously.

18   A.        Yes, I went to UNDA Grand Forks.

19   Q.        What degree did you study?

20   A.        Bachelor of Science in criminal justice

21   studies.

22   Q.        I assume you graduated.

23   A.        Yes, I did.

24   Q.        What year did you finish?

25   A.        That was '99.
```

1    Q.       What did you do after you finished your

2    degree in criminal justice?

3    A.       After I finished that I went straight into

4    law school at UNDA Grand Forks.

5    Q.       What made you want to go to law school?

6    A.       Well, originally I was a pre-med major in

7    undergrad and I took a criminal justice class and

8    found that I really liked the law.  And at that

9    point I just decided to switch to criminal justice

10   and go to law school.

11   Q.       Did you have an area that you focused on

12   in law school?

13   A.       No, not really.  It was just a general

14   education.

15   Q.       What year did you finish your law degree?

16   A.       That was in 2002.

17   Q.       I take it you took a Bar exam after you

18   finished.

19   A.       Yes, I took the Bar in North Dakota in

20   2002.

21   Q.       If you would, tell the jury what a Bar

22   exam is.

23   A.       A Bar exam is a nationally graded exam for

24   attorneys that tests a wide range of legal

25   knowledge about different subjects, different

```
 1    areas, Rules of Civil Procedure.

 2    Q.      Did you pass the Bar?

 3    A.      Yes, I did.

 4    Q.      Did you later take a Bar exam in Montana?

 5    A.      Yes, I took one in Montana in 2006.

 6    Q.      If you had taken one in North Dakota, why

 7    did you have to take one here?

 8    A.      Montana, to become admitted as an attorney

 9    here, they require you to take the Bar exam in

10    Montana.  So I retook it in Montana.

11    Q.      Aside from taking Bar examinations, what

12    did you do after you finished law school?

13    A.      Immediately after law school, I clerked

14    for a little over two years with a federal

15    magistrate in Bismarck, North Dakota.

16    Q.      Is that kind of a magistrate judge like

17    Judge Ostby here?

18    A.      Yes, it would.

19    Q.      How long did you serve as a law clerk?

20    A.      That was a little over two years.

21    Q.      Tell the jury, if you would, what does a

22    law clerk do?

