1                    IN THE U.S. DISTRICT COURT.
                FOR THE DISTRICT OF MONTANA
2                    BILLINGS DIVISION
                CAUSE NO. CV-07-166-BLG-CSO
3
    -----------------------------------------------
4
TIMOTHY McCULLOUGH                 :
5                                  :
          Plaintiff               : **COURT TRANSCRIPT**
6                                  :
    vs.                           :   Volume III
7                                  :
JOHNSON, RODENBURG & LAUINGER:
8                                  :
          Defendant               :
9
      -----------------------------------------------
10
              April 16, 2009
11
      -----------------------------------------------
12   R E P O R T E D   B Y:

13    VIRGINIA LEYENDECKER, Certified Shorthand

14   Reporter, (NJ License No. 1701) and Notary Public, on

15   the above date, commencing at 8:30  a.m., at the

16   James F. Battin United States Courthouse, 316 North

17   26th Street, Billings, Montana.

18

19   BEFORE: Hon. Carolyn S. Ostby

20

21

22

23

24

25

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

```
 1    A P P E A R A N C E S:

 2        HEENAN LAW FIRM
          BY:  JOHN HEENAN, ESQUIRE
 3             For the Plaintiff

 4        BOHYER, SIMPSON & TRANEL, P.C.
          BY:  FRED SIMPSON, JR., ESQUIRE
 5        and JOHN BOHYER, ESQUIRE
               For the Defendant
 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                                    <u>INDEX</u>

2

           WITNESS
3
       **Lisa Lauinger**
4
   Direct Examination by Mr. Heenan................101
5   Cross-Examination by Mr. Bohyer.................103
   Redirect Examination by Mr. Heenan..............109
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                         VK LEYENDECKER, LLC
                        20 Medicine Crow Road
                 Columbus, Mt. 59019 - (406) 322-5061

1

2          (The following discussion took

3     place in chambers:)

4               THE COURT:  The record will

5     reflect we are in chambers with counsel for the

6     settling of instructions.  Last evening, after we

7     recessed for the day and the jury had left, I

8     provided counsel with the Court's final jury

9     instructions numbered 16 through 43.

10              So let me ask the plaintiff

11    first, does the plaintiff have any objections to

12    the Court's proposed Instructions 16 through 43?

13              MR. HEENAN:  We will talk about

14    instructions that aren't being given later,

15    correct?

16              THE COURT:  Yes, but if you wish

17    to discuss one of your proposed instructions in

18    connection with one that I'm giving, you

19    certainly may do that.

20              MR. HEENAN:  Thank you, Your

21    Honor.

22              THE COURT:  I should also reflect

23    that I gave the parties a proposed Special

24    Verdict Form.  So if you have any objections, Mr.

25    Heenan, to that, this is the time to state that.

1          MR. HEENAN:  I have no objections

2     to the Special Verdict Form.  With respect to the

3     jury instructions, regarding the definition of

4     malice, which would be Instruction Number 26, we

5     had submitted something from the Court's January

6     8, 2009 order citing Plouffe for the legal

7     proposition that there is a rebuttable

8     presumption of malice if the jury finds the

9     absence of probable cause.  That's not reflected

10    in this instruction.

11          THE COURT:  Where is your

12    proposed instruction to that effect?  Do you have

13    the number of that?

14          MR. HEENAN:  Sure.

15          THE COURT:  What number?

16          MR. HEENAN:  There's the rub for

17    my failure to give you numbers, Your Honor.  Do

18    you want me to go back through and number them,

19    or do you want me to show you?

20          The instruction that we proposed

21    was from *Seltzer v. Morton* in determining whether

22    the defendant initiated the lawsuit with malice

23    for purposes of a malicious prosecution claim.

24          THE COURT:  Go through and number

25    them.  We won't have a clear record if they are

1    not numbered, and I did go through and number.

2                        MR. SIMPSON:  May I ask a

3    question?

4                        THE COURT:  Sure.

5                        MR. SIMPSON:  Yesterday, I

6    thought the Court had indicated there would be a

7    flow sheet or spreadsheet which hooked up the

8    Court's instructions with relation to the

9    parties' submitted instructions.

10                       THE COURT:  Right, but I told you

11   because the defense rested sooner than we thought

12   and we were giving them to you with so much time

13   to look at them yourself, we weren't going to do

14   that.

15                       MR. SIMPSON:  Sorry.  Thank you.

16                       MR. HEENAN:  Number 7,

17   plaintiff's proposed 17, Your Honor.

18                       THE COURT:  So the plaintiff is

19   proposing that plaintiff's 17 be given in

20   addition to the Court's, or in place of one of

21   the Court's?

22                       MR. HEENAN:  In addition to the

23   Court's, Your Honor.

24                       THE COURT:  Does the defendant

25   have any objection to that?

1          MR. SIMPSON:  I believe it's

2    redundant to one of the ones that the Court has

3    already determined to give.

4          THE COURT:  I'm quite sure there

5    is not an instruction on the inference.  There

6    are instructions on investigation, and in

7    addition, I want to talk with the parties about

8    their proposed instructions from yesterday, which

9    include that as well.

10          So I gather is that what you're

11    referring to is the investigation?  So it's the

12    second sentence.

13          MR. SIMPSON:  Yes.

14          THE COURT:  So the defendant has

15    no objection to the giving of plaintiff's 17,

16    first sentence only?

17          MR. SIMPSON:  No, we do object to

18    that because I don't believe that the inference

19    portion of that is the correct statement of the

20    law.

21          THE COURT:  That is what Plouffe

22    says.  Do you have any authority to the contrary?

23          MR. SIMPSON:  No, Your Honor.

24          THE COURT:  I will add to the

25    instructions.  Where do you propose that be

1    added, Mr. Heenan?  I would propose it would be

2    27-A.

3                    MR. HEENAN:  That would be ideal.

4    Thank you, Your Honor.

5                    THE COURT:  But it will not

6    include the second sentence, only the first

7    sentence.

8                    MR. HEENAN:  I agree with

9    counsel.  The second sentence is redundant -- not

10   redundant, but covered by the Court's

11   instructions.

12                   THE COURT:  Go ahead.

13                   MR. HEENAN:  The only other thing

14   I would add, Your Honor, it doesn't reference any

15   of the Court's proposed instructions, but the

16   Court, as I understand it, is going to instruct

17   the jury as to what Rule 36 of the Montana Rules

18   of Civil Procedure say.

19                   Yesterday we submitted Rule 11 of

20   the Montana Rules of Civil Procedure.  I have

21   concerns that if we are going to tell the jury

22   one of the rules of the Rules of Civil Procedure,

23   we ought to tell them both of the rules that are

24   in plaintiff's case.

25                   THE COURT:  I reached the same

1    conclusion last night in reviewing the proposed.

2    And I will give to the parties 29-A, which is not

3    in your packet.  And it's not exactly as proposed

4    by the plaintiff.

5               MR. HEENAN:  We have no

6    objection.  That's all of the issues that

7    plaintiff has, Your Honor.

8               THE COURT:  Does the plaintiff,

9    then, object to the refusal of any of the

10   plaintiff's offered instructions?

11              MR. HEENAN:  No, Your Honor.

12              THE COURT:  Turning, then, to the

13   defense.  First of all, let's talk about 29-A.

14   Any objection to 29-A?

15              MR. SIMPSON:  Yes, Your Honor,

16   there is.  Our position is that our client's not

17   being adjudged according to whether it violated

18   Rule 11 in this case.  It's not been an issue

19   that's been asserted in the pleadings that the

20   Court, with authority to sanction my client for

21   violation of Rule 11 of the State District Court

22   in the underlying debt-collection action, it's

23   our position that the giving of 29-A would be

24   improper.

25              THE COURT:  Well, it will be

1    given because not only did the plaintiff raise

2    this but the defendant raised this with respect

3    to the plaintiff's pleadings.  So I think it has

4    been injected by both parties as an issue in this

5    case.  So 29-A will be given.

6                    Any other objections, Mr.

7    Simpson, to the Court's instructions?

8                    MR. SIMPSON:  Yes.  The objection

9    first to Instruction Number 22, just, again, on

10   the grounds that the Unfair Trade Practices Act

11   has no application here and we have already

12   briefed that issue in our briefing.  So I won't

13   reiterate those grounds.

14                   THE COURT:  Okay.  22 will be

15   given.

16                   MR. SIMPSON:  Instruction 23 we

17   object to on the grounds that there is not

18   sufficient evidence in the record to support a

19   malicious prosecution claim against the

20   defendant.

21                   THE COURT:  That objection will

22   be overruled.

23                   But I do want to alert the

24   parties.  This is the only other instruction that

25   differs from the ones given to you yesterday.  It

1    differs only in a minor area.  It's easier for me

2    to read if the 'that' is included before each of

3    the elements.  So I will read it as, To prove

4    malicious prosecution plaintiff must show, Number

5    1, that a judicial proceeding was commenced;

6    Number 2, that defendant -- that's just a

7    grammatical change.

8                    Then, Number 6, as it was given

9    to you, it didn't have causation.  So Number 6

10   would be that the defendant's action caused

11   plaintiff damages.

12                    Any objection to those changes?

13                    MR. SIMPSON:  Not to the changes,

14   Your Honor.

15                    MR. HEENAN:  No, Your Honor.

16                    THE COURT:  You may continue.

17                    MR. SIMPSON:  We object, the

18   defendant objects to Instruction Number 26.

19   Primary grounds of the objection is that it's

20   confusing in light of Instructions 37 and 39,

21   which also reference malice.  And I don't know if

22   the best time to go through that is at this stage

23   or when we reach Instructions 37 and 39.

24                    But in essence, malice is being

25   defined in Number 26 with reference to a wish to

1     vex, annoy or injure another person, or,

2     alternatively, under Subpart 2, effectively that

3     is the definition of actual malice from the

4     statute.

5               When we get to Instruction Number

6     37, which discusses the standard by which a jury

7     can determine whether it will award punitive

8     damages, it again references the term malice,

9     which is subsequently defined in Instruction 39,

10    only with reference to the statutory definition

11    of actual malice contained, I believe, in

12    27-1-2-21, and I think there is a risk there that

13    the jury will be confused as to which standard

14    will be applied when you get to the punitive

15    damages question.

16              THE COURT:  Is it the defendant's

17    position that 26 incorrectly states the standard

18    of malice for purposes of a malicious prosecution

19    action?  If so, how and what is your authority?

20              MR. SIMPSON:  I don't have any

21    authority to state whether it incorrectly states

22    the standard from a malicious prosecution action,

23    but I think the risk of confusion is enough that

24    simply giving the definition of actual malice as

25    defined in the Montana Code is sufficient to

1    cover either basis.

2                    THE COURT:  That objection will

3    be overruled because the instruction does clearly

4    state for purposes of a malicious prosecution

5    claim, and the actual malice in the later

6    instructions to which counsel refers is in the

7    statutes with respect to punitive damages.  And

8    counsel cites an authority that this is an

9    incorrect statement of malice for purposes of a

10   malicious prosecution claim.  So please continue.

11                   MR. SIMPSON:  We object to

12   Instruction 27.  It's our position it's an

13   incorrect statement of the law, and at this time

14   I don't have any authority to cite in support of

15   my position, Judge.

16                   THE COURT:  That will be given.

17                   MR. SIMPSON:  We object to

18   Instruction 28.  It's our position that the

19   evidence is insufficient to support a claim for

20   abuse of process going to the jury.  It's also

21   our position that Element 2 is effectively

22   duplicative of Element Number 1.

23                   THE COURT:  That will be given.

24                   MR. SIMPSON:  We already covered

25   the objection to 29-A.  We object to Instruction

1    Number 30, not on the grounds that it incorrectly

2    summarized the Court's earlier order but simply

3    on the grounds that we disagree with the

4    substance of that order, Your Honor.

5                    THE COURT:  Okay.  That will be

6    given.

7                    MR. SIMPSON:  We object to Number

8    32 on the grounds that it's not supported by the

9    evidence in this case and it's cumulative in

10   light of Instruction Number 31.

11                   THE COURT:  I'm confused by your

12   last objection.

13                   MR. SIMPSON:  That it's

14   cumulative?

15                   THE COURT:  Yes.

16                   MR. SIMPSON:  Well, it's simply

17   saying that you may again award damages and

18   Number 31 instructs the jury that it can award

19   damages already.

20                   THE COURT:  31 is an introductory

21   instruction with respect to all of the damage

22   instructions and advises the jury, for example,

23   that by instructing them on damages the Court

24   doesn't mean to suggest for which party the

25   verdict should be rendered.  And so 32 tells them

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1  that because the Court determined that the Fair

2  Debt Collection Practices Act was violated they

3  must determine the damages that resulted from

4  that violation, and that the damages that can be

5  awarded from that violation in this case are the

6  humiliation, embarrassment, et cetera.

7          So I overrule that objection.  I

8  don't think those two are duplicative.

9          MR. SIMPSON:  33 we object to on

10  the grounds that there isn't sufficient evidence

11  to support a claim of emotional distress going to

12  the jury.

13          THE COURT:  33 will be given.

14          MR. SIMPSON:  We object to

15  Instruction Number 34 on the grounds that, as set

16  forth, I believe, at the pretrial conference,

17  it's our position it is for the Court rather than

18  the jury to decide whether statutory damages or

19  the amount of statutory damages should be awarded

20  in a Fair Debt Collection Practices Act, and

21  that's based on the lame duck statute.

22          THE COURT:  I understand that

23  objection.  And we will give Instruction 34 for

24  reasons we discussed at the final pretrial

25  conference.