23    A.      A law clerk helps the judge with preparing

24    responses, arranging hearings, preparing

25    courtrooms; pretty much helps the judge with
```

1    whatever they need done.

2    Q.      Do you write legal memorandums for the

3    Court?

4    A.      Yes.

5    Q.      Did you help provide input for the judge,

6    doing research and advising the judge on various

7    motions and disputes before the Court?

8    A.      Yes, I did.

9    Q.      Did you ever have a chance to sit in and

10   watch trials like this one?

11   A.      Not really.  The magistrate I worked for

12   was ill for part of his term and we didn't have as

13   many trials.

14   Q.      What was the name of the judge you worked

15   for?

16   A.      It was Magistrate Dwight Cozman (ph).

17   Q.      When your clerkship with Judge Cozman

18   finished up, what did you do following that time?

19   A.      When my clerkship ended, I started with

20   the Johnson, Rodenburg & Lauinger firm, and that's

21   where I've been ever since.

22   Q.      What year did you start with Johnson,

23   Rodenburg & Lauinger?

24   A.      That would have been 2004.

25   Q.      I want to make sure we have got this

1    correct.  You took the Bar exam in Montana and

2    North Dakota.  You passed both those Bars?

3    A.        That's correct.

4    Q.        Does that mean you're licensed to practice

5    law in both states?

6    A.        Yes.

7    Q.        Any other states where you're licensed to

8    practice law?

9    A.        No, just those two.

10   Q.        What are your job duties as an attorney at

11   Johnson, Rodenburg & Lauinger?

12   A.        At present, I'm handling the cases in

13   Montana.  So as the attorney, I handle the firm's

14   collection cases for Montana for the Bismarck

15   office.

16   Q.        And I think the jury's heard something

17   about this already, but what is the specialization

18   or the emphasis of your firm?  What kind of law do

19   you practice?

20   A.        We do, in our Bismarck office, we do

21   solely collection work.

22   Q.        You protect the rights of creditors?

23   A.        Yes, we represent creditors.

24   Q.        I understand there are a number of other

25   people employed at your office who aren't

1    attorneys but they assist you and Lisa in doing

2    various job duties.  Is that right?

3    A.      That's correct.

4    Q.      Tell me about what kinds of staff people

5    you have at the office and what kinds of things

6    they do.

7    A.      We have quite a few staff people.  Some of

8    them are responsible for opening mail, processing

9    outgoing mail.  Others are responsible for

10   communicating with debt collectors on accounts, to

11   set up payment plans or things of that nature.  On

12   the legal end, others will draft pleadings for

13   myself and Lisa to review and assist us with that.

14   Then we also have personnel that processes

15   payments, that kind of thing.

16   Q.      The folks that draft pleadings, court

17   documents, essentially for you and Lisa, if

18   somebody does that and hands you a Complaint and

19   says, Here you go, Charles, do you just sign it

20   and put it in the mail?  What do you do before you

21   take action on it?

22   A.      The legal pleadings that we use, first of

23   all, they are created by the attorneys and

24   approved by us.  We do have secretarial people who

25   will help us fill in the information from the

1      files and get them printed off and give them to us

2      to review.  At that point we get the documents,

3      and, as the attorney that is handling the file,

4      it's our job to look through the documents and

5      make sure the information is correct, all the

6      pieces are there that need to be there and they

7      are ready to go out before we sign them.

8      Q.      Whose responsibility is it when a document

9      goes out for what's in the document?

10     A.      The attorney on the file.

11     Q.      It's not the staff person?

12     A.      Correct.

13     Q.      Do you recall when you first became

14     involved representing CACV in its claim against

15     Mr. McCullough?  Just generally the time frame.

16     A.      I believe that would have been sometime in

17     2007.

18     Q.      Do you remember beginning of the year,

19     midyear?

20     A.      Probably closer to the beginning of the

21     year.

22     Q.      What was the nature of your involvement in

23     that case?  What were you going to do on that

24     file?

25     A.      It was placed with our office for

 1   collections and for litigation.

 2   Q.      Who was the attorney primarily responsible

 3   when you got involved for representing CACV on its

 4   claim against Mr. McCullough?

 5   A.      I was the attorney handling that file.

 6   Q.      So what was the first thing you recall

 7   doing when you got the file?

 8   A.      The first thing I recall doing on the file

 9   is preparing a letter to send out with validation.

10   Q.      Why do you do that?

11   A.      There's the federal Fair Trade Practices

12   Act, and that act requires us to send a letter to

13   a debtor notifying them of certain rights to

14   dispute debts, and if they do dispute those debts,

15   then we send out validation of the debt, some

16   information to them to let them know what the debt

17   is that we are saying is owed and who the creditor

18   is, information of that nature.

19                   MR. SIMPSON:  Judge --

20   BY MR. SIMPSON:

21   Q.      Do you have that letter in front of you?

22   A.      Yes, I do.

23                   MR. SIMPSON:  The screens are on?

24                   THE COURT:  Mm-hmm.

25   BY MR. SIMPSON:

1     Q.        It's Exhibit 504.  Is that the letter you

2     were talking about?

3     A.        No, this is the initial demand -- yes,

4     this is the initial demand letter I was speaking

5     of that notifies the debtor of their rights to

6     dispute.

7     Q.        You're familiar with this letter?

8     A.        Yes.

9     Q.        When did you first see this letter?

10    A.        I would have first seen the letter, I

11    believe, when the suit documents came to me for

12    review.

13    Q.        And do you know if you saw it, then,

14    shortly after it went out or before it was sent?

15    A.        I wouldn't have seen this letter until

16    after it had already gone out.

17    Q.        So you get the documents for review.  Go

18    ahead and tell the jury what it is you're going to

19    do.  You're going to draft a Complaint.  Is that

20    right?

21    A.        That's correct.

22    Q.        What do you do before you get the

23    Complaint filed?

24    A.        Well, the Complaint's drafted by one of

25    the paralegals in the office.  So then it comes to

1    me as a draft of the complaint.

2                    At that point I go through our

3    firm's file, and one of the things I do is make

4    sure this demand letter has gone out to the

5    defendant and they have had their chance to

6    dispute the debt and that the letter wasn't

7    returned as undeliverable or didn't go through for

8    some reason I can see.

9                    After that, I start looking at the

10   Complaint itself and checking all the information

11   in the Complaint, that we have the right plaintiff

12   name, defendant name, court caption is right,

13   right pages are there, the summons, the Complaint

14   cover letter.  Then I look at the actual

15   allegations in the Complaint, start checking

16   those, make sure the account number's right, the

17   balance information is right, the name of the

18   original creditor is right.

19                    While I'm doing this, I'm looking

20   at the file to make sure there wasn't any letter

21   sent in response to this initial demand letter

22   asking for validation that hasn't been responded

23   to.

24   Q.      Let me stop you there.  Was there in fact

25   any letter in your file disputing this debt?

1   A.        There was at some point.  I believe it was

2   there before the Complaint went out.

3   Q.        No, no.  Was there a letter from Mr.

4   McCullough disputing the debt?

5   A.     Oh, no.

6   Q.        I'm sorry to interrupt.  You were walking

7   us through what you do before you file a

8   Complaint.

9   A.        Certainly.  I was saying, one of the

10  things I'm looking for before I send a Complaint

11  out is to see that there wasn't a dispute prior to

12  the Complaint and that there wasn't a bankruptcy

13  filed, something of that nature, that would

14  prevent us from going forward with the suit.  I

15  also look to see that the suit, when it reaches

16  the Court, is going to be filed with the Court

17  before the statute of limitations on the debt

18  expires.  So I check that information in our files

19  as well.

20  Q.        Now, obviously the statute of limitations

21  is one of the big issues in this case.  You're

22  aware of that.

23            What did you do to make sure you

24  were going to comply with the statute of

25  limitations in this case?

1    A.       In this case I would have looked at the

2    electronic information that was sent to us from

3    the client and look to see what the date of last

4    payment was.  And I know the statute of

5    limitations is five years.  So I would make sure

6    that the suit was filed within five years of that

7    last payment date.

8    Q.       What is the big deal about the statute of

9    limitations?

10   A.       The statute of limitations is a rule that

11   says that after a certain number of years you

12   can't file a certain type of action.  So

13   basically, if you want to proceed with a legal

14   action, you need to do so before that time period

15   runs up.

16   Q.       Did you satisfy yourself that this

17   Complaint was going to be compliant with the

18   statute of limitations?

19   A.       Yes, I did.

20   Q.       Do you recall as you sit here what

21   information you were aware of in your file that

22   reflected the last payment date?

23   A.       I would have looked at the field in our

24   collection system that shows what the date of last

25   payment was, and we also have another place where

1    we show our calculation of the statute of

2    limitations based on that.  So I looked at those

3    two.

4    Q.      Was there any question in your mind that

5    the date of the last payment was within five years

6    of the date that you were going to file this

7    Complaint?

8    A.      No.  And on this particular file, there's

9    also been some correspondence back and forth by

10   e-mail early on to confirm what the date of last

11   payment was.

12   Q.      Did you have a chance to review that

13   correspondence?

14   A.      Yes, I would have reviewed that before I

15   sent the Complaint as well.

16   Q.      Tell the jury, if you would, why did you

17   file the complaint against Mr. McCullough?  What

18   was your purposes in doing so?

19   A.      I filed the Complaint because our client

20   placed a claim with us against Mr. McCullough for

21   this amount.

22           And when I reviewed the file at

23   the time the summons Complaint was drafted, it was

24   my belief the file was within the statute of

25   limitations and there was no reason not to file

```
 1     it.

 2     Q.      Did you have any question about whether

 3     this was a valid credit card debt?

 4     A.      No.

 5     Q.      Any other reason other than representing

 6     your client that you would attempt to sue him in

 7     this matter?

 8     A.      No.

 9     Q.      After the Complaint was filed, what was

10     your next step in the process?

11     A.      After the Complaint was filed, I believe

12     we received a letter next from a law firm, and it

13     was a little odd, but they indicated they didn't

14     actually represent Mr. McCullough but they were

15     asking that validation be provided.

16     Q.      Was that within 30 days of the letter you

17     sent out?

18     A.      No, it wasn't.

19     Q.      Let's jump ahead.  Did you at some point

20     send out a letter to Mr. McCullough providing

21     information to validate the debt?

22     A.      Yes.

23                 MR. SIMPSON:  Exhibit 508.  This

24     has not been admitted yet, Your Honor.

25                 THE COURT:  Okay.
```

1                    MR. HEENAN:  No objection, Your

2      Honor.

3      BY MR. SIMPSON:

4      Q.     Is this a true and correct copy of the

5      letter sent to Mr. McCullough?

6      A.     Yes, it is.  It would have had a handful

7      of documents attached to it as well.

8      Q.     Does this appear to be the letter in the

9      packet of documents that you had sent to Mr.

10     McCullough?

11     A.     Yes, it does.

12                    MR. SIMPSON:  I believe Mr.

13     Heenan already said he didn't object, but for the

14     record, I move for the admission of Defendant's

15     Exhibit 508.

16                    MR. HEENAN:  No objection.

17                    THE COURT:  Exhibit 508 is

18     admitted without objection.

19                    (Exhibit 508 is admitted into

20     evidence.)

21     BY MR. SIMPSON:

22     Q.     What was the purpose of sending this

23     letter and attachments to Mr. McCullough?

24     A.     This is a letter, and, as I indicated, I

25     got this letter from a law firm asking for

```
1    validation after the summons Complaints were sent

2    out.  And even though it wasn't requested within

3    30 days as it should have been, the validation, I

4    decided I wanted to go ahead and send the

5    validation, just to be safe.  I didn't want to

6    take a chance of violating the FDCPA.