```
 1                    MR. SIMPSON:  We object to
 2      Instruction Number 35, and, in particular, the
 3      last sentence is tantamount to a directed
 4      verdict.  It simply says, If you find for
 5      plaintiff on the question of liability, your
 6      award should include compensation for mental or
 7      emotional distress, and it's negated the cause
 8      element.
 9                    THE COURT:  What about that, Mr.
10      Heenan?
11                    MR. HEENAN:  Whatever the Court's
12      preference is, Your Honor.
13                    THE COURT:  This instruction, as
14      I recall, was taken from one of the parties'
15      proposed instructions that included in that last
16      sentence that your compensation should include,
17      and then listed the various types of awardable
18      damages.  Because the evidence in this case only
19      was presented with respect to mental or emotional
20      distress, I then eliminated all of those others
21      which left only that one.
22                    I understand your objection here.
23      What do you propose be done to fix it?  What if
24      we just said, If you find for plaintiff on the
25      question of liability, you may award compensation
```

1    for --

2                    MR. SIMPSON:  Mental or emotional

3    distress caused by the defendant's violation?

4                    THE COURT:  Yes.  Any objection

5    to that, Mr. Heenan?

6                    MR. HEENAN:  No, Your Honor.

7                    THE COURT:  If you find for

8    plaintiff on the question of liability, you may

9    award compensation for mental or emotional

10   distress -- what did you say?  Caused by --

11                   MR. SIMPSON:  Caused by the

12   defendant's conduct.

13                   THE COURT:  Okay.  We will make

14   that change.

15                   MR. SIMPSON:  We object to

16   Instruction 37 on the grounds that it's our

17   position punitive damages claim is not supported

18   by the evidence.  Also, as stated earlier with

19   respect to Instruction Number 26, Instruction 37

20   might be misconstrued if plaintiff refers to 26

21   in an attempt to determine how to resolve the

22   punitive damages question.

23                   THE COURT:  37 will be given.

24                   MR. SIMPSON:  We object to

25   Instruction 38.  It's our position that under

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1    *State Farm v. Campbell*, the correct burden of

2    proof is beyond a reasonable doubt rather than

3    clear and convincing evidence.  Also, if it's to

4    be given as is, I think it would be more clear to

5    the jury if it were to state, clear and

6    convincing means more than preponderance of the

7    evidence but less than beyond a reasonable doubt.

8                    THE COURT:  Okay.  38 will be

9    given.

10                   Well, let me ask the plaintiff,

11   did you have any objection to stating in 38 that

12   clear and convincing is more than a preponderance

13   but less than a reasonable doubt?

14                   MR. HEENAN:  Can I look over

15   Fred's shoulder?

16                   We would object as cumulative

17   because the instruction defines what clear and

18   convincing means to the jury.

19                   THE COURT:  I think it will be

20   given as is because we haven't defined beyond a

21   reasonable doubt, so I think that could add some

22   lack of clarity.

23                   MR. SIMPSON:  I don't have any

24   objections to the other instructions, but I

25   wanted to state an objection, or perhaps a

1       request a change to the Special Verdict Form.

2                       THE COURT:  Okay.

3                       MR. SIMPSON:  The defendant is

4       not objecting to the questions as framed.

5       However, it's our position that there should be

6       an instruction following Question Number 3 that

7       effectively tells the jury, if you answer no to

8       Questions 1, 2 and 3, don't answer Questions 4

9       and 5.  Have the foreperson sign the verdict

10      form.  Because if the jury doesn't find for the

11      plaintiff on one, two or three, it seems like

12      they can't award damages.

13                      THE COURT:  What about the Fair

14      Debt Collection Practices Act?

15                      MR. SIMPSON:  Good point.

16                      MR. BOHYER:  Do smiles show up on

17      the record?

18                      THE COURT:  No.  I don't think

19      they do.

20                      MR. SIMPSON:  Good point.

21                      THE COURT:  Any other objections

22      to the Special Verdict Form?

23                      Any objections that the

24      defendant has to the plaintiff's refusal of any

25      of the defendant's offered instructions?

1             MR. SIMPSON:  The rejection or

2    refusal of Defendant's Number 6.

3             THE COURT:  For the reasons

4    you've already stated?

5             MR. SIMPSON:  Yes.

6             THE COURT:  Okay.  You can go

7    ahead.

8             MR. SIMPSON:  Thank you.

9    Rejection or refusal of Defendant's Number 14;

10   refusal of Defendant's 15; refusal of Defendant's

11   19; refusal of Defendant's 20; refusal of Number

12   23; refusal of Number 24; and refusal of Number

13   25.

14            THE COURT:  Okay.  Those

15   instructions are refused.

16            Anything further anyone wants to

17   state with respect to the Court's jury

18   instructions and Special Verdict Form?

19            MR. HEENAN:  No.

20            MR. SIMPSON:  Your Honor, could I

21   have one minute to review the stipulations that

22   we reached to see if there are any we wanted you

23   to give the jury?

24            THE COURT:  Certainly.

25            MR. SIMPSON:  No.

 1                      THE COURT:  Okay.  This is well
 2     timed.  You have about 10 minutes.
 3                      Oh, Mr. Heenan.  35 minutes to
 4     begin with and leaving yourself 10 or what?
 5                      MR. HEENAN:  30, 15.
 6                      THE COURT:  So I give you the
 7     25-minuteand 10-minute warning.
 8                      MR. HEENAN:  I appreciate it.
 9                      THE COURT:  I will be gentle.
10                      (Brief recess.)
11                      THE COURT:  Good morning.  The
12     record will reflect that the parties, counsel and
13     the jury are present.
14                      I apologize to the jury that we
15     are starting at 9:30 rather than 9:15, as I told
16     you.  It's not because we have been drinking
17     coffee but working hard on finalizing the
18     instructions on the law to you.
19                      Now is the time, as I told you,
20     for the attorneys to make their closing arguments
21     to you.
22                      You may close for the plaintiff,
23     Mr. Heenan.
24                      MR. HEENAN:  Thank you, Your
25     Honor.  And may it please the Court, counsel and

1    ladies and gentlemen of the jury.

2                    This is a law firm that broke the

3    law.  This is a law firm that acted illegally.

4    This federal judge already said that the law firm

5    broke the law.  You've now heard all the

6    evidence.  You now have seen and heard how this

7    law firm broke the law.

8                    You've also heard they do it all

9    the time.  They did it with impunity.  They come

10   into the courtroom in the face of a federal judge

11   that said, You broke the law, they smile at you,

12   ladies and gentlemen, and say, We have done

13   nothing wrong.  And you, ladies and gentlemen,

14   today can stop them.

15                   Instruction Number 30, please.

16                   In a moment the Court will

17   instruct you as to the law that applies in this

18   case.  I want to take this opportunity to go

19   through some of the judge's instructions.  We

20   don't have time to go through them all.  I want

21   to move fast.  This is an important one, though,

22   Number 30.

23                   The Court, Her Honor, has already

24   ruled prior to the start of this trial some legal

25   findings, findings which you, the jury, must

1    accept as true.

2                    Number 1, Johnson, Rodenburg &

3    Lauinger violated the Fair Debt Collection

4    Practices Act by demanding attorneys' fees from

5    Mr. McCullough which were not permitted under

6    Montana law.

7                    Number 2, Johnson Rodenburg

8    violated the Fair Debt Collection Practices Act

9    by filing a lawsuit against Mr. McCullough which

10   was barred by the statute of limitations in

11   Montana.

12                   Number 3, Johnson Rodenburg

13   violated the Fair Debt Collection Practices Act

14   by continuing to maintain a lawsuit against Mr.

15   McCullough which was barred by the statute of

16   limitations of Montana.

17                   And Number 4, Johnson, Rodenburg

18   & Lauinger violated the Fair Debt Collection

19   Practices Act by serving the requests for

20   admission on Mr. McCullough in an abusive, unfair

21   and unconscionable attempt to collect a

22   time-barred debt.

23                   That's the law, ladies and

24   gentlemen, that you need to follow in your

25   deliberations as instructed to you by this judge.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1           So we don't start from scratch
2    like in most trials.  We started with the
3    acknowledgement, before you got here, before we
4    started this trial, that this law firm broke the
5    law.  And yet what have you heard from them?
6    What was their defense?  No, we didn't.  We
7    didn't do anything wrong, not a single thing
8    wrong.  And they certainly didn't come here to
9    apologize.  They didn't come here to apologize to
10   Mr. McCullough.  They came here to call him a
11   liar.
12           What about the evidence?  How do
13   we know it's illegal?  What did you hear?
14           Instruction Number 29-A, please.
15           The law in Montana obligates
16   lawyers that want to come to our state and
17   practice law in our state, when they sign legal
18   documents and sue people and when they bring
19   people into court, they need to conduct a
20   reasonable inquiry and make sure that it's well
21   grounded in fact.
22           And what that means, ladies and
23   gentlemen, is Montana does not tolerate frivolous
24   lawsuits.  We do not put up with frivolous
25   lawsuits in this state and we do not put up with

1          lawyers who file frivolous lawsuits.

2                     In Montana, you don't sue people

3          without evidence.  That's the law.  You heard

4          Andy Patten.  Mr. Patten, he is a well-regarded,

5          well-experienced, highly credible, highly ethical

6          collection lawyer.  And what did Mr. Patten tell

7          you?  He said you don't sue people without

8          evidence.  You have to do an independent inquiry

9          into the facts.  You can't blindly accept

10         information from a company like CACV, especially

11         when they say, Don't believe us.  Don't believe

12         what we tell you.  Do your own independent

13         investigation.

14                     And that applies not just to

15         collection cases, but to any case.  If someone

16         wants to file a lawsuit because of a car

17         accident, you don't just run to court and file

18         the lawsuit.  You get the police report.  You get

19         some medical records.  You independently verify

20         that there's a claim.  That's what lawyers in

21         Montana have to do.  And if they don't do it,

22         then they are filing frivolous lawsuits.  And

23         that's not allowed or permitted in Montana.

24                     So the judge has found, and you

25         need to follow her instruction to you, that

1    Johnson Rodenburg broke the law in the four ways

2    we went through under the federal Fair Debt

3    Collection Practices Act.

4              So what claims are left?  The

5    first claim is this Unfair Trade Practices Act

6    claim.

7              Instruction 22, please.

8              What does it mean to violate the

9    Unfair Trade Practices Act?  It means, when

10   someone's conduct constitutes unfair deceptive

11   acts or practice in the conduct of any trade or

12   commerce.

13             This claim isn't brought against

14   Johnson Rodenburg as a law firm.  It's brought

15   against Johnson Rodenburg as a debt collector

16   which uses our Montana court system to collect

17   debts.  We showed you how they do it and there is

18   no dispute about how they do it.  They file the

19   lawsuits, get judgements against people that

20   can't defend themselves, and take those

21   judgements and they garnish their wages, raid

22   their banks, put liens on their homes.  That's

23   how they collect debts.  They use the court

24   system.

25             And that's why we are on trial

1    and that's why they violated this Unfair Trade

2    Practices Act.  Because they are a debt collector

3    and because their conduct toward Mr. McCullough

4    was unfair and deceptive.  And you heard the

5    evidence and you've now been shown the Court's

6    rulings in that regard.

7                     They propound these requests for

8    admission.  We looked at them.  We looked at the

9    legal mumbo jumbo that they put in.  And what's

10   not in there?  30 days to respond or you're going

11   to lose.

12                    Why do they do that?  Because

13   that's the way Johnson Rodenburg can win a

14   lawsuit without having any evidence whatsoever in

15   their file, not a shred of evidence.  They know

16   because they're lawyers and they are up against

17   people like Mr. McCullough who aren't lawyers.

18   They know that they can use their law degree to

19   win a case without evidence.

20                    That's not fair in Montana.  And

21   that's not allowed in Montana and that's illegal

22   in Montana.

23                    Instruction Number 23.

24                    The next claim that you ladies

25   and gentlemen need to decide is what is called

1    malicious prosecution.  As I told you, in
2    Montana, the law does not tolerate lawsuits that
3    are brought maliciously, lawsuits that are
4    brought without probable cause.  So what do you
5    need to determine to decide whether this was a
6    malicious prosecution against Mr. McCullough?
7    That a proceeding was commenced and prosecuted
8    against him.  We know that.  They sued him in
9    state court, right across the street; that the
10   defendant was responsible for instigating,
11   prosecuting or continuing the proceeding.
12   Johnson Rodenburg signed the lawsuit and they
13   prosecuted the lawsuit.  That it was acted
14   without probable cause.
15                    Well, what does probable cause
16   mean?
17                    Instruction Number 27, please.
18                    Probable cause means whether the
19   defendant could or should have made further
20   inquiry or investigation as an ordinarily prudent
21   person.
22                    Here we are talking about a
23   prudent law firm.  And who is the prudent law
24   firm that we showed you?  It's Mr. Patten, an
25   ethical, honest, fair, law-abiding collections

1     lawyer who told you what it takes for a

2     collections lawyer in Montana to have probable

3     cause to sign their name on a Complaint and sue

4     someone and hale them into court.  He told you

5     and that evidence came in unchallenged, ladies

6     and gentlemen.  Johnson Rodenburg brought you no

7     one to refute anything that Mr. Patten said.

8     Unchallenged.

9                    It's not what you can do in

10    Montana.  Other states, I don't know.  But

11    Montana, when a lawyer signs the lawsuit, they

12    are saying to the Court, We have done our

13    homework.  We have done an investigation.  We

14    have looked at it independently.  We haven't

15    adopted whole e-mails from our client.  And we

16    have documents in our file that would be evidence

17    that we could use when we get to court to prove

18    our claim and win.

19                    And the evidence was here, ladies

20    and gentlemen, that Johnson Rodenburg didn't have

21    any evidence, no evidence whatsoever, when they

22    sued Mr. McCullough.  And that's not what a

23    prudent law firm would do.  A prudent law firm, a

24    law firm that follows the law, isn't going to

25    file a lawsuit without evidence.  They are not

1    going to file a lawsuit without doing an

2    investigation.

3                   If we could go back to Number 23,

4    please.

5                   What else for probable cause?

6    Not only do they not get any documents, but right

7    in their own file it showed that this information

8    they were relying on was false.  Right in their

9    own file it showed that Mr. McCullough had

10   already been sued.  You heard Mr. Dendy say that

11   he never called anyone to do any kind of

12   follow-up as to why the first lawsuit was

13   dismissed.  They just filed a lawsuit.

14                   What's the next element?  Malice.

15   What does malice mean?

16                   Number 26, please.

17                   Malice can be one of two things.

18   One, it can be a wish to annoy, vex or attempt to

19   do a wrongful act.  Or it can be where the

20   defendant has knowledge of facts or intentionally

21   disregards facts that create a high probability

22   of injury.

23                   We don't think Johnson Rodenburg

24   was out to get Mr. McCullough.  We just think

25   they didn't care about him.  He was just a name

1    on a batch, a name on a spreadsheet, one on a

2    list of all the people that Johnson Rodenburg was

3    to sue that day.

4              I'll bet you Johnson Rodenburg

5    knows more about Mr. McCullough now than they

6    know about any one of the thousands of people

7    they sue.  And they only know about it now

8    because he stood up for himself and haled them

9    into court and called them out to task for their

10   conduct towards him.  And they now learned a lot

11   about Mr. McCullough.

12             What else can I show you to help

13   you understand malice?

14             27-A, please.

15             Johnson Rodenburg is a law firm.

16   They are not a person.  They are a legal entity.

17   They are an entity on paper.  We can't get inside

18   their head.  We don't know what they were

19   thinking.  I'm allowed to show you what I think

20   they were thinking, and that is, they didn't

21   care.  They had no regard for Mr. McCullough or

22   anyone else they sued.  But you're allowed to

23   draw an inference about what it means to be

24   malicious.  And that inference is that if the

25   defendant initiated the lawsuit without probable

1    cause then you can infer from that fact that it

2    was with malice.  And that's what happened here.

3    No probable cause.  No proof.  No evidence.

4    Nothing.  And they sued him.

5                    Back to Number 23, please.  Thank

6    you, Madam Clerk.

7                    The justice proceeding terminated

8    favorably.  When Mr. McCullough hired a lawyer,

9    Johnson Rodenburg went away, because they don't

10   like to deal with lawyers that are defending

11   cases that want to actually see evidence that

12   say, All right, Johnson Rodenburg, bring it on.

13   Let's bring it into court, see what your proof

14   is.

15                    When that happens, they go away.

16   They like beating up on people like Timothy

17   McCollough, people without lawyers.  They are

18   pretty good at beating people like Timothy

19   McCollough.

20                    This case was dismissed with

21   prejudice.  That was the best result I could

22   achieve for my client.  The case went away

23   forever, and damages.  And we will get to that.

24   Because the notion that this is like running a

25   stop sign and not hitting anyone and having a

1    close call is offensive, but we are going to get

2    to that.

3                         So I submit, ladies and

4    gentlemen, you're going to be able to resolve

5    that malicious prosecution claim looking at the

6    laws we have just gone through.

7                         Final cause of action that you

8    need to determine is what is called abuse of

9    process.  Abuse of the legal process.  What is

10   that?

11                         Instruction Number 28, please.

12                         An abuse of the legal process is

13   when someone has the ulterior purpose of

14   extracting money from someone they don't know.

15                         Mr. McCullough didn't owe them

16   money.  And let's cure that right now.  What you

17   saw presented by Johnson Rodenburg is the way

18   that every time a debt collector gets called to

19   task for their illegal conduct, the case becomes

20   about what you owed the credit card.  Isn't that

21   how we started this trial?  "Who has a credit

22   card?  Everyone makes their payments.  What about

23   personal responsibility?"

24                         That's not this case, ladies and

25   gentlemen.  That case was across the street in

1      state court.  Johnson Rodenburg lost that case

2      because they didn't have any evidence.  You're

3      not that jury and don't fall into that trap.

4      There is a name for it, because debt collectors

5      use the defense that has been presented to you so

6      often when they get caught.  It's called the

7      deadbeat defense.  They say, Look at this guy.

8      He is a deadbeat.  Is there any doubt in your

9      mind -- one of the things I hope you do when you

10     get back there, you will have the evidence.  Look

11     at Exhibit 106.  Look at all the people they sued

12     in Montana.  Is there any doubt in your mind that

13     any one of those thousands of people, if they

14     stood up to Johnson Rodenburg the way Mr.

15     McCullough stood up to them, is there any doubt

16     in your mind you would have seen the exact same

17     defense?

18              Kerri Henan, who hasn't used the

19     credit card since she was divorced 16 years ago,

20     wouldn't she have been a deadbeat?  Because, why

21     didn't you pay the credit card, ma'am?  Everybody

22     owes their credit card, ma'am.

23              Ken Lucero, who came in.

24     Wouldn't he have been the deadbeat and wouldn't

25     they want to explore all the intricacies of his

1   background?  Weren't they trying to do that

2   anyway, even though he is not the plaintiff in

3   this case?

4                    It's called the deadbeat defense,

5   ladies and gentlemen.  It's called the deadbeat

6   defense.  And you're not that jury.  You're the

7   jury that decides whether Johnson Rodenburg was

8   trying to extract money that Mr. McCullough

9   didn't owe.

10                    He didn't owe.  There is no

11  dispute about that.  They already lost the case

12  once.  The statute of limitations was up.  The

13  judge has told you the statute of limitations was

14  up.  He didn't owe the money.  And yet they filed

15  it without a valid claim.  Again, no evidence.

16  No investigation.  No proof.  That's abuse of

17  process, ladies and gentlemen.

18                    So the judge said it was illegal.

19  You heard it was illegal.  What else?  They do it

20  all the time.  All the time.  You heard Mr.

21  Patten.  He looked at their business model.  He

22  looked at the way they operate.  All the lawsuits

23  that they are able to produce with this

24  Collection Master software, with this team of

25  non-lawyers, he called them a factory; a factory

1          that produces lawsuits, a factory that sues

2          people and hales them into court and counts on

3          the fact that they won't respond or won't respond

4          with a lawyer.  And they win.  They win because

5          they are lawyers, not because they deserve to

6          win.  And that's not fair.

7                    You heard Ms. Lauinger.  Nine out

8          of the 10 lawsuits they file are defaults.  They

9          win just by filing the paperwork.  They don't

10         even have to physically come into the courthouse.

11         They send it from North Dakota to all the 56

12         clerks of court in all the counties in Montana

13         and they sit back and wait 20 days and when the

14         20 days is up, judgement.

15                   We know what they do when they

16         get a judgement.  They convert this action that

17         could have been pennies on the dollar, pennies on

18         the dollar is how much these debt buyers pay for

19         these claims, and they turn it into a judgement

20         with all the interest, all the collection fees

21         and take that judgement and come after your bank

22         account, they come after your house, they come

23         after your property.

24                   Of the one in 10 people who are

25         able to figure out how to respond to these

1      lawsuits, not many of them have lawyers.  Why is

2      that?  Johnson Rodenburg knows it.  You sue

3      someone for $10,000 you get sued for $10,000.

4      You start calling lawyers and the lawyers say,

5      yeah, I would love to represent you.  I need a

6      $20,000 retainer and I think you have a great

7      defense and we will get rolling.  What is the

8      problem there?  It doesn't make any sense and

9      they know it.  It's their business model.

10                     What else do we show you to show

11     you they do it all the time?  Mr. Dendy said they

12     didn't have any less information here than they

13     usually do.  Did he say this was a fluke?  No.

14     He said they didn't do anything wrong.  They did

15     not do anything wrong.

16                     So it's a lucrative business.

17     You sue a hundred people.  95 of them you win.

18     You're not even up against the lawyer.  The five

19     that show up and have a lawyer you just drop.  No

20     harm, no foul.  Sorry.

21                     We brought you two other people

22     that have been sued by Johnson Rodenburg because

23     it was my intent, and I told you at the beginning

24     of the case, I was going to show you a pattern

25     and practice.  This is a business-conduct case.

1    This is putting this law firm and the way they

2    operate in Montana on trial.  You're that jury.

3    You're that jury that scrutinizes the way that

4    Johnson Rodenburg conducts themselves in the

5    state of Montana.

6                         I will leave for you what Ms.

7    Henan and Mr. Lucero said.  Imagine their

8    circumstances.  Imagine all the thousands of

9    people on Exhibit 106.  They all have wives and

10   children and circumstances, and they get sued and

11   some of them can react better than others.

12                        We brought you Mr. Eakin, another

13   highly ethical, fine, fine lawyer, a pillar of

14   this legal community.  He comes into this

15   courtroom, with no compensation to himself, he's

16   not being paid.  He has no interest in this case.

17   He walks you through Johnson Rodenburg's business

18   model.  He knows it in helping all the people

19   making under $10,000 a year that have been sued

20   by Johnson Rodenburg.  And he tells you what they

21   did to Mr. McCullough is part of their business

22   practices.

23                        So we showed you they do it all

24   the time.  So what is left?  Stop them.  Right

25   here, today, stop them.  You, ladies and

1    gentlemen, you have the power and the obligation.

2    You're the conscience of this community.   Today

3    you are the conscience of the state of Montana.

4    And you're going to decide today whether we

5    shelter companies like Johnson Rodenburg to

6    commit this type of unfair, deceptive, illegal

7    practice in our state.   Do we let lawyers from

8    out of state come in and break our laws?   You're

9    the only seven people who have the power to

10   decide that.   You're the conscience of the state

11   of Montana today.   Do we shelter this type of

12   conduct or do we punish it?

13                  Let's talk about that a little

14   bit.   Let's talk about personal responsibility.

15   Because isn't that what he wanted to talk about?

16   Isn't that what Johnson Rodenburg wanted to talk

17   about from the beginning of this case, from the

18   time we were selecting this jury?   Personal

19   responsibility.   "Everybody pays their credit

20   cards."

21                  What about Mr. McCullough?   Is he

22   a deadbeat?   He had a brain injury.   He had some

23   problems.   He lost his job.   He was out of work.

24   He is trying to get his disability.   He gets

25   behind on his credit cards.   He gets approved for