7    Q.      Now, what is shown here on page two of

8    Exhibit 508?

9                  MR. SIMPSON:  And maybe if you

10   could kind of draw out the upper two-thirds of

11   that.

12                  THE WITNESS:  That's a copy of a

13   credit card statement that was addressed to M.

14   Tim McCullough and Doraleen McCullough.

15   BY MR. SIMPSON:

16   Q.      Does it reference any payment information

17   on it?

18   A.      It does.  It references a payment of looks

19   like $44.52.

20   Q.      On what date?

21   A.      August 21 of 2000.

22   Q.      Now, did you take a look at that document

23   before you sent it on to Mr. McCullough?

24   A.      Yes, I'm sure I did.

25   Q.      Now, that doesn't square with June 30,
```

1     2004.  What is going on here?

2     A.      The last payment date that we had in our

3     file was a date that was provided by the client,

4     and it was a payment that they said was made to

5     them, not to the original creditor.

6     Q.      Would you expect to see a statement, a

7     credit card statement, from them, from CACV?

8     A.      No.  Usually the credit card statements on

9     a file will stop when the original creditor stops

10    handling the account, when it's sold.  After that

11    point you won't see the same kind of credit card

12    statement.

13    Q.      So, in your mind, did this cause you any

14    concern that you were looking at a payment of

15    August of 2000 rather than June of 2004?

16    A.      No.

17                  MR. SIMPSON:  If you would, would

18    you turn to page four in Exhibit 508, please.

19    BY MR. SIMPSON:

20    Q.      I'm not going to go through each of the

21    pages.  They are almost illegible.

22                  Can you tell by looking at the bad

23    photocopy what this is?

24    A.      It's a copy of the credit card agreement.

25    Q.      We have also heard the term card member

1    agreement.  Is that what this is?

2    A.      Yes.

3    Q.      The pages following are the same thing?

4    A.      Yes.

5    Q.      Did you take a look at the card member

6    agreement before it was sent out?

7    A.      Yes, I believe I would have.

8    Q.      Have you seen ones like this on occasions?

9    A.      Yes, I've seen a lot.

10   Q.      Any estimate of how many card member

11   agreements you've seen?

12   A.      I think I've seen hundreds of card member

13   agreements.

14   Q.      Have you ever seen one that doesn't

15   contain a clause that says the credit card company

16   gets to asks for attorneys' fees or gets to

17   recover attorneys' fees if the credit card user

18   doesn't pay the bill?

19   A.      No, I haven't.

20   Q.      So let's go back to where we were in the

21   process before I got us sidetracked with this

22   letter and these documents.

23                   You've sent out the Complaint.

24   It's gotten filed.  Is that correct?

25   A.      That's correct.

1    Q.        April of 2007.  Does that square with your

2    recollection?

3    A.        I don't recall the date, but that sounds

4    about right.

5    Q.        Did you proceed to have the lawsuit served

6    on Mr. McCullough?

7    A.        Yes.

8    Q.        What did you do to effect service of a

9    lawsuit?

10   A.        Usually we take the summons, original

11   summons, and send it, along with a copy of the

12   summons and a copy of the Complaint, either to the

13   local sheriff or to a process server.  And they

14   take it out and personally serve it upon the

15   defendant, hand the copies to them.

16   Q.        That is a process that is authorized by

17   the Rules of Civil Procedure?

18   A.        Yes, it is.

19   Q.        Did anything happen that you can recall --

20   first of all, do you remember when you had it

21   served on Mr. McCullough?

22   A.        No, I don't.

23   Q.        If I represent to you that the file shows

24   it was, I think Mr. McCullough testified, June of

25   2007, does that sound about right?

1    A.       That sounds about right.

2    Q.       Do you recall anything happening at your

3    office on this file around June or July of 2007?

4    Any events, any action occurring on this file?

5    A.       I guess I'm not exactly sure when

6    you're --

7    Q.       Did you file anything, did you have any

8    discussions with Mr. McCullough, anything occur on

9    the file?

10   A.       I need to see our paperless notes, I

11   guess.

12                   MR. SIMPSON:  Let's bring up

13   Exhibit 7.  This is Exhibit 7 and we are on page

14   four.

15   BY MR. SIMPSON:

16   Q.       Is that what you are referring to?

17   A.       Yes, this is the notes we keep in our

18   record.  It's notes of what we have done and what

19   is going on with the file.

20   Q.       Does that help to refresh your

21   recollection as to what if anything was occurring

22   in the June-July time frame of 2007?

23   A.       Yes, it does.  That was -- June was around

24   the time it was served.  And after it was served,

25   there was an answer that was served upon us to

1    file.

2    Q.      Did you look at the answer?

3    A.      Yes, I did.

4    Q.      Did it raise any questions in your mind,

5    Mr. McCullough has a statute of limitations?  Why

6    didn't you do anything about it at that time?

7    A.      I would have reviewed the last payment

8    information in our file and seen that the last

9    payment would have put us within the statute of

10   limitations and the statute of limitations is not

11   an uncommon defense and, more often than not, it's

12   not a valid defense to a case.

13   Q.      Do you have a recollection of receiving

14   any phone calls from Mr. McCullough after he filed

15   his answer?

16   A.      No, I don't.

17   Q.      Do you have any recollection of receiving

18   any voice mails from him?

19   A.      No, I don't.

20   Q.      If a person that you sue who is pro se or

21   a person that is representing himself or herself

22   calls you, do you have a practice one way or the

23   other whether you call them back?

24   A.      I call anybody back that calls me.

25   Q.      As to Mr. McCullough, it's your testimony

1    that you don't recall getting any calls from him?

2    A.       No, I don't.

3    Q.       Would they be documented in the file?

4    A.       Yes.  If we got a call, there would be a

5    note in the file there.

6    Q.       Do you see any notes in the file about --

7    well, looks like, let's take a look here.  Next

8    page, looks like he called on July 12.  Is that

9    right?

10   A.       Oh, yes, he did.

11   Q.       Did he leave a number to call him back?

12   A.       No, he didn't.

13   Q.       And I wanted to ask you about this because

14   I think it's an important point.  Was there a

15   scheduling conference set by the judge in the case

16   that you sued him on?

17   A.       Yes, there was.

18   Q.       And tell the jury what a scheduling

19   conference is.

20   A.       A scheduling conference is something a

21   court usually sets up after an answer comes in.

22   It's a chance for the parties to get together and

23   pick deadlines for the rest of the case.

24   Different courts do them different ways.

25   Sometimes you set a trial date. Sometimes you