```
 1    disability.  He finds out that he can tell all
 2    those credit card companies, ha-ha.  I don't owe
 3    you anymore because you can't collect from me
 4    because Social Security benefits are not
 5    collectable.
 6                    What does he do?  He pays anyway.
 7    He works out deals with the credit card companies
 8    that will work with him, and there is one that
 9    won't work with him and he doesn't have the money
10    to write them a check and make them go away.  And
11    they keep calling and calling and harassing him
12    and saying nasty things to him.  They curse at
13    him.  At some point he is more mad than wanting
14    to pay back a debt collector that he doesn't
15    know, and he is mad at them.  He tells them to
16    pound sand.
17                    What else about personal
18    responsibility?  What about corporate
19    responsibility?  What about responsibility from
20    this law firm after a federal judge in Montana
21    said, You broke the law, for them to come into
22    this courtroom and, as their defense, smile at
23    you, ladies and gentlemen, and tell you they
24    didn't do anything wrong?
25                    THE COURT:  Five minutes,
```

1     Counsel.

2                    MR. HEENAN:  Thank you, Your

3     Honor.

4                    In this courtroom, in this very

5     courtroom in criminal cases, under the federal

6     criminal laws, defendants who don't accept

7     responsibility for their conduct automatically

8     get more jail time because it's --

9                    MR. SIMPSON:  Your Honor, I

10    object.  This is not a criminal proceeding.  I

11    object.

12                   THE COURT:  Sustained.

13                   MR. HEENAN:  So how do we stop

14    them?

15                   Exhibit 32, please.

16                   One of the damages Mr.

17    McCullough's claiming and you, ladies and

18    gentlemen, need to decide is his personal

19    humiliation, his embarrassment, his mental

20    anguish, his emotional distress.  And the judge

21    has told you there is no fixed standard.  There

22    is no measure in this case.  There is not a

23    formula.

24                   But let me suggest to you a

25    formula.  And it's just my suggestion to you.  We

1    started this trial with Johnson Rodenburg's

2    lawyers saying Johnson Rodenburg doesn't take

3    very kindly to being a defendant in a lawsuit.

4    They don't like it very much.  They are not here

5    by choice.  That's what we were told.  They don't

6    like it.

7                    You know what?  If Johnson

8    Rodenburg was on the wrong end of a frivolous

9    lawsuit, do you think they would be coming in

10   saying no harm, no foul, it's just like running a

11   traffic light and not hitting anyone?  I suggest

12   to you that that would not at all be what Johnson

13   Rodenburg would be saying if they were on the

14   other side of a frivolous lawsuit.

15                   So if they were on the wrong side

16   of a frivolous lawsuit, what would we say?  We

17   would say, that's too bad.  No one should have to

18   be the victim of a frivolous lawsuit.  But you're

19   lawyers.  You're a law firm.  You know how to

20   respond.  So they would be about here.

21                   What about someone who is not a

22   lawyer?  What about someone who gets sued, they

23   have the financial means?  They are not a lawyer,

24   they have to go hire a lawyer, they have to pony

25   up the $20,000 to retain a lawyer.  It's