```
1    don't set one at that time, but it's typically a
2    chance for the parties to get together and create
3    a road map for how the case is going to proceed.
4    Q.      Now, what is the procedure?  Do you show
5    up in court?  Do you attend by phone?  How do they
6    usually work?
7    A.      It's different in every court.  Most of
8    the time it's by phone.  And this particular
9    court, in this case, wanted to do it by phone
10   conference, with both parties being there by
11   phone.
12   Q.      Did you make any efforts to try to set
13   that up?
14   A.      Yes, I did.
15   Q.      What did you do?
16   A.      Usually a phone number is provided on an
17   answer, when an answer is filed.  In this case
18   there wasn't a phone number provided.  We had a
19   number in our file, so I tried calling that number
20   and it was disconnected and I couldn't reach
21   anybody there.
22   Q.      Could you find any number for Mr.
23   McCullough?
24   A.      No, I couldn't.
25   Q.      According to your note, he didn't leave a
```

1    number when he called?

2    A.      That's correct.

3    Q.      So what is the next step in your lawsuit?

4    You've got the Complaint filed.  He filed an

5    answer.  At some point, did you have a scheduling

6    conference?

7    A.      Yes.  The Court went ahead with a

8    scheduling conference that day.  It was set.

9    Q.      I take it Mr. McCullough wasn't there.

10   A.      That's correct.

11   Q.      Did the judge just enter a routine

12   scheduling order?

13   A.      Yes, they did.

14   Q.      Does the scheduling order set out a trial

15   date?

16   A.      In this county, I believe it would have,

17   but I don't recall what the date was.

18   Q.      So at some point you decided to send

19   written discovery requests to Mr. McCullough.  Is

20   that right?

21   A.      That's correct.

22   Q.      What are written discovery requests?

23   A.      Discovery is a process for the parties to

24   exchange information so they can learn more about

25   the other side's case.

1    Q.      Is it something that is authorized by the
2    Rules of Procedure?
3    A.      Yes, they are provided for in the Rules of
4    Procedure.
5    Q.      Have you ever had, when you're
6    representing a client, discovery requests sent to
7    you?
8    A.      Yes, I have.
9    Q.      Do you ever have requests for admission
10   sent to you?
11   A.      Yes, I do.
12   Q.      Why did you decide to send Mr. McCullough
13   discovery requests?
14   A.      It's an opportunity to find out more about
15   his defenses.  He asserted a couple of defenses in
16   his answer, so I wanted to ask him questions about
17   that, find out what information he had that might
18   be relevant to those defenses.
19   Q.      Now, we know those went out in October of
20   2007.  Does that square with your recollection?
21   A.      Yes, it does.
22   Q.      We know at that time that Grace in your
23   office had had some e-mail exchanges with Bobby
24   Dunker at CACV.  Were you aware of that?
25   A.      Not at the time, no.

1    Q.       Just to set the scene, if you will, the

2    nature of those e-mails, as I understand it, was

3    that the payment by Mr. McCullough that people had

4    thought had been a payment on the account in 2004

5    was in fact a return of unused costs.  Is that

6    your understanding?

7    A.       Yes, it is.

8    Q.       Where was that information?  Where was

9    that e-mail?

10   A.       That e-mail had been printed into the

11   paperless file of the scanned image.

12   Q.       When did you first read that e-mail?

13   A.       The first time I recall reading that

14   e-mail is after having a conversation with someone

15   at Collect America later on in the case.

16   Q.       Was it before you sent out the discovery

17   requests to Mr. McCullough?

18   A.       No, it would have been after that date.

19   Q.       Did you have any inkling in your mind,

20   when you sent discovery to Mr. McCullough,

21   including the requests for admission, that maybe

22   you had a problem with the statute of limitations?

23   A.       No.

24   Q.       Would you have sent those out if you did?

25   A.       No, I wouldn't.

1    Q.      Did Mr. McCullough or his attorney respond

2    to those requests?

3    A.      Yes, the responses came in.  The responses

4    are put together by both the attorney and the

5    defendant.  So both of them had a part in

6    responding.

7    Q.      Is that a copy, at least, of the first

8    page of the responses?

9    A.      Yes, it is.

10   Q.      Now, there has been some testimony that,

11   or supposition, by the plaintiff's expert that you

12   sent these out in an effect to torpedo Mr.

13   McCullough's chance at defending this case.  Was

14   that your purpose?

15   A.      No, it wasn't.  Discovery is a process.

16   It's used in almost every case and it's a way of

17   getting information from the other side, what

18   their arguments are.

19   Q.      Did you ever move for summary judgement,

20   ask the Court to just enter judgement against Mr.

21   McCullough based on the paper pleadings, the paper

22   file?

23   A.      No, I didn't.

24   Q.      What did you do when you got his

25   responses?

1    A.        I would have to see the paperless notes, I

2    guess.

3                    MR. SIMPSON:  Let's bring those

4    back up.

5    BY MR. SIMPSON:

6    Q.        Let's go to Exhibit 7.

7    A.        I think it's probably on the next page. I

8    think we are probably seeing the responses coming

9    in there, November 30, but I'm not certain without

10   being able to see the actual document scanned in

11   there.

12   Q.        Let's take a look.  We are on Exhibit 7,

13   page seven.  Is that what you have in front of

14   you?

15   A.        Yes.

16   Q.        You made a note there on December 7, 2007,

17   right?  Is that your entry?

18   A.        Yes, it is.

19   Q.        Are they your initials there, CD?

20   A.        Yes.

21   Q.        Obviously the jury can read the note.

22   Tell us the context of how that note came to be

23   written.

24   A.        Defense counsel had served requests for

25   discovery upon us.  And for my client to respond

1    to those, I need to talk to them and they need to

2    give me information and we need to get responses

3    put together that we have to serve on defendant to

4    answer their questions.

5              So in the process of obtaining

6    that information, I was informed that what we

7    thought was the date of last payment on the

8    account wasn't a payment.  So the account was

9    actually past the statute of limitations.

10   Q.      Did that cause you some concern?

11   A.      Yes, it caused me a lot of concern.

12   Q.      What did you do?  Did she say, Go ahead

13   and keep the suit going, or did she tell you to

14   dismiss it?

15   A.      No, the only option at that point was to

16   dismiss the lawsuit.

17   Q.      You're under oath.  Can you tell the jury

18   whether this was the first time you learned your

19   suit was outside the statute of limitations?

20   A.      Yes, it is.

21   Q.      Did Leslie have any inkling, before that

22   time, that you're aware of, did she ever express

23   to you before this that she knew about this?

24   A.      No.

25   Q.      So you've had conversations with Leslie.

1    You know you have to dismiss it.  What do you do

2    about it at that point?

3    A.       At that point, I talked to defense counsel

4    to find out what his position was on dismissal

5    with the lawsuit.

6    Q.       That's Mr. Heenan?

7    A.       Yes, it was.

8    Q.       And did you in fact move to dismiss the

9    lawsuit?

10   A.       Yes, he indicated that the defendant

11   didn't oppose dismissal of the lawsuit with

12   prejudice.  So I drafted an unopposed motion to

13   dismiss the lawsuit with prejudice.

14   Q.       Let's go through real quickly with you,

15   not to belabor the point.  This is Defendant's

16   Exhibit 512.  Do you recognize the document?

17   A.       Yes.  This is a copy of the e-mail

18   response I got back from Mr. Heenan indicating his

19   client didn't oppose dismissal with prejudice.

20   Q.       Let's move on to Exhibit 513.  Do you

21   recognize Exhibit 513?

22   A.       Yes.

23   Q.       What is that?

24   A.       That's a copy of the actual unopposed

25   motion and notice of motion to dismiss that I

1    filed.

2    Q.      And page two of that, please?

3    A.      That's just the brief supporting the

4    motion to dismiss.  Yes, that's the brief.

5    Q.      So I take it the lawsuit was dismissed at

6    that point.

7    A.      Yes, it was.

8    Q.      Did you ever take any adverse action with

9    respect to trying to execute on anything, take any

10   of Mr. McCullough's assets, things of that nature?

11   A.      No.

12   Q.      Could you have without a judgement?

13   A.      No.

14   Q.      Were you ever sanctioned or punished by

15   the Court in the collection case for filing the

16   suit in the first place?

17   A.      No.

18   Q.      Were you ever punished or sanctioned by

19   that Court for sending Mr. McCullough requests for

20   admission?

21   A.      No.

22   Q.      Were you ever punished or sanctioned by

23   that Court for seeking attorneys' fees in that

24   case?

25   A.      No.

1    Q.       Do you think you did anything wrong when

2    you filed the lawsuit in this case?

3    A.       No, I don't.

4    Q.       In hindsight, I bet you wish you hadn't

5    filed it.

6    A.       That's correct.

7    Q.       Do you think you complied with the Rules

8    of Civil Procedure at the time you filed it, based

9    on what you knew at the time?

10   A.       Yes, I do.

11   Q.       Why is that?

12   A.       The information that I was relying on for

13   calculating the statute of limitations was

14   provided by the client.  And I talked about a

15   payment to the client, not a payment to the

16   original creditor.  That's the type of information

17   that I think I reasonably expect to be accurate

18   when it comes from the client.

19   Q.       Did you feel that you could rely on your

20   client to provide you accurate information that it

21   had in its file?

22   A.       Certainly.

23            MR. SIMPSON:  Charlie, I don't

24   have any more questions for you.

25            THE COURT:  You may

1    cross-examine, Mr. Heenan.

2                    MR. HEENAN:   Thank you, Your

3    Honor.

4    CROSS-EXAMINATION

5    BY MR. HEENAN:

6    Q.       Good afternoon, Mr. Dendy.

7    A.       Good afternoon.

8    Q.       As I understand it, let me start with

9    this.  You're not a defendant in the lawsuit.

10   True?

11   A.       That's correct.

12   Q.       The law firm that you work for is a

13   defendant.  They are the only defendant.  True?

14   A.       That's correct.

15   Q.       The Johnson, Rodenburg & Lauinger law

16   firm.

17   A.       Right.

18   Q.       And you're an employee of the Johnson,

19   Rodenburg & Lauinger law firm?

20   A.       That's correct.

21   Q.       You said you don't think you did anything

22   wrong.  Do you think Johnson, Rodenburg & Lauinger

23   did anything wrong with respect to its conduct

24   towards Mr. McCullough?

25   A.       No, I don't.

1    Q.        As I understand it, your testimony is it's

2    appropriate for you to rely on the representations

3    that are made by the client, in this case CACV.

4    A.        That's correct.

5    Q.        You haven't been here, but I'll tell you

6    that this jury has looked at a contract between

7    Johnson Rodenburg and CACV, where CACV tells

8    Johnson Rodenburg, Don't rely on the information

9    we tell you.  Do your own independent

10   investigation.

11              Have you seen that document

12   before, Mr. Dendy?

13   A.        Yes, I have.

14   Q.        Do you take your client at face value when

15   they tell you not to rely on the information they

16   bring you?

17   A.        The history of dealings with the client is

18   that they do provide that type of information to

19   us.

20   Q.        Provide what type of information?

21   A.        Information about the account.

22   Q.        Documents?

23   A.        They provide documents, balance

24   information.

25   Q.        They provide you information on the