```
1    frustrating to them to be sued.  It's frustrating
2    to them to be on the wrong side of a frivolous
3    lawsuit.  They are mad.  They would be about
4    here, maybe here.
5                What about someone that is sued
6    frivolously, sued maliciously and they don't have
7    any money?  They are one of Mr. Eakin's clients
8    who goes to Legal Services or can get into Legal
9    Services.  They are sued, they know it's
10   frivolous, but they are not a lawyer and don't
11   know how to respond.  They don't know what to do
12   about it and they can't get help.  Where are
13   they?  They are about here.  That's really
14   stressful.  It's stressful to be the victim of a
15   frivolous lawsuit and not know what to do about
16   it and not know how to protect yourself.
17                Where is Mr. McCullough?  Mr.
18   McCullough's up here.  You heard it.  He has a
19   mental condition.  He has all these problems.
20   They are not in dispute.  He has this preexisting
21   stress that he can't work, he can't be a
22   dishwasher.  He can't be a janitor.  That's how
23   bad his mental condition is.  Timothy McCollough
24   stays at home all day and feeds his chickens and
25   feeds his turkeys and never leaves his house.  He
```

1   lives in a little house out by the railroad

2   tracks out in Laurel, Montana.  He told you this.

3   It's not in dispute.  He is not a normal,

4   mentally healthy personal.  So the way he copes

5   is he isolates himself.

6                  So how does Tim react when he

7   gets hit with a second lawsuit after he thought

8   the thing had gone away?  He is up here.

9                  So what does that mean?

10                  Madam Clerk, if I could have up

11   the questionnaire.

12                  I'm going to suggest to you,

13   ladies and gentlemen, Tim's a million dollars.

14   He is a million dollars.  And you can decide and

15   it's your job to decide whether or not that's

16   more or less; the frustration, the anger, the

17   migraines, the insults, the being called a liar,

18   how much that is worth.  But it's worth

19   something.  It's worth a lot of something and I'm

20   suggesting to you it's a million dollars because

21   he is this high.

22                  And I don't know where the other

23   people on that Exhibit 106 fit in.  We don't know

24   their circumstances.  But I don't think there is

25   anyone on that list of the thousands of people

1    that could have been more defenseless, more

2    helpless to being attacked and prosecuted in a

3    lawsuit that was frivolous.

4                    Could I have the questionnaire?

5                    THE COURT:  The Special Verdict

6    Form?

7                    MR. HEENAN:  The Special Verdict

8    Form.

9                    THE COURT:  That's 30 minutes,

10   Counsel.

11                   MR. HEENAN:  Am I allowed to go

12   over and take out of my rebuttal?

13                   THE COURT:  You are.

14                   MR. HEENAN:  I sure appreciate

15   Your Honor keeping me on task.

16                   Question 1, did Johnson Rodenburg

17   violate the Unfair Trade Practices act?  Yes.

18                   Page two, please.

19                   Did Johnson Rodenburg maliciously

20   prosecute the debt-collection lawsuit against

21   Timothy McCollough?  Yes.

22                   Did Johnson Rodenburg abuse the

23   legal process in the debt-collection lawsuit

24   against Tim McCullough?  Yes.

25                   What amount of damages do you

1     find?

2                        Slide that up, please, Madam

3     Clerk.

4                        A million dollars, ladies and

5     gentlemen.  That's my suggestion to you.  And,

6     again, it's totally up to you.  That's my

7     suggestion as a lawyer.  It's not the evidence.

8     You decide the evidence.  You decide whether it's

9     more or less.  It's up to you.  But that's my

10    suggestion to you.

11                       We don't have a lot of time to

12    cover.  The violation of the Fair Debt Collection

13    Practices Act, per Congress, they built in a

14    statutory damage.  It can be between one dollar

15    and a thousand dollars.  I'm going to suggest a

16    thousand dollars.  But, again, that's up to you.

17                       Next page, please.

18                       Punitive damages, yes.  The judge

19    decided in this case you can decide whether

20    Johnson Rodenburg should pay punitive damages.

21    Again, ladies and gentlemen, you're the

22    conscience of this community.  Do we shelter and

23    protect law firms that come into our state and

24    break the law or do we punish them?  That's for

25    you to decide today.

1                    Finally, ladies and gentlemen, I

2     want to show you Instruction Number 16, because I

3     think this is important.  The judge is going to

4     instruct you that you decide this case based on

5     the evidence.  You don't decide it based on

6     sympathy.  I'm sure Mr. Dendy is a very fine man

7     who has a very nice wife and very nice kids.  But

8     it has nothing to do with this case.  Mr. Dendy

9     is not a defendant in this case.  Johnson

10    Rodenburg's trying to appeal to your sympathy by

11    putting Mr. Dendy up as the defendant.  He is not

12    the defendant on trial.

13                    Johnson, Rodenburg & Lauinger, a

14    legal entity, a legal partnership from North

15    Dakota, is on trial.  They try to appeal to your

16    sympathy when they have Mr. Dendy smile and tell

17    you he is a good father.  I'm sure he is.  But it

18    doesn't make it okay to sue people without

19    evidence.  And we showed you the evidence.

20                    Same with Mrs. Lauinger.  I'm

21    sure she is a very fine person.  I have no

22    quibbles with Ms. Lauinger, nor does my client.

23    Ms. Lauinger is not on trial.  She is sitting at

24    counsel table because a corporation, a

25    partnership in this case, has a right to put a

1    human face on a legal entity.  They have chosen

2    Ms. Lauinger to be the face of that entity.  She

3    is not the defendant in this case.  Johnson,

4    Rodenburg & Lauinger is the defendant.  So don't

5    consider the sympathy.  Don't consider whether

6    Mr. Dendy is probably a nice guy, Ms. Lauinger is

7    probably a nice woman.  Consider whether there's

8    an out-of-state law firm breaking the law, based

9    on the evidence you've heard.

10                    Thank you, ladies and gentlemen.

11                    THE COURT:  You may close for the

12    defendant, Mr. Simpson.

13                    MR. SIMPSON:  Thank you, Your

14    Honor.

15                    Good morning.  Well, the judge

16    has given me 45 minutes to make my closing

17    argument this morning, and I think you will be

18    happy to know I don't intend to take all of that.

19    I kind of wish the Courts would give jurors an

20    electric buzzer so when the lawyers speak too

21    long, the jurors can start pushing the buzzer to

22    tell the lawyer to shut up and sit down.  But I

23    will do my best not to put you in that position.

24                    Mr. McCullough didn't pay his

25    credit card.  We all know that.  He doesn't

1    dispute it.  He owed it.  There is no dispute.

2    The money was green when he spent it.  He didn't

3    pay it back.

4                   My client is not responsible for

5    that.  If Mr. McCullough paid his credit card

6    bill to Chase Manhattan, we wouldn't be here this

7    morning.  We wouldn't have been here this week.

8    He got out of paying his bill and now he wants

9    you to award him for it.  I think I just heard

10   his counsel ask you to give him $1,001,000.  That

11   just strikes me as incredible.  He didn't pay his

12   bill and now he wants you to reward him.  Don't

13   do it.

14                  You heard a lot of testimony

15   about what my client did or does as a general

16   business practice.  You didn't hear a lot of

17   testimony about what happened in particular in

18   Mr. McCullough's case because it's not that

19   appealing.  You heard about different cases, from

20   Ms. Henan, Mr. Lucero.  That's not this case.

21   That's another case.

22                  You heard about other lawsuits my

23   client files.  Why did you hear that?  You heard

24   it to distract you from the evidence in this

25   case.  The evidence isn't that favorable to Mr.

1    McCullough.  Again, he didn't pay his bill and
2    now he wants you to reward him for it.
3                    You heard a lot about what my
4    client does to obtain a judgement.  Well, you
5    know in this case my client never got a judgement
6    against Mr. McCullough.  You heard all the
7    horrible things that can happen to a person after
8    a judgement is entered.  You can garnish the
9    wages, get a lien on the real estate, take
10   people's money from a bank account.  That's true.
11   That's what the court system and the laws of this
12   country authorize.
13                   Did any of those things happen
14   here?  No.  Didn't happen to Mr. McCullough.  Ask
15   yourself why you're hearing about that over the
16   last couple days.  It's to distract you from what
17   happened here.  And that's nothing.
18                   In fact, I think I heard Mr.
19   Heenan say in his closing argument that you're
20   hearing about these other lawsuits that my client
21   filed and that's why they are on trial.  It's not
22   about what happened to Mr. McCullough.  They are
23   trying to make this about other people; other
24   people that aren't here before you today; other
25   people that aren't making claims.

1             And let's talk about this tactic

2     a little further.  What about the thing about the

3     requests for admission and my client not

4     including some magical language in the requests

5     that said, well, if you don't answer in 30 days,

6     they might be deemed admitted.  They will be

7     deemed admitted.  We know that Mr. Heenan, when

8     he sent them to my client in this case, didn't

9     include that same language.

10             And in fact, Madam Clerk, would

11    you bring up Instruction Number 29, please.

12             The Court's going to instruct

13    you, this is the law in Montana.  The Montana

14    Rules of Civil Procedure do not state that a

15    party who serves requests for admission must tell

16    the opposing party of the effect of the failure

17    to respond to the request in a timely manner.

18    That means my client didn't need to put this

19    magical 30-day language in the requests.  Montana

20    law says that what they did was okay.

21             It's a red herring, ladies and

22    gentlemen.  Mr. Heenan didn't do it.  My client

23    didn't do it.  I will submit to you a lot of

24    lawyers in this state don't do it, and that's

25    because the rules don't require it.

1          I want to talk a little bit about

2    Mr. Patten's testimony.  He sat there and told

3    you that it was really important, lawyers are

4    required to diligently represent their clients

5    and they are required to make a diligent

6    investigation before they file a lawsuit.

7          He was under an obligation,

8    before he came in and testified under oath and

9    offered you his expert opinion, to make a

10   diligent investigation as well.  But did he?  I

11   will submit to you that he didn't.  He didn't

12   remember whether my client had ever deemed the

13   requests for admission admitted, and he thought

14   my client had filed a motion for summary

15   judgement against Mr. McCullough.  He didn't do

16   an investigation, but he sat here and told you

17   that my client was wrong for not doing one in

18   this case.

19          Well, I tell you, I don't think

20   Mr. Patten was being dishonest.  I think he made

21   a mistake.  If he looked at the file, he would

22   have known better.

23          He also came in here and

24   criticized my client for filing a lawsuit beyond

25   the statute of limitations.  But do you remember,

1    on cross-examination, what did he say?  He had to

2    admit, Oh, yeah, I filed a lawsuit that was

3    beyond the statute of limitations on behalf of my

4    own law firm.  It can happen to any lawyer in the

5    state.

6              I want you to ask yourself, when

7    you're deliberating, who is really at fault here,

8    if it's not Mr. McCullough in the first place for

9    not paying his bill.  I will tell you it's CACV.

10   And ask yourself why isn't CACV here in the

11   trial.  They are not here to answer for their

12   mistakes and there is no question that they made

13   the pivotal mistake that led to this mess.

14             Could you pull up Exhibit 501,

15   please.

16             Here it is.  You've seen this

17   letter before.  This is the January 4, 2000

18   letter that I told you about before, in the

19   opening statement.  If this doesn't demonstrate a

20   reasonable investigation, I'm sorry, but I don't

21   know what does.  This is a letter from my client,

22   Johnson, Rodenburg & Lauinger, and they are

23   writing to their client and they say, You know

24   what?  We picked up a problem with the statute of

25   limitations.

1                    They are doing what they are

2     supposed to be doing.  They went to their client,

3     as any other lawyer does, and they said, What is

4     going on?  Give us something on this.

5                    Could you pull up 502, please.

6                    Here it is.  Here is an e-mail

7     from their client in response to Grace's letter.

8     What do they say?  They say he made a payment

9     within five years.  He made a payment on June 30,

10    2004 and that was a check for $75.

11                   Can you move to Exhibit 7-2,

12    please.

13                   Here it is.  Here's a note in the

14    file.  This is a note entered by the people at

15    CACV, e-mailed to Lisa, statute of limitations

16    not expired due to postdated check that was made

17    to us at CACV.  Please continue suit.

18                   Well, my client has two pieces of

19    written material from their client saying, no, we

20    made a mistake when we sent you a file

21    originally.  There was a payment in 2004.  There

22    was a payment within five years.  Go ahead and

23    file suit, please.

24                   That's a reasonable

25    investigation, ladies and gentlemen.  But, again,

1    ask yourselves, where is CACV?  They ought to be

2    here answering for their mistake.

3                     I'm going to go through the jury

4    instructions with you in a little bit, but I want

5    to talk, first, about the damages in this case.

6    I think one of the glaring omissions in this case

7    and maybe the biggest reason you heard from the

8    plaintiff about the other cases, the other cases

9    that aren't really here, Ms. Henan and Mr. Lucero

10   and the other lawsuits against people you haven't

11   heard from, one of the reasons you heard about

12   that is there a complete lack of evidence that

13   Mr. McCullough sustained any damage by reason of

14   the fact that he was a defendant in a lawsuit.

15   You didn't hear that he spent a single dime, not

16   one dollar in what lawyers like to call special

17   damages or hard damages or out-of-pocket costs.

18   Not one red cent.  But you've been asked by him

19   to give him a million dollars.

20                     Of course, since you didn't hear

21   any evidence about special damages or

22   out-of-pocket costs, he had to turn to something

23   else.  What does he turn to?  He turns to

24   emotional distress.  The only testimony you heard

25   on his emotional distress was that he had a

1    migraine a few days after the accident and then

2    it made him angry.

3                    I don't want to make light of Mr.

4    McCullough's situation, because he has had an

5    unfortunate life over the last 15, 20 years.

6    That's not why we are here.  That's not what this

7    case is about.  But I want you to consider his

8    claim for emotional distress and for a million

9    dollars in light of the evidence that you did

10   hear.

11                   You heard from Mr. McCullough

12   that he has had a headache virtually every single

13   day since 1990.  My client didn't cause that.

14   That's nothing new.  That's something that's been

15   ongoing for the last 19 years, and unfortunately

16   is probably likely to be ongoing for a long time

17   for Mr. McCullough.  And my client is not

18   responsible for that.

19                   You heard about his anger issues.

20   You heard that he was angry after this lawsuit.

21   But you also heard that he had been angry, he had

22   been so angry after his head injury in the 1990s

23   that, what did he do?  He made threats to

24   coworkers and was determined to be such a danger

25   to his coworkers that he was disabled.

1                   I will submit to you that the

2         anger and the headaches are nothing new.  They

3         are the same thing that's been going on for Mr.

4         McCullough since 1990.  Unfortunate?  Yes.  Is my

5         client responsible for it?  No.

6                   What else did Mr. McCullough tell

7         you?  He told you he didn't go to any doctors and

8         he didn't go to any psychologists to treat his

9         emotional distress.  I submit if it was real

10        serious or severe emotional distress he would

11        have done so.  He got treatment back in the

12        nineties after his head injury and he was

13        definitely in distress because of whatever was

14        going on with him at the time.  He saw other

15        psychiatrists.

16                   He didn't do that in this case.

17        He hasn't proved to you that he has serious or

18        severe emotional distress.  He also told you not

19        only did he not see any doctor, he couldn't

20        recall if it even altered his daily routine.

21                   I also want you to consider his

22        emotional distress claim in light of the

23        testimony of Dr. Veraldi.  Dr. Veraldi was his

24        own paid expert that came in and testified.  And

25        as kind of a side note, I told you at the

1    beginning I was planning on calling Dr.

2    McElhinney, but after we heard Dr. Veraldi

3    yesterday, we made the decision, you know what?

4    We don't want to waste your time with redundant

5    or duplicative testimony.

6                    You heard from Dr. Veraldi.  And

7    what did she say?  She said, first of all, she

8    said financial pressures in lawsuits cause

9    anybody stress.  Is that a surprise?  I don't

10   think so.  We all know that.

11                   But she couldn't tell you that

12   his diagnosis today is any different than it was

13   the day before the lawsuit.  She told you that

14   every single condition she diagnosed in him

15   preexisted the lawsuit, that is significant, with

16   nothing new going on.  This is the same pattern,

17   unfortunately, that Mr. McCullough has been in

18   since 1990.

19                   What else did she tell you?  I

20   think this is important to keep in mind when you

21   consider what you're being asked to do in this

22   case.  She told you that she can't rely on the

23   statements that Mr. McCullough was making to her.

24   That's significant.  She's his paid expert and

25   she's telling you, "I didn't rely on what he is

```
1    telling me."

2              I will submit, if his own paid

3    expert can't rely on what he's telling her, you

4    can't rely on him either.  I'm not saying that

5    because I think Mr. McCullough is dishonest.  I

6    don't.  But I think he has conditions that

7    prevent him from accurately reporting what is

8    going on with him.  Because of those conditions,

9    you simply can't believe what he is telling you.

10             Do I have about 10 minutes?

11             THE COURT:  No, you have about

12   15.

13             MR. SIMPSON:  Could you pull up

14   the first page of the verdict form, please.

15             THE COURT:  Actually, Counsel,

16   you have more than 15.

17             MR. SIMPSON:  Before we get to

18   the questions, one of the instructions, and I

19   don't have it in front of me, one of the

20   instructions the Court will give you in a few

21   minutes says that your answers to each of the

22   questions on the verdict form must be unanimous.