```
1     Collection Master screen.  Correct?
2     A.      And through e-mails.
3     Q.      Not actual documents, true?
4     A.      I don't understand.
5     Q.      Not a credit card contract, not an account
6     statement, not a cash check showing a date.  They
7     don't provide you those documents.  Isn't that
8     true?
9     A.      They did provide those documents in this
10    case.
11    Q.      It's my understanding that Johnson
12    Rodenburg didn't have any type of documentation in
13    its file at the time it sued Mr. McCullough.
14    A.      That's correct.
15    Q.      And isn't it fair that that's not an
16    isolated instance, that oftentimes Johnson
17    Rodenburg will sue someone without any actual
18    documentation from, in this case, CACV?
19    A.      Sometimes.  I don't know that it's that
20    often.
21    Q.      Sometimes?
22    A.      Sometimes.
23    Q.      Now, it's true, if Johnson, Rodenburg &
24    Lauinger wanted to, it could obtain documentation
25    or make efforts to obtain documentation prior to
```

1    suing people.  Isn't that fair?

2    A.      It's possible.

3    Q.      But Johnson Rodenburg doesn't do that.

4    Isn't that true?

5    A.      We didn't do it in this case.

6    Q.      Do you do it sometimes?

7    A.      Sometimes.

8    Q.      Sometimes not?

9    A.      Sometimes not.

10   Q.      If Johnson, Rodenburg & Lauinger would

11   have had all the documentation in the first

12   instance, it never would have filed the

13   time-barred lawsuit against Mr. McCullough.  Isn't

14   that true?

15                    MR. SIMPSON:  Objection.  Calls

16   for speculation and argumentative.

17                    THE COURT:  Overruled.

18                    THE WITNESS:  If we had the

19   documentation that we eventually received on the

20   file, we still would have filed the lawsuit

21   because, as I indicated before, the information

22   from the client was that a payment was made to

23   it.  And I wouldn't expect a payment to the

24   client to show up on copies of statements from

25   the original creditor.

1    BY MR. HEENAN:

2    Q.    So the clients don't maintain any type of

3    documentation with respect to when a payment is

4    made?

5    A.    Every client is different.

6    Q.    How about this client?

7    A.    They didn't provide anything.

8    Q.    And that didn't bother you in prosecuting

9    this lawsuit against Mr. McCullough.  True?

10   A.    True.

11   Q.    A demand was made against Mr. McCullough

12   for attorneys' fees.  Correct?

13   A.    That's correct.

14   Q.    And there was no document in Johnson

15   Rodenburg's file giving it a right to demand

16   attorneys' fees against Mr. McCullough.  Isn't

17   that true?

18   A.    We didn't have a copy of the card member

19   agreement when the suit was filed.

20   Q.    Is Mr. McCullough the only person that

21   Johnson Rodenburg has sued in the state of

22   Montana, and demanded attorneys' fees from,

23   without having a contract in its file permitting

24   attorneys' fees?

25   A.    I don't know.

1    Q.      Why not?

2    A.      I can't think of another file.

3    Q.      So is this the only time that Johnson,

4    Rodenburg & Lauinger has ever sued someone and

5    demanded attorneys' fees without having the

6    contract in the file giving it a right to assert

7    attorneys' fees?

8    A.      Probably not.

9    Q.      It's happened before?

10   A.      Probably.

11   Q.      Still happen?

12   A.      No.

13   Q.      Why not?

14                  MR. SIMPSON:  Objection.

15   Subsequent remedial measures.

16                  THE COURT:  Sustained.

17   BY MR. HEENAN:

18   Q.      You reviewed the Collection Master notes

19   prior to filing this lawsuit.

20   A.      That's correct.

21                  MR. HEENAN:  Can I have up

22   Exhibit 111, please.

23

24   BY MR. HEENAN:

25   Q.      You were aware CACV had already sued Mr.

1   McCullough and the case had been dismissed.  Isn't

2   that correct?

3   A.      No, I wasn't.

4   Q.      Would you have had these Collection Master

5   notes available for your review prior to filing

6   the lawsuit against Mr. McCullough?

7   A.      If those are a copy of the notes from our

8   office.

9               MR. HEENAN:  Pull up just the top

10  part here.

11  BY MR. HEENAN:

12  Q.      Can you read that, Mr. Dendy, in the

13  black?  I can show you my copy which might be a

14  little bit easier to read.

15              Maybe let me just speed this

16  along.  I will represent to you that Exhibit 111

17  was provided to me by Ms. Lauinger and represented

18  to me are the Collection Master notes.

19  A.      I understand.  That would have been

20  available, then.

21  Q.      Thank you.

22              MR. HEENAN:  You can take that

23  down.  Page 10 of that exhibit, please.

24  BY MR. HEENAN:

25  Q.      Reflected in the notes is the fact that