23   You all have to agree on every single question.

24             One of the other instructions is

25   going to say you individually need to consider
```

```
1    the evidence as you viewed it and you shouldn't
2    change your opinion just because somebody else
3    wants you to do so.  You have to live with the
4    verdict you're reaching so make sure it's based
5    on how you feel about this case, not how the rest
6    of the jurors do.  It has to be unanimous.
7                    Question 1, Did Johnson,
8    Rodenburg & Lauinger violate the Montana Unfair
9    Trade Practices Act?  I'm going to tell you you
10   want you to check No, but let's look at the
11   instructions on that.
12                   Could you bring up Instruction
13   22.
14                   Numbers 1, 2 and 3, those are the
15   elements.  Those are the things you have to find
16   before you check Yes to answer Question Number 1.
17   I will submit to you that the plaintiff can't
18   satisfy any of those elements.  He hasn't shown
19   that Johnson, Rodenburg & Lauinger did anything
20   that was unfair or deceptive in a trade or
21   commerce.
22                   In the first place, my client is
23   a law firm.  They are not engaged in a trade or
24   commerce as those terms are used.  They are
25   engaged in a professional practice of law.  It's
```

```
 1    not a trade or commerce.  More importantly, even

 2    if you thought it was, it's not unfair or

 3    deceptive what they did.  They utilized the court

 4    system.  That's the way this country works.  The

 5    court system, to represent a client and pursue a

 6    debt that was owed.  That is not an unfair or

 7    deceptive practice.

 8                    I've already talked about the

 9    damages aspect that is covered in two and three,

10    so I'm not going to go back and rehash that here.

11    I will submit to you again, briefly, that I don't

12    think the plaintiff has shown any damages in this

13    case.  My client's conduct didn't cause him any

14    damage.

15                    Could you move to the second page

16    of the verdict form, please.

17                    Question 2, Did Johnson,

18    Rodenburg & Lauinger maliciously prosecute the

19    debt-collection lawsuit against Timothy

20    McCollough?  Again, I think you're going to

21    answer no when you get to that point, but let's

22    look at the jury instruction on this.

23                    Please pull up Number 23.

24                    Mr. Heenan briefly touched on

25    this instruction during his closing argument, and
```

1      I think we can agree the areas of dispute are

2      primarily Number 3, Number 4 and Number 6.

3      Numbers 1 and 2, we contest that.  My client

4      instituted a lawsuit on behalf of its client.

5                    Let's look at Number 3.  The

6      defendant acted without probable cause.  And

7      there's an instruction on that.

8                    Can you pull up 24, please.

9                    THE COURT:  I've got it.

10                   MR. SIMPSON:  Thank you, Your

11     Honor.

12                   Here's what probable cause is:

13     One who takes an active part in the initiation or

14     continuation of civil proceedings against another

15     has probable cause for doing so if he reasonably

16     believes in the existence of facts upon which the

17     claim is based, and correctly or reasonably

18     believes under those facts the claim may be valid

19     under the applicable law.

20                   What do we have in this case?  My

21     client is a law firm.  It's representing its

22     client on a credit card debt that has

23     indisputably not been paid.  I will submit to you

24     that is a claim that may be valid under the

25     applicable law of Montana.  We all know that.

1       There's no secret to that.

2                       Do we reasonably believe in the
3       facts upon which the claim was based?  Sure.
4       There is nothing suggesting otherwise.  They got
5       the information from their client that said, hey,
6       we bought the debt.  Mr. McCullough doesn't
7       dispute there was a debt.  He reasonably believed
8       it.

9                       And if the statute of limitations
10      is an issue for somebody, you've seen the letter.
11      You've seen the e-mail.  You've seen the entry in
12      the electronic file that says, We made a mistake
13      when we initially sent you the file.  The correct
14      date is June 30, 2004.

15                      That is certainly grounds for my
16      client to reasonably believe it has a basis to
17      file a lawsuit.

18                      Could you go back to 22, please.
19      I'm sorry.  23.  I'm sorry.

20                      I'm sorry for jumping around with
21      these instructions, but just given the way they
22      are set forth, it's kind of necessary.

23                      The other main one that we have a
24      dispute with is Number 4, that the defendant was
25      actuated by malice.  Let's look at the Court's

1          instruction on malice.

2                          That's Number 26, please.

3                          This is the Court's Instruction

4          Number 26.  For purposes of a malicious

5          prosecution claim, the terms malice and malicious

6          mean either a wish to vex, annoy or injure

7          another person or an intent to do a wrongful act

8          established by proof or presumption of law.

9                          Let's talk about that for a

10         minute.  Did you hear any proof that Charlie or

11         Lisa or anyone else at Johnson Rodenburg wished

12         to vex, annoy or injure Mr. McCullough?  No.  The

13         unrefuted testimony on this point from Mr. Dendy

14         is that he filed the lawsuit on behalf of his

15         client because he thought there was an unpaid

16         credit card debt.  He was pursuing a legal

17         avenue, a legal recourse, for his client to try

18         to get that debt paid.  That's not a wish to vex,

19         injure or annoy someone.  That's an attempt to

20         represent a client and get a debt paid.

21                         Let's look at part two.  The

22         defendant has knowledge of facts or intentionally

23         disregards facts that create a high probability

24         of injury to the plaintiff, and deliberately

25         proceeds to act with indifference to the high

1        probability of injury to the plaintiff.

2                        I can't think of a certain fact

3        that Charlie knew of or intentionally disregarded

4        that created a high probability of injury to Mr.

5        McCullough.  He knew there was a credit card

6        debt.  He didn't know, turns out in the long run,

7        he didn't know the right date about the statute

8        of limitations.  But the only date that he did

9        know that was, to him, correct at the time was

10       this June 30, 2004 date.

11                       He didn't deliberately proceed to

12       act with an indifference to the high probability

13       of injury to the plaintiff.  He proceeded to act

14       as a lawyer does when a client asks a lawyer to

15       represent him or her.  He got the information he

16       needed.  He asked Mr. McCullough through a

17       letter, Hey, do you dispute this debt?  Mr.

18       McCullough didn't respond.  Maybe that would have

19       nipped it in the bud, but he didn't call.  He

20       didn't write.  My client utilized the court

21       system to try to get the debt paid, and that is

22       not a malicious act.

23                       Could you bring up 25, please.

24                       Just one other on the malicious

25       prosecution and then we will move on, because I