```
1     debtor filed an answer to a lawsuit and stated the
2     statute of limitations had expired and someone
3     says, if they are going by an open account, then
4     we are, and then sent to the second law firm.
5                  So you would have reviewed that
6     prior to suing Mr. McCullough, right?
7     A.      I don't recall seeing it prior to suing.
8     Q.      Do you look at all the notes before you
9     sue someone?
10    A.      Yes, I do.
11    Q.      If you would have seen that, would that
12    have been a red flag for you?
13    A.      Not necessarily.
14    Q.      Would you have wanted to follow up who was
15    the first law firm and why did they dismiss the
16    first lawsuit?
17    A.      Yes, I would.
18    Q.      But you didn't do that here.
19    A.      No.
20    Q.      Now, in the Collection Master account
21    screen, it was represented that Mr. McCullough had
22    made a payment on June 30 of 2004.  Do you recall
23    that document?
24    A.      Yes.
25    Q.      Or that exchange, the e-mails?
```

1    A.      Yes.

2    Q.      If we look at page eight, doesn't it say

3    right there in the notes, June 30, 2004, costs?

4    A.      Yes, it does.

5    Q.      Did you ever go back and look at your

6    client's notes to see what they had inputed under

7    that date, June 30, 2004?

8    A.      No.  That wouldn't be reflected in our

9    file here.

10   Q.      Why not?

11   A.      What you see here is what you get.

12   There's nothing I can click on here to get more

13   information.

14   Q.      Okay.  But you could have -- that is

15   something you would have reviewed prior to suing

16   Mr. McCullough?

17   A.      I would have looked at the notes.

18   Q.      And you would have looked at that note,

19   presumably.

20   A.      Yes.

21           MR. HEENAN:  Thanks.

22   BY MR. HEENAN:

23   Q.      Now, at some point you get these documents

24   in that we have looked at that are Exhibit 508.

25           MR. HEENAN:  If you could pull

```
 1    those back up, please.

 2    BY MR. HEENAN:

 3    Q.       Where do these documents come from?

 4    A.       Is it up?

 5                     MR. HEENAN:  508.

 6    BY MR. HEENAN:

 7    Q.       While he is pulling that up, you can

 8    answer.  Do you know where that document came

 9    from?  Or do you need to see it again?

10    A.       What was it?

11    Q.       It was -- there we go.

12                     MR. HEENAN:  Page two of that,

13    please.

14    BY MR. HEENAN:

15    Q.       Do you know where these documents came

16    from?

17    A.       They would have been provided to us by

18    Collect America.

19    Q.       Who at Collect America?

20    A.       I don't know.

21    Q.       Now, when we talk about CACV, you're aware

22    there are no employees of CACV, right?

23    A.       Yes.

24    Q.       Have you ever reviewed any type of

25    documentation whereby people purport to have the
```

1   authority to file lawsuits on behalf of CACV?

2   A.      Not that I can recall.

3   Q.      But when someone at Collect America tells

4   you something, you take them at their word that

5   that's appropriate to file a lawsuit on behalf of

6   CACV?

7   A.      Yes.

8   Q.      Now, when we look at this document, you

9   would have looked at these documents when they

10  came in.  Right?

11  A.      That's correct.

12  Q.      This lawsuit against Mr. McCullough was

13  filed in 2007, right?

14  A.      That's correct.

15  Q.      Five-year statute of limitations in

16  Montana.

17  A.      Right.

18  Q.      The account statement that Johnson

19  Rodenburg gets from somewhere is dated 2000,

20  right?

21  A.      That's correct.

22  Q.      So would that have been a red flag to you

23  with respect to the statute of limitations issue

24  that Mr. McCullough raised.

25  A.      No, because the information that the

1    client had provided us was that the last payment

2    was made to the client.

3    Q.       But now you have documents and the

4    documents show 2000.  So that wouldn't be a red

5    flag?

6    A.       These documents could be exactly what they

7    are.  And then the account was charged off and

8    sold to CACV, and then a payment was made to CACV.

9    That later payment's not going to change the way

10   this document in 2000 looks.

11   Q.       Wouldn't you want to see some

12   documentation from your client reflecting a

13   different date, or no?

14   A.       I think that's the type of transaction and

15   that's information that the client should have

16   straight.

17   Q.       You're aware that the client, CACV, has

18   testified that they rely on their counsel, Johnson

19   Rodenburg, to make sure the information is

20   straight.

21               MR. SIMPSON:  Objection.

22   Mischaracterizes testimony.

23               THE COURT:  Overruled.

24               THE WITNESS:  I'm not really

25   aware of that testimony.