```
 1     know you're getting tired of it.
 2                     The fact that a lawsuit ends in
 3     favor to a defendant, in this case Mr.
 4     McCullough, does not prove that the plaintiff
 5     lacked probable cause to bring the lawsuit.
 6                     Keep that in mind.  The fact that
 7     my client ultimately dismissed at the request of
 8     its client, the fact that it ultimately dismissed
 9     that lawsuit, doesn't mean that they lacked
10     probable cause to file it in the first place.
11                     Could you go back to the verdict
12     form, please.
13                     Number 3, Did Johnson, Rodenburg
14     & Lauinger abuse the legal process in the
15     debt-collection lawsuit against Tim McCullough?
16     I'm going to ask you to check the box No. I think
17     that's the only rational decision based on the
18     proof before you.
19                     Again, I'm going to take a quick
20     look at the jury instructions.
21                     Number 28, please.  Can I have
22     that?
23                     It says, Defendant is liable for
24     abuse of process if the plaintiff can prove that
25     my client, first, had an ulterior purpose of
```

1    extracting money from the plaintiff that he did

2    not owe.  That's the crucial part, that he did

3    not owe.  You heard it.  He admitted he incurred

4    the bill and he didn't pay it.  Under any common

5    sense definition, he owed the money.  My client

6    wasn't suing to extract something they thought he

7    didn't owe.  He owed the money and he couldn't

8    pay it.  He didn't pay it.

9                    My client was following the legal

10   process.  It was using the court system in the

11   way it was intended to be used, by filing a

12   lawsuit against him.  That's how we resolve

13   disputes in our society, by filing lawsuits.

14                    There's been some implication

15   that it's inappropriate for my client to seek

16   relief from the Court.  You've heard about all

17   the other lawsuits, but you know what?  It's

18   legal to file a lawsuit.  That's how this society

19   works.  When we have disputes, we don't go beat

20   each other up.  We come to court and ask the

21   Court for relief.

22                    My client gets a default

23   judgement against somebody in the other case.

24   That's because the other side didn't play and the

25   judge said, you know what?  You didn't show up.

1    Well, the plaintiff is entitled to a default

2    judgement.  That's how the system works.  My

3    client shouldn't be penalized for using the court

4    system.

5                    Number 2, this element isn't a

6    lot different than Number 1.  Defendant willfully

7    filed a debt-collection action without a valid

8    claim.  I tell you what.  It was a valid claim.

9    He didn't pay it.  We know that.

10                   Number 3, we have already talked

11   about the damages.  There aren't any damages here

12   and my client didn't cause anything to happen.

13   No damages.

14                   Could you go back to the second

15   page of the verdict form, please.  Slide that up

16   so they can see Question 4.  The wonders of

17   technology.

18                   I will tell you what it says, you

19   can see the top part.  The only part we are

20   missing is Part B, and that's a line that says

21   Fair Debt Collection Practices Act Statutory

22   Damages.

23                   One very minor point.  I don't

24   know if you think it's minor or not.  My client

25   doesn't think it's minor.  Mr. Heenan told you in

1   his closing that you can award from one dollar to

2   $1,000.  You can award zero.  You don't have to

3   put anything under the second part of this for

4   Fair Debt Collection Practices Act.  The judge

5   has not said you have to give Mr. McCullough a

6   single dime.

7               I've already talked about the

8   emotional distress.  I don't think he's proved

9   it.  If you're going to give him anything, keep

10  in mind what he got out of paying in the first

11  place, and then put that in relationship to what

12  he wants you to give him in this case.

13              My client sued him.  He had about

14  an eight or $9,000 credit card debt, including

15  interest.  My math is not that good, but he is

16  asking for a million bucks.  How many times 9,000

17  is that?  That's crazy.  If you're going to give

18  him anything, I will submit to you in the range

19  of 500 bucks.  Anything else is simply a windfall

20  and not justified.

21              Stand back, take a look at this

22  case through the lens of common sense.  Somebody

23  doesn't pay their bill, they get mad that they

24  get sued over it, they sue somebody and they want

25  a million bucks.  Doesn't make sense.

1          Could you turn to the next page

2     of the verdict form, please.  Thank you.

3          Please continue to Question 5

4     only if you answered Yes to Questions 1, 2 or 3,

5     and you found damages under Question 4-A.

6     Otherwise skip Number 5, sign and date the

7     verdict form and return it to the bailiff.

8          If you answered Questions 1, 2

9     and 3 No, and you didn't give Mr. McCullough any

10    damages for emotional distress, you do not even

11    get to Question Number 5.  You don't get there.

12          I don't think you're going to get

13    there.  At all.  Punitive damages are not

14    justified in this case.  There is not one iota of

15    proof that my client should be punished.

16          But let's look at the jury

17    instructions and see if we get a sense of that.

18          Before we get there, what is the

19    question?  Do you find by clear and convincing

20    evidence that punitive damages should be awarded

21    against Johnson, Rodenburg & Lauinger?  The

22    obvious question is no, but let's look if we

23    could, please, at the damages on the punitive

24    damages instruction.  I'm going to have to dig

25    that out here.

1          Number 37, if you have that

2     available.  Thank you.

3          Plaintiff asks for punitive

4     damages which may be allowed by you provided you

5     first find that the plaintiff has suffered actual

6     damages.  We already talked about the actual

7     damages.  In the first place, he doesn't have a

8     single dime in out-of-pocket damages.  The other

9     damages we talked about is emotional distress,

10    which isn't there.  Even if you conclude he

11    suffered some actual damages, he still has to

12    show injury through malice of another.

13          Malice.  That's the point here,

14    malice.  We have already talked a little bit

15    about malice when we talked about malicious

16    prosecution.  But there is a difference in the

17    instructions as to malice.  You heard one

18    definition of malice when we talked about

19    malicious prosecution.  Do you remember that?

20    One of the parts was a wish to vex, injure or

21    annoy another person, and the other instruction

22    or the other part of that instruction went to a

23    deliberate indifference of injury or a high

24    probability of injury to the plaintiff.  And

25    that's actually similar to what is set forth in

1     Number 39.

2                    Punitive damage cases, if you're

3     going to consider the question of malice, I don't

4     think you're going to get there, but if you do

5     get to answer Question 5, this is what the

6     plaintiff has to show.  He has the burden of

7     proof on this issue.  They have to show -- this

8     is what you have to answer -- did Charlie or Lisa

9     deliberately proceed to act in conscious or

10    intentional disregard of the high probability of

11    injury to Mr. McCullough?  No.  Did they

12    deliberately proceed to act with indifference to

13    the high probability of injury to the plaintiff?

14    No.

15                   You've seen the evidence.  You've

16    heard it.  I said it about 16 times up here and I

17    won't belabor it.  My client has a client.  It's

18    representing its client.  Its client gives my

19    client, Lisa and Charlie, bad information.  They

20    act on that information and they filed a lawsuit.

21    That is not malice.  My client made a mistake.

22    They made a mistake.  There is no question about

23    it, but they didn't act with malice.  There is

24    simply nothing to justify this.

25                   I have little question you're

1    going to answer No on Number 5.  There is one

2    other point on this.

3                     If you could please bring up

4    Number 38.

5                     Consider the proof with respect

6    to the question of malice through the lens of

7    Number 38.  He's got to prove all the elements of

8    that claim by clear and convincing evidence.

9    What does that mean?  Evidence in which there is

10   no serious or substantial doubt about the

11   correctness of the conclusions drawn from the

12   evidence.

13                    No serious or substantial doubt.

14   Well, there is plenty of doubt here.  There is

15   plenty of doubt.  My client's representing its

16   client.  My client is doing his job as a lawyer.

17   He's acting in good faith on the representations

18   made by his client.  Clear and convincing, that's

19   a pretty high standard to get to.  Plaintiff

20   hasn't achieved it.

21                    I'm going to conclude now.  I

22   appreciate your time.  I know we all have things

23   we would rather be doing, but your job here is a

24   very important part of the legal system.  My

25   client and I appreciate your time.  I know you

1    will reach the right decision.  Thank you.

2                   THE COURT:  Mr. Heenan?

3                   MR. HEENAN:  Thank you, Your

4    Honor.

5                   Ladies and gentlemen, we don't

6    use the Montana court system to resolve disputes.

7    We use the Montana court system to resolve

8    legitimate disputes, not frivolous ones.  Lawyers

9    need to have evidence.  When lawyers don't have

10   evidence and they sue you anyway, they are filing

11   frivolous lawsuits.

12                   And that's what you've seen here.

13   A business that comes into our state and, as a

14   practice, files frivolous lawsuits and makes a

15   lot of money filing frivolous lawsuits.

16                   Instruction Number 33, please.

17                   This is the law that the judge

18   has given you with respect to my client's

19   damages.  This is the instruction that you need

20   to follow.  You will follow what the judge is

21   telling you the law is.  Here is the law in

22   Montana.

23                   What is mental and emotional

24   suffering?  That is lawyer talk.  But what are we

25   talking about?  We are talking about grief,

1    shame, humiliation, embarrassment, anger,

2    chagrin, disappointment, worry and nausea.  We

3    know what those words mean.

4           How do we put a dollar value to

5    things like anger?  Well, the judge is telling

6    you.  There is no definite standard.  There is no

7    requirement that any witness come in here and

8    offer an opinion about what the appropriate

9    measure of that damage is.  That would be

10    invading your province.  It would be invading

11    what your task is, ladies and gentlemen, to set

12    the measure of those damages.

13           I made a suggestion to you.

14    Johnson Rodenburg has made a suggestion to you.

15    But you decide, not me, not Johnson Rodenburg.

16    You, ladies and gentlemen, decide.

17           What else is the judge telling

18    you?  Exercise calm and reasonable judgement.

19    Consider the evidence.  Don't rely on sympathy.

20    Consider the evidence that you saw.  And she is

21    telling you that the compensation must be just

22    and reasonable.  That's what you're here for,

23    ladies and gentlemen, to do justice.  You're

24    going to do justice today.

25           What we can be certain of is when

1     you're done rendering your verdict, Ms. Lauinger

2     and Mr. Dendy are going to return back to their

3     office in North Dakota.  And we can assume that

4     there's going to be a big stack of lawsuits

5     waiting for them to sign so they can file and sue

6     the next people all over this state and others.

7                      But what happens from there,

8     ladies and gentlemen?  What happens to that stack

9     of lawsuits?  You are going to decide.  You, by

10    your verdict today, decide what happens with that

11    stack of lawsuits.  You decide whether it's

12    business as usual and sign and sign and file and

13    file, and we don't need evidence and we will get

14    it later if they have a lawyer.

15                     Or there's something else you can

16    do today.  That when they get back and see the

17    stack of Complaints to sign, they can put the

18    brakes on.  By your verdict, they will put the

19    brakes on and they are going to say, Wait a

20    minute.  In Montana, that jury in Montana said we

21    need evidence before we sue people in Montana.

22    Make some calls, do what we have to do, but let's

23    get the documents in our file before we sue the

24    people.  I'm not signing the Complaint until I

25    have the documents because that's the law in

1     Montana.  And you, by your verdict, ladies and

2     gentlemen, can send that message.

3                    When someone says to you, why did

4     you award what you awarded?  You can say, Because

5     we made a law firm act like lawyers.  We told a

6     law firm, If you're going to practice in our

7     state, you're going to act like lawyers.

8                    On behalf of Mr. McCullough and

9     myself, I very much appreciate your time.  Thank

10    you.

11                   THE COURT:  Members of the jury,

12    now that you've heard all the evidence and the

13    arguments of the attorneys, it's my duty to

14    instruct you on the law that applies to the case.

15    A copy of these instructions will be available in

16    the jury room for you to consult if you find it

17    necessary.

18                   It is your duty to find the facts

19    from all the evidence in this case.  To those

20    facts you will apply the law as I give it to you.

21    You must follow the law as I give it to you

22    whether you agree with it or not.  You must not

23    be influenced by any personal likes or dislikes,

24    prejudice, sympathy.  That means you must decide

25    the case solely on the evidence before you.  You

1     will recall that you took an oath promising to do

2     this at the beginning of the case.

3                    In following my instructions, you

4     must follow all of them and not single out some

5     and ignore others.  All are equally important.

6     You must not read into these instructions or into

7     anything the Court may have done or said any

8     suggestion as to what your verdict should be.

9     That's a matter entirely up to you.

10                    In a civil case such as this one,

11    the party that makes a claim must prove the claim

12    by the greater weight of the evidence, sometimes

13    referred to as the preponderance of evidence.

14    This is called burden of proof.  A party who has

15    the burden of proof must persuade you by the

16    evidence that his or her claim is more probably

17    true than not true.  In other words, the evidence

18    supporting the propositions which a party has the

19    burden of proving must outweigh the evidence

20    opposed to it.

21                    In determining whether a party

22    has met this burden, you must consider all the

23    evidence, whether it's produced by the plaintiff

24    or the defendant.

25                    Some witnesses, because of

1        education or experience, are permitted to state

2        opinions and the reasons for those opinions.

3        Opinion testimony should be judged just like any

4        other testimony.  You may accept it or reject it

5        and give it as much weight as you think it

6        deserves, considering the witness's education and

7        experience, the reasons given for the opinion and

8        all the other evidence in the case.

9                     All parties are equal before the

10       law and a partnership is entitled to the same

11       fair and conscientious consideration by you as

12       any party.  A partnership can only act through

13       its employees, agents or partners.  Therefore a