```
 1    BY MR. HEENAN:

 2    Q.      You haven't reviewed Mr. Dunker's trial

 3    perpetuation testimony?

 4    A.      No.

 5                   MR. HEENAN:  Next page of that

 6    document, please.  Next page of that document,

 7    please.  Can you flip it somehow?

 8    BY MR. HEENAN:

 9    Q.      Now, this is a document that is dated

10    April 2002, right?

11    A.      Yes.

12    Q.      And according to the notes and the

13    Collection Master information that CACV provided

14    to Johnson Rodenburg, they represented that the

15    account had been sold to CACV in 2001.  Right?

16    A.      I believe that's correct.

17    Q.      So wouldn't that be a red flag for you if

18    they are giving you a contract saying it's

19    applicable to Mr. McCullough and it's dated after

20    the account has already been sold?

21    A.      That could be.  But I didn't notice it at

22    the time.

23    Q.      This review of information prior to filing

24    a lawsuit in this case against Mr. McCullough,

25    that is no different than your review of the other
```

1     lawsuits that you file in Montana?

2     A.      Every case is unique.

3     Q.      So sometimes you do more, sometimes you do

4     less?

5     A.      I wouldn't do less, but sometimes I do

6     more.

7     Q.      Okay.  When you do more, what do you do?

8     A.      Well, if there's -- sometimes there's been

9     a dispute before the lawsuit's filed, something,

10    some indication maybe of bankruptcy or something

11    else that requires special attention.

12    Q.      What if there hasn't been a dispute?  Is

13    the review you conducted prior to suing Mr.

14    McCullough the same as the review you conduct

15    prior to suing all the other people in Montana?

16    A.      If the other files look the same as this

17    one did before suit, yes.

18    Q.      Have you ever seen a Chemical Bank credit

19    card agreement?

20    A.      Not that I know of.

21    Q.      How many attorneys in Johnson Rodenburg

22    are licensed to practice law in the state of

23    Montana?

24    A.      In the Bismarck office?

25    Q.      How many offices does Johnson Rodenburg

```
1    have?
2    A.        Two, Bismarck and Fargo.
3    Q.        How many in the Bismarck office?
4    A.        There are two right now in Bismarck.
5    Q.        How many in the Fargo office?
6    A.        I believe two.
7    Q.        And you handle the Montana lawsuits in the
8    Bismarck office, right?
9    A.        Right.
10   Q.        And there's another attorney or attorneys
11   that handle the lawsuits from the Fargo office in
12   Montana?
13   A.        That's correct.
14   Q.        So you say the lawsuits filed are about
15   half of Johnson Rodenburg's total number of
16   lawsuits in Montana?
17   A.        I can't say.
18   Q.        You sent a subpoena to Chase Bank asking
19   for information about Mr. McCullough's account.
20   A.        That's correct.
21   Q.        And it came back that they didn't have any
22   information about Mr. McCullough or his account?
23   A.        That's correct.
24   Q.        You would agree with me that the review
25   you conduct before filing lawsuits in the state of
```

1      Montana is the proofreading of unverified

2      information provided by your debt-buyer clients.

3      True?

4      A.      No, I wouldn't agree with that.  It's a

5      review of the information supplied by the clients,

6      but I wouldn't agree that it's unverified.

7      Q.      You would agree it's just proofreading,

8      wouldn't you?

9      A.      It's proofreading and ensuring there

10     aren't any inconsistencies in the information.

11     Q.      You aren't looking at actual documents?

12     A.      That's correct.

13     Q.      Now, you testified about wanting to make

14     sure -- strike that.

15               What would you have done if Mr.

16     McCullough hadn't responded to the requests for

17     admission?

18               MR. SIMPSON:  Objection, calls

19     for speculation.

20               THE COURT:  Would you read the

21     question back?

22               (Designated question is read.)

23               THE COURT:  Overruled.

24               THE WITNESS:  Could you repeat

25     the question, please?