14       partnership is responsible for the acts of its

15       employees, agents and partners performed within

16       the scope of their authority.

17                    A person is presumed to intend

18       the ordinary consequences of his voluntary acts.

19       This presumption is what we call a disputable

20       presumption, which means it may be controverted

21       by other evidence.

22                    Plaintiff has asserted a claim

23       against defendant under the Montana Fair Debt

24       Collection Practices Act.  In order to prove his

25       claim, plaintiff has the burden of proving the

1    following:  Number 1, that defendant's conduct

2    toward Plaintiff constituted unfair or deceptive

3    acts or practices in the conduct of any trade or

4    commerce; 2, that defendant's conduct caused

5    plaintiff damages; and Number 3, the amount of

6    plaintiff's damages.

7              Plaintiff has asserted a claim

8    for malicious prosecution against the defendant.

9    To prove malicious prosecution, the plaintiff

10   must show the following:  Number 1, that a

11   judicial proceeding was commenced and prosecuted

12   against him; Number 2, that the defendant was

13   responsible for instigating, prosecuting or

14   continuing the proceeding; Number 3, that the

15   defendant acted without probable cause; Number 4,

16   that the defendant was actuated by malice; Number

17   5, that the judicial proceeding terminated

18   favorably for the plaintiff; and Number 6, that

19   the defendant's action caused the plaintiff's

20   damages.

21             One who takes an active part in

22   the initiation or continuation of civil

23   proceedings against another has probable cause

24   for doing so if he reasonably believes in the

25   existence of the facts upon which the claim is

1    based and correctly or reasonably believes that

2    under those facts the claim may be valid under

3    applicable law.

4                    The fact that a lawsuit ends in

5    favor of the defendant does not prove that the

6    plaintiff lacked probable cause to bring the

7    lawsuit.

8                    For purposes of a malicious

9    prosecution claim, the terms malice and malicious

10   mean this:  1, a wish to vex, annoy or injure

11   another person, or an attempt to do a wrongful

12   act established by proof or presumption of law;

13   or, Number 2, that the defendant has knowledge of

14   facts or intentionally disregards facts that

15   create a high probability of injury to the

16   plaintiff, and deliberately proceeds to act with

17   indifference to the high probability of injury to

18   the plaintiff.

19                    In determining whether the

20   defendant initiated the lawsuit without probable

21   cause, you may consider whether the defendant

22   could or should have made further inquiry or

23   investigation as an ordinarily prudent person

24   would have made in the same circumstances before

25   initiating the lawsuit.

1          In determining whether the

2     defendant initiated a lawsuit with malice for

3     purposes of a malicious prosecution claim, you

4     may infer that the defendant acted with malice if

5     you determine, based on the evidence, that the

6     defendant initiated the lawsuit without probable

7     cause.

8          Plaintiff has asserted a claim

9     for abuse of process against the defendant.  In

10    order for you to find that a defendant is liable

11    for abuse of process, the plaintiff must prove,

12    Number 1, that defendant had the ulterior purpose

13    of extracting money from the plaintiff that he

14    did not owe; Number 2, that the defendant

15    willfully filed the debt-collection action

16    without a valid claim; and Number 3, that the

17    defendant's actions caused the plaintiff damages.

18          The Montana Rules of Civil

19    Procedure do not state that a party who serves

20    requests for admission must tell the opposing

21    party of the effect of a failure to respond to

22    the requests in a timely manner.  The Rules of

23    Civil Procedure state that the signature of an

24    attorney or party constitutes a certificate by

25    the signer that the signer has read the pleading,

1      motion or other paper, that to the best of the

2      signer's knowledge, information and belief formed

3      after reasonable inquiry, it is well grounded in

4      fact and that it is not interposed for any

5      improper purpose, such as to harass.

6                    The Court, prior to the start of

7      this trial, made the final legal findings which

8      you must accept as true:  Number 1, that

9      defendant violated the Fair Debt Collection

10     Practices Act by demanding attorneys' fees from

11     Mr. McCullough which were not permitted under

12     Montana law; Number 2, that defendant violated

13     the Fair Debt Collection Practices Act by filing

14     a lawsuit against Mr. McCullough which was barred

15     by the Montana statute of limitations; Number 3,

16     that defendant violated the Fair Debt Collection

17     Practices Act by continuing to maintain a lawsuit

18     against Mr. McCullough which was barred by the

19     statute of limitations in Montana; and Number 4,

20     that defendant violated the Fair Debt Collection

21     Practices Act by serving the requests for

22     admission on Mr. McCullough in an abusive, unfair

23     and unconscionable attempt to collect a

24     time-barred debt.

25                    It is the duty of the Court to

1    instruct you about the measure of damages.  By

2    instructing you on damages, the Court does not

3    mean to suggest for which party your verdict

4    should be rendered.  The plaintiff has the burden

5    of proving damages by a preponderance of

6    evidence.  Damages means the amount of money that

7    will reasonably and fairly compensate plaintiff

8    for any injury you find was caused by defendant.

9    A damage award must be based upon evidence and

10   not upon speculation, guesswork or conjecture.

11                  Based upon the Court's

12   determination that defendant violated the Fair

13   Debt Collection Practices Act, you must fix the

14   amount of money that will reasonably and fairly

15   compensate plaintiff for damages that resulted

16   from defendant's violations of the Fair Debt

17   Collection Practices Act.  Your award should

18   include any actual damages suffered by the

19   plaintiff as a result of defendant's failure to

20   comply with the Fair Debt Collection Practices

21   Act.

22                  Actual damages include damages

23   for personal humiliation, embarrassment, mental

24   anguish and emotional distress.  There is no

25   fixed standard or measure in the case of

1    intangible items such as humiliation,

2    embarrassment, mental anguish or emotional

3    distress.  Mental and emotional suffering and

4    distress pass under various names such as mental

5    anguish, nervous shock and the like.  It includes

6    all highly unpleasant mental reactions such as

7    fright or grief, shame, humiliation,

8    embarrassment, anger, chagrin, disappointment,

9    worry and nausea.  The law does not set a

10   definite standard by which to calculate

11   compensation for mental and emotional suffering

12   and distress.  Neither is there any requirement

13   that any witness express an opinion about the

14   amount of compensation that is appropriate for

15   the kind of law.

16              The law does require, however,

17   that when making an award for mental and

18   emotional suffering and distress you should

19   exercise calm and reasonable judgement.  The

20   compensation must be just and reasonable.

21              In addition to actual damages,

22   and regardless of whether actual damages are

23   awarded, you may award statutory damages in an

24   amount not to exceed $1,000 for defendant's

25   violation of the Fair Debt Collection Practices

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1     Act.   In determining the amount of statutory

2     damages to be awarded, you should consider, among

3     other relative factors, the frequency and

4     persistency of noncompliance by the debt

5     collector, the nature of such noncompliance and

6     the extent to which such noncompliance was

7     intentional.

8                    If you find that defendant

9     violated the Montana Unfair Trade Practices Act,

10    maliciously prosecuted plaintiff or abused the

11    legal process, then you must determine the amount

12    of money which would reasonably and fairly

13    compensate plaintiff for all loss caused by the

14    defendant regardless of whether such loss could

15    have been anticipated.

16                   If you find for plaintiff on the

17    question of liability, you may award compensation

18    for mental or emotional distress caused by the

19    defendant's conduct.   Any compensation to which a

20    plaintiff is entitled should not be reduced

21    simply because the plaintiff was more susceptible

22    to injury than a normally healthy person.

23                   Plaintiff has asked for punitive

24    damages, which may be allowed by you, provided

25    you first find that the plaintiff has suffered

1      actual damages.  One who has suffered injury

2      through the malice of another may recover, in

3      addition to his or her actual damages, punitive

4      damages for the sake of example and by way of

5      punishing the other parties.

6                    Plaintiff must prove all the

7      elements of his claim for punitive damages by

8      clear and convincing evidence.  Clear and

9      convincing means evidence in which there is no

10     serious or substantial doubt about the

11     correctness of the conclusions drawn from the

12     evidence.  The evidence may be proved by direct

13     or circumstantial evidence.

14                    In punitive damage cases, a

15     defendant is guilty of malice if it has knowledge

16     of facts or intentionally disregards facts that

17     create a high probability of injury to the

18     plaintiff, and the defendant either, Number 1,

19     deliberately proceeds to act in conscious or

20     intentional disregard of the high probability of

21     injury to the plaintiff; or, Number 2,

22     deliberately proceeds to act with indifference to

23     the high probability of injury to the plaintiff.

24                    If you determine that punitive

25     damages should be awarded against the defendant,

1    you will be returned to court following the

2    deliberations.  Additional evidence will be

3    presented to you relating only to the amount of

4    punitive damages to be awarded.  That issue will

5    be argued by counsel and you will return to the

6    jury room to return the amount of punitive

7    damages in this case.

8                   When you begin your

9    deliberations, you should elect one member of

10   your jury as your presiding juror.  That person

11   will reside over your deliberations and will

12   speak for you here in court.  You will then

13   discuss the case with your fellow jurors to reach

14   agreement, if you can do so.

15                  Your verdict must be unanimous.

16   Each of you must decide the case for yourself but

17   you should do so only after you have considered

18   all the evidence, discussed it fully with the

19   other jurors and listened to the views of your

20   fellow jurors.  Do not hesitate to change your

21   opinion if the discussion persuades you that you

22   should.  Do not come to a decision simply because

23   other jurors think it is right.

24                  It is important that you attempt

25   to reach a unanimous verdict, but of course only

1    if each of you can do so after having made your

2    own conscientious decision.  Do not change an

3    honest belief about the weight and effect of

4    evidence simply to reach a verdict.

5                    If it becomes necessary during

6    your deliberations to communicate with me, you

7    may send a note through the bailiff signed by

8    your presiding juror or by one or more other

9    members of the jury.  No member of the jury

10   should ever attempt to communicate with me except

11   by a signed writing.  I will communicate with any

12   member of the jury on anything concerning the

13   case only in writing or here in open court.

14                   If you send out a question, I

15   will consult with the parties before answering

16   it, which may take some time.  Continue your

17   deliberations while waiting for the answer to any

18   question.

19                   Remember, you are not to tell

20   anyone, including me, how the jury stands,

21   numerically or otherwise, until after you've

22   reached a unanimous verdict or been discharged.

23   Do not disclose any vote count in any note to the

24   Court.

25                   May I see the verdict form,

1    please?

2                    As the lawyers have informed you

3    in their closing arguments, the Court has

4    prepared a Special Verdict Form for you.  It

5    contains, as you know now from argument, three

6    pages with five questions.

7                    I would suggest that you look

8    through the entire verdict and then proceed to

9    work your way through, starting with the first

10   question.  After you have reached unanimous

11   agreement on the verdict, your presiding juror

12   will fill in the Special Verdict Form, sign and

13   date it and advise the Court that you're ready to

14   return to the courtroom.

15                   That concludes the instructions

16   by the Court.  Will the bailiff please come

17   forward and be sworn.

18                   (At which time the bailiff is

19   sworn.)

20                   THE COURT:  We will stand in

21   recess during the jury deliberations.

22                   (Court is in recess.)

23                   THE COURT:  The record will

24   reflect counsel and the parties are present, as

25   is the jury.  The jury has given us notice that

1      they have reached a verdict.

2                      Who speaks for the jury?  And has

3      the jury unanimously agreed upon a verdict?

4                      JURY FOREPERSON:  We have.

5                      THE COURT:  Would you get the

6      verdict from the foreperson.

7                      What I'm going to do now is ask

8      the clerk to publish the verdict.  And what that

9      means is read it.  So she is going to read it,

10     and after she reads it, then either party may ask

11     that the jury be polled.  And what that means is

12     each one of you is asked if this was your verdict

13     and if it was correct as read.

14                     I'm going to ask now the clerk to

15     publish your verdict and do listen carefully in

16     case any party wishes you to be polled.

17                     THE CLERK:  In the United States

18     District Court for the District of Montana,

19     Billings Division, *Timothy McCullough v. Johnson,*

20     *Rodenburg & Lauinger*, CV-07-166-BLG-CSO Special

21     Verdict Form.

22                     We, the jury, in the

23     above-entitled action, answer the questions on

24     this verdict form submitted to us as follows:

25     Question Number 1, Did Johnson, Rodenburg &

1    Lauinger violate the Montana Unfair Trade

2    Practices?  Answer, Yes.

3                    Question 2, Did Johnson,

4    Rodenburg & Lauinger maliciously prosecute the

5    debt-collection lawsuit against Timothy

6    McCollough?  Answer, Yes.

7                    Question Number 3, Did Johnson,

8    Rodenburg & Lauinger abuse the legal process in

9    the debt-collection lawsuit against Timothy

10   McCollough?  Answer, Yes.

11                   Question Number 4, What damages

12   do you find were caused by Johnson, Rodenburg &

13   Lauinger?  Answer, A, Emotional distress,

14   $250,000; B, Fair Debt Collection Practices Act

15   statutory damages, $1,000.

16                   Question Number 5, Do you find,

17   by clear and convincing evidence, that punitive

18   damages should be awarded against Johnson,

19   Rodenburg & Lauinger?  Answer, Yes.

20                   Dated this 16th day of April,

21   2009, Jury Foreperson.

22                   THE COURT:  Does either party

23   wish the jury to be polled?

24                   MR. HEENAN:  No, Your Honor.

25                   MR. SIMPSON:  Yes, we do, Your