```
 1    BY MR. HEENAN:
 2    Q.      What would you have done if Mr. McCullough
 3    hadn't responded to the requests for admission?
 4    A.      If he hadn't responded under the requests
 5    for admission, the next step in the lawsuit would
 6    have been to prepare to file a motion for summary
 7    judgement.
 8    Q.      What would have happened?  What would your
 9    expectation be in filing a motion for summary
10    judgement?
11                    MR. SIMPSON:  Same objection.
12                    THE COURT:  Overruled.
13                    THE WITNESS:  I guess I don't
14    understand the question.
15    BY MR. HEENAN:
16    Q.      What is your expectation as a lawyer when
17    you file a motion for summary judgement?  What are
18    you hoping for?
19    A.      That summary judgement will be entered in
20    the case.
21    Q.      And then what would happen?
22    A.      Then there's a judgement in place.
23    Q.      And once there's a judgement in place,
24    then what happens?
25    A.      Depends on the particular case.  Sometimes
```

1    people set up payments, sometimes there would be

2    other execution attempts.

3    Q.       You collect on the judgement, right?

4    A.       Right.

5    Q.       And sometimes people set up payments.

6    What if they don't?

7    A.       Then we will probably try to collect on

8    it.

9    Q.       How do you try to collect on it?

10    A.       Through garnishment usually.

11    Q.       Tell the jury what garnishment is.

12    A.       When you obtain a Writ of Execution, a

13    document from the Court, that confirms the

14    balances owed on the judgement and then you can

15    send that to the sheriff or a process server to

16    serve on a person's employer or bank; somebody

17    that has money owed to the defendant to obtain

18    some or all of that money, to apply towards the

19    judgement that's owed.

20    Q.       Anything else that Johnson Rodenburg would

21    do to collect the judgement?

22    A.       Nothing I can think of right now.

23    Q.       Johnson Rodenburg didn't do anything wrong

24    here.  Is that your testimony?

25    A.       Yes, it is.

1    Q.       Now, you're aware that this federal judge

2    has concluded otherwise and said that Johnson

3    Rodenburg violated the federal law.  Correct?

4    A.       Yes, I am.

5    Q.       Four different ways, right?

6    A.       Yes.

7    Q.       Johnson Rodenburg acted illegally when

8    they sued Mr. McCullough, right?

9    A.       I don't know.  I don't recall the details

10   of the orders.

11   Q.       You haven't had a chance to look at those

12   orders?

13   A.       I've looked at them, but as I sit here

14   today, I don't recall what was in them.

15   Q.       So even though this federal judge has

16   issued a ruling saying that Johnson Rodenburg

17   violated the federal law four different ways, it's

18   your testimony, sir, that Johnson Rodenburg didn't

19   do anything wrong?

20   A.       Yes, it is.

21           MR. HEENAN:  No further

22   questions.  Thank you.

23           THE COURT:  Any redirect

24   examination?

25           MR. SIMPSON:  Yes, Your Honor.

1                      THE COURT:   You may proceed.

2

3    REDIRECT EXAMINATION

4    BY MR. SIMPSON:

5    Q.      Charles, you were asked some questions

6    about the card member agreement and there was a

7    agreement in the file that was dated April of

8    2002.  Do you remember that?

9    A.      Yes, I do.

10   Q.      You said you've seen hundreds of these

11   things.  Is that right?

12   A.      Yes, I have.

13   Q.      Do the terms vary significantly from year

14   to year per agreement?

15   A.      Not usually, but I don't have occasion to

16   sit and compare them.

17   Q.      I want you to look briefly.  You were

18   asked questions about your investigation on what

19   documents you had in the file to support your

20   claim.

21                      First let me ask you this.  Do you

22   sometimes, during the course of a lawsuit, get

23   documents that support your case as you go along?

24   A.      Yes, a lot of times.

25                      MR. SIMPSON:  Bring up Exhibit

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    506, please.

2    BY MR. SIMPSON:

3    Q.      This is Exhibit 506.  What is that

4    document?

5    A.      It's a copy of an Affidavit of Sale from

6    Chase Bank USA NA.

7    Q.      And what is it selling?  What is it

8    representing?  In layperson's terms, if you could,

9    what does this show?

10   A.      This is an affidavit signed by somebody at

11   Chase Bank saying that Chase sold and

12   transferred --

13                 MR. HEENAN:  I object, Your

14   Honor.  Hearsay, foundation.

15                 THE COURT:  Sustained.

16   BY MR. SIMPSON:

17   Q.      Was this a document that you received

18   during the course of your work on this file?

19   A.      Yes, it was.

20   Q.      Was it a document you relied on in

21   pursuing the claim against Mr. McCullough?

22   A.      I don't recall when it was received at

23   this point.  I would have to --

24   Q.      In your view, did it substantiate the

25   claim?

1    A.       Certainly.  This substantiates that the

2    account was owed and that it was transferred to

3    CACV by Chase.

4    Q.       This document was received at your office?

5    A.       Yes, it was.

6                     MR. SIMPSON:  I move for the

7    admission of 506.  The witness has testified it

8    was part of his investigation.  It was part of

9    the number of documents that he received.

10                    THE COURT:  He testified he

11   doesn't know when it came in.  And he indicated

12   to the jury his understanding of what it says, so

13   I have sustained the objection.

14   BY MR. SIMPSON:

15   Q.       You were asked some questions at the end

16   about all the things that could happen if you got

17   a judgement against Mr. McCullough or some other

18   debtor.  Do you remember those questions?

19   A.       Yes.

20   Q.       Again, I think we covered this once, but I

21   want to make this clear.  Did you get a judgement

22   against him?

23   A.       No, there was no judgement entered against

24   him.

25   Q.       So there was no garnishment?

1    A.        No.

2    Q.        Any execution on any property he owned?

3    A.        No.

4                   MR. SIMPSON:  No more questions.

5    Thank you.

6                   THE COURT:  Mr. Dendy, you may

7    step down.

8                   Please call your next witness.

9                   MR. BOHYER:  Judge, can we have a

10   moment to confer about our next witness, please,

11   just Fred and I?

12                  THE COURT:  Yes.

13                  MR. BOHYER:  Can we step back

14   here just a minute?

15                  THE COURT:  Let us take a short

16   break and let us know.

17                  Members of the jury, do remember

18   and follow the admonitions that I've given you

19   previously.  We will be in a short recess.

20                  (Brief recess.)

21                  (The following discussion takes

22   place in chambers:)

23                  MR. BOHYER:  I want to confirm on

24   the record that our understanding with respect to

25   the pre-admitted exhibits is correct.  And as I

1          understand Your Honor's ruling, those exhibits

2          that were pre-admitted and referred to by the

3          parties in opening or through witness testimony,

4          as long as they were pre-admitted, those are

5          going to the jury.  Correct?

6                         THE COURT:  Yes.

7                         MR. BOHYER:  With that, the

8          defendant rests.

9                         THE COURT:  Okay.  Any rebuttal?

10                        MR. HEENAN:  No, Your Honor, but

11         I think at this point it's appropriate for me to

12         make my motion.

13                        THE COURT:  Let's let the jury go

14         and I will tell them that you have rested and

15         then we will let them go.  And maybe this doesn't

16         need to be on the record.

17                         (Discussion off the record.)

18                        THE COURT:  With respect to the

19         handling of exhibits, I'm gathering by the

20         silence that nobody is objecting to the handling

21         of exhibits as outlined by the Court.  Is that

22         correct?

23                        MR. HEENAN:  Yes.

24                        THE COURT:  Defendant?

25                        MR. BOHYER:  Agreed.

1                    THE CLERK:  Can I make sure I
2     have it straight?
3                    THE COURT:  Yes, and we will do
4     that as soon as we let the jury go.  I will have
5     them come back at 9:15.
6                    (Brief recess.)
7                    THE COURT:  Court is in session.
8     Ladies and gentlemen of the jury, the defendant
9     has advised me that they have now rested, which I
10    explained earlier means they have now presented
11    all the evidence that they wish you to consider.
12    So you've now heard all of the evidence presented
13    upon which you will deliberate.
14                    So I'm going to release you this
15    afternoon and ask you to be back here at 9:15 in
16    the morning.  And at 9:15, then, the lawyers will
17    present their closing arguments to you.  I will
18    then instruct you on the law that is to govern
19    your deliberations and then you will retire to
20    deliberate on your verdict.  So I expect, by late
21    morning, you will have the case to deliberate.
22                    This evening, it's very
23    important, again, that you remember the
24    admonitions I've given you.  Don't discuss the
25    case with anyone.  Don't do any research on your

1    own, and keep an open mind until you've heard the

2    arguments of the lawyers, the instructions of the

3    Court and you retire to hear the opinions of your

4    fellow jurors and to deliberate.

5                    So have a nice evening and I will

6    see you tomorrow morning at 9:15.

7                    We will be in recess.

8                    (Court is adjourned.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1        C E R T I F I C A T E   O F   O F F I C E R.

2

3        I, Virginia Leyendecker, a Certified Shorthand

4    Reporter and Notary Public, do hereby certify that

5    the foregoing is a true and accurate transcript of

6    the testimony as taken stenographically by and before

7    me at the date, time and location aforementioned.

8        I do further certify that I am neither a relative

9    nor employee, nor attorney or counsel to any parties

10    involved; that I am neither related to nor employed

11    by any such attorney or counsel, and that I am not

12    financially interested in the action.

13

14

15

16    /s/Virginia E. Leyendecker, CSR

17    Notary Public

18    My Commission expires May 3, 2010

19    NJ C.S.R. License No. XI-1701

20

21

22

23

24

25