```
1     Honor.
2                     THE COURT:  Poll the jury.
3                     THE CLERK:  If you don't know the
4     number on your badge, that's what I will go by,
5     so look at your number, please.
6                     Juror Number 7?  Is this your
7     verdict?
8                     JUROR NUMBER 7:  Yes.
9                     THE CLERK:  Juror Number 37?
10                    JUROR NUMBER 37:  Yes.
11                    THE CLERK:  Juror Number 15?
12                    JUROR NUMBER 15:  Yes.
13                    THE CLERK:  Juror Number 32?
14                    JUROR NUMBER 32:  Yes.
15                    THE CLERK:  Juror Number 12?
16                    JUROR NUMBER 12:  Yes.
17                    THE CLERK:  Juror Number 2?
18                    JUROR NUMBER 2:  Yes.
19                    THE CLERK:  Juror Number 1?
20                    JUROR NUMBER 1:  Yes.
21                    THE COURT:  Ladies and gentlemen,
22    as I explained to you in the instructions that I
23    gave to you before you retired to deliberate, we
24    will now proceed to the next part of the trial,
25    which concerns the amount of punitive damages to
```

1    be awarded.  So we will take a brief recess.  I

2    will have to meet with the lawyers about that,

3    and then we will come back into court and I will

4    give you further direction as to how we will

5    proceed with that.

6              So bear with us for just a few

7    minutes and we will do this as efficiently as we

8    can.

9              I will see counsel in chambers.

10             (Brief recess.)

11             (The following discussion took

12   place in chambers:)

13             THE COURT:  The record will

14   reflect that we are in chambers with only counsel

15   present with the Court, discussing how we will

16   proceed.

17             The first question I have for

18   counsel is, is the plaintiff ready to proceed

19   immediately about the next phase of the case?

20             MR. HEENAN:  We are, Your Honor.

21             THE COURT:  What witnesses do you

22   intend to call?

23             MR. HEENAN:  We intend to call

24   Lisa Lauinger, to establish the net worth of this

25   defendant, and then we are prepared to make

1      argument.

2                      THE COURT:  Lisa Lauinger will be

3      the only witness?

4                      MR. HEENAN:  Yes.

5                      THE COURT:  Do you have any

6      exhibits that you intend to offer?

7                      MR. HEENAN:  We do.  It's been

8      marked as 112-1, which was has not been admitted,

9      Your Honor.  You reserved on it.

10                     THE COURT:  That is the tax

11     return.

12                     MR. HEENAN:  Correct.

13                     THE COURT:  Does the defendant

14     intend to offer or call any witnesses at this

15     stage?

16                     MR. BOHYER:  We would simply

17     examine our own client.

18                     THE COURT:  Do you have any

19     objections to the admission of Exhibit 112-1 at

20     this time?

21                     MR. BOHYER:  Yes, we do,

22     relevance of the objection, completeness of the

23     exhibit.

24                     THE COURT:  I am concerned about

25     the completeness of that and I think the

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1      financial affairs are certainly relevant.  I'm

2      not sure that the tax information itself is

3      relevant.

4                      MR. HEENAN:  If I may, Your

5      Honor.  In discovery we requested specifically,

6      there's an interrogatory that asked Johnson

7      Rodenburg to state their net worth for the years,

8      I forget the years, 2007 to present.  And I don't

9      know that a dollar amount was ever provided in

10     discovery.

11                     This is a document that was

12     provided in discovery, so that's kind of all I

13     have to work off.

14                     THE COURT:  There's a lot of

15     information on this one page, which is a form

16     1065 from the year 2007, Analysis of Net Income.

17     It contains information such as buildings and

18     depreciable assets, allowance for bad debts, et

19     cetera.

20                     Do you intend to use all of this

21     and you contend it is all pertinent?  Or is it

22     simply the total assets that are reflected of the

23     partners' capital accounts that are reflected,

24     which is the 2,015,000?

25                     MR. HEENAN:  It's more than

1    2,015,000.  This is a general partnership, so the

2    assets of the partners are also subject to the

3    net worth inquiry.  So certainly I'm allowed to

4    ask about what their distributions are on the

5    partners --

6                    THE COURT:  I'm talking about

7    this exhibit.

8                    MR. HEENAN:  I think -- I'm

9    sorry.  I thought somewhere on there -- see, they

10   distributed in 2007 $883,000 to the partnership.

11   Under general partnership law, that's all subject

12   to attachment as well.

13                   THE COURT:  Does the defendant

14   intend to offer any exhibits?

15                   MR. BOHYER:  No, Your Honor, we

16   do not.

17                   But I do have some reservations

18   about the questions that Mr. Heenan just raised

19   with respect to partnership distributions.  It

20   may indeed be subject to attachment, but an

21   inquiry by counsel with respect to the draw of

22   each partner is not relevant to the jury's

23   determination of what the amount of damages

24   should be against the partnership as a whole.

25                   If there needs to be essentially

1    a post-judgement discovery with respect to that,

2    then it might be, but not for this purpose.

3              MR. HEENAN:  I don't understand

4    why it's post-judgement -- it's my understanding

5    that this legal entity is a general partnership.

6    And under general partnership law, the net worth

7    isn't just the net worth of the partnership but

8    of the individual partners.  And if there's

9    liability with the partnership, then it attaches

10   to the individual partners under corporate and

11   partnership law.

12             THE COURT:  The Montana statute

13   on punitive damages states that at this portion

14   of the trial the defendant's financial affairs,

15   financial condition and net worth must be

16   considered.

17             And so the Court, in its rulings

18   on the admissibility of evidence, will be

19   governed by, of course, the Montana statute on

20   punitive damages.  So I think the plaintiff can

21   make your objections at the time, but I'm just

22   going to let you know that I think the plaintiff

23   is entitled to present evidence regarding

24   financial affairs and then the parties can make

25   argument with respect.

1              MR. BOHYER:  So I can make sure

2     my record is complete, the entire trial and,

3     indeed, in closing, we heard that Lisa Lauinger

4     is not a defendant here.  We heard none of these

5     people are defendants.  The defendant is Johnson,

6     Rodenburg & Lauinger.

7              And now the Court is going to

8     allow, as I understand it, inquiry into the

9     personal affairs of each of the partners who

10    aren't defendants in the case?

11              THE COURT:  I didn't say that.

12              MR. BOHYER:  Maybe I

13    misconstrued.

14              THE COURT:  I said the financial

15    affairs of the partnership.  The partnership is

16    the defendant.

17              MR. BOHYER:  My apologies, Your

18    Honor, I misconstrued what you said.

19              THE COURT:  How much time do you

20    need for argument after -- I assume this isn't

21    going to take very long.

22              MR. HEENAN:  Five or 10 minutes.

23              THE COURT:  For argument?

24              MR. HEENAN:  Yes.

25              MR. BOHYER:  I think that's fine,

1     Your Honor.

2                    THE COURT:  The only additional

3     instruction that I would propose to give has been

4     numbered Instruction Number 44, which, as I told

5     you earlier, is the Montana pattern instruction

6     on determining the amount of punitive damages.

7                    Is there any objection to the

8     giving of Instruction 44?

9                    MR. HEENAN:  No, Your Honor.

10                   MR. BOHYER:  No objection, Your

11    Honor.

12                   THE COURT:  I have also prepared

13    an additional Jury Verdict Form, and I'm going to

14    add, at the bottom of it, Please sign and date

15    this verdict form and notify the bailiff that you

16    have reached a verdict.

17                   With that addition, is there any

18    objection to the Jury Verdict Form for punitive

19    damages?

20                   MR. BOHYER:  No.

21                   MR. HEENAN:  No.

22                   THE COURT:  Do you need a little

23    bit of time or are we ready to go?

24                   MR. HEENAN:  Ready to go, Your

25    Honor.

1              MR. BOHYER:  Let me make sure my

2     client is ready, if we can make sure my client is

3     ready to sit on the stand, then we will be ready

4     to go.

5                   (Brief recess.)

6              THE COURT:  Court is again in

7     session.

8              Mr. Heenan, you may call your

9     first witness.

10             MR. HEENAN:  Thank you, Your

11    Honor.  We will call Ms. Lauinger to the stand.

12             THE COURT:  Will you please come

13    forward.  You've been previously sworn in the

14    case and that goes for all testimony you're about

15    to give.  Do you understand that?

16             THE WITNESS:  Yes.

17    DIRECT EXAMINATION

18    BY MR. HEENAN:

19    Q.     Ms. Lauinger, what was the total income

20    received by Johnson, Rodenburg & Lauinger in the

21    year 2007?

22    A.     I don't know.

23    Q.     Can I provide you a document?

24    A.     Yes.

25             MR. HEENAN:  May I approach the

1    witness, please?

2                    THE COURT:   You may.

3    BY MR. HEENAN:

4    Q.      Can you identify the document I just

5    handed you?

6    A.      It's page four of a tax form, 1065.

7    Q.      Related to the Johnson, Rodenburg &

8    Lauinger law firm?

9    A.      Correct.

10   Q.      And does that help you to answer what the

11   income was of Johnson Rodenburg in the year 2007?

12   I have it circled.

13   A.      I see Net Income.  Is that what you're

14   looking for?

15   Q.      Yes, sir.

16   A.      1.4 million.

17   Q.      And the year 2007, how much money was

18   distributed to the partners?

19                   MR. BOHYER:  I object to that on

20   relevance.

21                   THE COURT:  Overruled.

22                   THE WITNESS:  Is that where

23   Distributions are?

24                   MR. HEENAN:  Yes.

25                   THE WITNESS: $883,966.

VK LEYENDECKER, LLC
20 Medicine Crow Road
Columbus, Mt. 59019 - (406) 322-5061

1

2     BY MR. HEENAN:

3     Q.      In the year 2007, on line 22, what were

4     the total assets of Johnson, Rodenburg & Lauinger?

5     A.      Total Liabilities and Capital?

6     Q.      Correct.

7     A.      2,060,000.

8                     MR. HEENAN:  Thank you very much,

9     ma'am.  No further questions.

10                    THE COURT:  You may

11    cross-examine.

12                    MR. BOHYER:  Thank you, Your

13    Honor.

14    CROSS-EXAMINATION

15    BY MR. BOHYER:

16    Q.      Ms. Lauinger, you're the Lauinger in

17    Johnson, Rodenburg & Lauinger, correct?

18    A.      Yes.

19    Q.      Mr. Heenan just asked you with respect to

20    Exhibit 112 what the total assets of the firm were

21    per that document.

22                    Would you look at line 14 of

23    Exhibit 112.

24    A.      Yes.

25    Q.      What are the total assets there on the

1     left-hand column, about mid page?

2     A.       1,440,000.

3     Q.       That's the one I'm looking at.  And what

4     does that line state?  Does it say Total Assets?

5     A.       Yes.

6     Q.       Aside from this lawsuit with Mr.

7     McCullough, have you ever had any other dealings

8     with him?

9     A.       No.

10    Q.       Lisa, would you please tell the jury if,

11    since the debt-collection case with Mr.

12    McCullough, if your firm has changed its

13    procedures and protocols?

14    A.       Yes.

15    Q.       Describe for the jury how the procedures

16    and protocols have changed.

17    A.       Well, we now require more documentation

18    from our client before proceeding with suit.  We

19    have informed our clients of that requirement.  We

20    try to watch for red flags and try not to miss

21    them.

22    Q.       Could you tell the jury, please, when you

23    instituted the changes for those protocols?

24    A.       After Judge Ostby's order that ruled on

25    the motions that were pending in this case where

1    she set forth law, Montana law now, we changed our

2    procedures to comply with that.

3    Q.      And do you continue to comply with the

4    Court's order?

5    A.      Yes.

6    Q.      In terms of the volume of cases that the

7    jury has heard previously, and I may get the

8    number wrong, but something like 2700 cases have

9    been filed in Montana from early 2007 through mid

10   2008.  Again, with respect to how you changed the

11   conduct, will you tell the jury how that has

12   changed since Judge Ostby issued her order last

13   fall?

14   A.      Because of the additional requirements, we

15   don't have as many lawsuits pending because of the

16   requirements that have been put in place with our

17   clients.

18   Q.      After the Court issued its order last

19   fall, did you impose some sort of a moratorium on

20   suit filings?

21   A.      Yes, we did.  We were very unsure.  We are

22   attorneys and we want to represent our clients to

23   the best of our abilities, but we were very unsure

24   as to what we should be doing and what we

25   shouldn't be doing, even with discovery.  We

1    didn't know anymore.  So we pretty much put a hold

2    toward the end of the year on just proceeding on

3    cases and established some written guidelines and

4    put those in place to, unfortunately, I guess,

5    protect us and our -- I don't know if

6    unfortunately is the right word -- to protect us

7    and our client from further lawsuits.

8    Q.      With respect to the dealings the

9    debt-buyer clients such as CACV, have your

10   relationships with those types of entities changed

11   as well?

12   A.      Yes, we impose those same requirements

13   on -- we require them to provide us with the

14   documentation verifying the debt prior to

15   proceeding with suit.

16   Q.      And aside from Exhibit 112, I wanted to

17   ask you, are you a tax lawyer or business lawyer

18   outside of the creditor relations law that you

19   practice?

20   A.      No.

21   Q.      Do you understand net worth and

22   liabilities and assets and such?

23   A.      Very minimal.

24   Q.      Could you tell the jury what your

25   understanding of the firm's net worth was as of

1    the end of 2007 or 2008, please?

2    A.      According to the general partner, 1.1

3    million.

4                    MR. HEENAN:  I will object to the

5    extent this hasn't been produced in discovery.

6                    THE COURT:  The objection comes

7    too late.

8                    MR. HEENAN:  I move to strike the

9    answer.

10                   THE COURT:  Overruled.

11   BY MR. BOHYER:

12   Q.      In other words, there is not a substantial

13   difference with the net worth what you're aware of

14   and Exhibit 112.  It's a little bit less, correct?

15   A.      That's correct.

16   Q.      The jury in the underlying case was

17   presented evidence, as I mentioned, regarding the

18   number of other cases that were filed.  Did those

19   cases, of 2700 suits filed, did 2700 cases proceed

20   to default judgement?

21   A.      No.

22   Q.      Could you describe for the jury what

23   happens with those other cases, please?

24   A.      Those are cases that were filed in

25   Montana, but those were cases that not all

1    proceeded with default judgement.  We have at

2    least 10 percent that we have located the

3    defendant for service.  We have others where they

4    contact us to set up payment arrangements.  We

5    have many where they filed for bankruptcy.  We

6    have, you know, cases where they may put in a

7    response, but they may not have a defense, like an

8    inability to pay, and a motion would be made to

9    the Court for a judgement on the pleadings.

10                 We may have some that are disputed

11   and are resolved with a summary judgement motion,

12   but based on evidence from our client, and then

13   there are some that do proceed with default

14   judgement.  And all of the cases that do proceed,

15   which I don't know the number, you know, it's not

16   nine out of 10 or 90 percent of 2700.  There are a

17   lot of them that are resolved in a lot of

18   different ways.

19   Q.      With respect to the issues regarding Mr.

20   McCullough, have you been assessed any sort of

21   punitive damages prior to this hearing today?

22   A.      No.

23   Q.      Has your firm been subject to any sort of

24   criminal sanction?

25   A.      No.

1    Q.        How many employees do you have in your

2    firm?

3    A.        About 50.

4    Q.        And are they dependent upon the law firm

5    for their salaries and well being as well?

6    A.        Oh, yeah.

7    Q.        So whatever verdict is entered here today

8    will affect them as well?

9    A.        Yes.

10   Q.        When you got the case originally from CACV

11   and worked it up to the point where Mr. Dendy took

12   it over and filed the lawsuit, would you tell the

13   jury if you had any intention, you personally, did

14   you have any intent to harm Mr. McCullough?

15   A.        No.

16   Q.        Aside from the debt issue itself?

17   A.        No.

18                    MR. BOHYER:  That's all I have.

19   Thank you.

20                    MR. HEENAN:  Redirect, please.

21                    THE COURT:  You may.

22                    MR. HEENAN:  Thank you, Your

23   Honor.

24   REDIRECT EXAMINATION

25   BY MR. HEENAN:

1    Q.       Ms. Lauinger, Johnson, Rodenburg &

2    Lauinger has previously been found to have

3    violated the Fair Debt Collection Practices Act by

4    a Montana federal court.  Isn't that true?

5    A.       Yes.

6    Q.       Tell the jury how much Johnson Rodenburg

7    had to pay in that case.

8    A.       In Furman?

9    Q.       Correct.

10   A.       $1,000.

11   Q.       And that was prior to the lawsuit?

12   A.       Yes.

13   Q.       How exactly will this jury's punitive

14   damages verdict affect the employees at Johnson,

15   Rodenburg & Lauinger?

16   A.       Well, there's less income for the firm.

17   It affects all of us.  It will take away from

18   income or net worth, I guess.

19                   MR. HEENAN:  That's all I have.

20   Thank you, Your Honor.

21                   THE COURT:  I would like to see

22   counsel for just a moment.  Just stay where you

23   are.  This will just take a minute.

24                   (The following discussion took

25   place in chambers:)

1                    THE COURT:  I have just called
2     counsel into chambers because I wish to add to
3     the instruction that we previously discussed the
4     following sentence:  An award of punitive damages
5     may not exceed three percent of the defendant's
6     net worth.
7                    Is there any objection from the
8     plaintiff?
9                    MR. HEENAN:  No, Your Honor.
10                    THE COURT:  Any objection from
11    the defendant?
12                    MR. BOHYER:  No, Your Honor.
13                    THE COURT:  Let's go.  I will
14    instruct them in that regard.
15                    (Brief recess.)
16                    THE COURT:  You may close for the
17    plaintiff, Mr. Heenan.
18                    MR. HEENAN:  Thank you, Your
19    Honor.
20                    Ladies and gentlemen, I don't
21    intend to tread the same ground that we already
22    tread this morning.  You've obviously been
23    working really hard.  You get it.
24                    Now and only now, after your
25    verdict, after checking the box for Punitive

1     Damages do you hear any type of apologies from

2     Johnson, Rodenburg & Lauinger, do you hear any

3     type of acceptance for responsibility.

4                    MR. BOHYER:  I want to object to

5     that.  We can't introduce that evidence now.

6                    THE COURT:  Overruled.

7                    MR. HEENAN:  This is the first

8     time.  Before your verdict, you heard Mr. Dendy

9     smile and say they did nothing wrong.  Then we

10    get the self-serving testimony that boy, we are

11    sure sorry.  Gee, shucks, we are really sorry.

12                    They weren't sorry until you

13    rendered your verdict and did right by Mr.

14    McCullough and gave him the justice that he asked

15    you for.

16                    Now we are on to punitive

17    damages.  Punitive damages serve three purposes.

18    Number one, to punish someone for their

19    wrongdoing.  You heard about the wrongful

20    conduct.  I'm not going to go over it again.

21                    Number two, to stop the person

22    or, in this case, the law firm from doing

23    anything like it ever again; to punish them, to

24    make them realize what they did was wrong.

25                    And number three, to discourage

1        others, to send a message.  Your verdict is going

2        to be in the newspaper.  Your verdict is going to

3        go to all the other law firms all around the

4        country that are doing the same type of thing and

5        it's going to force people to take note and force

6        debt collectors to say, you know what?  This

7        deadbeat defense doesn't fly.  We have to start

8        following the law.  And your verdict could do

9        that.  Those are the three purposes.

10                      You're going to be instructed in

11       a minute that under Montana law the most you can

12       award, the absolute cap, is three percent of a

13       defendant's net worth.  In this case that's going

14       to come out to, well, three percent of

15       approximately two million dollars.  And I

16       apologize, I don't have a calculator with me.

17       That is a fraction, a fraction, ladies and

18       gentlemen, of the amount of money that that law

19       firm has extracted from people, from their bank

20       accounts, from their wages in the state of

21       Montana and sucked into North Dakota for the

22       profit of these lawyers.

23                      And I would ask that you send the

24       message by giving the absolute, the cap here,

25       letting Johnson Rodenburg know that you awarded

1    everything, the maximum amount that you could to

2    punish this law firm for their conduct.

3                          I thank you for your time and

4    your hard work.

5                          THE COURT:  You may close for the

6    defendant.

7                          MR. BOHYER:  Thank you.

8                          Ladies and gentlemen, I will be

9    brief as well.  I stand here hat in hand,

10   obviously.  And the couple of things that I

11   wanted to address were these:  The purpose of

12   punitive damages, a big one, is to try to

13   convince parties, if their conduct is adjudged

14   wrong, to change so it doesn't recur.

15                         Lisa Lauinger has told you what

16   protocols were changed in response to the Court's

17   order of last fall.  That has been in place now

18   for about five months.  The message has been

19   heard.

20                         While Mr. Dendy felt like he was

21   doing okay when he was doing his job, you folks

22   have concluded otherwise.  But to punish the

23   defendant more than the $250,000 it already has

24   been awarded I don't believe is warranted.  The

25   message has been gotten by Ms. Lauinger.  It's

1      been gotten by her law firm.  They have met, they

2      have talked with clients, they have said, Look.

3      You've got to get these papers to us before we

4      can do it or we are not doing it.  So the message

5      is heard.

6                     So on behalf of my client, I

7      would ask the jury not to award much.  The three

8      percent cap, I'm not going to quibble too much.

9      The net worth is 1.1 million or 1.4.  I don't

10     think that another 60 or $30,000, if that's what

11     is three percent, is warranted.  $250,000 is a

12     lot of money.

13                    I thank you on behalf of my

14     client for your time.

15                    Thank you, Your Honor.

16                    THE COURT:  Mr. Heenan, do you

17     have anything further?

18                    MR. HEENAN:  No, Your Honor.

19                    THE COURT:  You have heard the

20     additional evidence with respect to the subject

21     of the amount of punitive damages and the

22     arguments of the attorneys.

23                    And I have one additional

24     instruction for you that will guide your

25     deliberations on the amount of punitive damages.

1      And it is this:  In determining the amount of

2      punitive damages, you should consider all the

3      attendant circumstances, including the nature,

4      extent and enormity of the wrong, the intent of

5      the party committing it, the amount allowed as

6      actual damages, and generally all of the

7      circumstances attending the particular act

8      involved, including any circumstances which may

9      operate to reduce without wholly defeating

10     punitive damages.

11                Punitive damages should be of

12     such an amount as will deter the defendant from

13     and warn others against similar acts of

14     misconduct.  Thus, the wealth of the defendant is

15     a fact to be considered by you in determining the

16     amount of punitive damages.  An award of punitive

17     damages may not exceed three percent of the

18     defendant's net worth.

19                I have prepared another verdict

20     form for you.  It has only one question and the

21     question is, We, the jury, in addition to the

22     amount of damages we have already found were

23     caused, hereby unanimously find the plaintiff is

24     entitled to punitive damages in the sum of, and

25     then based on this instruction that I've given to

1    you, now you will retire to arrive at a unanimous

2    verdict -- and, again, it must be unanimous -- on

3    the amount of punitive damages.

4                    So will the bailiff please come

5    forward?  I think we have a different one.  Will

6    you swear the bailiff, please.

7                    THE CLERK:  I swore him in

8    earlier.

9                    THE COURT:  We will give this to

10   them.  Will everyone please rise while the jury

11   retires to consider its verdict.

12                   (At which time the jury leaves

13   the courtroom.)

14                   (Court is in recess.)

15                   THE COURT:  Court is in session.

16                   Has the jury reached a unanimous

17   verdict on the amount of punitive damages?

18                   THE FOREPERSON:  We have.

19                   THE COURT:  Would you please get

20   the verdict form from the foreperson.

21                   Once again, I will ask the clerk

22   to publish or read the verdict form.  And do

23   listen, because the parties do have the right to

24   ask you, individually, if this is your verdict.

25                   THE CLERK:  We, the jury, duly

1    empanelled in the above-entitled case, in

2    addition to the amount of damages we already

3    found were caused to the plaintiff, hereby

4    unanimously find that the plaintiff is entitled

5    to punitive damages from the defendant in the sum

6    of $60,000.

7                    Dated this 16th day of April,

8    2009, Jury Foreperson.

9                    THE COURT:  Does either party

10   wish the jury to be polled on the verdict?

11                   MR. HEENAN:  No, Your Honor.

12                   MR. BOHYER:  No, Your Honor

13                   THE COURT:  That concludes your

14   service as jurors.  But before we recess for the

15   evening, I want to thank the lawyers for their

16   professionalism.  Being a trial lawyer is a

17   tougher job than it looks like, I will tell you.

18   And these lawyers all performed very capably and

19   I express my appreciation for their

20   professionalism.

21                    I want to thank court staff, too.

22   These trials are able to proceed efficiently only

23   because of the court staff, and I appreciate the

24   good work that they do.

25                    Most importantly, I thank the

1    members of the jury.  As I explained to you, when

2    we started on Tuesday on the jury selection

3    process, the system can't work unless people are

4    willing to come and set aside their day-to-day

5    activities and serve as members of the jury.  So

6    I express my appreciation, on behalf of the Court

7    and the parties, for the hard work that you've

8    done.

9                        We will be in recess.

10                       (Court is adjourned.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1        C E R T I F I C A T E   O F   O F F I C E R.

2

3        I, Virginia Leyendecker, a Certified Shorthand

4    Reporter and Notary Public, do hereby certify that

5    the foregoing is a true and accurate transcript of

6    the testimony as taken stenographically by and before

7    me at the date, time and location aforementioned.

8        I do further certify that I am neither a relative

9    nor employee, nor attorney or counsel to any parties

10   involved; that I am neither related to nor employed

11   by any such attorney or counsel, and that I am not

12   financially interested in the action.

13

14

15

16   /s/Virginia E. Leyendecker, CSR

17   Notary Public

18   My Commission expires May 3, 2010

19   NJ C.S.R. License No. XI-1701

20

21

22

23

24

25